UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| C. WESTBROOK MURPHY<br>400 Fairlea Dr.<br>Edgewater, MD 21037<br>          Plaintiff,<br><br>    v.<br><br>PRICEWATERHOUSECOOPERS, LLP<br>1301 K St., NW<br>Suite 800<br>Washington, DC 20005<br>          Defendant. | CASE NUMBER  1:05CV01054<br><br>JUDGE: Richard J. Leon<br><br>DECK TYPE: Employment Discrimination<br><br>DATE STAMP: 05/26/2005 |

### COMPLAINT FOR RELIEF FROM
### AGE DISCRIMINATION IN EMPLOYMENT

1. This is an action to remedy the age-based refusal of defendant

PriceWaterhouseCoopers (PwC) to promote plaintiff C. Westbrook Murphy to the

position of partner in July 2004, in violation of the Age Discrimination in Employment

Act (ADEA), 29 U.S.C. §§ 621 et seq., and the District of Columbia Human Rights Act

(DCHRA), D.C. Code §§ 2-1401.01 et seq. PwC has likewise discriminated against other

similarly situated older employees by refusing to consider them for promotion to partner

because of their age. This action preserves the right to seek relief on behalf of all such

similarly situated employees whom PwC has refused to promote to partner because of

their age, pursuant to 29 U.S.C. § 216, as incorporated by 29 U.S.C. § 626(b). This Court

has jurisdiction over the ADEA claim under 29 U.S.C. § 626(c), and over the DCHRA

claim under 28 U.S.C. §§ 1332, 1367. Civil Action No. 02-0982 (RJL/DAR), which is

currently pending in this Court, challenges PwC's refusal to promote Murphy to partner in 2000 and 2001.

Parties

2. Plaintiff Murphy was born on January 30, 1940 and is now 65 years old. He has been employed with PwC since 1989 and serves in the position of Managing Director.

3. Defendant PwC was formed in July 1998 as the result of a merger between Price Waterhouse, LLP, and Coopers & Lybrand, LLP. PwC is a nationwide accounting and professional services firm, employing more than 27,000 individuals in the United States, including hundreds of employees in its Washington, D.C. offices. PwC is an employer as defined in 29 U.S.C. § 630(b), and D.C. Code § 2-1401.02(10).

Background

4. The PwC partnership consists of "partners," who are certified public accountants (CPA's), and "principals," who are not CPA's. "Partner" as used in this complaint includes any member of the partnership, whether or not he or she is a CPA.

5. PwC is a limited liability partnership. There are more than 2000 "partners." PwC is governed by a Board of Partners and Principals. The Board exercises broad authority over all aspects of Firm management. Partners are not generally liable (beyond the amount of their capital contribution) for the debts of the Firm. Most partners have little input into the day-to-day management of the Firm. The Board controls partner compensation, controls partners' ability to accept new clients, controls the manner in which partners supervise other employees, and controls other aspects of partners' employment in ways that are inconsistent with these individuals being considered

2

"employers" as defined in the ADEA and the DCHRA. Except for members of the

Board, and perhaps a few other PwC management officials, the limited liability partners

of PwC are "employees" within the meaning of the ADEA, 29 U.S.C. § 630(f), and the

DCHRA, D.C. Code § 2-1402.11, and thus are protected against age-based discrimination

in the terms and conditions of their employment.

6. While limited in their autonomy to govern the Firm, partners at PwC generally

receive higher compensation than other professionals, and are afforded more generous

pension benefits and greater work-related responsibilities than other professionals within

the Firm. Thus, partnership with PwC is a very lucrative asset.

7. The formal instrument governing PwC is the Partners and Principals

Agreement. Section 10.1 of the Agreement states:

> Section 10.1. Retirement
>
> (a) An Individual's association with the Firm shall cease at the end of the Fiscal Year in which he or she attains age 60.
>
> (b) Upon the recommendation of the Senior Partner and the approval of the Board of Partners and Principals, an Individual may defer retirement for such periods as the Board of Partners and Principals may determine until the end of the Fiscal Year in which the Individual attains age 61. Thereafter, upon the recommendation of the Senior Partner and the approval of the Board of Partners and Principals, an Individual may further defer retirement of an Individual for such periods as the Board of Partners and Principals may determine until the end of the Fiscal Year in which the Individual attains age 62.

This provision acts as a mandatory retirement provision which PwC routinely applies to

compel partner/employees to retire from the Firm at age 60. In no event may a

partner/employee remain with the Firm beyond age 62. PwC's policy and practice of

requiring such "partners" to retire at age 60 discriminates against such employees on the

3

basis of age in violation of the ADEA and the DCHRA by denying them the opportunity
to continue their employment with PwC after age 60. This mandatory retirement age for
partners also disqualifies Murphy and other older PwC employees from being considered
for promotion to partnership, as alleged in Paragraphs 20 through 29.

<u>PwC's Partner Admission Process</u>

8. PwC's fiscal year begins on July 1. Each fiscal year, PwC evaluates more than
100 non-partner employees for promotion to partnership. Those whose candidacy is
successful are admitted to partnership as of July 1, the following year.

9. PwC does not post vacancies for partnership and employees are not expected
to apply for admission.

10. The partnership admission process begins with management (typically a
Practice's Managing Partner) identifying professional employees for consideration for
partner, and those candidates are then asked to assist in the process of completing
paperwork describing their qualifications and the business case for their admission.
Candidacy forms used by PwC required candidates to specify their age.

11. Successive levels of PwC management and partner committees then review
recommended partnership candidates, and an increasingly wide range of partners provide
comments and opinions on the proposed candidate. This process culminates in a
dispositive vote at the Board of Partners and Principals on whether to admit the proposed
candidates to partnership.

<u>PwC Has Refused to Consider Murphy for Partnership Because of his Age</u>

12. Since his hiring in 1989, Plaintiff Murphy has been employed in the
Regulatory Advisory Services (RAS) Practice in Washington, D.C. RAS until 2004 was

4

one component of PwC's Banking Practice, which included more than 50 partners.

13. The Banking Practice was part of a larger group called Financial Services

Institutions (FSI), with over 200 partners. FSI, in turn, was part of a line of service

known as Assurance and Business Advisory Services.

14. Murphy is, and at all times relevant to this lawsuit was, exceptionally well

qualified for promotion to partnership. He is a graduate of Duke University and Yale

Law School. He served for two years as a Trial Attorney in the Department of Justice,

and more than ten years in the Office of the Comptroller of the Currency ("OCC"), where

he held increasingly responsible managerial positions. At PwC, Murphy has regularly

received positive performance appraisals and promotions, and has brought considerable

business to the Firm. He currently occupies the highest non-partnership professional .

position within PwC -- Managing Director. PwC has described the Managing Director

position as:

> A highly experienced professional who functions in most respects, as a
> partner, has the appropriate experience credentials of a partner and
> possesses established skills in marketing, practice building,
> technology, and staff development.

15. Murphy's contributions to the growth and success of the RAS practice have

included:

(a) Leading major client engagements;

(b) Managing responses by a number of financial institutions to urgent

regulatory demands;

(c) Providing innovative advice on regulatory and structural issues to

major clients;

> (d)  Assisting with major client engagements that result in millions of
> dollars of follow-on work;
>
> (e)  Training RAS staff;
>
> (f)  Assisting PwC itself in avoiding regulatory difficulties; and
>
> (g)  Authoring publications and speaking at public events.

16.  In the fall of 2004, PwC activated the position of Managing Director, and appointed 206 employees to this position, including Murphy.  According to PwC management, those selected to this position were "tremendously talented," and, after a selection process of "very serious rigor" were determined to have met a "very high level bar criteria."  The selection process required consideration both of personal qualifications and of the business case justifying promotion.  Those appointed to the position of managing directors were determined by PwC to possess "a very significant depth of skill, highly significant technical market expertise, recognized expertise, management responsibility, demand in the marketplace, [and] the ability to deal with and solve complex business issues."

17.  Although he was formally given the title in October 2004, Murphy in fact had been serving at the level of a Managing Director for several years.  PwC also held him out publicly as a Managing Director.

18.  PwC does not use age as criteria for appointing employees to the position of Managing Director, but age is a factor in partner admission decisions.  Managing Directors generally earn considerably less in salary and benefits than do partners.

19.  Murphy has repeatedly and expressly informed PwC management of his interest in promotion to partnership.

6

20. Notwithstanding Murphy's outstanding qualifications for partnership, PwC has refused to consider him for partnership because of his age. The mandatory partner retirement age described in Paragraph 7 has created an age-based bar to partnership admission which disqualifies plaintiff from being considered for partnership. As a result, Murphy was not considered for promotion to partnership when 103 other employees were promoted to partnership effective July 1, 2004. PwC has also refused to consider other older employees for partnership because of their age.

21. PwC promoted Jeff Lavine (as well as 102 other younger PwC employees) to partnership in July 2004. Lavine worked under Murphy's supervision within RAS prior to his promotion to partner, and has less tenure with PwC, less experience and knowledge of financial institution regulation, and less managerial experience than Murphy. Lavine was 39 when PwC promoted him to partner.

22. No partner inquired whether Murphy wished to be included in the group of PwC employees promoted to partnership as of July 1, 2004.

23. PwC has acknowledged that, because of his age, the Firm has not even considered Murphy for PwC's partnership. In litigation in this Court, PwC stated that "the sole impact of Murphy's admission as a partner would be his immediate retirement." PwC thus admits that the mandatory retirement age for employees who are called "partners" directly interferes with Murphy's right to be considered for promotion without regard to his age.

### PwC Has Engaged in a Pattern and Practice of Age Discrimination

24. Since PwC's creation on July 1, 1998, no employee age 60 or older has ever been promoted to partner.

7

25. The average age of a PwC employee selected for partnership is 37.

26. From PwC's creation on July 1, 1998 through September 15, 2003, the Firm has promoted 1,263 employees to partnership. Of those:

> (i) 949, or 75%, were under age 40;
>
> (ii) 85, or 7 %, were age 45 or older;
>
> (iii) 25, or less than 2% were age 50 or older;
>
> (iv) 4 were age 55 or older; and
>
> (v) none was age 60 or older.

27. PwC partners with management authority have stated their preference for promoting younger employees into the partnership, including that employees who are 60 or older cannot be considered for partnership, and that PwC prefers to admit only those individuals who can serve as partners for 20 years or more (i.e., employees under the age of 40).

28. PwC's preference for admitting partners under age 40, who can serve as partners for 20 years, encourages PwC's partners to assign the management of large and complex client engagements to non-partner employees in their 30's, so that these younger employees will have opportunities to demonstrate their managerial and client relationship abilities and thereby improve their chances for being selected for partnership. This practice discriminates in work assignments given to Murphy and to other older PwC non-partner employees.

29. PwC's explicitly age-based qualification for partnership has resulted, and continues to result, in a pattern and practice of age-based discriminatory treatment of Murphy and other older PwC employees who are candidates and potential candidates for

8

admission to the PwC partnership. In the absence of an order of this Court, PwC's

pattern or practice of discriminating in employment against older employees is likely to

continue.

### Damages

30. PwC's actions as described herein have caused Murphy monetary and non-

monetary loss. Monetary damage includes loss of salary, bonuses, benefits, as well as the

opportunity to become a PwC partner. PwC's actions have harmed Murphy's career and

caused him frustration, distress and loss of enjoyment of life.

31. PwC's actions as described herein were malicious, willful, wanton and in

reckless disregard of Murphy's rights.

32. Unless enjoined by this Court, PwC will continue the illegal age-based

employment practices alleged herein.

### Exhaustion of Administrative Remedies

33. Murphy's claims under the District of Columbia Human Rights Act require

no exhaustion of administrative remedies. His claims under the ADEA have been

administratively exhausted. On March 4, 2005, Murphy filed with the Equal

Employment Opportunity Commission a charge of age discrimination on behalf of

himself and other similarly situated employees (attached hereto as Exhibit 1, and

included herein as if fully set forth). More than 60 days have elapsed since the filing of

that charge.

### COUNT ONE
### DISCRIMINATION BASED ON AGE IN VIOLATION OF THE ADEA

34. Paragraphs 1-33 are realleged.

9

35. PwC has discriminated against Murphy, and against similarly situated older employees, on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a).

## COUNT TWO
## DISCRIMINATION BASED ON AGE IN VIOLATION OF THE DCHRA

36. Paragraphs 1-33 are realleged.

37. PwC has discriminated against Murphy, and against similarly situated older employees, on the basis of age in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.11.

## RELIEF

Plaintiff asks that this Court:

1) declare that PwC has violated the law by refusing to promote plaintiff, and other similarly situated employees, to partnership based upon age;

2) enjoin PwC from engaging in further acts of age discrimination and prohibit PwC from engaging in any acts of retaliation;

3) order that plaintiff be promoted to the position of partner, effective the date that he would have been promoted in the absence of discrimination, along with all back pay and benefits due;

4) award plaintiff liquidated damages under the ADEA in an amount equal to lost compensation;

5) award plaintiff compensatory damages in an amount to be proved at trial;

6) award plaintiff punitive damages in an amount to be proved at trial;

7) award plaintiff reasonable attorneys' fees and expenses;

8) award plaintiff prejudgment interest on all monetary sums awarded;

9) award such other relief as the Court deems just.

## JURY DEMAND

Plaintiff requests trial by jury as to all issues in this case.

Douglas B. Huron  89326
Richard A. Salzman  422497
Tammany M. Kramer  483146
HELLER, HURON, CHERTKOF
LERNER, SIMON & SALZMAN
1730 M Street, NW
Suite 412
Washington, DC  20036
(202) 293-8090

Attorneys for Plaintiff Murphy

11

# HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN

### P.L.L.C.
#### ATTORNEYS AT LAW

1730 M STREET, N.W. • SUITE 412
WASHINGTON, DC 20036-4517

(202) 293-8090
FAX: (202) 293-7110
E-MAIL: info@hellerhuron.com

March 4, 2005

DELIVERED BY HAND
Equal Employment Opportunity Commission
Washington Field Office
1801 L St., NW
Suite 100
Washington, DC 20507

      Re:    Enclosed EEOC charge on behalf of Westbrook Murphy

To whom it may concern:

      Our firm represents Westbrook Murphy in connection with the enclosed and fully-executed charge of age discrimination he is filing against his employer, PriceWaterhouse Coopers, LLP. We look forward to cooperating in any way necessary in furtherance of the investigation of this charge. Please feel free to contact me if there is any information that you need.

                  Very truly yours,

                  Richard A. Salzman

EEOC
WASHINGTON FIELD OFFICE
2005 MAR -4 P 4: 14
1400 L ST NW
WASHINGTON D.C. 20005

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

_____ and EEOC
*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Date of Birth |
|---|---|
| Mr. C. Westbrook Murphy | 1/30/1940 |

| Street Address | City, State and ZIP Code |
|---|---|
| 400 Fairlea Dr. | Edgewater, MD 21037 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| PricewaterhouseCoopers L.L.P. | more than 500 | (202) 414-1000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1301 K St., NW    Suite 800W | Washington, DC 20005 |

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☒ AGE ☐ DISABILITY ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: July 1, 2004    Latest: ongoing

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Please see the attached statement.

District of Columbia : SS
Subscribed and Sworn to before me, in my presence,
this 04 day of March, 2005

Gretchen R. Waller
Gretchen R. Waller, Notary Public, D.C.
My commission expires May 31, 2009

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State or Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>Gretchen R. Waller |
| 3/4/05<br>Date    C. Westbrook Murphy<br>Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*<br>March 04, 2005<br>Gretchen R. Waller<br>Notary Public, District of Columbia<br>My Commission Expires 5-31-0 |

UNITED STATES OF AMERICA
EQUAL OPPORTUNITY EMPLOYMENT COMMISSION

IN THE MATTER OF

| | |
|---|---|
| C. WESTBROOK MURPHY, ) <br> and OTHER AFFECTED EMPLOYEES ) <br> OF PRICE WATERHOUSECOOPERS, ) <br> LLP ) <br> ) <br>     Complainant, ) <br> ) <br> v. ) <br> ) <br> PRICEWATERHOUSE COOPERS, LLP, ) <br> ) <br> ) <br>     Respondent. ) <br> ) | Docket No. |

## DISCRIMINATION COMPLAINT

Complainant C. Westbrook Murphy ("Murphy"), residing at 400 Fairlea Drive, Edgewater, MD 21037, charges PricewaterhouseCoopers ("PwC"), whose address is 300 Madison Avenue, New York, NY 10019, with discrimination in employment because of his age. This charge is filed on behalf of Murphy and on behalf of similarly situated PwC professional employees. In particular, Respondent has:

- Denied Complainant and other older PwC non-partner professional employees promotional opportunities and discriminated in pay and benefits because of their ages, and
- Forced employees who are "partners" to retire at age 60.

These discriminatory practices occurred during 2004 at PwC's offices at 1301 K Street, N.W., Washington, DC 20005, and elsewhere throughout the United States, affected Complainant and other PwC employees throughout the United States, and continue the age-based discriminatory pattern and practices occurring since PwC was created effective July 1, 1998.

1

THE PARTICULARS ARE:

1. PwC is a nationwide accounting and professional services firm, employing approximately 27,500 individuals in the United States.

2. Since 1989 PwC or one of its predecessor firms has employed Murphy at PwC's offices in the District of Columbia.

   a. Murphy was born on January 30, 1940, and now is 65 years old.
   b. In March 2001, Murphy filed with the District of Columbia Office of Human Rights (Docket Nos. 01-060-P(CN) and 02-039-P(CN)), and crossed-filed with this Commission, charges of age discrimination. In May 2002, Complainant sued PwC and others in the United States District Court for the District of Columbia, and consequently withdrew his charge from further administrative consideration. *Murphy & Schuler v. PwC, et al.*, Civil Action No. 01-02cv982 (RJL/DAR). Those claims are pending in U.S. District Court.

3. Murphy now charges that during 2004 PwC discriminated against him, and continues to discriminate against him, in consideration for promotion to partnership, in pay and benefits, and in work assignments, as detailed hereafter. This discrimination occurred because of Complainant's age. Complainant alleges that during 2004 PwC discriminated against other older PwC employees in work assignments, in pay and benefits, and in consideration for promotion because of their ages; and that PwC required many partners who are by law employees to retire because they had reached the age of 60.

4. PwC is organized under the law of the State of Delaware as a limited liability partnership.

5. PwC has adopted a Partners and Principals Agreement ("Agreement") to govern its structure and operations. A copy of the agreement is annexed hereto as Appendix A. This Agreement (Section 5.1) creates a Board of Partners and Principals ("Board") to manage PwC, and vests with the Board exclusive powers, *inter alia,* to:

   a. Approve all policies affecting the rights, responsibilities, or obligations of partnership members (§5.6(a));
   b. Approve PwC's philosophy, policies, and direction (§5.6(b));
   c. Approve the admission of employees to partnership (§5.6(c));
   d. Submit to the partnership proposed amendments to the Agreement (§5.6(f));
   e. Determine PwC's net capital and contribution to capital required of partnership members (§§5.6(s) and 9.1); and
   f. Approve policies for the participation of partnership members in PwC's profits and losses (§§5.6(t) and 8.1).

6. Members of the partnership consist of "partners," who are certified public accountants ("CPA") and "principals," who are not CPAs (Agreement §2.3). A

2

principal may not sign an audit opinion or perform other services which may be rendered only by a CPA (*id.*). "Partners" and "principals" sometimes are referred to in the Agreement as "Individuals" (*id.* at Art. 1). Unless the context otherwise requires, "partner" as used in this charge includes any member of the partnership, whether or not he or she is a CPA.

7. Section 10.1 of the Agreement provides that a partner's association with the firm shall cease at the end of the fiscal year in which or she attains age 60, or in limited circumstances, age 62. PwC's fiscal year ends on June 30. Section 10.1 acts as a mandatory retirement age for every partner.

8. Each fiscal year PwC evaluates more than 100 non-partner employees for promotion to partnership. Those whose candidacy is successful are admitted to partnership as of the next July 1, the first day of PwC's fiscal year.

9. The Age Discrimination in Employment Act, 29 U.S.C. §§621 *et seq.*, ("ADEA") and the District of Columbia Human Rights Act, D.C. Code §§2-1401 *et seq.*, ("DCHRA") prohibit Respondents from discriminating in the terms, conditions, or privileges of Complainant's employment because of Complainant's age. Consideration for promotion to partnership, pay, benefits, and work assignments are each legally protected terms, conditions, or privileges of employment.

10. The mandatory partner retirement age alleged in Paragraph 7 established an age-based requirement for partnership admission which wholly disqualifies Murphy from being considered for partnership. As a result, Murphy was not considered for promotion to partnership when 103 other employees were promoted to partnership effective July 1, 2004. (*See* Appendix B, June 4, 2004 memorandum.) Respondents' refusal to consider Complainant and other older PwC employees for promotion to partnership because of their age violates the ADEA and the DCHRA.

11. PwC expressly acknowledges that Murphy, because of his age, cannot be admitted to PwC's partnership: PwC informed the U.S. District Court that ". . .the sole impact of Murphy's admission as a partner would be his immediate retirement. . . ." Defendant's Memorandum of Points and Authorities filed Oct. 23, 2004 in *Murphy & Schuler v. PwC et al., supra* (Oct. 23, 2003). Respondents thus acknowledge that the mandatory retirement age for employees who are called "partners" directly interferes with Complainant's right under the ADEA to be considered for promotion without regard to his age.

12. PwC's explicitly age-based qualification for partnership has resulted, and continues to result, in additional age-based discriminatory treatment of Complainant and other PwC employees who are candidates and potential candidates for admission to the PwC partnership.

    a. Since PwC's creation on July 1, 1998, no employee age 60 or older has been promoted to partner.

3

b.  The leader of PwC's Banking Practice—which includes Complainant—has stated that PwC prefers to promote to partnership employees ". . .who can be partners for 20 years or more to become partners so you can continue to grow the practice." (*See* Appendix C, April 13, 2003 memorandum.) Since a partner must retire at age 60, employees who are 40 or younger are the only ones ". . .who can be partners for 20 years or more. . . ," and these younger employees thus enjoy a significant advantage in consideration for partnership.

13. As a result of PwC's aged-based preference for promoting younger employees to partnership:

a.  The average age of a PwC employee selected for partnership is 37.
b.  According to information PwC produced, during the period between PwC's creation on July 1, 1998 and September 15, 2003, PwC promoted 1,263 employees to partnership. Of those:
    i)   949, or 75%, were under age forty;
    ii)  Only 85, or 7 %, were age 45 or older;
    iii) Only 25, or less than 2% were age 50 or older; and
    iv)  Only 4 were age 55 or older.
    In short, the older an employee becomes after age 40, the less chance he or she has of being considered for partnership.

14. Employees have no opportunity to apply for partnership with PwC. Murphy has repeatedly expressed interest in being promoted into the partnership. Murphy understands the process used in 2004 to consider employees for promotion within the Banking Practice (which included Murphy), as explained by the partner who led the Banking Practice, to be:

a.  Twice yearly he (the leader of the Banking Practice) solicits the approximately 50 partners of the Banking Practice for their recommendations about which employees should be promoted to partner within the next few years;
b.  He uses these recommendations in creating and maintaining a list of those whom he believes should be candidates for promotion to partner;
c.  He selects an existing partner to be each potential candidate's sponsor;
d.  Each summer he selects five to eight individuals whom the Banking Practice proposes for admission to partnership effective the following July 1; and
e.  He asks each candidate's sponsoring partner to complete a form proposing the candidate for partnership.

(*See* Appendix D, January 28, 2002 memorandum; Appendix E, October 3, 2003 and September 24, 2003 memoranda.)

15. After the nomination process described in Paragraph 14, the proposal for each candidate then is reviewed by a business unit review committee composed of partners in PwC's Financial Services Practice, of which the Banking Practice is a component part. The leader of the Financial Services Practice uses the results of this review to

4

select from among the nominees for partnership those whom he will recommend to PwC's partnership admission committee. After review by the partnership admissions committee, the Board determines which employees will be promoted to partnership effective the following July 1. (*See* Appendix E; *see also* Appendix F, December 3, 2001, November 29, 2001, and November 15, 2001 e-mails and memoranda.)

16. PwC's preference to admit to the partnership employees under age 40 who can serve as partners for 20 years, encourages PwC's partners to assign the management of large and complex client engagements to non-partner employees in their 30s, so that these younger employees will have opportunities to demonstrate their managerial and client relationship abilities and thereby improve their chances for being selected for partnership. This practice discriminates in work assignments given to Complainant and, on information and belief, to other older PwC non-partner employees.

17. Because of Complainant's age and PwC's discriminatory pattern and practices, PwC refused to consider him for partnership, and did not promote him to the position of partner when other, younger and less experienced employees were promoted to partner, effective July 1, 2004.

18. Murphy repeatedly has called PwC's aged-based discriminatory practices to the attention of appropriate PwC management officials, including communications:

    a. In June 2001, to PwC's Ethics Office, as shown in the June 25, 2001 and February 20, 2002 memoranda (Appendix G);

    b. In April 2002, to PwC's Chief Diversity Officer, as shown in April 5, 2002 memorandum (Appendix H);

    c. In April 2002, to PwC's National Director of Human Resources, as shown in the April 5, 2002 and April 29, 2002 memoranda (Appendix I);

    d. In May and June 2002, by service on Respondent Nally and on each other then member of the Board of a summons and the complaint in the lawsuit for age discrimination identified in Paragraph 2; and

    e. In June 2004, to PwC's Vice Chairman for Operations, Chief Diversity Officer, National Marketing Director, and leader of U.S. Tax Services, as shown in the June 15, 2004 memorandum (Appendix J).

19. PwC continues to maintain its unlawful policy of selecting employees for promotion to partnership based upon age, rather than on abilities and skills.

20. Complainant (apart from his age) was as well or better qualified to become partner as the PwC employees who were promoted to partner effective July 1, 2004. Because PwC bases its selection for partnership on an employee's performance over a sustained period of years, information in Paragraphs 21 through 29 is not confined to 2004.

21. At all relevant times, approximately 25% of the revenues of PwC and its predecessor firms have been generated by clients in the financial services industry, including

banks. The business of banks and other financial service firms is subject to significant regulation by federal and state governmental agencies. To assist both the firm and its clients in understanding and responding to this governmental regulation, Price Waterhouse, a predecessor of PwC, in 1987 establish in Washington, DC, a Regulatory Advisory Services practice ("RAS"). Price Waterhouse recruited Robert R. Bench, then a U.S. Deputy Comptroller of the Currency, to become a partner of Price Waterhouse and initiate and head this RAS practice. Bench continued to head the RAS practice until he retired at age 60, effective June 30, 2003.

22. Bench was the sole professional assigned to this RAS practice until he recruited first Harold Schuler in 1988 and then Murphy in 1989 to join as, respectively, the second and third RAS professional employees. Murphy and Schuler are still employed in the RAS practice.

23. Prior to joining PwC in 1989, Murphy was highly experienced in, and knowledgeable about, the regulation of banks and other financial institutions.

   a. Murphy's experience included:

      i)   With the U.S. Department of Justice: hired in 1965 as a trial attorney for the Civil Division;
      ii)  With the Office of the Comptroller of the Currency ("OCC"):
           (1) Hired in 1967 as Director of Litigation,
           (2) Appointed in 1970 as Deputy Chief Counsel,
           (3) Appointed in 1975 as Deputy Comptroller for Law and General Counsel,
           (4) Appointed in 1976 as Deputy Comptroller for Administration, and while serving in this position:
               (a) Acted as liaison with the U.S. Treasury Department,
               (b) Created a new Human Resources Office and program, and
               (c) Developed the first budget in the then 112-year history of the OCC
      iii) In private law practice beginning in 1978, representing banks and other financial institutions.

24. Since 1989, Complainant has contributed significantly to the success and growth of the RAS practice, which now employs more than two dozen professionals, and to the reputation of PwC as a leading professional services firm for financial institutions. Tim Ryan, now leader of PwC's Financial Services Practice describes RAS as ". . .the finest regulatory practice in the United States—indeed, in the world." (*See* Appendix K, June 27, 2003 memorandum.)

25. Complainant Murphy's contributions to the success and growth of the RAS practice include:

   a. Leading major engagements with Norwest (now Wells Fargo) Mortgage and American Express, each of which resulted in significant follow-on work;

b. Managing responses by a number of financial institutions to urgent regulatory demands, including:
   i) Toronto Dominion Securities,
   ii) Banco Mercantil,
   iii) First Florida Banks,
   iv) First Federal Savings and Loan of Puerto Rico, and
   v) State Farm Insurance;
c. Assisting at major client engagements—such as Asahi Bank, GMAC Mortgage, and Barclays—leading to follow-on work with billings in the millions of dollars;
d. Bringing in clients, such as the Indian trust fund plaintiffs and the Rural Health Care Corporation, which each led to millions of dollars in billings for other PwC advisory practices;
e. Providing innovative advice on regulatory structure and related issues to major clients, such as:
   i) Royal Bank of Scotland,
   ii) JP Morgan Chase,
   iii) State Street Bank and General Electric (proposed joint venture), and
   iv) Chevron;
f. Providing thought leadership both within PwC and more broadly, including through authoring the following publications:
   i) The first edition of PwC's highly respected "A Foreign Banker's Guide to the United States,"
   ii) "An Executive's Guide to FIREA,"
   iii) "An Executive's Guide to the FDIC Improvement Act" (which the FDIC itself sent out in response to requests for information about this new law),
   iv) The first edition of PwC's regulatory compliance handbooks (with editing of later editions), and
   v) "An Executive's Guide to Financial Modernization";
g. Training the RAS staff and others within the firm;
h. Enhancing PwC's reputation through speaking engagements and through participation in bar association activities with the general counsels of bank regulatory agencies and of major financial institutions and with leading banking law practitioners, including chairing the Banking Law Committee of the Federal Bar Association;
i. Perhaps most importantly, assisting PwC to avoid regulatory difficulties (and potential sanctions) in matters arising from client engagements, including those with Centrust FSB, Shawmut National Corporation, Bank of Credit and Commerce International, and Great Smokey National Bank Corporation;
j. Working during 2003 with PwC's regulatory/ Congressional liaison staff in formulating the accounting profession's response to regulatory and legislative efforts to increase the exposure of bank auditors to regulatory sanctions; and
k. Advising PwC leadership, audit engagement teams, and clients about the requirements of many laws regulating PwC and its clients, including:
   i) The Sarbanes-Oxley Act, and
   ii) The Federal Banking laws, including
       (1) The National Bank Act

(2) The Federal Reserve Act,
(3) The Bank Holding Company Act,
(4) The Gramm-Leach-Bliley Act,
(5) The Federal Deposit Insurance Act, and
(6) The audit and attestation requirements of §112 of the Federal Deposit Insurance Corporation Improvement Act and §404 of the Sarbanes-Oxley Act.

26. Since joining PwC in 1989 in the position of Senior Manager, Complainant has been promoted and received regular salary increases:
   a. In 1991, Murphy was promoted to the position of Director.
   b. In 1999, RAS practice head Bench recommended Murphy for promotion to the position of Managing Director. Bench informed Murphy that this recommendation was rejected because PwC had abolished the position of Managing Director. Thereafter, Murphy nonetheless performed the duties of a Managing Director, and was referred to as Managing Director in marketing materials, proposals and his professional resumes.

27. According to PwC,

   a. PwC described the position of Director, which Murphy held, as:

   ". . .a lead professional with recognized technical expertise and acknowledged credentials in a specific market who has demonstrated practice development and project management skills. This position is equivalent to a vice president level in a client organization and may be viewed, in some respects, as a partner equivalent."

   b. PwC described the position of Managing Director, for which Bench Recommended Murphy before being informed that PwC had abolished the position, as:

   "A highly experienced professional who functions in most respects, as a partner, has the appropriate experience credentials of a partner and possesses established skills in marketing, practice building, technology, and staff development." [See Appendix N]

28. In responding to the charges of discrimination filed with the D.C. Office of Human Rights in 2001 (see Par. 2.b, *supra*), PwC conceded:

   "Mr. Murphy is considered by both his colleagues and PwC clients for whom he has worked as an expert in the field of bank regulatory law. He has enjoyed favorable reviews of his substantive work since joining Price Waterhouse [in 1989], and such favorable reviews have continued following the merger [in 1998] that created PwC. Mr. Murphy. . . has received regular pay increases. . . from $120,000 in 1989 to his current annual salary of $240,000."

8

29. In the Fall of 2004, PwC activated the position of Managing Director, and appointed 206 employees to this position, including Murphy. According to PwC management, those selected to this position were "tremendously talented," and, after a selection process of "very serious rigor" were determined to have met a "very high level bar criteria." The selection process required consideration both of personal qualifications and of the business case justifying promotion. Those appointed to the position of managing directors were determined by PwC to possess "a very significant depth of skill, highly significant technical market expertise, recognized expertise, management responsibility, demand in the marketplace, [and] the ability to deal with and solve complex business issues."

30. In recommending Complainant Murphy for the position of managing director, RAS Managing Partner William J. Lewis stated:

> Westbrook is being proposed for the role of a Governance, Legal, and Compliance Subject Matter Expert within FS FORCe. Westbrook was recommended in 1999 by the then managing director of the bank regulatory practice for promotion to managing director. At that time, the managing director position was eliminated by ABAS. Since, Westbrook has been referred to as managing director in marketing materials, proposals and his own biographies. Accordingly, Westbrook has been advised that he is eligible to apply with a business case as a candidate for Managing Director at this time.

> The proposal of Westbrook for this role recognizes both his sustained significant contribution to the growth and success both of Banking Practice and of our Regulatory Advisory Practice business unit, and the leading role he plays as a subject matter expert in:

> - Governance,
> - Compliance,
> - Internal controls,
> - Financial services regulation, and
> - Regulation of the accounting profession.

> **History at PwC**

> Westbrook in 1989 became RAS third professional staff member, and has played an important role in its growth into a leading and highly-regarded regulatory consulting practice.

> * * * * *

> **Thought leader on Sarbanes-Oxley**

> During the last two years, I and Banking leader Tim Ryan asked Westbrook to devote portions of his year for special assistance in the implementation of the Sarbanes-Oxley Act ("Sarbanes"). If fiscal 2003, Westbrook was a member of the FS Sarbanes task force, with a large part of his year specifically devoted to assisting the firm (at a macro level) and the firm's FS leadership (at a micro level) with the implementation of Sarbanes Oxley requirements across a series of firm and client subject areas. In FY 2004, while he

9

was not seconded to a formally structured effort, he devoted a significant amount of time
to matters critical to the firm, emanating from the Sarbanes legislation.

Sarbanes brought significant changes to both PwC and its clients, and Westbrook's
substantial analyses of implications associated with these new requirements has been
instrumental in ensuring that engagement teams and firm leaders in understanding and
responding to these changes. Besides a thorough understanding of the workings of
government, Westbrook brought to this effort his self-study of the issues leading to the
enactment of Sarbanes, including watching many of the Congressional hearings and
reading some of the important literature, such as the "Powers" report on Enron.
Westbrook's efforts displayed extraordinary analytical and communication abilities.

The following are just a few of the topics on which Westbrook provided meaningful
advice, usually with days (or even hours) of new regulatory issuances:

- A detailed analysis (incorporating comments from other PwC professional staff, PwC
  independence, PwC risk management, and OGC partners) of how the SEC's new
  restrictions on non-audit services would affect regulatory advisory engagements. A
  portion of this memo 10 months later became the basis for a proposed PwC
  submission to the SEC asking the SEC to revisit the questionable position its staff
  had taken on the scope of the limitation "expert services;"
- Memos on CEO and CFO certifications under Sarbanes §302, including the meaning
  of "disclosure controls and procedures;"
- Audit partner rotation;
- Proxy disclosure of audit fees, including consideration of what constitutes an "audit;"
- Corporate governance, including director independence and new audit committee
  responsibilities; and
- New disclosure requirements for securities issuers

*****

Both we and our clients benefited from Westbrook's explanations of this changing world.
(See, e.g., the attached story about Westbrook's Sarbanes presentation to the annual
convention of the Peurto Rican Banker's Association.) He was the only Director to
participate in a September, 2002, meeting of banking partners largely devoted to
understanding and preparing for Sarbanes. Additionally, Westbrook produced for firm-
wide use by PwC's L&E a computer-based training introductory course on Sarbanes.

**Thought Leader on Governance and Internal Controls**

More recently, Westbrook's efforts have focused extensively on the implementation in
the banking industry of the internal control attestation requirements of Section 404 of
Sarbanes Oxley, and the unique interaction between 404 and similar internal control
requirements imposed on banks 12 years ago by the Federal Deposit Insurance
Corporation Improvement Act (FDICIA Section 112). For example:

- His writings in the last 8 months on this subject include two articles for PwC's
  "Banking Issues", a paper presented at the Spring Meeting of the American Bar
  Association's Banking Law Committee, and seven memos distributed within the
  banking practice. (We have shared his papers on the interaction between Sarbanes

10

404 and FDICIA 112 with regulatory officials at the FDIC and the Fed (the last
responding to a specific request from Fed Governor Beis)).

- Within PwC Wes has responded to a steady stream of questions from engagement
  teams and their clients, including phone calls on 404 issues with MBNA and JP
  Morgan Chase;
- Wes has participated in policy formulation with me, Lee Dixon, Tim Ryan, and Jim
  Lee;
- Last September, Wes prepared the slides Jim Lee used to brief the annual Banking
  Practice conference on the expectations for year-end 2003 bank internal control
  attestations.
- In June he taught a course on risk and controls at the American Banker's
  Association's Graduate School of Banking.

Westbrook now is working on a practice guide for PwC financial service engagement
teams who are required as part of their annual internal control attestation to consider the
effectiveness of the client's compliance function. See PCAOB Auditing Standard No. 2,
Pars. 15 & 140. He is drawing not only on his familiarity with financial institution
compliance programs, but also on his significant experience with using agreed upon
procedures to attest to a client's compliance with important regulatory statutes and
regulations, such as those governing Bank Secrecy Act reporting and transactions
between a bank and its affiliates. These experiences and expertise will be particularly
useful not only in the required audit attestations to internal controls, but also in promoting
BD/IM Compliance function certifications

From a technical perspective, Westbrook will be leading our efforts on the following
important initiatives:

- Working with the FDIC and the other banking agencies in modifying the existing
  regulation implementing FDICIA to accommodate the changes resulting from
  Sarbox, particularly those dealing with internal control attestations;
- Continuing the role he has performed since 1992 of being the "go to guy" in the
  Banking Practice on questions about FDICIA—a role of particular importance since
  the next year is likely to bring the most significant changes since FDICIA was
  implemented 12 years ago;
- Developing the practice aid discussed above for engagement teams to evaluate a
  client's compliance function as part of the internal control attestation;
- Developing agreed-upon procedures for use in meeting a requirement the Federal
  Reserve recently imposed on about a dozen of the world's major banks to obtain an
  independent accountant's attestation to the bank's compliance with certain anti-
  money laundering laws when distributing large amounts of U.S. currency; and
- Cross-selling with IM and BD Compliance personnel the services of annual
  compliance function certifications.

**External Recognition**

Westbrook continues to be well known and well regarded among his peers outside the
firm. For the last two years he has moderated a panel of the bank regulatory agency
general counsels for the Banking Law Committee of the Federal Bar Association (see
attachment), and now chairs that Committee. (Committee members include the general
counsels of the bank regulatory agencies, the SEC and the Treasury; of the New York

Clearing House, the Financial Services Roundtable, and other major trade associations; and leading members of the DC banking bar. In past years, Westbrook's contacts with members of this group have led to engagements with fees of several million dollars, as noted above. His July 2004 letter to the *American Banker* about the enforcement powers of the Office of the Comptroller of the Currency drew thanks from the OCC, including from Comptroller Hawke himself (a long-time professional colleague and past chair of the same FBA Committee).

(*See* Appendix L, Prospectus re: promotion to Managing Director.)

31. Murphy believes, and therefore alleges, that the great majority of the employees promoted in October 2004 to the position of managing director are over the age of 40, and are older than the great majority of employees who were promoted to partnership during 2004. The Respondent PwC pays substantially less money and benefits to Complainant and to other managing directors, and gives to them less responsible assignments, than to those persons who have the title of "partner" or "principal."

32. More than 2,000 of PwC's U.S. employees are limited liability partners of PwC. Under Delaware law (6 Del. Code §1515) and §8.2 of the Agreement, these partners are not liable for the debts of PwC; and under §§5.6(t) and 8.1 these partners have no right to share in PwC's income except as determined by the Board.

33. Except for members of the Board, and perhaps a few other PwC management officials, the limited liability partners of PwC are "employees" within the meaning of §11(f) of the Age Discrimination in Employment Act, 29 USC §630(f), and the DCHRA, D.C. Code §1-2512, and other state laws and thus protected against age-based discrimination in the terms and conditions of their employment. PwC's own partners have stated:

    i)   "There is no sense of partnership."
    ii)  PwC has a "corporate style of governance."
    iii) "It isn't a practice anymore; it isn't a partnership any more; it's a business."

(*See* Appendix M, August 13, 2002 memorandum.)

34. PwC's routine practice is to compel partners to retire at age 60, as stated in §10.1 of the Agreement. This mandatory retirement age discriminates against most of PwC's nominal "partners" in violation of the ADEA and the DCHRA. PwC and its Board have continued to implement this age-based retirement policy although they had full knowledge of the likelihood that such policy violates Federal, State and local equal employment opportunities laws.

I have commenced no civil, criminal or other administrative actions based on the above allegations concerning promotions made by PwC other than as set forth in Paragraph 2.b.

12

This complaint is CROSS FILED with the District of Columbia Office of Human Rights.

**Complainant,** being duly sworn, hereby deposes and says that he has read the foregoing Complaint and knows the contents thereof; that the same is true of his own knowledge, except as the matters therein stated on information and belief; and that as to these matters he believes the same to be true.

*C. Watton Murphy*

COMPLAINANT MURPHY

Subscribed and sworn to before me on this 4th day of March, 2005.

Gretchen R Waller

Notary Public, District of Columbia
My Commission Expires 5-31-2009

13

### List of Appendices to C. Westbrook Murphy Complaint

| No. | Date | To | From | Description/ Topic |
|---|---|---|---|---|
| A | April 1, 2001 | | | PricewaterhouseCoopers LLP Partners and Principles Agreement |
| B | June 4, 2004 | PwC US Staff | Dennis M. Nally | List of new partners |
| C | April 13, 2003 | File | Westbrook Murphy | Memo – Regulatory Advisory Services (RAS) staff meeting |
| D | Jan. 28, 2002 | David Rose | Westbrook Murphy | Memo – PwC promotion policy |
| E | Oct. 3, 2003 | RAS | Westbrook Murphy | Memo – Partner admission process |
| | Sept. 24, 2004 | | Westbrook Murphy | Memo – Insights into the Partner Admission Process |
| F | Dec. 3, 2001 | Westbrook Murphy | Bob Bench | E-mail – PwC partners and directors |
| | Nov. 29, 2001 | Bob Bench | Westbrook Murphy | E-mail – " |
| | Nov. 15, 2001 | File | Westbrook Murphy | Memo – " |
| G | June 25, 2001 | Ethics Office | Westbrook Murphy | E-mail – Report of alleged ethics violation |
| | June 25, 2001 | Ethics and Business Conduct Office | Westbrook Murphy | Memo – " |
| | Feb. 20, 2002 | File | Westbrook Murphy | Memo – Ethics Report |
| H | April 5, 2002 | Toni L. Riccardi | Westbrook Murphy | E-mail – Age discrimination |
| I | April 5, 2002 | Bob J. Daugherty | Westbrook Murphy | E-mail – "Re: Thanks. . .and what's coming in April" |
| | April 29, 2002 | Westbrook Murphy | Bob J. Daugherty | E-mail – "Response to your message" |
| J | June 15, 2004 | File | Westbrook Murphy | Memo – Meeting with Managing Committee |
| K | June 27, 2003 | Am Banking Group | Tim Ryan | E-mail – Bob Bench |
| L | Sept. 7, 2004 | John Verderese | William Lewis | Memo of transmittal |
| | | | William Lewis | Prospectus recommending promotion to Managing Director |
| M | Aug. 13, 2002 | File | Westbrook Murphy | Memo – RAS staff meeting |
| N | May 13, 1994 | | Dick Kearns | Directorship Program Guidelines |