# PRICEWATERHOUSECOOPERS

To: File
From: Westbrook Murphy
Date: June 15, 2004
Re: Meeting with Managing Committee

On Wednesday and Thursday, June 9 and 10, 2004, members of PwC's U.S. Management Committee were in Washington, D.C. for two purposes:

- On Wednesday afternoon, to have open meetings with PwC staff, and
- On Thursday, to conduct an all day meeting of the Committee.

The U.S. Management Committee deals with operational issues, and is subordinate to the U.S. Board of Partners and Principals, who set policy and execute the other responsibilities vested in them by the U.S. Partners' and Principals' Agreement. Some persons serve on both committees.

PwC staff in the DC metro area were invited to meet with members of the Management Committee at one of two Wednesday afternoon sessions, an earlier one for junior staff or a later one for senior staff (senior managers and directors). The invitation stated that U.S. Senior Partner Denis Nally would attend.

I was invited to, and attended, the later meeting, beginning at 3:30 p.m. For these meetings, senior staff were divided alphabetically by first names into two groups of about 50 persons each, which met in adjoining rooms with different Management Committee members. The meeting was scheduled to end at 5:00 p.m., and actually ended about 5:30 p.m.

The group to which I was assigned met with:

- Gene Donnelley, Vice Chairman for Operations,
- Dean Kearn, National Marketing Director,
- Rick Stamm, head of the U.S. Tax Practice, and
- Toni Riccardi, Chief Diversity Officer.

During the meeting, Vice Chairman Donnelly said that PwC in the U.S. had 2,033 partners and about 24,000 staff. He said that 37 was the average age at which a PwC employee was admitted to partnership, and 57 was the average age at which a PwC partner retired.

Concerning the 103 admissions to partnership announced June 4, to be effective July 1, 2004, Mr. Donnelly stated:

> "We did not turn away any qualified candidates for partner this year. We offered a partnership to every person recommended by the lines of business."

# PricewaterhouseCoopers

During the meeting I expressed a hope that PwC's management would consider two issues: one of credibility and the other of risk management.

Credibility: I pointed to the statistics that:

- Since PwC was formed six years ago, more than 75% of the employees admitted to partnership were under age 40 and the time of their admission; and
- Of the 77 PwC employees admitted to partnership last year [i.e., effective July 1, 2003], none were older than 46.

I also noted that I was older than 60, which—without more—disqualified me from even getting to the starting line in being considered for partnership.

This data, I stated, was inconsistent with statements often made by management that PwC bases promotions and other personnel actions solely on merit, without regard to an employee's personal characteristics. This inconsistency damages management's credibility.

Risk Management: I stated that I had filed a lawsuit against the firm, relying on:

- The Age Discrimination in Employment Act, and
- The Supreme Court's decision in *Price Waterhouse v. Hopkins* (whose result I briefly explained).

I further noted that I had sued only after efforts to address this age discrimination issue within PwC had failed. These efforts included:

- Fling a charge with the PwC Ethics Office, based on the provision in PwC's Code of Ethics and Business Conduct espousing equality in employment, and particularly stating that PwC conforms to applicable laws against employment discrimination;
- Raising the issue with Ms. Riccardi, in her role as Chief Diversity Officer; and
- Raising the issue with Bob Daugherty, U.S. Director of Human Resources.

The failure of these internal processes intended to benefit or protect employees, I suggested, further damaged management's credibility. Additionally, a lawsuit appeared to be my only avenue of challenging the mandatory partner termination provision of Section 10 of the partnership agreement. I had seen no indication that PwC's management appreciated the risk of this litigation to a fundamental aspect of its partnership structure.

Vice Chairman Donnelly responded that, in view of the litigation, the probably should say nothing about the issues I raised—I response I acknowledged to be reasonable in the circumstances. He did state, however, that he knew of one employee in his early 50s who turned down consideration of partnership because of the large retirement contributions that would be required until he reached 60, as contrasted with employees who are

**PRICEWATERHOUSECOOPERS**

admitted at a younger age and are able to spread those contributions over a greater number of years. I replied that I had a colleague who had made the same decision, which I believed to be further evidence of age-discriminatory employment practices.

Mr. Donnelly additionally offered to discuss "off-line" the issues I had raised. After the meeting adjourned, I spoke briefly with him, offering to discuss these issues in any setting with which he was comfortable, either on or off the record. He promised to contact me after he had had an opportunity to speak with someone else (whose name I didn't catch). As of June 15, I have not heard from him.

This discussion was professional and—insofar as I could discern—cordial.