UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| C. WESTBROOK MURPHY, and<br>HAROLD SCHULER,<br><br>        Plaintiffs,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS, LLP, et al.,<br><br>        Defendants. | Case No. 1:02CV00982 (RJL/DAR) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212-294-6700

Attorneys for Defendants

Murphy understood that his expression of interest was essential to his being considered as a candidate for partner. Accordingly, when he eventually did wish to be considered, he expressed his interest in a written memorandum dated March 14, 2001, which he personally delivered to Bench and to Jim Walls, who was then Managing Partner of the D.C. office (Def. Exh. 14; Murphy Dep. at 171-72). Murphy admitted that, although initially employed by the firm at age 49, he never expressed an interest until age 61 in March 2001 (Murphy Dep. at 418):

> Q. Is it also correct that you did not express an interest in being considered for partner until you were age sixty-one or sixty-two?
>
> A. Sixty-one.
>
> * * * *
>
> Q. No expression of interest before then. Is that correct?
>
> A. That is correct.

Significantly, and presumably in light of his admitted failure to express an interest in partnership at any time during the first twelve years of his employment with the firm, Murphy readily conceded that Bench did not discriminate against him (Murphy Dep. at 414):

> Q. Do you believe that Mr. Bench discriminated against you by not recommending you as a candidate for promotion partner?
>
> A. No.

Murphy further conceded that before filing his initial complaint with the DCOHR, the day after he eventually asked to be considered as a candidate for partner in March 2001, he had never before complained formally or informally of discrimination at PwC (id. at 854).

### 1. **Murphy's Pursuit of an Early Retirement Deal**

In point of fact, Murphy never had an interest in becoming a partner in the firm. Indeed, his March 2001 memorandum requesting such consideration -- along with his

15

contemporaneously filed charge of discrimination with the DCOHR -- were prepared to advance his then recently stated intention to cut an early retirement deal.

Murphy had decided in the fall of 2000, that he wished to then retire early at age 60 if PwC would provide him with continued medical benefits as a retiree (Murphy Dep. at 135-36). In response to his inquiries, Murphy was advised repeatedly that he would not be eligible under the terms of the PwC retirement and benefits plans to receive health insurance coverage as a retiree unless he worked until age 65 (id. at 137-45). In mid-December 2000, Murphy asked Bench, as Managing Partner of the RAS practice, "about what kinds of arrangements might be made in the way of the firm either providing healthcare service, healthcare insurance apart from these plans . . . or going to work on a part-time basis" (id. at 145). Rather than attempting to dissuade Murphy from seeking to retire or work part-time, Bench "was receptive to the idea," and agreed to make inquiry on Murphy's behalf (id. at 145-47).

Bench contacted Darlene Shea, who was then a personnel specialist with responsibilities for the RAS practice group, and Shea contacted Murphy with respect to his interest in retirement or part-time employment (Murphy Dep. at 147-50). Shea reaffirmed the advice Murphy was previously given that he would not be eligible to receive retiree health benefits until his normal retirement date at age 65 (see Def. Exh. 13). In an e-mail to Shea dated March 8, 2001, Murphy ultimately stated (id. at 149-50):

> "But - as I said - I believe the answer I am looking for likely lies not in a parsing of the obscure language, but in <u>cutting an early retirement deal with whoever possesses the authority to do so</u>. . . . [M]y wish is to retire and then to be covered by the PwC medical insurance plan as a retiree. The outcome is of less consequence than how we get there [Def. Exh. 13, emphasis supplied].

Eight days later, Murphy personally delivered his March 14, 2001 memorandum to Bench and Walls, and filed his charge of discrimination with the DCOHR (Murphy Dep. at 171).

16

His memorandum opened with a reference to his interest in retiring with continued health insurance, and was followed by his request to be considered for promotion to partner at age 62, and an assertion that the age 60 retirement provision for partners was unlawful (Def. Exh. 14). The memorandum proceeds to state that Murphy filed a charge of discrimination with the DCOHR, attaches a copy of the charge, notes that it is a predicate for filing a lawsuit in federal court, and closes by informing Bench that the DCOHR will encourage a confidential settlement to avoid litigation (id.).

In light of Murphy's March 8, 2001 e-mail to Shea stating his intention to "cut[] an early retirement deal with whoever possesses the authority to do so" (Def. Exh. 13), the concluding paragraph of his March 14 memorandum to Bench was plainly calculated to advance that objective. As Murphy testified (Murphy Dep. at 177):

> Q.   Wasn't the final paragraph of your memo communicated in an effort to negotiate the early retirement deal that you sought?
>
> A.   I would have been glad then and I would be glad now and at most intervening times to negotiate . . . a resolution of this controversy that could have earlier avoided litigation and now terminates in litigation, and we have made several attempts to do so, sometimes at my suggestion, sometimes at the suggestion of PwC. Those attempts have so far been unsuccessful.

Bench's only response was to tell Murphy that he was "disappointed" that Murphy had elected to proceed in this manner (Murphy Dep. at 114-15). Murphy acknowledged that if PwC had agreed to provide him with retiree health benefits at age 60, he would not have "express[ed] an interest in being promoted to partner and to take the steps that seemed to me to be necessary to accomplish that interest" (id. at 162). Indeed, as noted, Murphy had never expressed an interest in being a candidate for partner until his request for early retirement with medical benefits had been denied (id at 418).

17

Murphy thereafter made several unsuccessful attempts to cut an early retirement deal (Murphy Dep. at 165, 188, 310-11). At the same time, Murphy never asked Bench or Walls to seek to have the partnership agreement amended to eliminate the allegedly illegal retirement provision for partners (id. at 218-19). After engaging in unsuccessful mediation, Murphy (and Schuler) withdrew their charges filed with the DCOHR before the DCOHR had conducted an investigation or reached any determination on the merits of their claims (id. at 220-23, 343-49).

Murphy's lack of a genuine interest in becoming a partner in PwC is further reflected in his testimony that he is not even now prepared to accept an offer of partnership status (Murphy Dep. at 605-06). He said he would want to make certain inquiries before making a decision, but had failed to make any such inquiries before filing his administrative charges, and commencing and prosecuting this action, whereby he purports to seek partnership status (id. at 605-08). Indeed, Murphy's indifference is underscored by his failure to make inquiries about partner compensation (id. at 98-100) or the partner retirement plan (id. at 604-05) even when he clearly had an appropriate opportunity to do so (see id. 96-99). Moreover, based on discussions he had with a similarly situated RAS employee, who had made such inquiries and decided that he did not wish to be a partner (id. at 90-92), Murphy testified that he would have made the same decision (id. at 107-09).

2. **Murphy's Relinquishment of Managerial Duties**

While Murphy purports to complain about being denied partnership consideration in the July 1, 2000 and July 1, 2001 promotion cycles, he fails to note that beginning in December 1999, and for an indefinite period thereafter, he voluntarily relinquished all of his managerial responsibilities as a professional employee in the RAS group. He did so in an attempt to avoid PwC's extension to managerial employees of "independence" requirements previously applicable only to partners (Murphy Dep. at 707-09). Independence requirements refer to the requirements

18

of the SEC and AICPA that accounting firms engaged to audit financial statements of public companies be financially independent of their audit clients (id. at 489).

Murphy understood that independence was a matter of most serious concern to PwC (Murphy Dep. at 613). PwC had been censured by the SEC in January 1999 for violating certain independence rules (id. at 612), and was ordered to take various measures to avoid further problems (id. at 617-18). Among other things, the SEC order required "that no manager hold securities of any public audit client of the firm," that under certain circumstances a manager be required to dispose of a security within five business days, and that PwC implement new policies and procedures in this regard as soon as possible (id. at 618-20). Murphy understood that he was a "manager" covered by the SEC order (id. at 618).

When PwC implemented new policies and procedures in July 1999, Murphy's initial reaction was to advise the partner in charge of PwC's independence function (Murphy Dep. at 641-42) that the "[i]mposition of the proposed expansion of independence requirements is inconsistent with my remaining with PwC in a managerial position" (id. at 644-45). In other words, Murphy was threatening to resign if certain independence requirements were to be extended to him (id. at 645).

Thereafter, in response to notices from PwC's independence office to dispose of certain investments in audit clients, Murphy decided instead to attempt to avoid the expanded independence requirements by relinquishing all of his managerial duties as a PwC Director (Murphy Dep. at 169-70). He so advised Bench (id. at 636; Def. Exh. 39), and, on December 27, 1999, proceeded to delegate all of his managerial duties to his fellow employees in the RAS group (id. at 506-08; Def. Exh. 30). In the succeeding months, Murphy repeatedly advised officials in PwC's independence office by e-mail that he was refraining from exercising any of

19

the managerial responsibilities of his position as a Director (id. at 742-43; Def. Exh. 53 (e-mail dated March 3, 2000, stating that, "I continue to refrain from exercising managerial duties until PwC realigns its offices more sensibly"); id. at 745-46; Def. Exh. 54 (e-mail dated March 24, 2000, stating that, since December 27 1999, Murphy had refrained from exercising managerial duties, and attaching a chart he prepared "to document for your records how my duties changed after December 27, 1999"); id. at 751; Def. Exh. 55 (e-mail dated March 14, 2000, stating that, "I ceased to exercise any managerial duties after December 27, 1999. Thus even if the Washington, D.C. cluster is relevant for independence purposes, I do not have a managerial position within that cluster")).

While relinquishing all of his managerial responsibilities, Murphy was seeking to persuade PwC's independence office to limit its restrictions and disposition requirements to audit clients that were serviced directly by PwC's Washington office (Murphy Dep. at 636-37, 741-42). He was, at the same time, refusing to comply with notices to dispose of certain personal investments in order to avoid incurring any taxable capital gains (id. at 623-24, 635-36).[7] Murphy's ploy failed (id. at 751-52). His relinquishment of managerial duties did not serve to exempt him from the applicable independence restrictions, which applied to all employees with the title of "Manager" and above, regardless of the duties actually performed by such employees (id. at 509-10).

Murphy thereupon made inquiries about a demotion to a position below Manager -- two levels below his position as Director (Murphy Dep. at 510-15, 796-97). He was advised there were no such positions then available (id. at 513-15).

---

[7] The independence rules posed special problems for Murphy in light of the substantial magnitude and breadth of this personal investment portfolio (id. at 623, 631-34).

20

Murphy retained counsel to represent him at a hearing in April 2000 to consider sanctions and disciplinary actions against him for his failure to dispose of certain securities (Murphy Dep. at 747-57). Murphy agreed to voluntarily dispose of the securities before the hearing panel reached a decision, and received a letter of reprimand (id. at 756).

Murphy asserts that, following the hearing in April 2000, he reassumed the managerial duties he had relinquished in December 1999 (Murphy Dep. at 738-39). But, despite the fact that he had repeatedly confirmed by e-mail during that period that he continued to refrain from exercising any of his managerial responsibilities as a Director (id. at 742-43, 746, 751), Murphy never communicated that he had reassumed those duties or was available to do so (id. at 772). Indeed, it appears that Murphy never fully reassumed his managerial responsibilities (id. at 771-87).

In an "Accomplishments Reports" dated March 21, 2001, covering the twelve-month period ending March 31, 2001, (Def. Exh. 62; Murphy Dep. at 845-46, 848), Murphy acknowledged that his accomplishments during that period had been "limited" by his voluntary failure to "act[] in a managerial capacity" (id. at 870). Murphy had communicated his purported interest in being a candidate for partner just one week before submitting that "Accomplishments Report" (Def. Exh. 14).

In sum, Murphy expressed no interest in being a partner at PwC until March 2001 because he clearly had no such interest. From his relinquishment of all managerial responsibilities beginning in December 1999, to his request to be demoted in early 2000, to his stated desire to retire in the fall of 2000, to his inquiry about part-time employment in December 2000, to his stated intention to seek to cut an early retirement deal in 2001, it is evident that

21

Murphy's nonpromotion claims were asserted as a mere ploy to force PwC to provide him with retiree health benefits to which he was not entitled.

### 3.   Murphy's Assertion of Futility

Against this background, Murphy nonetheless seeks to excuse his admitted failure to express any interest in being a candidate for partner until March 2001 by asserting that any such expression of interest would have been "futile." His assertion is based on a passing comment made to him in 1989 during a pre-employment interview with William Linnenbringer, who was then Managing Partner of PW's Financial Services Institutions practice to whom Bench, as Managing Partner of the newly formed RAS practice, then reported (Murphy Dep. at 63-64). According to Murphy, Linnenbringer commented "in passing" that "it would not make sense for retirement and other reasons" for Murphy to join the firm as a partner (id. at 65, 70). That was the long and short of it: Linnenbringer said nothing more on the subject, did not explain the comment, and Murphy said nothing in response (id. at 65-66, 70). Murphy conceded that he "was not sure [he] had any particular understanding of that comment" (id. at 66).

Murphy further testified that the passing comment was consistent with a statement in a Bench memorandum at that time that it would be "economically disadvantageous" for Murphy to be a partner (Murphy Dep. at 88-90). But Murphy does not recall that Bench ever said anything to him in that regard (id. at 110-11). And, Murphy thereafter made no inquiries on the subject until after he had filed his administrative charge in March 2001, some twelve years later (see id. at 90-95; 100-03).

In a rebuttal statement Murphy prepared and submitted to the DCOHR on the issue of his failure to ever express an interest in partnership opportunities during the first twelve years of his employment with the firm, Murphy relied solely on Linnenbringer's passing comment to argue that his failure should be excused as futile (Murphy Dep. at 203-09). However, Murphy's

## Conclusion

For the reasons stated, it is respectfully submitted that defendants' motion for summary judgment dismissing plaintiffs' remaining nonpromotion claims should be granted.

Dated: February 4, 2005

Respectfully submitted,

WINSTON & STRAWN LLP

/s/ Eric M. Nelson
Eric M. Nelson (admitted *pro hac vice*)
Stephen L. Sheinfeld (admitted *pro hac vice*)
Mark A. Konkel
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

Thomas M. Buchanan # 337907
WINSTON & STRAWN LLP
1400 L Street, N.W.
Washington, D.C. 20005
(202) 371-5700

Counsel for the Defendants