UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
C. WESTBROOK MURPHY,                    )
                                        )
                                        )
         Plaintiff                      )
                                        ) Civil Action Nos. 05-1054 (RJL/DAR)
         v.                             )                    02-982 (RJL/DAR)
                                        )
PRICEWATERHOUSECOOPERS, LLP,            )
                                        )
                                        )
         Defendant.                     )
_____ )

**PLAINTIFF MURPHY'S REPLY IN SUPPORT OF MOTION
TO COMPEL DISCOVERY RESPONSES**

Last December Judge Leon set what seemed (at the time) to be a generous period

of 210 days for additional fact discovery, followed by a shorter period devoted to experts.

Discovery in these joined cases can still be completed in an orderly fashion under the

existing schedule if defendant would truly engage in the process.

Although defendant laces its Opposition Memorandum with frequent complaints

about the breadth of Plaintiff Westbrook Murphy's requests, most are aimed at areas that

PwC agrees are open to further inquiry.  For example, of the fourteen interrogatories

Murphy issued in Case 1, eleven of them seek information about the various policies and

procedures governing partners at the firm (the "owner/employee" issue).  Fourteen out of

twenty interrogatories in Case 2 target the same information, just in later years (2004 and

2005).  PwC has acknowledged that further discovery on the "owner/employee" issue is

warranted, and it appears that defendant can answer most, if not all of it, by simply

producing existing written policies.  There is no reason why this discovery could not have been fully answered by now, without a motion to compel. [1]

The remaining discovery focuses largely upon issues that are central to any discrimination case, but which PwC has so far successfully avoided answering.  First, Murphy has asked PwC to explain precisely why he was not sponsored for partnership in the years at issue.  Defendant denies that age was a factor (despite considerable evidence to the contrary) [2] and implies, without ever actually stating, that Murphy somehow lacked necessary qualifications.  [See Opposition at 2.]  The discovery Murphy seeks would clearly frame the disputed issues in this case.  And since PwC hints at a qualifications defense, Murphy has sought information about the employment history, performance and general qualifications of other professionals within his line of service (Financial Services) who have been admitted to partnership.

Murphy also seeks records that have not yet been produced about his own tenure with the firm (not just documents in his official personnel file), all non-privileged documents relating to his internally-raised claims of discrimination, and information about other similarly situated complaints of discrimination.  All of this information is narrowly tailored and relevant to his claims.  PwC's only substantive objection to

---

[1]  It took both the threat and filing of this Motion, but defendant has recently produced several policies that appear to answer many of the interrogatories, and defendant has promised (without agreeing to a date certain) a "rolling production" of more responsive information.  And late in the afternoon on the day this Reply was filed, defendant finally started to match the documents it has produced to the particular interrogatories and requests so that Plaintiff can understand which of the requests have purportedly been answered.  PwC must still complete that process, and verify its answers.  It would facilitate this process if the Court would order defendant to fully answer these interrogatories by a date certain, so that the parties can understand that the production is complete and move to the next stage of discovery (including depositions).

[2]  As we noted in our initial Motion, Judge Leon has already twice denied PwC's argument that a reasonable jury could not find that age was a determining factor in Murphy's non-admission to partnership.  Indeed, PwC highlights that Murphy's age barred him from being considered for partnership by arguing in its Opposition that "If Murphy had been admitted as a partner. . . he would have been subject to immediate retirement under the provisions of PwC's partnership agreement."  [Opp. at 2.]

producing it is that RAS Director Bob Bench was solely responsible for Murphy's non-promotion, and that information about the larger Financial Services practice is therefore irrelevant. That contention is wrong and indeed refuted by documents PwC has already produced.

Lacking any persuasive objection on the merits, PwC strenuously raises a procedural bar, arguing that further production of liability discovery is precluded by this Court's November 22, 2004 Order. PwC's interpretation is not convincing, but since Judge Leon has now extended discovery in any event, there is no reason to deny Murphy important information that he needs to try this case. As the Supreme Court has emphasized, a civil rights plaintiff must be "afforded a full and fair opportunity to demonstrate pretext," Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981), since defendants rarely admit to the elusive issue of discriminatory intent. Plaintiff has not yet had access to important information that may discredit PwC's reasons for denying him partnership.

The other general area of inquiry is damages. PwC would like discovery to close in this case without ever having to provide the total annual compensation earned by any of the similarly situated professionals who have been made partner. Defendant would then undoubtedly argue that whatever information Murphy presents at trial about the partnership salary he was denied is speculative, and insufficient to prove his losses. Plaintiff can only obtain this information through discovery, and he has again issued reasonable and narrowly tailored requests. There is no even arguable procedural bar to this discovery, since the Court "deferred" damages discovery until after PwC's summary judgment motion was resolved. It is now time to produce this data (which, according to

PwC policies, is maintained in automated fashion and would likely take only a few minutes to compile).

### 1. The November 22, 2004 Order Should Not Preclude Murphy from Obtaining Obviously Relevant and Withheld Information

The parties are sparring over the meaning of this Court's November 22, 2004 Order. Plaintiff believes that, read as a whole, that Order stayed discovery in Case 1 pending the resolution of defendant's second Summary Judgment Motion. There is considerable support for this interpretation. During the argument at the November 4, 2004 conference (on which the Court's Order was predicated), Defendant specifically argued that its soon-to-be-filed summary judgment motion would dispose of the case and moot further discovery, and that the parties should be spared the unnecessary expense and discovery burdens. Questions the Court then put to Plaintiff's counsel evidenced the Court's concern that such discovery might be "premature."

On November 22, 2004 the Court ruled and denied Plaintiff's request for further discovery. The Order was not explicit about whether such discovery was permanently precluded or merely stayed, but there is a strong indication that the Court meant the latter. Indeed, the Court noted:

> Plaintiffs have not shown that they need additional discovery in order to file their opposition to the dispositive motion which Defendants will file in January 2005; accordingly, further discovery, even if such discovery were otherwise warranted, is appropriately stayed pending the determination of the dispositive motion.

[Compel Opp. Tab B, 11/22/04 Order at 2.]

In its Opposition, PwC dismisses this statement as mere "dictum." [Opp. at 11.] It is not clear, and defendant does not offer to explain, why the Court would put "dicta"

4

in its Order. But in any event, until recently defendant seemed to share Plaintiff's

construction of the ruling. At the October 18, 2005 scheduling hearing with Judge Leon,

PwC's counsel described the state of discovery in Case 1 as follows:

> Mr. Nelson: Damages discovery was deferred in August 2003 and
> all discovery was stayed in November 2004. And I would think in
> the normal course we would go back to Magistrate Judge Robinson
> to pick up and develop a discovery plan for the rest of the case.
>
> The Court: Sure.

[Compel Tab 3, Tr. 10/18/05 Status Conf. at 8-9 (emphasis added).]

PwC tries to deflect its own description of the November 22, 2004 Order as mere

"passing mischaracterizations" [Opp. at 11], but PwC's actions betrayed a different

understanding. For example, the parties' agreement in December 2005 to extend fact

discovery for seven months shows that significant additional discovery was contemplated

by both sides (and directed by the Court). Moreover, PwC received the written discovery

requests at the December 8, 2005 hearing. Neither in its initial written objections (served

by agreement on January 20, 2006), or in the January 31, 2006 meeting of counsel (in

which parties discussed in turn every one of the requests and objections for four hours), [3]

did PwC contend that the November 22 Order barred additional discovery. Not until

February 2, 2006, did PwC first adopt the position that discovery in Case 1 (or Case 2 for

that matter) was effectively closed.

Of course, it is for this Court to determine the proper construction of its

November 22, 2004 Order. If Plaintiff's understanding of the Order is incorrect, and if

the Court originally intended liability discovery to close in November 2004, then Plaintiff

---

[3] At various places in its Opposition, PwC suggests that Murphy somehow failed in his duty to confer with defendant before filing this Motion. That is plainly not so; the parties met for more than four hours face to face and debated all aspects of the discovery at issue before Murphy filed this Motion.

respectfully asks the Court to reconsider. Discovery orders are always "interlocutory" and subject to revision if the Court is persuaded that a change is warranted. <u>Lopez v. Baxter Healthcare Corp. (In re Baxter Healthcare Corp.)</u>, 151 F.3d 1148, 1149 (9th Cir. 1998) (citing <u>In re Recticel Foam Corp.</u>, 859 F.2d 1000, 1003-04 (1st Cir. 1988)). Here, the landscape of the case has changed significantly; summary judgment in Case 1 has been denied, and the case has been joined with a new lawsuit challenging a later non-promotion, and discovery has been extended in both cases until early July. The parties have further agreed that evidence obtained in either lawsuit is admissible in the other. Plaintiff should be permitted to obtain comparative data relevant to all claims at issue.

Moreover, to the extent that the Court was relying in November 2004 on defendant's argument that liability discovery was essentially complete, that assertion is simply inaccurate. Indeed, by that point, defendant had provided very little by way of written discovery responses. There was no information about the performance or qualifications of <u>anyone</u> promoted to partner (even within RAS).[4] No personnel files, performance appraisals, billing records, formal "soundings," informal e-mails, notes or memoranda about candidates had been produced. Nor was there any information about other complaints of age discrimination (either internal, or filed with a court or administrative agency), and defendant had not produced specific records about Plaintiff Murphy's history with the firm (not contained in his OPF), which had been requested. In

---

[4] Defendant did not produce any documents about any comparators until February 17, 2006. At that point, defendant produced parts of the personnel files of David Albright and Jeff Lavine, two RAS employees (significantly younger than Plaintiff) promoted into the partnership, and documents relating to soundings for Dan Weiss (who was denied partnership). Of course, the fact that defendant produced those files in February 2006 is at odds with its current argument that liability discovery was closed in both cases, effective November 22, 2004. Defendant has not provided similar information for any of the other Financial Services employees considered for partnership.

short, liability discovery was not complete in November 2004, and it is not complete now.

PwC's reliance upon the D.C. Circuit's opinion in <u>Hussain v. Nicholson</u>, 435 F.3d 359, 363 (D.C. Cir. 2006) is misplaced, because the situation the court faced there was not remotely similar to the issues here. In <u>Hussain</u>, the plaintiff engaged in no discovery at all, and simply allowed the discovery deadline to expire. Then, after his employer moved for summary judgment, he retained new counsel and sought to modify the scheduling order to reopen discovery. The district court refused, and the appellate court held that the ruling was not an abuse of discretion. Plaintiff here has not slept on his rights; he has vigorously pursued discovery, both before and after PwC's failed summary judgment motion. <u>Hussain</u> simply does not support PwC's bid to foreclose discovery here.

Finally, all of the discussion above pertains only to Case 1. Defendant cannot plausibly contend that an Order entered in November 2004 in one case precludes discovery in a separate non-promotion claim, which had not even been presented to the EEOC at that time, much less filed with the Court. The agreement to incorporate discovery orders from Case 1 was meant to govern procedure in Case 2, so the parties would not be reinventing the wheel on matters like protective orders. Plaintiff was obviously not agreeing to forego all liability discovery on Case 2.

Defendant could not have been confused about this. Indeed, in their September 12, 2005 "Joint Statement Pursuant to Local Rule 16.3(d)," the parties noted their "divergent positions" regarding discovery in Case 2. [<u>See</u> Tab 1, Joint 16.3 Report at 4.] Plaintiff believed there was no limit on discovery, whereas defendant argued that

"discovery in this action should be precluded to the extent it was or could have been taken in the Pending Action."  Plaintiff plainly had not agreed to forego liability discovery in Case 2; if he had, both parties' "divergent" statements would have been superfluous.  Likewise, through e-mail exchanges in November 2005 (before the parties submitted their final Rule 16.3 Report in December), Plaintiff described in considerable detail some of the comparative data he would be seeking in Case 2 discovery, and emphasized that "we are certainly not intending this email to in any way limit otherwise proper discovery."  [Tab 2, 11/29/05 e-mail from R. Salzman to E. Nelson.]  Plaintiff also described his understanding that "information learned in either case is subject to the protective orders in the first but can be used in either consistent with the protective agreement."  [Id. (emphasis supplied).]

Defendant's argument seems to be that it hoodwinked counsel into agreeing to forego all liability discovery in Case 2, by including the phrase "the parties agree that all discovery taken, and all discovery and protective orders entered in the Pending Action should be deemed applicable to this action, as if taken and entered herein."  [Tab 1, Joint 16.3 Report at 4 (emphasis supplied).]   As noted above, Plaintiff does not believe that the November 22, 2004 Order was intended to preclude (rather than stay) further liability discovery in Case 1, and Plaintiff certainly was not agreeing to abandon his rights under Fed. R. Civ. Proc. 26 to discover facts relevant to his case.

In sum, PwC can hardly claim prejudice if it is now required to disclose information which is undeniably "calculated to lead to the discovery of admissible evidence."  It was given the opportunity to obtain summary judgment before producing complete discovery responses in Case 1, but its motion failed, and it is now clear that a

trial will be needed to resolve these claims. Plaintiff should be afforded the opportunity to try his case effectively, and that requires allowing him access to information that may be necessary to discredit the proffered reasons for his non-admission. PwC's procedural objections should be denied.

In Case 1, the procedural objection discussed above was PwC's <u>only</u> argument opposing the following requests: Interrogatories 13 and 14, and Document Requests 5-8, 11-12, and 23-27. In Case 2, this was the <u>only</u> argument opposing Document Requests 12, 13, and 15-18. Defendant should be ordered to answer those requests, in full.

### 2. Defendant Offers No Valid Objection to the Remaining Liability Discovery

PwC offers just one substantive argument for denying the remaining liability discovery. It asks the Court to limit all of the comparative data that Plaintiff seeks to coworkers within Plaintiff's small unit (the Regulatory Advisory Service, or RAS), and not to the larger Financial Services practice, of which RAS is one component. Defendant contends that the only decision-maker of consequence in this case was RAS Managing Partner Robert (Bob) Bench, and that the motives (and thus, history of assessing partner qualifications) of other partners within the Banking and Financial Services practices are irrelevant.

The suggestion that Bob Bench was some rogue operator, who was alone responsible for any bias keeping older workers from the partnership, is absurd. Defendant's argument is not serious, and is merely an effort to dodge appropriate discovery. Bob Bench would not have been the only decision-maker in Murphy's bid for partnership. Indeed, if Bench was the only relevant partner in this process, then co-

Plaintiff Hal Schuler -- whom Bench proposed for partnership in 1999 -- already would be a PwC partner.

In 1999 Bob Bench recognized that he needed more partners within RAS. At that time, Schuler and Murphy were the two most senior RAS members who were not already partners. Both Schuler and Murphy supervised other RAS professionals, both frequently led client engagements, and both had stellar performance backgrounds. Murphy was just about to turn 60, and Bench obviously was aware of the policy prohibiting anyone age 60 or older from remaining a PwC partner -- indeed, a few years later Bench himself retired at age 60, pursuant to the policy. Instead of sponsoring Murphy for partnership, Bench proposed promoting him to Managing Director (a position PwC itself described as "a highly experienced professional who functions in most respects, as a partner, [and] has the appropriate experience credentials of a partner") to which the mandatory retirement policy did not apply. Bench explained his proposal:

> Assuming we succeed in promoting Dave [Sapin] and Jeff [Lavine] to Directors, I want Wes to supervise them and Gary [Welsh], i.e., 3 directors, who in turn are (and will be) supervising a growing team of attorneys (Nelson, Foster, Conte, VanHuysen, etc.). . . . Wes will be supervising some $9m in chargeable hours directly (avg. $250 per hour) and more, depending on the engagements. We're talking revenues here of $5mm+. Lastly, Wes has been operating as a Managing Director for 24 months. He generates sales 5mm+, he oversees large engagement revenues, and he deals at the executive vice president level continually at clients and at the partner level internally.

[SJ Opp. Ex. 5 (bracketed material supplied, emphasis added).]

But Hal Schuler was five years younger than Murphy, and his age was not yet an absolute bar for partner admission -- at least not for Bob Bench. Bench formally sponsored Schuler for partnership, but his candidacy was later shot down in the sounding

process, when FSI Managing Partner Robert Moritz rejected him for reasons that Bench could not explain (as Bench testified, perhaps it was his "blue eyes"). [SJ Opp. Ex. 11 at 128.]

The fallacy of PwC's argument here is thus highlighted by Hal Schuler's experience. Bob Bench sponsored Schuler for partnership, but Schuler was rejected up the chain (at the Financial Services level) for reasons that strongly suggest age bias. Had Bench sponsored Murphy, who was already 60, Murphy still would have had to run the gauntlet through Financial Services, and then through another sounding up the chain of the firm, culminating with a vote at the Board of Partners and Principles. At each step, partners would be evaluating his candidacy, and presumably comparing him to the qualifications of other Financial Services professionals (not limited to RAS) who were also sponsored for partnership.

A document recently produced by PwC describing the FY 2000 partner admission process, makes this clear:

> The ABAS US Admission Process for FY00 is comprised of two components: the Business Unit Review (BUR) and the ABAS Candidate Assessment Committee (ACAC)
>
> The BUR Process
>
> Each Business Unit (CIP, E&M, FS,[5] GRMS, MM, Services, R&Q, IICE and TS) identified potential partner candidates during the annual ABAS business unit manager evaluation process. In order to proceed with these candidates to the BUR process, each Business Unit prepared an overall business case outlining their future partner needs considering current partner headcount, anticipated withdrawals, retirements, direct admissions, current revenue and budgeted revenue. . . . Global proposals (including the candidate's proposed role and responsibilities) have been completed and entered into the Partner Affairs (PA) Global

---

[5] "FS" refers to Financial Services.

Admissions Database and the US Sounding Process is currently underway. . .

BUR committees . . . are expected to perform the following:

- personnel file review,
- soundings review and follow up, as appropriate;
- candidate ranking, and
- conclude on each candidate as to admit, defer admission or do not admit.

[Tab 3, 10/9/99 e-mail from John Carter to Robert Dubner, Dennis Nally and others.]

This internal PwC document confirms what Financial Services leader Mortiz said at a September, 2003 banking practice employee meeting: that the "Business Unit" which "identified" partner candidates was the larger Financial Services practice, not the smaller RAS, and Financial Services applicants were evaluated and ranked in a sounding process at that level. [See SJ Opp. Ex. 1, ¶ 18; SJ Opp. Ex. 13 at 3.] Thus, Murphy was not simply competing for partnership consideration with fellow professionals within RAS, but with others in the Financial Service business unit and in the firm as a whole, and there is no basis to limit discovery only to RAS.

It is also evident from this document that PwC maintains a database -- the Partner Affairs Global Admission Database (PAGAD) -- with detailed information about the qualifications of candidates who were proposed for admission. The firm also conducts a "personnel file review" on each candidate. These are the same kinds of records (sounding documents and personnel files) which Murphy is seeking in discovery, and it is clear that they are central to the partner admission process. It cannot seriously be disputed that these records may contain relevant information. Indeed, there may be discussion related to the candidates' respective ages which could provide further direct proof of discrimination in this case, because PwC expressly instructed each applicant to provide

12

his "date of birth" and "age at proposed admission date" on the application forms being reviewed during sounding.  [See SJ Opp. Ex. 15.]  In these circumstances, it is not fanciful to believe that partners may have commented on the age of prospective candidates.

Even absent direct evidence, the records plainly would contain information about the candidates' record of billings, revenue generation, performance, and position history that would be relevant to determining whether or not Murphy's qualifications compared favorably with younger applicants who were admitted.  Since it appears that PwC can extract this information from the PAGAD with "the push of a button," defendant cannot plausibly contend that it would be burdensome (or even difficult) to quickly produce all relevant documents.

Finally, in addition to these formal partner proposals and sounding documents, there very likely are other relevant documents that exist but that have not yet been produced.  For example, Mr. Carter's e-mail refers to an "overall business case" which "each business unit" prepared, "outlining their future partner needs considering current partner headcount, anticipated withdrawals, retirements, direct admissions, current revenue and budgeted revenue."  PwC has not produced any "business case" for any of the units in this litigation, and at a minimum such records pertaining to Financial Services should be provided.  Similarly, Mr. Carter noted that partner candidates are eventually interviewed, and that their practice leaders are often contacted to informally "gain details about the candidates' nomination and/or clarification on any issues."  [Tab 3 at 2.]  It is inconceivable that none of this information is recorded in notes or memoranda, and yet none has been produced.

In support of its argument that discovery in this case must be limited to RAS, defendant cites to a number of cases.  Perhaps the most perplexing is PwC's reliance on the D.C. Circuit's decision in <u>Mungin v. Katten Muchin & Zavis</u>, 116 F.3d 1549, 1557 (D.C. Cir. 1997).  <u>Mungin</u> was not a case dealing with discovery issues at all.  Rather, the D.C. Circuit was evaluating the sufficiency of the evidence to support a jury finding of racial discrimination.  Mungin had been hired to perform bankruptcy work, but the firm's bankruptcy practice had dried up shortly after he arrived, causing his departure.  Mungin claimed, among other things, that he was discriminatorily denied partnership consideration, even though he had worked at the firm for only a year, and had never received a real performance evaluation.  The only evidence Mungin relied on to try to prove discrimination was his claim that the firm had failed to adhere to its partnership consideration policies.  The Court noted, however, that the evidence did not raise an inference of bias, because the policies Mungin relied on pertained to a separate department, which played no part in his failure to be considered for partnership:

> Mungin offered absolutely nothing that would have permitted a reasonable jury to conclude that the firm discriminated against him when it failed to consider him for partnership. He tried to establish that the insurance group headed by Dombroff had certain procedures for recommending partners. <u>But the partnership decisions were made by departments, and in Mungin's case, by the finance and reorganization department, not the insurance department</u>. Without any evidence that this department--the one that chose not to nominate him--acted discriminatorily, Mungin failed to prove a claim.

<u>Mungin</u>, 116 F.3d at 1557 (emphasis supplied).  Here, the discovery that Murphy seeks does not pertain to a separate department; RAS is part of Financial Services and Murphy would have been reviewed by Financial Services partners had the firm not overlooked him because of his age.  <u>Mungin</u> adds nothing to the issue here.

Similarly unhelpful is PwC's reliance on cases where the court denied "company wide" discovery because the plaintiff could not demonstrate how it related to his particular claims of discrimination.  See, e.g., Carman v. McDonnell Douglas Corp., 114 F.3d 790, 792 (8th Cir. 1997) ("Company-wide statistics are usually not helpful in establishing pretext in an employment-discrimination case, because those who make employment decisions vary across divisions.  Absent some more particularized argument from plaintiff as to how such information might have helped in this case, we cannot say that the District Court abused its discretion.").  By contrast, in Case 1 Judge Leon already has ruled that "Plaintiffs may still use evidence of systematic or general discrimination in establishing their individual discrimination claims."  [9/27/04 Memorandum Order and Opinion at 32 (emphasis added).]  And Case 2 directly challenges PwC's firm-wide "pattern or practice of age-based discriminatory treatment of Murphy and other older PwC employees who are candidates and potential candidates for admission to the PwC partnership." [Complaint, ¶ 29]

But in any event, Plaintiff is not generally seeking "company wide" discovery. Almost all of his requests for comparative data in Case 1 are focused on Financial Services.[6]  And while some of his Case 2 discovery as written seeks firm-wide information, Murphy is willing to narrow his requests to Financial Services, without

_____

[6] The exception to this is Case 1 Document Requests 9 and 13.  Request 9 seeks personnel records for any PwC employee sponsored for partnership who was age 50 or older.  This information is highly relevant (even though firm-wide), because it could reveal a firm-wide practice that well-qualified applicants nearing the age of retirement had no chance for partnership, even if younger than 60.  The firm has not identified how many employees fall into this category, so there is no basis to assume it would be unduly burdensome to produce this information.  Request 13 seeks minutes or related documents from the U.S. Board of Partners and Principals, the Board's Committees on Admissions and on Partner Affairs, and similar entities within PwC.  These records likely contain contemporaneous information about the policies and practices concerning partner consideration, the qualifications that the Board was seeking in partner candidates, and may also contain direct evidence regarding bias against older candidates.  These entities did not meet often, and plaintiff's narrow temporal scope renders these requests reasonable and not overbroad.

prejudice to later seeking broader discovery if warranted.[7]  As we noted in Plaintiff's

initial motion, however, firm-wide discovery would be warranted here, because the

policy which excludes anyone age 60 or older from partnership is firm-wide.  In fact, it is

anchored in the firm's governing instrument -- the Partners and Principles Agreement.

PwC's suggestion that any discrimination at work here originated with Robert Bench, and

that discovery must therefore be limited to his RAS unit, is unavailing.  For this reason,

Murphy's case closely resembles the situation in <u>Waters,</u> in which Magistrate Judge

Facciola rejected the same argument PwC employs here:

> To permit discovery only of a single decision-maker's prior
> decisions so atomizes the organization that it ignores the
> possibility that isolated decisions are the result of an organizational
> culture or ethos that encourages or condones discriminatory
> behavior. What may superficially appear to be decisions made by
> individual decision-makers may, when linked together, form what
> the courts call a "pattern or practice" of treating people of a certain
> protected class in a certain way. <u>Thus, to say, that only the acts of
> the decision-maker who made the decision in plaintiff's case are
> discoverable takes as established what has never been proven, that
> this decision-maker acted in splendid isolation without the
> possibility of being influenced by anyone else in the organization</u>.

<u>Waters v. United States Capitol Police Bd.</u>, 216 F.R.D. 153, 158 (D.D.C. 2003)

(emphasis supplied).

    In sum, there is no reason to conclude at this juncture that Bob Bench acted in

"splendid isolation," and every basis to believe that the reason he did not sponsor

Westbrook Murphy for partnership is because Murphy was already too old under the

Firm's existing policies.  PwC's argument that Bench alone is responsible for Murphy's

non-admission, and that discovery can be targeted only at Bench, is unavailing.

---

[7]  This limitation would apply to Case 2 Interrogatories 4, 5 and 17 (but not 6 or 20, as defendant has agreed to provide the information, but has not yet done so).  The limitation would also apply to Document Requests 2-5 and 9-10.

Since this is the only substantive objection PwC has proffered with respect to liability discovery, Plaintiff's Motion to Compel should be granted. PwC should be required to answer the following discovery: Case 1 Document Requests 1, 2, 4, 9-13, 15 and 29 in full; Case 2 Interrogatories 4-6, 17 and 20 and Document Requests 2-11, 17-24 and 27-28 (as limited to Financial Services, see n. 7, above).

### 3. Damages Discovery

Defendant has refused to produce two types of information that is highly relevant to the issue of damages. First, Plaintiff has sought information about the total amount of compensation that partners, who work within FSI and were admitted in relevant years, have earned. This information would be the most reliable indicator of Plaintiff's likely partnership compensation, and thus relevant to his damages if he succeeds in proving that PwC denied him partnership because of his age. Second, Murphy seeks standard information to help determine PwC's financial capacity, relevant to the issue of punitive damages.

### A. Partner Compensation Information

Defendant has provided no information about what other partners have earned. Indeed, even with respect to David Albright and Jeff Lavine, who both worked within RAS, PwC has provided none of the requested information. There is no basis for defendant to continue to withhold discovery regarding the earnings of partners to whom Plaintiff would be similarly situated if he had not been denied admission. This information is unquestionably relevant to the issue of damages, and there is a protective order in place to assuage any concerns about improper use of the information and maintaining privacy.

17

PwC policies reveal that partner compensation varies annually, and depends largely upon the subjective judgments of several partner evaluators (higher in the chain) regarding a particular partner's "responsibility level" and yearly performance.  At the discretion of other "reviewing partners," a particular partner is assigned each year to one of 15 "responsibility levels," which dictates a range of salary, as well as "equity shares" in overall profits.  [See Tab 4, Excerpt of Partner Planning, Evaluation & Reward Handbook (Bates Nos. 8702-4).]  That compensation is further refined by subjective performance appraisals, also delivered annually by a reviewing partner.  [Id. at 8705.]

Given the complexity and subjective nature of the process, and "because it is impossible to recreate the past . . . 'it is only equitable that any resulting uncertainty [as to remedy] be resolved against the party whose action gave rise to the problem.'" McKenzie v. Sawyer, 684 F.2d 62, 77 (D.C. Cir. 1982) (citations omitted).  In these circumstances, Plaintiff is entitled to discover the best information available to try to determine his losses, and here that is information showing the results actually obtained by partners within his line of service, who were admitted during the years at issue in this case.  Defendant's argument that this information has no bearing whatsoever on Plaintiff's likely annual compensation as a partner, is simply wrong.

Finally, the policies reveal that each year, a partner receives a "fact sheet" posted to a partner database called PID, which shows his total annual compensation, responsibility level and current equity interest in the firm. [Tab 5.]  Plaintiff has not sought discovery for each partner firm-wide, but only for those admitted within Financial Services during a relevant time frame.  Defendant could easily assemble this information from the automated PID system.

B. <u>Punitive Damages</u>

Murphy has claims in this case under the D.C. Human Rights Act (DCHRA), which, like Title VII, allows for an award of punitive damages. <u>Arthur Young & Co. v. Sutherland</u>, 631 A.2d 354 (D.C. 1993); <u>Daka v. McCrae</u>, 839 A.2d 682, 694 (D.C. 2003). The issue of a defendant's wealth can become probative to punitive damages under the DCHRA in two ways; first, the plaintiff may (but is not required to) rely on the defendant's wealth as a factor in his case-in-chief on punitive relief. Second, the defendant is permitted to point to a lack of financial capacity as a mitigating measure for any punitive award. But PwC refuses to produce documents plainly relevant to punitive damages, namely tax returns and financial statements for 2003-2005.

In its opposition to plaintiff's motion to compel, defendant raises points regarding punitive damages discovery that are more appropriate for summary judgment, where the Court could rule on PwC's erroneous contention that there are no facts to support a punitive award.[8] PwC's problem is that Judge Leon has already denied summary judgment on Murphy's individual claims in Case 1, and the Court has definitively stated that summary judgment on the material issues in Case 1 is finished. [Memorandum Order and Opinion at 29 (denying summary judgment on DCHRA claims); Compel Tab 3, Tr. 10/18/05 status conf. at 17.] Moreover, Judge Leon has specifically ordered that

---

[8] Indeed, PwC tellingly cites as support for its position cases dealing with summary judgment. <u>Koonce v. Merit Oil Co. of D.C., Inc.</u>, 1991 U.S. Dist. LEXIS 12508, *8 (D.D.C. 1991)(granting defendant's motion for summary judgment on punitive damages and therefore denying plaintiff's motion to compel discovery). <u>See also</u> <u>Hazeldine v. Beverage Media</u>, 1997 U.S. Dist. LEXIS 8971, *5 (S.D.N.Y. 1997) ("Defendants' first argument in opposition to plaintiff's discovery requests is that there is no factual basis for an award of punitive damages. This argument is essentially a request for partial summary judgment on the issue of punitive damages.") Regardless, the discovery had thus far in Case 1 (albeit incomplete) and the summary judgment filings describe circumstances sufficient to support a potential punitive damages award, such as PwC's failure to promote Murphy to partner (and instead proposing him for Managing Director) at a time when the head of RAS was notifying those higher up the chain that RAS needed partners.

damages discovery and liability discovery will not be bifurcated. [Jan. 9, 2006 minute

order.] This includes discovery on punitive damages as well.

In this Circuit, an award of punitive damages should be related to the defendant's

ability to pay. <u>Hutchinson v. Stuckey</u>, 952 F.2d 1418, 1422 n.4 (D.C. Cir. 1992).

However, as the Seventh Circuit has noted, net worth does not necessarily tell the correct

story, <u>Mathias v. Accor Econ. Lodging</u>, 347 F.3d 672, 677-678 (7th Cir. 2003),[9] and

Murphy should be permitted to obtain broader information than simply the company's

"net worth." And since either Plaintiff or PwC may invoke the issue of the firm's wealth

at trial, plaintiff has the right to engage in discovery to prepare for this issue. If, down

the road, the parties wish to attempt to craft a stipulation on this issue for trial purposes,

that is a future possibility which does not preclude plaintiff's exploration of the issue

during discovery. Indeed, discovery on this point now may streamline the issue for trial

purposes.

After first denying that it must produce any financial information, PwC next

claims that net worth data is all that it must produce, and wrongly implies that <u>Daka</u>

stands for the proposition that a defendant is <u>only</u> required to reveal its net worth. [Opp.

at 36.] <u>Daka</u> does not stand for that proposition; but merely addressed whether the

plaintiff there had sufficiently proven net worth at trial. [<u>Daka</u>, 839 A.2d at 695.]

Indeed, in another case against the same defendant, <u>Daka v. Breiner</u>, 711 A.2d 86, 100

(D.C. 1998), the punitive award was based upon the defendant's "income," not "net

worth." But in any event, for present purposes the point is that since the defendant's

---

[9] "'[N]et worth' is not the correct measure of a corporation's resources. It is an accounting artifact that reflects the allocation of ownership between equity and debt claimants. A firm financed largely by equity investors has a large 'net worth' (= the value of the equity claims), while the identical firm financed largely by debt may have only a small net worth because accountants treat debt as a liability." <u>Id</u>. at 677-78.

wealth is relevant to punitive relief, <u>Chatman v. Lawlor</u>, 831 A.2d 395, 404 n.13 (D.C. 2003), Murphy is not obligated merely to accept whatever figure PwC would like the jury to hear.  He is entitled to explore this issue through discovery and to test the veracity of any such assertion by PwC.

PwC's attempt to defer discovery yet again -- this time on punitive damages -- should similarly be unavailing.  As noted above, Judge Leon has expressly ordered that damages discovery will be taken concurrent with all other discovery in the case.  Plaintiff is entitled to information relevant to punitive damages now, and he is not required to wait until some later point in the proceedings.

Lastly, the requested materials are relevant in this case not just to punitive damages, but also to the <u>Clackamas</u> issues (such as information relating to the operation of the partnership and the distribution of assets and liabilities).  Defendant should produce the requested financial information.

### 4. <u>Owner/Employee Discovery</u>

PwC agrees that discovery on this issue is appropriate, and says that there is "no basis or need" for Murphy's motion to compel.  Defendant's comments are reassuring.  However -- more than four months after Murphy served these requests by hand -- PwC still has not remotely provided all responsive information.

Moreover, defendant apparently believes that it should be able to unilaterally decide which of the requests it will answer, and which to ignore.  PwC warns that its "willingness to voluntarily provide reasonable additional discovery on the <u>Clackamas</u> issue is not without limits," and complains that a resolution of the issue "does not turn on the degree or detail Murphy appears to be seeking."  [Opposition at 38.]  But Murphy's

requests target precisely the sort of information that the Supreme Court in <u>Clackamas</u> deemed to be dispositive.

For example, the very first factor the Supreme Court identified was "(1) whether the organization could hire or fire the individual or set the rules and regulations of the individual's work." <u>Clackamas Gastroenterology Assocs., P.C. v. Wells</u>, 538 U.S. 440, 449 (2003). At PwC, the term for firing a partner is "involuntary withdrawal" from the partnership, and in both Case 1 and 2, Murphy asked PwC to produce information about involuntary withdrawals during relevant years. [<u>See</u> Case 1 Document Request 14; Case 2 Request 25.] PwC objects to these requests as "irrelevant," and to date, has provided no responsive information.

Similarly, the interrogatories and document requests asking PwC to describe its policies and practices regarding matters such as restrictions on a partner's ability to engage business, what fees she will charge, how partners are evaluated, how they account for their time, where partners are assigned to work, and what leave and travel policies pertain to partners, etc., are all directly related to the degree of control that the firm exercises over partners.

As the Court emphasized in <u>Clackamas</u>, even the factors identified by the EEOC are not "exhaustive" and the issue "cannot be decided in every case by a shorthand formula or magic phrase." Rather,

> As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed. The mere fact that a person has a particular title -- such as partner, director, or vice president -- should not necessarily be used to determine whether he or she is an employee or a proprietor. See *ibid.* ("An individual's title . . . does not determine whether the individual is a partner,

officer, member of a board of directors, or major shareholder, as opposed to an employee"). Nor should the mere existence of a document styled "employment agreement" lead inexorably to the conclusion that either party is an employee. See *ibid.* (looking to whether "the parties intended that the individual be an employee, as expressed in written agreements or contracts"). Rather, as was true in applying common law rules to the independent-contractor-versus-employee issue confronted in *Darden*, the answer to whether a shareholder-director is an employee depends on "'all of the incidents of the relationship . . . with no one factor being decisive.

Clackamas, 538 U.S. at 451 (emphasis supplied).

Thus, the discovery that Plaintiff has propounded does not dwell, as defendant wrongly suggests, in "minutia," but seeks details of the relationship between the firm and "partners" that are critical to inquiry of whether most partners at PwC are truly owners of the firm or are more like employees, subject to considerable control.

As we noted above, it appears that defendant can answer many of the interrogatories and document requests on the Clackamas issue by simply printing out copies of existing policies. For other requests, such as producing information about partners who have been "involuntarily withdrawn" from the firm, or providing minutes of various governing boards and committees, a policy response will not suffice, and PwC must produce historical information in its files. The fact that PwC may actually need to search for responsive records does not provide it license to simply refuse to respond. Defendant has had four months to compile the information that will be dispositive of the "owner/employee" question, an issue which defendant appears ready to make the center-piece of yet another motion for summary judgment. It is time for PwC to fully answer these requests.

Accordingly, the Court should order defendant to provide complete answers and responsive records to the following: Case 1 Interrogatories 2-3 & 5-12 and Document

Requests 13, 14 & 16-22, and Case 2 Interrogatories 3, 7-16 & 19 and Document Requests 25, 26, 29-42 & 52.

## **CONCLUSION**

There is nothing remarkable or burdensome about the discovery which Plaintiff seeks.  All of it is relevant to his claims, and much of it can be produced by defendant simply printing out information already contained in various databases.  We are now four months into a contemplated seven-month discovery schedule, it is time for PwC to fully respond to written discovery, so that the parties can move forward to depositions and complete discovery on time.

Plaintiff thus asks for an Order compelling PwC to fully answer the outstanding discovery within ten days.  Plaintiff has attached an appropriate proposed order, which specifies the discovery which remains to be answered.

_____/s/_____

Richard A. Salzman 422497
Douglas B. Huron  89326
Tammany M. Kramer  483146
HELLER, HURON, CHERTKOF
LERNER, SIMON & SALZMAN
1730 M Street, NW   Suite 412
Washington, DC  20036
(202) 293-8090
fax:  (202) 293-7110

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
C. WESTBROOK MURPHY,                    )
                                        )
                                        )
            Plaintiff                   )
                                        )   Civil Action Nos. 05-1054 (RJL/DAR)
        v.                              )                     02-982 (RJL/DAR)
                                        )
PRICEWATERHOUSECOOPERS, LLP,            )
                                        )
                                        )
            Defendant.                  )
_____       )


## ORDER


     Plaintiff Murphy's Motion to Compel is hereby GRANTED.  Within ten (10) calendar days from entry of this Order, defendant shall provide full and complete responses to the following of Plaintiff's discovery requests:

     1.)    For Case No. 02-982 ("Case 1"), defendant shall respond in full to *Interrogatories 1-14* and shall produce all responsive records for *Document Requests 1-27 and 29-31.*

     2.)    For Case No. 05-1054 ("Case 2"), defendant shall respond in full to *Interrogatories 1, 3, 6-16 and 18-21* and shall produce all responsive records for *Document Requests 6-8, 11-22, 24-42 and 44-52.*

     3.)    For Case No. 05-1054 ("Case 2"), defendant shall respond with all responsive information and documents relating to PwC employees, partners and principals within Financial Services (FSI) for *Interrogatories 4, 5 and 17* and *Document Requests 2-5 and 9-10.*

Defendant shall provide formal written responses to all discovery covered by Nos. 1-3 above.  For each interrogatory to which defendant responds by reference to documents, defendant shall identify by Bates numbers the specific responsive documents separately for each such interrogatory response, as required by Fed. R. Civ. P. 33(d). This applies as well to all documents already produced by defendant to the plaintiff in response to specific interrogatories.  For all interrogatories, including those defendant responds to by reference to documents, defendant shall provide a sworn verification for each response.

SO ORDERED.

_____
Date

_____
UNITED STATES MAGISTRATE JUDGE