# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

JUDITH BARNETT,                          )
                                         )
      Plaintiff,                 )
                                         )
v.                                       )     Civil Action No. 04-1245 (RWR)/(AK)
                                         )
PA CONSULTING GROUP, INC.,               )
                                         )
      Defendant.                 )
_____  )

## MEMORANDUM ORDER

      Pending before this Court are Plaintiff's Motion to Compel ("Mot.") [15], Defendant's

Opposition ("Opp'n") [18], Plaintiff's Reply [21], and the Defendant's Sur-Reply. Plaintiff

seeks to compel the Defendant, PA Consulting Group, Inc. ("PA") to serve full and complete

responses to her interrogatories and document requests.[1] PA contends that Plaintiff's requests

are largely irrelevant and overly broad and in some cases would impose an undue burden on the

Defendant. Plaintiff also challenged approximately 50 documents that Defendant withheld as

attorney-client privilege or work product, alleging that Defendant improperly funneled the

disputed documents through Defendant's general counsel's office to shield them from discovery.

The Court reviewed the documents *in camera*. For the reasons set forth below, Plaintiff's

Motion to Compel is hereby GRANTED in part and DENIED in part.

---

      [1]Specifically, Plaintiff seeks to compel Defendant to provide full and complete responses
to Interrogatories Nos. 1-6, 9-13 and 16-17, and Document Requests Nos. 2, 4-8, 10-16, and 18-
19. (Mot. at 4-9.)

**Background**

From October 2000 to November 2003, Plaintiff Judith Barnett worked as a Management Consultant in PA's Transportation Practice. PA is organized as a partnership and the position of Management Consultant is immediately below that of Partner. (Mot. at 2.) In November of 2003, PA merged its Transportation Practice into its Information Technology Infrastructure ("ITI") Practice, thereby eliminating several positions including Plaintiff's. (Opp'n at 3.) Plaintiff asserts that PA discriminated against her in its Reduction in Force ("RIF") based on her age and her gender. (Mot. at 2.) She was 57 at the time. (*Id.*) According to the Plaintiff, PA eliminated her position despite the fact that she was the second highest revenue producer in the Transportation Practice, (Am. Comp. ¶ 16), and had received outstanding performance reviews, the latest of which noted that she was "making progress to partner level," (Mot. at 5.) Plaintiff subsequently sued PA, alleging sex discrimination in violation of the D.C. Human Rights Act ("DCHRA") and age discrimination in violation of the DCHRA and the federal Age Discrimination in Employment Act ("ADEA"). (Am. Compl. ¶¶ 20-26.)

Plaintiff claims that the RIF disproportionally affected women and older professional employees without justification. According to Plaintiff, PA terminated six of the seven women in the Transportation Practice, as well as the three oldest Managing Consultants and the oldest Principal Consultant. (Reply at 2.) Plaintiff also claims that women do not have a fair opportunity to become Partner at PA, and that PA has "accorded preference to young men" since its founding. (Am. Compl. ¶ 17.) According to Plaintiff, only five of 179 Partners are women. (*Id.*)

Defendant disputes that Plaintiff's age or gender were a factor in its decision to eliminate

2

Plaintiff's position. Defendant claims that "a significant downturn and substantial financial setbacks" in PA's Transportation Practice after the events of September 11, 2001 led PA to reorganize the Practice by "narrowing its focus and eliminating 'non-core' services." (Opp'n at 3.) PA essentially dissolved the Transportation Practice and integrated the remaining employees into the ITI Practice based in London, England. (*Id.*)

In her Motion to Compel, Plaintiff seeks a variety of information about PA Consulting and its Transportation and ITI Practices, including PA's corporate status, the total number of partners and female partners in PA, personnel information for employees in the Transportation and ITI Groups, age and/or sex discrimination complaints filed against PA and information about other reorganizations or RIFs within PA. Defendant argues that the information Plaintiff seeks is largely irrelevant to both the substance and time frame of her age and gender discrimination claims. As a general matter, Defendant objects to any interrogatories and document requests that seek discovery outside the Transportation Practice. Defendant also objects to those requests that seek information beyond 2003, the year of Plaintiff's termination. Accordingly, Defendant limited its discovery production to information related to PA's Transportation Practice, the year 2003, and any additional documents considered or reviewed by Mr. Patrick Kelly, the ITI Partner in charge of the RIF and the individual who, according to Defendant, was solely responsible for the decision to eliminate Plaintiff's position. (Opp'n at 4-5.) In addition to its overarching relevance objections to scope and time frame, the Defendant also makes several specific objections to individual interrogatories and document requests.

3

## **Analysis**

I.    *Plaintiff's Interrogatories and Document Requests*

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the

claim or defense of any party." Fed. R. Civ. P. 26(b)(1). Relevant information need not be

admissible at trial if the discovery appears reasonably calculated to lead to the discovery of

admissible evidence. *Id.* Once a relevancy objection has been raised, the party seeking discovery

must demonstrate that the information sought is discoverable. *See Alexander v. FBI*, 194 F.R.D.

316, 325 (D.D.C. 2000). Relevancy is broadly construed, but may be limited in both substantive

scope and time in order to avoid overly broad and unduly burdensome requests. *See Glenn v.*

*Williams*, 209 F.R.D 279, 281 (D.D.C. 2002). If there is an objection based on undue burden, the

objecting party "bears the burden of showing why discovery should be denied." *Ellsworth*

*Assocs., Inc. v. United States*, 917 F. Supp. 841, 845 (D.D.C. 1996).

A.    Discovery Outside the Transportation Practice

Defendant argues that the Plaintiff's termination was the result of a RIF that took place in

an unprofitable unit, by a single decision-maker, Mr. Patrick Kelly, the senior partner in the ITI

Practice. (Opp'n at 1.) Therefore, according to the Defendant, any discovery requests should be

limited to the Transportation Practice, plus any additional documents reviewed and relied on by

Kelly in his decision to terminate Plaintiff's employment. (*Id.* at 8.) At most, Defendant is

willing to expand discovery to include the ITI Practice, which absorbed the Transportation

Practice.[2] (*Id.*)

---

[2]Defendant seeks to bolster its claim that information outside the Transportation Practice
is not relevant to Plaintiff's discrimination claim by characterizing these requests as seeking
discovery from corporate entities totally unrelated to the actual named Defendant. Plaintiff

The scope of discovery in employment discrimination cases is generally limited to those

employment units in which the employees are similarly situated to the plaintiff. *See, e.g., Glenn*

*v. Williams*, 209 F.R.D. 279, 280-81 (D.D.C. 2002) (denying request for agency-wide discovery

when alleged discriminatory acts were limited to the specific divisions in which plaintiffs

worked); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th

Cir. 2003) (noting appropriateness of limiting discovery to similarly situated employees, relevant

departments and decision-makers). In cases involving a RIF, whether discovery will be limited

---

describes "PA Consulting Group, Inc." as an international company headquartered in London,
England with 179 Partners and a Transportation Practice in Washington, DC. (Am. Compl. at ¶¶
3, 8, 17.) According to the Defendant, however, "PA Consulting Group, Inc." is not an
international company at all, but rather is a New Jersey corporation with "a current roster of 37
employees" and its principal office in Washington, DC. (Opp'n at 2.) According to the
Defendant, the Transportation Practice that employed Plaintiff was a part of the New Jersey-
based "PA Consulting Group, Inc." (*Id.*) Defendant claims that the "international" company
referred to by the Plaintiff is actually PA's parent company, PA Holdings LTD, doing business as
("d/b/a") PA Consulting Group. (*Id.* at 2-3.) According to Defendant, PA Holdings LTD, d/b/a
PA Consulting Group, has over 75 individual incorporated companies and divisions in over 35
countries and over 3,000 employees worldwide. (*Id.*)

Even if the named Defendant is the New Jersey corporation, the Court questions whether
various PA Consulting corporate entities are as unrelated as Defendant claims. According to the
Defendant, "PA [Holdings LTD] and its affiliates are run much like a law firm with insular
divisions and practice groups that, in some cases, may span multiple corporate entities." (Opp'n
at 2.) Furthermore, even though the ITI Practice was not part of the New Jersey Corporation, but
was a different PA Consulting affiliate also based in London, England, (*id.* at 6 n.1), it appears
that the decision to eliminate the Transportation Practice and integrate its remaining employees
into the ITI Practice was made by top executives of PA Consulting, a.k.a. PA Holdings LTD,
(Reply at 3-4). Ultimately, however, an exhaustive assessment of the relationships among PA's
various corporate entities is not necessary for purposes of deciding Plaintiff's Motion because
Plaintiff has provided evidence that high-level PA executives in London in fact exercised
significant control over the RIF and may have participated directly in the decision to terminate
Plaintiff. (Reply at 5-7; Sur-Reply at 1.)

Therefore, for purposes of discovery, and until the evidence demonstrates otherwise, the
Court will use the term "PA," "PA Consulting" or "PA Consulting Group" to refer to the entity
that is headquartered in London, England, with approximately 3,000 employees worldwide. The
Court expresses no opinion, however, on the question of which corporate entity will ultimately
be determined to be the real party in interest.

to the plaintiff's employment unit depends largely on who exercises control over the planning

and implementation of the RIF.  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1084 (11th

Cir. 1990) (denying request for nationwide discovery because termination decisions were made

locally).   Even if the decision to initiate a RIF is made at a national or corporate-wide level, the

discovery can be limited to the employing unit if the unit exercised "considerable autonomy" in

planning and implementing the RIF.  *Id.* at 281-82.

Defendant devotes considerable time to arguing that Kelly was the sole decision-maker

involved in the RIF that eliminated Plaintiff's position.  (Opp'n at 6-8.)  Thus, according to

Defendant, the only employees similarly situated to the Plaintiff are those individuals also

employed by the Transportation Practice in 2003 and any discovery outside the Transportation

Practice is irrelevant to Plaintiff's claim.  (*Id.* at 7-8.)  However, the Plaintiff has provided

evidence showing that "a high level team of executives" including PA's CEO Jon Moynihan and

its CFO Bruce Tindale exercised considerable control over the implementation of the RIF.

(Reply at 1.)   Emails from the months leading up to the RIF indicate that Moynihan and Tindale

were part of a core group of a few high level executives who reviewed the Transportation

Practice and discussed which individual employees to let go.  (*See* Reply at 5-7; *Id.*, Exs. 3-6.)

Where, as here, there is reason to believe that the challenged employment action was initiated

from the senior executive level, not the local level, the rationale for limiting discovery to the

"employing unit" no longer applies.  *See Earley*, 907 F.2d at 1084 (looking to "source of

complained of discrimination" for purposes of setting scope of discovery).

Defendant claims that Plaintiff has mis-interpreted the email traffic and that Kelly's

declaration that he was the sole decision-maker in the case suffices to end any discussion of the

6

matter. (Sur-Reply at 3.)  The Court disagrees.  "Generally speaking, 'relevance' for discovery

purposes is broadly construed."  *Food Lion, Inc. v. United & Commercial Food Workers Int'l*

*Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997).  Given the evidence that high level PA executives

were involved in identifying at least some of the individuals to be "RIF-ed," Plaintiff is entitled

to explore the role these individuals played in the RIF of her position.  In fact, even if Kelly was

the sole decision-maker, discovery outside the Transportation Practice would not necessarily be

irrelevant.  "It is well established that statistical data and comparative information concerning an

employer's treatment of [other employees] is relevant evidence in an individual discrimination

claim against that employer." *Minority Employees at NASA (MEAN) v. Beggs*, 723 F.2d 958, 962

(D.C. Cir. 1983).  That the employees about whom comparative information is sought must be

sufficiently similarly situated to make a comparison useful, *Balderston,* 328 F.3d at 320, does not

automatically translate into a *per se* rule limiting discovery to the division or unit in which the

employee works, *see Waters v. U.S. Capitol Police Bd.*, 216 F.R.D. 153, 158 (D.D.C. 2003) ("to

permit discovery only of a single decision-maker's prior decisions so atomizes the organization

that it ignores the possibility that isolated decisions are the result of an organizational culture or

ethos that encourages or condones discriminatory behavior"); *Hollander v. Am. Cyanamid Co.*,

895 F.2d 80, 84-85 (2d Cir. 1990) (noting relevance of company-wide practices to an individual

case).

Unquestionably, Plaintiff is similarly situated to employees and former employees in the

Transportation Practice.  However, she is also similarly situated to other PA employees with

similar levels of authority and responsibility.  Plaintiff held a high-level management position,

Managing Consultant, the position immediately below that of Partner. (Mot. at 2.)  Plaintiff

7

asserts that her goal was to become a Partner at PA and her latest evaluation indicated she was

"making progress to partner level." (*Id.*)   PA's treatment of other women and older employees

who were similarly on the cusp of partnership is relevant to Plaintiff's claim of age and gender

discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 233 (1989) (noting relevance of

evidence that only 7 of 662 partners were women in suit by female employee alleging

discrimination in company's failure to promote to partnership).   Thus, Defendant's insistence

that discovery be confined to the Transportation Practice is unwarranted.   More specific

relevance objections will be addressed by individual interrogatory or document request.

B.      Time Frame

Defendant also challenges the span of time for which Plaintiff has requested information.

Defendant generally objects to any requests outside of 2003, the year of the RIF.[3]   (Opp'n at 10-

18.)   The vast majority of Plaintiff's requests covered a five-year period: three years prior to her

termination and one year after her termination. Four years is generally considered a reasonable

amount of time for discovery in employment discrimination cases. *See Riordan v. Kempniers*,

831 F.2d 690, 698-99 (7th Cir. 1987); *see also Glenn*, 209 F.R.D. at 282 (limiting discovery to a

three year period); *Waters*, 216 F.R.D. at 158-59 (permitting discovery covering a seven year

time span, in light of fact that agency was "relatively small and self-contained"); *Marshall v.*

*D.C. Water & Sewage Auth.*, 214 F.R.D. 23, 26 (D.D.C. 2003) (approving discovery request

covering a five year period).   Defendant's refusal to provide any information beyond 2003 is

therefore unreasonable.   Specific objections to the time-frame of individual interrogatories and

---

[3]For Interrogatories 12 & 13 and Document Requests 15 & 16, which seek information related to other complaints of sex and age discrimination lodged against PA, Defendant has agreed to expand its responses to include the years 2001 and 2002. (Opp'n at 14, 19.)

document requests will be taken in turn.

        C.      Specific Interrogatories and Document Requests

             1.      Interrogatory No. 1

Interrogatory No. 1 asks PA to fully describe its corporate status, including all parent and/or subsidiary entities.  For each entity, Plaintiff seeks the number of employees and the identity of all directors and/or officers.  Basic information about PA's corporate status, which implicates its capacity to be sued and its status as an employer is relevant to Plaintiff's claim. Information about PA's corporate status is particularly relevant in this case, as there appears to be serious questions regarding the control exercised by "PA Holdings, LTD," the alleged parent company, over the decision to eliminate Plaintiff's position.   Defendant shall fully respond to Interrogatory No. 1.

             2.      Interrogatory No. 2.

Interrogatory No. 2 sought the identity of each person employed in PA's Transportation Practice from January 1, 2000 to the present.   Plaintiff subsequently amended its request to end by Dec. 31, 2004.  For each employee, Plaintiff sought the person's date of birth, gender, date of hire, termination date (if applicable), title and yearly salary.  Defendant objected to the time frame requested by Plaintiff.  Defendant also initially objected to providing salary information, (Mot., Attachment 3 at 3), but apparently subsequently provided salary information for employees working in the Transportation Group in 2003, (Opp'n at 11).  As explained above, information about PA's treatment of employees who worked in the Transportation Practice prior to Plaintiff's separation from PA may well be relevant to Plaintiff's claim of sex and/or gender discrimination. *See Minority Employees at NASA (MEAN),* 723 F.2d at 962.  Moreover, five

years is an appropriate time frame, particularly considering the relatively small size of the Transportation Practice.  Defendant shall fully respond to Interrogatory No. 2.

       3.      Interrogatory No. 3

Interrogatory No. 3 seeks the same information as in No. 2, but for the ITI Practice. Defendant initially objected, arguing that because Plaintiff never worked in the ITI Practice she is not similarly situated to any of its employees.  (Mot., Attach. 3 at 6.)  Defendant subsequently offered to provide "demographic information for the ITI practice for an appropriate period of time."  (Opp'n at 12.)  The Court believes that information about employees in the ITI Practice is relevant to Plaintiff's claims or, alternatively, may lead to the discovery of relevant, admissible evidence.

The Transportation Practice was merged into the ITI Practice.  Defendant asserts that Plaintiff's position was eliminated because her expertise in Middle Eastern and North African trade consulting did not fit within the Transportation Practice's "core" services and activities, primarily airline consulting.  (Opp'n at 3.)   If, in fact, Plaintiff's expertise would have fit within the services and activities of the newly constituted ITI Practice, such information would be highly relevant to Plaintiff's claim that Defendant's articulated rationale was pretextual. However, due to the significantly larger size of the ITI Practice, the five-year time span requested by the Plaintiff would unduly burden Defendant.  Instead, Defendant is ordered to fully respond to Interrogatory No. 3, but limited to the years 2002, 2003 and 2004.

       4.      Interrogatories Nos. 4 & 5

Interrogatory No. 4 asks Defendant to "specify the total number of PA partners" both worldwide and in the United States, as well as the number of female partners worldwide and in

the United States, beginning Jan. 1, 2000 and ending December 31, 2004.  Interrogatory No. 5

seeks personnel information about the same partners, including name, date of birth, gender, date

he or she became a partner, area of practice and total yearly compensation.  Defendant refused to

provide any information about partners outside of the Transportation Practice, in which there was

only one. (Mot., Attach. 3 at 7.)   As noted previously, given Plaintiff's position as a Managing

Consultant who was "making progress to partner level," (Mot. at 2), information about the

number of partners and female partners in PA is highly relevant to Plaintiff's claim of sex

discrimination.  Indeed, Plaintiff alleges that only five of PA's 179 partners are women. (Reply at

14 n.8.)

    Additionally, some demographic and salary information about PA partners is also

relevant to Plaintiff's claims of age and gender discrimination.  Specifically, the name, age,

gender and compensation of PA partners is relevant to or likely to lead to the discovery of

relevant admissible evidence related to Plaintiff's claims of age and gender discrimination.

Compensation data is also relevant for the additional purpose of calculating damages.  The Court

does not believe, however, that PA partners' "area of practice" is relevant or likely to lead to the

discovery of relevant admissible evidence.  There is no allegation that PA, either in its RIF or in

other employment practices, funnels women or older employees into particular practice areas or

otherwise discriminates in a way that would disparately impact particular practice areas.  *See*

*EEOC v. D.C. Public Schools*, 217 F.R.D. 12, 13-15 (D.D.C. 2003).  Defendant is ordered to

fully comply with Interrogatory No. 4.  Defendant shall also fully respond to Interrogatory No. 5,

except that Defendant shall not be required to provide information regarding partners' area of

practice.

5.      Interrogatory No. 6

Interrogatory No. 6 asked Defendant to identify by name every woman who has ever been a partner at PA.  Defendant objects to this particular Interrogatory largely on the basis that it has "no temporal limit."  (Opp'n at 12.)  The list of female partners is short.  According to Plaintiff, it numbers in the single digits. (Reply at 14 n.8.)  Defendant does not appear to dispute this assertion.  Therefore, the lack of a "temporal limit" in no way burdens the Defendant.  Defendant shall fully respond to Interrogatory No. 6.

6.      Interrogatory No. 9/Document Requests Nos. 2 & 14

Interrogatory No. 9 asked Defendant to identify each PA employee whose job had been abolished through a RIF or other reorganization since January 1, 2002, and to state whether that individual was separated from employment or was offered another position within PA.   For each individual, Plaintiff sought his or her date of birth, gender, date of hire, termination date, title, and yearly salary.  Document Request No. 2 requested documents relating to any RIFs that took place in 2003, and the factors and criteria used to implement the RIF.  Document Request No. 14 was only slightly different, asking for documents related to PA policies regarding RIFs or reorganizations. Defendant objected to the requests as overly broad and irrelevant to the narrow claims that Plaintiff was discriminated against in a RIF for which Kelly was the sole decision maker.  As discussed above, Plaintiff has provided significant evidence indicating that Kelly may not have been the sole decision maker.   Defendant's objection on the basis of relevance is therefore without merit.

Defendant also objects to this particular Interrogatory on the grounds that it is unduly burdensome and would require PA to produce files for "potentially dozens or hundreds [of] other

employees 'RIF'ed' worldwide." (Opp'n at 9.) To alleviate the burden on Defendant, the Court

will narrow the scope of Interrogatory No. 9 to tie it more closely to the actual decision makers in

Plaintiff's case. Evidence submitted by Plaintiff (primarily email traffic among senior PA

executives) indicates that the following individuals may have been involved in making decisions

about which Transportation Practice employees to fire and which to retain: CEO John Moynihan,

CFO Bruce Tindale, Jim Miller, Ken Rubin, Patrick Kelly, Jon Kanter and Carl Potter. (See

Reply, Attachments 4 & 5.) Therefore, Defendant shall fully respond to Interrogatory No. 9 for

any employee whose job was abolished by a RIF in which any of the above-listed individuals

were substantially involved. By substantially involved, the Court means involvement in the

actual implementation of a RIF similar to the level of involvement indicated by the email traffic

attached to Plaintiff's Reply; substantially involved includes participation in a working group

that suggests or identifies particular employees or categories of employees to let go

      With respect to Document Requests Nos. 2 & 14, Defendant's objection that the

reference to any document that "evidences, refers to or reflects" any PA corporate reorganization

and/or reduction in force or policies about RIFs is vague and over broad is well taken. Such a

broad description would likely include numerous documents that make some minor reference to a

reorganization but that in fact have nothing to do with the factors or criteria PA used to conduct

the reorganization. Therefore, for the 2003 RIF/corporate reorganization of the

Transportation/ITI Practice, as well as any other RIF or corporate reorganization in which CEO

John Moynihan, CFO Bruce Tindale, Jim Miller, Ken Rubin, Patrick Kelly, Jon Kanter and/or

Carl Potter were involved, PA shall provide any documents that describe the standards, criteria or

policy at PA regarding RIFs and implementations of RIFs. *See Jones v. Wash. Metro. Area*

*Transit Auth.*, 205 F.3d 418, 434 (D.C. Cir. 2000) (finding evidence of violation of agency's own procedures probative of pretext).

       7.      Interrogatories Nos. 10 & 11/Document Requests Nos. 7, 8 & 10-12

Interrogatories Nos. 10 and 11 ask for the total yearly revenue generated by and the total yearly billable hours and/or utilization rate for each Transportation Practice employee since 2000 respectively. Document Request Nos. 7, 8 & 10-12 seek related documents about Transportation Practice employees' performance and reviews. Defendant objected to providing any information about employees' performance records beyond 2003, but claims that it did provide records for 2003, at least "as [those records] were considered in the RIF decisions." (Opp'n at 13.) Plaintiff, however, asserts that Defendant has not in fact provided the requested information, even for 2003. According to the Plaintiff, Defendant has refused to provide any "performance appraisals, customer survey results, underlying revenues records, utilization records, position descriptions, disciplinary records or pay records for any Transportation employees" other than Plaintiff herself. (Reply at 13.)

The Court need not reconcile this particular factual dispute in order to rule on the motion. However, the Court notes that Defendant's careful use of the phrase "as considered in the RIF decisions," (Opp'n at 13), raises the possibility that Defendant did not in fact provide any of the requested information for individual Transportation Practice employees, even for those employees who were employed in the Transportation Practice in 2003 and thus potentially considered for the RIF. Defendant previously asserted that Kelly "based his decisions on specific reports of 2003 profitability, performance, and employee area of expertise . . . . [and] did not review historical employee performance data or personnel files." (Opp'n at 3-4.)

For reasons already fully described herein, Defendant's objection is without merit. If any employees are similarly situated to the Plaintiff, it is the employees of the Transportation Practice at the time of the RIF. Historical performance data of employees also potentially under consideration to be "RIF-ed" is relevant to Plaintiff's claim of pretext. However, the Court will limit Defendants' production of employees' historical performance data to those individuals employed in the Transportation Practice at some point in 2003, the year of the RIF. Defendant shall fully and completely respond to Interrogatories Nos. 10 and 11 for any individual employed in the Transportation Practice at any point in 2003. For each individual, the Defendant shall produce the responsive information for the time period starting Jan. 1, 2000 and ending Dec. 31, 2003. Subject to the same limitations, Defendant shall respond in full to Document Requests Nos. 7, 8 & 10-12.

8.      Interrogatories Nos. 12 & 13/Document Requests Nos. 15 & 16

Interrogatories Nos. 12 & 13 and Document Requests Nos. 15 & 16 seek information about administrative complaints, lawsuits and other formal internal complaints of age and sex discrimination. For reasons explained above, Defendants shall fully respond, expect that Defendants' response may be limited to those complaints, lawsuits, etc. that allege some form of adverse employment action and that either involve the Transportation Practice, the ITI Practice, PA Holdings LTD or any of the following individuals: John Moynihan, Bruce Tindale, Jim Miller, Ken Rubin, Patrick Kelly, Jon Kanter and/or Carl Potter. Defendant shall produce the responsive information for the time period starting Jan. 1, 2000 to Dec. 31, 2004.

9.      Interrogatories Nos. 16 & 17

Interrogatory No. 16 sought updated contact information for former PA employees with

knowledge of Plaintiff's case. (Mot. at 7.) Interrogatory No. 17 sought information about Defendant's net worth. (*Id.*) Defendant provided the requested information concurrent with its Opposition. (Opp'n at 15.) Plaintiff's Motion is therefore moot with respect to Interrogatories Nos. 16 & 17.

        10.     Document Request No. 4

Document Request No. 4 seeks the personnel files for the approximately 30 employees who worked in the Transportation Practice in 2003. For the reasons explained in Paragraph Seven, above, Defendant's objections are without merit. Defendant shall provide the requested documents, subject to the Protective Order already in place in this case.

        11.     Document Request No. 5

Document Request No. 5 seeks the personnel files for all PA employees terminated via a RIF since January 1, 2003. Defendant objects to the breadth of this request. According to the Defendant, it "has eliminated the positions of roughly 357 individuals in the U.S. alone, including the positions of some 150 regular employees." (Sur-reply at 4.) The Court agrees that collecting personnel files for so many employees would place an undue burden on Defendant. Nor does the Court believe that the Plaintiff has demonstrated a particular need for the type and amount of detailed information found in a personnel file. Plaintiff's motion to compel with respect to Document Request No. 5 is therefore denied.

        12.     Document Request No. 6

Document Request No. 6 requested a copy a document titled "PA's Early History." Defendant states that it has produced this document, therefore Plaintiff's Motion is moot with respect to Request No. 6.

13.	Document Request No. 13

Document Request No. 13 seeks a copy of each PA employee handbook and other documents describing personnel policies and benefits in effect since January 1, 2000.	Defendant provided a copy of the handbook effective for 2003 and noted that Plaintiff would presumably already be in possession of any previous versions, if any.	If there is a previous iteration of the employee handbook, Defendant shall provide it.

14.	Document Requests Nos. 18 & 19

Document Requests Nos. 18 & 19 seek tax returns for PA from 2000 onward as well as PA's most recent financial statement.  Defendant asserts that it concurrently produced the requested information.  (Opp'n at 20.)   The motion is therefore moot with respect to these two document requests.

II.	*Documents Withheld as Privileged or Work Product*

In response to Plaintiff's discovery requests, Defendant submitted a privilege log for 84 documents.  The vast majority of documents listed on the privilege log were copies of emails or email strings. (*See Mot.*, Attach. 3.)  Plaintiff challenged Defendant's claim of privilege for approximately 50 of these email strings.  (Mot. at 10.)  Specifically, Plaintiff challenged those emails on which PA's in-house counsel Simone Denny was listed as a recipient. (*Id.*)   According to Plaintiff, Defendant appeared to be inappropriately "funneling" emails through in-house counsel in order to claim privilege, even when legal advice was not the primary purpose of the communications.  (*Id.*)  Plaintiff requested an *in camera* review of the documents, which the Court granted.  *See* Dkt. No. 34.

The Attorney-Client privilege exists "to encourage full and frank communication between

17

attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  As such,

the privilege "the giving of information to the lawyer to enable him to give sound and informed

advice" as it does to the lawyer's advice itself.  *Id.* at 390.  Communications from a client to an

attorney are considered privileged if

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to
> whom the communication was made is a member of the bar of a court or his
> subordinate and (b) in connection with this communication is acting as a lawyer; (3) the
> communication relates to a fact of which the attorney was informed (a) by his client (b)
> without the presence of strangers (c) for the purpose of securing primarily either (i) an
> opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d)
> not for the purpose of committing a crime or tort; and (4) the privilege has been (a)
> claimed and (b) not waived by the client.

*In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984).

Defendant has also claimed that approximately 14 of the 50 documents challenged by the

Plaintiff are protected by the attorney work product doctrine.  Modern work product doctrine

shields from discovery "documents or tangible things . . . prepared in anticipation of litigation,"

absent a showing that a party has a "substantial need" for the materials and the information

sought is unavailable through other means without undue hardship.  Fed. R. Civ. P. 26(b)(3); *see*

*also Hickman v. Taylor*, 329 U.S. 495, 510-13 (1947); *In re Sealed Case*, 676 F.2d 793, 809-10

(D.C. Cir. 1982).  The materials may be prepared by an attorney or by a party or her or her

representative, but the key requirement is that the documents be prepared "in anticipation of

litigation or for trial."

The work product doctrine also provides significantly greater protection to work product

that reveals an attorney's "mental processes." *Upjohn*, 449 U.S. at 400.  Thus, while a showing

of substantial need will suffice for ordinary work product, i.e., work product that reveals

otherwise "relevant, nonprivileged facts," a party must show "extraordinary justification" to

require disclosure of work product that would reveal "the opinions, judgments, and thought processes of counsel." *In re Sealed Case*, 676 F.2d at 809-10.

       1.      Document No. 2 (Bates Stamped PRIV0003-4)

Document No. 2 is only partially privileged. Document No. 2 is an email string of 3 emails that begins with an email from Annette Wigton to Patrick Kelly and Simone Denny, copied to Mark Thomas, on Oct. 14, 2003 at 16:46 (2:46 p.m.). The second paragraph of this email, which begins on the page Bates Stamped PRIV003 and ends on PRIV004, is privileged. The remaining portions of the email, however, are not privileged. The remainder of the email constitutes Wigton's instructions to Kelly regarding how to proceed with the logistics of the termination of Plaintiff's position.

This type of business conversation between a human resources manager and another employee of PA Consulting, neither of whom are lawyers and which neither seeks legal advice nor communicates information for the purpose of seeking legal advice, is not privileged. *Upjohn*, 449 U.S. at 389-91. Such a conversation does not become privileged by including in-house counsel on the email. *See Neuder*, 194 F.R.D. at 295 ("documents prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged since they are not communications made 'primarily for legal advice'") (*citing Pacamor Bearings*, 918 F. Supp. at 511). The other two emails in the string, both of which begin and end on Bates Stamped PRIV003, appear to be similarly related to the logistics of terminating Plaintiff's employment and do not appear to be related to a request for legal advice.

       2.      Document No. 3 (Bates Stamped PRIV004-5)

Document No. 3 is not privileged. Document No. 3 is an email from Annette Wigton, a

PA Manager in Human Resources, to Patrick Kelly and Simone Denny, copied to Mark Thomas.

The email recounts a conversation between Barnett and Wigton regarding another employee's

practice of law while working at PA, in apparent contravention of PA policy.   Nothing in the

email indicates that it is for the purpose of seeking legal advice.  *See Neuder v. Battelle Pacific*

*Northwest Nat'l Laboratory*, 194 F.R.D. 289, 295 (D.D.C. 2000) (party asserting privilege bears

burden of showing that communications were for purpose of seeking legal advice.)  Indeed, the

entire email simply repeats a conversation between Barnett and Wigton.  A party cannot conceal

a non-privileged communication merely by repeating it to counsel.  *See Upjohn Co. v. United*

*States*, 449 U.S. 383, 396 (1981); *see also Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F.

Supp. 491, 511 (D.N.H. 1996) ("documents which merely communicate information obtained

from independent sources are not protected by the attorney-client privilege") *(citing Smith v.*

*Conway Org., Inc.*, 154 F.R.D. 73, 78 (S.D.N.Y. 1994)).

       3.     Document No. 4

Document No. 4 is same email as the first email in Document No. 2.

       4.     Document No. 5-7, 15-16, 35-36, 42-44, 53-54, 67-68, 73-74, 81

Document No. 5 is an email string that starts on page Bates Stamped PRIV0006 and ends

on PRIV0016.  All the emails in Document No. 5, with the exception of one, are privileged.  The

relevant email is dated Dec. 22, 2003 and Bates Stamped PRIV0008.  It recounts a conversation

between Plaintiff and another former employee of PA Consulting.  Conversations do not become

privileged by virtue of being repeated to counsel.  See discussion in item no. 2 above.

With the exception of one or two additional emails, each of the remaining documents

contain emails that are literally identical to the emails in Document No. 5.[4]  The only emails not

already included in Document No. 5 are two emails in Document No. 6, Bates Stamped

PRIV0017, and an email in Document No. 81, Bates Stamped PRIV0270.  None of these three

emails are privileged, nor, for that matter, do they seem particularly informative.   The email

exchange between Jim Miller and Patrick Kelly on Dec. 17, 2003, Bates Stamped PRIV0017, is

not privileged.  Defendant should provide this page to Plaintiff, with the last email on the page

redacted.  Finally, the email from Jim Miller on Dec. 17, 2003 at 10:45 a.m. to Simone Denny,

Annette Wigton and Mira Aiello, Bates Stamped PRVI-0270, is not privileged.  The email does

nothing more than tell Mira Aiello where Jim Miller may be reached by phone.  Defendant will

provide the page to Plaintiff, with the subsequent email redacted.

     5.      Documents Nos. 10-14, 24, 34, 70-72 & 82

Most of the documents in this group are identical.  Document No. 10 (Bates Stamped

PRIV0032-34) is an email string relating to the transfer of emails related to MARS, Inc. from

Defendant to Plaintiff.  While two paragraphs in one email in the string in Document No. 10 are

protected as work product, the remaining content in this particular email string was not properly

withheld.  The email string begins with an email from MARS, Inc. terminating its relationship

with PA Consulting and instructing PA to deliver all correspondence and files related to work

performed by PA on behalf of MARS, Inc. to Judith Barnett.  (Document No. 10 at Bates

Stamped PRIV0034.)  Plaintiff was copied on the email.  MARS, Inc. was one of Plaintiff's

---

[4]In addition to submitting multiple sets of the same email string at various stages,
Defendant did not even bother to group the related documents by subject matter, forcing the
Court to spend hours determining which documents were related and/or identical and organizing
them accordingly.  The Court urges Defendant to cull out such repetitive material in the future.

major clients. (Mot. at 10.)  It appears that after Barnett's position was terminated, MARS, Inc. decided to continue working directly with Barnett, rather than stay with PA Consulting.  The second email in the string is an email from the Plaintiff to Annette Wigton and Jim Miller notifying them that she would need to take her C drive with her because she had "five years of hundreds of Mars emails, with my others." (Document No. 10, Bates Stamped PRIV0034.) Since Plaintiff was either a recipient or sender of the first two emails, these emails are obviously not privileged.

The remaining emails in the string are a discussion among Annette Wigton, Patrick Kelly, Jim Miller, Diana Poss and Simone Denny about the logistics of giving Plaintiff the MARS emails and electronic files to which she is entitled while also ensuring Plaintiff did not take intellectual property unrelated to MARS and to which she would not be entitled.   The Court does not believe that the communications contained in these emails are primarily for the purpose of legal advice and are therefore not privileged.  *See Upjohn*, 449 U.S. at 394 (communications to corporate counsel must be for the purpose of seeking legal advice).

Although Simone Denny is copied on each email, only one email appears to have been directed to her.  This email, from Annette Wigton on Nov. 11, 2003 at 15:58 (Bates Stamped PRIV0033-34), and Ms. Denny's response on Nov. 11, 2003 at 12:19 p.m. (Bates Stamped PRIV0033) are not privileged.  Annette Wigton's email to Simone Denny merely forwards Plaintiff's email regarding the C drive, and asks Denny for advice on how to respond since Plaintiff's email suggests that her C drive also contains non-MARS information and emails.  In the context of the email string, Wigton's email to Denny appears to request business advice, not legal advice, namely, how, logistically does PA go about separating MARS material from other

22

material belonging to PA.  When communications between corporate in-house counsel and the corporation's employees relate primarily to business advice or management decisions as opposed to legal advice, the communications are not privileged.  *See Boca Investerings P'ship v. United States*, 31 F. Supp. 2d 9, 11 (D.D.C. 1998); *Pacamor Bearings, Inc.*, 918 F. Supp. at 510-11.

Moreover, the facts communicated by Wigton to Denny are not confidential, but essentially repeat the content of Barnett's email to Wigton and Miller.  As noted previously, "'[d]ocuments which merely communicate information obtained from independent sources are not protected by the attorney-client privilege.'" *Id.* at 511 (*citing Smith v. Conway Org., Inc.*, 154 F.R.D. 73, 78 (S.D.N.Y. 1994))  Similarly, Denny's response to Wigton is not protected by attorney client privilege because it does not "rest[] in significant and inseparable part on the client's confidential disclosure." *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1998).  With respect to communications from an attorney to a client, "[t]he attorney-client privilege does not protect an attorney's opinion or advice, but only 'the secrecy of the underlying facts' obtained from the client." *Cobell v. Norton*, 377 F. Supp. 2d 4, 10 (D.D.C. 2005) (*quoting Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 254 (D.C. Cir. 1977).  Thus, the privilege does not apply to a communication from an attorney to a client that rests entirely on information that is not confidential, but simply repeated from other sources.  *See id.* at 10-11.  However, the last two paragraphs of Simone Denny's email are protected as work product.

Although Simone Denny is copied on the remaining emails, the communications do not appear to be directed at her, nor do they seek or convey legal advice.  Rather, the communications in the remaining emails appear to be a discussion of how to handle the logistics of giving Plaintiff the MARS emails to which she is entitled while also protecting PA's

23

intellectual property.  Concerns raised include whether refusing Plaintiff's request for her entire C drive would "set off a 'storm'" and whether it would be logistically feasible to have another employee sit with Plaintiff and go through the emails one by one.  These type of communications among PA's employees, which relate to personnel issues and the logistics of severing a relationship with a client and an employee, do not convey facts for the purpose of seeking legal advice and are therefore not privileged.  *See Boca Investerings P'ship*, 31 F. Supp. 2d at 11. The presence of in-house counsel on the email string does not shield otherwise unprivileged communications.  *See Neuder*, 194 F.R.D. at 293; *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 403 (8th Cir. 1987).

Documents Nos. 12 and 34 are literally identical to Document No. 10, with one minuscule difference between 10 and 12.[5]  Documents 13, 70-72 & 82 are the exact same email string as Document 10, except each is an earlier, shorter iteration.

Document No. 14 (Bates Stamped PRIV0042-44) is partially duplicative of Document No. 10.  The last page appears to be a portion of the same email in Document No. 10 from MARS, Inc. to Jim Miller and Judith Barnett terminating MARS' relationship with PA Consulting.  The remaining pages are not privileged for the same reasons as explained for Document No. 10.

Document No. 24 (Bates Stamped PRVI0064-66) is largely duplicative of Document No. 10.  However, the non-duplicative emails are privileged.

---

[5]One email in the string in Document No. 10 says "fbm," which the Court understands to mean "fine by me."  Document 12 is identical to Document 10 in every respect, except that the email in that particular link in the string says "ok" instead of "fbm."

24

   6.  Documents Nos. 8 & 25

  Documents Nos. 8 and 25 (Bates Stamped PRIV0026-29 & PRIV0067-69 respectively) are largely identical email strings. Both documents seek legal advice and involve discussion of legal strategy and are therefore privileged.

   7.  Documents Nos. 28-30

  Documents Nos. 28-30 are emails relating to PA's preparation of its response to Plaintiff's EEOC charge. The emails in Documents 28 (Bates Stamped PRIV0074-75) and 29 (Bates Stamped PRIV0076-77) are largely duplicative. Document 29 contains the same emails as Document 28, plus two additional emails in the string. The first email in the string, from Annette Wigton to Patrick Kelly, Jim Miller, Simone Denny and Mark Thomas, on April 7, 2004 at 15:22, seeks comments on PA's draft response to the EEOC, which was initially reviewed by Simone Denny.[6] The remaining emails in the string are comments, suggestions and corrections regarding PA's response to the EEOC.

  Given the strong possibility that an EEOC investigation would result in litigation, PA's response to the EEOC and the emails providing edits and comments regarding that response can fairly be said to have been prepared in anticipation of litigation. *See In re Sealed Case*, 146 F.3d 881, 884) (D.C. Cir. 1998) (document is prepared in anticipation of litigation if lawyer has an "objectively reasonable" belief that "litigation was a real possibility"); *see also Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260-62 (3d Cir. 1993) (consultant's report prepared in response to OSHA investigation protected by work product doctrine); *Pacamor Bearings*, 918

---

   [6]The email notes that the draft response is attached, however, the attachment was not provided to the Court. A subsequent version of the draft response to the EEOC was included with Document No. 30.

F. Supp. at 513 (applying work product doctrine to documents prepared in response to agency investigation because investigation "presents more than a remote prospect of future litigation").

Nothing in Document 28 or 29 appears to fall within the attorney client privilege. The emails do contain information relevant to Plaintiff's claims. However, any relevant factual information contained in the emails should be available to the Plaintiff through depositions. Thus, the Court cannot say that the Plaintiff would be unable to obtain the information "without undue hardship." *See Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307-08 (D.C. Cir. 1997) (rejecting government's argument that it had a "substantial need" for attorney work product when government was merely seeking "corroborative evidence"); *see also In re Sealed Case*, 676 F.2d at 809 (party seeking disclosure of attorney work product bears the burden of demonstrating substantial need for the material and inability to obtain the equivalent from another source). Therefore, Documents Nos. 28 and 29 were properly withheld.

Document No. 30 is an email from Annette Wigton to Simone Denny forwarding her an updated version of PA's response to the EEOC charge, with staff's comments incorporated. This document is exempt from disclosure under the attorney work product doctrine.

8.      Documents Nos. 32, 56 & 69

Documents Nos. 32, 56 & 69 are largely identical. Document No. 32 is an email string from Annette Wigton to Simone Denny, Patrick Kelly, Jim Miller, and copied to Mark Thomas, Stuart Mackenzie and Diana Poss. The email seeks legal advice about Plaintiff's request for a 401(k) profit sharing contribution and is therefore privileged.

9.      Documents Nos. 37 & 47-52

Documents Nos. 37 & 47-52 are virtually identical email strings discussing PA's

26

response to Plaintiff's initial letter to PA alleging discrimination and reserving her right to initiate legal action. The emails are properly withheld as work product.

            10.    Document No. 33

Document No. 33 (Bates Stamped PRIV0095-97) appears to consist of three separate and unrelated email strings. The email strings on Bates Stamped PRIV0097 & PRIV0096 relate to emails discussed previously involving the logistics of Plaintiff taking MARS, Inc. files. Nothing in PRIV0097 is privileged and the document was not properly withheld. The last paragraph of the email on PRIV0096 is from Annette Wigton responding to an inquiry from Mark Thomas, an HR representative based in London. The last paragraph (numbered (3) in the email) is privileged because it repeats legal advice from Simone Denny. The remaining portions of the email, however, are not privileged. Defendant shall produce both pages, with the final paragraph of PRIV0096 redacted. Finally, PRIV0095 is properly withheld as privileged and work product.

            11.    Documents No. 38, 55 & 79-80

Document No. 38 (Bates Stamped PRIV0119-0121), Document No. 55 (PRIV0202) Documents Nos. 79-80 (PRIV0268-69) were properly withheld as work product.

            12.    Document No. 58

Document No. 58 (PRIV0216-23) is an email from Jon Kanter to Annette Wigton, neither of whom serve as counsel to PA, forwarding her two excel spreadsheet files containing an analysis of PA employee performance. Neither the email nor the attachments seek nor convey legal advice, nor do they appear to have been created in anticipation of litigation. One attachment lists the name, date of hire, personal sales and utilizations percentages and targets for nearly 200 PA partners and managing consultants across multiple practice areas from 1999

27

through week 49 of 2003.  The second attachment is a 2003 sales and management report for

Transportation Practice employees.  Defendant shall produce the email and attached files.

        SO ORDERED.


Dated: April _17th_, 2006            _____/s/_____

                                       ALAN KAY

                                       UNITED STATES MAGISTRATE JUDGE