UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
C. Westbrook Murphy, *et ano.,*                 )
                    Plaintiffs,                  )
                                                )    Civil Action No. 02-0982 (RJL/DAR)
        v.                                      )
PricewaterhouseCoopers, LLP, *et ano.,*         )
                    Defendants.                  )
_____)
                                                )
C. Westbrook Murphy,                            )
                    Plaintiff,                   )
                                                )    Civil Action No. 05-1054 (RJL/DAR)
        v.                                      )
PricewaterhouseCoopers, LLP                     )
                    Defendant.                   )
_____)

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER BARRING THE DEPOSITION OF DENNIS M. NALLY

### Preliminary Statement

Defendant PricewaterhouseCoopers LLP ("PwC" or the "firm") moves for a protective order, pursuant to Fed.R.Civ.P. 26(b)(2) & (c), with respect to the noticed deposition of Dennis M. Nally ("Nally"), the Chairman and Senior Partner of the firm.

Plaintiff C. Westbrook Murphy ("Murphy") is a recently retired professional employee of PwC, having been employed in the firm's Regulatory Advisory Services ("RAS") unit in the District of Columbia until his voluntary retirement in February 2006. Murphy asserts straightforward non-promotion claims against PwC, complaining in these two related age discrimination actions of his non-admission as a partner in the July 1, 2000, July 1, 2001 and July 1, 2004 annual partner admissions cycles. At a status hearing on October 12, 2006, Murphy's counsel advised the Court (Leon, J.) that Murphy had decided to pursue his claims

individually, and not collectively on behalf of an opt-in class.  This Court previously held that, as

an individual, non-class plaintiff, Murphy cannot pursue his claims on a "pattern or practice"

theory of recovery (Murphy v. PricewaterhouseCoopers LLP, 357 F.Supp.2d 230, 246-47

(D.D.C. 2004).

Murphy has taken extensive discovery.  Notwithstanding his admission that Robert

Bench, the former managing partner of RAS, was the sole decision-maker in not sponsoring

Murphy as a candidate for partner, Murphy has noticed or taken the depositions of fourteen

witnesses from PwC, including nine partners.  (Bench was previously deposed for two days, and

will be deposed for a third day on November 29, 2006.)  In addition, PwC has produced over

20,000 pages of documents to Murphy, and has answered extensive sets of interrogatories

propounded by Murphy.

PwC now seeks protection only with respect to the noticed deposition of Dennis M.

Nally, who currently serves as the Chairman and Senior Partner of PwC, and a member of its

Board of Partners and Principals ("Board" or "Board of Partners").  He was elected to those

positions by votes of the PwC partners, pursuant to the provisions of the firm's Partners and

Principals Agreement ("Partnership Agreement"), and is now serving his second and final term

of office in accordance with the term limits specified in that agreement.  Nally is a member of

the American Institute of Certified Public Accountants and the New York State Society of CPAs,

and maintains his office in New York.

Murphy does not contend that Nally has any personal knowledge of the facts concerning

Murphy's claims.  Nally never worked in the RAS unit, never had any supervisory responsibility

over Murphy, and had no involvement in the decision-making process concerning which

employees in RAS would be sponsored as candidates for partner.  Murphy nonetheless seeks to

depose Nally for half a day on factors relating to the "partner/employee" issue and PwC's retirement provision for partners. However, as detailed below, Nally does not have any unique or superior knowledge of any facts bearing on these points.

Indeed, at his deposition on May 1, 2003, and at his most recent deposition on November 15, 2006, Murphy was unable to identify any pertinent factual matters as to which Nally has personal knowledge that might be unique to him.

Murphy had initially named Nally as an individual defendant, along with some twenty other alleged members of PwC's Board of Partners. Notably, while those claims were dismissed (Murphy, 357 F.Supp.2d at 242-44), Murphy testified that he had named Nally and his fellow Board members as defendants for "psychological effect." Murphy is thus admittedly engaging in the familiar tactic of noticing the deposition of a high-ranking official, who has little or no knowledge of the issues involved in the case, principally for in terrorem impact.

Virtually every court that has addressed the issue has recognized that deposing officials at the highest levels within a defendant organization creates a tremendous potential for abuse and harassment. Mindful of the importance of allowing liberal discovery, courts have nonetheless been wary of attempts to depose such officials, particularly when other means of discovery exist. These courts have routinely issued protective orders shielding high-level officials from deposition where the official does not have unique personal knowledge of facts relevant to the plaintiff's claims, and the plaintiff has failed to exhaust less intrusive and burdensome means of discovery, such as written interrogatories and depositions of lower-level officials or representatives of the defendant.

PwC has willingly produced nine other partners for deposition, including a member of the Board of Partners and its admissions committee, and the partner who serves as National Partner

Affairs leader and reports directly to the Senior Partner and the Partner Affairs Committee of the Board of Partners. Murphy has had an unrestricted opportunity to ask each of the partner deponents and others about Nally's involvement in the matters at issue, and not one of them identified Nally as having participated in or having knowledge of the decisions and conduct which underlie Murphy's claims. Moreover, Murphy has examined each of the deponents on matters relating to the "partner/employee" issue, which, as Murphy put it, turns on "the way the firm operates and its structure" (Exhibit A at 129-30).

Moreover, PwC's counsel offered to have Nally answer written interrogatories concerning the scope and substance of his knowledge that Murphy believes might have a bearing on his claims, without prejudice to Murphy's seeking to take Nally's deposition after reviewing his sworn answers to the written questions. Without explanation, Murphy's counsel rejected that offer.

In accordance with the dictates of Rule 26(b)(2), Fed.R.Civ.P., the courts have consistently precluded the depositions of high-ranking officials under these circumstances. That Rule provides a mechanism for protection from depositions of senior officials, when their depositions would be "unreasonably cumulative or duplicative," or where the information sought is "obtainable from some other source that is more convenient, less burdensome or less expensive." To hold otherwise, and permit open access to high-level officials at large organizations before less intrusive and onerous avenues of obtaining such discovery have been exhausted, would require such officials to appear at innumerable depositions in cases throughout the country, regardless of their ability to provide specifics about any particular cases or disclose unique or superior knowledge concerning any relevant facts at issue.

This motion for a protective order with respect to the noticed deposition of Nally follows the most recent discussion between counsel (at Murphy's deposition on November 15, 2006) pursuant to LCvR 7(m). As more fully set forth below, and in the accompanying declaration of Eric M. Nelson, Esq., Murphy testified as to the matters he believes Nally to have personal knowledge, and Murphy's counsel declined the opportunity to propound written interrogatories to Nally as to those matters.[1] Under the circumstances, as further detailed below, a protective order is warranted.

## Statement of Facts

A.      **The Claims**

Plaintiff Murphy complains in Case 1 (No. 02-982) of his non-admission as a partner at PwC effective July 1, 2000 and July 1, 2001 and, in Case 2 (No. 05-1054), effective July 1, 2004, allegedly because of his age.

PwC is a large firm, with over 20,000 employees and more than 2,000 partners and principals dispersed among 86 offices in 36 states around the country. Until his voluntary retirement in February 2006, Murphy had been employed in PwC's District of Columbia office in its RAS unit, described by Murphy as "a relatively small consulting group within PwC's Banking Practice" (Docket No. 134 at 4). Murphy seeks to predicate a *prima facie* case of age discrimination on the admission as partners of two younger employees in the RAS unit in the District of Columbia -- David Albright and Jeff Lavine -- effective July 1, 2000 (Case 1) and July 1, 2004 (Case 2), respectively (id. at 4-5).

Murphy's Complaint in Case 1, filed in May 2002, alleged a "pattern and practice" of discrimination based on age (¶19), and purported to assert his claims collectively, on behalf of an

---

[1] As the deposition is presently scheduled for December 15, 2006, PwC's counsel intends to further confer with Murphy's counsel in an effort to reach agreement either on an expedited briefing schedule or a stay of the deposition pending resolution of this motion.

opt-in class of allegedly similarly situated PwC employees.  By Memorandum Order and

Opinion dated September 27, 2004, this Court (Leon, J.) dismissed the class allegations of the

Complaint on the ground that plaintiffs had failed to allege such claims at the administrative

stage (Murphy, 357 F.Supp.2d at 247).  The Court further ruled that plaintiffs -- as individual,

non-class plaintiffs -- were "barred from proving their discrimination claims under a 'pattern or

practice' theory" (id.).

       Murphy filed Case 2 -- complaining of his non-admission as a partner effective July 1,

2004 -- in May 2005.  His Case 2 Complaint (¶1) purports to "preserve" his right to pursue that

claim collectively, on behalf of an opt-in class of similarly situated PwC employees.  At a status

conference before Judge Leon on October 18, 2005, Murphy's counsel asserted that Murphy had

cured the deficiency in his administrative filing in Case 1, and wanted "the opportunity to

explore a collective action" in Case 2 (Exhibit B at 4).[2]  Murphy thus opposed consolidation with

Case 1 on the ground that pursuing Case 2 collectively would make it a more complicated and

protracted proceeding (see id.).  At the most recent status conference on October 12, 2006,

following extensive discovery, Murphy's counsel advised Judge Leon that Murphy had decided

not to proceed collectively in Case 2, and agreed that it now "makes sense to consolidate" Case 1

and Case 2 (Exhibit C at 3-4).

       Accordingly, Murphy is now pursuing all of his claims as an individual, non-class

plaintiff.

**B.**    **Discovery History**

       Based on Minute Orders entered January 9, 2006, Case 1 and Case 2 have in essence

been consolidated for discovery purposes.  By those Minute Orders, entered in each of the

related cases, Judge Leon approved the parties' Joint Proposed Scheduling Order, and directed

---

[2] The Exhibits cited herein are annexed to the accompanying Declaration of Eric M. Nelson, Esq.

that all discovery taken in each of the two cases be deemed applicable to the other, as if taken therein.

PwC has provided extensive discovery on Murphy's claims since the initial Scheduling Order in early 2003. In response to Murphy's various requests, PwC has produced over 20,000 pages of documents, and has responded to separate sets of interrogatories in each of Case 1 and Case 2, in excess of the Fed.R.Civ.P. 33(a) limits. This year alone, PwC responded to a combined total of 122 separate interrogatories and document requests, exclusive of subparts (nearly 200 separate written discovery requests, including subparts).

In 2003, Murphy took the depositions of four PwC partners. The deponents included Murphy's immediate supervisor, Robert Bench, who was deposed for two full days in June 2003, immediately preceding his retirement; Tim Ryan (then head of the Banking practice); Robert Moritz (then head of Financial Services); and, Paul Sullivan (a member of the Board of Partners and its admissions committee).

Murphy testified at deposition that he worked in RAS throughout his tenure with the firm, and that all promotions of RAS employees would have to be "approved" by Bench, the managing partner of RAS (until his retirement on July 1, 2003) (Exhibit D at 894). Murphy thus understood that the partnership consideration process for employees in RAS would have to be initiated, if at all, by Bench (id. at 895):

> Q.     When you say approved by Mr. Bench, do you mean the process would have to be initiated by Mr. Bench?
>
> A.     That was my understanding.
>
> Q.     Okay. So that for any promotions for professional employees [in] RAS, Mr. Bench would have to initiate a process and make a recommendation before anything could happen?
>
> A.     That was my understanding.

7

Following Bench's retirement on July 1, 2003, the partnership consideration process for employees in RAS would be initiated by Bench's successors in RAS (id. at 895-96).

Murphy was never recommended as a candidate for partner at PwC, and was thus never subject to the partnership admissions process.  In his two-day deposition of Bench, Murphy's counsel elicited no testimony to suggest that Bench acted pursuant to instructions or a policy from above, or that he even conferred with any other partners in deciding not to recommend Murphy as a candidate for partnership.  Moreover, Murphy's depositions of partners Ryan, Moritz and Sullivan revealed nothing to suggest otherwise.

In 2006, after the filing of Case 2, Murphy's new counsel requested another deposition of Bench, as well as the depositions of nine additional PwC partners and employees (see Exhibit E). Murphy's list of deponents included six partners in addition to Bench:  David Albright (RAS); Jeffrey Lavine (RAS); William Lewis (RAS); John Carter (National Partner Affairs leader); Roger Hindman (National Benefits leader); and, Dennis Nally (Senior Partner and Chairman). Other deponents included Elizabeth Carol Nebe (a Managing Director in Partner Affairs, with responsibilities for partner admissions, partner compensation and firm governance), and Darlene Shea (National Human Resources Director for financial services).

On July 27, 2006, in response to an e-mail request from Murphy's counsel to provide available dates for these deponents between September 5 and October 6 (the then fact discovery deadline), PwC's counsel responded as follows, specifically objecting to a deposition of Nally and a re-deposition of Bench (Exhibit F):

> I think you would agree that you are requesting an unusually large number of depositions for a straightforward nonpromotion case, especially since plaintiffs previously deposed at length four PwC partners. On the assumption you will conclude most of the examinations in substantially less than the one day of 7 hours limit,

we have requested the availability in September of the persons you have listed, with two exceptions (Dennis Nally and Robert Bench).

Dennis Nally, the firm's Senior Partner and Chairman, has no discoverable information that is not readily and more appropriately obtainable from other deponents you have listed. As you know, in response to your specific requests, we have not located any communications by or to Mr. Nally relating to plaintiffs' age discrimination complaints; nor have we found any documents reflecting consideration by Mr. Nally or the Board of altering the age-60 retirement provision for partners.

Robert Bench was fully deposed over the course of two days in June 2003, immediately preceding his retirement from the firm and relocation from the DC area. No additional documents warranting a reopening of the examination have been located or produced.

Counsel have since reached agreement limiting the deposition of Bench but, despite extended e-mail and telephone discussions, have been unable to reach agreement on the propriety of Murphy's request to depose Nally.

## C.    Nally Deposition

Murphy's Case 1 Complaint alleged claims not only against PwC, but against some 20 alleged members of its Board of Partners, including Nally (Complaint, ¶9). None of the allegations against the Board members were specific to Nally. The Court granted PwC's motion to dismiss all ADEA claims against all of the individual Board member defendants (Murphy, 357 F.Supp.2d at 244). In also dismissing the remaining state law claims against Nally and other Board members for lack of personal jurisdiction, the Court reasoned as follows (id. at 243) (emphasis supplied):

Contrary to the arguments set forth in their opposition, the plaintiffs merely allege the following in their complaint: "These Board members collectively and individually have been and are responsible for the discriminatory policies, practices and conduct alleged in the Complaint, and they have maintained and implemented the discriminatory policies and practices set forth below." Compl. ¶ 9. The plaintiffs then allege that these individual defendants "participated in the age discriminatory

9

policies and practices and decisions described above against plaintiffs and other[ ] similarly situated employees…" <u>Id.</u> at ¶ 51. <u>Nowhere in the complaint is it alleged that the individual defendants specifically made decisions regarding employees in PwC's District of Columbia office or had any contact with that office of the plaintiffs that would satisfy the "minimum contacts" analysis.</u>

During the pendency of the motion to dismiss, Murphy testified that he had named the individual Board members as defendants for "psychological effect" (Exhibit D at 457-458). In response to an inquiry as to why Nally was listed in Murphy's initial disclosures as a person likely to have information supporting his claims, Murphy's counsel interjected, "If we knew, we wouldn't need discovery, Counsel" (<u>id.</u> at 465), and Murphy testified that all members of the Board of Partners "have information about the admissions process and the promotions process that we alleged to be discriminatory" (<u>id.</u> at 466). Neither Murphy nor his counsel could state that Nally had any relevant information that other Board members would not have (<u>id.</u> at 466, 468-69). Nally's deposition was not requested or noticed in Case 1.

In August through October 2006, counsel conferred by telephone and e-mail concerning Murphy's intention to notice Nally's deposition. Murphy's counsel never took issue with PwC's counsel's statements and representations in his July 27, 2006 e-mail that Nally had no discoverable information that was not readily and more appropriately obtainable from other deponents on Murphy's list, that Nally was not a party to any communications relating to Murphy's age discrimination complaints, and that there were no documents suggesting that the Board had ever considered changing the age-60 retirement provision for partners (<u>see</u> Exhibit F). The representations concerning the absence of documents were in response to specific requests made by Murphy's counsel, and were embodied in PwC's formal written responses to Murphy's written discovery requests.

Murphy's counsel responded to that e-mail by asserting that Murphy sought to depose Nally on "Clackamas factors" -- referring to the Supreme Court decision in <u>Clackamas Gastroenterology Associates, P.C. v. Wells</u>, 538 U.S. 440 (2003), which sets forth the standard for resolving Murphy's allegations that PwC partners should be deemed "employees" within the coverage of ADEA. Murphy's counsel thus stated in his July 27, 2006 reply e-mail (Exhibit G):

> Mr. Nally likely has personal knowledge of all of the relevant Clackamas factors, and you have repeatedly represented that you view the Clackamas issue as "dispositive" of this case. While we disagree with that assertion, we certainly agree that it is important, and you have acknowledged that it is an area in which discovery is appropriate. We intend to focus on clackamas matters with Mr. Nally.

After further communications regarding scheduling issues, PwC's counsel advised Murphy's counsel by e-mail on August 30, 2006 that: "Any date we provide for Mr. Nally will be without prejudice to our right to seek a protective order since he has no personal knowledge of any facts concerning plaintiffs' claims, and does not possess superior or unique knowledge of any facts bearing on Clackamas issues" (Exhibit H). Murphy's counsel's August 31, 2006 e-mail reply simply reiterated that: "I have already informed you that our inquiries to Nally will focus primarily on Clackamas related issues, and on the retirement policy" (Exhibit I).

Murphy's counsel's proffered justification for seeking to depose Nally was limited to those areas of inquiry. Murphy's counsel thus did not respond to PwC's counsel's September 2, 2006 reply that: "We cannot force you to discuss the issues or to clearly articulate your position, but believe you should be precluded from asserting any further justification for the deposition in the event PwC is constrained to move for a protective order" (Exhibit J).

In further discussions between counsel, Murphy's counsel never offered any additional justification or suggested any other areas of inquiry. PwC's counsel offered to have Nally answer written interrogatories as to the extent and substance of his personal knowledge, without

prejudice to Murphy's right to pursue Nally's deposition after reviewing his sworn written responses. Ultimately, Murphy's counsel rejected that proposal, without explanation, in an e-mail dated October 25, 2006: "We've also considered your proposal to defer deposing Mr. Nally and instead submit written questions to him, but are not willing to agree" (Exhibit K).

**D.     Clackamas Discovery**

After reviewing PwC's Partnership Agreement, and deposing four PwC partners, Murphy moved for partial summary judgment on the Clackamas issue in August 2003 (Docket No. 59 at 18-22). In so moving, Murphy necessarily considered the discovery record to be complete on that issue. PwC cross-moved for partial summary judgment on the issue based on the same discovery record (Docket No. 68 at 50-63). At the motion hearing on April 12, 2004, Murphy's counsel commented on the discovery record, as follows (Exhibit L at 86-87):

> The only thing we think it might be appropriate to take more discovery on is the relationship among partners. We don't think that's necessary because we think it's clear that under [the Partnership Agreement] the partners have very little authority in that their role is similar to shareholders rather than the partners in a real partnership.
>
> That is something that could be subject of further discovery. I'm not sure how helpful it would be to tell you the truth. So we think it's before you. We think you ought to rule on it.

Judge Leon did not reach the Clackamas issue in his Memorandum Order and Opinion deciding the cross-motions, as the Court dismissed the claim then at issue on other grounds.

In counsels' LCvR 16.3(c) conferences in August 2005, following the filing of Case 2, Murphy's new counsel stated that Murphy wanted to take further discovery on the Clackamas issue. PwC agreed to provide further discovery on this dispositive issue (see Exhibit B at 11-12; Exhibit M at 8). PwC has since responded, without objection, to extensive interrogatories and document requests Murphy's counsel believes may have some bearing on Clackamas factors.

In addition, each of the nine PwC partners deposed have responded to inquiries Murphy believes to be <u>Clackamas</u> related.  These deponents have included Paul Sullivan, a member of the Board of Partners, and John Carter, the National Partner Affairs leader.  Further, Murphy has deposed Elizabeth Carol Nebe, a Managing Director in Partner Affairs.

Nally has no unique or superior personal knowledge of any material facts bearing on the <u>Clackamas</u> issue, and Murphy has not suggested otherwise.  Indeed, at his most recent deposition two days ago, on November 15, 2006, Murphy reiterated that Nally "surely has knowledge about the way the firm operates and its structure and other factors that would be pertinent to" the <u>Clackamas</u> issue (Exhibit A at 129-30), but acknowledged that "I couldn't tell you" that any such knowledge is "unique to him" (<u>id.</u> at 132-33).

**E.**      <u>**Retirement Provision for Partners**</u>

On September 18, 2006, after representing that Murphy's document production was complete, Murphy's counsel disclosed by e-mail that they had "in the last couple of days found one or two additional documents, attached here" (Exhibit N).  The attached "one or two additional documents" included a memo to "File" from Murphy dated August 22, 2005, purporting to summarize portions of a Managing Director's Conference attended by "about 180 PwC managing directors" the prior week (<u>id.</u>).

Murphy's memo states, among other things, that" PwC Senior Partner and CEO Dennis Nally spoke . . ., and then took questions from the floor" (<u>id.</u>).  In response to a Murphy comment and question, Murphy's memo states, in Murphy's words, that Nally commented in substance: "Some client audit committees and CEO's felt more comfortable if the PwC audit engagement partner possessed the gray hair that often signaled experience, and that for this reason, PwC was examining whether to change its mandatory retirement age of 60" (<u>id.</u>)

Whether or not consideration was being given in August 2005 to changing the age-60 retirement provision for partners in PwC's Partner Agreement is totally irrelevant to Murphy's claims. Any such change after July 1, 2004 would have no impact on Murphy since, at age 60 in 2000, he would have been subject to immediate retirement if he had been admitted as a partner on July 1, 2000, July 1, 2001 or July 1, 2004, as he claims he should have been. In any event, no such change was under consideration by the Board of Partners, as disclosed by PwC's responses to written discovery requests on this point.

At Murphy's most recent deposition on November 15, 2006, PwC's counsel unequivocally reaffirmed the representation "that the [PwC] board never considered changing the mandatory retirement age for partners" (Exhibit A at 138). Murphy acknowledged that Nally "is the only one I've heard say that the firm was considering changing the mandatory retirement age" (id. at 132), and further acknowledged that whatever Nally had said at the August 2005 Managing Directors Conference in response to Murphy's question, there were more than one hundred people present (id.). Any remaining questions or doubts Murphy may have on these essentially irrelevant points, could readily be clarified or resolved by Nally's sworn responses to written interrogatories that Murphy has declined to propound.

## F.    Miscellaneous E-Mails

At his November 15, 2006 deposition, Murphy claimed that Nally had personal knowledge of three e-mail communications Murphy's counsel had not previously cited as justification for noticing Nally's deposition.

The first is an e-mail that does not exist. Murphy testified that, in the fall of 2005, he had been told by Pilar Rivera-Cruz (a senior manager who worked as an auditor in PwC's District of Columbia offices) that she had been told by a partner in the Boston office that Nally had sent an e-mail to all PwC partners referring to Murphy's age discrimination claims (Exhibit A at 118-19).

14

Murphy further testified that he had no recollection of the name of the partner in Boston (id. at 120); that he could not recall making any efforts to determine whether such an e-mail had in fact been sent (id. at 122); and that he could not explain why he did not simply inquire of any of the 2,000 partners who would have received any such e-mail (id. at 123). Murphy also testified that he understood that his attorneys had later made a formal Rule 34 document request for the purported Nally e-mail (id. at 126-27), and he professed not to recall that such an e-mail was specifically requested at a meeting between counsel which he had attended at the offices of his counsel in January 31, 2006 (id. at 117-18).[3]

In responding to Murphy's written discovery requests, and through subsequent communications between counsel, PwC stated that there was no such e-mail (see Exhibit F) -- a representation that was repeated at Murphy's recent deposition (Exhibit A at 138). Murphy nonetheless testified that, if Nally had in fact written an e-mail, "[h]e would have to have knowledge of what he was writing about" (id. 129). Under the circumstances, it is submitted that Murphy's refusal to accept a sworn written confirmation from Nally that he sent no such e-mail to the more than 2000 PwC partners, and to instead insist on taking his deposition, is harassing and abusive.

The two other e-mails Murphy referenced in his testimony (Exhibit A at 130-31) do exist, but bear only the remotest conceivable relevance to his claims. One is a short "thank you" e-mail to Murphy dated 3/9/98 from a partner at a predecessor firm (PwC was not in existence until 7/1/98) showing Nally among seven "cc's" (see Exhibit O). The second is a "very short e-mail" reply from Nally to an unsolicited e-mail from Murphy in August 2002 on the then recently enacted Sarbanes Oxley Act (Tr. at 120-21; see Exhibit P).

---

[3] Immediately following that conference, Murphy's counsel confirmed that Murphy had agreed to narrow a particular document request to specifically encompass "e-mails from/to Dennis Nally . . . that mention or pertain to plaintiff's claims of age discrimination" (see Exhibit Q).

G.    **Alternative Means of Discovery**

At the deposition of Murphy on November 15, 2006, PwC's counsel reiterated the offer to provide Nally's responses to written interrogatories as to the scope of his knowledge (Exhibit A at 134). Murphy's counsel replied that that would "not be acceptable in lieu of a deposition," and PwC's counsel clarified that it would be without prejudice to seeking to pursue a deposition after reviewing the interrogatory answers (id.). In response to PwC's counsel's further clarification that the offer to answer written interrogatories was without prejudice to Murphy's pursuing a deposition if, after reviewing the answers, he felt there was a basis for it, Murphy's counsel asserted that they "were not required to do it that way" (id. at 136).

Murphy's counsel thus did not recognize any obligation to exhaust other, less intrusive and burdensome means of discovery before deposing a high-ranking official whose knowledge is not unique, stating:   "Our answer is we believe, as with any other person with knowledge, Dennis Nally is someone who can be called to a deposition" (id. at 135). As detailed below, counsel's belief does not comport with the pertinent cases under Rule 26(b)(2), Fed. R. Civ. P. The courts in this Circuit, and elsewhere, require a party to first propound written interrogatories before seeking to depose a high-ranking official under the circumstances presented here.

## **Argument**

### **A PROTECTIVE ORDER BARRING THE DEPOSITION OF CHAIRMAN AND SENIOR PARTNER NALLY SHOULD BE ISSUED**

Rule 26(b)(2), Fed.R.Civ.P., provides, in pertinent part, for limitations on discovery, as follows:

> The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that:  (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or

16

less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.  The court may act upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(c).

The potential for harassment and abuse of high-ranking officials of large defendant organizations through the simple expedient of serving a notice of deposition has long been recognized by the courts.  See Scott A. Mager, Curtailing Deposition Abuses of Senior Corporate Executives, 45 No. 1 JUDGES' J. 30 (2006); Jill S. Goldsmith, Courts Tend to Limit Depositions of High-Level Execs:  If Person Has No Unique Knowledge, Plaintiffs Must Use Other Means, NAT'L L.J., Vol. 24, No. 7 (Oct. 8, 2001) at C2; Gregory D. Hanley and Jeffrey S. Kinsler, Protecting High-Ranking Corporate Officials from Unnecessary and Harassing Depositions, 40 FEDBNJ 296 (June 1993).

Consistent with Rule 26(b)(2), numerous courts, including this Court, have adopted the general rule that depositions of high-ranking officials will be precluded unless and until other less intrusive avenues of discovery have been exhausted, and the plaintiff can show that the putative deponent has unique or superior personal knowledge of facts relevant to the plaintiff's claims.  See, e.g., Patterson v. Avery Dennison Corp., 281 F.3d 676, 681-82 (7th Cir. 2002) (barring deposition of company vice president and controller because the information sought was "obtainable from sources more convenient, less burdensome and less expensive," and plaintiff failed to avail herself of the opportunity to submit interrogatories to the official); Cardenas v. Prudential Ins. Co. of America, 2003 WL 21293757, at *2 (D. Minn. 2003) (affirming magistrate judge's denial of motion to compel deposition of several Prudential executives where plaintiff's affidavits failed to demonstrate that the executives "possess[ed] any information that could not

17

be obtained from lower level employees or other sources, much less that their knowledge of plaintiffs' allegations is 'unique'"); Evans v. Allstate Ins. Co., 216 F.R.D. 515, 518-19 (N.D. Okla. 2003) (granting protective order because corporate defendant had already provided adequate information or the information could be obtained from other sources without deposing high-level officers); Low v. Whitman, 207 F.R.D. 9, 13 (D.D.C. 2002) (granting motion for protective order barring deposition of "a high ranking official who did not participate in the employment decision at issue," and "[t]he only relevant testimony he can give appears to have been explored thoroughly in other depositions"); Harris v. Computer Associates Int'l, Inc., 204 F.R.D. 44, 46-47 (E.D.N.Y. 2001) (request to depose CEO denied); Alexander v. Federal Bureau of Investigation, 186 F.R.D. 1, 5 (D.D.C. 1998) (staying depositions of high-ranking officials, holding that "the submission of interrogatories by plaintiffs is the appropriate manner in which to initially proceed"); Springfield Terminal Railway Co. v. United Transportation Union, 1989 WL 225031, at *2 (D.D.C. 1989) (granting protective order requiring plaintiff "to proceed first by the less burdensome means of interrogatories in order to attempt to avoid the need for any deposition"); Mulvey v. Chrysler Corp., 106 F.R.D. 364, 366 (D.R.I. 1985) (requiring plaintiffs to first propound interrogatories to Chairman of defendant corporation, without prejudice to a later application to take oral deposition if warranted by answers to interrogatories).

In asserting that, "as with any other person with knowledge, Dennis Nally is someone who can be called to a deposition" without first exhausting other means of discovery (Exhibit A at 135), Murphy's counsel appears to be unaware of the cases and authorities recognizing that high-ranking officials are entitled to protection from deposition in circumstances such as those presented here.

The basic approach adopted by the courts in cases such as this is illustrated by

Community Federal Savings and Loan Assoc. v. Federal Home Loan Bank Board, 96 F.R.D. 619

(D.D.C. 1983), where this Court issued a protective order shielding two members of the

defendant Board, including its Chairman, from depositions.  The Court noted that the plaintiff

had not shown that these high-ranking officials had "any unique personal knowledge concerning

the decision" at issue (id. at 621).  The Court further concluded that other, less intrusive, means

of obtaining the discovery sought were available to the plaintiff (id.):

> [Plaintiff] has not shown that the information it hopes to elicit from
> [the putative deponents] is not ascertainable by way of
> interrogatories addressed to the Board, the deposition of a single
> spokesman designated to testify for it, or the testimony of the nine
> other witnesses whose depositions the Board has not opposed.

Further, since the putative deponents were high-level government agency officials, the Court

expressed concern that such depositions might disrupt the agency's primary function if

"reasonable limits" were not imposed (id.).

The Community Federal holding and rationale has been applied by the courts in cases

involving high-level officials of private, non-governmental organizations.  For example,

Community Federal was followed, cited and discussed with approval in the oft-cited decision in

Baine v. General Motors Corp., 141 F.R.D. 332, 334 (M.D. Ala. 1991), where the court quashed

a deposition notice of a vice president of the defendant corporation.  The Court thus held that:

> when a party seeks to depose high-level decisionmakers who are
> removed from the daily subjects of litigation, the party must first
> demonstrate that the would-be deponent has "unique personal
> knowledge" of the matter in issue [citation omitted].  Moreover, . .
> . the unique personal knowledge must be truly unique -- the
> deposition would not be allowed where the information could be
> had through interrogatories, deposition of a designated
> spokesperson or deposition testimony of other persons.

(id. at 334).  In so ruling, the court noted that "the Federal Rules by their plain terms allow the court to limit discovery so as to avoid cumulation, duplication, harassment, expense and burdensomeness.  See Fed.R.Civ.P. 26(b)(2).  The discretion to limit discovery extends to imposing restrictions where the discovery sought 'is obtainable from some other source that is more convenient, less burdensome, or less expensive'" (id. ).  See Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979) (upholding the exercise of discretion not to allow the plaintiff to depose the president of the defendant company until after lesser-ranking employees had been deposed).

In this case, Murphy seeks to depose Nally primarily as to his knowledge bearing on Clackamas factors.  But, despite extensive discussion between counsel by telephone and e-mail, Murphy's counsel has never contended that Nally's knowledge in this regard is "unique."  To the contrary, the Clackamas standard turns on the provisions of the governing Partnership Agreement, and on matters with which each and every partner is familiar (see Docket No. 68 at 50-63).  As Murphy described it, the issue relates primarily to "the way that the firm operates and its structure" (Exhibit A at 129-30).

Indeed, each of the eight partners deposed by Murphy to date has been examined on Clackamas issues.  Each deponent among this diverse and representative group of partners -- which includes recently admitted partners, senior partners, a partner who served on the Board, and the National Partner Affairs leader -- answered all Clackamas related inquiries.  None of them gave any testimony suggesting a need to depose Nally or any other partner.

In this regard, this case is not unlike Low, where this Court granted a protective order preventing the deposition of a "high ranking official who did not participate in the employment decision at issue" (207 F.R.D. at 13).  The Court accepted the plaintiff's contention that the high-ranking official had "oversight responsibility for employment issues," and considered the

plaintiff's further contention that the official should be deposed regarding his personal

knowledge of the defendant's affirmative action activities and their impact on "personnel

decisions, such as plaintiff's non-selection" (id.).  The Court also considered the defendant's

assertion that "four witnesses have or will be extensively questioned about [defendant's] diversity

plans and the impact they may have had on personnel decisions," and concluded that "'[t]he only

relevant testimony [the high-ranking official] can give appears to have been explored thoroughly

in other depositions" (id.).  In granting the protective order, the Court stated that "[i]f plaintiff

can establish from those transcripts or elsewhere a compelling case that [the high-ranking

official] can be expected to provide information that no one else has, I would certainly reconsider

my decision" (id.).

     Similarly, in Murray v. County of Suffolk, 212 F.R.D. 108, 110 (E.D.N.Y. 2002), the

court granted a protective order quashing the deposition notice of the Commissioner of the

Suffolk County Police Department.  The plaintiff did not contend that the Commissioner "had

any personal involvement in any of the events involved in this action," but sought to depose him

"because 'he is the ultimate individual in care of departmental policy'" and is "the only witness

who can answer questions in reference to unwritten custom or policies" (id. at 109).  In granting

the protective order, the Court concluded that "there is nothing in the plaintiff's application that

warrants the conclusion that the information sought from [the Commissioner] is  not available

from other sources in the Suffolk County Police Department, i.e., the eight (8) scheduled

depositions of police personnel in this action" (id. at 110).

     Murphy has never asserted that Nally possesses unique personal knowledge of

Clackamas related information that has not and cannot be obtained from the thirteen other PwC

witnesses deposed in this litigation.  Moreover, Murphy declined PwC's offer to have Nally

answer written interrogatories.  In <u>Springfield Terminal Railway</u>, where a high-ranking public official similarly offered to answer written interrogatories in lieu of a deposition, this Court granted a protective order requiring the plaintiff "to proceed first by the less intrusive means of interrogatories in order to attempt to avoid the need for any deposition" (1989 WL 225031 at *2); <u>see also</u> <u>Alliance for Global Justice v. District of Columbia</u>, 2005 WL 1799553, *3 (D.D.C. 2005) (where plaintiffs did not claim to have propounded interrogatories, the court declined to order the deposition of a high-ranking official "without any showing whatsoever that the information plaintiffs seek cannot be obtained by other means").

The same rationale was followed in <u>Alexander</u>, where this Court stayed the depositions of high-ranking officials, holding that "the submission of interrogatories by plaintiffs is the appropriate manner in which to initially proceed" (186 F.R.D. at 5).  In so holding, this Court cited <u>Mulvey v. Chrysler Corp.</u>, where the court protected the Chairman of the defendant corporation by ruling that the plaintiffs first propound written interrogatories to the Chairman, without prejudice to a subsequent application to take his oral deposition if the written answers are shown to be insufficient (106 F.R.D. at 366).  The court there recognized that because the Chairman, by virtue of his position, "can be easily subjected to unwarranted harassment and abuse," he "has a right to be protected, and the courts have a duty to recognize his vulnerability." (<u>id.</u>).

Similarly, in <u>Patterson</u>, the Seventh Circuit upheld the refusal of the district court to compel the deposition of a high-ranking executive of the corporate defendant (281 F.3d at 681-82).  The Court observed that the plaintiff had "failed to submit any interrogatories to [the executive], although she had the right and the opportunity to do so," and concluded that the plaintiff's "failure to take advantage of this inexpensive, convenient method of discovery, <u>i.e.</u>,

22

interrogatories, casts serious doubt over her claim that [the executive] possessed information that was more than marginally relevant to her civil action." (<u>id.</u>).

As to Murphy's memo to file summarizing a remark Nally made at a conference in August 2005, PwC has disclosed (in response to Murphy's document requests) that the Board of Partners never considered changing the retirement provision for partners and that there are no documents reflecting any such consideration.  Murphy has unreasonably rejected PwC's offer to have Nally answer written interrogatories on this or any other point.  Moreover, even if a change was being considered in August 2005, it would be entirely irrelevant to Murphy's claims, as he would have been subject to immediate retirement upon his admission as a partner in 2000, 2001 or 2004, when he claims he was discriminatorily denied promotion.  Under such circumstances, any effort to depose Nally on this point would be especially inappropriate and unreasonable. "[T]he oral deposition of a high-level corporate executive should not be freely granted when the subject of the deposition will be only remotely relevant to the issues of the case" (<u>Evans</u>, 216 F.R.D. at 918; <u>Folwell v. Hernandez</u>, 210 F.R.D. 169, 176 (M.D.N.C. 2002); <u>Harris</u>, 204 F.R.D. at 47 (conversation involving Chairman and CEO of defendant only "remotely relevant" since it occurred <u>after</u> plaintiff had been relieved of job duty)).

Finally, the unconfirmed hearsay on which Murphy predicates his speculation that Nally sent an e-mail to all partners referencing Murphy's claims is simply false  And, the two "Nally e-mails" Murphy identified at his deposition are, at best, only remotely relevant.

In sum, having failed to exhaust less intrusive alternative means of obtaining any discovery Murphy may legitimately require from Nally, a protective order barring his deposition is warranted.  Neither "psychological effect" nor strategic advantage provide a legitimate basis for the conduct of the deposition.

## Conclusion

For the reasons stated, it is respectfully submitted that PwC's motion for a protective order with respect to the deposition of its Chairman and Senior Partner should be granted.

Dated:  November 17, 2006

Respectfully submitted,

/s/ Eric M. Nelson
Eric M. Nelson, Esq. (admitted *pro hac vice*)
Stephen L. Sheinfeld, Esq. (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
Facsimile:  (212) 294-4700

Thomas M. Buchanan, Esq. #337907
Julie A. Klusas Gasper, Esq. #D00244
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20036
(202) 282-5000
Facsimile:  (202) 282-5100

Counsel for Defendant
PricewaterhouseCoopers LLP