# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------x

C. WESTBROOK MURPHY, et al.,      )

             Plaintiffs,   )

    v.                            )   Civil Action

PRICEWATERHOUSECOOPERS, LLP,      )   No. 02-982

et al.,                           )   (RJL/DAR)

             Defendants.   )

--------------------------------x

C. WESTBROOK MURPHY,              )

             Plaintiff,    )

    v.                            )   Civil Action

PRICEWATERHOUSECOOPERS, LLP,      )   No. 05-1054

             Defendant.    )   (RJL)

--------------------------------x

Deposition of CHARLES WESTBROOK MURPHY

Washington, D.C.

Wednesday, November 15, 2006

10:00 a.m.

Job No.:  22-91057

Pages 1 - 273

Reported By:  Joan V. Cain

d7ab3711-267f-402c-b0fe-6f887b87a4ae

1       A P P E A R A N C E S

2

3    ON BEHALF OF PLAINTIFF C. WESTBROOK MURPHY:

4        RICHARD A. SALZMAN, ESQUIRE

5        HELLER HURON CHERTKOF LERNER

6        SIMON & SALZMAN

7        Suite 412

8        1730 M Street, Northwest

9        Washington, D.C.   20036

10       Telephone:   (202) 293-8090

11

12   ON BEHALF OF DEFENDANTS:

13       ERIC M. NELSON, ESQUIRE

14       WINSTON & STRAWN, LLP

15       200 Park Avenue

16       New York, New York 10166-4193

17       Telephone:   (212) 294-6700

18

19

20

21

22

23

24

25

d7ab3711-267f-402c-b0fe-6f887b87a4ae

1                CHARLES WESTBROOK MURPHY

2        A    I don't believe so.

3        Q    Are you aware of anyone -- any other PwC

4    employees who have independently asserted a claim

5    against PwC similar to yours?

6             MR. SALZMAN:  Do you mean a claim of denied

7    partnership based on age?  Is that what you mean by

8    "similar"?

9             MR. NELSON:  Yes.  That's a fair

10   characterization, yes.

11       A    As supplemented by Mr. Salzman, no, I'm not

12   aware of any person.

13   BY MR. NELSON:

14       Q    Are you aware of any person who asserted an

15   age discrimination claim against PwC?

16       A    I believe that there was and maybe still is

17   an age discrimination claim pending against PwC in New

18   England by somebody who was an administrative

19   employee.

20       Q    Do you recall being present at a meeting

21   among counsel at your attorney's offices on January

22   31st of this year where PwC's preliminary objections

23   to your discovery requests were discussed?

24       A    Yes.

25       Q    Do you recall that I had asserted an

1          CHARLES WESTBROOK MURPHY

2    objection to your request for all documents concerning

3    the handling of your claims?

4         A    No.

5         Q    You don't recall that?

6         A    That's correct.  I do not recall that.

7         Q    Do you recall that you and/or your counsel

8    stated that you had been told that -- that Dennis

9    Nally had sent to PwC partners a message referring to

10   your age discrimination claim?

11        A    I do not recall that conversation at that

12   meeting.

13        Q    Do you recall that conversation at any

14   meeting?

15        A    Not with -- not with counsel for PwC.

16        Q    Is it a fact that you had been told that

17   Dennis Nally had sent a message to the PwC partners

18   referring to your age discrimination claim?

19        A    I had been so told.

20        Q    And who told you that?

21        A    Pilar Rivera-Cruz.

22        Q    And who is Mr. Cruz?

23        A    Ms. Cruz.

24        Q    Ms. Cruz.

25        A    She is an auditor, I believe a senior

1  CHARLES WESTBROOK MURPHY

2  manager, who had been part of RAS.  But at the time --

3  this would have been the fall of 2005 -- was no longer

4  with RAS at least in fact.  I don't know whether she

5  was still listed as on the staff or not, but she had

6  spent almost all of her working time over the last

7  year on the audit engagement at Freddie Mac.

8      Q    Is that a client of Mr. Lewis?

9      A    Mr. Lewis is now the engagement partner.  He

10  was not then.  The engagement partner then was Maryann

11  Murphy.

12      Q    And Ms. Cruz works in the Washington office

13  of PwC?

14      A    Yes.

15      Q    And what did she tell you?  Did she tell you

16  this in the fall of 2005, whatever you're about to

17  tell me?

18      A    Correct.

19      Q    Okay.  And what did she say?

20      A    That she had been working on the audit at

21  Freddie Mac.  And whatever portion of that audit she

22  was working on was being supervised by a partner from

23  Boston and that he had asked her whether she knew

24  Mr. Schuler and me and said that he had received an

25  e-mail or a memo addressed to all partners from Dennis

1          CHARLES WESTBROOK MURPHY

2    Nally that referred to us -- referred specifically in

3    one way or another to us by name and our claim.

4          Q    Did she identify the partner in Boston?

5          A    I believe she did.

6          Q    And who would that have been?

7          A    I do not remember.

8          Q    You have no recollection?

9          A    Correct.

10         Q    Well, where is Ms. Cruz now?

11         A    I don't know.

12         Q    Does she still work for PwC?  I don't mean

13   this minute.

14         A    So far as I know, she does.

15         Q    And do you recall anything else she told you

16   about this partner in Boston?

17         A    No.

18         Q    Do you recall anything else she told you on

19   this subject?

20         A    No.

21         Q    Did you make any effort to verify what she

22   had told you?

23         A    Yes.

24         Q    What did you do?

25         A    I suggested that PwC should be asked to

1          CHARLES WESTBROOK MURPHY

2    withdraw that question.

3    BY MR. NELSON:

4        Q    You knew -- you understood that you had made

5    or your counsel on your behalf had made the request;

6    is that right?

7        A    Yes.

8        Q    Are you aware of any discussions between

9    counsel for PwC and your counsel about this request?

10       A    Not that I remember.

11       Q    You don't recall being told that by his

12   counsel for PwC was undertaking to determine whether

13   there was such a message or an e-mail?

14           MR. SALZMAN:  I think you're asking for

15   privileged conversation now.

16           MR. NELSON:  Are you advising him not to

17   answer?

18           MR. SALZMAN:  Yes.

19   BY MR. NELSON:

20       Q    Okay.  Apart from asking your attorneys to

21   request PwC's counsel to produce the document that

22   existed, did you make any other efforts within PwC to

23   determine whether there was such an e-mail sent?

24       A    Not that I recall.

25       Q    Did you ask any PwC partners that you knew,

1    CHARLES WESTBROOK MURPHY

2    call for privileged communication.

3        MR. NELSON:  Well, to his knowledge, if

4    counsel notified.

5        A    I do not remember communicating to counsel

6    for PwC about this message, either before or after it

7    was sent.  I do not know what my counsel may have

8    communicated to PwC counsel.

9    BY MR. NELSON:

10       Q    Did you understand that your request to

11   Mr. Nally was included in a Rule 34 document request

12   that had been served in the litigation?

13       A    I think I've already testified that I

14   believe that it was.

15       Q    And do you recall when that request was

16   served?

17       A    I believe that was served, if I might -- if

18   I'm remembering correctly, I believe we only served

19   one document -- well, maybe it was one for each case

20   in December of '05.  We only -- I think the best of my

21   memory, that's the only time any document request was

22   served.

23       Q    And you do recall, without recalling the

24   substance, that counsel for PwC and your counsel and

25   you were present -- had met at the end of January to

<sup>1</sup>              CHARLES WESTBROOK MURPHY

2  discuss the pending document requests; is that right?

3       A     It was to discuss discovery requests.  I

4  believe that was documents request and interrogatories

5  and there may have been some other matters.  And I was

6  somewhat disappointed because that was the day after

7  my birthday.  And I thought maybe you were coming down

8  to wish me happy birthday.

9       Q     But you were present during the discussion,

10 right?

11      A     I was present.

12      Q     Well, do you believe it's appropriate for

13 you as an attorney to make ex parte discovery requests

14 to an adverse party in a litigation?

15           MR. SALZMAN:  Objection to the

16 term "appropriate."  By that, do you mean ethical?

17           MR. NELSON:  I include that in the

18 word "appropriate," yes.

19           MR. SALZMAN:  What else does it include?

20           MR. NELSON:  It asks whether Mr. Murphy

21 considers whether it was appropriate or not.

22           MR. SALZMAN:  If you understand the

23 question, go ahead.

24      A     The question assumes several things.  One is

25 that I was acting as an attorney.  I was not.  I was

1                   CHARLES WESTBROOK MURPHY

2    acting as an employee at PwC.  I understood that the

3    senior partner had sent out a message that referred

4    specifically to me.  And I hoped that he would be

5    courteous enough to send me a copy if he had done so.

6    BY MR. NELSON:

7         Q    Did you receive any response to this e-mail?

8         A    I did not.

9         Q    Did you follow up in any way?

10        A    No.

11        Q    Why not?

12        A    Within three weeks, I had left the firm.

13        Q    You didn't follow up in those three weeks;

14   is that right?

15        A    That is correct.

16        Q    Did you send this e-mail from your laptop

17   computer that was issued to you by PwC?

18        A    Yes.

19        Q    What was redacted from the top of

20   Defendants' Exhibit 73?

21        A    After I sent the e-mail, I then sent a copy

22   to myself at home so that it would -- and to my

23   attorneys.

24        Q    And was there a message that was redacted?

25        A    Not that I remember.

1                    CHARLES WESTBROOK MURPHY

2        Q    So, what was redacted?  Just forwarding of?

3        A    So far as I know, that's correct.

4             MR. NELSON:  I'll ask counsel to check that.

5    I don't think that should have been redacted for a

6    number of reasons.

7             MR. SALZMAN:  We'll take it under

8    advisement.

9             MR. NELSON:  We'd ask for production of the

10   unredacted version of Defendants' Exhibit 73.

11   BY MR. NELSON:

12       Q    Do you believe that Mr. Nally has personal

13   knowledge of any facts relevant to your claims?

14            MR. SALZMAN:  I'm going to object to the

15   extent it calls for a legal conclusion.

16       A    Yes.

17   BY MR. NELSON:

18       Q    In what areas?

19            MR. SALZMAN:  Same objection.

20       A    Well, if, in fact, he did write an e-mail,

21   as I believe that he did, he would have to have

22   whatever knowledge -- I'm sorry.  He would have to

23   have knowledge of what he was writing about.  He

24   surely has knowledge about the way that the firm

25   operates and its structure and other factors that

1    CHARLES WESTBROOK MURPHY

2    would be pertinent to whether some or all of the

3    persons who were called partners at PwC are employees

4    for purposes of the Age Discrimination in Employment

5    Act.

6         Q    Is that the so-called "Clackamas" issue?

7         A    That's how counsel have been referring to

8    it.

9         Q    Are there any other areas you believe

10   Mr. Nally has personal knowledge of facts relevant to

11   your claims?

12        A    I know he got a copy of an e-mail that Rick

13   Richardson sent to me thanking me or congratulating me

14   for helping to bring in a piece of business to the

15   firm that was valued at $6 million.  And I

16   communicated directly with him in the -- with

17   Mr. Nally in August of 2002 about an issue relating to

18   the recently enacted Sarbanes-Oxley Act and how one of

19   the provisions of that act affected or might affect

20   PricewaterhouseCoopers.

21        Q    You say you e-mailed that to Mr. Nally?

22        A    I did.

23        Q    Among others or just to Mr. Nally?

24        A    I believe just to him.

25        Q    And what was -- what's the relevance in your

1        CHARLES WESTBROOK MURPHY

2    mind?  How does that relate to your claims?

3        A    I got back from him a very short e-mail that

4    said something like good idea or thank you for the

5    suggestion or some such.

6        Q    Any other -- you believe that Mr. Nally has

7    any other personal knowledge of any facts relevant to

8    your claims?

9        A    In reviewing the documents produced by PwC,

10    there were some several referred to or actual copies

11    of documents that he had sent dealing with the

12    question of whether a partner -- that would bear on

13    the question of whether a partner is an employee.

14        Q    Well, that would fall in the category of

15    knowledge relevant to what we call the "Clackamas

16    factors"?

17        A    Yes.

18        Q    Anything else?

19        A    Well, as recited in Exhibit 72 in August, I

20    spoke with him directly about it in front of --

21    about -- not specifically my claim, but about the

22    firm's admission policy and whether that was age

23    based.  And he tried to -- he did respond to that

24    question for which I gave him some credit.  He's the

25    only one who actually tried to deal with it.  And he

1          CHARLES WESTBROOK MURPHY

2     said, as I recited in that memo, that the firm was

3     thinking about raising the mandatory requirement age.

4          Q     That was in your memo; is that correct?

5          A     That is correct.

6          Q     And whatever Mr. Nally said and you said at

7     that meeting, there were more than a hundred people

8     present; is that right?

9          A     Correct.

10         Q     Any other areas where you believe Mr. Nally

11    has personal knowledge of any facts relevant to your

12    claims?

13         A     Not of which I am aware.

14         Q     Do you believe that Mr. Nally's knowledge

15    with respect to any of these matters that you've just

16    mentioned to be unique?

17         A     I have no basis for answering that one way

18    or another.  I think I did just say that he is the

19    only one I've heard say that the firm was considering

20    changing the mandatory retirement age.

21         Q     You believe that any knowledge that

22    Mr. Nally has is unique to him?

23         A     I'm sure that he has knowledge that's unique

24    to him.

25         Q     Relevant to your claims?

1              CHARLES WESTBROOK MURPHY

2        A     That, I couldn't tell you.

3        Q     Are you aware of the fact that PwC's counsel

4    recently offered to have Mr. Nally answer written

5    interrogatories as to the scope of his personal

6    knowledge --

7              MR. SALZMAN:  I'm going to object to that.

8    BY MR. NELSON:

9        Q     -- as to matters you consider to be

10   relevant?

11             MR. SALZMAN:  It calls for communication

12   between me and my client.  I'm going to advise him not

13   to answer that question.

14             MR. NELSON:  Well, I thought you already

15   advised me that you discussed this with your client.

16             MR. SALZMAN:  Well, that doesn't mean that

17   he testifies about it on the record.

18             MR. NELSON:  I didn't say someone was aware

19   of something.  He told me you discussed it.  That's

20   all.  I'm not asking for the substance of the

21   communication with you, I'm not.

22             MR. SALZMAN:  I think you are.  By asking if

23   he's aware of something that you and I talked about, I

24   think you are asking for conversations between me and

25   my client.  I will agree on the record that you and I

1          CHARLES WESTBROOK MURPHY

2    have talked about this.  I'm not sure --

3          MR. NELSON:  All right.  Do you recall that

4    you told me that you discussed this with Mr. Murphy or

5    is my memory mistaken on that?

6          MR. SALZMAN:  I don't know.  I don't

7    remember.

8          MR. NELSON:  You don't remember?

9          MR. SALZMAN:  No.

10          MR. NELSON:  Well, let me -- Mr. Salzman,

11    let me once again reiterate the offer to have

12    Mr. Nally respond to written interrogatories to the

13    scope of his knowledge.

14          MR. SALZMAN:  Okay.  I understand your

15    offer.

16          MR. NELSON:  And?

17          MR. SALZMAN:  That's not acceptable in lieu

18    of a deposition.

19          MR. NELSON:  The offer, just to be clear, is

20    without prejudice to seek his deposition after

21    reviewing the answers.

22          MR. SALZMAN:  I don't think we are required

23    to do it that way.

24          MR. NELSON:  I'm not asking whether you are

25    required to do it that way.  We think you are required

1          CHARLES WESTBROOK MURPHY

2    to do this.  And I'm asking you -- this is, I guess, a

3    final meet and confer.  I thought we might understand

4    something more from Mr. Murphy's testimony and I

5    don't.  So, I'm reiterating that offer once more and

6    asking whether you're prepared to agree to that.

7              MR. SALZMAN:  No.  And I don't consider it a

8    final meet and confer because you and I had this

9    conversation several weeks ago and we were very clear

10   in what our position was.

11             MR. NELSON:  Well, so your answer is no?

12             MR. SALZMAN:  Right.  Our answer is we

13   believe that, as with any other person with knowledge,

14   Dennis Nally is someone who can be called to a

15   deposition.

16             MR. NELSON:  And you understand that this

17   offer's without prejudice to your deposing him after

18   you review the answers?

19             MR. SALZMAN:  If you are agreeing that

20   you'll produce him for deposition after we review the

21   answers, then, no, I didn't understand that to be the

22   offer.  I understood your offer to be that in lieu of

23   the deposition, you would provide us with written

24   answers to written questions and then you would

25   revisit the question of producing him for a

1                   CHARLES WESTBROOK MURPHY

2       deposition.

3               If you are prepared to offer that it will

4       proceed in stages where first we ask written questions

5       of him and then we agreed that he will appear

6       regardless for a deposition, then I may take that

7       under advisement.  I didn't understand that to be your

8       offer.

9               MR. NELSON:  The offer was without prejudice

10      to your pursuing the deposition if after reviewing the

11      answers, you feel there's a basis for it.  That's the

12      offer.

13              MR. SALZMAN:  I don't believe we're required

14      to do it that way.

15              MR. NELSON:  Well, okay.  We believe you are

16      required to do that.  And that's why, you know, I'm

17      trying to avoid what would otherwise be unnecessary

18      motion practice.  You're nodding.

19              MR. SALZMAN:  I'm nodding that I understand

20      what you're saying, I think, unless what you're saying

21      is that you are agreeing that you will produce him

22      after we review the written answers.  If that's what

23      you're saying, then that's fine.

24              MR. NELSON:  I'm agreeing that we would

25      revisit it and presumably you would revisit it.  We've

1              CHARLES WESTBROOK MURPHY

2    things, including what Mr. Murphy asked Mr. Nally in

3    this e-mail?

4              We represented to you there was no such

5    communication sent to the partners.  We represented to

6    you that the board never considered changing the

7    mandatory retirement age for partners.  We've made

8    various representations to you.

9              MR. SALZMAN:  Okay.  And?

10             MR. NELSON:  That's what I'm saying.

11             MR. SALZMAN:  Okay.

12             MR. NELSON:  And we've responded to

13   discovery requests, which, you know, gave you the same

14   information.  We think it's really -- there's no basis

15   for you deposing Mr. Nally.

16             MR. SALZMAN:  Yeah.  You and I have had many

17   conversations about that.

18             MR. NELSON:  I don't know that we've had

19   many.  I think we've had some e-mail communications

20   and some telephone conversations.

21   BY MR. NELSON:

22      Q    Mr. Murphy --

23             MR. SALZMAN:  Excuse me.  Off the record.

24   If that conversation is through, can we take a break?

25             MR. NELSON:  Sure.

1          CHARLES WESTBROOK MURPHY

2          MR. SALZMAN:  Let's take a break.

3                  (Recessed at 3:07 p.m.)

4                  (Reconvened at 3:26 p.m.)

5          MR. NELSON:  Can we mark as Defendants'

6     Exhibit 74, Plaintiff Murphy's Answers to Defendants'

7     Interrogatories?  These are undated, but they were

8     served, I believe, at the end of September of this

9     year.

10                 (Defendants' Exhibit 74 was marked for

11    identification and was retained by counsel.)

12         MR. NELSON:  Can we go off the record for a

13    minute?

14                 (Discussion off the record.)

15    BY MR. NELSON:

16         Q    Mr. Murphy, could you please identify

17    Defendants' Exhibit 74 for the record?

18         A    It has the caption of the two cases filed

19    against PwC in the United States District Court for

20    the District of Columbia.  And it's titled Plaintiff

21    Murphy's Answers to Defendants' Interrogatories.

22         Q    And did you prepare these interrogatory

23    answers?

24         A    Yes.

25         Q    Is that your signature on the last page