# Exhibit D

11/30/2004 MURPHY, WESTBROOK

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF COLUMBIA
 2
 3      ------------------------------------x
        C. WESTBROOK MURPHY,                :
 4                                          :
        and                                 :
 5                                          :
        HAROLD SCHULER,                     : Case No.
 6                                          : 1:02CV00982
                  Plaintiffs,               :
 7                                          :
           v.                               :
 8                                          :
        PRICEWATERHOUSE COOPERS, LLP, ET AL,:
 9                                          :
                  Defendants.               :
10                                          :
        ------------------------------------x
11
12         Continued Deposition of C. WESTBROOK MURPHY
13                       Washington, D.C.
14                  Tuesday, November 30, 2004
15                          10:15 a.m.
16
17
18
19
20
21
22
23      Job No. 22-46677
24      Page No. 884 -999, Volume 5
25      Reported by:  Sandy Medford Nelson
```

11/30/2004 MURPHY, WESTBROOK

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3         DAVID L. ROSE, ESQUIRE
 4         Rose & Rose, P.C.
 5         1320 19th Street, Northwest, Suite 601
 6         Washington, D.C. 20036
 7         (202) 331-8555
 8    ON BEHALF OF DEFENDANT:
 9         ERIC M. NELSON, ESQUIRE
10         MARK KONKEL, ESQUIRE
11         Winston & Strawn, LLP
12         200 Park Avenue
13         New York, New York 10166-4193
14         (212) 294-4700
15
16
17
18
19
20
21
22
23
24
25
```

11/30/2004 MURPHY, WESTBROOK

1    MR. ROSE: What is it you want to ask him
2    about it?
3    MR. NELSON: Well, I want to ask him about
4    a document he's produced.
5    MR. ROSE: He's answered your questions.
6    I'm just wondering what the relevance of something
7    he says he's not familiar with it is.
8    BY MR. NELSON:
9    Q    Do you understand that the promotion
10   process involves a sponsoring partner? Referring
11   to the last page.
12   A    This form has a date on it of July 1,
13   19 -- prospectus for directorship candidate for
14   July 1, 1998. That was the first day of the merger
15   between Pricewaterhouse and Coopers and Lybrand.
16   So this firm would have been used -- the form
17   probably would have been used, judging by the date,
18   during the spring of 1998.
19        During that time, the regulatory advisory
20   services, where I have been ever since I joined the
21   firm, was managed by Robert Bench, whose deposition
22   has been taken in this action. It was and clear to
23   me that all promotions would have to be approved by
24   him. Beyond that, I don't remember any great
25   familiarity with the procedure.

11/30/2004 MURPHY, WESTBROOK

1  Q  When you say approved by Mr. Bench, do you
2  mean the process would have to be initiated by
3  Mr. Bench?
4  A  That was my understanding.
5  Q  Okay. So that for any promotions for
6  professional employees and RAS, Mr. Bench would
7  have to initiate the process and make a
8  recommendation before anything could happen?
9  A  That was my understanding.
10 Q  And would that -- are you familiar with
11 the term sponsoring partner in this context or not?
12 A  I am not.
13 Q  And Mr. Bench retired, did he not,
14 effective July 1, 2003?
15 A  I believe that's correct.
16 Q  And who replaced Mr. Bench?
17 A  William J. Lewis.
18 Q  And did Mr. Lewis play the same role in
19 connection with -- in RAS?
20 A  To a lesser degree.
21 Q  To a lesser degree than Mr. Bench?
22 A  Yes.
23 Q  And in what respects?
24 A  There are -- besides Mr. Lewis, there are
25 three other partners in RAS: David Albright, John

11/30/2004 MURPHY, WESTBROOK

1  Campbell, most recently Jeff Levine who started off
2  as a law clerk with me. And Mr. Lewis shares his
3  managerial responsibilities with the other partners
4  in the group to a greater extent than Mr. Bench
5  did, including recommendations for promotions.
6       In addition to that, the firm now has a
7  much more elaborate process for approving whatever
8  recommendations go forward from the RAS group than
9  it did before 1998.
10      Q    Before 1998 --
11      A    So, Mr. Lewis's discretion in promotions
12 is because of the processes involved after his
13 recommendation. His discretion or the weight of
14 his opinion is somewhat less than it would have
15 been when Mr. Bench was running RAS during the
16 1990's.
17      Q    Okay. In the testimony you just gave, you
18 referred to a change being made in July 1, 1998.
19 Did the changes that you're describing happen or
20 became effective when Mr. Bench retired and
21 Mr. Lewis replaced him?
22      A    Some did. Some became effective earlier
23 than that.
24      Q    All right. Well, as we've noted, this
25 form is blank. Is it correct that you were not a

5/1/2003 MURPHY, WESTBROOK

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLUMBIA
 3
 4     - - - - - - - - - - - - - - X
 5     C. WESTBROOK MURPHY,         :
 6           and                    :
 7     HAROLD SCHULER,              :
 8              Plaintiffs,         :   C.A. No.
 9     v.                           :   1:02CV00982
10     PRICEWATERHOUSECOOPERS, LLP, :
11     et al.,                      :
12              Defendants.         :   Volume 2
13     - - - - - - - - - - - - - - X
14                    May 1, 2003
15                    10:39 a.m.
16
17           Continuation of the deposition of C.
18     WESTBROOK MURPHY held at the offices of
19     Winston & Strawn, 1400 L Street, N.W.,
20     Washington D.C., pursuant to adjournment,
21     before Jana Mulhollan, a Registered
22     Professional Reporter and Notary Public in
23     and for the District of Columbia.
24
25
```

5/1/2003 MURPHY, WESTBROOK

1   APPEARANCES:

2

3       On behalf of the Plaintiffs:

4           DAVID L. ROSE, ESQ.

5           Rose & Rose, P.C.

6           1320 19th Street, N.W., Suite 601

7           Washington, D.C.  20036

8           (202) 331-8555

9           daver@roselawyers.com

10

11      On behalf of the Defendants:

12          ERIC M. NELSON, ESQ.

13          STEPHEN L. SHEINFELD, ESQ.

14          Winston & Strawn

15          200 Park Avenue

16          New York, New York  10166

17          (212) 294-2646

18          emnelson@winston.com

19

20

21

22

23

24

25

5/1/2003 MURPHY, WESTBROOK

1   punitive damages against the individuals.
2   Is that right --
3       A.   That is correct.
4       Q.   -- in your mind?
5            So you've named all of these
6   individuals in an effort to hold them liable
7   for punitive damages?
8       A.   Yes.
9       Q.   Is there any other way that suing
10  these individuals benefits you or could
11  benefit you?
12      A.   I think there may be a -- for lack
13  of a better word, what I will call, a
14  psychological effect in getting their
15  attention to the issue in the illegal
16  practice that would be greater than -- more
17  likely to call to their attention
18  individually what I believe to be the legal
19  practice embodied in the partnership
20  agreement and as it's administered by naming
21  them personally than just a lawsuit against
22  the firm alone.
23      Q.   And is that a strategy or tactic of
24  yours?
25      A.   Well, as I have -- as we have

5/1/2003 MURPHY, WESTBROOK

1  discussed at length today, I have tried to
2  call the illegal practices of PwC to a
3  number of people who I believe are
4  responsible, and this is a continuation of
5  that effort.
6     Q.  So the individual Defendants are
7  named for the psychological effect in the
8  hope that somebody will pay attention to
9  your complaint, is that it?
10    A.  That's correct.  I'm not sure
11 psychological is the correct word, but it's
12 the best I can do at the moment.
13    Q.  And did you attempt that tactic back
14 in the early '80s when you brought suit
15 against a number of OCC officials personally
16 alleging the violation of constitutional
17 rights?  Is that similar?
18    A.  No.  I didn't bring -- I didn't
19 bring suit in the sense that I brought suit
20 against these people.
21    Q.  No, I understand that you were not a
22 party to that suit but you were the counsel?
23    A.  I was the counsel.
24    Q.  -- to the party that -- and you
25 advised your client and pursued -- to pursue

458

1   and did pursue claims against individual
2   officials of OCC. Is that right?
3       A. That -- well, again, there's the
4   confusion as to who was the party there. My
5   party -- my clients there were, I believe,
6   three banks. It was either two banks or
7   three banks and we filed a complaint
8   challenging a temporary cease and desist
9   order that had been issued by the office of
10  the controller of the currency. And naming
11  as individual Defendants about a dozen
12  people at -- from the controller of the
13  currency's office.
14      Q. Right. And I think you testified
15  that you asserted those claims against the
16  individuals personally and that the --
17      A. The banks asserted those claims
18  against the individuals personally.
19      Q. Through you as their counsel. Is
20  that right?
21      A. That's correct.
22      Q. For violation of the bank's
23  constitutional rights, is that right?
24      A. That's correct. And I'm trying to
25  remember -- the CEO of the bank may also

5/1/2003 MURPHY, WESTBROOK

1    have been a plaintiff. I just don't
2    remember whether he was or not.
3      Q. And was that similar strategy in
4    order to -- or as we put it, for lack of a
5    better word, psychological effect? Is it
6    intended to get OCC's attention?
7      A. No.
8      Q. What was the purpose of doing that?
9      A. It appeared when we filed -- it
10   appeared, at least to me when I filed the
11   complaint, that some of those persons had
12   violated the constitutional rights of my
13   clients and that they should be held
14   personally responsible. Now, determining
15   which of those persons that might be would
16   have to await discovery.
17     Q. You didn't really have a factual
18   basis for it when you asserted it. Is that
19   right?
20     A. Of course we did. We could look at
21   the result and the result appeared to be
22   unconstitutional. We did not know which of
23   the individual Defendants at the time had
24   done what.
25     Q. So you alleged that each and every

460

5/1/2003 MURPHY, WESTBROOK

```
 1    one of them had violated your clients
 2    constitutional rights.  Is that right?
 3        A.  Right.
 4        Q.  And how many of them were there?
 5        A.  About a dozen.
 6        Q.  Did they occupy a position similar
 7    to the position that you occupied while you
 8    were at OCC?
 9        A.  That depends on your definition of
10    similar.  As far as I remember, none of them
11    held any of the jobs that I had held at OCC.
12    While I was at OCC I was sued personally for
13    several million dollars.
14        Q.  For violation of constitutional
15    rights?
16        A.  I believe so, yes.
17        Q.  Did the discovery establish that any
18    of the dozen or so OCC officials that you
19    side on behalf of your client, in fact,
20    committed a violation of your client's
21    constitutional rights?
22        A.  That would be in the eye of the
23    beholder -- I believe, when we were here
24    last week we established that the cases were
25    dismissed.
```

461

5/1/2003 MURPHY, WESTBROOK

```
 1        Q.  You lost.  Is that right?
 2        A.  The cases were dismissed.
 3        Q.  Did your clients receive anything --
 4   consideration for the dismissal?
 5        A.  An OCC -- a pending OCC appeal from
 6   a preliminary injunction that had been
 7   issued by the district court was part of the
 8   dismissal.
 9        Q.  Look at paragraphs 34 and 35 of your
10   complaint for a moment.
11             Is it correct that those allegations
12   do not apply to you?
13        A.  Which allegations, Mr. Nelson.
14        Q.  34 and 35 of your complaint.
15        A.  That is correct.
16        Q.  Did you receive a pay increase and a
17   bonus in 2001?
18        A.  I received a pay increase.  I don't
19   remember about the bonus.
20        Q.  You just don't recall one way or the
21   other?
22        A.  I don't recall one way or another.
23        Q.  Are you older than Mr. Schuler?
24        A.  I am.  And he is younger than I.
25             MR. NELSON:  Let's take a brief
```

5/1/2003 MURPHY, WESTBROOK

1  you suggest those names?
2  A. I don't believe so.
3  Q. Do you agree with your counsel that
4  the persons listed in paragraph A(1) are
5  likely to have information relevant to and
6  supporting your claim?
7  A. Yes.
8  Q. What information does Dennis Nally
9  likely have that supports your claims?
10      MR. ROSE: If we knew, we wouldn't
11 need discovery, Counsel. I object to the
12 question.
13      MR. NELSON: Well, there are other
14 rules involved here, Mr. Rose.
15      MR. ROSE: Well, you can ask.
16      MR. NELSON: I don't care to ask
17 you. I think your client agrees Mr. Nally
18 is likely to have information supporting his
19 claims.
20      BY MR. NELSON:
21 Q. What information is that?
22      MR. ROSE: He wants to ask you, I
23 believe.
24      THE WITNESS: Well, have you
25 directed me not to answer or not?

5/1/2003 MURPHY, WESTBROOK

1  MR. ROSE: No.
2  THE WITNESS: Well, all of the
3  persons named in paragraph 1 are or were
4  members of the U.S. Board of Partners and
5  principals and which have information about
6  the admissions process and the promotions
7  process that we alleged to be
8  discriminatory.
9  BY MR. NELSON:
10 Q. Would they have any information on
11 those subjects that other members of the
12 board would not have?
13 A. I do not know. And I note that
14 paragraph 1 says: And other defendants and
15 members of the board.
16 MR. NELSON: Mr. Rose, do you care
17 to give us some help with this, as you
18 offered?
19 MR. ROSE: Certainly Sullivan is
20 mentioned because he was a member. I don't
21 know whether we had information that
22 suggested that the others had been members
23 of the membership -- I think it's not
24 membership committee. I think it's
25 admissions, but I think that's the gist of

5/1/2003 MURPHY, WESTBROOK

1  Q. So Mr. DiPiazza was listed here as a
2  potential witness with information
3  supporting Defendants' claims based on his
4  response to Mr. Murphy's question at the
5  luncheon?
6      MR. ROSE: Yes. Presumably, that's
7  what he thought and still thinks.
8      MR. NELSON: Did you name him for
9  any other reason?
10     MR. ROSE: I think -- I don't know.
11 I don't remember but the way that's framed,
12 I believe, I thought when I was writing this
13 that they had some responsibility for the
14 admissions practices. And I don't know if
15 they have any -- I don't really -- am not --
16 at the moment I cannot remember whether
17 that's correct or not.
18     MR. NELSON: Are they named here
19 for any other reason?
20     MR. ROSE: They're members of the
21 board obviously. They're Defendants.
22     MR. NELSON: Well, do they -- is
23 that information that other members of the
24 board did not possess?
25     MR. ROSE: When the chief executive

5/1/2003 MURPHY, WESTBROOK

1   officer speaks for an organization, his
2   speech is -- is self conduct and his speech
3   was a reaffirmation of the policy, and both
4   of them, Nally and DiPiazza, were named
5   first because one of them was, based on our
6   information, the senior partner -- I didn't
7   know that term at the time -- and the other
8   the CEO essentially and the other one had
9   been recently and was still the CEO of
10  Global, whatever that means.
11          MR. NELSON:  So are they included
12  here principally for psychological effect
13  due to the level of -- level positions or do
14  they actually possess information --
15          MR. ROSE:  I don't know whether they
16  possess it.  If I knew, I wouldn't have to
17  do depositions.
18          But I would assume -- I had assumed
19  when I wrote this that -- I do assume now,
20  based on what I know, that the members of
21  the board confronted policies concerning the
22  mandatory retirement practice in 1998, that
23  they were on the board then and they are
24  certainly aware that they're continuing to
25  practice, as indicated by the fact that the