**Exhibit P**



**Dennis Nally**
08/24/2002 10:45 AM

To: Westbrook Murphy/US/ABAS/PwC
cc:
Subject: Re: Non-audit services.

Thanks. Good perspective. Now we just have to get our message out to our clients and the marketplace.
Take care



EXHIBIT

00204



**Westbrook Murphy**
08/23/2002 02:32 PM
(202) 414-4301
Washington, DC
US

To: Dennis Nally/US/EXEC/PwC@Americas-US
cc: Dean M. Kern/US/TLS/PwC@Americas-US
Subject: Non-audit services.

Thanks for your note about the impact the Sarbanes-Oxley Act limitations on PwC's tax practice and other non-attest services.

One way to deal with the misperceptions of clients about the scope of the Sarbox limitations is to point to the Senate Committee report that explains those limitations. For example, the committee's report (p.18) explained Sarbox's prohibition on "expert" services, as follows:

"The accounting firm should not act as an advocate of the client, which would be involved in providing legal and expert services to an audit client in legal, administrative, or regulatory proceedings. . . ."

More generally, Sarbox will ban only those specific non-audit services that the Committee believed to present an inherent conflict of interest for the auditor. An explanation of the Committee's view of its own handiwork (Sect. 201 of the Act originated in the Senate Committee) is discussed in the note below, together with a complete excerpt from the Committee's report.

Personally, I view Sarbox as a great opportunity for auditing firms to assist both audit and non-audit clients in improving their corporate governance, internal controls, and financial reporting. That's what Congress wants public companies to do, and we are the experts in how to do it.

In that connection, the revised independence standards GAO issued on January 25, 2002, discuss the ability of an auditor to provide "routine activities" to its audit clients, including "internal assessment methodologies that can be used by management."

The GAO standards state:

> **3.23**        Auditors may participate on committees or task forces in a purely advisory capacity to advise entity management on issues related to the knowledge and skills of the auditors without impairing their independence. However, auditors should not make management decisions or perform management functions. For an example, auditors can provide routine advice to the audited entity and management to assist them in activities such as establishing internal controls or implementing audit recommendations, can answer technical questions, and/or provide training. The decision to follow the auditor's advice remains with management of the audited entity. These types of interactions are normal between the auditor and the management of the audited entity given the auditor's technical expertise and the knowledge the auditor gains of the audited entity's operations. An auditor may also provide tools and methodologies, such as best practice guides, benchmarking studies, and internal control assessment methodologies that can be used by management. By their very nature, these are routine activities that would not require the audit organization to apply the safeguards described in paragraph 3.25.

This GAO standard appears completely consistent with the Sarbox limitations on non-audit services. Stated differently, Sarbox does not appear to ban any of the "routine activities" mentioned in Par. 3.23 of the GAO standards.

----- Forwarded by Westbrook Murphy/US/ABAS/PwC on 08/23/2002 11:15 AM -----



**Westbrook Murphy**
08/12/2002 11:22 AM
(202) 414-4301
Washington, DC
US

To: Bob Bench/US/ABAS/PwC@Americas-US
cc: Bill Lewis/US/ABAS/PwC@Americas-US, Tim
     Ryan/US/ABAS/PwC@Americas-US
Subject: Non-audit services.

00265



Attached are excerpts from the Senate Committee Report on the bill that became Sarbox.

These excerpts note that the Committee, in drafting its bill, rejected a complete ban on an public accountant providing any non-audit service to its audit clients, and instead adopted what the Committee called a "more flexible approach". The Committee, thus, banned only the providing of 8 listed non-audit services to audit clients, and--in the attached text--explained why it considered each of these 8 services to constitute a conflict of interest for the auditor.

In addition to the explanations for these specific prohibitions (including "expert services"), the following passages are key to understanding the Committee's view of this legislation--

The Committee's Report quotes approvingly the following testimony from Comptroller General Walker:

> The independence provision [of the bill] * * * strikes a
> reasoned and reasonable balance that will enable auditors
> to perform a range of non-audit services for their audit clients
> and an unlimited range of non-audit services for their
> non-audit clients. Most importantly, the proposed legislation
> adopts a "principle based" and "substance over form"
> approach that can stand the test of time and, if adopted,
> will better protect the public's interests.

The Committee explained that it intended, in its ban of 8 listed services, to:

> "to draw a clear line around a limited list of non-audit services that accounting firms may not
> provide to public company audit clients because their doing so creates a fundamental conflict
> of interest for the accounting firms. The list is based on simple principles."

As noted in my earlier (Aug. 9) memo, the "simple principle" underlying the ban on expert services was the Committee's determination that a public accounting firm "should not act as an advocate" by "providing legal or expert services to an audit client in legal, administrative, or regulatory proceedings."

Remember that these limitations on non-audit services technically are not effective until sometime in 2003, after the Public Company Accounting Oversight Board has begun operations and registered public company accountants.



Indepence explain.doc

**Dennis Nally**
08/22/2002 06:09 PM

To: PwC Consulting Staff,PwC US Staff
cc:
Subject: PwC Update



## This Message is from Dennis Nally
## US Firm Senior Partner

When I wrote to you two weeks ago, I indicated that the Sarbanes-Oxley Act provides a framework regarding regulation of the accounting profession. As the weeks go by, there is growing confusion around how some of the terms in the Act's provisions are defined. For example, the provisions clearly indicate that tax services are allowed (meaning that we can continue to provide tax services to our audit clients)--but that "expert services" are not. What makes this difficult is that the term "expert services" is not defined. This kind of confusion, coupled with recent executive indictments and the well-publicized "perp walks," is resulting in an unprecedented level of conservatism in boardrooms across America.

These two factors--confusion and conservatism--are beginning to have an impact on our business, and we cannot afford to take a "wait and see" approach. The provisions may not be defined by the SEC and the new Oversight Board for the accounting profession for months to come. So, our Firm is moving ahead with some decisive actions and a degree of speed and agility that are not "business as usual" for the largest of the Big Four firms.

### In the Marketplace

Here are some examples of what is happening in the marketplace: The CFO of one of our major audit clients got a call from a "vice chairman" of one of the other Big Four firms inquiring about how the company was handling the non-attest services provided by its auditor, PwC. The person also asked if a dollar cap or limit on these services had been put into place--to which the CFO responded "none of your business." The call developed into a "we can fill the void and be your primary non-attest service provider in all areas"--to which the CFO responded "in tax, we already work with everyone." Another audit client just terminated a 12-month non-attest contract, three months into the project, on the advice of its law firm. And we heard from an international tax planner at yet another client that his company may take the position that they want to be "good corporate citizens" by using their auditing firm for only audit work--even though they are aware that there is a carve-out for tax consulting work.

Examples are only examples, but they indicate several areas where we need to be particularly alert: (1) Our competitors are very aggressively and unashamedly going after our non-attest work at our most prominent clients. (2) In the absence of any formal interpretation of the Sarbanes-Oxley Act, many law firms are advising their clients (many of whom are also our clients) to err on the side of being conservative. And many law firms that also provide tax services are out-and-out telling clients that they can best protect themselves by putting a stop to all tax work provided by PwC and hiring the law firm to provide the same tax services. These law firms have nothing to lose and everything to gain by urging their clients to be ultra-conservative regarding non-attest work. (3) In the face of the uncertainties, many companies are defining the Sarbanes provisions before the SEC and the new Oversight Board do so--and they are defining the provisions with maximum caution.

Clearly, there is turmoil resulting from the uncertainty around the Sarbanes-Oxley provisions. That being said, there have also been numerous instances in which our audit clients have confirmed that they want us to continue to provide non-attest services. And some Audit Committees have already instituted a pre-approval process for non-attest services.

### Dual Market Approach: Proactive Client Service and Aggressive Targeting

Given the set of circumstances I've just outlined, we are going into the "Sarbanes" marketplace with a clear strategy and we are doing it rapidly. Carter Pate, our Sales and Business Development (SBD) Leader, is already working with our Industry groups, our SBD group, our Business Development Executives, and our Office Managing Partners. This group will the lead the way, as we defend our current client base and extend it. Here's the dual approach we are taking in the marketplace:

Proactive Client Service: We need to stay in constant contact with our clients regarding the Sarbanes-Oxley Act. We need to get in front of our clients' Audit Committees with our strongest possible argument for why allowing PwC to provide non-attest services is the right course. We must pull out all the stops to defend and protect our client base.

Aggressive Targeting: We need to take action to help PwC become the "preferred provider" of all non-attest services to companies where we do not provide the audit. The members of our sales and marketing organizations, along with the other groups I mentioned above, are working together to go to market just as aggressively as our competitors. The other firms are reported to be saying that PwC is too big to move with agility. Speed is critical in this market, so we have to prove them wrong.

We are making sure that our messages to both attest and non-attest clients are consistent. We're talking about our capabilities and about our high quality standards. We're making it clear that we have skills that can add value to our clients' organizations, and that we want to build long-term relationships with them. Unlike our competitors, we are determined to take the high road in how we communicate this to our clients and the marketplace. I am confident that we will be successful.

**Capturing Market Reactions**

We have also launched an initiative to gauge the marketplace reaction to the Sarbanes-Oxley Act, and this is being led by Dean Kern, US Marketing Leader. Dean is working with the Global Relationship Partners of some our largest/most important attest and advisory clients to get feedback regarding these clients' reactions to specific provisions in the Sarbanes Act. The purpose is two-fold. First, we need to understand how and to what extent the market for our services is changing. We view this as an ongoing project, as market demand will evolve for at least the next year, while the SEC and the new Oversight Board interpret the provisions of the Act. Second, this enables us to learn about broader concerns from a management and Audit Committee perspective. We recognize that there will not be any clear answers on best practices concerning those provisions of the Act that do not become effective in the near term. That being said, we do expect that the feedback will provide insights into the direction that clients are taking, or, at a minimum, feedback regarding concerns or areas that will require a change to the company's policies or practices. This is only the first of a number of initiatives that will help us keep on top of market reactions, so that we can understand the impact on our business and leverage all opportunities for growth.

**Chairman's Program**

About a year ago, we began developing a plan around our top clients. The events of the past 10 months, capped by the Sarbanes Act, confirm that such a program is critical to our long-term success. This Program is more important than ever, given the current regulatory environment, with the dramatically enhanced emphasis on quality, and the critical need to grow our practice through the advisory or non-attest side of our business. Here's an overview of what the Program is all about.

The Chairman's Program focuses our efforts along two tracks--attest and advisory--and it is directed at protecting our Firm's "crown jewel" clients, and at companies with the largest potential economic payback. We believe that these clients must be treated differently, and we have identified 100 clients as the initial core of the Chairman's Program. Fifty are attest clients; 50 are advisory clients. This is not a one-size-fits-all program; rather, as we move forward with implementation, it will be based on what is best for each client.

The Chairman's Program is also a relationship management program that provides our Firm's leadership with another direct link to the executive suite of our most important clients; and it provides these clients with closer access to our leadership. We are trying to do everything we can to keep communications with clients open, and we want to be able to react with speed if any issues surface with any clients, but particularly with these 100 franchise clients. We have identified a Global Relationship Partner to focus on each of the 50 attest clients that are part of the Program, and we are currently identifying the right partners to focus on the 50 advisory clients.

*   *   *

As you would expect, the environment that I've just described has made us re-think some of the priorities we've addressed in the past and re-think the way we do things. It demands that we have a very clear focus. The reorganization of our Firm that I wrote about in the last PwC Update is part of this kind of re-thinking to make sure that we are doing the right things, at the right time. And this leads me to the next in our series, **Secrets of Success at PwC.**

### Secret of Success #6:  Focus/Set Goals

From your own experience, you know how important it is to be able to sort out the things that must be taken care of, from the ones that don't matter so much. A "rifle" approach is much more efficient and effective than a "shotgun" approach that wastes time and effort.

As you progress in your job responsibilities, your level of success depends on being able to judge your priorities and focus on the ones that are most important and time-critical. Once you sort out the top priorities from the "nice to do" list, you are in a position to focus on what needs to be done. Then and only then can you make progress. And, at that point, you are free to set goals without the distraction of "a hundred other things." Developing this kind of sharp focus and specific goal setting is essential because of the many things you are called on to do every day. "Focus" is also about creating the right balance between your work life and your personal life. It doesn't take long to learn that you simply cannot be successful in achieving the objectives that matter--if you're spending your time and efforts on what is irrelevant and unrelated to your goals.

Over the next several weeks, our partners will be meeting at venues across the country to discuss the challenges that are facing us and providing their feedback to our Management team. In my remarks regarding the "State of our Firm" at those meetings, I will try to bring a sharp focus to what we need to do to take our Firm successfully into the future, given the current external environment. The three areas of focus are People, Quality, and Profitable Growth--and I will talk with you about these three areas in the weeks ahead.

So when I tell you that focus/goal setting is one of the Secrets of Success at PwC, you can be assured that this applies to everyone and that it is relevant, regardless of your level of responsibility! As always, I invite your comments.

Regards,

**PwC Secrets of Success**

Feedback

00269