UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| C. WESTBROOK MURPHY,<br>　　　　Plaintiff<br><br>　v.<br><br>PRICEWATERHOUSECOOPERS, LLP, *et al.*<br>　　　　Defendants. | Civil Action No. 05-1054 (RJL/DAR) |
| C. WESTBROOK MURPHY, *et al*.<br>　　　　Plaintiffs<br><br>　v.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br>　　　　Defendant. | Civil Action No. 02-982 (RJL/DAR) |

**PLAINTIFF MURPHY'S OPPOSITION TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER BARRING THE DEPOSITION OF DENNIS M. NALLY**

Dennis Nally has unique personal knowledge about an issue that is central to this litigation, and upon which PwC intends to seek summary judgment. Whether or not most people who hold the title "partner" at a firm are truly owners, exempt from employment discrimination laws, or are more like employees, is an intense factual inquiry ultimately determined by the degree of control that a line partner has over the operation of the firm. See Clackamas Gastroenterology Associates v. Wells, 538 U.S. 440, 451 (2003) ("[t]he mere fact that a person has a particular title – such as partner, director, or vice president – should not necessarily be used to determine whether he or she is an employee or a proprietor. . . .   Rather . . . the answer to whether a shareholder-director is an employee depends on 'all of the incidents of the relationship.' ").

As much as anyone in PwC's history, Dennis Nally has played a leading role in creating and managing PwC. He was a member of the transitioning Board of Partners and Principles when PwC was formed in July 1998; he then served as the Managing Partner -- "overseeing the entire US firm." [Exh. 1, DiPiazza 9/12/2000 e-mail; Exh. 2, Carter depo. at 12-13] Now he is in his second term as PwC's Senior Partner, managing the entire operations of the firm. There is no one who has greater knowledge about the relationship between rank and file partners, and those who govern the firm.

Mr. Nally also has claimed to have unique personal knowledge about the central evidence of age discrimination at issue in this case. PwC maintains a mandatory retirement policy in which "partners" must ordinarily withdraw from the firm (notwithstanding performance or productivity) at age 60. Plaintiffs are two extremely talented professionals who, because of their ages and because of the firm's mandatory retirement policy, have watched younger less qualified employees pass them by for partnership.[1] PwC will undoubtedly argue in this case that it has legitimate business reasons for such a policy, and that it is not unlawful as applied to "partners." But Mr. Nally admitted at a PwC conference that some CEO's of clients of the firm had expressed an interest in having older partners remain working for them – as Mr. Nally put it, they "possessed the gray hair that often signaled experience" [Exh. 3, Plaintiff's verified interrogatory answers, at 15] Nally explained that because of this sentiment, the firm was considering revising the mandatory retirement policy. To date, though, the policy remains. His knowledge of this incident is relevant and discoverable.

Mr. Nally is not immune from discovery, simply because he is the Senior Partner of the

---

[1] Judge Leon has already denied PwC's bid for summary judgment on the merits of plaintiffs' claims in Case 1 (which challenge their denied admission to the partnership in 2000 and 2001), but PwC has stated that it intends to seek summary judgment in both Case 1 and Case 2 (which challenges non-promotion in 2004) on the Clackamas question.

2

firm. Indeed, on the last occasion in which PwC's partnership decisions were successfully challenged as discriminatory in this Court, Price Waterhouse's then senior partner, Joseph Connor, appeared for deposition. Hopkins v. Price Waterhouse, 825 F.2d 458, 463 (D.C. Cir. 1987). Here, Plaintiffs can demonstrate that Mr. Nally possesses important discoverable information by virtue of his unique role and history with the firm. Plaintiffs have twice changed the date of this deposition to accommodate Mr. Nally's schedule, and have waited until all other fact depositions were taken before deposing Mr. Nally. His deposition is still necessary. Finally, in other litigation PwC was found to have misled a court in an effort to downplay the extent of Mr. Nally's personal knowledge about events at issue, and the firm was sanctioned by the presiding judge for discovery abuse. PwC's claim of lack of knowledge here should not be accepted at face value. This deposition should go forward.[2]

### A.  Mr. Nally has Direct Knowledge of Matters Pertinent to Plaintiff's Claims.

1. Mr. Nally was Part of the Firm's Leadership that Created PwC and the Mandatory Retirement Policy

In 1989, Price Waterhouse and Coopers & Lybrand merged and formed PricewaterhouseCoopers (PwC). At the time of the merger, Mr. Nally was part of the leadership that created the new firm. [See, e.g., Minutes of September 9, 1998 U.S. Board Meeting, Exh. 4] At a meeting of the Board in September 1998, the founding partners (including Mr. Nally), discussed how the Board would "harmonize withdrawing partner provisions," along with other relevant matters, such as procedures for Board elections, procedures for the admissions of partners, and procedures for appointing territory leadership positions. [Id. at PwC18901] Upon information and belief, Coopers & Lybrand had a mandatory retirement age of 62 for its partners

---

[2] PwC's lengthy characterization of the history of these cases is self-serving and inaccurate. It is also largely irrelevant to a resolution of this Motion. In light of the imminent hearing on Monday morning, December 4, 2006, however, Plaintiffs will focus their opposition on what is relevant to the question at issue.

prior to the merger, and Price Waterhouse had a mandatory retirement age of 60. Mr. Nally will be able to testify as to the discussions regarding what the retirement policy would be for the newly-formed firm.

Plaintiff attempted to explore the evolution of the mandatory retirement policy by seeking any documents which analyzed or described the policies around the time of the merger, but PwC contended that no such documents existed. Plaintiffs should, therefore, be allowed to inquire from Mr. Nally regarding his recollection of these deliberations, since he was one of the founding members of the firm.

Mr. Nally can also provide testimony regarding the business rationale for PwC's mandatory retirement policy for partners. Though John Carter, U.S. Partner Affairs Leader, was asked at his deposition about the reason for PwC's mandatory retirement policy for partners, his answer was merely that he believed it related to the need for vitality. [Exh. 2, Carter depo. at 222] Elizabeth Carol Nebe, a high-level Managing Director with substantial responsibility within Partner Affairs, stated that she "couldn't say" why PwC had a mandatory retirement policy for partners. [Exh. 5, Nebe depo. at 110] Two other partners who have been deposed stated that they too did not know why the policy was in place, but one of them concluded on his own that "turnover" was the reason. [Exh.6, Lavine depo. at 149-51[3]] As Senior Partner and a Board member from the inception, Mr. Nally presumably can explain why this facially discriminatory policy is supposedly necessary.

Indeed, Mr. Nally has at all times played a central role in administering this policy. Pursuant to the governing instrument of PwC -- the Partners and Principles Agreement -- it is the

---

[3] The other partner, William Lewis, was deposed on November 17, 2006, and Plaintiffs do not yet have the transcript from that deposition. However, Mr. Lewis testified in his deposition that he did not know why the policy existed and had never "focused" on it.

Senior Partner (now Mr. Nally) who can recommend exceptions to the mandatory retirement policy, and (with Board approval) thereby allow a partner to work past the age of 60.  [See Partners & Principals Agreement, § 10.1(b), attached as Exhibit 7]  Mr. Nally therefore should have personal knowledge of each instance in which the firm has granted and denied an exception, and why.  In short, the firm's mandatory retirement policy is of critical importance to Plaintiffs' age discrimination claims, and as a founding Board member, Managing partner and Senior Partner, Nally helped to put it in place and administer it.  He should have a deep understanding of the firm's rationale for this policy, and the way in which it has been applied.  There is no valid reason why he cannot be required to testify about it.

2. Mr. Nally's Public Statements About Changing the Policy

Plaintiff has provided sworn interrogatory answers and testified at his deposition about a conference in August 2005 for PwC Managing Directors where he spoke with Mr. Nally about the reason for the mandatory retirement policy for partners.  [Exh.8, Day 6 of Murphy depo. at 62; Exh. 3]  In response to a question from Plaintiff, Mr. Nally said that the firm did not take age into account when making any partnership decisions, but then agreed that the firm was at that very moment considering changing the mandatory retirement policy.  Nally explained that:

> Some client audit committees and CEOs felt more comfortable if the PwC audit engagement partner possessed the gray hair that often signaled experience; and that for that reason, PwC was examining whether to change its mandatory retirement age of 60.

[Exh. 3]  To date, more than a year later, PwC has not altered or abandoned that policy.

This incident is obviously relevant to plaintiffs' claims.  If some PwC clients were actually suggesting a change in policy because they wanted older, more experienced professionals to continue to be able to service their business, then PwC's insistence on keeping

5

the policy is even more probative of age bias.  That is, Nally's statement (if true) would seem to undermine the notion that business reasons justify keeping an explicit age policy in place.

Moreover, Mr. Nally surely has known about the existence of Plaintiffs' legal claims (first filed in this court in the spring of 2002) that the mandatory retirement policy precludes older employees from being considered for partnership.  He may also be aware of the statistics that plaintiffs have presented to support these claims (i.e., that not a single employee age 60 or older has <u>ever</u> been admitted to the partnership, and that the older a sponsored employee is, the less likely she is to be admitted).  Judge Leon acknowledged in denying defendant's motion for summary judgment (nearly a year before Mr. Nally's public statements) that "plaintiffs may still use evidence of systemic or general discrimination in establishing their *individual* claims." Opinion and Order, 9/27/04, at 33 (emphasis in the original).  It would certainly be relevant to remedial issues (such as punitive damages and injunctive relief) if the Senior Partner of the firm had consciously left in place a policy that directly discriminated against employees because of their age.  Indeed, under the District of Columbia Human Rights Act, punitive damages are particularly appropriate where high level corporate executives either "participated in the allegedly ulawful act, authorized it, or approved [ratified] the act before or after it was done." Standardized Civil Jury Instructions for the District of Columbia, § 16:02; <u>see also</u>, <u>Arthur Young & Co. v. Sutherland</u>, 631 A.2d 354, 373 (D.C. 1993). Plaintiffs are entitled to explore whether Mr. Nally and other high level executives at the firm have decided to leave in place a policy which they know to be discriminatory.

PwC's response to this issue is particularly weak and telling.  It claims that it has previously assured Plaintiff that there are no documents which reflect Mr. Nally's alleged statements at the conference, or any consideration by the firm to changing this policy.  [Def.'s

6

Brief at 10] That hardly disposes of the matter. Indeed, the lack of any documentation makes it all the more important for Plaintiff to have the opportunity to inquire from Mr. Nally directly why he made these statements at the conference, what clients have said to him about the policy, and what discussions he has had with other partners about continuing this policy. The fact that no one at PwC sought fit to write any of this down on paper does not render it off-limits for deposition.

**B.    Mr. Nally's Unique Position with the Firm Makes His Testimony Important to the Clackamas Analysis**

In Clackamas the Supreme Court recognized that, even though styled as a partnership, an institution may have grown so large that nominal partners really function more as employees than as owners of the enterprise.

> The question whether a shareholder-director is an employee, however, cannot be answered by asking whether the shareholder-director appears to be the functional equivalent of a partner. Today there are partnerships that include hundreds of members, some of whom may well qualify as "employees" because control is concentrated in a small number of managing partners. Thus, asking whether shareholder-directors are partners -- rather than asking whether they are employees -- simply begs the question.

Clackamas, 538 U.S. at 446 (emphasis supplied).

PwC has more than 2000 partners. And if, as it has repeatedly stated it intends to do, defendant files a motion for summary judgment on the Clackamas issue, the record will show that the firm imposes strict control on line partners.[4] PwC contends that all of its partners are owners, left unprotected by age discrimination laws, and even if Plaintiff Murphy had been admitted to the partnership, the firm could lawfully and immediately have forced his retirement.

---

[4] For example, it is undisputed that partners are given performance appraisals by supervising partners, that their pay is determined by supervising partners, that they can be disciplined by supervising partners for not complying with firm policies or for not obtaining mandatory training etc. They are given limits for vacation pay,

At issue in this case, therefore, is not just the decision making specifically in connection with plaintiffs' non-selections, but also the firm's policies and practices, its governance structure and operations, and how this impacts on the type and degree of "control" that is exercised over individual partners.  As the Supreme Court explained:

> At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant. The general definition of the term "servant" in the Restatement (Second) of Agency § 2(2) (1958), for example, refers to a person whose work is "controlled or is subject to the right to control by the master." See also id., § 220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control"). In addition, the Restatement's more specific definition of the term "servant" lists factors to be considered when distinguishing between servants and independent contractors, the first of which is "the extent of control" that one may exercise over the details of the work of the other. Id., § 220(2)(a). We think that the common-law element of control is the principal guidepost that should be followed in this case.

Clackamas, 538 U.S. at 448.

In describing the analysis courts should follow to resolve this issue, the Supreme Court adopted the factors identified by the Equal Employment Opportunity Commission, focusing on the indicia of control:

> We are persuaded by the EEOC's focus on the common-law touchstone of control, and specifically by its submission that each of the following six factors is relevant to the inquiry whether a shareholder-director is an employee:
>
> "Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work
>
> "Whether and, if so, to what extent the organization supervises the individual's work
>
> "Whether the individual reports to someone higher in the organization
>
> "Whether and, if so, to what extent the individual is able to influence the organization

---

they have limits on authority to spend money, and to take personnel actions within the firm.  These are just a few of the many examples in the record of how PwC partners are controlled by the firm.

8

> "Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts
>
> "Whether the individual shares in the profits, losses, and liabilities of the organization."

Id. at 449.

Mr. Nally's position at PwC is unique. He was personally involved in the merger of the two firms, and has since that time served as Board member, Managing Partner of the U.S. firm (the number two executive level position in the firm), and Chairman of the Board and Senior Partner – overseeing the entire operations of the firm. Plaintiffs are not aware of any person other than Mr. Nally who has served in each of these positions. Mr. Nally has a singularly unique perspective on both the way the firm is run at the top and the interrelationships among the various leadership entities that govern the firm.

As a Board member, Mr. Nally acquired knowledge directly relevant to this case. Minutes from the meetings of the U.S. Board of Partners and Principals reflect that he attended numerous Board meetings where issues that are directly relevant to the Clackamas inquiry were discussed and acted upon by the Board. For example, whether the partnership at large would be permitted to see the Board members' compensation; discussions about the process for voting (i.e., how votes based on equity in the firm would be administered); discussion of suspending the process for the partnership at large to ratify the slate for the Board Nominating Committee (which determines which partners get nominated for Board membership). [Exh. 9, Feb. 7, 2001 minutes] Mr. Nally was present and participated in each of these deliberations.

Mr. Nally has also served longer than anyone in the history of the firm in the position of Senior Partner. In that role, he has been responsible for recommending to the Board instances in which the firm would force the departure of a partner, due to issues such as non-performance,

9

misconduct or other reasons. [See Exh. 7, Partners and Principles Agreement, § 11.2 ("Required Withdrawal.")] The EEOC and the Supreme Court in <u>Clackamas</u>, identify whether or not a partner can be fired, as the first relevant factor in the "owner/employee" analysis. Mr. Nally presumably is aware of each instance in which that has happened at the firm. As Senior Partner, Mr. Nally has likewise been responsible for appointing members to managing committees, and for recommending their removal as Members at large. [<u>Id.</u>, § 6.1(e) and (i)] He has been integral to the governance of the firm, and has unique personal knowledge of each of these matters.

PwC claims that plaintiffs should not be entitled to depose Mr. Nally, because they could obtain this information from other sources. For example, it argues that Plaintiff should be content to rely upon the deposition of John Carter, who has been the firm's head of Partner Affairs since July 1, 2001. But Mr. Carter has never served on the Board, and he has never served as Managing or Senior Partner. He did not regularly attend Board meetings, and did not possess the executive level authority that Mr. Nally holds.[5] While he is certainly knowledgeable about many of the firm's policies that will be relevant to the <u>Clackamas</u> analysis, he is not an adequate substitute for Mr. Nally. In any event, the fact that plaintiffs have obtained some testimony about these matters from other witnesses does not immunize Mr. Nally from being deposed. <u>Cooper v. Welch Foods, Inc.</u>, 105 F.R.D. 4, 6 (W.D.N.Y. 1984) (the possibility of duplicative testimony is not ordinarily a valid ground to grant a protective order).

**C. There Are No Extreme Circumstances to Warrant Precluding the Deposition**

Mr. Nally is clearly a busy man. He also has knowledge that is very important to this

---

[5] For example, Carter does not know what kind of criteria the nominating committee members use to help them narrow down the list of potential Board candidates; he does not have direct or detailed knowledge of what the Board subcommittees are responsible for; and he has no knowledge of the potential "negative business impact," as the Board called it, of the Partnership Agreement's "Involuntary Withdrawal Provision." [Exh. 2 at 25, 27, 50, 198-99]

case, and Plaintiffs have always been willing to accommodate his schedule.  Indeed, Plaintiffs first informed PwC of their intention to depose Mr. Nally in a letter dated May 25, 2006. [Exh. 10, May 25, 2006 letter]  Since then, Mr. Nally's deposition was twice set for dates agreeable to PwC, and twice moved because of his travel plans.  Plaintiffs are again prepared to agree upon a date for the deposition that would not burden Mr. Nally's responsibilities to the firm.  Plaintiffs have also agreed to travel to New York to take his deposition.  Defendant has not explained how requiring Mr. Nally to attend a deposition (whose duration is limited to a maximum of seven hours by rules of this Court and would very likely take considerably less time) would cause any harm to him or the firm.

PwC acknowledges, as it must, that Mr. Nally is not immune from being the object of discovery, and defendant implicitly acknowledges that he has discoverable information by offering to provide written interrogatories in lieu of deposition.  Written answers (which often are more the product of the lawyer than the witness), however, are not an adequate substitute for the ability to pose questions, and follow up questions, directly to Mr. Nally.  And notwithstanding PwC's assertions to the contrary, "high ranking corporate executives are not automatically given special treatment which excuses them from being deposed." Treppel v. Biovail Corp., 2006 U.S. Dist. LEXIS 7836, *3  (S.D.N.Y. 2006)(citations omitted).  See also, e.g., Morales v. E.D. Etnyre & Co., 229 F.R.D. 661, 2005 U.S. Dist. LEXIS 13945 (D.N.M. 2005)(declining to preclude deposition of CEO, observing that the CEO might have personal knowledge of manufacturer's policies, record keeping, and authorization or ratification of one of its officer's actions); Horsewood v. Kids "R" Us, 1998 U.S. Dist. LEXIS 13108 (D. Kan. 1998)(denying protective order and ordering corporate executive to appear for deposition).

Similarly, the fact that Mr. Nally may be busy or important is also not determinative.

General Star Indem. Co. v. Platinum Indem. Ltd., 210 F.R.D. 80, 83 (S.D.N.Y. 2002) (fact that witness has busy schedule is not, by itself, basis for denying discovery from high-ranking corporate official); Naftchi v. New York Univ. Med. Ctr., 172 F.R.D. 130 (S.D.N.Y. 1997) (denying motion for order precluding deposition of medical school dean in employment discrimination action against university).

In support of its efforts to block Mr. Nally's deposition, PwC cites case law dealing with attempted discovery of government officials, such as Alexander v. FBI, 186 F.R.D. 1 (D.D.C. 1998) and Alliance for Global Justice v. District of Columbia, 2005 U.S. Dist. LEXIS 15190 (D.D.C. 2005). Alexander dealt with attempts to depose highest-ranking senior White House staffers, such as the Press Secretary and the Director of Communications for the White House; the concern was over interference with the ability of the subpoenaed witnesses to function as high-level public servants. Alexander v. FBI, 186 F.R.D. 1, 2, 5 (D.D.C. 1998). Alliance for Global Justice addressed the proposed deposition of the mayor of the nation's capital, in a case dealing with municipal liability for police actions taken against demonstrators. The court issued a protective order barring the mayor's deposition, specifically noting that no other discovery had been taken on any of the issues the mayor could address. Alliance for Global Justice v. District of Columbia, 2005 U.S. Dist. LEXIS 15190 (D.D.C. 2005)(discussing need for protection for heads of governmental departments or members of the President's Cabinet).

While Plaintiff acknowledges that Mr. Nally is clearly an important figure at PwC, he is not on the same level as the head of a federal agency, an Advisor to the President, or the mayor of the nation's capital. Indeed, if a sitting president can appear for deposition in a civil litigation, surely Mr. Nally can be subjected to the same discovery procedure. See, e.g., Jones v. Clinton, 12 F. Supp. 2d 931 (E.D. Ark. 1998).

Other cases PwC cites are also easily distinguishable. PwC relies on Salter v. Upjohn Co., 593 F.2d 649 (5th Cir. 1979), but in that case the Fifth Circuit noted that, far from barring the deposition of Upjohn's president, the district court had merely required the plaintiff to depose other Upjohn employees first, before taking any deposition of the company president. "[T]he trial judge was merely exercising the broad discretion...he has in controlling the timing of discovery." Id. at 651. The Fifth Circuit noted that if the plaintiff was still not satisfied and had properly noticed the deposition again, the plaintiff should have been allowed to depose the company president. Id. Here, Plaintiff Murphy has already taken all other depositions in his cases, and he is similarly "not satisfied" and needs to depose Mr. Nally.

PwC's reliance on Thomas v. IBM, 48 F.3d 478 (10th Cir. 1995) is no more persuasive. There the plaintiff was an administrative clerk who had no direct contact with, but was seeking to depose, IBM's chairman. The notice of deposition was also untimely and was otherwise procedurally flawed, and the court additionally held that the plaintiff's failure to depose other corporate personnel, including her own immediate supervisors, was sufficient reason to prevent the deposition of the chairman. Id. at 484. That situation does not remotely resemble the circumstances here.

It is unusual for a trial court to prohibit the taking of a deposition altogether; absent extraordinary circumstances, such an order would likely be in error. Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979). See also, e.g., Heat & Control, Inc. v. Hester Indus., 785 F.2d 1017 (Fed. Cir. 1986). Rather than merely making "conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one"; "[t]he moving party has a heavy burden of showing 'extraordinary circumstances' based on 'specific facts' that would justify such an order." Flanagan v. Wyndham Int'l, 231 F.R.D. 98, 102 (D.D.C.

2005)(quoting Alexander v. FBI, 186 F.R.D. 71, 75 (D.D.C. 1998)).  In the present case, no such "extraordinary circumstances" exist, and Mr. Nally's deposition should go forward.

### D. Claimed Lack of knowledge is Insufficient Grounds to Prohibit the Deposition

Finally, PwC assures the Court that Mr. Nally does not have unique personal knowledge of any relevance.  However, "[o]verwhelming authority indicates that an alleged lack of knowledge is an insufficient ground to prohibit the taking of a deposition"; "the very purpose of the disposition discovery is to test the extent of the deponent's knowledge and claims of ignorance."  Kuwait Airways v. American Security Bank, 1987 WL 11994, *2 (D.D.C. 1987)(unpublished decision).  [Attached as Exh. 11]

Even where, as here, a high-ranking corporate officer denies knowledge of the underlying facts, that claim is "subject to testing by the examining party."  Treppel v. Biovail, 2006 U.S. Dist. LEXIS 7836, at *3 (quoting Consolidated Rail Corp. v. Primary Indus. Corp., 1993 U.S. Dist. LEXIS 12600, at *1 (S.D.N.Y. 1993)); Horsewood, 1998 U.S. Dist. LEXIS 13108, at * 17-22   (finding that claim of lack of personal knowledge does not suffice to meet burden of showing good cause and ordering corporate executive with knowledge of policies and procedures to appear for deposition); Amherst Leasing Corp. v. Emhart Corp., 65 F.R.D. 121, 123 (D. Conn. 1974)(stating that owner should have to establish his ignorance at deposition rather than through affidavit); 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil 2D §2037 at 5000 (1994).  "Lack of knowledge claimed by…high executives may, in and of itself, be relevant evidence."  Travelers Rental v. Ford Motor Co., 116 F.R.D. 140, 144 (D. Mass. 1987) ("[I]t would be improper for the Court to require that [plaintiff] accept these officials' affidavits of limited knowledge and virtually no recollection at face value with no opportunity for testing at depositions").

14

As discussed above, Mr. Nally does have direct personal knowledge relevant to this case. Moreover, this is not the first time that PwC has claimed that Mr. Nally does not have any discoverable information that is not readily and more appropriately obtainable from other deponents. [Def.'s Brief at 10.] In another litigation, "PwC objected to the Nally deposition based upon the representation of counsel that Nally did not have any information or knowledge of the allegations contained in Plaintiff's complaint." See Warmack-Muskogee Ltd. Partnership v. PricewaterhouseCoopers, et al., Circuit Court of Miller County, Ark., Docket No. E-2001-504-3 (March 28, 2003), attached as Exhibit 12, at pp. 3-4. However, after ordering the deposition of Dennis Nally and reviewing that deposition transcript, "[t]he Court finds that PwC misrepresented to the Court that Nally did not have knowledge relating to the issues of this case…The Court finds that the actions of Defendant, PwC, were intended to evade discovery and mislead the Court…" [Id. at 4] The Court then proceeded to impose significant sanctions for contempt. [Id.] In light of this finding, PwC's assertion here that Mr. Nally knows nothing of substance relevant to this case should, at a minimum, be treated with caution.[6]

In short, Dennis Nally is an important witness in this case. Plaintiffs are prepared to accommodate his busy schedule, but defendants have not presented any valid basis to preclude his deposition. The Motion for a Protective Order should be denied, and defendant should be ordered to produce Mr. Nally for deposition within the next 45 days.

                                                                                                                                   __/s/_____
                                                                                                                                   Douglas B. Huron  (89326)
                                                                                                                                   Richard A. Salzman  (422497)
                                                                                                                                   Tammany M. Kramer  (483146)
                                                                                                                                   HELLER, HURON, CHERTKOF
                                                                                                                                   LERNER, SIMON & SALZMAN, PLLC

---

[6] Plaintiff is not suggesting that it was the same attorneys representing PwC as in the case at issue here, but obviously Mr. Nally and the same defendant permitted its counsel to make a representation that the Court found to be untrue.

15

                                    1730 M Street, NW, Suite 412
                                    Washington, DC  20036
                                    (202) 293-8090
                                    fax:  (202) 293-7110

                                    Counsel for Plaintiff Murphy

Dated:  December 1, 2006