Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------X
C. WESTBROOK MURPHY, et al.,

        Plaintiffs,        Case No. 02-982
                             (RJL/DAR)
       vs.

PRICEWATERHOUSECOOPERS, LLP, et al.,

        Defendants.
------------------------------------------X
C. WESTBROOK MURPHY, et al.,

        Plaintiffs,        Case No. 05-1054
                             (RJL/DAR)
       vs.

PRICEWATERHOUSECOOPERS, LLP, et al.,

        Defendants.
------------------------------------------X
HAROLD SCHULER,

        Plaintiff,         Case No. 05-2355

       vs.

PRICEWATERHOUSECOOPERS, LLP, et al.,

        Defendants.
------------------------------------------X

DEPOSITION OF JOHN F. CARTER

New York, New York

Friday, October, 20, 2006

Reported by:
ELIZABETH SANTAMARIA



PLAINTIFF'S EXHIBIT
2
Ps Opp. Prot. Order

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

4df0442a-efd5-4a78-a734-2140a2c5926a

1          Carter

2      A.    In the past seven years?  When you
3  say seven years, you are going back to what year?
4      Q.    Say 2000.
5      A.    2000.  I came off of the global
6  assurance leadership team when I went on the U.S.
7  management committee in September of 2000.
8      Q.    Anything else?  Any other leadership
9  committees?
10     A.    No other leadership committees.
11     Q.    How long were you on the global
12 assurance leadership team?
13     A.    I assumed that role at the time of
14 the merger, July 1, 1998.
15     Q.    What was your role on the global
16 assurance leadership team?
17     A.    I was the global HR leader for the
18 assurance practice.
19     Q.    How did you come to be the partner
20 affairs leader?
21     A.    I was asked to assume the role by Sam
22 DiPiazza, who was then the U.S. senior partner, and
23 Dennis Nally, who was then the U.S. managing
24 partner.
25     Q.    Had you previously expressed interest

1                       Carter

2   in serving in that capacity?

3         A.      Had I expressed interest?  I'm not

4   sure I had directly expressed interest.  I had a

5   relationship, a working relationship, with Frank

6   Scalia and with the global partner affairs leader.

7   So I was knowledgeable of the function, but I'm not

8   sure if I ever had expressed direct interest.

9         Q.      Is Frank Scalia related to Justice

10  Francis Antonin Scalia?

11        A.      I have no clue.

12        Q.      You don't know if that's his son?

13        A.      I have no clue.

14        Q.      So you were asked by Mr. DiPiazza and

15  Mr. Nally if you would serve as the U.S. partner

16  affairs leader.  What were the next steps after they

17  approached you?

18              MR. NELSON:  Next steps for what?

19        Q.      Was there an election process?

20        A.      For me to assume that role?

21        Q.      Correct.

22        A.      No.

23        Q.      Did you have to submit any kind of

24  application packet or materials in connection with

25  assuming that role?

```
 1                      Carter
 2   same as the U.S. leadership team?
 3           A.     Correct.
 4           Q.     You mentioned the partner affairs
 5   committee of the board.
 6           A.     Correct.
 7           Q.     Can you explain to me the functional
 8   relationship between the partner affairs committee
 9   and the U.S. leadership team?
10           A.     The functional relationship is really
11   through the discharging of my responsibilities as
12   the U.S. partner affairs leader.  The partner
13   affairs committee, the board would not interact
14   directly with the full U.S. leadership team.
15           Q.     How many subcommittees of the board
16   are there in addition to the partner affairs
17   committee?
18           A.     I believe there are seven.
19           Q.     What are they?
20           A.     I knew you were going to ask me that.
21                  To the best of my recollection, the
22   finance committee, the governance committee, the
23   management evaluation and compensation committee,
24   the admissions committee, the partner affairs
25   committee, the risk management committee and the
```

Page 27

1                           Carter
2   pulse survey.  We have an upward feedback program,
3   we have a peer feedback program.  When I say "people
4   programs," that's what I would mean.
5           Q.      Is there anything else you can think
6   of that constitute a people program?
7           A.      Again, it's a very broad question.  I
8   mean everything.  Learning and education strategy.
9   And, again, I'm not a member so I don't have direct
10  knowledge of it so I'm trying to give you a feel for
11  it in response to your question.
12          Q.      Whatever your understanding is
13  is fine.
14                  Is there anything else that you are
15  aware of that falls under the rubric "people
16  program"?
17          A.      You keep using "rubric."  What do you
18  mean by "rubric"?
19          Q.      Term.
20          A.      Just so I understand.
21                  MR. NELSON:  Are you referring to a
22          people program?  People committee?
23                  MS. KRAMER:  People programs.
24          Q.      What else constitutes a people
25  program?

Page 50

1        Carter
2        A.    Any partners, with the exception of
3   designated members of management or partners who
4   have served their limit on the board, are eligible
5   for nomination to the board.
6        Q.    I believe you mentioned that the
7   nominating committee whittles down the list of
8   potential candidates or I think you said winnows,
9   narrows.
10       A.    Narrows.
11       Q.    What do you known about what goes
12  into that process of winnowing down the list of
13  potential --
14             MR. NELSON:  Beyond what he already
15       testified to?
16             MS. KRAMER:  Yes.
17       Q.    What kind of criteria do the
18  nominating committee members use to help them winnow
19  down --
20       A.    I never served on one so I don't
21  know.
22             The nominating committee in the
23  prescriptive guidance at times is given minimum
24  guarantees as to who will be ultimately represented
25  on the board.  As an example, the Advisory line of

Page 198

1                    Carter

2  program, but in substance it's essentially the same.

3            MS. KRAMER:  Please mark

4       Exhibit 23.

5            (Plaintiff's Exhibit 23, document

6       bearing Bates Nos. PWC19094 - 19102, marked

7       for identification, as of this date.)

8       Q.    Mr. Carter, I am showing you what has

9  been marked as Exhibit 23.  It is a document

10 produced by PWC, the minutes of the June 27, 2001

11 transition U.S. board of partners and principals

12 meeting, Bates stamped PWC 19094 through 19102.

13            Let me know when you have had a

14 chance to look at that, please.

15           MR. ROSE:  That's 2001?

16           MS. KRAMER:  This is June 27, 2001.

17           MR. ROSE:  Thank you.

18      Q.    Have you had a chance to look at

19 this?

20      A.    Briefly.

21      Q.    I would like to direct your attention

22 to Page PWC19096, the section entitled "Involuntary

23 Withdrawal Provision," and the second sentence says,

24 "For discussion focused on the negative business

25 impact of this provision."

Page 199

1                        Carter

2           Do you have an understanding of what
3   the negative business impact was of the provision
4   for involuntary withdrawal?
5           A.   Can you restate your question now
6   that I have read that paragraph?
7           Q.   What is the negative business impact
8   of the involuntary withdrawal provision?
9                MR. NELSON:  Are you asking him if
10          he recalls what was stated at this
11          meeting?
12               MS. KRAMER:  I am asking him what
13          his understanding is of any negative
14          business impact of the involuntary
15          withdrawal provision.
16          A.   It would be a bit of speculation on
17  my part to respond to that.
18               MR. NELSON:  No speculation.  You
19          shouldn't guess or speculate.  If you
20          don't know, you don't know.
21          Q.   You were present at this meeting,
22  right?
23          A.   I would have been present at portions
24  of this meeting, but given the time frame here I was
25  clearly there for the post-retirement conduct.  And

Page 222

1            Carter

2        A.    I have no idea the age of our
3    employees or when our employees retire.
4        Q.    What is your understanding of why
5    there is a mandatory retirement age at
6    PriceWaterhouse?
7        A.    It is really for the vitality of the
8    partnership, to continue the growth and prospects
9    for admission.  And as you may well know, it is a
10   pretty stressful environment, and I think it is one
11   of the things that an individual knows upon
12   admission, clearly been voted on by the partners at
13   the time of the merger and when an individual is
14   admitted in signing the articles of the partnership,
15   have full knowledge of that.  And it keeps, if you
16   will, it fresh and allows for mobility and for
17   continued admissions.
18       Q.    Is there a mandatory retirement age
19   for nonpartners?
20       A.    No.
21       Q.    Why not?
22       A.    Isn't it illegal?
23             MR. NELSON:  Well, isn't it?
24       Q.    Would the same --
25             MR. ROSE:  Is that the witness