UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
C. Westbrook Murphy, *et ano.,*         )
              Plaintiffs,               )
                                        )     Civil Action No. 02-0982 (RJL/DAR)
       v.                               )
                                        )
PricewaterhouseCoopers LLP, *et ano.,*  )
              Defendants.               )
_____)
                                        )
C. Westbrook Murphy,                    )
              Plaintiff,                )
                                        )     Civil Action No. 05-1054 (RJL/DAR)
       v.                               )
                                        )
PricewaterhouseCoopers LLP              )
              Defendant.                )
_____)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR RECONSIDERATION OF
MAGISTRATE JUDGE'S ORDERS DENYING ITS
MOTION FOR A PROTECTIVE ORDER BARRING
THE DEPOSITION OF DENNIS M. NALLY**

WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20036
(202) 282-5000

Attorneys for Defendant

## Table of Contents

Page

Preliminary Statement .................................................................................................1

Questions Presented ...................................................................................................4

Statement of Facts ......................................................................................................5

    A.  The Record .................................................................................................5

    B.  The Claims and Parties ...............................................................................6

    C.  Discovery and The Nally Deposition .........................................................8

    D.  The Proffered Areas of Inquiry ................................................................11

        1.  The Partner Retirement Provision.....................................................11

        2.  The Partner/Employee Issue ............................................................16

Argument ...................................................................................................................20

    THE MAGISTRATE JUDGE'S ORDER DENYING THE PROTECTIVE ORDER
    SHOULD BE SET ASIDE AS CLEARLY ERRONEOUS AND CONTRARY TO LAW ....20

    A.  Standard of Review ..................................................................................20

    B.  The Magistrate Judge's Failure to Consider Nally's High-Level Position as
        Chairman and Senior Partner of PwC was Contrary to Law and Clearly
        Erroneous .................................................................................................21

    C.  The Magistrate Judge's Ruling that the Deposition Proceed on the Ground
        that Nally Admittedly has "Some" Relevant Knowledge, Without Regard
        to Whether that Knowledge is "Unique" or Superior, is Contrary to Law ...............29

    D.  The Magistrate Judge's Finding that PwC Failed to Meet Its Burden of
        Establishing Entitlement to a Protective Order Precluding, Conditioning
        or Limiting the Deposition of Nally is Contrary toLaw and Clearly Erroneous........33

    E.  The Magistrate Judge's Refusal to Allow PwC to File Reply Papers in Support
        of Its Motion for a Protective Order, is Contrary to Law and Clearly Erroneous......37

    F.  The Magistrate Judge's Ruling that a Deposition of Nally was Not Limited in
        Duration to Less than Seven Hours is Contrary to Law and Clearly Erroneous........40

Conclusion .................................................................................................................44

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
C. Westbrook Murphy, *et ano.*,    )
              Plaintiffs,          )
                                   )    Civil Action No. 02-0982 (RJL/DAR)
         v.                        )
                                   )
PricewaterhouseCoopers LLP, *et ano.*,  )
              Defendants.          )
_____)
                                   )
C. Westbrook Murphy,               )
              Plaintiff,           )
                                   )    Civil Action No. 05-1054 (RJL/DAR)
         v.                        )
                                   )
PricewaterhouseCoopers LLP         )
              Defendant.           )
_____)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR RECONSIDERATION OF
MAGISTRATE JUDGE'S ORDERS DENYING ITS
MOTION FOR A PROTECTIVE ORDER BARRING
THE DEPOSITION OF DENNIS M. NALLY**

**Preliminary Statement**

This memorandum is in support of the motion of defendant PricewaterhouseCoopers LLP ("PwC"), pursuant to Fed. R. Civ. P. 72(a) and LCvR 72.2(b), for reconsideration of Magistrate Judge Robinson's Order, filed December 4, 2006, denying PwC's motion for a protective order with respect to the noticed deposition of its Senior Partner and Chairman, Dennis M. Nally; and, the separate Minute Entry, filed December 5, 2006, finding that the parties never reached agreement to limit that deposition to a period of fewer than seven hours.

In support of its motion for a protective order, PwC relied on a consistent line of federal cases throughout the country recognizing that noticing the depositions of officials at the highest

1

levels within a defendant organization presents tremendous potential for abuse and harassment. The courts have thus routinely issued protective orders shielding high-level officials of both public and private entities from deposition where the official does not have unique personal knowledge of facts relevant to the plaintiff's claims, and the plaintiff has failed to exhaust less intrusive and burdensome means of discovery, such as written interrogatories and depositions of lower-level officials. Such limitations are warranted under Fed.R.Civ.P. 26(b)(2) where the depositions of high-level officials would be "unreasonably cumulative or duplicative" or where the discovery sought "is obtainable from some other source that is more convenient, less burdensome, or less expensive."

Ruling from the Bench at the conclusion of an unnecessarily expedited hearing on PwC's motion, without the benefit of reply papers from PwC, Magistrate Judge Robinson found that the cases granting protective orders with respect to the depositions of high-level officials of <u>private</u> organizations were not applicable in this Court simply because the cases in this District involved only <u>government</u> officials. While recognizing that there is no decision in this Court rejecting the application of such decisions to non-government officials, the Magistrate Judge nonetheless instead applied the general standard applicable to deponents who do not occupy high-level positions. The Magistrate Judge thereby applied a standard in this District that differs from the standard applied to depositions of high-level officials of non-governmental entities in every other District Court to have considered the issue. It is respectfully submitted that the Magistrate Judge's ruling is contrary to well-established law.

The Magistrate Judge further found that the cases in this District directing plaintiffs to first propound written interrogatories to high-ranking government officials, before seeking to subject such officials to deposition, did so only for the purpose of determining whether the

officials had <u>any</u> relevant knowledge, and not whether any such knowledge was <u>unique</u> or superior. On this point, the Magistrate Judge overlooked decisions of this Court ordering interrogatories bearing on the latter question of unique knowledge, and disregarded authorities outside this District applying the same standard. On this point, as well, it is submitted that the Magistrate Judge's findings are contrary to law.

In disregarding the case law addressing depositions of high-ranking officials, the Magistrate Judge failed to recognize the pertinent facts and considerations which present a classic situation for the issuance of a protective order in this case. The Magistrate Judge thus appeared not to have considered plaintiff's affirmative testimony that he had named Nally as an individual defendant in this case solely for "psychological effect," and plaintiff's inability to identify any relevant information Nally might possess that is not also known to other partners in the firm. While all claims against Nally were subsequently dismissed by this Court, plaintiff's testimony plainly suggests that he is engaging in the familiar tactic of noticing the deposition of the highest-ranking official of the defendant for <u>in terrorem</u> impact -- the reason courts are especially wary of attempts to depose such officials.

Apart from the failure to apply the appropriate legal standard, the Magistrate Judge imposed an improper burden on PwC to support its motion. First, the Magistrate Judge found that PwC had not met its burden of demonstrating that PwC's operations would be disrupted by the deposition of its Chairman and Senior Partner. But, on this point, the courts presume that the deposition of the highest-ranking official of any organization would unduly disrupt the business of that organization in cases where the senior official does not have unique or superior knowledge of relevant facts.

Second, the Magistrate Judge concluded that PwC had not met its burden, in its initial motion papers, of demonstrating that any relevant testimony Nally might be able to provide would be cumulative and duplicative of information plaintiff had already discovered from lesser-ranking deponents or through other means. But, the specific matters and documents on which plaintiff claimed a need to depose Nally were proffered by plaintiff for the first time in his opposition papers, and the Magistrate Judge deprived PwC of its right to submit reply papers. As further detailed below, it is submitted that the findings of the Magistrate Judge in this regard are clearly erroneous.

PwC's motion sought a protective order with respect to a deposition of Nally that was noticed by plaintiff for a half day pursuant to an understanding and agreement between counsel. Plaintiff opposed the motion for a protective order, and did not seek any affirmative relief. After denying the protective order motion on December 4, 2006, Magistrate Judge Robinson made a separate finding at the conclusion of a telephone hearing the following day, December 5, 2006, that the "Parties never reached an agreement to limit the deposition . . . to a period of fewer than seven hours." It is submitted that such finding, and the implicit ruling that the deposition could proceed for more than a half day, was clearly erroneous.

Accordingly, PwC respectfully moves for reconsideration by the District Judge on the ground that the Magistrate Judge's rulings were clearly erroneous and/or contrary to law.

## **Questions Presented**

1.      Whether the Magistrate Judge's failure to consider Nally's high-level position as Chairman and Senior Partner of PwC in ordering that his deposition proceed, without first requiring plaintiff to propound interrogatories, was contrary to law and/or clearly erroneous.

4

2.    Whether the Magistrate Judge's ruling that the deposition proceed on the ground that Nally admittedly has "some" relevant knowledge, without regard to whether that knowledge is "unique" or superior, was contrary to law and/or clearly erroneous.

3.    Whether the Magistrate Judge's finding that PwC failed to meet its burden of establishing entitlement to a protective order precluding, conditioning or limiting the deposition of Nally was clearly erroneous and/or contrary to law.

4.    Whether the Magistrate Judge's refusal to allow PwC to file reply papers in support of its motion for a protective order, as provided in LCvR 7(c), was contrary to law and/or clearly erroneous and/or contrary to law.

5.    Whether the Magistrate Judge's ruling that a deposition of Nally was not limited in duration to less than seven hours was clearly erroneous and/or contrary to law.

### Statement of Facts

**A.    The Record**

PwC filed its motion for a protective order, with supporting papers, on November 18, 2006 (Docket No. 163).[1]  Pursuant to a docket entry by Magistrate Judge Robinson filed November 28, 2006, plaintiff's opposition papers were filed December 1, 2006 (Docket No. 164), and the motion was set for a hearing on December 4, 2006.

At the conclusion of the motion hearing on December 4, 2006, the Magistrate Judge denied PwC's motion for a protective order, as reflected in a Minute Entry filed on that date.  The transcript of the motion hearing is annexed as Exhibit A to the accompanying Declaration of Eric M. Nelson, Esq. ("Nelson Declaration").  The Magistrate Judge stated that "should there be any

---

[1] "Docket No." citations herein are to the first-filed action (Civil Action No. 02-0982).  Identical papers were also filed in the related case (Civil Action No. 05-1054).

occasion for further review of my order the transcript will provide the findings that I have made" in denying the protective order (id. at 59-60).

At a telephone conference held on December 5, 2006, Magistrate Judge Robinson ruled that the "Parties never reached an agreement to limit the deposition of Dennis M. Nally to a period of fewer than seven hours," and directed that the deposition proceed (see Minute Entry filed 12/5/06). The transcript of that status conference is annexed to the Nelson Declaration as Exhibit B. The Magistrate Judge indicated that the transcript was available "for purposes of further review of this narrow issue" (id. at 22).

By Minute Order filed December 13, 2006, the Magistrate Judge granted the parties' consent motion to stay the deposition pending resolution of PwC's instant motion for reconsideration (Docket No. 166).

**B.    The Claims and Parties**

Plaintiff C. Westbrook Murphy ("Murphy") is a recently retired professional employee of PwC, having been employed in the firm's Regulatory Advisory Services ("RAS") unit in the District of Columbia until his voluntary retirement in February 2006. Murphy asserts straightforward non-promotion claims against PwC, complaining in these two related age discrimination actions of his non-admission as a partner in the July 1, 2000, July 1, 2001 and July 1, 2004 annual partner admissions cycles. At a status hearing on October 12, 2006, Murphy's counsel advised this Court (Leon, J.) that Murphy had decided to pursue his claims individually, and not collectively on behalf of an opt-in class. This Court previously held that, as an individual, non-class plaintiff, Murphy cannot pursue his claims on a "pattern or practice" theory of recovery (Murphy v. PricewaterhouseCoopers LLP, 357 F.Supp.2d 230, 246-47 (D.D.C. 2004)).

6

PwC is a large firm, with over 20,000 employees and more than 2,000 partners and principals dispersed among 86 offices in 36 states around the country. Throughout his tenure with the firm, Murphy had been employed in PwC's District of Columbia office in its RAS unit, described by Murphy as "a relatively small consulting group within PwC's Banking Practice" (Docket No. 134 at 4). Murphy seeks to predicate a *prima facie* case of age discrimination on the admission as partners of two younger employees in the RAS unit in the District of Columbia -- David Albright and Jeff Lavine -- effective July 1, 2000 (Case 1) and July 1, 2004 (Case 2), respectively (id. at 4-5).

Dennis M. Nally currently serves as the Chairman and Senior Partner of PwC, and a member of its Board of Partners and Principals ("Board" or "Board of Partners"). He was elected to those positions by votes of the PwC partners, pursuant to the provisions of the firm's Partners and Principals Agreement ("Partnership Agreement"), and is now serving his second and final term of office in accordance with the term limits specified in that agreement. Nally is a member of the American Institute of Certified Public Accountants and the New York State Society of CPAs, and maintains his office in New York.

Murphy does not contend that Nally has any personal knowledge of the facts concerning Murphy's claims. Nally never worked in the RAS unit, never had any supervisory responsibility over Murphy, and had no involvement in the decision-making process concerning which employees in RAS would be sponsored as candidates for partner.

Murphy's Case 1 Complaint alleged claims not only against PwC, but against some 20 alleged members of its Board of Partners, including Nally (Complaint, ¶9). None of the allegations against the Board members were specific to Nally. The Court granted PwC's motion to dismiss all ADEA claims against all of the individual Board member defendants (Murphy, 357

F.Supp.2d at 244). In also dismissing the remaining state law claims against Nally and other Board members for lack of personal jurisdiction, the Court noted that "[n]owhere in the complaint is it alleged that the individual defendants specifically made decisions regarding employees in PwC's District of Columbia office or had any contact with that office of the plaintiffs…" (id. at 243).

During the pendency of the motion to dismiss, Murphy testified that he had named the individual Board members as defendants for "psychological effect" (Docket No. 163, Exhibit D at 457-458). In response to an inquiry as to why Nally was listed in Murphy's initial disclosures as a person likely to have information supporting his claims, Murphy's counsel interjected, "If we knew, we wouldn't need discovery, Counsel" (id. at 465), and Murphy testified that all members of the Board of Partners "have information about the admissions process and the promotions process that we alleged to be discriminatory" (id. at 466). Neither Murphy nor his counsel could state that Nally had any relevant information that other Board members would not have (id. at 466, 468-69). Nally's deposition was not requested or noticed in Case 1.

## C.    **Discovery and The Nally Deposition**

PwC has provided extensive discovery on Murphy's claims since the initial Scheduling Order in early 2003. In response to Murphy's various requests, PwC has produced over 20,000 pages of documents, and has responded to separate sets of interrogatories in each of Case 1 and Case 2, in excess of the Fed.R.Civ.P. 33(a) limits. This year alone, PwC responded to a combined total of 122 separate interrogatories and document requests, exclusive of subparts (nearly 200 separate written discovery requests, including subparts). (See Docket No. 163 at 7.)

In 2003, Murphy took the depositions of four PwC partners. The deponents included Murphy's immediate supervisor, Robert Bench, who was deposed for two full days in June 2003,

8

immediately preceding his retirement; Tim Ryan (then head of the Banking practice); Robert

Moritz (then head of Financial Services); and, Paul Sullivan (a member of the Board of Partners

and its admissions committee). (Id.)

In 2006, after the filing of Case 2, Murphy's new counsel requested another deposition of

Bench, as well as the depositions of nine additional PwC partners and employees (see Docket

No. 163, Exh. E).  Murphy's list of deponents included six partners in addition to Bench:  David

Albright (RAS); Jeffrey Lavine (RAS); William Lewis (RAS); John Carter (National Partner

Affairs leader); Roger Hindman (National Benefits leader); and, Dennis Nally (Senior Partner

and Chairman).  Other deponents included Elizabeth Carol Nebe (a Managing Director in Partner

Affairs, with responsibilities for partner admissions, partner compensation and firm governance),

and Darlene Shea (National Human Resources Director for financial services).  (Id. at 8.)

PwC objected to a deposition of Nally on the ground that he had no discoverable

information that was not readily and more appropriately obtainable from other deponents on

Murphy's proposed list (Docket No. 163, Exh. F).  During the course of extended discussions and

e-mails between counsel, Murphy's counsel stated that they wished to depose Nally on

unspecified matters concerning the so-called Clackamas (partner/employee) issue and PwC's

retirement provision for partners, but declined to provide any further detail or justification for the

professed need to depose Nally (see Docket No. 163 at 11).  At his deposition on November 15,

2006, Murphy identified specific documents and matters on which he believed Nally would have

knowledge or information, but could not identify any such matters as to which Nally's

knowledge might be unique to him (see Docket No. 163, Sch. A).

PwC obtained the transcript of Murphy's deposition on an expedited basis, and promptly

filed its motion for a protective order on November 18, 2006.  In support of its motion, PwC

specifically addressed the particular matters and documents cited by Murphy as justification for deposing Nally, and further detailed the extensive discovery undertaken by Murphy. In opposition, Murphy relied principally on different documents and matters, not previously identified, as the basis on which Murphy sought to depose Nally.

The Magistrate Judge, believing the motion should be decided on an expedited basis, deprived PwC of its right to file reply papers. By docket entry filed November 28, 2006, the Magistrate Judge directed that Murphy's opposition to PwC's motion be filed no later than Friday, December 1, 2006, and scheduled a hearing on the motion for Monday, December 4, 2006, at 10:30 a.m. The Magistrate Judge recognized that PwC was thereby deprived of its right to file reply papers, but found that PwC suffered no prejudice as a result. Disregarding the factors considered by the courts in cases involving high-ranking officials, the Magistrate Judge found that PwC had failed to meet its initial burden of demonstrating entitlement to a protective order under the general standard applicable to protective orders not involving such officials.

Murphy has never contended that Nally has unique or superior knowledge of facts bearing on any matters as to which he seeks to depose him. Moreover, Murphy flatly rejected PwC's offer to have Nally provide answers to written interrogatories as to the extent and substance of his personal knowledge, without prejudice to Murphy's right to pursue Nally's deposition if Murphy considered it necessary and justified after reviewing Nally's sworn written responses (see Docket No. 163 at 11-12, 16). Murphy has never -- in opposition to PwC's motion or otherwise -- contended or explained how he might be prejudiced by following this procedure, which has been routinely adopted by the courts, including this Court, in circumstances similar to those presented here.

**D.**     **The Proffered Areas of Inquiry**

In his opposition memorandum (Docket No. 164), Murphy detailed the specific issues as to which he professed a need to depose Nally on two matters he previously identified only as general areas of inquiry:  (1) PwC's retirement provision for partners; and, (2) the partner/employee (Clackamas) issue raised by plaintiff's allegations that PwC partners should be deemed "employees" within the coverage of the ADEA.

**1.**     **The Partner Retirement Provision**

Murphy argued a need to depose Nally to discover the reason for the PwC partners' inclusion in their Partnership Agreement of a mandatory retirement provision under which the partners agreed to retire from the firm at age 60 (Docket No. 164 at 3-5).  In support of that contention, Murphy relied on the minutes of PwC's Board meeting in September 1998, following the formation of the firm on July 1, 1998 by the merger of Price Waterhouse LLP and Coopers & Lybrand L.L.P. (id. at 3-4).  Until submission of his opposition papers, Murphy had never before asserted that issue, or identified the Board meeting minutes, as justification for deposing Nally.

Murphy contends that the Board minutes reflect that Nally, as a "founding" partner of PwC, participated in "deliberations" concerning the adoption of the mandatory retirement provision for partners (id.).  The Board minutes suggest no such thing.  By the time of that meeting, the Partnership Agreement, including the retirement provision, had been adopted by the partners effective July 1, 1998.  The minutes reflect that Nally was one of more than thirty partners and eight guests who attended the meeting (see id., Exh. 4).  There is no indication that any of the attendees were "founding" partners (whatever that means), that Nally held any particular position in the firm at that time, or that Nally participated in any discussion at that meeting (id.).

Moreover, contrary to Murphy's assertion, there is no indication in the minutes that there was any discussion of the partner retirement provision.  In this regard, Murphy appears to be confusing a reference in the minutes to "harmoniz[ing] withdrawing partner provisions" (see id., Exh. 4 at PwC 18896) as a reference to the retirement provision (see Docket No. 164 at 3). However, "Withdrawal" of partners is governed by Article XI of the Partnership Agreement, while Article X governs "Retirement" (see id., Exh. 4).  There is no reference in the minutes to the Retirement provisions.

In any event, there is no issue or mystery here concerning the mandatory retirement provision for partners or its purpose.  In his memorandum in opposition to PwC's earlier motion for summary judgment, Murphy cited and adopted the statements of two partners as to the reason for PwC's age 60 retirement provision for partners (Docket No. 121-1 at 20-21).  First, Murphy quoted from the response of Samuel DiPiazza, who Murphy identified as the then Senior Partner and Chair of the Board of PwC, to a question asked by Murphy himself at a televised broadcast from the National Press Club on June 17, 2002 (id. at 21).  As set forth in the transcript, DiPiazza stated that PwC was a "private partnership," and that the partners at the firm (and its predecessor firms) had a "long tradition" for "dozens and dozens of years" of agreeing to retire at age 60 in order to make room for "the next generation of partners" (Docket No. 121-32 at 2).  Apparently satisfied with DiPiazza's transcribed statement at the National Press Club, Murphy never sought to take his deposition.

Second, Murphy quoted from his own memorandum of a meeting at which Paul Sullivan, a member of PwC's Board, stated that mandatory retirement of partners was necessary to assure "turnover" in the partnership (Docket No. 121-1 at 21).  Further, and in the same vein, Murphy disingenuously ignores the deposition testimony of partner John Carter, who has for many years

served as the firm's National Partner Affairs leader, that the reason for the retirement provision was "to continue the growth and prospects for admission," and to "allow for mobility and for continued admissions of new partners" (Docket No. 164, Exh. 4 at 222).

There is no real issue as to the purpose of PwC's partner retirement provision, and the testimony on this point is not controversial.  The "long tradition" of such provisions in both accounting and law partnerships dates back decades.  All major accounting firms, and most major law firms, have such provisions (see Docket No. 125, Exh. B at 46, 65-65, 75).[2]  Indeed, this Court noted that it could take judicial notice that law firm partnership agreements customarily include mandatory retirement provisions (id. at 65, 75).

Assuming arguendo the relevance of the issue, Nally's testimony as to his understanding of the purpose of the mandatory partner retirement provision would, at best, be cumulative of the consistent testimony of a number of PwC partners already deposed -- testimony that was adopted and cited by Murphy himself in substantive motion papers.  Moreover, there is absolutely no evidence to support Murphy's wholly speculative assertions that Nally was a "founding" partner who purportedly participated in "deliberations" concerning PwC's continuation of the long tradition" of mandatory partner retirement provisions at each of PwC's predecessor firms.  Murphy's refusal to propound written interrogatories to Nally is telling, as his answers would confirm that there is no basis for subjecting him to deposition on this point.

On the same general issue, Murphy relies on his own "Memorandum to File" purportedly summarizing a comment made by Nally in response to a question from Murphy at a conference held in August 2005 and attended by more than 100 PwC managing directors and a number of partners.  As summarized by Murphy, Nally purportedly commented in substance: "Some client

---

[2] Yet another PwC partner testified that his understanding -- that the business purpose of the mandatory retirement provision was to foster "turnover in the partnership" -- was derived from discussions with partners at Brown Brothers Harriman (Docket No. 164, Exh. 6 at 150).

13

audit committees and CEO's felt more comfortable if the PwC audit engagement partner

possessed the gray hair that often signaled experience, and that for this reason, PwC was

examining whether to change its mandatory retirement age of 60" (Docket No. 163, Exh. N).

Since Murphy testified about his Memorandum to File at his most recent deposition on

November 15, 2006, this point was addressed by PwC in its memorandum in support of its

motion for a protective order (Docket No. 163 at 13-14, 23).  As stated in that memorandum (id.

at 14):

> Whether or not consideration was being given in August 2005 to
> changing the age-60 retirement provision for partners in PwC's
> Partner Agreement is totally irrelevant to Murphy's claims.  Any
> such change after July 1, 2004 would have no impact on Murphy
> since, at age 60 in 2000, he would have been subject to immediate
> retirement if he had been admitted as a partner on July 1, 2000,
> July 1, 2001 or July 1, 2004, as he claims he should have been.  In
> any event, no such change was under consideration by the Board of
> Partners, as disclosed by PwC's responses to written discovery
> requests on this point.
>
> At Murphy's most recent deposition on November 15,
> 2006, PwC's counsel unequivocally reaffirmed the representation
> "that the [PwC] board never considered changing the mandatory
> retirement age for partners" (Exhibit A at 138).  Murphy
> acknowledged that Nally "is the only one I've heard say that the
> firm was considering changing the mandatory retirement age" (id.
> at 132), and further acknowledged that whatever Nally had said at
> the August 2005 Managing Directors Conference in response to
> Murphy's question, there were more than one hundred people
> present (id.).  Any remaining questions or doubts Murphy may
> have on these essentially irrelevant points, could readily be
> clarified or resolved by Nally's sworn responses to written
> interrogatories that Murphy has declined to propound.

In his opposition papers, Murphy asserts that, "If some PwC clients were actually

suggesting a change in policy because they wanted older, more experienced professionals to

continue to be able to serve their business, then PwC's insistence on keeping the policy is even

more probative of age bias" (Docket No. 164 at 5-6). PwC's counsel responded to that assertion

at the December 4, 2006 hearing on the motion (Nelson Declaration, Exh. A at 29-30):

> The unremarkable acknowledgment that there is a business
> downside to a partner retirement provision has no bearing on any
> issue in this case. None. Whether or not that downside outweighs
> the business justification for the provision adopted by PWC and all
> other major accounting firms and most law firms to make room for
> more partners is irrelevant. This case has nothing to do with the
> business judgment exercised by thousands of partners in agreeing
> to retire at age 60. As I said, without any dispute a mandatory
> retirement provision is lawful among partners and would be
> unlawful if applied to employees, no matter what its intended
> purpose.

Murphy further asserts that "Nally's statement (if true) would seem to undermine the

notion that business reasons justify keeping an explicit age policy in place" (Docket No. 164 at

6). That assertion assumes, incorrectly, that the alleged discriminatory act in this case is the

adoption and continuation of PwC's mandatory retirement provision for partners. Indeed,

Murphy's opposition memorandum is misleadingly premised on the assumption that the central

issue in this case is whether or not the partner retirement provision is lawful.

PwC's counsel provided clarification on this point at the December 4, 2006 hearing,

noting that Murphy's claim is that he was denied admission as a partner because of his age, while

similarly situated allegedly less qualified younger employees were admitted (Nelson Declaration,

Exh. A at 23). Thus, the alleged discriminatory act is Murphy's non-promotion, not the adoption

or continuation of the partner retirement provision (id. at 23-24). Murphy was not a partner, and

was not subject to mandatory retirement at any age (id. at 24).

Both sides recognize that mandatory retirement provisions for partners are lawful since

partners are outside the coverage of the ADEA. If admitted as a partner at age 60, as he claims

he should have been, Murphy would have been lawfully subject to immediate retirement, and

15

been out of a job that would otherwise have continued indefinitely. Murphy thus alleges that PwC partners should be deemed "employees" within the coverage of the statute. Hence, the issue in this case concerning the partner retirement provision is not whether it is lawful or discriminatory. It is by its terms age-based, but lawful in that it is applicable only to partners. Accordingly, whatever the reason for its inclusion in PwC's Partnership Agreement, the provision is lawful as to partners, and would be unlawful if applied to employees.

In any event, assuming arguendo that Nally's comment at the August 2005 conference bears any relevance to any issue in this litigation, Nally is prepared to provide sworn answers to written interrogatories as to the substance and basis for his comment (id. at 30).

## 2.    **The Partner/Employee Issue**

In support of its motion for a protective order, PwC addressed discovery on this broad issue without the benefit of the specific proffer set forth in Murphy's opposition papers (see Docket No. 163 at 12-13). PwC noted that Murphy had moved for summary judgment on the so-called Clackamas issue in August 2003, and that his counsel had advised this Court at the hearing on that motion in April 2004 that no further discovery was necessary to a resolution of the issue (id. at 12). At Murphy's counsel's request, PwC agreed to reopen discovery on the issue in 2005, and thereafter responded without objection to extensive interrogatories and document requests Murphy believed to have some bearing on a resolution of the issue (id.). PwC further permitted, without objection, nine PwC partners to be deposed on the Clackamas issue (id. at 13).

During the course of extensive "meet and confers" between counsel prior to the filing of this motion for a protective order, and the two depositions of Murphy, there was no contention on the part of Murphy or his counsel that Nally had any unique or superior personal knowledge

of any material facts bearing on the <u>Clackamas</u> issue (<u>id.</u> at 10, 11, 13). Murphy testified that the issue turns on "the way the firm operates and its structure" (<u>id.</u> at 13). Similarly, in opposition to a protective order, Murphy notes that the focus of the <u>Clackamas</u> inquiry is on "the firm's policies and practices, its governance structure and operations" (Docket No. 164 at 8).

Resolution of the <u>Clackamas</u> issue turns principally on the terms and provisions of the Partnership Agreement, which details the respective rights and obligations of the partners, the Board members, and the Senior Partner. It also details the procedures for election of the Board and of the Senior Partner, and specifies term limits; contains protections against expulsions; and addresses capital requirements, personal liability of partners, and the like.

These are the details of how "the firm operates and its structure" that Murphy testified <u>Clackamas</u> is concerned with. The Partnership Agreement itself thus provides answers to the <u>Clackamas</u> inquiries, and governing partnership agreements are what the <u>Clackamas</u> partnership cases consider. That is why Murphy himself moved for summary judgment on the issue back in August of 2003, relying principally on the Partnership Agreement.

But apart from that, Murphy has already deposed nine PwC partners and questioned each of them about the provisions of the Partnership Agreement, as well as about various written policies and procedures applicable to partners, all of which have been produced by PwC in response to Murphy's various requests. The partner deponents have included Paul Sullivan, who has served his two-term limit as a member of the Board; and John Carter, who has served for many years as the National Partner Affairs leader and as a long-time member of the firm's Management Committee. Murphy also deposed two managing partners of the RAS unit in which Murphy had been employed; the head of the Banking practice; the head of the Financial Services practice; the National Benefits Leader; and a recently admitted partner, among others.

Any one of the more than 2,000 partners in the firm could have testified as to how the firm is structured, how it operates, and how it is governed, and nine of them did so testify. In addition, PwC answered extensive interrogatories and produced over 20,000 pages of documents, more than half of them in response to what Murphy asserted to be <u>Clackamas</u>-related requests. Apart from the Partnership Agreement, Murphy was provided with innumerable and wide-ranging documents on firm policies and procedures relating to how the firm operates, including such matters as acceptance of new clients and engagements; establishing fees to be charged on client engagements; review of partner performance; compensation of partners; the manner in which partners account for their time; vacation and sick leave; assignment of offices; and partner supervision of employees.

At the hearing on the motion, Murphy's counsel did not dispute the extent of this discovery, conceding that "we have taken a good deal of discovery on the <u>Clackamas</u> issue." (Nelson Declaration, Exh. B. at 42). But the Magistrate Judge stated that the court had "no means to evaluate the detail," and inquired as to the basis for PwC's contention that the deposition testimony of Nally would be cumulative (<u>id.</u> at 32-34).

Until filing his opposition to PwC's motion, Murphy proffered nothing more than the broad, conclusory assertion that Nally would have knowledge relating to each of the <u>Clackamas</u> factors, and declined to provide any detail as to specific areas of proposed inquiry. Moreover, Murphy made no contention that Nally's knowledge was unique or superior in any respect.

In opposition to PwC's motion, Murphy for the first time specified the <u>Clackamas</u> matters as to which he contends Nally has unique personal knowledge (Docket No. 164 at 9-10). Murphy notes that the first <u>Clackamas</u> factor is whether the organization can "fire" an individual, and that, under the detailed procedures for "Required Withdrawal" of partners set forth in the

18

Partnership Agreement, the process is to be initiated by a recommendation of the Senior Partner (id.). From this, Murphy asserts that "Nally is presumably aware of each instance in which that has happened at the firm" (id. at 10).

This is utterly irrelevant detail under this Clackamas factor, which concerns the grounds for, protections against, and procedures for removal of partners, all of which are specified in Article XI of the Partnership Agreement. In any event, partner John Carter, who has served as National Partner Affairs leader and liaison with the Partner Affairs Committee of the Board for a period longer than Nally has served as Senior Partner, was examined at length on these matters at his deposition (Nelson Declaration, Exh. C at 201-209). Under the Partnership Agreement, any recommendation for a partner withdrawal is to be made and acted upon by the Partner Affairs Committee (see Docket No. 164, Exh. 7, § 11.2).[3]

The only other purported Clackamas-related matter as to which Murphy suggests Nally has unique personal knowledge is that the Senior Partner is delegated responsibility under the Partnership Agreement for making Board committee appointments and recommending the removal of Board members (see Docket No. 154 at 10). Nally's knowledge as to these matters is obviously not unique, and details beyond the provisions of the Partnership Agreement are not relevant.

Perhaps 50 (or more) of the more than 2,000 PwC partners have served on the Board. Murphy selected the partners, including one Board member (Paul Sullivan) and the National Partner Affairs leader (John Carter), he wished to depose. While indicating that "there may be some [Rule] 30(b)(6) issues that would also be the subject of depositions," Murphy stated that

---

[3] Carter testified that there has been only one recommendation for a "Required Withdrawal," and that the partner in question voluntarily withdrew from the firm before any vote of the Partner Affairs Committee (Nelson Declaration, Exh. C at 202-03). While the infrequency with which the "Required Withdrawal" provisions have been invoked may be of some relevance under Clackamas, the specific details surrounding particular instances are not.

the individual deponents he identified by name "are likely more or less most of the key

individual depositions needed to properly air the issues in the case and help move the discovery

phase towards completion, in accordance with Judge Leon's wishes" (Docket No. 164, Exh. 10).

Murphy did not request or notice any Rule 30(b)(6) deponent on <u>Clackamas</u>-related issues, but

instead chose to depose John Carter, who is the most knowledgeable partner on issues relating to

firm structure and governance.

Murphy admittedly named Nally purely for "psychological effect," and was unable to

identify any arguably relevant knowledge or information Nally might impart that was not and

could not be readily obtained from other lesser ranking deponents.  In opposition to PwC's

motion for a protective order, Murphy repeatedly asserts that Nally's <u>position</u> and <u>perspective</u> is

unique but fails to show that any of his <u>knowledge</u> is unique.  These are the considerations the

courts have uniformly deemed dispositive in deciding motions directed to the depositions of

high-ranking officials of defendant organizations.

### **Argument**

### **THE MAGISTRATE JUDGE'S ORDER DENYING THE PROTECTIVE ORDER SHOULD BE SET ASIDE AS CLEARLY ERRONEOUS AND CONTRARY TO LAW**

**A.**    **Standard of Review**

Fed.R.Civ.P. 72(a) provides that a party may file objections to an order of the magistrate

judge, and that "[t]he district judge to whom the case is assigned shall consider such objections

and shall modify or set aside any portion of the magistrate judge's order found to be clearly

erroneous or contrary to law."  LCvR 72.2(c) similarly provides that, on a motion for

reconsideration of a magistrate judge's ruling, "a judge may modify or set aside any portion of a

magistrate judge's order under this Rule found to be clearly erroneous or contrary to law."

It has been held that a "clearly erroneous" finding should be made on a motion to reconsider where "'on the entire evidence' the court 'is left with the definite and firm conviction that a mistake has been committed.'" (Globalaw Limited v. Carmon & Carmon Law Office, 452 F.Supp.2d 1, 5 (D.D.C. 2006), citing Nender v. Battelle Pac. Northwest Nat'l Lab., 194 F.R.D. 289, 292 (D.D.C. 2002) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 365 (1948)).

**B.     The Magistrate Judge's Failure to Consider Nally's
High-Level Position as Chairman and Senior Partner
of PwC was Contrary to Law and Clearly Erroneous**

PwC respectfully submits that the Magistrate Judge's finding -- that "there is simply no authority" in this Court that the considerations "which govern to some extent the depositions of high-ranking government officials also apply to so-called high-ranking corporate officials" (Nelson Declaration, Exh. A at 53) -- is contrary to law and clearly erroneous.

In its memorandum in support of the protective order, PwC cited various law journal articles discussing cases recognizing that the potential for harassment and abuse of high-ranking executives of corporations and other private business organizations through the simple expedient of serving a notice of deposition (Docket No. 163 at 17).

PwC's memorandum proceeded to cite, discuss and apply decisions of numerous courts following the general rule that depositions of high-ranking officials will be precluded unless and until less intrusive avenues of discovery have been exhausted, and the plaintiff can show that the putative deponent has unique or superior knowledge of facts relevant to the plaintiff's claims (id. at 17-23). Included among those cases are five decisions of this Court: Community Federal Savings and Loan Association v. Federal Home Loan Bank Board, 96 F.R.D. 619 (D.D.C. 1983), Springfield Terminal Railway Co. v. United Transportation Union, 1989 WL 225031 (D.D.C. 1989); Alexander v. Federal Bureau of Investigation, 186 F.R.D. 1 (D.D.C. 1998); Low v.

21

<u>Whitman</u>, 207 F.R.D. 9 (D.D.C. 2002); <u>Alliance for Global Justice v. District of Columbia</u>, 2005 WL 1799553 (D.D.C. 2005).  The would-be deponents in each of those cases were high-level government officials, and the decisions noted a public policy concern that their depositions might be disruptive of the operations of the agencies they served.

However, in each of the cases, as in the cases involving high-level non-government officials, this Court granted a protective order precluding the deposition of the high-level official in the absence of the showing that the official had unique or superior personal knowledge of relevant facts.  And, in each case, this Court noted that the party seeking the deposition had failed to exhaust other less intrusive means of obtaining the discovery sought.

The courts in other Districts apply precisely the same approach in cases involving high-level officials of non-government entities.  Indeed, in the frequently cited decision in <u>Baine v. General Motors Corp.</u>, 141 F.R.D. 332 (M.D. Ala. 1991), that court discussed and followed the early decision of this Court in <u>Community Federal Savings</u> in granting a protective order quashing the deposition notice of a vice president of the defendant corporation.  As in the <u>Community Federal Savings</u> case in this Court, <u>Baine</u> so ruled on the ground that it had not been established that the information sought could not be had through other discovery means, and it had not been demonstrated that the corporate vice president in question had any unique or superior personal knowledge of relevant facts (<u>id.</u> at 335).

Noting that the plaintiffs in <u>Community Federal Savings</u> had sought depositions of "several high-level agency administrators" (<u>id.</u> at 334), the <u>Baine</u> court did not consider that to be a distinguishing factor.  Rather, that court concluded that the deposition of a corporate vice president "would be oppressive, inconvenient and burdensome inasmuch as it has not been established that the information necessary cannot be had from [other deponents], interrogatories,

or the corporate deposition" (id. at 335). As further authority for granting the protective order, the Baine court relied on the discretion afforded under Rule 26(b)(2), Fed.R.Civ.P., "to limit discovery so as to avoid accumulation, duplication, harassment, expense and burdensomeness," and where the discovery sought "is obtainable from some other source that is more convenient, less burdensome, or less expensive" (id. at 333).

In noting that "[t]he legal authority is fairly unequivocal in circumstances such as these," the Baine court also relied on Mulvey v. Chrysler Corp., 106 F.R.D. 364 (D.R.I. 1985), which involved the chairman of the corporate defendant (Baine, 141 F.R.D. at 333). In Mulvey, the district judge reconsidered and set aside a ruling of the magistrate judge permitting the deposition of that high-level corporate official (106 F.R.D. at 365). The court in Mulvey, like the court in Baine, noted that Rule 26 "specifically gives the court authority to limit discovery if it determines that the discovery sought is obtainable from other sources, that is, those that are more convenient and less burdensome" (id. at 366). The district judge in Mulvey held that "an orderly discovery process will be best served by resorting to interrogatories at this time, without prejudice to a subsequent oral deposition if the answers to the interrogatories so warrant" (id.).

While Community Federal Savings was followed and applied to a high-level non-government official in Baine, the cases in this Court came full circle in Alexander v. Federal Bureau of Investigation, 186 F.R.D. 1 (D.D.C. 1998), which cited and followed the holding in Mulvey in granting a protective order staying the depositions of high-ranking government officials (id. at 5) ("[i]f plaintiffs wish to question these witnesses, the submission of interrogatories by plaintiffs is the appropriate manner in which to initially proceed"), citing Mulvey, 106 F.R.D. at 366. Accordingly, the decisions of this Court involving government officials, and the decisions of other District Courts involving non-government officials, are cited

23

interchangeably and follow precisely the same analysis in granting protective orders in accordance with the limitations set forth in Fed.R.Civ.P. 26(b)(2).

Despite the fact that the cases themselves make no such distinction, the Magistrate Judge found that "there is simply no authority" in this Court that the considerations "which govern to some extent the depositions of high-ranking government officials also apply to so-called high-ranking corporate officials" (Nelson Declaration, Exh. A at 52). The Magistrate Judge concluded that "the considerations which have been discussed in the context of depositions of high-ranking government officials. . . simply point out some of the issues which are important in the evaluation of motions for protective orders where the deponents are in fact high-ranking government officials" (id. at 53). In so ruling, the Magistrate Judge did not address the fact that the cases involving high-ranking officials of non-government entities uniformly follow the same approach as the government official cases.

The Magistrate Judge noted that Murphy had cited a decision of this Court as authority to the contrary, but declined to rely on it to hold that "the considerations governing the depositions of high-ranking government officials do not apply to corporate officials" (id. at 52-53). That case -- Kuwait Airways Corp. v. American Security Bank, N.A. 1987 WL 11994 (D.D.C. 1987) -- does not suggest that the cases involving depositions of government officials have no application to depositions of non-government officials. Rather, Kuwait Airways notes merely that no "special rule exists wherein noticing the deposition of a high-level corporate executive constitutes per se harassment and annoyance" (id. at *3), and that "high-ranking corporate executives are not automatically given special treatment which excuses them from being deposed" (id. at *4) (emphasis supplied). Moreover, the court recognized cases which deferred depositions of high-ranking corporate executives pending exhaustion of other discovery means,

24

but noted that the deposition in question could not easily be rescheduled, if later deemed necessary, since "great expense and organizational effort are involved in scheduling a trip to [Kuwait]" (id. at 3).  The court also noted that it was not a case where the depositions of high-ranking executives were noticed "for little reason" (id. at 4).

It appears that the Magistrate Judge declined to follow established law simply because the line of cases in this Court did not arise in the context of depositions of high-ranking non-government officials.  The Magistrate Judge thereby adopted a rule in this Court at odds with the pertinent cases in every other District Court to have considered the issue.  The Magistrate Judge instead applied the general standard in cases not involving high-ranking officials, such as Flanagan v. Wyndham International Inc., 231 F.R.D. 98 (D.D.C. 2005) (denying a protective order preventing the deposition of a minor child) (see Nelson Declaration, Exh. A at 16-17).  In so doing, the Magistrate Judge did not consider the limitations specified in Rule 26(b)(2) that the courts have routinely applied in cases involving high-ranking officials.

Accordingly, in denying PwC's motion for a protective order, the Magistrate Judge did not consider the fact that Nally, as Chairman and Senior Partner of PwC, was the highest-ranking official of the firm, and disregarded Murphy's testimony that he had named Nally solely for "psychological effect."  This cannot be reconciled with the pertinent case law or Rule 26(b)(2)(i), which provides for limitations where "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome or less expensive."  That provision is obviously applicable to both government and non-government officials and entities.

It is submitted that Nally's position as the Senior Partner and Chairman of the firm -- coupled with Murphy's admission that he named Nally for "psychological effect," his speculative

and attenuated showing of the relevance and importance of the proposed deposition inquiries, and his flat rejection of Nally's offer to first provide sworn answers to written interrogatories -- warrants heightened scrutiny of the propriety of the noticed deposition.

While the same public policy implications of the depositions of high-level government officials may not be a factor here,[4] the cases involving depositions of high-level officials of non-government business entities and organizations recognize compelling reasons for special scrutiny.  In Mulvey, for example, the district judge recognized that -- because the chairman of a corporation "is a singularly unique and important individual who can easily be subjected to unwarranted harassment and abuse" -- "[h]e has a right to be protected, and the courts have a duty to recognize his vulnerability" (Mulvey, 106 F.R.D. at 366).  See Scott A. Mager, Curtailing Deposition Abuses of Senior Corporate Executives, 45 No. 1 JUDGES' J. 30 (Winter, 2006) (noting that "[i]n an increasingly litigious society, the attempt to capriciously set depositions of high-ranking corporate executives, who are often referred to as 'apex officials,' has become commonplace;" and, that "to permit this kind of open access of apex officials, these persons would be required to appear at innumerable depositions in all parts of the state or country, regardless of their ability to provide specifics about any particular case or other relevant information").

Finally, we note that, notwithstanding the Magistrate Judge's finding that there is no precedent in this Court for the application of the case law on which PwC relies, the Magistrate

---

[4] It is submitted that the public policy concern that "the time and energies of public officials be conserved for the public's business to as great an extent as may be consistent with the ends of justice in particular cases" (Community Federal Savings, 96 F.R.D. at 621), has some application to PwC, as a major independent public accounting firm. The Supreme Court has recognized that "the independent auditor assumes a public responsibility transcending any employment relationship with [its] clients;" that the "independent public accountant" performs a "'public watchdog' function" and owes "ultimate allegiance" that extends to the "investing public;" and, that public accountants are charged with "public obligations" in performing their role (United States v. Arthur Young & Co., 465 U.S. 805, 817-18 (1984); see also Independent Petrochemical Corp. v. Aetna Casualty and Surety Co., 117 F.R.D. 292, 297 n.8 (D.D.C. 1987)).

Judge appears to have had no difficulty following those authorities at a hearing on May 22, 2006 in <u>Intex Recreation Corp. v. Team Worldwide Corp.</u>, Civil Action No. 04-1785, resolving a motion for a protective order with respect to the noticed deposition of the president of the plaintiff corporation in that case (<u>see</u> Nelson Declaration, Exh. D). The authorities cited by the parties in <u>Intex</u> were essentially the same as those cited by the parties here, including <u>Mulvey</u>, <u>Baine</u> and <u>Kuwait Airways</u>, with the defendant arguing that the cases decided in this Court were applicable only to depositions of high-ranking officials of government agencies (<u>see</u> <u>id.</u>, Exh. E). At the hearing, the plaintiff conceded that its president had relevant knowledge, but contended that "he has no unique knowledge that is relevant to this case that can't be acquired through other sources" (Nelson Declaration, Exh. D at 17). The plaintiff's counsel stated that "the question really is whether or not he has unique knowledge which cannot be acquired through other depositions, either already noticed and/or already taken," and argued that "this is a cumulative deposition" and that "the information required can be acquired from someone other than the president rather than have him be taken just because he is the president of the company" (<u>id.</u> at 19). On the law, the plaintiff's counsel argued that "the cases we have cited in the motion obviously show that the court does have the authority and the power to limit discovery in such instances of a corporate officer," and proceeded to cite <u>Blaine</u> and <u>Mulvey</u> and distinguish <u>Kuwait Airways</u> (<u>id.</u> at 18-19).

Consistent with the authorities on which the plaintiff therein relied, and on which PwC here relies, the Magistrate Judge suggested that the discovery sought from the president might be obtained through a Rule 30(b)(6) deposition rather than through the "deposition of the head of the corporation" (<u>id.</u> at 22); that the protective order should be denied "to the extent there is a relevant inquiry which <u>only</u> [the president] could answer" (<u>id.</u> at 24); and, that "both sides have

acknowledged that a deposition in this circumstance, or of an official, and representative of this type, is <u>not customary</u>, but it might be allowed in certain circumstances" (<u>id.</u> at 26) (emphasis supplied). The Magistrate Judge then suggested <u>sua</u> <u>sponte</u> that the motion be resolved by it being denied without prejudice to being "renewed <u>only</u> if it develops that the answers to the relevant inquiries cannot be obtained" from other deponents (<u>id.</u> at 25-26), noting that "a ruling on this motion might well be premature" (<u>id.</u> at 28) (emphasis supplied). Accordingly, with the parties' agreement to the Magistrate Judge's suggestion, the motion was withdrawn, subject to the conduct and consideration of other discovery (<u>id.</u> at 27-28).

On PwC's motion, the Magistrate Judge declined to follow the authorities and approach, followed a few months earlier in the <u>Intex</u> case, precluding the depositions of high-ranking officials unless and until less intrusive avenues of discovery have been exhausted, and the party noticing the deposition can show that the putative deponent has unique or superior personal knowledge of relevant facts. In instead denying outright PwC's motion for a protective order with respect to the noticed deposition of Nally, the Magistrate Judge did not respond to the repeated assertions of PwC's counsel that Murphy could claim no prejudice whatsoever from first considering and evaluating sworn answers by Nally to written interrogatories before seeking to pursue the deposition (Nelson Declaration, Exh. A at 37, 50).

It is respectfully submitted that the rulings of the Magistrate Judge are contrary to law and clearly erroneous.

**C.    The Magistrate Judge's Ruling that the Deposition
Proceed on the Ground that Nally Admittedly has
"Some" Relevant Knowledge, Without Regard to
Whether that Knowledge is "Unique" or Superior,
is Contrary to Law**

The Magistrate Judge found that "none of the authorities on which the Defendant relies stand for the proposition that a party must show that a deponent or would-be deponent is the most knowledgeable person or has unique knowledge" (id. at 55).  The Magistrate Judge thus stated the belief that the pertinent cases decided by this Court were "concerned that perhaps the deponent had no knowledge at all," and found that "[t]here is simply no requirement that to take a deposition a party must show that a person has unique knowledge or superior knowledge" (id. at 56).  With regard to PwC's position that the need for or propriety of a deposition should not be considered until Nally had first provided sworn answers to written interrogatories as to the extent and substance of his knowledge on the points proffered by Murphy, the Magistrate Judge found "that there is simply no authority for that request" (id. at 58), except to the extent it might facilitate a determination of whether a deponent had any personal knowledge (id. at 58-59).

PwC's counsel responded at the hearing to the Magistrate Judge's requests to identify decisions of this Court providing "for written interrogatories prior to a deposition to test whether or not the person has unique knowledge or whether the discovery is available from other sources" (id. at 11-12), stating that "the purpose for which Judge Lamberth required written interrogatories in [Alexander v. Federal Bureau of Investigation] was to allow the plaintiff to present evidence demonstrating that the would-be deponents had some relevant knowledge" (id. at 10).  PwC's counsel identified decisions of this Court which had applied the standard of "unique" knowledge (id. at 11-15, 21-22).

In <u>Alexander</u>, Judge Lamberth noted that, "[t]here is substantial case law standing for the proposition that high-ranking government officials are generally not subject to depositions unless they have <u>some</u> personal knowledge about the matter <u>and</u> the parties seeking the deposition makes a showing that <u>the information cannot be obtained elsewhere</u>" (186 F.R.D. at 4) (emphasis supplied) (citations omitted). Knowledge that "cannot be obtained elsewhere" is unique. Since it was claimed in <u>Alexander</u> that the high-ranking officials had no relevant knowledge, the Court ordered interrogatories to determine whether they had some relevant knowledge, stating that it would then "revisit the issue of whether depositions would be appropriate" (<u>id.</u> at 5). The Court did not indicate that it would allow the depositions if the interrogatories revealed that the high-level officials merely had some relevant knowledge that could be obtained elsewhere.

Most recently, in <u>Alliance for Global Justice v. District of Columbia</u>, this Court cited <u>Alexander</u> for the holding that, "Plaintiff must therefore show that: (1) the [high-ranking official] has some personal knowledge of the events at issue and (2) the <u>information cannot be obtained elsewhere</u> (2005 WL 1799553 at *2) (emphasis supplied). Because the plaintiff had not met that burden, this Court granted a protective order preventing the deposition. In so ruling, this Court noted that the plaintiff did not claim to have propounded interrogatories, and declined to order "a deposition without any showing whatsoever that the information plaintiffs seek <u>cannot be obtained by other means</u>" (<u>id.</u> at *3) (emphasis supplied). Knowledge that "cannot be obtained by other means" is unique.

In <u>Low v. Whitman</u>, this Court similarly granted a protective order preventing the depositions of a high-ranking official, noting that "[t]he only relevant testimony he can give appears to have been explored thoroughly in other depositions" (207 F.R.D. at 13). This Court further stated that it would reconsider the protective order if plaintiff could establish from other

discovery "a compelling case" that the high-ranking official "can be expected to provide information that no one else has" (id.) (emphasis supplied).

This Court granted a protective order prohibiting the depositions of Board members in Community Federal Savings on the ground that the plaintiff had "presented no information from which the Court could conclude that [the] Board members. . . have any unique personal knowledge concerning the decision" (96 F.R.D. at 621) (emphasis supplied); and that "it ha[d] not been shown that the information that [plaintiff] hopes to elicit from them is not ascertainable by way of interrogatories addressed to the Board, the deposition of a single spokesman designated to testify for it, or the testimony of the nine other witnesses whose deposition the Board has not opposed" (id. at 621-22).

Finally, as noted above, in the Intex case, the corporate plaintiff had conceded that its president had some relevant knowledge, and contended only that he had no "unique" relevant knowledge that could not be obtained from other sources (Nelson Declaration, Exh. D at 17). The same Magistrate Judge who ruled in this case noted in Intex that a protective order should be denied "to the extent there is a relevant inquiry only [the president] could answer" (id. at 24) (emphasis supplied).  The Magistrate Judge proceeded to resolve the motion by securing the parties' agreement that other discovery first be taken to determine "whether any of the circumstances which might warrant a deposition of [the corporate president] are present" (id. at 27-28).

The Magistrate Judge's findings on PwC's motion -- that, under the applicable cases, alternative means of discovery might be ordered only for purposes of determining whether the

31

putative deponent has <u>some</u> personal knowledge of relevant facts -- is quite clearly erroneous and contrary to law.

This Court, and others, have directed parties to first exhaust other means of discovery, not merely to facilitate a determination as to whether the high-ranking official possesses unique personal knowledge not obtainable from other sources.  Propounding interrogatories to a putative deponent might also suffice as a means of discovery in lieu of a deposition.  For example, in <u>Springfield Terminal Railway</u>, where a high-ranking official offered to answer written interrogatories in lieu of a deposition, this Court granted a protective order requiring the plaintiff "to proceed first by the less intrusive means of interrogatories in order to attempt to avoid the need for any deposition" (1989 WL 225031 at *2).

PwC has repeatedly offered to have Nally personally provide sworn answers to written interrogatories on the relevant matters Murphy may believe him to have unique knowledge, without prejudice to Murphy seeking his deposition if he believes it to be justified and necessary after reviewing the sworn written responses.  Murphy's refusal to avail himself of this opportunity is telling, as is his failure to suggest how he might be prejudiced by following this procedure.

The Seventh Circuit decision in <u>Patterson v. Avery Dennison Corp.</u>, 281 F.3d 676 (7th Cir. 2002), upholding the refusal of the district court to compel the deposition of a high-ranking executive of the corporate defendant, is instructive.  The Court observed that the plaintiff had "failed to submit any interrogatories to [the executive], although she had the right and the opportunity to do so," and concluded that the plaintiff's "failure to take advantage of this inexpensive, convenient method of discovery, <u>i.e.</u>, interrogatories, casts serious doubt over her

claim that [the executive] possessed information that was more than marginally relevant to her civil action" (id. at 681-82).

Under the circumstances, it is respectfully submitted that the Magistrate Judge's failure to consider that the discovery sought through a deposition of Nally "is obtainable from some other source that is more convenient, less burdensome, or less expensive," as provided in Fed.R.Civ.P. 26(b)(2)(i), and order "that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery," as provided in Fed.R.Civ.P. 26(c)(3), is contrary to law and clearly erroneous.

**D.** **The Magistrate Judge's Finding that PwC Failed to Meet Its Burden of Establishing Entitlement to a Protective Order Precluding, Conditioning or Limiting the Deposition of Nally is Contrary to Law and Clearly Erroneous**

Based on the general Rule 26(c) standard, the Magistrate Judge found that PwC had not met its burden of showing "good cause" for the issuance of a protective order. (Nelson Declaration, Exh. A at 53-54). After quoting the Rule 26(c) language that a protective order is warranted to protect a party from "annoyance, embarrassment, oppression or undue burden or expense," the Magistrate Judge stated that PwC "made no reference whatsoever to any undue burden upon Mr. Nally" (id. at 54). The Magistrate Judge found that PwC has "offered no evidence . . . of any disruption of corporate operations which would occur should Mr. Nally be deposed" (id.), and further found that there is "simply no authority" for PwC's stated concern that, if Nally could be subjected to deposition in the circumstances presented in this case, he would be subjected to depositions in innumerable other cases (id. at 55).

Murphy does not dispute that PwC is a large firm, with over 20,000 employees and more than 2,000 partners dispersed among 86 offices in 36 states around the country. Moreover,

Murphy recognizes that Nally, as PwC's Senior Partner and Chairman, "is clearly a busy man" (Docket No. 164 at 10), and notes that a number of scheduled dates for his half-day deposition (subject to a ruling on its propriety) were adjourned "because of his travel plans" (id. at 11). The Magistrate Judge was substantially less accommodating and solicitous of Nally's position, responsibilities and schedule. Although Murphy had requested an order to produce Nally for deposition "within the next 45 days" (id. at 15), the Magistrate Judge directed at the December 4, 2006 hearing that counsel agree by 5:00 p.m. that same afternoon on a date for the deposition to be completed no later than December 20, 2006 (see Nelson Declaration, Exh. A at 59-62).[5] The Magistrate Judge reaffirmed the deadline after ruling at a telephone conference on December 5, 2006 that the deposition be scheduled for a full day (id., Exh. B at 23).

The cases granting protection to high-ranking officials have not required a specific evidentiary showing of undue burden or disruption. This Court has "consistently recognized the undue burden that falls on public officials as a consequence of compulsion to attend depositions" (Alliance for Global Justice, 2005 WL 1799553 at *1, quoting Springfield Terminal Ry. Co., 1989 WL 22503 at *2, citing Community Federal Savings, 96 F.R.D. 619) (additional citations omitted). With regard to high-level non-government officials, see, e.g., Mulvey, 106 F.R.D. at 366 (recognizing that the chairman of a corporation "is a singularly unique and important individual who can easily be subjected to unwarranted harassment and abuse"); Baine, 141 F.R.D. at 335 (finding that deposing a corporate vice president "would be oppressive, inconvenient, and burdensome inasmuch as it has not been established that the information necessary cannot be had" through other means of discovery).

---

[5] The Magistrate Judge extended the time to fix a date for the deposition by 24 hours to December 5, 2006 at 5:00 p.m. (id. at 62-63).

The Magistrate Judge also found that PwC's contention that Nally's testimony would be "cumulative" was "merely conclusory," because "there has simply been no reference to any discovery from any other source which is cumulative of that which the Plaintiff seeks through the deposition of Mr. Nally" (id. at 56). That is simply incorrect.

With regard to Murphy's purported need to depose Nally as to the purpose of PwC's mandatory partner retirement provision, and the reasons for its adoption, PwC's counsel identified, at the expedited hearing, the consistent statements and testimony of other partners on this point (Nelson Declaration, Exh. A at 25-27). PwC provides further detail herein (pp. 12-13, supra) supporting its position that Nally's testimony on this point would be, at best, cumulative.

As to Murphy's memo to file, purportedly summarizing a remark made at a conference on August 2005, there were more than 100 managing directors and a number of partners present. Moreover, PwC has disclosed (in response to Murphy's document requests) that the Board never considered amending the retirement provision for partners, and there are no documents reflecting any such consideration. Even if there was some justification for Murphy's professed need to probe further into this essentially irrelevant point, there are numerous other sources from which this discovery could be obtained.

On the Clackamas issue, PwC has shown, what is apparent from the nature of that issue, that any one of the more than 2,000 PwC partners could provide testimony on these points, and nine partners did so. The partner deponents included a member of PwC's Board (Sullivan) and the National Partner Affairs leader (Carter), who is the most knowledgeable partner in the firm on these matters, and was deposed by Murphy specifically for that purpose. Moreover, none of

the partner deponents deferred any inquiries to Nally.[6]  Murphy's proffer in opposition to the

protective order motion seeks wholly irrelevant detail from Nally which could, in any event,

have been obtained from numerous other sources.

Contrary to law, the Magistrate Judge's ruling improperly shifts the burden by imposing

on PwC a burden to disprove what Murphy has an affirmative obligation to establish.  In

Alexander, this Court thus cited to "substantial case law" requiring that "the party seeking the

deposition makes a showing that the information cannot be obtained elsewhere" (186 F.R.D. at

4) (citations omitted) (emphasis supplied).  And, in Alliance for Global Justice, this Court

granted a protective order preventing a deposition, holding that it "need not address whether the

[high-ranking official] has the requisite personal knowledge to be deposed, as it is clear that

plaintiffs have made no showing that the information they seek cannot be obtained elsewhere"

(2005 WL 1799553 at *3) (emphasis supplied).  Accord Low, 207 F.R.D. at 13 (stating that the

court would reconsider the grant of a protective order preventing a deposition "[i]f plaintiff can

establish" from other discovery that the putative deponent "can be expected to provide

information no one else has") (emphasis supplied); Springfield Terminal Railway, 1989 WL

225031 at *2 (plaintiff "has not demonstrated that the less burdensome discovery proposed by

[the putative deponent] is unsatisfactory") (emphasis supplied); Baine, 141 F.R.D. at 335

(deposition "would be oppressive, inconvenient and burdensome inasmuch as it not been

established that the information necessary cannot be had" from other sources"); Community

Federal Savings, 96 F.R.D. at 621-22 (plaintiff "has not shown that the information is hopes to

elicit from them is not ascertainable" through other means of discovery).

---

[6] The Magistrate Judge deemed this to be a significant point in the Intex case by specifically inquiring at the hearing whether any of the deponents had "defer[red]" to the corporate president (see Nelson Declaration, Exh. D at 18).

Apart from improperly shifting the burden to PwC, the Magistrate Judge further ruled that PwC's "good cause" showing "should have been made as of the time the motion was filed" (id. at 52), and that "[t]he time to have made the showing that discovery is cumulative was as of the time the motion was filed" (id. at 57). The Magistrate Judge recognized that PwC was precluded from filing reply papers, but found that PwC could not be prejudiced by being deprived of that right in light of the holding that PwC's burden was to make the requisite showing in its initial motion papers (id. at 51-52). PwC submits that this ruling, too, is contrary to law and clearly erroneous.

During the course of extensive "meet and confers" prior to PwC's filing of its motion for a protective order, Murphy's counsel refused to make a specific proffer as to the proposed areas of inquiry of Nally (see Docket No. 163 at 11-12). PwC filed its motion two days following Murphy's deposition on November 15, 2006, wherein Murphy for the first time identified specific documents and areas as to which he contended Nally has personal knowledge (see id., Exh. A). While PwC specifically addressed each of those points in support of its motion, Murphy then proffered new and different points in opposition to the motion.

Under the circumstances, PwC could not have anticipated Murphy's tactic and addressed in its opening motion papers a new proffer thereafter made for the first time in opposition to the motion. The Magistrate Judge thus imposed an impossible burden on PwC, and improperly ruled that reply papers would be superfluous.

**E.      The Magistrate Judge's Refusal to Allow PwC to File Reply Papers in Support of Its Motion for a Protective Order, is Contrary to Law and Clearly Erroneous**

LCvR 7(d) provides the movant a right to file reply papers: "Within five days after service of the memorandum in opposition the moving party may serve and file a reply

memorandum." LCvR 1.1(a) provides that the Local Rules "govern all proceedings" in this Court. Under the circumstances, even assuming the Magistrate Judge had discretion to modify that Local Rule, it is submitted that it was a clear abuse of discretion to have deprived PwC of five business days to file a written reply.

The Magistrate Judge found "that there is no prejudice to the Defendant by being effectively precluded from filing a reply" because the court believed it had afforded counsel "every opportunity to reply orally" at the hearing commencing at 10:30 a.m. on Monday, December 4, 2006 (id. at 52). In accordance with the expedited schedule fixed by the Magistrate Judge in a docket entry on November 28, 2006, Murphy had filed his opposition papers late in the afternoon on Friday, December 1, 2006, more than eleven days after PwC had filed its motion on November 18, 2006. The Magistrate Judge erroneously believed that "the plaintiff's time to file an opposition was significantly reduced" by that schedule (id. at 2)(see LCvR 7(b)).

The Magistrate Judge stated that it was important to "determine the motion on an expedited basis" for reasons the Magistrate Judge believed to be "obvious" (id. at 51). In the Magistrate Judge's view, the "obvious reasons" were that a Status Hearing before the District Judge was scheduled for December 8, 2006, "these related cases have been pending for some time and discovery should be concluded as expeditiously as possible under the circumstances" (id.) In reaching that conclusion, the Magistrate Judge may have been unaware that the stipulated 150-day period for expert discovery had not yet commenced, and the District Judge had indicated that its docket precluded a trial date before 2008.

PwC's counsel noted the obvious prejudice arising from the expedited scheduling of a hearing, which deprived PwC of its right to file a reply. PwC's counsel repeatedly noted that, under the schedule fixed by the Magistrate Judge, it appeared that Murphy may have in fact been

provided extra days to file his opposition papers (id. at 4, 50), while PwC's counsel was forced to reply orally at a Monday morning hearing after being afforded a two-day weekend to review the opposition (id. at 4, 18, 34, 50).  In response to the Magistrate Judge's request for authority for a proposition asserted at the hearing, PwC's counsel stated, "I can't give it to you as I stand here; I could if we could submit a reply.  I had this weekend to look at this . . ." (id. at 18).  Similarly, in response to the Magistrate Judge's request for a further showing that Nally's testimony on a point proffered by Murphy for the first time in his opposition would be cumulative, PwC's counsel stated, "if we [c]ould submit reply papers we could provide further detail" (id at 33).  In response the Magistrate Judge's suggestion that PwC had not met its burden on that point, PwC's counsel further stated (id. at 34):

> I could make a showing, but I am replying now on a two-day read
> of the papers and doing the best I can.  But if Your Honor is
> interested in further detail, we can provide it.

The Magistrate Judge did not respond to PwC's counsel's assertions, presumably believing that reply papers would be superfluous because PwC's burden was to anticipate Murphy's specific proffer in his opposition papers and rebut it in its opening motion papers.  Nor did the Magistrate Judge indicate why -- in light of the Magistrate Judge's view that the motion had to be resolved at a motion hearing prior to the Status Hearing scheduled for 3:00 p.m. on Friday, December 8, 2006 -- it had to be resolved at a motion hearing on the morning of Monday, December 4, 2006.

For the reasons set forth in this memorandum in support of reconsideration, PwC submits that on the existing record, and in the absence of reply papers, the order of the Magistrate Judge denying PwC's motion for a protective order should be set aside as contrary to law and clearly erroneous, and that the protective order should be granted by this Court.  However, to the extent

this Court may conclude that reply papers should be considered to reach a proper resolution, PwC submits that the Magistrate Judge's denial of its right to file a reply was clearly erroneous and contrary to law; and that the denial of a protective order should be set aside, with leave granted to submit a reply memorandum.

**F.      The Magistrate Judge's Ruling that a Deposition of
         Nally was Not Limited in Duration to Less than Seven
         Hours is Contrary to Law and Clearly Erroneous**

The Magistrate Judge directed that Nally be produced for deposition for a full day no later than December 20, 2006, despite the fact that his deposition had been noticed by Murphy for a half day in accordance with a prior understanding and agreement between counsel.  The Magistrate Judge heard counsel on this point after denying PwC's motion for a protective order at the December 4, 2006 hearing (see Nelson Declaration, Exh. A at 63-83), and again at a telephone conference the next day, December 5, 2006 (see Nelson Declaration, Exh. B).

The e-mail correspondence between counsel and the deposition notices served by Murphy, which document and reflect the agreement that the Nally deposition be limited to a half day, are annexed as Exhibits to the Nelson Declaration.  The Magistrate Judge found, at the conclusion of the telephone conference, that the parties never reached agreement to limit the deposition to a period of fewer than seven hours (id. at 24), and entered a Minute Order to that effect on December 5, 2006.

PwC submits that the Magistrate Judge's finding, and implicit ruling that the deposition of Nally be scheduled for a full day, is clearly erroneous and contrary to law for several reasons. First, whether or not there was an agreement to limit the deposition to a half-day, it was noticed by Murphy for a half day.  PwC moved for a protective order with respect to the "noticed" deposition (Docket No. 163 at 1), and noted that Murphy "seeks to depose Nally for a half-day"

40

(id. at 2-3).  Murphy opposed the motion for a protective order, but did not seek affirmative

relief.  The Magistrate Judge denied PwC's motion for a protective order.  Accordingly, if the

deposition proceeds, it should proceed as limited in the notice -- namely, for a half-day.

If PwC had any reason to believe Murphy sought to depose Nally other than as noticed,

PwC would have addressed the issue in its motion for a protective order; or, if Murphy had

affirmatively cross-moved to compel the deposition for a full day, PwC would have briefed the

issue in opposition to the cross-motion.

The issue arose in the context of a discussion at the December 4, 2006 hearing of the

Magistrate Judge's direction that the deposition be scheduled for a time and date no later than

December 20, 2006 (see Nelson Declaration, Exh. A at 63).  PwC's counsel stated that the

deposition was noticed for a half-day (id.).  After Murphy's counsel disagreed, the Magistrate

Judge stated that "this is an issue we should resolve now. . . as part of the ruling on the motion

for a protective order" (id at 66).  PwC's counsel noted that he "didn't think this was an area in

dispute" (id. at 67).  In response to the Magistrate Judge's inquiry as to what counsel was

requesting, PwC's counsel responded by stating that "[m]y request is that I thought [Murphy's

counsel] would abide by the agreement," and explained the reason for the request (id.):

> And I indicated to Your Honor that this is very disruptive.  Your
> Honor said I haven't proved it, but that's my representation to the
> court, so a full day is much more disruptive than a half day.  A full
> day is more difficult to schedule for this particular witness.

After hearing further argument on the issue, the Magistrate Judge scheduled a "brief

status conference by telephone" for 11:00 a.m. the following morning, December 5, 2006, "to

make an assessment of whether or not there was an agreement" limiting the deposition to less

than a full seven-hour day (id. at 77-78).  At the conclusion of that off-the-record telephone

41

conference at 11:00 a.m. on December 5, 2006, the Magistrate Judge scheduled a telephone

hearing for 1:30 p.m. that afternoon so that PwC might have a record on which to seek

reconsideration by this Court in the event of a finding that there was no agreement limiting the

duration of the deposition (Nelson Declaration, Exh. B at 3-4).  Because documents referenced

by counsel during the course of that telephone hearing are not included in the record, they are

annexed as Exhibits F through N of the Nelson Declaration.

At the December 4, 2006 hearing, the Magistrate Judge noted that, while LCvR 26.2(c)

provides that "the parties may agree" to limit the duration of a deposition, the Rule does not state

what kind of showing is required (id., Exh. A at 72).  The Magistrate Judge indicated that an e-

mail communication or some other document, which "suggests" that the parties did in fact agree

to a limitation, would provide a basis on which to find such an agreement (id).  See

Higginbotham v. KCS International, Inc., 202 F.R.D. 444, 455-56 (D. Md. 2001) (limitation on

duration of deposition pursuant to subpoena requires "some record showing that the parties

consented to the modification").

As set forth in the transcript of that hearing, and in the Nelson Declaration (¶¶ 10-18),

PwC submits that the Magistrate Judge's finding that counsel never reached agreement as to the

duration of the deposition is clearly erroneous.  It is submitted that the e-mail correspondence

and the deposition notices clearly reflect an agreement to limit the Nally deposition to a half day.

The record includes a chain of e-mail correspondence between counsel plainly documenting that

agreement and understanding (id., ¶¶ 10-14, Exhs. F-J), followed by formal Notices of

Depositions served by Murphy in accordance and consistent with the agreement (id., Exhs. K).

Murphy thus noticed Nally's deposition for 10:00 a.m. on October 3, 2006, and the

deposition of PwC's national human resources director (Darlene Shea) for 2:30 p.m. that same

day (id.).  These deposition notices contain the standard provisions that the depositions will "continue from day to day . . . until completed," and that the specified dates and times could be adjourned to "such other dates and times as mutually agreed upon" (id.).  Absent agreement, a unilaterally served notice that the deposition will "continue from day to day" cannot override the provisions of LCvR 26.2(c) limiting a deposition to "one day of seven hours" or different limits agreed to by the parties.  Significantly, however, and again consistent with the parties' agreement, the noticed date and time for the Nally deposition on the morning of October 3, 2006 was twice adjourned by mutual agreements (confirmed by e-mails) to November 6, 2006, and then to December 5, 2006, in "the afternoon" of those days (id., ¶¶ 17-18, Exhs. L, N ).

Finally, in response to the Magistrate Judge's request (at the conclusion of the December 4, 2006 hearing) for a showing of "good cause" to limit the Nally deposition in the absence of an agreement, PwC's counsel noted that the limited inquiries Murphy had proffered as relevant and necessary "shouldn't take very long," and did not warrant disrupting the chairman's schedule and the business of the firm for more than a half day (id., Exh. A at 78-79).  The Magistrate Judge did not make any findings on this point.

PwC submits that the Magistrate Judge's ultimate finding -- "that the defendant has not offered any evidence of any agreement between the parties to limit the duration of the deposition of Mr. Nally" (id., Exh. B at 24) -- is clearly erroneous.  Accordingly, in the event this Court concludes that the deposition should proceed, it is submitted that it should be limited in duration to a period of no longer than three and a half hours.

## Conclusion

For the reasons stated, it is respectfully submitted that PwC's motion for reconsideration should be granted, and the orders of the Magistrate Judge set aside and modified to grant a protective order with respect to the deposition of PwC's Senior Partner and Chairman.

Dated:  December 22, 2006

Respectfully submitted,

/s/ Eric M. Nelson
Eric M. Nelson, Esq. (admitted *pro hac vice*)
Stephen L. Sheinfeld, Esq. (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
Facsimile:  (212) 294-4700

Thomas M. Buchanan, Esq. #337907
Julie A. Klusas Gasper, Esq. #D00244
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20036
(202) 282-5000
Facsimile:  (202) 282-5100

Counsel for Defendant
PricewaterhouseCoopers LLP