**EXHIBIT C**

```
    0001
 1
 2                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 3
       ----------------------------------------X
 4     C. WESTBROOK MURPHY, et al.,
 5                         Plaintiffs,         Case No. 02-982
                                                   (RJL/DAR)
 6                vs.
 7     PRICEWATERHOUSECOOPERS, LLP, et al.,
 8                         Defendants.
       ----------------------------------------X
 9     C. WESTBROOK MURPHY, et al.,
10                         Plaintiffs,         Case No. 05-1054
                                                   (RJL/DAR)
11                vs.
12     PRICEWATERHOUSECOOPERS, LLP, et al.,
13                         Defendants.
       ----------------------------------------X
14     HAROLD SCHULER,
15                         Plaintiff,          Case No. 05-2355
16                vs.
17     PRICEWATERHOUSECOOPERS, LLP, et al.,
18                         Defendants.
       ----------------------------------------X
19
20                   DEPOSITION OF JOHN F. CARTER
21                        New York, New York
22                     Friday, October, 20, 2006
23
24     Reported by:
       ELIZABETH SANTAMARIA
25
```

1

1

2

3

4

5

6                                          October 20, 2006

7                                          10:24 a.m.

8

9

10          DEPOSITION of JOHN F. CARTER, held at

11       the offices of Winston & Strawn, 200 Park

12       Avenue, New York, New York, pursuant to

13       Notice, before ELIZABETH SANTAMARIA, a

14       Notary Public of the State of New York.

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2        A p p e a r a n c e s :
 3
 4              HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN
 5              Attorneys for Plaintiff
 6              C. Westbrook Murphy
 7                    1730 M Street, N.W. - Suite 412
 8                    Washington, D.C. 20036-4517
 9              BY:   TAMMANY M. KRAMER, ESQ.
10
11              WINSTON & STRAWN LLP
12              Attorneys for Defendant
13              PriceWaterhouseCoopers, LLP
14                    200 Park Avenue
15                    New York, New York 10166-4193
16              BY:   ERIC M. NELSON, ESQ.
17                    STEPHEN L. SHEINFELD, ESQ.
18
19
20
21
22
23
24
25
```

```
1
2          A p p e a r a n c e s  (c o n t 'd) :
3
4              ROSE & ROSE, P.C.
5              Attorneys for Plaintiff
6              Harold Schuler
7                    1320 19th Street N.W. - Suite 601
8                    Washington, D.C. 20036
9              BY:    DAVID L. ROSE, ESQ.
10             (Present via telephone)
11
12
13             ALSO PRESENT:   C. Westbrook Murphy
14                             John Daly, Esq.
                               Office of the General Counsel - PWC
15
16                       --o0o--
17
18
19
20
21
22
23
24
25
```

```
1
2          J O H N   F.   C A R T E R, called as a witness,
3              having been duly sworn by a Notary Public,
4              was examined and testified as follows:
5      EXAMINATION BY
6      MS. KRAMER:
7              Q.    Good morning, Mr. Carter.
8              A.    Good morning.
9              Q.    My name is Tammany Kramer and I
10     represent C. Westbrook Murphy.  I have a few
11     questions for you today.
12                   Can you state your full name and
13     address for the record.
14             A.    John F. Carter, 220 Riverside
15     boulevard, apartment 8N, New York, New York 10069.
16             Q.    You are currently a partner at
17     PriceWaterhouseCoopers; is that correct?
18             A.    Yes.
19             Q.    Throughout the day today I am going
20     to be asking you questions where I use the term
21     "partner."  When I use that term, I'm going to mean
22     it to include partners and principals, unless my
23     question indicates otherwise.  Is that all right
24     with you?
25             A.    Fine.
```

```
1                         Carter
2                    So that would be an example that I
3      can think of but, again, for the record I'm not sure
4      what the board discussed.
5                    MS. KRAMER:  Please mark
6             Exhibit 24.
7                    (Plaintiff's Exhibit 24, document
8             bearing Bates Nos. PWC00002 - 00028, marked
9             for identification, as of this date.)
10             Q.    Mr. Carter, I am showing you the
11     PriceWaterhouseCoopers partners and principals
12     agreement as in effect April 1, 2001, Bates number
13     PWC00002 through 00028.
14                   MR. ROSE:  Through what?
15                   MS. KRAMER:  02 through 28.
16                   MR. ROSE:  Is that the partnership
17            agreement?
18                   MS. KRAMER:  It is the 2001
19            partnership agreement.
20                   MR. ROSE:  Okay.  Thank you.  I'm
21            sorry.
22             Q.    I would like to direct your attention
23     to page PWC 22, Section 11.2 on required withdrawal.
24                   MR. NELSON:  This document wasn't
25            produced with the notations and the
```

```
1                        Carter
2            underscoring.  I just want to note that
3            for the record.
4            Q.    Reviewing Section 11.2, required
5       withdrawal, sitting here today can you tell me if
6       there is any difference between the required
7       withdrawal provision that's currently in effect
8       under the partners and principals agreement and what
9       is reflected here in Exhibit 24?
10           A.    In substance, I don't believe any
11      revisions have been made to these provisions.
12           Q.    Can you tell me any examples of
13      instances where withdrawal has been required by the
14      firm?
15                 MR. NELSON:  I can't hear you,
16           Tammany.  Please speak up.
17           Q.    Can you describe examples of
18      instances where withdrawal has been required by the
19      firm?
20           A.    Required as specified in Section
21      11.2?
22           Q.    Yes.
23           A.    Since I have been in the role, there
24      was one request for required withdrawal.
25           Q.    What were the circumstances of that
```

```
1                       Carter
2    request?
3          A.    The circumstances was for -- again,
4    my recollection serving me, it was
5    performance-related coupled with some questionable
6    personal conduct.  The individual ultimately
7    voluntarily withdrew.
8          Q.    Do you remember what stage the
9    request for withdrawal got to before the person
10   voluntarily withdrew?
11         A.    The individual was delivered a letter
12   requesting that they withdraw and they had an
13   appearance before the partner affairs committee with
14   their counsel.  A vote of the partner affairs
15   committee was never taken.
16         Q.    To your knowledge, what situations,
17   if any, have there been where a partner was given
18   the suggestion that withdrawal from the firm would
19   be preferable?  Short of going through this
20   formalized process that's described in Section 11.2.
21               Do you understand my question?
22               MR. NELSON:  Can I have the
23         question back.
24               (Record read.)
25               MR. NELSON:  Just note my objection
```

```
1                         Carter
2              to the form.  I'm not sure I understand
3              it.
4              A.     When you say suggested withdrawal,
5       what do you mean by that?
6              Q.     Short of going through this process
7       under Section 11.2 where there is a formal
8       recommendation that somebody be reviewed and put
9       through the hearing and given a letter telling them
10      they should withdraw, all that stuff, short of that
11      what instances are you aware of where some part of
12      the partnership deemed it desirable for a partner to
13      depart from the firm and that message was conveyed
14      to the partner?
15                    MR. NELSON:  I have to object to
16             that question.  Some part of the
17             partnership thought that it might be
18             desirable or preferable for another
19             partner to withdraw?  I mean --
20             Q.     Do you understand my question?
21             A.     I think I understand your question.
22             Q.     I think you do too.
23             A.     If a partner is rated as
24      underperforming currently for two evaluation cycles
25      and if -- for the skill set that they have to
```

```
1                       Carter
2     deliver service or their performance is not deemed
3     to be at the level expected, they may be approached
4     as part of a counseling and developmental session as
5     to whether their continuing being a partner is both
6     in their and the firm's best interest.
7          Q.     How often are you aware of that
8     having happened?
9                 MR. NELSON:  It's coming up on a
10           counseling session, this topic?  Is that
11           the question?
12         Q.     How often has it been that a partner
13    has been -- how often has it been that a partner's
14    continuation with the firm has been discussed in
15    negative terms?
16                MR. NELSON:  Objection to the form
17           of the question.
18         Q.     How often does it come up that
19    somebody's performance and skills lead PWC to
20    consider them somebody who might be better off
21    leaving the firm?
22                MR. NELSON:  PWC to consider?
23           These questions are --
24         Q.     You described a scenario where, short
25    of going through this process in Section 11.2, there
```

1                          Carter

2        is a discussion with a partner about performance and

3        skill sets.

4                   MR. NELSON:  I don't know that it

5             was necessarily his testimony it was short

6             of going through a process or that it was

7             related to going through a process, but --

8                   MR. ROSE:  Let him testify, for

9             heaven's sake.

10            Q.     You just described scenarios where

11       two evaluation cycles may be gone through, a partner

12       may be deemed as underperforming and so on.  How

13       often to your knowledge has such a situation arisen

14       leading up to the partner being asked to leave or

15       suggested that the partner should consider leaving?

16            A.     There are several questions there, so

17       if I may break them down.

18                   I would say every year at the end of

19       an annual evaluation cycle, there may be partners

20       who have been rated as underperforming for more than

21       one year successively.  In each of those situations

22       a partner may not be approached as part of a

23       coaching session as to where the career is going

24       from a developmental perspective, and as I'm not

25       party to each of those individual conversations, I

```
 1                         Carter
 2      can't quantify the number of those that are actually
 3      conducted, but there are not a significant number of
 4      partners who are rated as underperforming two cycles
 5      in a row.  The conversation, if held, is very
 6      developmental, as to whether they want to consider
 7      voluntarily withdrawing or what are the development
 8      plans that need to be put in place to improve their
 9      performance within the partnership.
10              Q.    Are you aware of any instances, short
11      of the process described in Section 11.2, where a
12      partner was informed that if he or she did not leave
13      the partnership voluntarily, that the process under
14      11.2 would be initiated?
15              A.    I am aware of one, maybe two
16      situations where a partner would have been informed
17      that if they could not develop a developmental plan
18      that was viewed to get them back on track or
19      voluntarily withdraw, that the actions specified in
20      Section 11.2 may be undertaken, but very rarely.
21              Q.    And in those instances, to your best
22      memory, has the partner left the firm?
23              A.    My recollection of only two instances
24      that I am aware of, I believe one is still an active
25      partner today and one did voluntarily withdraw.
```

```
1                         Carter
2           Q.    Can independence issues be the cause
3    of a partner being required to withdraw?
4                 MR. NELSON:  You are asking
5           hypothetically again?
6                 MS. KRAMER:  In terms of the
7           policy.
8           A.    Section 11.2 specifies the reasons
9    why.  I am aware of one instance where an individual
10   did withdraw as a result of an independence issue
11   that could not be remedied.  There may have been
12   two, one of which I know voluntarily withdrew, one
13   of which eventually voluntarily withdrew.  So it has
14   been a reason.
15          Q.    Sorry.  Are you saying that
16   Section 11.2 describes the different reasons a
17   partner may be required to withdraw?  Did I
18   misunderstand your testimony?
19          A.    It says the reason for any
20   recommendation shall be limited to the sustained
21   performance by the individual in 11.2A(i).  (ii) is
22   the willful violation and (iii) is any action or
23   non-action by him.  So there are specified reasons
24   under which you can request an individual or require
25   them to withdraw.
```

208

```
1                        Carter
2          Q.    Which of these Roman numerals, (i),
3    (ii) or (iii), would the independence issue fall
4    under?
5          A.    I think it could actually fall under
6    (ii) or (iii).  Independence is extremely important
7    and vital to our business.
8          Q.    Why?  When you say that, you mean
9    compliance with independence?
10         A.    Compliance with independence, yes.
11         Q.    Those requirements are externally
12   imposed?
13         A.    They are externally imposed.
14         Q.    Do you know who Alan Schott is,
15   S-C-H-O-T-T?
16         A.    I do not.
17         Q.    Other than these three Roman numerals
18   under Section 11.2A, is there any other piece of
19   writing that describes more specifically instances
20   where withdrawal may be required?
21         A.    I mean the partnership agreement is
22   the governing document.  There may have been
23   translations or interpretations of that made in
24   memos or documents but I can't point to one at this
25   point in time.
```