UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| C. Westbrook Murphy, *et ano.*, ) | |
| ) | Civil Action No. 02-00982 (RJL/DAR) |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| PricewaterhouseCoopers LLP, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |
| ) | |
| C. Westbrook Murphy, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 05-01054 (RJL/DAR) |
| ) | |
| v. ) | |
| ) | |
| PricewaterhouseCoopers LLP, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
<u>DISMISSING PLAINTIFF MURPHY'S REMAINING CLAIMS</u>**

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212-294-6700

Attorneys for Defendant

## Table of Contents

Page

Table of Authorities ......................................................................................................... ii

Preliminary Statement ....................................................................................................... 1

Statement of Facts ............................................................................................................. 3

    A.   The Parties .......................................................................................... 3

    B.   Prior Proceedings and Remaining Claims ......................................... 5

    C.   The Reasons for Murphy's Non-Admission as a Partner .................... 7

    1.  The Partner Admissions Process ......................................................... 7

    2.  Murphy Did Not Meet the Minimum Qualifications for Consideration as a Partner Candidate from the RAS Unit ................................................. 8

    3.  Murphy's Relinquishment of Managerial Duties ............................... 11

    4.  Murphy's Demonstrated Lack of Interest in Partnership .................... 11

    5.  The July 1, 2004 Admission Cycle ..................................................... 14

    6.  Murphy's Comparators in RAS ......................................................... 16

Argument .......................................................................................................................... 17

  I.   SUMMARY JUDGMENT IN FAVOR OF PwC IS WARRANTED ON THE UNDISPUTED FACTS ........................................................................ 17

    A.   The McDonnell Douglas Framework ................................................. 17

    B.   Prima Facie Case ............................................................................... 18

    C.   The Legitimate, Nondiscriminatory Reasons for Not Considering Murphy for Partnership .............................................................................. 21

    D.   Pretext .............................................................................................. 23

  II.  MURPHY IS NOT "AGGRIEVED" BY AN "ADVERSE EMPLOYMENT ACTION" ........................................................................................ 25

Conclusion ........................................................................................................................ 29

## Table Of Authorities

## Cases

*Amiri v. Capital Restaurant Concepts, Ltd.*, 2005 WL 3273971 (D.D.C. 2005)...............21

*Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998) ..............................18

*Amiri v. Stoladi Property Group*, 407 F. Supp. 2d 119 (D.D.C. 2005) ............................28

*Barbour v. Browner*, 181 F.3d 1342 (D.C. Cir. 1999)........................................................23

*Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999)........................................................... 27-28

*Butler v. Ashcroft*, 293 F. Supp. 2d 74 (D.D.C. 2003)......................................................21

*Carter v. George Washington University*, 387 F.3d 872 (D.C. Cir. 2004)........................21

*Cuddy v. Carmen*, 694 F.2d 853 (D.C. Cir. 1982) ............................................................18

*Fischbach v. D.C. Department of Corrections*,
    86 F.3d 1180 (D.C. Cir. 1996) ................................................... 21, 22, 23, 24

*Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002) ..................................................... 27-28

*Forman v. Small*, 271 F.3d 285 (D.C. Cir. 2001) .............................................................18

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ......................................................... 25-26

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ..........................................................24

*Hopkins v. Price Waterhouse*, 920 F.2d 967 (D.C. Cir. 1990) ................................... 26-27

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1997) ..............19

*Jackson v. Gonzales*, 496 F.3d 703 (D.C. Cir. 2007) .......................................................23

*Lathram v. Snow*, 336 F.3d 1085 (D.C. Cir. 2003)...........................................................24

*Logan v. Department of Veteran Affairs*, 404 F. Supp. 2d 72 (D.D.C. 2005) ...................18

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................ 17-18, 21, 22

*Morgan v. Federal Home Loan Mtg. Corp.*, 328 F.3d 647 (D.C. Cir. 2002) ....................22

*Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549 (D.C. Cir. 1997) ......................... 19-20

*Murphy, et ano. v. PricewaterhouseCoopers, LLP,*
    357 F. Supp. 2d 230 (D.D.C. 2004) ......................................................2, 3, 5, 6, 17, 21

*Murray v. Gilmore*, 406 F.3d 708 (D.C. Cir. 2005)...........................................................23

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ..........................................................26

*Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133 (2000)................................18

*Smith v. City of Jackson*, 544 U.S. 228 (2005) .................................................................28

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) ...................................................21

*Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139 (D.C. Cir. 2004) .................................19

*Texas v. Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ............18, 21

*Thomas v. Gandhi*, 2007 WL 4210162 (D.D.C. Nov. 29, 2007).......................................24

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).................................................28

*Watson v. Fort Worth Bank and Trust*, 487 U.S. 977 (1988) ............................................28

*Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007)....................................................23, 24

## **Statutes**

29 U.S.C. § 623(a)(1).........................................................................................................27

29 U.S.C. § 623(a)(2).........................................................................................................27

29 U.S.C. § 626(c)(1).........................................................................................................27

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
C. Westbrook Murphy, *et ano.*,     )
                                    )     Civil Action No. 02-00982 (RJL/DAR)
                    Plaintiffs,     )
                                    )
        v.                          )
                                    )
PricewaterhouseCoopers LLP, *et al.*,)
                                    )
                    Defendants.     )
_____)
                                    )
C. Westbrook Murphy,                )
                                    )
                    Plaintiff,      )     Civil Action No. 05-01054 (RJL/DAR)
                                    )
        v.                          )
                                    )
PricewaterhouseCoopers LLP,         )
                                    )
                    Defendant.      )
_____)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
DISMISSING PLAINTIFF MURPHY'S REMAINING CLAIMS**

**Preliminary Statement**

Defendant PricewaterhouseCoopers LLP ("PwC") is entitled to summary judgment dismissing the remaining claims of plaintiff C. Westbrook Murphy ("Murphy") in these related age discrimination actions.[1]  The claims are individual claims for non-admission as a partner in PwC's July 1, 2000, July 1, 2001 and July 1, 2004 partner admission cycles.

_____
[1]  PwC is simultaneously filing a separate motion for summary judgment dismissing the remaining claims of co-plaintiff Harold Schuler.

This litigation has an extended history, including two rounds of fact discovery. Discovery was reopened by Order of the Magistrate Judge in May 2006 to permit inquiry into "the reasons for Schuler and Murphy's non-promotion to partnership" (Docket No. 143 at 6-7), in light of this Court's acknowledgment in its September 2004 decision that "the record is, as of yet, not fully developed regarding the particular circumstances under which the two plaintiffs were not advanced to partnership" (Murphy, et ano. v. PricewaterhouseCoopers, LLP, 357 F. Supp. 2d 230, 249 (D.D.C. 2004)). Extensive fact discovery on that issue was thereafter taken by plaintiffs, and concluded in February 2007.

The undisputed facts, developed principally in reopened discovery, overwhelmingly establish Murphy's absolute and relative lack of qualifications for a partnership position at PwC. The threshold requirement for consideration as a potential partner candidate was sustained outstanding performance over time, reflected in "1" rated annual performance evaluations.[2] With the exception of one year, Murphy was consistently a "2" or "3" rated performer throughout his tenure with PwC. Accordingly, he was for that reason never considered as a potential partner candidate.

As a matter of law, Murphy's absolute failure to meet the minimum qualification for partnership consideration precludes his establishment of a prima facie case of discrimination, and warrants summary judgment dismissing his claims on that ground (see Point I.B., infra). Moreover, even assuming arguendo that he could establish a prima facie case, Murphy's relative lack of qualifications -- as reflected in the sustained "1" rated performance over time of the two younger employees who were admitted as partners from Murphy's business unit, and as articulated at length by the two managing partners of that business unit -- is a legitimate, non-discriminatory explanation for Murphy's non-selection, entitled to deference by the Court. As

---

[2]   Performance was rated on a scale of "1" to "4," with "1" being the highest.

there is no evidence from which a reasonable jury might infer that this proffered reason was a pretext for discrimination, summary judgment is also appropriate on this alternative ground under established precedent in this Circuit (see Point I.C., infra).

Finally, in light of PwC's lawful age-60 retirement provision for partners, Murphy's non-admission as a partner at age 61 was not an actionable "adverse employment action" (see Point II, infra). To the contrary, his admission as a partner would have lawfully resulted in his immediate retirement from PwC, and precluded him from continuing his employment to age 65 to receive the substantial benefits to which he ultimately became entitled upon his voluntary retirement as an employee on February 28, 2006, at age 66. Murphy's purported challenge to PwC's partner retirement provision -- an ill-conceived campaign waged for in terrorem effect -- should not serve to divert this Court's attention from the patent lack of merit of his remaining individual claims.[3]

## **Statement of Facts**

### A.     **The Parties**

Murphy had been employed for many years at the Office of the Controller of Currency ("OCC") before resigning in 1978 to engage in the private practice of law (Murphy Dep. at 18, 59-60).[4]  During the 1980's, Murphy was asked to resign as a partner in two law firms, and was earning less than $20,000 a year as a solo practitioner when hired by Price Waterhouse LLP ("PW"), one of the two predecessor firms to PwC (id. at 18, 22-23, 27-32, 34, 41-42, 44-45, 419 & 590-91).  He was hired by PW in 1989 at the age of 49 as a Senior Manager in its Regulatory

---

[3]   As this Court previously suggested, these claims should be determined on the basis of the particular circumstances under which Murphy was not advanced to partnership (Murphy, 357 F. Supp. 2d at 249).  Notably, this Court also stated its view that the retirement provision in the Partnership Agreement "cannot form the sole basis of a 'disparate treatment' theory, given that [it] neither addresses nor binds the plaintiffs in any way" (id.).

[4]   Portions of deposition transcripts and documents from the discovery record cited herein are annexed to the Declaration of Eric M. Nelson, Esq., dated January 15, 2008, except that documents designated "For Attorneys of Record Only" are being filed under seal pursuant to the Order of the Magistrate Judge filed August 21, 2003 (Docket No. 61) and Local Civil Rule 5(j).

Advisory Service ("RAS") unit in Washington, D.C., at an annual base salary of $120,000.00 (Complaint, ¶ 25; Murphy Dep. at 57-60).

Throughout his employment with the firm, Murphy worked in the RAS unit in the D.C. office. He was promoted to Director in 1991 (Murphy Dep. at 116-17) and, after several unsuccessful requests for promotion to Managing Director beginning in 1994 (see id. at 155-56; Exhs. A, B), he was named a Managing Director in 2004 (Murphy Dep. at 796, 890). His annual base salary at the time of his retirement in 2006 at the age of 66 was $270,000 (Murphy 11/15/06 Dep. at 18-19).

PwC was formed effective July 1, 1998 through a merger of PW and Coopers & Lybrand L.L.P. As were each of its predecessor firms, PwC is a partnership governed by a written partnership agreement (the "Partnership Agreement") (Exh. C). PwC is principally an accounting and audit firm, with over 20,000 employees and more than 2,000 partners located among 86 offices in 36 states around the country.

As described by Murphy, the RAS unit based in the firm's D.C. office is "a relatively small consulting group within PwC's Banking Practice, which in turn is part of the Financial Services Practice" (Docket No. 134 at 4). During the period relevant here, RAS was one of two specialized units in the firm's Banking practice, the other unit being Mortgage Banking (Ryan Dep. at 163-64). Banking, along with four other units (Capital Markets, Insurance, Investment Management and Real Estate), was part of the Financial Services ("FS") practice (id. at 102). FS, in turn, was part of the firm's Audit and Business Advisory Service (id. at 9-10, 63-64).

The RAS practice unit provides advice to banks and thrifts in areas of regulatory concern (Exh. D at 01842). It is self-contained and unique within the firm -- "a small piece of the firm, which is an audit firm" (Ryan Dep. at 169). Since "the career model in [the] firm is skewed to its

4

audit function" (id.), and RAS is a "business advisory unit" that does not fit "the traditional

business model of an audit" firm, the experience, skills and qualifications of RAS partners and

employees differ from those of partners and employees in the other business units and practices

within the firm (see id. at 172-73; Murphy 11/15/06 Dep. at 84 (necessary qualifications include

"deep knowledge of the banking industry")).

**B.      Prior Proceedings and Remaining Claims**

In its Memorandum Opinion and Order filed September 28, 2004 (Docket No. 104)

(Murphy v. PricewaterhouseCoopers LLP, et al., 357 F. Supp. 2d 230 (D.D.C. 2004)), this Court

decided PwC's partial motion to dismiss and the parties' cross-motions for partial summary

judgment on plaintiffs' "pattern or practice" claim. The decision narrowed substantially the

scope of plaintiffs' complaint, which purported to assert a class or "collective" action alleging

age discrimination on a "pattern or practice" theory against PwC and more than 20 other named

defendants (see Complaint filed May 20, 2002).

As a result of that decision, Murphy's only remaining claims in the first-filed action (02-

cv-00982) are claims against PwC for non-promotion to partnership in the firm's July 1, 2000

and July 1, 2001 partner admission cycles.[5] Those two non-promotion claims against PwC have

proceeded as individual claims, as the Court ruled that they could not be pursued either as class

claims or on a "pattern or practice" theory of recovery (Murphy, 357 F. Supp. 2d at 247).

Following the completion of plaintiffs' depositions, and without further discovery, PwC

moved for summary judgment on plaintiffs' remaining individual claims in February 2005 on the

limited grounds that plaintiffs could not meet their threshold burden of establishing certain

elements of a prima facie case of discrimination (see Docket No. 119 at 2, 5). That motion

---

[5]    Murphy recently consented to dismissal of the remaining claims asserted against Robert Morris, the only
remaining individual defendant (see Murphy, 357 F. Supp. 2d at 244).

specifically did not address plaintiffs' "qualifications" to be partners, and did not articulate the legitimate, non-discriminatory reasons plaintiffs were not admitted as partners (see Docket No. 125, Attachment #1 at ¶¶ 5-7). The motion was denied, without opinion, by Order of this Court entered August 30, 2005 (Docket No. 128).

Murphy separately commenced a second action against PwC in June 2005 (05-cv-01054), assigned to this Court as a related case, purporting to complain of his non-admission as a partner in PwC's July 1, 2004 partner admission cycle. Although initially commenced as a class or "collective" action, Murphy's counsel announced after the completion of extensive fact discovery that the claim would be pursued only as an individual non-promotion claim. For purposes of discovery, Murphy's Case 2 was in essence consolidated with his remaining claims in Case 1 (see Minute Order entered January 9, 2006).

Discovery in the initial action was reopened by Orders of Magistrate Judge Robinson in May and August 2006 (see Docket Nos. 143, 152). In reopening discovery, the Magistrate Judge recited this Court's statement in its Memorandum Opinion and Order, entered in September 2004, that "the record is, as of yet, not fully developed regarding the particular circumstances under which the two plaintiffs were not advanced to partnership" (see Murphy, 357 F. Supp. 2d at 249), and concluded that "the trial court's acknowledgment that the record has not been fully developed regarding the reasons for Schuler and Murphy's non-promotion to partnership" warranted "further liability discovery" (Docket No. 143 at 6-7). Plaintiffs have since conducted and completed extensive discovery bearing on, among other things, the particular circumstances and reasons for Murphy's non-admission as partner in each of the annual admissions cycles that remain at issue -- 2000, 2001 and 2004.

This motion is based primarily on undisputed facts from that reopened discovery record.

**C.**     **The Reasons for Murphy's Non-Admission as a Partner**

    **1.**     **The Partner Admissions Process**

PwC has an annual partner admissions cycle, culminating in the announcement of new partners effective July 1, the beginning of PwC's fiscal year (Exh. E, ¶ 1; <u>see</u> Murphy Dep. at 847, 892-93). The annual partnership consideration process begins in the practice areas (Docket No. 134 at 16-17) early in the preceding fiscal year (<u>see</u> Docket No. 121 at 42-43). The potential candidacy of a particular employee in a practice unit is initiated by the recommendation of a partner in that unit (Docket No. 134 at 16-17). Murphy testified that Robert Bench, who was the managing partner of the RAS unit and Murphy's immediate supervisor throughout Murphy's employment with the firm (until Bench's retirement on June 30, 2003), was responsible for all promotions of RAS employees (Murphy Dep. at 894).

Murphy thus understood that the partnership consideration process for employees in RAS would have to be initiated, if at all, by Bench (<u>id.</u> at 895):

> Q.     When you say approved by Mr. Bench, do you
> mean the process would have to be initiated by Mr. Bench?
>
> A.     That was my understanding.
>
> Q.     Okay. So that for any promotions for professional
> employees [in] RAS, Mr. Bench would have to initiate a process
> and make a recommendation before anything could happen?
>
> A.     That was my understanding.

Following Bench's retirement on June 30, 2003, the partnership consideration process for employees in RAS would be initiated by the four remaining partners in RAS (<u>id.</u> at 895-96). Prior to his retirement, while Bench would have been the partner to initiate a recommendation for a Murphy candidacy, he would have done so in consultation with the other RAS partners (Bench 11/29/06 Dep. at 58-59, 61-62). Potential partner candidates from RAS would be

discussed by an annual review committee ("ARC"), consisting of the RAS partners and the head of the banking practice (id.).

### 2. Murphy Did Not Meet the Minimum Qualifications for Consideration as a Partner Candidate from the RAS Unit

The undisputed testimony establishes that Murphy was never recommended as a candidate for partner because he did not meet the threshold requirement for sponsorship from the RAS unit.

As to the identification of partner candidates in RAS, Bench, in consultation with the other RAS partners, would first consider business need (see Bench 11/29/06 Dep. at 50-52; Lewis Dep. at 155-56, 158-59). Assuming a consensus that there was room for another partner in RAS, the RAS partners would consider who among the RAS employees was best qualified to meet the perceived or projected business need (id.). As a threshold qualification, only those employees who had "sustained outstanding performance over time," reflected in "1" rated annual performance evaluations, were considered as potential partner candidates in the RAS unit (Bench 11/29/06 Dep. at 170-71).

From 1998 through 2004, the period at issue here, each of the three RAS employees sponsored as candidates for partner -- Harold Schuler, David Albright and Jeffrey Lavine -- were sustained "1" rated performers (see Exh. F at PwC 03242; Exh. G at PwC 04122; Exh. H at 5). The Partner Candidate Proposal for Schuler's admission in the July 1, 1999 cycle, for example, set forth Schuler's "1" performance ratings for fiscal years 1997, 1998 and 1999 (Exh. F at PwC 03242) and noted that he was a "sustained exceptional performer" (id. at 03243). Although that candidacy did not survive "soundings," the next step in the partner admissions process (see Carter Dep. at 96-97), Bench sought to initiate another candidacy for Schuler for the July 1, 2000 admission cycle, noting that Schuler "remain[ed] a sustained 1-rated performer" (see Exh. I).

By September 1999, Bench had identified four RAS employees -- David Albright, David Sapin, Jeff Lavine and Harold Schuler -- who were meeting the "sustained performance over time" criteria to be considered as potential partner candidates (Bench 11/29/06 Dep. at 185-86). Albright was proposed and admitted in the July 1, 2000 cycle; Sapin transferred out of RAS to another unit (id. at 187-88); Lavine was proposed in the July 1, 2003 and July 1, 2004 cycles, and admitted in the latter cycle; and, Schuler was not sponsored again after his proposed candidacy for the July 1, 1999 cycle did not proceed due to insufficient support in the sounding process.

The ratings were determined based on annual performance evaluations (Bench 11/29/06 Dep. at 63-65). The performance evaluation process was an extensive exercise involving both the evaluating partner and the subject employee (Murphy Dep. at 124-28). There was a detailed written performance evaluation form that was signed by both the partner and the employee (id. at 127-28), and specifically included an evaluation of potential for promotion (id. at 129-31; Bench 11/29/06 Dep. at 65; Schuler Dep. at 173).

Murphy was never a sustained "1" rated performer. His annual performance ratings were as follows (Exh. J; Exh. K; Exh. L; Exh. M)

| Fiscal Year | Rating[6] |
|---|---|
| 1997 | "2" |
| 1998 | "2" |
| 1999 | "1" |
| 2000 | -- |
| 2001 | "3" |
| 2002 | "3" |
| 2003 | "2" |

---

[6]   It appears that Murphy was not formally rated for fiscal year 2000, as there are no documents reflecting a rating for that year either in PwC files or among the extensive records produced by Murphy. The absence of a rating for that year is likely explained by the facts that Murphy had voluntarily relinquished all of his managerial responsibilities for an indefinite period beginning in December 1999 and extending at least through April 2000 (see p. 11, infra.).

2004                                   "3"

Accordingly, Murphy was never proposed by Bench, or considered by the ARC, as a

potential candidate for partner. As Bench testified (Bench 11/29/06 Dep. at 170-71):

> Q. Okay. Did the [ARC] committee talk about or consider sponsoring Mr. Murphy?
>
> A. The committee only considered one-rated -- people with sustained outstanding performance over time, generally one-rated people. Westbrook [Murphy] was not a one-rated person or did not have sustained performance over time.
>
> Q. So is it your testimony that the committee did not consider Mr. Murphy?
>
> A. My testimony is the committee considered candidates with sustained outstanding performance over time who were rated one. That's my testimony. I think that's accurate, over time.
>
> * * * *
>
> Q. * * * * In any of the ARC committee meetings was his name discussed as someone who should be thought about, considered for partnership?
>
> MR. NELSON: That's been asked and answered, I think.
>
> A. I don't recall anybody who did not have sustained outstanding performance over time and rated on a sustained basis less than one considered to be a partner.
>
> Q. So is the answer to my question that, to your recollection, Mr. Murphy was not discussed at any ARC committee meetings as someone who would be a candidate for partnership?
>
> A. Correct.

Murphy readily admitted that Bench had not discriminated against him (Murphy Dep. at

414):

> Q. Do you believe that Mr. Bench discriminated against you by not recommending you as a candidate for promotion to partner?

A.     No.

Murphy further conceded that, before filing his initial complaint with the DCOHR in March

2001, he had never complained formally or informally of discrimination at PwC (id. at 854).

### 3.     Murphy's Relinquishment of Managerial Duties

During the period in which he now claims he should have been considered as a candidate

for partner, Murphy openly and voluntarily relinquished all of his managerial responsibilities as a

Director in the RAS unit for an indefinite period beginning in December 1999, and continuing

through at least April 2000.  Moreover, he also requested a demotion in early 2000.  The facts

are fully set forth, with detailed citations to the record, in PwC's memorandum on a prior motion

(Docket No. 119-2, at 18-22), which is respectfully incorporated herein by reference.

In response, Murphy made no attempt to dispute the facts, and instead asserted that his

extended relinquishment of managerial duties, and the delegation of those responsibilities to his

fellow employees in RAS, was a justified effort to avoid "independence" requirements and

protect his personal investment portfolio (see Docket No. 121 at 42).  But, whether or not

Murphy's protest was otherwise justifiable,[7] the point here is that his conduct was utterly

inconsistent with any claim that Murphy was qualified and interested in a partnership position.

### 4.     Murphy's Demonstrated Lack of Interest in Partnership

Murphy understood that, as his immediate supervisor and Managing Partner of the RAS

group, Bench's recommendation was necessary for Murphy to be considered as a candidate for

partner (Murphy Dep. at 414-15).  Yet, until March 2001 -- too late for consideration in the 2001

cycle -- Murphy admittedly never expressed to anyone at PwC, including Bench, any interest in

becoming a candidate for partner (id. at 113-14).  In point of fact, Murphy never had an interest

---

[7]     Murphy was twice sanctioned after a hearing for "independence" violations.  He received a letter of reprimand in
April 2000 (Murphy Dep. at 756; see id. at 747-57); and, just weeks prior to the July 1, 2001 partner admission
date, Murphy was sanctioned with a two-week suspension without pay (Murphy Dep. at 765, 827-28, 831; Exh.
N at Murphy-03374)).

in becoming a partner in the firm.  Indeed, his March 2001 memorandum requesting such

consideration -- along with his contemporaneously filed charge of discrimination with the

DCOHR -- were prepared to advance his then recently stated intention to cut an early retirement

deal.

Murphy had decided in the fall of 2000, that he wished to then retire early at age 60 if

PwC would provide him with continued medical benefits as a retiree (Murphy Dep. at 135-36).

In response to his inquiries, Murphy was advised repeatedly that he would not be eligible under

the terms of the PwC retirement and benefits plans to receive health insurance coverage as a

retiree unless he worked until age 65 (id. at 137-45).  In mid-December 2000, Murphy asked

Bench, as Managing Partner of the RAS practice, "about what kind of arrangements might be

made in the way of the firm either providing healthcare service, healthcare insurance apart from

these plans . . . or going to work on a part-time basis" (id. at 145).  Rather than attempting to

dissuade Murphy from seeking to retire or work part-time, Bench "was receptive to the idea,"

and agreed to make inquiry on Murphy's behalf (id. at 145-47).

Bench contacted Darlene Shea, a personnel specialist with responsibilities for the RAS

practice group, and Shea contacted Murphy with respect to his interest in retirement or part-time

employment (id. at 147-50).  Shea reaffirmed the advice Murphy was previously given that he

would not be eligible to receive retiree health benefits until his normal retirement date at age 65

(see Exh. O).  In an e-mail to Shea dated March 8, 2001, Murphy ultimately stated (see Murphy

Dep. at 149-50):

> But -- as I said -- I believe the answer I am looking for likely lies
> not in a parsing of this obscure language, but in cutting an early
> retirement deal with whoever possesses the authority to do so. . . .
> [M]y wish is to retire and then to be covered by the PwC medical
> insurance plan as a retiree.  The outcome is of less consequence
> than how we get there.  [Exh. O, emphasis supplied.]

Eight days later, Murphy personally delivered his March 14, 2001 memorandum to Bench, and filed his charge of discrimination with the DCOHR (Murphy Dep. at 171). His memorandum opened with a reference to his interest in retiring with continued health insurance, followed by his request to be considered for promotion to partner at age 62, and an assertion that the age 60 retirement provision for partners was unlawful (Exh. P). The memorandum proceeds to state that Murphy had filed a charge of discrimination with the DCOHR, attaches a copy of the charge, notes that it is a predicate for filing a lawsuit in federal court, and closes by informing Bench that the DCOHR will encourage a confidential settlement to avoid litigation (id.).

Bench's only response was to tell Murphy that he was "disappointed" that Murphy had elected to proceed in this manner (Murphy Dep. at 114-15). Murphy acknowledged that if PwC had agreed to provide him with retiree health benefits at age 60, he would not have "express[ed] an interest in being promoted to partner and to take the steps that seemed to me to be necessary to accomplish that interest" (id. at 162). Indeed, as noted, Murphy had never expressed an interest in being a candidate for partner until his request for early retirement with medical benefits had been denied (id. at 418).

Murphy further testified that he is not even now prepared to accept an offer of partnership status (id. at 605-606). He said he would want to make certain inquiries before making a decision, but had failed to make any such inquiries before filing his administrative charges, and commencing and prosecuting this action, whereby he purports to seek partnership status (id. at 605-608). Indeed, Murphy's indifference is underscored by his failure to make inquiries about partner compensation (id. at 98-100) or the partner retirement plan (id. at 604-05), even when he clearly had an appropriate opportunity to do so (see id. 96-99). Moreover, based on discussions he had with a similarly situated RAS employee (Gary Welsh), who had made such inquiries and

decided that he did not wish to be a partner (id. at 90-92), Murphy testified that he would have made the same decision (id. at 107-09).

Murphy produced a memorandum he wrote on February 1, 2002 (Exh. Q) -- based in part on his conversations with Gary Welsh (Murphy 11/15/06 Dep. at 239-40), who had declined an offer from Bench to be sponsored as a candidate for partner in his mid-50's (Murphy Dep. at 92; Bench Dep. at 210-11) -- describing the disadvantages of becoming a partner at age 56 or older (Murphy 11/15/06 Dep. at 235).   Among other things, had Murphy been admitted as a partner in the July 1, 2000 admission cycle at age 60, he would have been immediately retired pursuant to the age-60 partner retirement provision, and lost retirement and retiree health care benefits that he otherwise now receives as a result of continuing his employment until his voluntary retirement in February 2006 (see Exh. Q; Murphy 11/15/06 Dep. at 235-40).   Murphy thus testified that he would not have wanted to be admitted as a partner on July 1, 2000, or on July 1, 2004, in light of the age-60 partner retirement provision (id. at 249-50).

   5.    **The July 1, 2004 Admission Cycle**

Murphy's less than exceptional performance continued through 2004.   He was a "3" rated performer in 2001, 2003 and 2004, and was "2" rated in 2002 (Exh. M).   Hence, he never made the sustained "1" rated performance standard for consideration as a candidate for partner from RAS.

William Lewis, a RAS partner, succeeded Bench as managing partner of the RAS unit upon Bench's retirement on July 1, 2003 (Lewis Dep. at 41-42; Murphy 11/15/06 Dep. at 96). As Murphy's immediate supervisor, Lewis discussed with Murphy his purported aspiration to become a partner (Lewis Dep. at 173-74; Murphy 11/15/06 Dep. at 98-100).   Murphy had never expressed or discussed an interest in partnership with Lewis prior to the filing of his claim (Lewis Dep. at 173-74).

Lewis counseled Murphy that he would have to demonstrate sustained high-rated performance, which he had failed to do to that point (id. at 175-76).  To that end, Murphy was advised that he would have to develop client relationships to "get work" and "repeat calls" so that "he could sustain himself and a group of people as partner" (id. at 176-77).  Lewis also advised Murphy that he had 1,100 hours of time "that was not just non-chargeable, it was not accounted for," which was not "consistent with what we would expect of a partner" (id. at 176).  In light of this large block of unsupported and unexplained time, Lewis counseled Murphy that "he couldn't expect to be evaluated as a high performer and have the kind of objectives that he was starting to articulate about making partner if he had over half of his year unaccounted for" (id. at 178-79; see Murphy Dep. at 875).

Murphy testified that, after he had filed his claim, he submitted to Lewis an annual plan in which he purported to state an interest in becoming a partner, and a need to "overcome" what he referred to as "PwC's illegal employment policy" (Murphy 11/15/06 Dep. at 97-99; see Lewis Dep. at 174).  Given that Murphy's performance was not close to being at a level that would qualify him to be considered for sponsorship as a candidate for partner, and in light of the context in which Murphy had raised his purported interest in becoming a partner, Lewis did not believe Murphy's stated interest in partnership was "genuine," but was asserted to advance his legal claim (Lewis Dep. at 181):

> Q.     Did you believe that Mr. Murphy's interest in being a partner was genuine?
>
> A.     Frankly, no; I don't.
>
> Q.     Why?
>
> A.     I thought that he was raising it, you know, in concert with the action he was taking, frankly.

6.    **Murphy's Comparators in RAS**

As noted, Murphy's colleagues with sustained "1" rated performance over time were sponsored as partner candidates from RAS in the July 1, 1999 (Schuler), July 1, 2000 (Albright), and July 1, 2003/July 1, 2004 (Lavine) admission cycles.  Although Murphy's performance ratings did not meet that standard, he nonetheless claims he was better qualified for partner than Schuler, Albright and Lavine (see Murphy 11/15/06 Dep. at 88-90), and seeks to predicate a prima facie case of age discrimination on the admissions of Albright and Lavine.  The RAS managing partners, Lewis and Bench, who were cross-examined at some length on Murphy's performance relative to the performance of Albright and Lavine, had a different view.

Murphy had subject matter expertise in federal banking laws and regulations, a narrow area of compliance expertise for which client demand was not sufficient to keep him fully occupied (Lewis Dep. at 90-92).  Albright and Lavine were "able to expand their subject matter expertise into adjacent areas more effectively than [Murphy] did[,]" enabling them to "serve in more functions and engagements than [Murphy] was able to do" (id. at 92-94).  Murphy, unlike Albright and Lavine, failed to demonstrate "a deep subject matter expertise of a type that [RAS] was able to sell in the marketplace" (id. at 94-97).  And, Murphy "wasn't out selling internal audit work" or "delivering it to the scale that a guy like [Albright] was" (id. at 99-100).

Lavine had "expanded his subject matter expertise into areas like anti-money laundering, foreign bank regulation, consumer compliance" and a number of sub-categories of those areas (id. at 102-03).  Lavine thus "helped win and lead significant engagements in internal audit services" (id. at 103).

In contrast, the firm did not sell client services in the narrow area of Murphy's subject matter expertise (id. at 104).  "[H]e didn't take the opportunity to broaden his subject matter expertise into other areas" (id. at 106-107).  As a consequence, while Murphy "worked hard at

any task he was given [,]" he "was often not productively . . . engaged" and "needed someone to provide him with work" (id.).  Rather than selling work, he "was getting his work from larger opportunities that someone else had sold and identified" (id. at 108-109).

Bench explained that "sustained performance over time" for Albright was "across a population" of clients, partners and issues (Bench 11/29/06 Dep. at 118).  He was a "busy guy" with clients and partners "around the country" calling him (id. at 118-19; see id. at 119-20 (for Albright, "it was one engagement after the other after the other after the other"); id. at 127 ("[t]he demand for [Albright's] time was extraordinary")).  Albright was "traveling 70 percent of the time and charging 1800 hours a year" (id. at 125).  Similarly, Lavine "was a sustained one-rated, outstanding performer across all spectrums," and had "enormous chargeable time" (id. at 164; see id. at 160-66).  In contrast, Murphy "wasn't charging the hours that [Albright and Lavine] were" (id. at 125).  Albright and Lavine and others in RAS were "paying for" Murphy (id. at 125-26).

The relative performance differences among the various RAS employees are reflected in the written performance evaluations and ratings (id. at 85-86).  The material and dispositive fact is that Albright and Lavine were sustained "1" rated performers over time, while Murphy was not.

## **Argument**

### **I.**

### **SUMMARY JUDGMENT IN FAVOR OF PwC IS WARRANTED ON THE UNDISPUTED FACTS**

#### **A.    The McDonnell Douglas Framework**

Murphy's remaining individual claims should be determined under the McDonnell Douglas burden-shifting framework (see Murphy, 357 F. Supp. 2d at 246-47 & n.13), which was

recently set forth by this Court, as follows (Logan v. Dept. of Veteran Affairs, 404 F. Supp. 2d 72, 75-76 (D.D.C. 2005) (Leon, J.)):

> The plaintiff has the burden of proving, by the preponderance of the evidence, a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff proves the prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [action]." Id. Lastly, should the defendant carry this burden, the plaintiff "has an opportunity to discredit the employer's explanation," Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998), by showing the defendant's reasons were a pretext for discrimination, see Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (explaining that the plaintiff cannot discredit an employer's explanation by merely showing that the action was unfair or undesirable, but only by showing that the explanation was phony).

Although "the intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff'" (Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 143 (2000), quoting Texas v. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

**B.    Prima Facie Case**

The standard for establishing a prima facie case of age discrimination was stated by the D.C. Circuit in Forman v. Small, 271 F.3d 285, 292 (D.C. Cir. 2001), as follows:

> In failure to promote cases, a prima facie case is made by showing: (1) the plaintiff is at least forty years of age; (2) the plaintiff was qualified for the position in question; (3) the plaintiff was not promoted; and (4) the plaintiff was disadvantaged in favor of a younger person. See Cuddy v. Carmen, 694 F.2d 853, 856-57 (D.C. Cir. 1982).

While "[t]he ultimate question is whether age was a determining factor in the disputed employment decision" (id.) (citation omitted), to establish a prima facie case, "McDonnell Douglas principally demands 'that the alleged discriminatee demonstrate at least that his

rejection did not result from the two most common legitimate reasons on which an employer

might rely to reject a job applicant:  an absolute or relative lack of qualifications or the absence

of a vacancy in the job sought'" (Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1150 (D.C.

Cir. 2004), citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1997)).  Thus,

the requirement that a plaintiff prove that he or she was qualified for the position sought in order

to establish a prima facie case (see id. at 1155).

     Based on the undisputed facts and his own admissions, Murphy cannot meet his threshold

burden of establishing that he was qualified to even be considered as a candidate for partner.

The partnership consideration process begins in the various practice units of the firm.  In the

RAS unit, only those employees who had sustained "1" rated performance over time were

considered as potential partner candidates.  The three RAS employees who were sponsored for

partnership (Schuler, Albright and Lavine) all had "1" performance ratings for each of at least the

three years preceding their sponsorship by the RAS partners.

     Murphy's performance ratings did not qualify him for consideration as a potential partner

candidate from RAS, and he was, therefore, not considered.  During the period 1997 through

2004, Murphy was a sustained "2" or "3" rated performer, having received a "1" rating only in

1999.  He had signed off on his annual performance evaluations without taking issue with these

ratings.  Moreover, he cannot show that any employee, much less a younger employee, with

similarly low performance ratings was considered as a potential candidate for partner from the

RAS unit.

     The D.C. Circuit considered a similar claim in Mungin v. Katten Muchin & Zavis, 116

F.3d 1549, 1557 (D.C. Cir. 1997), where the plaintiff claimed the defendant law firm failed to

consider him for partnership because of his race.  The defendant firm had a partnership

admissions process similar to that at PwC (id.):

> [Plaintiff] introduced evidence that department heads would confer
> with other partners in their departments to recommend particular
> associates for partnership.  The recommendation[] [is] then passed
> through several more committees -- the committee comprised of all
> the department heads, the partnership review committee, the
> executive committee, and finally the board of directors -- with
> names being screened out along the way.

Like the process at PwC, "associates are screened out from consideration at the first

round, when the department head and/or the partners in that department decide not to nominate

certain associates to the committee of department heads" (id.).  The plaintiff in Mungin was

employed as an associate attorney in the firm's finance and reorganization department, which did

not nominate him as a candidate for partner.  In reversing the district court's denial of the

defendant law firm's motion for judgment as a matter of law on the denial of partnership claim,

the Court rejected the plaintiff's attempt to offer proof relating to procedures for recommending

partners in the insurance group (id.) (emphasis supplied):

> But the partnership decisions were made by departments, and in
> [plaintiff's] case, by the finance and reorganization department, not
> the insurance department.  Without any evidence that this
> department -- the one that chose not to nominate him -- acted
> discriminatorily, [plaintiff] failed to prove a claim.

Accordingly, while Murphy took extensive and wide-ranging discovery concerning

partner admissions in other business units in the substantially larger FS practice, of which the

RAS unit was a part, any evidence relating to business units other than RAS is irrelevant here.

Under PwC's partnership consideration process, it was the RAS unit partners who screened RAS

employees for sponsorship as partner candidates in the first instance; and, it is undisputed that

Murphy failed to meet the minimum qualifications for such consideration or sponsorship from

that unit.

Where, as here, it is undisputed that a plaintiff fails to meet the qualifications for the position sought, summary judgment is warranted for inability to establish a <u>prima</u> <u>facie</u> case.  <u>See</u> <u>Carter v. George Washington Univ.</u>, 387 F.3d 872, 882-83 (D.C. Cir. 2004) (summary judgment affirmed where the plaintiff failed "to meet the minimum objective criteria" for the promotion sought and thus "failed to show that she meets the qualifications requirement of the <u>McDonnell</u> <u>Douglas</u> <u>prima</u> <u>facie</u> case"). Given that Murphy cannot establish a <u>prima</u> <u>facie</u> case, the analysis of his claims need not proceed to the next step in the <u>McDonnell Douglas</u> framework.

**C.    The Legitimate, Nondiscriminatory Reasons**
**for Not Considering Murphy for Partnership**

Assuming <u>arguendo</u> that Murphy could meet his initial burden of establishing a <u>prima</u> <u>facie</u> case, "the second step under <u>McDonnell Douglas</u> . . . is the employer's burden to articulate a non-discriminatory reason for its action" (<u>Fischbach v. District of Columbia Dep't of Corr.</u>, 86 F.3d 1180, 1182 (D.C. Cir. 1996), citing <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254-55 (1981).  To satisfy this burden, the employer "need only 'proffer,' not prove, a legitimate non-discriminatory reason" (<u>Amiri v. Capital Rest. Concepts, Ltd.</u>, 2005 WL 3273971 at *4 (D.D.C. 2005) (Leon, J.), citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Butler v. Ashcroft</u>, 293 F. Supp. 2d 74, 78 (D.D.C. 2003) (Leon, J.) (citation omitted)). The third and final step is that the plaintiff must then respond "with evidence that the proffered reason was pretext" (<u>Murphy</u>, 357 F. Supp. 2d at 247; <u>see</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (to prove pretext, a plaintiff must show "<u>both</u> that the reason was false, <u>and</u> that discrimination was the real reason")).

As detailed above, Murphy was not considered a potential candidate for partnership because he did not meet the threshold standard of sustained "1" rated performance over time. With the exception of 1999, he was consistently rated a "2" or a "3" for each year during the

period 1997 to 2004. The ratings were determined each year based on detailed and extensive evaluations of performance by supervisors. Moreover, the underlying reasons for Murphy's performance ratings relative to the ratings of similarly situated RAS employees are consistently described in the testimony of the RAS partners.

In Fischbach, the D.C. Circuit found a similar reason for a failure to promote to be "both reasonable and non-discriminatory" (86 F.3d at 1182). There, the promotion decision was based on a numerical scores assigned by interview panels which, in turn, were based on candidates' answers to questions during the interviews (id.). The candidate with the highest numerical score was selected, which the D.C. Circuit noted "precludes the possibility that [the decision-maker] discriminated against [the plaintiff] on the basis of his race" (id.).

Moreover, partner Lewis, who became the RAS managing partner and Murphy's immediate supervisor upon Bench's retirement on June 30, 2003, testified that he did not understand or believe Murphy's asserted interest in becoming a partner to be a "genuine" interest.[8] Although Lewis nonetheless counseled Murphy that he, among other things, would have to become a sustained "1" rated performer if he truly aspired to be a partner, a good faith belief that an employee is not interested in the position at issue has been recognized by the D.C. Circuit as a legitimate, nondiscriminatory reason for not considering the employee as a candidate (see Morgan v. Fed. Home Loan Mtg. Corp., 328 F.3d 647, 653-54 (D.C. Cir. 2002)).

As PwC's proffered reasons are both reasonable and nondiscriminatory, "that is enough to take us to the next step under McDonnell Douglas: [plaintiff] must prove that the employer's proffered explanation is a pretext" (Fischbach, 86 F.3d at 1182) (citation omitted).

---

[8]  Similarly, Bench's only reaction to Murphy's belated request to be considered as a partner candidate in March 2001 was to express disappointment that Murphy had seen fit to make such a request for the sole purpose of filing a charge of discrimination against the firm for leverage to cut an early retirement deal.

D.    __Pretext__

To meet his burden, Murphy must show not only that the proffered explanation for not considering him as a candidate for partner was pretextual but also "that this pretext shielded discriminatory motives" (Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007); (Murray v. Gilmore, 406 F.3d 708, 713 (D.C. Cir. 2005)). The issue is not "the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers" (Woodruff v. Peters, 482 F.3d 521, 531 (D.C. Cir. 2007), citing Fischbach, 86 F.3d at 1183). Murphy's burden is to provide an evidentiary basis "for rejecting the presumptive validity" of the proffered explanation (id.).

Notwithstanding the performance ratings by the RAS partners, Murphy asserted at his deposition that he considered himself to be the RAS employee best qualified for partnership in both the July 1, 2000 and the July 1, 2004 admission cycles (see Murphy 11/15/06 Dep. at 88-90). He ranked his co-plaintiff, Schuler, as the second best qualified RAS employee (id.). He did not consider Albright to be qualified when admitted as a partner in 2000 (see id. at 89), and he ranked Lavine fourth best qualified from RAS when he was admitted in 2004 (id. at 90).

In the context of summary judgment decisions, the D.C. Circuit has emphasized several basic principles concerning a plaintiff's burden of proving pretext in cases where the challenged employment decision was based on the employer's assessment of relative performance and qualifications. First, the district court "must respect the employer's unfettered discretion to choose among qualified candidates" (Fischbach, 86 F.3d at 1183), and not sit as a "super-personnel department" that reexamines such business decisions (id.; accord Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007); Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999)). Even in cases where the plaintiff is deemed qualified, "liability cannot rest solely upon a judge's

determination that an employer misjudged the relative qualifications of admittedly qualified candidates" (Fischbach, 86 F.3d at 1183) (citation omitted).

Moreover, a showing that a qualifications-based explanation is pretextual requires evidence that "a reasonable employer would have found the plaintiff significantly better qualified for the job" (Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (citation omitted)).  "[T]o justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination" (id., citing Lathram v. Snow, 336 F.3d 1085, 1091 (D.C. Cir. 2003) (citing a "wide and inexplicable gulf" between candidates); see Thomas v. Gandhi, 2007 WL 4210162 (D.D.C. Nov. 29, 2007) (Leon, J.)).

Here, Murphy's ratings were consistently and materially lower than the sustained "1" ratings of each of the three RAS employees who were sponsored as partner candidates during the relevant time frame.  Under the circumstances, Murphy's burden to show pretext with respect to the qualifications-based explanation of the selection process is formidable, if not impossible. With performance ratings significantly lower than the ratings of the employees nominated as partner candidates from RAS, Murphy would have to offer evidence from which a reasonable jury might infer that Murphy was nonetheless significantly better qualified than the selectees.

This is a non-promotion, not a termination, case.  Accordingly, while Murphy was a valued employee who can undoubtedly marshal highly favorable statements concerning his performance and contributions to the firm, he cannot meet his burden of producing evidence that the RAS partners "did not honestly believe" that his performance ratings over time did not qualify him for consideration as a candidate for a partnership position (see Woodruff, 482 F.3d at 531).

Albright and Lavine were younger RAS employees who were sponsored as candidates by the RAS partners, and ultimately admitted to partnership on July 1, 2000 and July 1, 2004, respectively.  The managing partners in RAS, Bench and then Lewis, gave extensive testimony on cross-examination as to the qualifications of Albright and Lavine relative to Murphy that are reflected in the performance ratings.  Accordingly, to the extent Murphy seeks to show discrimination by comparing his qualifications to these similarly situated, younger employees, he must present evidence sufficient to meet the same heavy burden of demonstrating that he was significantly better qualified.

In any event, Murphy testified that Bench, as RAS managing partner and Murphy's immediate supervisor until July 1, 2003, was the partner who would have initiated the partnership consideration process, and expressly and unequivocally admitted that Bench did not discriminate against him in not recommending him as a candidate for partner.  That admission is dispositive of Murphy's claims for the July 1, 2000 and July 1, 2001 partner admission cycles.

Under the circumstances, it is submitted that no reasonable juror could conclude that PwC's stated reasons for not considering Murphy as a candidate for partner were pretexts for discrimination.

## II.

## MURPHY IS NOT "AGGRIEVED" BY AN  "ADVERSE EMPLOYMENT ACTION"

Murphy recognizes that partners may lawfully subject themselves to a mandatory retirement agreement (see Docket No. 121 at 26).  His claim is premised on the assertion that, although the ADEA does not proscribe discrimination among partners, a partnership may not deny partnership consideration to its employees on the basis of age, where such consideration is a term, condition or privilege of employment (id. at 22, citing Hishon v. King & Spalding, 467

U.S. 69, 75 (1984), and Price Waterhouse v. Hopkins, 490 U.S. 228, 233 n.1 (1989)).[9]  The

preceding Point I demonstrates, on the undisputed facts, that Murphy was not denied partnership

consideration because of his age.

   Hishon decided nothing more than the legal viability of a Title VII sex discrimination

complaint, at the pleading stage, of a female law firm associate alleging that she was

discriminatorily denied admission as a partner.  Notably, in his concurring opinion in Hishon,

Justice Powell emphasized that, while an employer cannot discriminatorily deny partnership

status to its employees, there is nothing to preclude a partnership from expelling or retiring a

partner, even for discriminatory reasons, once partnership status is conferred (see 467 U.S. at

79-80 (Powell, J., concurring)).  However, Justice Powell further noted in a footnote that an

employer "may not evade the strictures of Title VII simply by labeling its employees as

'partners'" (id. at 80 n.2).

   Later, in Hopkins, following remand of that case from the Supreme Court, the D.C.

Circuit cited Justice Powell's footnote in Hishon in recognizing that a person in the plaintiff

employee's position "may find protection under the statute [Title VII] should she be admitted to

the partnership on unequal terms or suffer retaliation on becoming a partner based on her

previous assertion of Title VII rights.  Under such conditions, the admission to partnership may

amount to a subterfuge for discriminating against the employee and the victim of discrimination

arguably would remain protected by the statute" (Hopkins v. Price Waterhouse, 920 F.2d 967,

978 n.10 (D.C. Cir. 1990)).  The courts have otherwise recognized no limitation, under the

employment discrimination statutes, on a partnership's right to retire or expel a partner.

_____

[9]    Both Hishon and Hopkins were Title VII sex discrimination cases.  Thus, neither case considered or addressed
the situation involved here, where partners, once admitted, lawfully subject themselves to mandatory retirement
based on age.

Accordingly, Murphy would be lawfully subject to immediate retirement if he were to be admitted as a partner at PwC. Since the mandatory age-60 retirement provision for partners has been in place at PwC (and its predecessor firms) for decades (see Docket No. 121 at 21), Murphy could have no claim that it was adopted as a pretext for retaliation or a subterfuge for discrimination against him as a newly admitted partner (see Hopkins, 920 F.2d at 978 n.10).

Under the circumstances, Murphy lacks standing to complain of his non-admission as a partner. The ADEA authorizes a civil action only by employees who have allegedly suffered an "adverse employment action" (Brown v. Brody, 199 F.3d 446, 456 (D.C. Cir. 1999)). Since the sole impact of Murphy's admission as a partner would be his immediate retirement, Murphy cannot complain that the denial of admission is an "adverse employment action."

The requirement that an employment action be "adverse" to be actionable is fundamental. The ADEA makes it unlawful to discriminate against an individual (29 U.S.C. § 623(a)(1)) or otherwise "adversely affect" an individual's status as an employee because of his/her age (29 U.S.C. § 623(a)(2)). To have standing to bring a civil action under the ADEA, a person must be "aggrieved" by an unlawful employment action (29 U.S.C. § 626(c)(1); see Brown, 199 F.3d at 455 (under similar provision of Title VII, "there must still be some kind of injury for an . . . employee to state a claim")).

Thus, to complain of discrimination, an individual must establish, inter alia, that he "suffered an adverse employment action" (Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 2002), citing Brown, 199 F.3d at 452). As the D.C. Circuit held in Brown, and reaffirmed in Forkkio, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible

harm" (Forkkio, 306 F.3d at 1131, citing Brown, 199 F.3d at 457).  While a failure to promote generally constitutes an adverse employment action, not so in this case, where plaintiff Murphy's "promotion" to partner would result in an immediate termination of his employment that would otherwise continue indefinitely in the absence of such "promotion."[10]

Indeed, Murphy himself detailed in writing the disadvantages of his becoming a partner (Exh. Q; Murphy 11/15/06 Dep. at 235-36), and initially testified that he was not prepared to accept an offer of partnership status (Murphy Dep. at 605-06).  Ultimately, he expressly admitted at his reopened deposition that he would not want to become a partner in either the July 1, 2000 or July 1, 2004 admission cycles only to then be subject to immediate retirement pursuant to the age-60 retirement provision for partners (Murphy 11/15/06 Dep. at 250).

In sum, since Murphy cannot establish that he suffered an adverse employment action as a consequence of his not being admitted as a partner, he cannot complain of his non-promotion to that status.  As held by this Court in Amiri v. Stoladi Property Group, 407 F. Supp. 2d 119, 125-26 (D.D.C. 2005) (Leon, J.), under circumstances where a plaintiff cannot show that he has suffered an adverse employment action, summary judgment is appropriate for failure to establish a prima facie case.[11]

---

[10]    PwC has no mandatory retirement age for employees (Carter Dep. at 222).

[11]    For reasons stated in PwC's accompanying memorandum in support of its motion for summary judgment dismissing co-plaintiff Schuler's remaining claims, Murphy cannot salvage or resurrect his claims by relying on the "disparate impact" theory recognized by the Supreme Court in Smith v. City of Jackson, 544 U.S. 228 (2005) (see Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment Dismissing Plaintiff Schuler's Remaining Claims, dated January 15, 2008, at 27-31).  Moreover, Murphy cannot meet his burden of proving that the application of the partner retirement provision, assuming it is an "employment practice," caused the absence of newly admitted partners over age 60 (see id. at 29, citing Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656-57 (1989); Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994 (1988)).  There is no evidence that PwC had any policy, written or otherwise, excluding employees over age 60 from partnership consideration.  Rather, the evidence affirmatively shows that, like Murphy himself, no such employees had any interest in a partnership position.

## **Conclusion**

For the reasons stated, it is respectfully submitted that PwC's motion for summary

judgment dismissing Murphy's remaining claims should be granted.

Dated:  January 15, 2008

                    Respectfully submitted,


                    /s/ Eric M. Nelson
                    Eric M. Nelson, Esq. (admitted *pro hac vice*)
                    Stephen L. Sheinfeld, Esq. (admitted *pro hac vice*)
                    Minoti Patel, Esq. #484405
                    WINSTON & STRAWN LLP
                    200 Park Avenue
                    New York, New York 10166
                    (212) 294-6700
                    Facsimile:  (212) 294-4700


                    Julie A. Klusas Gasper, Esq. #D00244
                    WINSTON & STRAWN LLP
                    1700 K Street, N.W.
                    Washington, D.C. 20036
                    (202) 282-5000
                    Facsimile:  (202) 282-5100

                    Counsel for Defendant
                    PricewaterhouseCoopers LLP