```
1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - - - x

     C. WESTBROOK MURPHY,                    :

4            and                            :

     HAROLD SCHULER,                         :

5                                            :

                     Plaintiffs,             :

6                                            :

             vs.                             :   CASE NUMBER

7                                            :

     PRICEWATERHOUSECOOPERS, LLP, et al.,   :   1:02CV00982

8                                            :

                     Defendants.             :

9    - - - - - - - - - - - - - - - - - - x

10                          Washington, D.C.

11                          Wednesday, April 23, 2003

12              Deposition of C. WESTBROOK MURPHY, a

13   witness herein, called for examination by counsel

14   for Defendants in the above-entitled matter,

15   pursuant to notice, the witness being duly sworn by

16   KAREN YOUNG, a Notary Public in and for the District

17   of Columbia, taken at the offices of Winston &

18   Strawn, 1400 L Street, N.W., Washington, D.C., at

19   10:13 a.m. on Wednesday, April 23, 2003, and the

20   proceedings being taken down by Stenotype by KAREN

21   YOUNG, and transcribed under her direction.

22

23

24

25
```

**4/23/2003  MURPHY, WESTBROOK**

```
1      APPEARANCES:

2          On Behalf of the Plaintiffs:

3              DAVID L. ROSE, ESQ.

4              Rose & Rose, P.C.

5              1320 19th Street, N.W., Suite 601

6              Washington, D.C. 20036

7              (202) 331-8555

8

9          On Behalf of the Defendants:

10             ERIC M. NELSON, ESQ.

11             STEPHEN L. SHEINFELD, ESQ.

12             Winston & Strawn

13             200 Park Avenue

14             New York, NY 10166-4193

15             (212) 294-2646

16

17

18

19

20

21

22

23

24

25
```

**4/23/2003  MURPHY, WESTBROOK**

```
1                    C O N T E N T S
2      THE WITNESS:
3      C. WESTBROOK MURPHY
4              By Mr. Nelson ........................... 4
5
6                    E X H I B I T S
7      DEFENDANTS' EXHIBIT NO.                    PAGE NO.
8      1     Biography ............................... 76
9      2     Application for position ................ 78
10     3     Bench memo to Linnenbringer, 4/20/89 ...... 85
11     4     Bench letter to Murphy, 5/31/89 .......... 111
12     5     O'Malley letter to Senior Managers,  ..... 112
13              7/5/89
       6     Bench letter to Murphy, 4/25/91 .......... 115
14     7     Bench letter to Murphy, 6/25/98 .......... 118
       8     Bench letter to Murphy, 8/15/98 .......... 121
15     9     Bench letter to Murphy, 6/28/99 .......... 122
       10    Bench letter to Murphy, 8/25/99 .......... 123
16     11    Bench memo to Murphy, 3/21/97 ............ 128
       12    Assurance Performance Appraisal and  ..... 132
17              Development Programme
       13    Murphy e-mail to Shea, 3/8/01 ............ 138
18     14    Murphy memo to Bench, 3/14/01 ............ 171
       15    Discrimination Complaint in the  ........ 192
19              Office of Human Rights
       16    Bench memo to Walls, 5/4/94 .............. 200
20     17    Rose letter to Stewart, 8/8/01 .......... 203
21     18    Amended Discrimination Complaint ........ 211
22     19    Murphy memo to Ethics & Business  ........ 214
23              Conduct Office, 6/25/01
24     20    Murphy memo to file, 2/20/02 ............. 233
25                         -   -   -
```

3

**4/23/2003  MURPHY, WESTBROOK**

```
 1                 P R O C E E D I N G S
 2   Whereupon,
 3                 C. WESTBROOK MURPHY,
 4              residing at 400 Fairlea Drive, Edgewater,
 5              Maryland, called for
 6              examination by counsel for
 7              Defendants and having been duly
 8              sworn by the Notary Public, was examined
 9              and testified as follows:
10                      -   -   -
11          EXAMINATION BY COUNSEL FOR DEFENDANTS
12          BY MR. NELSON:
13      Q.    Can we have you state your full name for
14   the record?
15      A.    Charles Westbrook Murphy.
16      Q.    And what is your residence address?
17      A.    400 Fairlea, F-A-I-R-L-E-A, Drive,
18   Edgewater, Maryland 21037.
19      Q.    And how long have you resided there at
20   that address?
21      A.    Almost five years.
22      Q.    And what was your residence address before
23   that?
24      A.    11311 Old Club Road, Rockville, Maryland.
25      Q.    How long at that address approximately?
```

4

4/23/2003 MURPHY, WESTBROOK

1        A.      That's correct.

2        Q.      When did you graduate from law school?

3        A.      June 1965.

4        Q.      Can you give me your professional

5    employment history by dates and employer following

6    your graduation from law school?

7        A.      From August of 1965 through September of

8    1967, I was employed as an attorney by the Civil

9    Division of the United States Department of Justice.

10   From September of 1967 until December 31, 1977, I

11   was employed by the Office of the Controller of the

12   Currency in several different positions.  From

13   January of 1978 until June of 1989, I practiced law

14   in the District of Columbia, and during that time,

15   with three different firms and for a period of time

16   on my own.  Since June 1989, I've been employed by

17   Price Waterhouse and now its successor,

18   PricewaterhouseCoopers.

19       Q.      And what firm did you join in January of

20   1978?

21       A.      Wald, W-A-L-D, Harkrader,

22   H-A-R-K-R-A-D-E-R, and Ross.

23       Q.      And how long did you practice at that

24   firm?

25       A.      I believe until 1980.

4/23/2003 MURPHY, WESTBROOK

1      A.    I believe the firm that I left to join,

2    Baker & Hostetler, offered a better opportunity to

3    develop a banking practice.

4      Q.    Can you describe that better opportunity

5    or why was it better?

6      A.    Baker & Hostetler was a large firm with

7    offices in several different cities, including

8    Cleveland, Denver and another city in Florida I

9    believe, Orlando, and it was a more business-

10   oriented firm than Wald, Harkrader & Ross and had

11   connections in cities of those places in the banking

12   community.

13     Q.    Did you join its Washington office?

14     A.    I did.

15     Q.    Did you practice in its Washington office?

16     A.    Yes, I did practice in the Washington,

17   D.C. office.

18     Q.    How large a firm was it at that time in

19   terms of number of lawyers approximately?

20     A.    There were approximately a hundred lawyers

21   in the D.C. office, and I would guess 500

22   nationwide.

23     Q.    Did you join Baker & Hostetler immediately

24   upon your departure from Wald Harkrader?

25     A.    Yes.

### 4/23/2003 MURPHY, WESTBROOK

1      Q.    Were you an equity partner?

2      A.    Yes.

3      Q.    Throughout your tenure at that firm?

4      A.    Yes.

5      Q.    Was the firm a partnership?

6      A.    Yes.

7      Q.    Did you have any role in management?

8      A.    No.

9      Q.    Do you know whether the firm had a

10    mandatory retirement age for partners?

11     A.    I do not.

12     Q.    Did you contribute capital to that firm?

13     A.    Yes.

14     Q.    Did you share in the profits and losses?

15     A.    Yes.

16     Q.    Were you part of a department at Baker &

17    Hostetler, a department of the firm?

18     A.    No.

19     Q.    And what was the nature of your practice

20    at Baker & Hostetler?

21     A.    Bank regulatory matters.

22     Q.    Did you do any litigation?

23     A.    Yes, I litigated some bank regulatory

24    matters.

25     Q.    Do you know approximately what percentage

4/23/2003 MURPHY, WESTBROOK

1     Hostetler?

2          A.     No.

3          Q.     You have no recollection?

4          A.     Not with any precision.

5          Q.     Was it over a hundred thousand dollars?

6          A.     It would have been over a hundred thousand

7     dollars.

8          Q.     Was it over $150,000?

9          A.     I can't say.

10         Q.     Was your compensation when you left Baker

11    & Hostetler higher than it was when you began, if

12    you recall?

13         A.     I don't recall.

14         Q.     When did you leave Baker & Hostetler?

15         A.     I believe it was 1984.

16         Q.     So your recollection is you practiced as a

17    partner at Baker & Hostetler for approximately three

18    years, four years?

19         A.     Four years.

20         Q.     What gave rise to your departure from

21    Baker & Hostetler?

22         A.     An unsuccessful year at generating

23    business.

24         Q.     That was your last year or --

25         A.     Yes, yes.

4/23/2003 MURPHY, WESTBROOK

1      Q.    Was it a series of unsuccessful years or

2      --

3      A.    Not to my remember -- not to my memory.

4   My memory is it was a series of fairly successful

5   years.

6      Q.    Who were some of your clients at Baker &

7   Hostetler, or who were all of your clients?  Who

8   were your clients?

9      A.    Well, there was the Whitney National Bank

10  in New Orleans, a bank holding company in New Jersey

11  named MidLantic, several small banks in West

12  Virginia.  At the moment, I don't remember any

13  others.

14     Q.    How much or how little business did you

15  develop in your last year at Baker & Hostetler?

16     A.    The last year I do not remember with any

17  precision, but it would have been less than a

18  hundred thousand dollars.

19     Q.    And how much did you generate in your best

20  year approximately?

21     A.    Half a million dollars.

22     Q.    Was it suggested that -- by the firm that

23  you seek employment elsewhere?

24     A.    Yes.

25     Q.    And who made that suggestion to you?

4/23/2003 MURPHY, WESTBROOK

1     A.    The managing partner of the D.C. office.

2     Q.    Alan somebody, you don't remember his

3  name?

4     A.    Yes, right.

5     Q.    Do you recall what he said to you?

6     A.    No.

7     Q.    Do you recall when he advised you that you

8  should seek employment elsewhere?

9     A.    The best of my memory, 1984.

10    Q.    Do you recall -- did he put a time

11  limitation?

12    A.    Yes, and I don't remember -- it was

13  several months.  I don't remember, but it was more

14  specific than that.

15    Q.    Did he have the authority to fire partners

16  or fire you, so to speak?

17    A.    No.

18    Q.    Who did?

19    A.    I do not remember whether it was the

20  managing committee or the partnership as a whole.

21    Q.    But in any event, you were given a few

22  months to leave the firm; is that correct?

23    A.    That's correct.

24    Q.    And what did you do next?  Were you

25  unemployed for any period of time?

4/23/2003 MURPHY, WESTBROOK

1    A.    For a period of several months, I

2    practiced law by myself.

3    Q.    And where was that?

4    A.    In Washington, D.C.

5    Q.    Where were your offices during that

6    period?

7    A.    At an office in the Euram building on

8    Dupont Circle.

9    Q.    And your best recollection was that was a

10   period of several months in 1984?

11   A.    Yes.

12   Q.    Do you recall how many months?

13   A.    My best recollection is fewer than six.

14   Q.    Is it correct that you were unable to find

15   another position with a law firm within the time you

16   were allotted by the managing partner of Baker &

17   Hostetler?

18   A.    That's correct.

19   Q.    Did you make any efforts to remain at

20   Baker & Hostetler for --

21   A.    No.

22   Q.    And how did the private practice go during

23   that time frame as a sole practitioner?

24   A.    I suppose the best answer is I was still

25   looking for another law firm.

4/23/2003 MURPHY, WESTBROOK

1      Q.    Did you have any employees?

2      A.    No.

3      Q.    And did you at some point find another law

4    firm?

5      A.    Yes.

6      Q.    What law firm was that?

7      A.    Zuckert, Z-U-C-K-E-R-T, Scoutt,

8    S-C-O-U-T-T, and Rasenberger, R-A-S-E-N-B-E-R-G-E-R.

9      Q.    And when did you start working for that

10   firm?

11     A.    I believe 1985.

12     Q.    Do you recall when in 1985?

13     A.    No.

14     Q.    What gave rise to your joining that firm?

15     A.    I knew some of the people who were there.

16     Q.    Who did you know?

17     A.    Gene Zuckert and Tenney Johnson.

18     Q.    I'm sorry.  What was Mr. Johnson's first

19   name?

20     A.    Tenney, T-E-N-N-E-Y.

21     Q.    And who was James Zuckert?

22     A.    No, the Zuckert was Eugene Zuckert.

23     Q.    I'm sorry.  Eugene Zuckert.  Who was he?

24     A.    Well, at the time, he was a lawyer and

25   named partner in that firm.  He previously had been

4/23/2003 MURPHY, WESTBROOK

```
1     secretary of the Air Force.

2          Q.    And who was Mr. Johnson?

3          A.    He was a lawyer at the firm.

4          Q.    Partner?

5          A.    Partner.  He had previously been deputy

6     general counsel to the Federal Highway

7     Administration.

8          Q.    And how did you know Mr. Zuckert?

9          A.    I had met him through my father.

10         Q.    When was that?

11         A.    I don't remember.

12         Q.    Was your father a lawyer?

13         A.    Yes.

14         Q.    Where did he -- did he practice law?

15         A.    Yes.

16         Q.    Where?

17         A.    Washington, D.C.

18         Q.    Private practice?

19         A.    Both in private practice and in the

20    government.

21         Q.    Did he practice with a firm while he was

22    in private practice?

23         A.    Yes.

24         Q.    What firm was that?

25         A.    He practiced for more than 25 years with a
```

4/23/2003 MURPHY, WESTBROOK

```
1        A.    We had a mutual friend.

2        Q.    I take it you had no other offers of

3   employment at the time you joined the Zuckert firm?

4        A.    I believe that's correct.

5        Q.    And what was your position at the Zuckert

6   firm?  Were you a partner?

7        A.    I do not remember.

8        Q.    You don't recall whether you were a

9   partner?

10       A.    That's correct.

11       Q.    Do you recall whether you were an

12   associate?

13       A.    Well, I would either have been a partner

14   or of counsel.

15       Q.    And what was your compensation arrangement

16   with the Zuckert firm?

17       A.    I don't remember that either.

18       Q.    You have no recollection?

19       A.    No.

20       Q.    Was it a fixed amount?

21       A.    I'm sorry.  I just don't remember.

22       Q.    Did you receive compensation while --

23       A.    I did receive compensation.

24       Q.    You don't recall what it was?

25       A.    That's correct.
```

4/23/2003 MURPHY, WESTBROOK

```
1    National Bank?

2         A.    That's correct.

3         Q.    Was anyone else working with you on the

4    matter?

5         A.    I don't believe so.

6         Q.    Did you have local counsel in the Northern

7    District of New York?

8         A.    Yes, the bank had a regular counsel.

9         Q.    Who was that?

10        A.    I don't remember his name.

11        Q.    And what was the outcome of that

12   proceeding to enforce compliance?

13        A.    It was settled.

14        Q.    What was the nature of the settlement?

15        A.    I believe the controller believed that the

16   bank had done all that it could to comply with the

17   cease and desist order and withdrew it.

18        Q.    What gave rise to your departure from the

19   Zuckert firm?

20        A.    The firm didn't believe that I was

21   contributing enough economically to the firm and

22   suggested I leave, which I did.

23        Q.    And who made that suggestion to you?

24        A.    There was a managing partner -- he was not

25   one of the named partners -- whose name I do not
```

4/23/2003 MURPHY, WESTBROOK

```
 1    remember, but he was the one with whom I had those

 2    conversations.

 3         Q.    Did you leave immediately following this

 4    person's advice to you?

 5         A.    I don't remember.

 6         Q.    Did you disagree with that advice, that

 7    you weren't making a sufficient economic

 8    contribution to the firm?

 9         A.    No.

10         Q.    When was this, if you recall?

11         A.    I believe 1988.

12         Q.    Do you recall when in 1988?

13         A.    No.

14         Q.    And what did you do next?

15         A.    I practiced on my own.

16         Q.    Where was your office?

17         A.    I had an office in International Square at

18    18th and Eye Streets in Washington, D.C.

19         Q.    Did you have any employees?

20         A.    I had a part-time secretary.

21         Q.    Did you engage in any legal work while you

22    were in private practice?

23         A.    Yes.

24         Q.    What type of work did you engage in?

25         A.    Bank regulatory matters.
```

4/23/2003 MURPHY, WESTBROOK

1       Q.      Were you making any money as a sole

2    practitioner?

3       A.      Yes.

4       Q.      Approximately how much were you making?

5       A.      The best I can remember is less than a

6    hundred thousand dollars annually.

7       Q.      Annually?  Were you seeking other

8    employment while you were practicing as a sole

9    practitioner?

10      A.      Yes.

11      Q.      And what were you doing to seek other

12   employment?

13      A.      I was working with a headhunter.

14      Q.      What kinds of positions were you seeking?

15      A.      Other law firms.

16      Q.      Who was the headhunter?

17      A.      I don't remember.  I remember his first

18   name was Miles.  I don't remember either his last

19   name or the name of the firm.

20      Q.      How long were you working with Miles?

21      A.      Several months.

22      Q.      How did that go?

23      A.      I don't believe I got any offers.

24      Q.      Did you have any interviews?

25      A.      Oh, yes.

4/23/2003 MURPHY, WESTBROOK

1        Q.    Had you given up at any point, given up

2    the search for employment at a law firm?

3        A.    I'm not sure that I understand the

4    question.  I eventually took a job with Price

5    Waterhouse, and that was not a law firm.

6        Q.    I understand that.  At the time that you

7    took the job with Price Waterhouse, were you still

8    seeking employment at a law firm?

9        A.    Yes.

10            MR. ROSE:  Can we go off for a second?

11            MR. NELSON:  Sure.

12                  (Recessed at 11:23 a.m.)

13                  (Reconvened at 11:38 a.m.)

14            BY MR. NELSON:

15        Q.    Mr. Murphy, did you ever have any

16    difficulties with OCC when you were in private

17    practice?

18            MR. ROSE:  I'll object to the form of that

19    question.  I don't think it's -- I just think -- I

20    don't know exactly what it means and I think you

21    ought to try to be a little more specific.

22            BY MR. NELSON:

23        Q.    Can you answer that?

24        A.    I'm not sure I know what you mean by

25    difficulties.

### 4/23/2003 MURPHY, WESTBROOK

1      Q.      Was Mr. Bench brought into Price

2   Waterhouse as a partner?

3      A.      Yes.

4      Q.      And that was what?  1987?

5      A.      Correct.

6      Q.      Do you recall the other offer that

7   Mr. Bench had?  You said he had two offers, one from

8   Price Waterhouse and another offer that he discussed

9   with you?

10      A.      The one that I recall, it was one of the

11   large banks in New York.

12      Q.      Is it correct that Mr. Bench is not an

13   attorney?

14      A.      That is correct.  By training, he is a

15   bank examiner.

16      Q.      You testified that Mr. Bench asked you

17   whether you'd be interested in joining his practice

18   or the practice, Regulatory Advisory Services

19   practice at PW --

20      A.      That is correct.

21      Q.      -- at some point in 1989?

22      A.      That is correct.

23      Q.      Was that in a telephone conversation,

24   face-to-face meeting?  How did he communicate that

25   suggestion to you?

57

**4/23/2003 MURPHY, WESTBROOK**

1    A.    I don't remember.

2    Q.    And what was your initial reaction?

3    A.    That I would be interested in talking

4    about it.

5    Q.    And did he give you any details of his

6    suggestion in terms of what your role would be or

7    what sort of a position might be available to you at

8    Price Waterhouse?

9    A.    Well, the discussions led to his preparing

10   a memorandum which I believe we produced for you

11   recommending my employment, which described at some

12   length what he believed I would contribute to the

13   practice, or what the practice would expect of me,

14   and I think that memorandum is an accurate

15   representation of our discussions.

16   Q.    Well, how much time elapsed between

17   Mr. Bench's initial overture and an offer being made

18   to you?

19   A.    A few months.

20   Q.    Apart from discussions with you about what

21   you could contribute to Price Waterhouse, did he

22   discuss with you any terms of your employment?

23   A.    Yes.

24   Q.    What did he say to you?

25   A.    Well, I don't remember what he said to me.

### 4/23/2003  MURPHY, WESTBROOK

```
 1      I remember what the final terms were, which I was
 2      employed as a senior manager at a salary of $120,000
 3      a year.
 4          Q.    Were those terms negotiated?
 5          A.    They were surely discussed.
 6          Q.    Had Price Waterhouse through Mr. Bench or
 7      otherwise offered you employment at less than
 8      $120,000 a year at any point?
 9          A.    Not that I remember.
10          Q.    Well, what was your response to
11      Mr. Bench's initial overture as to whether you would
12      be interested?
13          A.    I said I'd be interested in talking about
14      it.
15          Q.    Did you have a prior relationship or
16      acquaintanceship with anyone else at Price
17      Waterhouse at that time?
18          A.    Yes.
19          Q.    With whom did you have a prior
20      relationship?
21          A.    Harold Schuler.
22          Q.    Anyone else?
23          A.    No.
24          Q.    And what was the nature of your
25      relationship or acquaintanceship with Mr. Schuler?
```

4/23/2003 MURPHY, WESTBROOK

```
1          A.     Mr. Schuler also had worked at the Office

2     of the Controller of the Currency, where I knew him.

3     Price Waterhouse had hired him for the Regulatory

4     Advisory Services practice in 1988.

5          Q.     Had you worked with Mr. Schuler at OCC?

6          A.     Yes.

7          Q.     Did you work closely with him?

8          A.     No.

9          Q.     And during what period had Mr. Schuler

10    worked at OCC?

11         A.     I'm sorry?

12         Q.     During what period had Mr. Schuler worked

13    at OCC?

14         A.     I believe he started as a field examiner

15    in the late 1960s.  He left the OCC in the late

16    1970s.

17         Q.     But when had you met him?

18         A.     I'm sorry?

19         Q.     When had you met Mr. Schuler for the first

20    time?

21         A.     During the early 1970s.

22         Q.     What did Mr. Schuler do when he left OCC

23    in the late 1970s, to your knowledge?

24         A.     I believe he went to work for the Farm

25    Credit Administration.
```

4/23/2003 MURPHY, WESTBROOK

```
1      the PW retirement plans, suggests that it's that

2      structure that would make it economically

3      disadvantageous for me to be a partner.

4               BY MR. NELSON:

5          Q.    But I think you testified earlier you

6      didn't make any inquiries concerning that after

7      Mr. Linnenbringer made the comment; is that right?

8          A.    That is correct.

9          Q.    And picking up on your counsel's

10     clarification a few moments ago, did you discuss

11     that issue at any point in time with anyone?

12               MR. ROSE:  Other than his counsel.

13               BY MR. NELSON:

14         Q.    Other than counsel.

15         A.    Yes.

16         Q.    When?

17         A.    We had discussions -- I believe there were

18     some discussions at some of the RAS staff meetings,

19     and I know that I had a discussion with Gary Welsh

20     approximately two years ago.  Mr. Welsh is a

21     colleague of mine in the Regulatory Advisory

22     Services practice.  He was then at the time of this

23     discussion age 54, and he had -- Mr. Bench had asked

24     Mr. Welsh whether Mr. Welsh would be interested in

25     being considered for partnership.  Before
```

4/23/2003  MURPHY, WESTBROOK

1    responding, Gary Welsh made some inquiries about

2    what the financial impact would be, and those -- the

3    results of that -- those inquiries, which he shared

4    with me, I wrote of in a memorandum that I believe

5    we have produced to you.

6        Q.    What did your memorandum say on that

7    point?

8        A.    It says that the partners -- that there is

9    a separate plan for the partners, separate

10   retirement plan, that one must be a partner for five

11   years for the benefits to vest under that plan, that

12   the partners' contributions for somebody who became

13   a partner at age 54 or 55 would be quite

14   substantial, perhaps as much as 25 percent of his or

15   her compensation.

16          It also says that the partner when he left

17   the firm could not continue health insurance that's

18   normally available to retirees unless his retirement

19   benefits had vested under either the partner plan or

20   whatever plan applied to this person if he or she

21   were an employee or becoming a partner.

22       Q.    And this is what your colleague Mr. Welsh

23   told you?

24       A.    Yes.

25       Q.    And were you aware of that before

1    Mr. Welsh related this to you?

2        A.    Let's say I was more definitively aware of

3    it afterwards.  I suspected that what he told me was

4    the case, but he made inquiries of the human

5    resources person for the banking practice, a woman

6    named Shea, Darlene Shea, S-H-E-A, and that

7    memorandum records what he was told by Ms. Shea, and

8    on the basis of that information, Mr. Welsh informed

9    Mr. Bench that he would not be interested in being

10   considered for partner.

11       Q.    Well, were you present when Mr. Bench

12   asked Mr. Welsh whether he would be interested in

13   being considered for partner?

14       A.    I was not.  I'm relying on what Mr. Welsh

15   told me.

16       Q.    And did Mr. Welsh -- what else did

17   Mr. Welsh tell you, if anything, about Mr. Bench's

18   inquiry as to his interest in a partnership?

19       A.    Nothing that I remember.

20       Q.    And what else, if anything, do you

21   remember of what Mr. Welsh told you about the

22   retirement plans and the other information he

23   related?

24       A.    I think I've given you the main points.

25   There may be some more detail in that memo, which by

4/23/2003 MURPHY, WESTBROOK

1       advantage or disadvantages of partnership?

2            A.     No.

3            Q.     That was the subject -- we've moved pretty

4       far forward.  I want to go back.  We're going back

5       to this April 20, 1989 memorandum which refers to

6       comments made to you pre-employment suggesting that

7       it would be economically disadvantageous for you to

8       be a partner, and my question was, you testified

9       that you didn't make any inquiries and that wasn't

10      further discussed back in 1989.

11           A.     That's correct.

12           Q.     But that that subject was discussed with

13      Mr. Welsh and also at some RAS staff meetings.  What

14      else do you recall about discussions at RAS staff

15      meetings other than --

16           A.     An RAS staff meeting in August of 2002,

17      Tim Ryan and Darlene Shea were both there and

18      Darlene Shea made a presentation of several minutes'

19      duration about the compensation for PwC partners.

20      One of the main -- one of the agenda items for the

21      meeting was partnership considerations and how --

22      the process through which an employee might become a

23      partner.  In connection with that discussion,

24      Darlene Shea talked about the compensation of

25      partners.  I wrote -- she had some written

4/23/2003 MURPHY, WESTBROOK

1    materials, and I believe they'd been produced to you

2    together with my memorandum about that meeting.

3        Q.    Did Mr. Shea say anything about the

4    advantages or disadvantages of becoming a partner?

5    Again, that's the subject I'm trying to inquire

6    about now, again going back to your pre-employment

7    -- the pre-employment memorandum.

8        A.    My memory is that it was more of what I'll

9    call a technical discussion, for lack of a better

10   word, simply of the way the partner compensation

11   worked, the way compensation was determined for

12   partners.

13       Q.    And generally what do you recall that

14   Ms. Shea said in that regard?

15       A.    That the typical partner compensation

16   increased over time as a partner, but more

17   concretely, typically a partner who had been a

18   partner of 20 years would have a compensation higher

19   than someone who had been a partner for five years.

20       Q.    Did that come as a surprise to you?

21       A.    No.

22       Q.    Do you recall anything else that Ms. Shea

23   said?

24       A.    I believe she said that entry-level

25   partners made less than some employees and that when

4/23/2003 MURPHY, WESTBROOK

1    an employee who was making more than a partner

2    became a partner, his or her compensation was

3    actually reduced.  In that I believe for other

4    reasons she was not correct.

5        Q.    What did she say was the compensation

6    level for entry-level partners?

7        A.    The figure $200,000 is what I remember.

8    We would have to look at the memo I wrote up of the

9    meeting to see if it's any more precise than that.

10       Q.    What is your present compensation?

11       A.    $252,000.

12       Q.    You testified that Ms. Shea was wrong?

13       A.    Yes.

14       Q.    And how did you discover that?

15       A.    There's a partner in the RAS office named

16   David Albright, who was made a partner I believe in

17   the year 2000 and who at the time, he was making --

18   became a partner, had a salary that was higher than

19   the average -- than the entry-level partner

20   compensation, and I believe his compensation was

21   actually increased rather than decreased.

22       Q.    And how do you know that?

23       A.    I don't remember how I know that.  I can't

24   even say that I know that for sure, but that is my

25   understanding.

4/23/2003 MURPHY, WESTBROOK

1      Q.     That's your understanding, and that is why

2  you think that Ms. Shea's statement was wrong?

3      A.     That's correct, that's why I believe she

4  was incorrect.

5      Q.     From your understanding of that one

6  situation?

7      A.     Yes.

8      Q.     You're not aware of any other situations

9  like that, are you?

10     A.     No.

11     Q.     Did you make any inquiries about that

12  issue?

13     A.     I'm sorry.  About which issue?

14     Q.     Issue of an employee whose compensation at

15  the time of being admitted to partner is higher than

16  what is -- than the entry-level compensation for

17  partners.

18     A.     Not other than inquiries that had been

19  made in connection with this litigation.

20     Q.     What does that mean?  I didn't qualify my

21  question in any way.

22            MR. ROSE:  He means interrogatories.

23            BY MR. NELSON:

24     Q.     Oh, okay.  You mean inquiries you made --

25            MR. ROSE:  Is that correct?

4/23/2003 MURPHY, WESTBROOK

```
1            THE WITNESS:  Yes.

2            BY MR. NELSON:

3       Q.    -- in the form of interrogatories?  Is

4   that it?

5       A.    Yes.

6       Q.    You made no other inquiries of your

7   employer about this, did you?

8       A.    Not that I remember.

9       Q.    Well, getting back to Defendants' Exhibit

10  3 and the paragraph of Mr. Bench's memo to

11  Mr. Linnenbringer entitled "Partnership" --

12      A.    Yes.

13      Q.    The conversations you related that you had

14  with Mr. Welsh about two years ago -- was that the

15  first time that you ever had any discussion

16  concerning the issue or matters stated in

17  Mr. Bench's April 20, 1989 memorandum?

18      A.    And by matter, you mean the relationship

19  between the structure of the retirement plan for

20  partners and the economic advantages or

21  disadvantages?

22      Q.    Yes, that's exactly what I mean.

23      A.    I discussed that subject with Paul Allen

24  Schott, S-C-H-O-T-T, who was a partner at Coopers &

25  Lybrand before the Coopers firm and the Price
```

4/23/2003 MURPHY, WESTBROOK

1      Q.     Had you discussed it with Mr. Schott

2   before that?

3      A.     I don't remember, but I believe we

4   produced the plan.  In any event, it should be in

5   the personnel file.

6      Q.     The plan referring to the development

7   plan?

8      A.     The development plan.

9      Q.     And I'm sorry.  When was that plan

10  prepared?

11     A.     I think it's dated November 5, 2001.

12     Q.     Going back to Mr. Welsh for a moment, did

13  you agree with Mr. Welsh's decision to tell

14  Mr. Bench that he was not interested in being

15  considered for promotion or considered for

16  partnership?

17          MR. ROSE:  I don't think this is part of

18  the question.  I think -- how he agrees with someone

19  else's decision?

20          MR. NELSON:  Very easily.  Mr. Murphy

21  apparently discussed it with him or Mr. Welsh

22  discussed it with Mr. Murphy.

23          THE WITNESS:  The only response I can give

24  is I understood his decision and the reasons that he

25  had made it.  I don't know whether I would have made

1      the same decision in his place or not.

2                 BY MR. NELSON:

3          Q.    Well, did you say anything to Mr. Welsh

4      about his decision?

5          A.    Not that I remember.  I mean, not other

6      than asking him what he had responded to Mr. Bench.

7          Q.    Well, what decision would you have made?

8          A.    In Mr. Welsh's place and faced with the

9      requirement to retire at age 60, probably the same

10     decision.

11         Q.    Decision being that you would not wish to

12     be considered for admission as a partner?

13         A.    The decision being that the way -- the

14     combination of the age limitation and the

15     partnership agreement and the retirement, the

16     structure of the retirement plan made it

17     economically disadvantageous for anyone, or at least

18     for most people to become a partner by age 54 or 55.

19         Q.    What does the retirement division have to

20     do with that?

21         A.    I believe I mentioned, I think it's in

22     that memo that I wrote that the retirement plan

23     takes five years to vest, and when coupled with a

24     mandatory retirement age of 60 for partners, that

25     means anybody who could become a partner at age 55

1    or later could not have a vested retirement.

2        Q.    What about age 54?

3        A.    At age 54, the principal difficulty as I

4    understand it is the need to contribute to the

5    retirement plan in substantial amounts, which is

6    compressed when one is in one's mid-50s, and Gary

7    Welsh understood and I understood from him that that

8    could be as much as 25 percent of your annual

9    compensation.

10       Q.    And Mr. Welsh concluded that that was --

11   made an economic decision that he did not wish to

12   make contribution in that magnitude?

13       A.    That is correct.

14       Q.    And do I understand you to say you would

15   have made the same decision?

16       A.    Probably.

17       Q.    Referring back to the last page of

18   Defendants' Exhibit 3, paragraph Roman 5A states,

19   "Westbrook is prepared to begin with PW as soon as

20   possible.  Our target date is May 1."  Is it correct

21   that you were prepared to begin employment at PW as

22   soon as possible?

23       A.    I believe -- well, as soon as possible

24   after this memo was written, which is April 20th,

25   yes, I believe that's correct.

### 4/23/2003 MURPHY, WESTBROOK

1    Q.    And do you know who wrote your name at the

2    top of the first page?

3    A.    No.

4    Q.    So that's not your handwriting, is it?

5    A.    That's not my handwriting.

6    Q.    Did you receive this letter in July 1989?

7    A.    Probably.  I received it either then or

8    shortly thereafter because I have a copy.

9    Q.    Did you read it when you received it?

10    A.    I don't remember.

11    Q.    Well, would it have been your practice to

12    do that?

13    A.    It would have been my practice to read it,

14    yes.

15    Q.    And is it correct you would have then been

16    an employee of Price Waterhouse for a little over a

17    month?

18    A.    That's also correct.

19    Q.    Did you discuss the letter or any of its

20    content with anyone at Price Waterhouse?

21    A.    Not that I remember.

22    Q.    Did you ever express to anyone at Price

23    Waterhouse or PwC an interest in being a candidate

24    for partner?

25    A.    Yes.

4/23/2003 MURPHY, WESTBROOK

1      Q.    And to whom did you express that interest?

2      A.    Bob Bench.

3      Q.    Anyone else?

4      A.    Not that I remember.

5      Q.    And when did you express to Mr. Bench an

6   interest in being a candidate for partner at PW or

7   PwC?

8      A.    In March 2001.

9      Q.    And was that the only occasion on which

10  you expressed such an interest to Mr. Bench?

11     A.    I believe so.

12     Q.    Was anyone else --

13     A.    Excuse me.  Can we go off the record a

14  minute?

15          MR. NELSON:  Sure.

16             (Discussion off the record)

17          BY MR. NELSON:

18     Q.    Was anyone else present when you expressed

19  this interest to Mr. Bench in March of 2001?

20     A.    No.

21     Q.    What did you say to Mr. Bench?

22     A.    I said that I believed that PwC should

23  consider me to be a partner.  It was illegal for

24  them not to do so because of my age, and I was at

25  the time age 61, and I gave him a copy of the charge

**4/23/2003 MURPHY, WESTBROOK**

1    that I had filed with the D.C. Human Rights

2    Commission.

3        Q.    What did Mr. Bench say to you?

4        A.    He said he was disappointed.

5        Q.    Disappointed at your having filed the

6    charge?

7        A.    I believe that's what he meant.

8        Q.    Do you recall anything else that Mr. Bench

9    said to you?

10        A.    No.

11        Q.    Do you recall anything else that you said

12    to Mr. Bench?

13        A.    No.

14            MR. NELSON:  Mark as Defendants' Exhibit 6

15    --

16            MR. ROSE:  Excuse me.  Just hang on a

17    second.

18                        (Defendants' Exhibit No.

19                         6 was marked for

20                         identification.)

21            BY MR. NELSON:

22        Q.    -- a letter from Mr. Bench to Mr. Murphy

23    dated April 25, 1991.  It's Bates stamped 00083.

24    Can you identify Defendants' Exhibit 6?

25        A.    Yes.

4/23/2003 MURPHY, WESTBROOK

1       Q.    What is it?

2       A.    It's a letter to me from Robert Bench

3  dated April 25, 1991 informing me that I have been

4  promoted to a director effective July 1, 1991.

5       Q.    Did you know about your promotion to

6  director effective July 1, 1991 before receiving

7  this letter?

8       A.    I don't believe so.

9       Q.    It just came by mail to your home?

10      A.    I don't remember whether that was so or

11  whether it was personally delivered to me.

12      Q.    Did you discuss this promotion with

13  anyone?

14      A.    Well, as was then the practice, in late

15  May or early June, the Washington, D.C. office of

16  PricewaterhouseCoopers had a --

17      Q.    You mean Price Waterhouse?

18      A.    I'm sorry, Price Waterhouse -- Price

19  Waterhouse had a dinner dance at the Congressional

20  Country Club for all those that have been promoted,

21  including those that were promoted to partner, and I

22  attended that, and I'm sure it was discussed that

23  night.

24      Q.    That was to mark the occasion of your

25  promotion and other --

4/23/2003 MURPHY, WESTBROOK

1       A.      Yes.

2       Q.      -- people's promotions?  I think you

3   testified earlier that your recollection was that

4   Mr. Schuler was also promoted to director at this

5   time.

6       A.      That's correct.

7       Q.      Is that your recollection?

8       A.      That's -- yes.

9       Q.      Did you receive any other promotions

10  during your tenure with the firm?

11      A.      No.

12      Q.      Do you know whether Mr. Schuler received

13  any other promotions?

14      A.      I believe that he is now a managing

15  director, so I assume that he must have been

16  promoted, but I don't know that.

17      Q.      Is it correct that you would not have

18  attended the cocktail party at the Congressional

19  Country Club for Mr. Schuler's promotion?

20      A.      I think that practice has been

21  discontinued, but I don't remember when.

22      Q.      And you don't recall when Mr. Schuler was

23  promoted to managing director; is that right?

24      A.      No, that is correct, I don't recall.

25              MR. NELSON:  Can we have marked as

4/23/2003 MURPHY, WESTBROOK

1    been being made in late May or in early June were

2    deferred until September, so the letter telling me

3    that that was my salary was dated I believe

4    September 1st, 2002, and it included a retroactive

5    adjustment to make up the difference between the new

6    salary and the current salary for the months of July

7    and August.

8        Q.    Well, is it correct then that you were

9    simply notified of the salary increase later in the

10   year?

11       A.    That's the economic effect, yes.

12       Q.    But your increase to 252,000 was effective

13   July 1 of 2002?

14       A.    That's my -- yes.

15       Q.    Does the firm have a performance

16   evaluation or appraisal procedure?

17       A.    Yes.

18       Q.    Can you generally describe that procedure?

19       A.    The procedure has changed somewhat over

20   the years.  Why don't we stick with the current one

21   for now.

22       Q.    Well, has it changed in general terms or

23   specifics?

24       A.    More in the mechanics.  Under the present

25   procedure, at the beginning of each engagement, each

4/23/2003 MURPHY, WESTBROOK

```
1     staff member and the partner managing that

2     engagement, or as we got further down in the staff

3     ranks, the junior staff member and the manager of

4     the engagement are supposed to agree on objectives

5     for the employee to achieve during the engagement.

6              At the end of the engagement, then the

7     supervisor is supposed to complete a form on how

8     well the employee met those objectives, and there is

9     a long series of questions.  These forms are now

10    maintained and completed on an electronic database.

11    In practice, at least for Regulatory Advisory

12    Services, the system has never worked as I just

13    described.

14    Q.    In terms of timing or --

15    A.    In terms of timing.  The evaluation -- for

16    an example, the evaluations are due sometime next

17    month, sometime in May, and I'm not sure that

18    anybody has yet completed one in our group,

19    including the initial step of the objectives.

20    Q.    And this is done for each engagement?  Is

21    that it?

22    A.    It's done for each engagement.  Then as I

23    understand it, for our group, once those evaluations

24    are complete, a committee meets that's called the

25    annual review committee, or ARC, that consists of
```

1    the RAS partners -- there are four of them, Tim

2    Ryan, who is managing partner for the banking

3    practice, and somebody from human resources.

4             They discuss the evaluations and determine

5    who to recommend for promotion, what bonuses to

6    either award or recommend, what salary increases to

7    award or recommend.  This process, the committee

8    process was explained at the RAS staff meeting in

9    August of 19 -- I'm sorry.  August of 2002 by

10   Darlene Shea, who I mentioned before.

11        Q.    And generally how does the present

12   performance evaluation or appraisal procedure differ

13   from the procedure in place at Price Waterhouse?

14        A.    The mechanic is very different, that is,

15   there was a hand -- a hard form that was completed

16   by hand.  I know a number of my evaluations were

17   done by Bob Bench in his own handwriting.

18        Q.    As opposed to electronically?

19        A.    As opposed to electronically.

20        Q.    Or even typed?

21        A.    Or even typed.  And the practice at least

22   in our shop, or at least as far as I know, was to do

23   one evaluation that covered everything that had

24   happened, complete one evaluation form that covered

25   everything that had happened during the year rather

4/23/2003  MURPHY, WESTBROOK

1    than an engagement-by-engagement evaluation.  I also

2    think that the action on the evaluation,

3    recommendation for bonus or promotion, was handled

4    in a different manner, that is, there wasn't the

5    formality of the committee meeting that there is

6    now.  I think Bench may have just sent his

7    recommendations on to be approved either by the

8    managing partner in the D.C. office or by the

9    manager of the -- managing partner of the financial

10   services institution practice.

11        Q.    Well, but were the appraisal or evaluation

12   forms signed by the appraisee as well as the

13   appraiser?

14        A.    Yes.

15        Q.    And it was -- that's true for both firms;

16   is that right?

17        A.    That's been the practice, yes, all --

18   since I've been at -- since 1990 as far as I know.

19        Q.    And has the appraisee always been afforded

20   an opportunity to comment either --

21        A.    I believe so.

22        Q.    Either verbally or in writing?

23        A.    I believe so.

24        Q.    Or both?

25        A.    Or both, yes.

4/23/2003 MURPHY, WESTBROOK

1      Q.    That's always been the practice as far as

2    you know?

3      A.    I believe that's correct.

4      Q.    If the appraisee signs an appraisal

5    without a comment, does that signify the appraisee's

6    agreement with the evaluation or assessment?

7      A.    It would to me, yes.

8                              (Defendants' Exhibit No.

9                               11 was marked for

10                              identification.)

11              BY MR. NELSON:

12      Q.    Exhibit 11 will be performance

13    evaluations, Bates stamped PwC01501 through

14    PwC01507.  Can you identify Defendants' Exhibit 11?

15      A.    It's a memorandum to me dated March 21,

16    1997 from Bob Bench attaching a performance

17    evaluation explaining who will review the evaluation

18    and inviting me to provide comments, and it contains

19    my handwritten comments dated April 2nd, 1997.

20      Q.    And do those comments appear on the first

21    page of this exhibit?

22      A.    Correct.

23      Q.    And that's your handwriting and that's

24    your signature?

25      A.    Correct.

4/23/2003 MURPHY, WESTBROOK

1      Q.      Is it correct that Defendants' Exhibit 11

2  attaches the performance evaluation forms in use --

3      A.      Yes.

4      Q.      -- at Price Waterhouse --

5      A.      Yes.

6      Q.      -- in the spring of 1997?

7      A.      Yes.

8      Q.      Are these electronic forms or --

9      A.      I don't -- I believe not.

10     Q.      Did you also sign your name on page PwC

11  0105 -- 01506?  Is that your signature next to

12  Mr. Bench's signature?

13     A.      Yes.

14     Q.      What period of time do these evaluations

15  of your performance cover?

16     A.      Typically they are -- they cover a

17  12-month period beginning April 1st and ending March

18  31st, and they are prepared in advance of the end of

19  the fiscal year, which would be June 30th, so that

20  the decisions are then made on the basis of this

21  performance evaluation for salaries, bonuses,

22  promotions.

23     Q.      And does this -- this form cover -- covers

24  what period then, these forms?

25     A.      It covers -- it would cover the 12 months

4/23/2003 MURPHY, WESTBROOK

1    beginning April 1, 1996.

2        Q.    You say in your note to Mr. Bench on the

3    first page, quote, "I agree with your," quote

4    unquote, "improvement comment as well as the rest of

5    the evaluation, thanks," closed quote.  What, quote

6    unquote, improvement comment were you referring to?

7    Is that -- well, you can tell me.  I note that on

8    page 1506, there's a heading areas for improvement.

9        A.    Yes, it says steadier -- there is such an

10   area, page 01506, there's a heading, "Areas for

11   Improvement," and under that it's typed "Steadier

12   client contact, courtesy calls."

13            MR. ROSE:  Page?

14            MR. NELSON:  Got it, Dave?  It's on 1506.

15            MR. ROSE:  Yeah.

16            BY MR. NELSON:

17       Q.    Mr. Murphy, what was your understanding

18   about that comment?

19       A.    A suggestion that I should more regularly

20   call or communicate with staff or officers of

21   clients whom we were serving, and in my reply note,

22   I suggest to Mr. Bench that I have done so more than

23   he is aware of and actually named three names, but

24   nonetheless, still agreed with his comment.

25       Q.    Further down on that page, the same page,

4/23/2003 MURPHY, WESTBROOK

1     1506, is the heading, "Progression Toward Next Staff

2     Level."  Do you see that?

3          A.    Yes.

4          Q.    Under that heading, it states, "none,

5     some, significant" and "recommended for promotion to

6     next level" dash "July 1," and there's a mark next

7     to the word "some."  What does that indicate?

8          A.    Well, it indicates exactly what's on the

9     page.

10         Q.    Namely what?  That Mr. Bench evaluated

11    your qualifications towards -- I guess progression

12    means promotion; is that right?

13         A.    I would -- that would be my understanding.

14         Q.    And he rated -- and you agreed with the

15    rating?

16         A.    Well, a progression toward next staff

17    level.  I would presume that going to the next staff

18    level is the promotion, the progression toward

19    promotion.

20         Q.    And this is a rating of your

21    qualifications or where you stand in terms of

22    promotion to the next level?

23         A.    Yes, progress toward promotion.

24         Q.    Progress towards promotion.  And does that

25    indicate that you were evaluated in this particular

4/23/2003 MURPHY, WESTBROOK

1     evaluation two levels below recommendation for

2     promotion?

3          A.     That is correct.

4                 MR. NELSON:  This will be Defendants'

5     Exhibit 12, a performance appraisal Bates stamped

6     00125 to 00133.

7                                (Defendants' Exhibit No.

8                                 12 was marked for

9                                 identification.)

10          BY MR. NELSON:

11          Q.     Can you identify Defendants' Exhibit 12?

12          A.     Yes, it's a performance appraisal for me

13     on a particular engagement involving GMAC Mortgage.

14     The appraisal was completed in mid-April, I believe

15     April 16, 2001.  I think it was completed by another

16     director in the Regulatory Advisory Services named

17     Ric Pace.

18          Q.     This form relates solely to that

19     particular engagement; is that right?

20          A.     That is correct.  The engagement had

21     several different phases, for lack of a better word,

22     that I believe was spelled out on page 126.

23          Q.     It was a complex engagement?

24          A.     Yes, indeed.  On the first page, one of

25     the questions is the degree of difficulty, and it

4/23/2003 MURPHY, WESTBROOK

1       Q.     Did you ever communicate to anyone at PwC

2   you had desired to retire?

3       A.     Yes.

4       Q.     When did you first communicate an interest

5   in retirement?

6       A.     In the fall of 2000.

7       Q.     And to whom did you communicate that

8   interest?

9       A.     I believe the first communications

10  pertinent to your question were simply seeking

11  information about the interaction between the

12  retirement plan, one particular retirement plan, and

13  the health benefits plan, and it was addressed to a

14  personnel clerk someplace, personnel official.

15  There was -- it took me several months and several

16  memos to receive an answer to my question, and I

17  don't remember now who the various memos were

18  written to.

19      Q.     You made inquiries regarding the medical

20  benefits that would be available to you?

21      A.     The question I was trying to understand

22  was was I eligible to retire from PwC and continue

23  medical benefits as a retiree.

24      Q.     And what was your age at the time you made

25  those inquiries?

4/23/2003 MURPHY, WESTBROOK

```
1        A.      Sixty.

2        Q.      And did you wish to retire at that age?

3        A.      Yes.  If I could have retired and

4    continued the medical benefits then, I would have

5    done so.

6        Q.      And why was your desire to retire

7    conditioned on participation in the retiree medical

8    plan?

9        A.      Because I believed that it would be wise

10   to have health insurance.

11       Q.      Could you have purchased health insurance

12   on your own?

13       A.      I was never able to get a satisfactory

14   answer to that question.

15       Q.      From whom?

16       A.      From insurance companies.

17       Q.      You made inquiries?

18       A.      I did.

19       Q.      And why were the answers to that inquiry

20   not satisfactory?

21       A.      Because I couldn't -- I could not get an

22   answer from them as to what the insurance would

23   cover and what it might cost.

24       Q.      When did you make those inquiries?  In

25   relation to the inquiries you made --
```

136

4/23/2003 MURPHY, WESTBROOK

1       A.    I believe it was a year later.

2       Q.    Did you ask anyone at PwC whether they

3   could provide that information to you?

4       A.    I did in connection with negotiations to

5   try and settle my discrimination claim.

6       Q.    Did you do it any time before that, at the

7   time that you initially were trying to contact

8   health providers or health insurers?

9       A.    No.

10      Q.    Why not?

11      A.    I was having difficulty getting a reliable

12  and straight answer about the plans that they had.

13  I did not think it would be useful to ask them about

14  plans that they didn't have.

15      Q.    Well, at some point, did they -- weren't

16  you told that you could not participate in the

17  retiree -- or PwC's retiree health plan until you

18  were age 65?

19      A.    In early December of 2000, I was informed

20  that I could not then retire and continue health

21  insurance coverage as a PwC retiree, and either then

22  or sometime later, I learned at least the firm's

23  position on the rest of your question, namely that I

24  would have to work until 65 before I would be able

25  to retire from PwC and continue health coverage as a

4/23/2003 MURPHY, WESTBROOK

1    retiree.

2        Q.    And did you ever get an answer to your

3    inquiry as to whether or not you could purchase your

4    own coverage if you retired prior to age 65?

5        A.    No.

6            MR. ROSE:   Can we go off the record for a

7    second?

8                (Recessed at 3:57 p.m.)

9                (Reconvened at 4:14 p.m.)

10                        (Defendants' Exhibit No.

11                        13 was marked for

12                        identification.)

13            BY MR. NELSON:

14        Q.    Defendants' Exhibit 13 is a series of

15    e-mails Bates stamped PwC00961 through PwC00966.

16    Can you identify Defendants' Exhibit 13?

17        A.    Well, as you just said, it's a series of

18    e-mails beginning in the fall of 2000 and carrying

19    over.  The last one seems to be dated March 2001

20    directed to Darlene Shea.

21        Q.    Is that March 8th?

22        A.    Yes, and they deal with the question that

23    we were talking about before the break, namely would

24    I then be able to, then being in 2000, early 2001,

25    be able to retire and continue medical insurance as

4/23/2003 MURPHY, WESTBROOK

1    a retiree.

2         Q.    Did you either send or receive each of the

3    e-mails included in Defendants' Exhibit 13?

4         A.    I'm sure that I either sent or received

5    all the ones that show me as either sending them or

6    receiving them.  I don't know whether there are any

7    in here with a different addressee.

8         Q.    Would you check?  It appears that some

9    were forwarded to you, but --

10        A.    Yeah, I believe I either sent or received

11   each of these e-mails on the date that's indicated

12   on the e-mail.

13        Q.    Are the e-mails in this Exhibit 13 in

14   reverse chronological order?

15        A.    The most recent is on top.  The earliest

16   is on the bottom.

17        Q.    Let's begin by looking at the last page of

18   Defendants' Exhibit 13.  That's page 966.

19             MR. ROSE:  Excuse me.  I have page 290

20   attached to --

21             MR. NELSON:  Off the record.

22                (Discussion off the record)

23             BY MR. NELSON:

24        Q.    Referring to the last page, on November 7,

25   2000, you sent an e-mail to Donna L. Miller

4/23/2003 MURPHY, WESTBROOK

1    requesting confirmation that you were covered by the

2    retirement plan that was frozen on June 30, 1994; is

3    that correct?

4        A.    Yes.

5        Q.    And who was Ms. Miller?

6        A.    I have no idea.  She's -- in her address

7    string here, the letters HR appear, which suggest

8    human resources.

9        Q.    And why did you direct your e-mail or your

10   inquiry to Ms. Miller?

11       A.    I don't now remember.

12       Q.    Why was the retirement plan frozen on June

13   30, 1994?  What was that all about?

14       A.    It was terminated then except for

15   employees who had been under the plan for five years

16   or more and thus were vested.

17       Q.    Less than a half hour later on November 7,

18   2000, Ms. Miller sent you an e-mail confirming that

19   you were in fact vested in the retirement plan; is

20   that right?

21       A.    That is correct.

22       Q.    A few hours later on the same day,

23   November 7, 2000, you replied to Ms. Miller by

24   e-mail asking whether you were, quote unquote,

25   eligible to retire under the plan and stating that

4/23/2003 MURPHY, WESTBROOK

1    under the language of the plan, quote, "My ability

2    to retire at age 60 with 11 years of PW" slash "PwC

3    employment and continue my medical insurance depends

4    in turn on my being able to retire and immediately

5    begin receiving benefits under the frozen retirement

6    plan," closed quote.  Did you send that e-mail to

7    Ms. Miller at 2:44 p.m. on November 7, 2000?

8        A.    I believe that's correct.

9        Q.    On Defendants' Exhibit 13, next indicates

10   that Ms. Miller forwarded your e-mail to Melinda

11   Burnham, B-U-R-N-H-A-M, at 8:51 a.m. on November 8,

12   2000.  Do you see that?  That's on page 965.  Do you

13   see the forwarding line above --

14       A.    Oh, yes.

15       Q.    -- your name on the bottom?  Who was

16   Ms. Burnham, if you know?

17       A.    I do not know.

18       Q.    Do you know whether she was also in HR?

19       A.    No, I don't.

20       Q.    At 3:04 p.m. on November 8, 2000,

21   Ms. Burnham sent to you the following message.  "You

22   have to be at least age 60 with 20 years of service

23   to retire early under the terms of the retirement

24   plan for employees of PricewaterhouseCoopers LLP.

25   Based on a hire date of May 1989, the earliest you

4/23/2003 MURPHY, WESTBROOK

1    could retire is at your," quote unquote, "normal

2    retirement date," dash, "end of the month you turn

3    age 65."  Did you receive that e-mail from

4    Ms. Burnham?

5         A.    Yes.

6         Q.    Did you reply to it?

7         A.    Yes.

8         Q.    Is your reply set forth in the e-mail sent

9    at 4:32 p.m. on November 8, 2000?

10        A.    Yes.

11        Q.    Ms. Burnham then replied to your e-mail at

12   4:43 p.m. on November 8, 2000, and that e-mail

13   concludes with the following advice.  That's on page

14   964 -- it was Ms. Burnham's e-mail to you says the

15   earliest you could retire and receive benefits of

16   the grandfather option is age 65, as you did not

17   have 20 years of service.  Did you receive that

18   e-mail from Ms. Burnham?

19        A.    Yes.

20        Q.    You then replied to Ms. Burnham's advice

21   by e-mail at 6:41 p.m. on November 8th, 2000 and

22   inquired in the third paragraph of your e-mail,

23   quote, "I am trying to discover how the frozen plan

24   interacts with PwC's medical insurance plan and

25   whether I can retire at age 60 and continue my

4/23/2003 MURPHY, WESTBROOK

1    medical insurance under the PwC staff indemnity plus

2    plan," closed quote.  I assume your desire was to

3    retire at age 60 and continue to receive medical

4    insurance; is that right?

5         A.    As of the fall of 2000, that was correct.

6         Q.    Did Ms. Burnham then advise you that you

7    would not be eligible for retiree medical benefits

8    unless and until you retired at age 65?

9         A.    Yes.

10        Q.    And is Ms. Burnham's advice as set forth

11    in her e-mail to you dated -- her e-mail to you sent

12    on November 9, 2000 at 9:34 a.m.?

13        A.    Yes.

14        Q.    It appears that you then forwarded the

15    foregoing e-mails to Elizabeth Engelhart at 6:45

16    p.m. on November 14, 2000 and questioned

17    Ms. Burnham's advice on medical plan coverage; is

18    that correct?

19        A.    That's correct.

20        Q.    And who was Ms. Engelhart?

21        A.    Ms. Engelhart then was the human resources

22    assistant assigned to the banking practice for

23    professional employees.

24        Q.    And did you know her?

25        A.    I had not then met her.  I may have talked

### 4/23/2003 MURPHY, WESTBROOK

1    to her on the telephone.

2         Q.    Why did you ask Ms. Engelhart for a second

3    opinion, so to speak, on medical insurance coverage

4    on early retirement?

5         A.    This is -- because I couldn't understand

6    the answers I had gotten from what's in effect a

7    call-in service that I communicated with by e-mail

8    that's called employee benefits.  I didn't believe

9    that they understood the question very well.  I was

10   not certain that they had given me the correct

11   answer, so having them on record as to what they

12   thought, I then sent it along to the person who

13   would actually be responsible in the human resources

14   machinery.

15        Q.    You didn't think they understood or you

16   weren't happy with the response?

17        A.    Yes, both.

18        Q.    Both.  Referring now to page PwC00962, it

19   next appears that Ms. Engelhart forwarded your

20   inquiry to Nancy Heppner, H-E-P-P-N-E-R?

21        A.    Yes.

22        Q.    -- who in turn forwarded it to Patricia

23   Saylor, S-A-Y-L-O-R.  Then on December 8th, 2000,

24   Ms. Engelhart forwarded to you Ms. Saylor's advice

25   that, quote, "According to the grandfathering rules,

4/23/2003 MURPHY, WESTBROOK

1     in order to continue medical coverage after

2     retirement, an employee must be 65 with ten years of

3     service or at least age 60 with 20 years of service.

4     It does not appear that Mr. Murphy meets either of

5     these criteria." Did you receive that confirmation

6     of Ms. Burnham's earlier advice to you?

7          A.     Yes.  Ms. Engelhart forwarded it to me on

8     the 8th of December.

9          Q.     What did you do next?

10          A.     I talked to the managing partner of the

11     RAS practice, Bob Bench, about what kind of

12     arrangements might be made in the way of the firm

13     either providing health care service, health care

14     insurance apart from these plans that are discussed

15     in this memo or going to work on a part-time basis.

16          Q.     When did you have that conversation with

17     Mr. Bench?

18          A.     Mid-December 2000.

19          Q.     And what did Mr. Bench say to you at that

20     point?

21          A.     I don't remember his exact words, but I

22     believe he was receptive to the idea and said that

23     he was -- he would inquire and see what arrangements

24     might be made.

25          Q.     Are you talking about working on a part-

1    time basis?

2        A.    That was one possibility, yes.

3        Q.    He was amenable to that?

4        A.    Yes.

5        Q.    And was he -- what else did he say?

6        A.    I don't remember specifically.  As I

7    believe I already testified to, I don't remember

8    what his words were.

9        Q.    Well, what else did he say in substance?

10   He said Wes, I'm amenable to this or I'll look into

11   this?  What did he say?

12       A.    In substance, that's what he said.

13       Q.    And just let me be clear on what your

14   inquiry was.  You suggested that in lieu of early

15   retirement, you would like to work on a part-time

16   basis?

17       A.    That was one of the suggestions, yes.

18       Q.    And what was the other suggestion?

19       A.    That the firm arrange for health insurance

20   coverage for me and I would retire.

21       Q.    What was your preference at that point?

22       A.    Between the two, I'm not sure I had a

23   preference.

24       Q.    What happened next?  How did you leave it

25   with Mr. Bench after that conversation where you

### 4/23/2003 MURPHY, WESTBROOK

1    proposed some alternatives?

2        A.    He said he would inquire and get back to

3    me.

4        Q.    And then what happened?

5        A.    I don't remember other than he never got

6    back to me, at least not in any substantive way.  I

7    assume from the last e-mail in this chain that's in

8    Exhibit 13, that he must have consulted Darlene

9    Shea, who wrote that e-mail, who was then a

10   personnel specialist for the financial services

11   practice at PwC, of which the banking practice was

12   and is a part.

13       Q.    Did you follow up with Mr. Bench?  You

14   said he never got back to you.

15       A.    I believe that I did and that he said

16   something vague like I'm working on it.

17       Q.    And did you contact Ms. Shea or did she

18   contact you on that issue or on the general issue of

19   early retirement?

20       A.    My best memory is that she called me.

21       Q.    And on how many occasions did you discuss

22   the issue with Ms. Shea, if you recall?

23       A.    Once or twice.

24       Q.    Were those telephone conversations?

25       A.    Yes.

4/23/2003  MURPHY, WESTBROOK

1      Q.     And what was the substance of your

2   telephone conversation with Ms. Shea?

3      A.     She was apparently trying to understand

4   the request that I had made to Bob Bench and that he

5   had communicated to her for trying to arrange for me

6   to retire with health insurance.

7      Q.     And what about your alternative request to

8   work part time?

9      A.     I do not remember whether Ms. Shea and I

10   discussed that or not.

11      Q.     Do you recall anything else that was said

12   in your conversations with Ms. Shea?

13      A.     No.

14      Q.     Did she give you an answer to the original

15   question that you asked about early retirement and

16   continuing to be covered by a medical plan?

17      A.     Well, I don't remember having received a

18   response to the memo that's here in --

19      Q.     Well, I'm not asking about the memo here.

20      A.     -- Exhibit 13.

21      Q.     I'm talking about your conversations with

22   Ms. Shea, which presumably preceded the first e-mail

23   in Exhibit 13.  That first e-mail begins with,

24   "Thanks for discussing with me my wish to retire and

25   then be covered by the PwC medical insurance plan as

148

4/23/2003 MURPHY, WESTBROOK

1    a retiree."

2        A.    Yes.

3        Q.    So I just read that from your e-mail to

4    Darlene Shea dated March 8, 2001.  My question was

5    did Ms. Shea respond substantively to that request

6    and that wish to retire and then be covered by the

7    retiree medical plan?

8        A.    I don't believe so.

9        Q.    No response whatsoever?

10       A.    Not that I remember.

11       Q.    Well, after confirming -- and now

12   referring to your e-mail to Darlene Shea,

13   after confirming your, quote, wish to retire and

14   then be covered by the PwC medical insurance plan as

15   a retiree, closed quote, your e-mail to Ms. Shea

16   then proceeds to question PwC's interpretation of

17   the language of the medical plan on this issue; is

18   that correct?

19       A.    It questions the interaction between the

20   language of the medical plan and the language of the

21   retirement plan.

22       Q.    In the last paragraph of your e-mail to

23   Ms. Shea, you state -- you state as follows, quote,

24   "But as I said, I believe the answer I am looking

25   for likely lies not in a parsing of this obscure

4/23/2003 MURPHY, WESTBROOK

1    language, but in cutting an early retirement deal

2    with whoever possesses the authority to do so.  My

3    wish is to retire and then be covered by the PwC

4    medical insurance plan as a retiree.  The outcome is

5    of less consequence than how we get there," closed

6    quote.  Had you discussed with -- you had discussed

7    that with Ms. O'Shea; is that right?

8        A.   Yes.

9        Q.   Had you discussed with Ms. -- I said

10   O'Shea.  It's Shea.  Had you discussed with Ms. Shea

11   the proper person with whom you might negotiate an

12   early retirement deal, as you put it?

13       A.   Not that I remember.

14       Q.   You don't recall Ms. Shea advising you

15   with respect to that; is that right?

16       A.   It's right that I do not recall.

17       Q.   Did you make any efforts to cut an early

18   retirement deal with anyone at PwC?

19       A.   Not that I remember other than Mr. Bench

20   and Ms. Shea.

21       Q.   You mean other than what you've already

22   testified to?

23       A.   Correct.

24       Q.   And you didn't make any further efforts?

25       A.   Correct.

4/23/2003 MURPHY, WESTBROOK

1      whatever response Ms. Shea might make to me.

2          Q.    Did you do anything to try to increase

3      your leverage in any negotiation of an early

4      retirement package?

5          A.    No.

6          Q.    Nothing?

7          A.    No.

8          Q.    I don't know if the court reporter can

9      hear that.  You said no?

10         A.    No.

11         Q.    Why did you wish to retire at age 60?

12         A.    I seemed to have reached the end of the

13     line professionally at PwC.  In 1999, Mr. Bench had

14     recommended me for promotion to the position of

15     managing partner.  His recommendation had not been

16     accepted.

17         Q.    You say for managing partner?

18         A.    Pardon?

19         Q.    Promotion to what position?

20         A.    Managing director.  By year 2000, I was 60

21     and partnership -- advancement to partnership seemed

22     to be foreclosed under the provisions as I then

23     understood them of the partnership agreement that

24     require the partners to retire at age 60, so there

25     seemed to be no further avenue for advancement in

4/23/2003 MURPHY, WESTBROOK

1    available with what coverage and at what cost.

2        Q.    And were you unable to afford coverage on

3    your own?

4        A.    No.

5        Q.    You were not unable?

6        A.    That's correct.

7        Q.    You were able?

8        A.    Yes.

9        Q.    You just didn't want to; is that right?

10       A.    That's correct.

11       Q.    You testified a few minutes ago that

12   Mr. Bench's recommendation to promote you to the

13   position of managing director had not been accepted.

14   When did that occur, or at least when were you

15   advised of that?

16       A.    The recommendation was made in late May or

17   early June of 1999.

18       Q.    And what were you told?

19       A.    I'm sorry.  It was probably made earlier

20   than that.  It was probably made a month or so

21   earlier, and I heard nothing back from it, so

22   sometime thereafter, probably in June of 1999, I

23   inquired of Mr. Bench what had happened to his

24   recommendation.

25       Q.    And what did he say?

4/23/2003 MURPHY, WESTBROOK

1       A.    He said that he had met in New York with

2   several people -- I don't know who -- to discuss

3   promotions and salary increases and bonuses and that

4   he had been told that the position of managing

5   director had been abolished.

6       Q.    What led you to conclude that you would

7   have received further compensation increase, salary

8   increases had you been promoted to managing director

9   that you wouldn't otherwise receive as -- in

10  whatever your position was?

11      A.    I'd strongly suspect that the salaries of

12  those -- managing directors under the title of the

13  description of that position as I understand it have

14  greater responsibility than directors, and I assume

15  that they are compensated accordingly.

16      Q.    Well, that's your assumption.  Did you ask

17  -- make any inquiries in that regard to Mr. Bench

18  when he told you that he was told that the position

19  had been abolished?

20      A.    Not that I remember.

21      Q.    Did you ask him whether this would have

22  any constraints on salary increases going forward?

23      A.    Not that I remember.

24      Q.    And in fact, you've received a number of

25  salary increases after receiving that advice; isn't

4/23/2003 MURPHY, WESTBROOK

1    A.    Disappointed would be a good description.

2    Q.    What did you do after receiving Ms. Shea's

3    March 8, 2001 -- or not receiving.  I'm sorry.

4    After sending your e-mail to Ms. Shea on March 8,

5    2001 with respect to these issues of early

6    retirement?

7    A.    Sometime then, if I remember correctly, it

8    was sent in early March of 19 -- I'm sorry, of 2001,

9    and sometime before the end of March, I filed with

10    the D.C. Human Rights Commission a charge of

11    employment discrimination.

12    Q.    And did you do that as a result of your

13    not being permitted to take early retirement or

14    receive retiree medical benefits?

15    A.    It is true that if I had been able to

16    retire and get -- and continue medical benefits, I

17    would not have started to explore other options,

18    which was to express an interest in being promoted

19    to partner and to take the steps that seemed to me

20    to be necessary to accomplish that interest.

21    Q.    What do you mean, begin to explore other

22    options?

23    A.    The option of being promoted to a partner.

24    Q.    Are you saying that you began to explore

25    those options on March 8th, 2001?

162

### 4/23/2003 MURPHY, WESTBROOK

1    somebody, probably with Darlene Shea, possible

2    alternatives on a more permanent basis, but nothing

3    came of those discussions, and the independence

4    difficulty was resolved I believe in April of 2000.

5        Q.    Did you relinquish your management

6    responsibilities in December of 1999 to avoid having

7    to divest yourself of certain investments, personal

8    investments?

9        A.    No.

10        Q.    Why did you do that?

11        A.    To give PwC time to consider an issue that

12    I believe they had not considered very well in that

13    context of how to define the word "office" as used

14    in the independence rules.

15        Q.    Could you have avoided your difficulties

16    with the independence requirements by divesting

17    yourself of an investment, personal investment in T.

18    Rowe Price mutual funds?

19        A.    That I believe was not the issue at the

20    time that we're talking about.  I believe that there

21    was a later issue and as a result of that, my wife

22    did sell T. Rowe Price mutual funds.

23        Q.    Well, could you have avoided the

24    independence difficulties you were experiencing at

25    the time by divesting yourself of some personal

4/23/2003 MURPHY, WESTBROOK

1    investment or another, whether it was T. Rowe Price

2    or something else?

3        A.    Yes, and that's eventually what happened.

4        Q.    Did PwC ask you to relinquish management

5    responsibilities?

6        A.    No, they did not, although I discussed

7    this with Mr. Bench before and he agreed in what I

8    was going to do, and the idea was to try and avoid

9    any -- try to avoid or minimize the question of --

10   any questions that might arise under the

11   independence rules pending PwC looking into the

12   issue that I asked them to look into, namely what

13   was -- how to use the word "office," how to define

14   the word "office" as it was used in the independence

15   rules.

16       Q.    Is it correct that you were unwilling to

17   divest yourself of personal investments at the time

18   that you relinquished your management

19   responsibilities?

20           MR. ROSE:  I'm going to -- I should have

21   done this a little earlier, but as far as -- our

22   view is that the controversy over the divestment

23   rules is not relevant to this proceeding, and I just

24   want to make that objection to your question and it

25   is -- and that the issue has been -- was resolved to

4/23/2003 MURPHY, WESTBROOK

1       the satisfaction of certainly PwC, so I'm going to

2       have a -- I do object to this line of questioning

3       and I'm at this point or soon going to instruct him

4       not to answer, but --

5              MR. NELSON:  On grounds of relevance?

6              MR. ROSE:  Yes.

7              MR. NELSON:  Just so the record is clear

8       on this, it's our position that a plaintiff who is

9       complaining of a denial of promotion can't avoid

10      discovery of efforts to relinquish management

11      responsibilities or requests for demotion, and if

12      those -- if those actions arose out of an effort to

13      protect personal investments or to avoid divestiture

14      of investments to comply with independence

15      requirements, then this inquiry is highly relevant,

16      just so the record's clear.

17             MR. ROSE:  Well, I don't disagree that if

18      -- you know, that there may be some circumstances

19      where an inquiry of this kind would be relevant, but

20      let's just go on.

21             MR. NELSON:  I'd like to have marked as

22      Defendants' Exhibit 14 a memo from Mr. Murphy to

23      Mr. Bench dated March 14, 2000.  This was produced

24      by plaintiffs and it's Bates stamped 00290.

25                          (Defendants' Exhibit No.

4/23/2003 MURPHY, WESTBROOK

1                              14 was marked for

2                              identification.)

3              BY MR. NELSON:

4         Q.    Can you identify Defendants' Exhibit 14?

5         A.    This is a memo that I wrote to Bob Bench

6    on the date -- and hand-delivered to him personally

7    on the date indicated.

8         Q.    The date indicated being March 14, 2001?

9         A.    Right, and it also showed that I sent a

10   carbon copy to Jim Walls, and if I remember, he was

11   not in and I left it for him in a sealed envelope.

12        Q.    And is it correct that this memo was sent

13   and delivered -- or delivered to Mr. Bench and

14   Mr. Walls less than a week after you had advised

15   Ms. Shea that you wished to collect an early

16   retirement deal with whoever possesses the authority

17   to do that at PwC?

18        A.    It is approximately a week after the memo,

19   the e-mail that is in Exhibit 13.

20        Q.    And that was March 8th; is that correct?

21        A.    That is correct.

22        Q.    2001?

23        A.    That is correct.

24        Q.    And I'm sorry.  I think you may have

25   mentioned this earlier, but who was Mr. Walls?

1      A.      Mr. Walls was the managing partner for the

2  D.C. office.

3      Q.      And why did you deliver a copy of this

4  memo to Mr. Walls?

5      A.      Because I thought he should know about it

6  before he got an inquiry from somebody in the higher

7  management of PwC.  I thought he should be prepared

8  for any inquiry he got.

9      Q.      So is that as a courtesy?

10      A.      Yes.

11      Q.      And you thought it important to send him

12  -- well, you thought -- you're talking about your

13  having filed a charge against PwC with the D.C.

14  Office of Human Rights?  Is that what you're talking

15  about?

16      A.      That's correct.

17      Q.      And you felt it important to deliver that

18  charge to Mr. Walls with this memorandum,

19  Defendants' Exhibit 14?

20      A.      Yes, in -- you used the word "important."

21      Q.      Appropriate.

22      A.      I believed that it was the appropriate

23  thing to do given Mr. Walls' position.

24      Q.      Referring to the first paragraph, do you

25  know what inquiries of PwC management Mr. Bench made

1    on your behalf?

2        A.    I do not.

3        Q.    When did Mr. Bench inform you that his

4    inquiries to date had not produced a positive

5    response?

6        A.    Sometime after early December.  January or

7    February -- and/or February of 2001.

8        Q.    And just so the record's clear, these

9    inquiries concerned your request to retire early

10   with medical benefits; is that right?

11       A.    That is correct.

12       Q.    Did it appear to you that you were not

13   then in a position to collect an early retirement

14   deal with PwC management?

15       A.    It appeared to me that PwC was completely

16   uninterested in doing so.

17       Q.    Referring to the second paragraph of your

18   memo to Mr. Bench, I think you've answered this

19   before, so forgive me if I'm asking it again.  Had

20   you ever before advised Mr. Bench that you wished to

21   be considered as a candidate for promotion to

22   partnership?

23       A.    No.

24       Q.    Referring to the third paragraph of your

25   memo to Mr. Bench, when were you first told that the

173

4/23/2003 MURPHY, WESTBROOK

1    principal is a partner?

2        A.    Yes.

3        Q.    And simply --

4        A.    Bob Bench, for example, carries the title

5    of managing partner of RAS, but he is actually a

6    principal because he is not a CPA.

7        Q.    Just so the record's clear throughout this

8    deposition, when we're referring to partner, we mean

9    to encompass within that term a principal.

10       A.    That's fine.

11             MR. ROSE:   And that's what we've done in

12   discovery also.

13             MR. NELSON:  I understand that.  The

14   record should be clear.

15             MR. ROSE:   Yeah, sure.

16             MR. NELSON:  It should also be clear that

17   principal is A-L.  Right?  Sorry.

18             BY MR. NELSON:

19       Q.    Referring to the penultimate paragraph of

20   your memo to Mr. Bench, when had you filed the

21   charge with the D.C. Office of Human Rights?

22       A.    It was either that day, March 14th, or the

23   next day I believe.

24       Q.    And why did you tell Mr. Bench and

25   Mr. Walls that the charge was a predicate to your

4/23/2003 MURPHY, WESTBROOK

1    filing a lawsuit in court?

2        A.    I believe that they should be advised of

3    what this proceeding was and what inquiry it might

4    generate outside the firm.  I believe the last

5    paragraph says I'm informed that the proceedings at

6    the Office of Human Rights are confidential and that

7    the office will encourage the parties to resolve

8    their differences without litigation.

9        Q.    And why did you think it was your

10   responsibility to advise Mr. Bench and Mr. Walls as

11   to what this proceeding was?

12       A.    Well, I advised Mr. Bench on questions

13   like that all the time as part of my job, and I

14   thought it would be a question that he would

15   obviously have and I might as well answer.

16       Q.    Well, hadn't you filed this charge against

17   the firm, PwC?

18       A.    Yes.

19       Q.    And did you understand that PwC either

20   through its Office of General Counsel or through the

21   retention of outside counsel would receive

22   independent legal advice?

23       A.    I assumed that they would.

24       Q.    And did you understand that Mr. Walls and

25   Mr. Bench as partners of PwC could seek advice with

1          THE WITNESS:  No.

2          MR. ROSE:  I think that had been asked and

3    answered previously.

4          BY MR. NELSON:

5     Q.    Why did you point out that the proceedings

6    were confidential?

7     A.    As I believe I already said, I thought

8    Mr. Bench should understand what proceeding had been

9    commenced and what some of the ramifications might

10   be.  He was my supervisor.  He would surely get

11   inquiries from the people to whom he reported.

12    Q.    Did you think --

13    A.    And I did not wish for him to learn about

14   this from PwC's outside lawyers or somebody else's

15   lawyers.  I believe that I had taken an action that

16   could affect the employment relationship and I

17   thought he should be among the first to know about

18   that.

19    Q.    Well, I'm not talking about your advising

20   Mr. Bench that you filed a charge against PwC.  I'm

21   asking why you're informing Mr. Bench of certain

22   things that you state in your memo to him.

23    A.    It was in an effort for -- to help explain

24   to him what the charge was and what it was about and

25   what the then-current stage of the process was.

4/23/2003 MURPHY, WESTBROOK

1      Q.    And didn't you think it inappropriate for

2    you to be giving Mr. Bench legal counsel on a

3    problem that you created?

4      A.    I'm sorry, Mr. Nelson.  I think there are

5    several things wrong with your question.  I think

6    the problem was created by the PwC partnership in

7    its promotion practices, but no, I did not think

8    that anything in this memo was inappropriate, and if

9    I had, I would not have put it in there.

10     Q.    You initiated this proceeding; is that

11   correct?

12     A.    It is true that I initiated the

13   proceeding.

14     Q.    And you understood at least if not

15   intended that this would create a problem for PwC;

16   is that right?

17           MR. ROSE:  I think that's been asked and

18   answered.

19           BY MR. NELSON:

20     Q.    Is that right?

21           MR. ROSE:  He said the problem is --

22           THE WITNESS:  I thought that this would

23   force PwC to deal with what I believed then and

24   believe now is its illegal behavior, and part of my

25   responsibility ever since I've been with PwC in

1    director.

2        Q.    When he had been promoted to that

3    position?

4        A.    I don't remember him telling me when he

5    was promoted to that position.

6        Q.    Did it come as a surprise to you that

7    Mr. Schuler was promoted to managing director in

8    1993?

9        A.    No.  I believe he's very talented and

10   deserved to be a managing director.

11       Q.    That wasn't what I asked you.

12       A.    Well, that's why I don't believe -- that's

13   why I'm not surprised.

14       Q.    Did you forget or do you claim that you

15   are unaware that Mr. Bench had recommended you for

16   promotion to managing director in 1994?

17       A.    Obviously I forgot.

18       Q.    Do you agree with Mr. Bench's statement

19   that Westbrook Murphy now serves essentially as a

20   managing director?

21       A.    Yes.

22       Q.    As you sit here now, why do you believe

23   you were denied promotion to managing director in

24   1994?

25       A.    I do not know.

1        Q.    Well, do you think it was because of your

2    age?

3        A.    I do not know.

4        Q.    Is it correct that you did not ask to be

5    considered for promotion to partner or principal in

6    May 2000?

7        A.    Yes.

8            MR. NELSON:  I need to take a quick break.

9                (Recessed at 6:22 p.m.)

10               (Reconvened at 6:30 p.m.)

11           MR. NELSON:  I'd like to have marked as

12    Defendants' Exhibit 17 a letter from Rose & Rose to

13    the D.C. Office of Human Rights dated August 8,

14    2001.

15                            (Defendants' Exhibit No.

16                             17 was marked for

17                             identification.)

18           BY MR. NELSON:

19        Q.    Mr. Murphy, can you identify Defendants'

20    Exhibit 17?

21        A.    It's a letter that my attorneys wrote on

22    August 8, 2001 to the District of Columbia Office of

23    Human Rights responding to or rebutting the response

24    of PwC to my charge.  I believe this rebuttal was

25    requested either by the rules or by special request

257

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3

 4    - - - - - - - - - - - - - - - X

 5    C. WESTBROOK MURPHY,              :

 6         and                         :

 7    HAROLD SCHULER,                   :

 8              Plaintiffs,            :     C.A. No.

 9    v.                               :   1:02CV00982

10    PRICEWATERHOUSECOOPERS, LLP,     :

11    et al.,                          :

12              Defendants.            :     Volume 2

13    - - - - - - - - - - - - - - - X

14                   May 1, 2003

15                   10:39 a.m.

16

17         Continuation of the deposition of C.

18    WESTBROOK MURPHY held at the offices of

19    Winston & Strawn, 1400 L Street, N.W.,

20    Washington D.C., pursuant to adjournment,

21    before Jana Mulhollan, a Registered

22    Professional Reporter and Notary Public in

23    and for the District of Columbia.

24

25
```

258

```
 1    APPEARANCES:

 2

 3        On behalf of the Plaintiffs:

 4            DAVID L. ROSE, ESQ.

 5            Rose & Rose, P.C.

 6            1320 19th Street, N.W., Suite 601

 7            Washington, D.C.  20036

 8            (202) 331-8555

 9            daver@roselawyers.com

10

11        On behalf of the Defendants:

12            ERIC M. NELSON, ESQ.

13            STEPHEN L. SHEINFELD, ESQ.

14            Winston & Strawn

15            200 Park Avenue

16            New York, New York  10166

17            (212) 294-2646

18            emnelson@winston.com

19

20

21

22

23

24

25
```

```
 1                  C O N T E N T S

 2      WITNESS                        EXAMINATION

 3      C. WESTBROOK MURPHY

 4         By Mr. Nelson ................... 260

 5            Afternoon Session - 94

 6                  E X H I B I T S

 7      DEFENDANTS' EXHIBIT NO.         PAGE MARKED

 8         21 ............................... 260

 9         22 ............................... 273

10         23 ............................... 282

11         24 ............................... 288

12         25 ............................... 295

13         26 ............................... 312

14         27 ............................... 420

15         28 ............................... 422

16         29 ............................... 463

17         30 ............................... 506

18         31 ............................... 509

19         32 ............................... 519

20

21

22

23

24

25
```

260

1              P R O C E E D I N G S

2                          (10:39 a.m.)

3           MR.  NELSON:  Let me ask the

4     reporter to mark as Defendants' Exhibit 21

5     an e-mail from Mr. Murphy to Bob J.

6     Daugherty dated April 5, 2002.  This is

7     Bates stamped PwC 01329 through PwC 01332.

8           (Defendants' Exhibit No. 21 was

9     marked for identification.)

10    Whereupon,

11           C. WESTBROOK MURPHY,

12    called as a witness, having been duly sworn

13    previously by a Notary Public, was further

14    examined and testified as follows:

15       EXAMINATION BY COUNSEL FOR DEFENDANTS

16                     (RESUMED)

17           BY MR. NELSON:

18       Q.  Mr. Murphy, can you identify the

19    document marked as Defendants' Exhibit 21?

20       A.  It appears to be a copy of an e-mail

21    I sent to Bob Daugherty who I understand to

22    be the national director for human resources

23    at PricewaterhouseCoopers and it responds to

24    or -- it's dated April 5, 2002 in response

25    to a memo that he sent to me and I assume

1    that meeting with, I believe, with Sarah

2    Miller from the American Bankers

3    Association.  I got an invitation for Edward

4    Monahan, known as Ted, who was also on the

5    RAS staff, to speak in January of 2002

6    before the American Bankers Association

7    trust conference on the subject of money

8    laundering.  And Mr. Monahan did speak and

9    that's -- that is the kind of public

10   appearance that all of us are encouraged to

11   make.

12        Q.  When was the last time you brought

13   in any significant business to PwC?

14        A.  I believe 1999.

15        Q.  When in 1999?

16        A.  I don't remember.

17        Q.  And what -- what was the business?

18        A.  It would have been either in the

19   first half of 1999 or in 1998.

20        Q.  And what business was that?

21        A.  There were two pieces of independent

22   business that I remember.

23        One was a lawyer here in Washington

24   who is representing the American Indians in

25   a lawsuit against the Department of the

```
1    Interior and was looking for expert help in

2    support of that litigation.

3        Q.  What was that name of that lawyer?

4        A.  Dennis Gingold, G-i-n-g-o-l-d.

5            And I put him in touch with the

6    people in our firm who could provide that

7    litigation, and I believe that our

8    engagement resulted in several million

9    dollars in business.

10        Q.  That was in 1998?

11        A.  I think so.

12            MR. ROSE:  I'm sorry.  It's calendar

13    year -- I think he's saying calendar year

14    '98 but PW fiscal year '99 that starts in

15    July.

16            BY MR. NELSON:

17        Q.  That was the last significant piece

18    of business that you brought into the firm?

19        A.  I don't believe I said that.

20        Q.  Okay.  What was?

21        A.  I believe it was -- there were

22    several pieces of business along about that

23    time frame.

24            I also introduced -- I got a request

25    from another lawyer with whom I had been to
```

1    professional meetings for assistance for a

2    client of his that was, as I remember, a

3    quasi government agency.  Whether it was

4    part of the government or not, its role was

5    to allocate moneys paid by telephone

6    companies for communication systems for

7    rural hospitals.  And they needed some

8    expertise, and I put them in touch with the

9    proper people at PwC.  And my memory is that

10   that turned into a $6 million engagement.

11          Then, in addition, I was

12   responsible, again, in approximately that

13   time frame --

14          Q.  Again, this time frame is a 1998,

15   fiscal 1999?

16          A.  -- more or less, yes -- for bringing

17   in business as follow-on engagements.

18          One was at a foreign bank in

19   New York where a number of us had spent a

20   good deal of time, and I believe Mr. Bench

21   gave me credit for assisting in bringing in

22   an $8 million piece of follow-on work.

23          Q.  What was the name of the client?

24          A.  Asahi Bank.  A-s-a-h-i.

25          And I also brought in some follow-on

1    work -- but I don't remember now in what

2    amount -- at what was then Norwest,

3    N-o-r-w-e-s-t, Mortgage Company.

4        Q.  Also in this time frame?

5        A.  Yes.

6        Q.  Nothing more recent than that,

7    correct?

8            MR. ROSE:  I'm sorry?

9            MR. NELSON:  I said:  Nothing more

10   recent.  Is that correct?

11           THE WITNESS:  I believe that's

12   correct.

13           BY MR. NELSON:

14       Q.  Apart from attending bar meetings,

15   in a more recent time frame -- we're talking

16   about a 12-month period beginning March or

17   April of 2001 -- did you do anything else to

18   network among lawyers?

19       A.  I believe I had some presentations,

20   speaking engagements, during that 12-month

21   period.  I'm certain that I remember one --

22   it was a program sponsored by PwC itself for

23   mortgage bankers.

24       Q.  I think you mentioned Gary Welsh the

25   last time.  You mentioned him again this

1      to him.

2           Q.   You personally handed it to him?

3           A.   Yes, sir.

4           Q.   I believe you testified that

5      Mr. Bench's reaction was to express

6      disappointment.  Is that right?

7           A.   That is correct.

8           Q.   And you didn't recall anything else

9      that he said.  Is that right?

10          A.   I believe that's right, yes.

11          Q.   And you still don't recall anything

12     else?

13          A.   That's right.

14          Q.   Did you discuss on any subsequent

15     occasion -- discuss with Mr. Bench your

16     charge of discrimination?

17          A.   No.

18          Q.   Do you believe that Mr. Bench

19     discriminated against you by not

20     recommending you as a candidate for

21     promotion to partner?

22          A.   No.

23          Q.   Do you understand that Mr. Bench's

24     recommendation was necessary for you to be

25     considered as a candidate for promotion to

1    partner?

2         A.   I do.

3         Q.   And it is correct that Mr. Bench was

4    your immediate supervisor throughout your

5    tenor as an employee at PwC?  Is that right?

6         A.   That is correct.

7              MR. ROSE:  Still is.

8              THE WITNESS:  Pardon.

9              MR. ROSE:  Still is.

10             THE WITNESS:  That is correct.  Was

11   and still is.

12             BY MR. NELSON:

13        Q.   Did it ever occur to you that for

14   reasons unrelated to your age, you did not

15   meet the qualifications for admission as a

16   partner?

17        A.   Yes.

18        Q.   And what qualifications do you think

19   you may have fallen short on?

20        A.   I'm not sure that there are any.

21   You asked if that possibility occurred to

22   me, and yes, it did.  I suppose that will

23   wind up being the subject matter of this

24   litigation.

25        Q.   Well, do you believe there are any

418

1       A.   Probably 1993 or 1994.

2       Q.   Do you still believe that you're

3   qualified for partner?

4       A.   Yes.

5       Q.   Is it correct that you were employed

6   by PwC at age 49?

7       A.   That is correct.

8       Q.   Is it also correct that you did not

9   express an interest in being considered for

10  partner until you were age 61 or 62?

11      A.   Sixty-one.

12      Q.   Sixty one?

13      A.   Sixty-one.

14      Q.   No expression of interest before

15  then.  Is that correct?

16      A.   That is correct.

17      Q.   And is it also correct that you did

18  not express such an interest until your

19  request for early retirement with medical

20  benefits was rejected?

21      A.   That is correct.

22      Q.   Is it correct that you spent

23  virtually the entire decade of the 1980s

24  engaged in the private practice of law?

25      A.   That is correct.

419

1        Q.  Was your career as a private

2    practitioner financially successful?

3        A.  Some years, yes.  Some years, no.

4    Overall not as successful as I would have

5    liked it to be.

6        Q.  You were asked to leave two law

7    firms.  Is that correct?

8        A.  That is correct.

9        Q.  Baker and Hostetler and what was the

10   name of the other firm?

11       A.  Zuckert, Scoutt & Rasenberger.

12       Q.  Is it correct that your

13   compensation, at the conclusion of your

14   career as a private practitioner in 1989,

15   was lower than it was in the early part of

16   that decade?

17       A.  It was lower than it was in some

18   years in the early part of the decade, I

19   believe.  And we undertook last time to

20   provide you a year-by year compensation

21   figures and I believe I have the records

22   from which I can do that and we will do

23   that.

24       Q.  Okay.  Are you going to provide the

25   records or are these redacted records which

1        A.  I do.

2        Q.  Does the SEC have independence

3    requirements for employees and partners of

4    firms such as PwC that are engaged in an

5    audit business?

6        A.  It does.

7        Q.  And does the American Institute of

8    Certified Public Accountants also have

9    independence requirements for employees and

10   partners of audit firms?

11       A.  It does.

12       Q.  Generally, what is your

13   understanding of the purposes of

14   independence requirements?

15       A.  Independence, as used in the

16   accounting profession and by the SEC and the

17   AICPA means that the firm that audits the

18   financial statement should be financially

19   independent -- that the accountant who

20   audits the financial statements should be

21   financially independent from the company

22   whose books are being audited.  That's the

23   simple way of stating it.  From there on, it

24   goes into a number of different details.

25       Q.  Has PwC developed its own

1          Q.  And did you disseminate that chart

2     to the individuals to whom you were

3     assigning your managerial duties?

4          A.  I did.

5               MR. NELSON:  I'd like to have marked

6     as Defendants' Exhibit 30, an e-mail from

7     Mr. Murphy dated March 20, 2000.  It is a

8     redacted version which is Bates stamped

9     PwC 00932 to PwC 00934.

10               (Defendants' Exhibit No. 30 was

11     marked for identification.)

12               BY MR. NELSON:

13          Q.  Mr. Murphy, can you identify

14     Defendants' Exhibit 30?

15          A.  It's an e-mail that I wrote to the

16     persons who temporarily assumed the

17     managerial duties that I relinquished on

18     December 27, 1999.

19          Q.  And did you send this e-mail to each

20     of the addressees on March --

21          A.  Yes.

22          Q.  -- 20th, 2000.

23          A.  Yes.

24          Q.  Could you as briefly as possible

25     identify each of the addressees on this

1    e-mail?

2         A.   Albert Tolzey (phonetic) was then a

3    director in RAS.

4              John Donovan, I believe we already

5    identified as a senior advisor.

6              Gary Welsh is a director in RAS.

7              And that's who it was addressed to.

8    There are several people who got copies.

9         Q.   And what about the cc's, if you

10   could please identify those by position?

11        A.   David Albright was then, I believe,

12   a partner.  I'm not sure.  He may have been

13   a director.

14             Bob Bench was the managing director

15   of RAS.

16             Jeff Lavine, a director of RAS.

17             And Bill Lewis, a partner at RAS.

18        Q.   The subject of your e-mail is,

19   quote, unquote, managerial duties and the

20   first three sentences read as follows:

21   Thank each of you for taking over the

22   managerial duties that I relinquished on

23   December 27th, 1999 in an attempt to avoid

24   independence difficulties with the ownership

25   of blank mutual funds.  Attached is a

1    summary I've prepared of the burdensome

2    duties of which you've relieved me.  Please

3    review its accuracy and let me know if I

4    failed to describe anything correctly, close

5    quote.

6          Did you, in fact, relinquish your

7    managerial duties on December 27, 1999?

8          A.  Yes.

9          Q.  Did you receive any responses to

10   this e-mail dated March 20, 2000?

11         A.  I don't believe so.  And I see that

12   the rest of this memo on the exhibit defines

13   the managerial position from the AICPA rules

14   and I was attempting to conform to that

15   definition.  As I turned out, PwC had a

16   different definition.

17         MR. NELSON:  Can we now have marked

18   as Defendants' Exhibit 31, a copy of an

19   e-mail from Mr. Murphy to Darlene Shea dated

20   March 24, 2000.  This is also a redacted

21   version that is Bates stamped PwC 1322 --

22   let me just go off the record for one

23   minute.

24         (Discussion off the record.)

25         MR. ROSE:  It's just one page and

1      it's Bates stamped PwC 01322.

2              (Defendants' Exhibit No. 31 was

3      marked for identification.)

4              BY MR. NELSON:

5          Q.   Mr. Murphy, can you identify

6      Defendants' Exhibit 31?

7          A.   It's an e-mail with -- dated

8      March 24, 2000 from me to Darlene Shea.

9          Q.   Did you prepare --

10         A.   And there were several attachments

11     to it, but they are not attached to this

12     exhibit.

13         Q.   Where are the attachments reflected

14     on this e-mail?

15         A.   Well, at the bottom of this page it

16     says, forwarded by Westbrook Murphy, a memo

17     to me from Alan Young and I believe there

18     may have been several more that were

19     originally attached.

20         Q.   Did you prepare and send this e-mail

21     on or about March 24th, 2000?

22         A.   I did.

23         Q.   Had you concluded based on the

24     advice you had received that, quote, simply

25     refraining from exercising managerial duties

510

1    was unlikely to resolve independence issues?

2       A.   That is correct.

3       Q.   Referring to the third paragraph of

4    your e-mail, you had been advised by the

5    office of general counsel that, quote, the

6    firm interprets the term single quote,

7    managerial position, close single quote, to

8    include anybody with the status of single

9    quote, manager, close single quote, or

10   above, close quote.  Is that correct?

11      A.   I'm sorry.  What is the question?

12   Is the question did you read it correctly?

13      Q.   Had you been given that advice?

14      A.   I had been given that advice and I

15   attached it and that's what I was referring

16   to when I testified about Exhibit 30 that

17   has a functional definition of manager or

18   managerial duties and I said that PwC had a

19   different definition and its definition

20   is -- simply looks to the title of the job.

21      Q.   And what was your position or status

22   at PwC at this time?

23      A.   I was director, which would be

24   included in the phrase manager or above.

25      Q.   So director was above the status of

1   manager.  Is that correct?

2        A.   That is correct.

3        Q.   How many levels above?

4        A.   I believe the positions are in

5   ascending order, manager, senior manager,

6   director, managing director.

7        Q.   Is it correct that the last

8   paragraph of your e-mail to Ms. Shea

9   requests a demotion?

10       A.   No.

11       Q.   What does it request?

12       A.   It asks, are there positions or

13  classifications available that might

14  alleviate the independence issues that were

15  associated with the name or manager or

16  above.

17       Q.   So those positions would necessarily

18  be below the position of manager, would they

19  not?

20       A.   I do not know.  I do not know all of

21  the positions that the firm has.

22       Q.   You had been advised by Mr. Alan,

23  of the general counsel's office that the

24  firm interprets the term managerial position

25  to include anyone with the status of manager

512

1    or above.  Is that correct?

2        A.  That is correct.

3        Q.  And you were director two levels

4    above manager.  Is that right?

5        A.  That is also right.

6        Q.  Were you requesting of Ms. Shea that

7    you be reassigned to a position below the

8    status of manager?

9        A.  I wasn't.

10        MR. ROSE:  Asked and answered twice.

11    Go ahead.

12        THE WITNESS:  I was not.  I was

13    requesting information.

14        BY MR. NELSON:

15        Q.  Well, did you state in your e-mail

16    to Ms. Shea, quote, the appropriate solution

17    may well be to reassign me to a position

18    that does not have a status of manager or

19    above and then ask of Ms. Shea, what

20    positions or classifications are available

21    to achieve that purpose?  Did you write

22    that?

23        A.  I did.

24        Q.  And did you communicate that to

25    Ms. Shea?

1       A.   I did.

2       Q.   Did Ms. Shea or anyone else respond

3   to the inquiry in the last paragraph of your

4   e-mail?

5       A.   Yes.

6       Q.   What was the response?

7       A.   Ms. Shea, I believe, called me -- I

8   don't think it was an e-mail -- and she said

9   that no such positions existed.

10      Q.   Were no positions at PwC below the

11  status of manager?

12           MR. ROSE:   That's not what he said.

13           THE WITNESS:   The question is, what

14  positions or classifications are available

15  that might achieve that purpose.

16           BY MR. NELSON:

17      Q.   Yes?

18      A.   And I believe she told me there were

19  none available.

20      Q.   There were none available, meaning

21  that there were no openings in any such

22  positions?

23      A.   Well, there were surely -- there

24  were none available at my present salary or

25  anything like my present salary -- my then

1    present salary.

2         Q.  Well, where did you --

3         A.  In effect, she thought I was nuts.

4         Q.  Where did you request to maintain

5    your present salary?  Where is that

6    requested?

7         A.  I don't believe that's in the memo.

8         Q.  That was not --

9         A.  After I -- after we discussed it, I

10   agreed with her.

11        Q.  Did she tell you that there were

12   positions available but the salary would be

13   lower?

14        A.  I don't think she said that.

15        Q.  By the way, Mr. Young is in the

16   office of general counsel at PwC?

17        A.  That is correct.

18        Q.  Did you memorialize this

19   conversation with Ms. Shea in any way?

20        A.  Not that I remember.

21        Q.  You didn't tape-record it or

22   anything?

23        A.  No.

24        Q.  Did you prepare a memorandum to the

25   file with respect to that?

1      A.  No.  So far as I was concerned that

2   was the end of that issue or that question.

3      Q.  So you were told that there were no

4   positions available to you below the level

5   of manager.  Is that right?

6      A.  Right.

7      Q.  I believe you testified at the last

8   session of your deposition that you also

9   requested or proposed that you become a

10  part-time employee to avoid these

11  independence difficulties.  Do you recall

12  that testimony?

13     A.  No.  I don't believe that I

14  testified that -- I don't believe I

15  testified that way.  Among other -- I'm sure

16  I didn't testify that way because I don't

17  believe becoming a part-time employee

18  affects the applicability of the

19  independence standards.

20     Q.  Did you ever make a request or

21  suggestion or proposal that you become a

22  part-time employee for any reason?

23     A.  When I talked to Mr. Bench in

24  December of 2000 about the possibility of

25  retiring and continuing health benefits, he

545

1            UNITED STATES DISTRICT COURT

2               DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - - - - - x

C. WESTBROOK MURPHY                    :

4                                       :

        and                             :

5                                       :

HAROLD SCHULER,                        :

6                                       :

            Plaintiffs,                 :

7                                       :

        vs.                             :   CASE NUMBER

8                                       :

PRICEWATERHOUSECOOPERS, LLP, et al.,   :   1:02CV00982

9                                       :

            Defendants.                 :

10  - - - - - - - - - - - - - - - - - x   Volume 3

11                      Washington, D.C.

12                      Thursday, May 15, 2003

13        Continued Deposition of C. WESTBROOK

14  MURPHY, a witness herein, called for examination by

15  counsel for Defendants in the above-entitled matter,

16  pursuant to notice, the witness being duly sworn by

17  KAREN YOUNG, a Notary Public in and for the District

18  of Columbia, taken at the offices of Winston &

19  Strawn, 1400 L Street, N.W., Washington, D.C., at

20  1:09 p.m. on Thursday, May 15, 2003, and the

21  proceedings being taken down by Stenotype by KAREN

22  YOUNG, and transcribed under her direction.

23

24

25

546

1    APPEARANCES:

2        On Behalf of the Plaintiffs:

3            DAVID L. ROSE, ESQ.

4            Rose & Rose, P.C.

5            1320 19th Street, N.W., Suite 601

6            Washington, D.C. 20036

7            (202) 331-8555

8

9        On Behalf of the Defendants:

10           ERIC M. NELSON, ESQ.

11           Winston & Strawn

12           200 Park Avenue

13           New York, NY 10166-4193

14           (212) 294-2646

15

16

17

18

19

20

21

22

23

24

25

547

1

2                    C  O  N  T  E  N  T  S

3    THE WITNESS:

4    C. WESTBROOK MURPHY

5           By Mr. Nelson ................... 549

6           By Mr. Rose ..................... 663

7           By Mr. Nelson ................... 671

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

548

1                        E X H I B I T S

2   DEFENDANTS' EXHIBIT NO.                           PAGE NO.

3   33      Transcript of National Press Club  ....... 566

4           speech

5   34      Employment income, 1977 - 2002 .......... 583

6   35      Murphy memo to file, 2/1/02 ............. 596

7   36      SEC Press Release ....................... 611

8   37      SEC Order ............................... 616

9   38      Murphy memo to Mooney, 7/8/99 ........... 620

10  39      Murphy e-mail to Bench, 12/27/99 ........ 626

11

12

13  PLAINTIFFS' EXHIBIT NO.                          PAGE NO.

14  21      Revenue information for RAS ............. 663

15                       -  -  -

16

17

18

19

20

21

22

23

24

25

549

```
 1                    P R O C E E D I N G S

 2    Whereupon,

 3                   C. WESTBROOK MURPHY,

 4                   residing at 400 Fairlea Drive, Edgewater,

 5                   Maryland, called for

 6                   examination by counsel for

 7                   Defendants and having been duly

 8                   sworn by the Notary Public, was examined

 9                   and testified as follows:

10                         -   -   -

11    EXAMINATION BY COUNSEL FOR DEFENDANTS (RESUMED)

12                   BY MR. NELSON:

13        Q.    Mr. Murphy, is it correct that you are an

14    experienced attorney and an experienced litigator?

15        A.    Yes.

16        Q.    Is it correct that as an attorney, you

17    have performed certain legal services on your own

18    behalf in connection with this case?

19                   MR. ROSE:  I object to this line of

20    questions, but you may answer the first one.

21        A.    It depends on how you define legal

22    services.  I guess I can't answer the question

23    without a more precise definition.

24        Q.    You have conducted some legal research and

25    drafted some legal memoranda supporting your claims?
```

1    1985.

2         A.     I believe it's the exact amount.

3         Q.     In 1989, you were employed by Price

4    Waterhouse for seven months from June 1 through

5    December 31; is that correct?

6         A.     That's correct.

7         Q.     Is it correct that your income from Price

8    Waterhouse for that seven-month period in 1989 was

9    $70,000?

10        A.     I believe that's correct, Counsel.

11        Q.     Is it also correct that your total income

12   for the first five months of 1989 as a solo

13   practitioner was $7,933?

14        A.     I believe that was the net from that, yes.

15        Q.     And is it correct that your annualized

16   income as a solo practitioner in 1989 was less than

17   $20,000?

18        A.     I don't know what you mean by annualized.

19   I didn't work for the entire year as a solo

20   practitioner.

21        Q.     Well --

22        A.     If you mean do you multiply $7,900 times

23   -- what would that come out to, the math is whatever

24   the math is.

25        Q.     Well, I'll represent to you that that

```
1    comes out to be less than $20,000 a year, but I
2    guess anyone can do the math.
3              MR. ROSE:  We hope so.
4              BY MR. NELSON:
5         Q.    Is it correct that you were earning less
6    than 420,000 a year as -- when you became employed
7    by Price Waterhouse in 1989 at a salary of $120,000
8    a year?
9         A.    No, the previous year I had earned
10   $67,000, and -- plus, and I don't know what my
11   earnings would have been for 1989 had I continued in
12   private employment -- excuse me, in -- as a solo
13   practitioner.
14        Q.    Okay.  But is it correct that for the
15   first five months of 1989, before you joined PW,
16   your total income was less than $8,000?
17        A.    The total net income, so far as I know,
18   that's correct.
19        Q.    I believe you testified that your present
20   salary is $252,000 a year; is that correct?
21        A.    That's correct.
22        Q.    Is it correct that your most recent salary
23   increase at PwC was approximately $20,000 a year?
24        A.    No.
25        Q.    What was your most recent salary increase?
```

604

1     amount permitted by law?

2          A.     No.

3          Q.     What is your practice?

4          A.     To contribute the maximum amount that

5     would be currently tax deductible.

6          Q.     Is it correct that retirement plan

7     contributions come from pre-tax dollars and that

8     income taxes are deferred on those contributions?

9          A.     For the ones that I make, I believe that's

10    correct.

11         Q.     And is it correct that that is an

12    advantage?

13         A.     That's an advantage of a tax-deferred

14    retirement plan, yes.

15         Q.     Well, from a financial or tax perspective,

16    do you consider it to be advantageous to make

17    tax-deferred contributions to retirement plans?

18         A.     Yes.

19         Q.     The larger the permissible tax-deferred

20    contribution, the better; is that right?

21         A.     That's what I believe.

22         Q.     Referring to paragraph numbered 4 of

23    Defendants' Exhibit 35, is it correct that the

24    amounts deducted from compensation for contributions

25    to partner -- to the partner retirement plan are tax

605

1    deferred?

2        A.    I do not know.

3        Q.    You have no knowledge?

4        A.    That is correct.

5        Q.    Did you ever make an inquiry?

6        A.    No.

7        Q.    Does it matter to you?

8        A.    It might.

9        Q.    Under what circumstances might it?

10       A.    It might if we were computing damages for

11   this case.  It might if I was considering becoming a

12   partner, should that offer be extended.

13       Q.    If that offer was to be extended, what

14   would your response be?

15       A.    If you'd like to sign me up this

16   afternoon, I'll be glad to.

17       Q.    Then you would accept a partnership

18   without any inquiry?

19       A.    No.  I would want to inquire.

20       Q.    What would you want to inquire about?

21       A.    I would want to inquire about what the

22   compensation would be, what the benefits would be.

23       Q.    Anything else?

24       A.    Well, I'd like to read the partnership

25   agreement, which most partners have not, but I guess

606

1    I have, so I don't need to inquire about that.  I

2    would like to see what the firm's financials look

3    like.

4        Q.    Well, did you make any of those inquiries

5    of Mr. Bench when you told him in March of 2001 that

6    you wanted to be a partner?

7        A.    No.

8        Q.    Why not?

9        A.    It would have been absolutely futile to do

10    so.

11        Q.    To make an inquiry?

12        A.    Of Mr. Bench in March of 2001, yes.

13        Q.    Why is that?

14        A.    There was and still is no chance of my

15    becoming a partner unless this lawsuit is

16    successful.

17        Q.    Didn't you ask Mr. Bench to -- did you

18    advise Mr. Bench that you wanted to be considered

19    for partnership?

20        A.    That's absolutely correct.

21        Q.    And did you make that inquiry for purposes

22    of settlement as opposed to any desire to become a

23    partner?

24        A.    That is incorrect.

25        Q.    What is correct?

607

1     A.     What is correct is I told Mr. Bench in

2     March of 2001 that I wished to be considered for

3     partner.

4     Q.     But you hadn't made any -- reached any

5     conclusion that you would accept that status; is

6     that right?

7     A.     I suppose that that is right and that

8     would be -- put me in exactly the same situation as

9     every other partner who is offered a partnership.  I

10    don't think -- I think the decision on whether

11    somebody will be offered a partnership is made

12    before that decision is accepted, and it would be

13    during the time between the decision, when the

14    decision is made and announced and when it becomes

15    effective that the candidate would have an

16    opportunity to make the kind of due diligence

17    inquiries that you may be suggesting.

18    Q.     Well, are those the types of inquiries

19    that Mr. Welsh made when he was asked whether he

20    wanted to be considered for partner?

21    A.     He made some of those inquiries.

22    Q.     And you got the benefit of the information

23    that Mr. Welsh received; is that right?

24    A.     That is true.

25    Q.     What other inquiries other than the ones

608

1    that Mr. Welsh made would you make?

2        A.    What the firm's financial condition is,

3    what income -- what my compensation would be as a

4    partner, what the benefits are, including the

5    retirement plan and how they are funded, whether the

6    firm would contemplate any change or what changes

7    they might contemplate in work assignments.

8        Q.    Well, did you not think it prudent to make

9    those inquiries before filing a charge --

10            MR. ROSE:  Asked and answered.

11            BY MR. NELSON:

12        Q.    -- and a complaint in federal district

13    court?

14        A.    I think it would have been futile to make

15    those inquiries.  I don't know -- I expect one of

16    the issues we may have in this litigation is the

17    extent to which we're able to get financial --

18    plaintiffs are able to get financial information

19    from PwC.

20        Q.    Referring to paragraph number 2 on the top

21    of page 2, is there a typographical error of some

22    sort in the first sentence of that paragraph?

23        A.    I believe there is, yes.

24        Q.    And how should it read?

25        A.    In the second line, after the

617

1                                       identification.)

2                    BY MR. NELSON:

3          Q.      Can you identify Defendants' Exhibit 37?

4          A.      It appears to be a copy of an order issued

5     by the U.S. Securities and Exchange Commission on

6     January 14, 1997 concerning the failure of PwC to

7     comply with SEC independence rules, and I believe

8     that this would be -- that this Exhibit 37 would be

9     the January 1999 order that is referred to in the

10    press release that's been marked Exhibit 36.

11         Q.      Is this the order that you obtained at

12    some point in 1999?

13         A.      That is correct.

14         Q.      And did you review it carefully?

15         A.      I'm sure that I read it all.

16         Q.      Referring to page 6, referring to the

17    order which begins in the middle of the page --

18         A.      Yes.

19         Q.      Specifically the paragraph A, did you

20    understand that PwC was censured by the SEC for

21    independence violations?

22         A.      That's what Exhibit 37 says.

23         Q.      Referring to paragraph B, did you

24    understand that PwC was ordered by the SEC to take

25    various measures to provide reasonable assurance

618

1    that PwC was complying with rules requiring the

2    public accounting firms be independent in fact and

3    appearance of their audit clients?

4         A.    That again is what Rule 37 -- I'm sorry,

5    what Exhibit 37 says.

6         Q.    And did you understand that to be the case

7    when you reviewed this order?

8         A.    I have no reason to question what the

9    order says.

10        Q.    Referring to paragraph 3 on page 8, that's

11   Bates 01032, that paragraph of the order refers to

12   managers.  Do you see that?  It's on page 01032,

13   page 8.  It begins, "Requiring that no manager hold

14   securities of any public audit client of the firm."

15   Do you see that?

16        A.    Yes.

17        Q.    Did you understand that you were a manager

18   within the meaning of this provision?

19        A.    Yes.

20        Q.    Did you --

21        A.    Excuse me.  Counsel, the provision we're

22   referring to is 3 -- paragraph 3A3.

23        Q.    Correct, but that appears as paragraph 3

24   on page 8, which is Bates numbered 01032; is that

25   right?

619

1      A.      That's correct.

2      Q.      Did you understand that the SEC ordered

3  PwC to take measures, quote, "Requiring that no

4  manager hold securities of any public audit client

5  of the firm in contravention of the applicable rules

6  and regulations respecting professional

7  independence"?

8      A.      That's my understanding, or was my

9  understanding.

10     Q.      Referring to subparagraph 3F, did you

11 understand that those measures would require a

12 manager under certain circumstances to dispose of a

13 security within five business days?

14     A.      Correct.

15     Q.      Referring now to the last page of the SEC

16 order, that's 01035, the first full paragraph on

17 that page, did you understand that PwC was directed

18 to implement new policies and procedures as soon as

19 possible?

20     A.      I'm sorry, Counsel.  I can't find your

21 reference.

22     Q.      Last page, first full paragraph.

23     A.      Oh, first full paragraph.  I'm sorry.

24     Q.      It says, "Such policies and procedures as

25 are set forth shall be implemented as soon as

620

1    possible."

2        A.    Correct, yes, that's what the order says.

3        Q.    Did PwC thereafter implement new

4    independence policies and procedures --

5        A.    Yes.

6        Q.    -- in accordance with this order?

7        A.    Well, they implemented new policies and

8    procedures.  Not all of what they implemented was

9    required by this order.

10       Q.    Was it in response to this order as far as

11   you know?

12       A.    Not all of what they included in the new

13   policies responded to this order.

14       Q.    Were they precipitated by this order?

15       A.    I think this order was probably the

16   occasion for -- in fact -- for issuing new policies

17   and procedures.

18            MR. NELSON:  Can we have marked as

19   Defendants' Exhibit 38 documents Bates numbered

20   01036 through 01065?

21                        (Defendants' Exhibit No.

22                         38 was marked for

23                         identification.)

24            BY MR. NELSON:

25       Q.    Mr. Murphy, I show you Defendants' Exhibit

1     A.     That was my belief.

2     Q.     Were you concerned about how PwC's new

3     independence policies would affect you personally?

4     A.     Yes.

5     Q.     What was your concern about the effect of

6     these independence policies on you personally?

7     A.     I was lucky enough to have been over the

8     years financially able to invest in stocks issued by

9     a number of U.S. companies, some of which were

10     clients of PwC but none of which I had anything to

11     do with in the sense of auditing and none of which

12     were audited to the best of my knowledge then by the

13     PwC office in Washington, D.C.

14          The expansion of the rules could have

15     required divestiture of a substantial number of

16     security.  The firm I believe after I sent this memo

17     changed its policy to grandfather in an existing

18     holding of security that was, A, permissible under

19     the SEC and AICPA rules, and B, was owned by the

20     employee on the date in June 1999 that PwC issued

21     its new rules.  That substantially ameliorated the

22     difficulty as far as I was concerned, the

23     grandfather provision.

24     Q.     I asked you what was your concern at this

25     time, namely in 1999.

1    Price audits, and therefore, the holdings would be

2    permissible.

3              The implication of Mr. Walls' memo was

4    that PwC seemed very likely to change its mind and

5    determined that Washington, D.C. was part of -- was

6    an office that performed a substantial part of the

7    T. Rowe Price audit, and if that was so, then the

8    holding of these securities by my wife would no

9    longer be permissible under the AICPA or the SEC

10   rules as they then existed.

11        Q.    And it would not be grandfathered; is that

12   correct?

13        A.    Yeah, that is correct, PwC had no ability

14   to grandfather a holding that was in violation of

15   either the SEC or the AICPA.  What PwC did have the

16   ability to do was to interpret those rules and apply

17   them to employees at Price Waterhouse.

18        Q.    Referring to the third paragraph of your

19   e-mail to Mr. Bench, Defendants' Exhibit 39, did you

20   advise Mr. Bench that your sale of T. Rowe Price

21   mutual funds would create significant difficulty to

22   you personally?

23        A.    What the memo says, the first sentence of

24   that paragraph is, quote, "Jim's heads-up creates

25   significant difficulty," period.

Case 1:05-cv-01054-RJL    Document 64-2    Filed 01/15/2008    Page 123 of 198

1    Q.    And that's difficulty for you and your

2    wife; is that right?

3    A.    That is a way of introducing the rest of

4    that paragraph, which explains what I think I have

5    just explained, that she -- my wife owns T. Rowe

6    Price securities that would lose their

7    grandfathering exemption if indeed the Washington,

8    D.C. office was determined to be a performing office

9    in the audit of the T. Rowe Price mutual funds.

10    Q.    Is there a typo in the second sentence of

11    the third paragraph or a word missing?  It begins,

12    "Cindy and for several years have."  Did you mean to

13    say Cindy and I?

14    A.    I believe the "and" is incorrect.  Yes,

15    there is a typo, and I believe it's the "and."  I

16    believe that these mutual funds were held

17    exclusively in her name.

18    Q.    Is it correct that whether it was you or

19    your wife, that the ownership of shares in seven T.

20    Rowe Price mutual funds then had an aggregate net

21    asset value of $240,000, including unrealized gains

22    of $90,000?

23    A.    Yes, and I'd like to now, having read that

24    paragraph, it says, and I'm sure it's correct, that

25    one of the funds my wife and I own jointly.  The

SPHERION DEPOSITION SERVICES
(212) 490-3430

633

1    rest were in her name only.

2         Q.     But the total net asset value of you and

3    your wife's holdings in T. Rowe Price mutual funds

4    was $240,000; is that correct?

5         A.     Approximately, yes.

6         Q.     And that included unrealized gains of

7    $90,000?

8         A.     Approximately, yes.

9         Q.     Is it correct that you advised Mr. Bench

10   that $240,000 was not material to you and your

11   wife's combined net worth?

12        A.     That is correct.

13        Q.     And that was using a five percent standard

14   of materiality?

15        A.     That's correct.

16        Q.     Is it correct that you were thereby

17   advising Mr. Bench that you had a combined net worth

18   in excess of $4.8 million?

19        A.     Yes.

20        Q.     Why did you --

21        A.     Well, at least to the extent that net

22   worth was defined under the AICPA rules and the SEC

23   rules, and I don't remember the ins and outs of that

24   at the moment.

25        Q.     Well, but you were advising Mr. Bench by

634

1     making the statements in the third paragraph that

2     you had a combined net worth in excess of $4.8

3     million; is that correct?

4          A.     Yes.

5          Q.     Why did you advise Mr. Bench that you had

6     a combined net worth in excess of 4.8 million?

7          A.     Well, that's not what the memo says.  The

8     memo talks about the five percent -- talks about,

9     quote, "The five percent of materiality that applies

10    under the independence rules to some types of

11    investments," and that was to give -- end quote.

12    That was to give Mr. Bench and whoever else might be

13    involved an indication as to the size of this

14    investment compared to our net worth, which is a

15    concept that shows up with some regularity in the

16    independence rules.

17         Q.     Well, why was it important to include

18    these dollar amounts in your memo to Mr. Bench if it

19    was important?

20         A.     I believe that Mr. Bench should be

21    informed the magnitude of what this issue would be

22    so far as my wife and I were concerned, and I had --

23    this was not the only conversation that Mr. Bench

24    and I had about the independence rules.  We had had

25    a number of conversations during the fall of 1999

636

1          A.     I believe that's correct.

2          Q.     And would that have been possibly subject

3     to capital gains tax?

4          A.     I'm sure it would have.

5          Q.     Is it correct that you asked Mr. Bench to

6     request that PwC make certain changes in its

7     proposed independence policies so that you could

8     avoid having to sell your T. Rowe Price mutual

9     funds?

10         A.     In the application of the policies, yes.

11         Q.     And did you also suggest that you

12    relinquish your managerial duties pending a

13    resolution of your request that PwC change certain

14    of its independence policies?

15         A.     Yes.

16         Q.     Did you do that to avoid having to sell

17    your T. Rowe Price investments?

18         A.     That was one of the reasons.

19         Q.     What were the other reasons?

20         A.     To avoid any question arising that while

21    the discussion that I hoped would ensue about the

22    interpretation of the word "office," or as PwC was

23    then using, "Washington cluster," that during

24    whatever time it would take to discuss that, there

25    could be no question as to whether I was exercising

1                    (Recessed at 4:04 p.m.)

2                    (Reconvened at 4:07 p.m.)

3              BY MR. NELSON:

4        Q.     I want to go back to Exhibit 38.

5    Mr. Murphy, do you have Defendants' Exhibit 38 in

6    front of you?

7        A.     Yes.

8        Q.     Can you identify the e-mail and attached

9    memo that is Bates stamped 01036 through 01043?

10       A.     Yes, I'm sorry.  I thought I had done that

11   once already.

12       Q.     We looked at the -- your memorandum to the

13   file at the end of this exhibit.

14       A.     Well, I also identified the memo that

15   begins on 01037 as one that I had written and it's

16   addressed to Bill Mooney on July 8, 1999, and this

17   e-mail transmits the July 8 memo to Mr. Mooney with

18   copies to others.

19       Q.     And did you prepare and send this e-mail

20   and memo --

21       A.     Yes, I did.

22       Q.     -- in July 1999?

23       A.     Yes, I did.

24       Q.     Who is Bill Mooney?

25       A.     Bill Mooney was then in charge of the

642

1    independence function within PwC, and it was my

2    understanding that he was responsible for designing

3    and implementing the independence policies that

4    would respond to the SEC and Force 1 order that's

5    been identified as Defendants' Exhibit 37.

6        Q.    Are you finished with this?  I want you to

7    focus on Exhibit 38 if you don't mind.

8        A.    May I look at that just a minute?

9        Q.    Yeah.  Just for the record, Mr. Murphy has

10   been looking at other exhibits and he'd like to look

11   at Defendants' Exhibit 13.

12       A.    Thank you.

13       Q.    Did you want to say something about

14   Defendants' Exhibit 13?

15       A.    No.

16       Q.    Did you record and enter your time for the

17   preparation of your memo to Mr. Mooney regarding

18   independence policies?

19       A.    I'm sure that I did.

20       Q.    Were you asked by anyone at PwC to prepare

21   this memo?

22       A.    I'm not certain.  Some of my colleagues in

23   the Regulatory Advisory Services were also greatly

24   disturbed by the proposed expansion of the

25   independence rules.  I guess at this point, it was

1     that right?

2          A.     Yes.

3          Q.     Referring to the second full paragraph on

4     page 6 that's 01042, you state in the second

5     sentence of that paragraph that, quote, "Imposition

6     of proposed expansion of the independence

7     requirements" --

8          A.     I'm sorry, Counsel.

9                 MR. ROSE:  We're not on the same page.

10                THE WITNESS:  What page are we on?

11                MR. ROSE:  1042?  Is it Bates stamped

12    1042?

13                MR. NELSON:  Yes, it's 1042 and it's the

14    second sentence of the second full paragraph, the

15    sentence that begins, "Suffice it to say" --

16                MR. ROSE:  That's the third sentence I

17    think.

18                BY MR. NELSON:

19         Q.     I'm sorry, it is the third sentence of the

20    second full paragraph.

21         A.     I'm sorry.  I'm still not with you.

22                MR. ROSE:  "Suffice it to say."  Right

23    here.

24                BY MR. NELSON:

25         Q.     It's the paragraph in which you state,

1    quote, "Imposition of the proposed expansion of the

2    independence requirements is inconsistent with my

3    remaining with PwC in a managerial position."  Do

4    you see that?

5        A.    Yes.

6        Q.    Were you threatening to resign by that

7    statement?

8        A.    If PwC -- that statement was intended to

9    convey the thought that if the PwC rules remained in

10   effect as they were right then in existence, which

11   was July 9, that I would seriously consider leaving

12   the firm, yes.

13       Q.    So is it correct that you were then

14   contemplating resigning in the event that the

15   proposed expansion of the independence requirements

16   were to be adopted by PwC or not changed?

17       A.    If they were not changed from what I

18   understood to be either proposed or adopted as of

19   July 8, 1999.

20       Q.    You state that, quote, "Many of my

21   colleagues feel likewise."

22       A.    That is correct.

23       Q.    Could you identify those colleagues?

24       A.    John Donovan, Jeff Lavine, Paul Nelson,

25   David Sapin.  I believe that's it.

675

1          A.     My best estimate, and -- it would be half.

2     PwC does have some documentation from which that

3     could be determined.   My best estimate.

4          Q.     Just to be clear, the 1,100 non-chargeable

5     hours you devoted to Sarbanes-Oxley was over what

6     period of time?

7          A.     Nine -- I'm sorry.   Ten months.   The same

8     ten-month period.   That, by the way, does not

9     include the time on the -- that would include --

10    that number, 1,100, would include the regulatory and

11    legislative efforts that I described.   It would not

12    include the efforts at updating the guidance for

13    internal control reporting and attestations by

14    banks.

15         Q.     When did that ten-month period begin?

16         A.     July 1, 2002.

17         Q.     With respect to the legislative and

18    regulatory efforts that you testified to a few

19    moments ago --

20         A.     Yes.

21         Q.     -- working with the other big four

22    accounting firms and with AICPA, generally -- I

23    don't need chapter and verse.   What was your role in

24    those efforts?

25         A.     The work product of the first effort, the

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

ORIGINAL

-------------------------------- )

C. WESTBROOK MURPHY                )

    and                        )

HAROLD SCHULER,                    )

           Plaintiffs,     )

       v.                     )    Case No.

PRICEWATERHOUSECOOPERS, LLP,       )    1:02CV00982

et al.,                            )

          Defendants.      )

-------------------------------- )    VOLUME 4


Deposition of C. WESTBROOK MURPHY

Thursday, November 18, 2004

Washington, D.C.

10:36 a.m.


Pages:  684  through 883


Job No.:  22-46060


Reported by:  Bess A. Avery, RMR

LEGALINK
A WORDWAVE COMPANY

LegaLink Manhattan
420 Lexington Avenue, Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

Deposition of C. WESTBROOK MURPHY, held at the offices of:

Winston & Strawn LLP

1400 L Street, Northwest

Eleventh Floor

Washington, D.C.  20036

(202) 371-5700

Pursuant to agreement, before Bess A. Avery, Registered Merit Reporter and Notary Public in and for the District of Columbia.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    DAVID L. ROSE, ESQUIRE

    ROSE & ROSE, P.C.

    1320 19th Street, Northwest

    Suite 601

    Washington, D.C.  20036

    (202) 331-8555


ON BEHALF OF THE DEFENDANTS:

    ERIC M. NELSON, ESQUIRE

    MARK KONKEL, ESQUIRE

    Winston & Strawn, LLP

    200 Park Avenue

    New York, New York  10166-4193

    (212) 294-2646

```
 1                C. WESTBROOK MURPHY

 2                  C O N T E N T S

 3    EXAMINATION OF C. WESTBROOK MURPHY            PAGE

 4        By Mr. Nelson................................  688

 5

 6                  E X H I B I T S

 7              (Retained by Mr. Nelson.)

 8    DEFENDANT'S DEPOSITION EXHIBIT NUMBER         PAGE

 9    50   E-mail message from Dennis Nally .............. 690

10    51   E-mail from W. Murphy dated February 25, 2000.. 704

11    52   Chart entitled "PwC Work Assignments for ...... 727

12    C. Westbrook Murphy"

13    53   Copies of e-mails ............................ 740

14    54   E-mail from Mr. Murphy ....................... 745

15    55   A series of e-mails .......................... 748

16    56   An e-mail from Mr. Murphy .................... 754

17    57   Letter on Rose & Rose letterhead ............. 758

18    58   An e-mail to PwC U.S. partners and staff ...... 788

19    59   An e-mail .................................... 799

20    60   An e-mail .................................... 807

21    61   An e-mail .................................... 818

22    62   An e-mail .................................... 844

23

24

25
```

```
 1              C. WESTBROOK MURPHY

 2                 P R O C E E D I N G S

 3   Whereupon,

 4              C. WESTBROOK MURPHY,

 5      being first duly sworn, testified as follows:

 6      FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

 7   BY MR. NELSON:

 8      Q    Mr. Murphy, is it correct that PwC's

 9   independence requirements were a matter of personal

10   concern to you insofar as they impacted your

11   investment portfolio and decisions and those of your

12   wife?

13      A    They are a personal concern to everybody who

14   works for PwC.  They apply to all of us.

15      Q    And was it a matter of personal concern to

16   you?

17      A    Of course, it was.

18      Q    All right.  Were the PwC independence

19   requirements especially important to you in light of

20   the size and breadth of your investment portfolio?

21      A    I've got -- no, that question seems to ask

22   for a comparison and I've got no way to do that,

23   because I don't know what importance these other

24   people placed on it.  I do know that the SEC did an

25   investigation -- I'm sorry -- it was an independent
```

C. WESTBROOK MURPHY

1

2     Q     In any event you wrote this message.  Is

3  that right?

4     A     I did write the message.  It is unclear to

5  whom, if anyone, I sent it.

6     Q     Do you recall sending a message of this type

7  to anyone or communicating these statements to anyone

8  in the independence office at any point in time?

9     A     No, I don't.  I remember writing this memo,

10  I do not remember whether I sent it.

11     Q     You state in this message, quote, "In my

12  view the attempt last summer of PricewaterhouseCoopers

13  to extend to managers and directors the independence

14  restrictions that apply to partners not only was

15  misguided but was and is unlawful."

16          Do you see that?

17     A     Yes.

18     Q     What were you referring to?

19     A     Well, for misguided in July of 2000 -- I'm

20  sorry -- July of 1999, shortly after the new rules

21  were promulgated.

22     Q     Which were the rules, the SEC rules?

23     A     No, no.  When PwC voluntarily extended to

24  managers and directors on a prospective basis the same

25  rules that theretofore had applied to partners, I

```
 1                    C. WESTBROOK MURPHY

 2   wrote a memorandum of several pages to the head of the

 3   independence office as it then existed.  It's been

 4   through a lot of changes since then, but the partner

 5   in PwC who was primarily responsible for drafting the

 6   new rules explaining why I thought they were

 7   misguided.

 8            And we surely must have produced that memo

 9   to you.  I wouldn't be surprised that I've testified

10   about it already, but I don't remember.

11       Q    Who was that partner?

12       A    I'm sorry, I don't remember.  If I remember

13   during the day, I will let you know.

14       Q    Why does this e-mail characterize the rule

15   change as an attempt?

16       A    If it's unlawful, then it's an attempt.

17       Q    In other words, it was a rule change that

18   was put in effect, but you considered it to be

19   unlawful and, therefore, not enforceable.  So it was

20   an unsuccessful attempt in your view.  Is that right?

21       A    That was my view.  And I nonetheless tried

22   to comply with it.

23       Q    And it was nonetheless enforced.  Is that

24   right?

25       A    That is correct.
```

```
 1              C. WESTBROOK MURPHY
 2      Q    And the rule we are talking about is a rule
 3  extending the rule previously applicable to partners
 4  to managerial employees?
 5      A    That is correct.  That is making the
 6  nationwide rule that was previously applicable only to
 7  partners voluntarily, that is voluntarily by PwC, also
 8  applicable to employees who are directors or managers.
 9      Q    And those rules, those rules changes applied
10  to you personally.  Is that right?
11      A    That is correct.
12      Q    Do you recall whether those changes were
13  mandated by the Securities & Exchange Commission?
14      A    They were not.  I do recall, and they were
15  not.
16      Q    Were any changes mandated by the SEC?
17           MR. ROSE:  Does that question have a time
18  frame or are you --
19           MR. NELSON:  Yeah, I'm talking about this
20  particular change that Mr. Murphy is referring to in
21  July of 1999.
22      A    Well, first I understand your question to
23  ask for changes that the SEC might specifically have
24  mandated from PricewaterhouseCoopers?
25  BY MR. NELSON:
```

```
 1                    C. WESTBROOK MURPHY

 2   produced for you, as to whether they were properly

 3   applying the rule on location; that is, simply were

 4   they defining, and I mentioned a while ago that they

 5   defined the Washington, D.C. office to include

 6   Baltimore, Tysons Corner, Bethesda, someplace down in

 7   South Carolina, I believe.  And it was clear to me

 8   that the issue that I was raising was not going to be

 9   resolved in a very timely manner, so I consulted with

10   my then supervisor, Robert Bench, and what we decided

11   to do was temporarily that I would abandon managerial

12   duties pending a resolution of the issue that I was

13   raising.

14            And I did so, because of my concern not to

15   violate any of the independence rules.  And so this is

16   a list of what I was doing at the time and who could

17   take over those duties pending a resolution of the

18   issues that I was discussing with the independence

19   office.

20       Q    Well, is it correct you relinquished your

21   managerial duties in December of 1999?

22       A    The date on the chart is December 27, '99.

23   That may be correct and my memory is several weeks

24   later in early January, but I don't think that makes

25   any difference.
```

C. WESTBROOK MURPHY

1

2 Q But that's the date that you relinquished

3 the managerial duties.  Is that right?

4 A Temporarily, that is correct.

5 Q So that you would no longer -- so it would

6 not be subject to that particular independence rule?

7 A That is correct.

8 Q What was Barry Welsh's position at that

9 time?

10 A Director of regulatory advisory services.

11 Q The same as yours?

12 A Correct.

13 Q Had he been working on the Canadian Bankers

14 Association engagement at the time you transferred

15 your managerial responsibilities to him?

16 A I'm going to have to read this to try to

17 refresh my memory on that subject.

18 (Witness reviews document.)

19 Yes.

20 BY MR. NELSON:

21 Q He had been working on it at the time that

22 you transferred your managerial responsibilities?

23 A Yes.  My memory is we were preparing a

24 memorandum or position paper for the Canadian Bankers

25 Association on certain aspects of the U.S. regulation

                          C. WESTBROOK MURPHY

1

2    1999?

3         A    I said that I would not do it and the

4    definition in anybody's independence rules of who is a

5    manager was imprecise, so to some extent, I guess to a

6    large extent, this table reflects my own attempts to

7    apply more precisely what was a very imprecise

8    definition.  As I remember the SEC rule made pretty --

9    it was either the SEC or the AICPA rule made pretty

10   clear that the determination of who was a manager was

11   determined not exclusively by job title but by

12   responsibilities.

13        Q    So you were seeking to relinquish what you

14   understood to be managerial responsibilities at this

15   time?

16        A    That is correct.

17        Q    Does --

18        A    Pending resolution of the disagreement that

19   I had with the independence office.

20        Q    Beginning in December of 1999, in late

21   December of 1999 for an indefinite period until there

22   was some resolution of an independence issue.  Is that

23   what your testimony is?

24        A    That's correct.  And my memory is that it

25   was resolved in April of that year.

C. WESTBROOK MURPHY

1

2     Q    April of 2000?

3     A    2000, yes.  So it would have been about a

4  three or four month period.

5     Q    Does this chart marked Defendant's

6  Exhibit 52 reflect the full extent of your managerial

7  responsibilities as of December 27, 1999?

8     A    It was surely intended to do so.

9     Q    Did Messrs. Welsh, Donovan and Albertazzi

10 accept the transfers of those responsibilities to

11 them?

12    A    Yes.

13    Q    Is it correct that you repeatedly advised

14 the independence office that you were -- your holding

15 of certain securities did not violate the independence

16 rules because you had relinquished your managerial

17 duties in December of 1999?

18         MR. ROSE:  Does repeatedly mean more than

19 once?

20         MR. NELSON:  Yes, repeatedly means more than

21 once.

22    A    I don't remember.  I'm sure that the

23 independence office sometime during early 2000 was

24 aware, A, of my position about how the independence

25 rules should be interpreted and, B, about the actions

                    C. WESTBROOK MURPHY

1

2    I'm sorry -- December 27, 1999.

3         Q    Isn't that the date --

4         A    -- is a companion piece to the chart that's

5    entered here as Exhibit 52.  Then in March, March 3,

6    2000, is a memo from me to security dispositions about

7    12 holdings that either my wife or I owned.  And it

8    does attach a copy of my memo to Mr. Bench of

9    December 12, which would advise them about what I had

10   done with managerial duties.  It also refers to a note

11   to the independence office dated February 29, 1999

12   which does not seem to be here.

13        Q    Did you prepare and send the e-mail on page

14   1875 on March 3, 2000?

15        A    I believe that I did.

16        Q    And to whom did you send it?

17        A    To the independence office.  It's addressed

18   to security disposition.  That's a piece of the

19   independence office.

20        Q    Is it correct that the first sentence of

21   your e-mail states, "My holding of these securities

22   does not violate the independence rules"?

23        A    That is correct.

24        Q    Is it also correct that the last sentence on

25   the first page of your March 3, 2000 e-mail states:

C. WESTBROOK MURPHY

1
2    "I continue to refrain from exercising managerial

3    duties until PwC realigns its offices more sensibly"?

4        A    That is correct.

5        Q    And how did you want PwC to realign its

6    offices?

7        A    The way that it now has done so that, for

8    example, as you will see in Jim Wall's memo.  The

9    Washington cluster consists of all offices in

10   Washington, D.C., McLean, Tysons Corner, Falls Church,

11   Arlington, Bethesda, Fairfax, Charleston, South

12   Carolina and Springfield, Virginia.  And I did not

13   believe that the question of what is an office is one

14   that a determination was made by PwC itself, and I

15   believe it was drawn too broadly, and within a year

16   the firm agreed with me.  For example, now the Tysons

17   Corner office is no longer part of the Washington,

18   D.C. office.

19       Q    Well, you say within a year.  This is dated

20   March 3, 2000.

21       A    Yes.

22       Q    You are saying by March 3 of 2001 the

23   offices had been realigned for --

24       A    I believe so.  And there, again, there was

25   no announcement and I learned -- no, I'm sorry.  It

```
 1              C. WESTBROOK MURPHY
 2   4, 5, 6 was determined that the disposal notice was
 3   sent to me by mistake.
 4              MR. NELSON:  Can we have marked as
 5   Defendant's Exhibit 54 an e-mail from Mr. Murphy dated
 6   March 24, 2000 with an attachment.  And the exhibit is
 7   Bates numbered 1830 through 1833.
 8              (Murphy Deposition Exhibit Number 54 was
 9   marked for identification and retained by counsel.)
10   BY MR. NELSON:
11       Q    Can you briefly identify Defendant's
12   Exhibit 54?
13       A    This is a memorandum from me dated March 24,
14   2000 to the security disposition office, the same
15   office to which Exhibit 53 is attached, and apparently
16   I sent it in part because I had not received any reply
17   from them, although this refers, this Exhibit 54,
18   refers to a March 14 memo that is not before us now.
19              It also asks about yet another security,
20   Latin American Discovery Fund, and that is an issue
21   that is not one of location.
22       Q    Does it also refer to Dupont and
23   T. Rowe Price?
24       A    Yes, and those are issues of location.
25       Q    Did you prepare and send this e-mail message
```

```
 1                  C. WESTBROOK MURPHY

 2   on March 24, 2000?

 3        A    I believe that I did.

 4        Q    Is it correct that the first sentence of

 5   this e-mail states, quote, "I disagree that the

 6   continued retention of these securities violates the

 7   independence requirements"?

 8        A    That is correct.

 9        Q    In the last paragraph you state, quote, "I

10   have prepared for you and am attaching a chart to

11   document for your records how my duties changed after

12   December 27, 1999."

13             Do you see that?

14        A    Yes.

15        Q    Is the chart you attached, the chart we

16   marked a few minutes ago as Defendant's Exhibit 52?

17        A    That is correct.

18        Q    Is it correct, as you state in the last

19   sentence of this March 24, 2000 e-mail, that since

20   December 27, 1999 you refrained from exercising your

21   managerial duties?

22        A    I believe that is correct.

23        Q    Now, what was -- generally what was the

24   purpose of this e-mail?  Why did you send it?

25        A    I was still trying to get a resolution of
```

C. WESTBROOK MURPHY

issues on which the independence office and I

disagreed.

    Q    And were you responding to the attached

notice of required disposition of certain securities

that you and/or your wife owned?

    A    Apparently I was.

    Q    You had been ordered to dispose of these

investments.  Is that correct?

    A    That is correct.  And as I pointed out when

we were talking about Exhibit 53, those orders were

sometimes in error.

    Q    But they were nonetheless orders, is that

right, from persons with authority to issue them?

    A    I don't know.  It shows up in an e-mail that

doesn't even have any name on it, just has a name of

the office.  For all I know the janitor sends them.

    Q    Was it the janitor who sanctioned you for

violating the rules of obeying them?

    A    No, I know who did that.

    Q    Okay.

    MR. NELSON:  We mark now as Defendant's

Exhibit 55 a series of e-mails bearing Bates numbers

1759 through 1776, bearing -- or not bearing -- all of

these documents were produced from Mr. Murphy's files

```
                        C. WESTBROOK MURPHY
1

2    in June of 2003.

3              (Murphy Deposition Exhibit Number 55 was

4    marked for identification and retained by counsel.)

5    BY MR. NELSON:

6         Q    Can you identify Defendant's Exhibit 55?

7         A    Exhibit --

8         Q    Generally identify it.

9         A    55 is, I believe, 16 pages, if my arithmetic

10   is correct, of e-mails concerning the independence

11   issues that we have been discussing for the last 15 or

12   20 minutes.  And it includes a series of prior

13   e-mails.  This particular one is dated March 29, 2000

14   and it's addressed to Lawrence Anderson who was in the

15   independence office at the time, as I understood it.

16        Q    And you prepared and sent this e-mail to

17   Mr. Anderson on March 29, 2000.  Is that correct?

18        A    I believe that is correct.

19        Q    I note that Robert G. Harper is cc'd on

20   this.  Do you see that?

21        A    Yes.

22        Q    Do you remember who Mr. Harper was?

23        A    I do not now remember who Mr. Harper was.

24        Q    Did you receive the notice of independence

25   hearing?
```

C. WESTBROOK MURPHY

2    A    Yes.

3    Q    On the page marked as 1760.  That's the

4  second page of this exhibit?

5    A    Yes.

6    Q    What was the purpose of the hearing?

7    A    Well, this page 1760 speaks for itself.

8    Q    Is it correct that you had received three or

9  more notices requiring you to dispose of certain

10 securities on or about certain dates -- or on or

11 before certain dates?

12   A    Well, I don't know whether that's correct or

13 not, but for purposes of this deposition, I won't

14 dispute it.

15   Q    Okay.  But you had received notices to

16 dispose of investments and declined to do so.  Is that

17 correct?

18   A    I had received notices, I had raised

19 questions for, I believe it was eight securities that

20 I talked about a minute ago, they are listed in

21 page -- sorry, in Exhibit 53, I'm sorry, it's just six

22 securities.  The notices were determined to have been

23 sent in error.  For the remaining notices the

24 disagreement had not yet been resolved.  And this

25 notice says that, apparently, the resolve in the

C. WESTBROOK MURPHY

notice says I have to have a hearing.

Q    Well, you didn't ask for the hearing.  Is
that correct?

A    No, I would have been glad for an
explanation via e-mail.

Q    Well, you read this notice of hearing
carefully, did you not?

A    I'm sure I did at the time.

Q    And you understand that the purpose of this
hearing was to consider sanctions and disciplinary
action against you.  Is that right?

A    That's what it says.

Q    And the notice also said that it was
important for you to dispose of these securities
immediately, is that right, looking at the penultimate
paragraph?

            MR. ROSE:  Which page?

            MR. NELSON:  1760, the second page.

A    That is what it says.

BY MR. NELSON:

Q    Could you, turn, please, to page 1763.  And
is this page part of an e-mail that you sent on March
14, 2000?

A    Yes, it is.

                    C. WESTBROOK MURPHY

1

2      Q      And to whom was that e-mail sent?

3      A      The March 14 e-mail?

4      Q      Yes.

5      A      The security disposition office part of the

6  independence office.

7      Q      At the bottom of the page marked 1763 over

8  to page 1764 you state under the heading managerial

9  position the following quote from this:  "As explained

10  in the discussion of the T. Rowe Price mutual funds

11  immediately below I ceased to exercise any managerial

12  duties after December 27, 1999.  Thus, even if the

13  Washington, D.C. cluster is relevant for independence

14  purposes, I do not have a managerial position within

15  that cluster."

16          Is it correct that you wrote that statement?

17      A      It is correct that I wrote that.

18      Q      Could you turn to the page marked 1765.  And

19  I'm referring now to the penultimate paragraph of your

20  March 14, 2000 e-mail.  It's the paragraph where you

21  state, quote, "I thus request the independence office

22  to determine that, so long as I do not exercise

23  managerial responsibilities, my wife and I are

24  permitted to continue holding of our shares in the six

25  T. Rowe Price Mutual Funds identified in the notices I

```
 1                    C. WESTBROOK MURPHY
 2    have received from the independence office," closed
 3    quote.
 4              Mr. Murphy did the independence office ever
 5    grant that request?
 6         A    No.
 7         Q    Did they respond to it?
 8         A    Yes.
 9         Q    What did they say?
10         A    We had a hearing.  Mr. Rose accompanied me,
11    it was in New York.  And as a net result -- I may have
12    to go through these one at a time -- but as a net
13    result I disposed of, or my wife disposed of the
14    shares in Dupont and in T. Rowe Price Mutual Funds
15    which is fairly well explained in these documents, I
16    believe, and also the shares of Latin American
17    Discovery Fund.
18              And there the question was somewhat
19    different.  It was -- the independence rules are even
20    more complex in the way that they apply to mutual
21    funds.  And I was asking for an explanation of how
22    they applied to this particular fund.  And at the
23    hearing there were, I guess, about half a dozen people
24    from PwC and three or four tried to explain it and
25    were unsuccessful.
```

```
 1                    C. WESTBROOK MURPHY

 2          And then finally a gentleman named Eric

 3    Knisley explained it, and he explained it very nicely

 4    so that I understand it, and I immediately then agreed

 5    on the spot to dispose of that.  And I believe I

 6    agreed to then dispose of the rest of them and apart

 7    from some tracking, to make sure that I had

 8    accomplished those dispositions, I believe that fully

 9    disposed of the issue.

10       Q    Is it correct that PwC never realigned its

11    office in response to your request that it do so?

12       A    Don't know whether they realigned the

13    office, whether it was in response to my request or --

14    no, I don't know.  I was not the one who did it.

15       Q    It was quite some time later.  Is that

16    correct?

17       A    I believe it was within nine months after

18    the period we are talking about now.

19          MR. ROSE:  Mr. Nelson, if this is a good

20    time to take a break, I'd appreciate it if we could

21    do it.

22          MR. NELSON:  Sure.  Let's go off the record.

23       (Luncheon recess taken -- 12:40 to 2:09 p.m.)

24          MR. NELSON:  I'd like to mark as Defendant's

25    Exhibit 56 an e-mail from Mr. Murphy dated April 9,
```

C. WESTBROOK MURPHY

1
2    2000.  It's Bates number 1783.

3          (Murphy Deposition Exhibit Number 56 was

4    marked for identification and retained by counsel.)

5    BY MR. NELSON:

6          Q    Mr. Murphy, can you identify Defendant's

7    Exhibit 56?

8          A    Yes.  This is a memorandum that I wrote and

9    I wrote it to the independence office with a carbon

10   copy to a woman named Maureen Loftus.  This was after

11   the hearing in which I participated that I testified

12   about a few minutes ago.  And Ms. Loftus was on the

13   panel at the hearing and was the one from the panel

14   who monitored disposition of funds and securities.

15   And this concerned, this memo April 9, 2000, concerns

16   disposition of the T. Rowe Price mutual funds.

17         Q    And you prepared and sent this e-mail on

18   April 9, 2000?

19         A    I surely prepared and sent it and as far as

20   I know it was on April 9, 2000.

21         Q    What was Ms. Loftus' position, if you know?

22         A    Other than I just described, I don't know.

23         Q    You said she was on the panel, but you don't

24   know what her job title was?

25         A    No.  I believe -- no, I don't.  No, I don't.

C. WESTBROOK MURPHY

1

2    Q    What does FAS stand for, if you know?

3    A    FAS is a reference to a line of service

4 within PricewaterhouseCoopers, the name has changed

5 since then, and I don't remember what the acronym

6 stands for, but it was a consulting practice, as

7 opposed to an auditing practice, which is referred to

8 as AVAS.

9    Q    Do you know whether she was a partner?

10    A    I believe she was, but I am not certain.

11    Q    And what was the purpose of your sending

12 this e-mail?

13    A    She requested it.

14    Q    What did it communicate?

15    A    That sounds to me pretty obvious on the

16 face.  The requested plan for disposing of shares of

17 six T. Rowe Price mutual funds.

18    Q    And what was the reason for your decision to

19 dispose of those shares at that time?

20    A    Well, as you remember, the T. Rowe Price

21 mutual funds were tied up in the question of whether

22 Baltimore was part of the Washington cluster or not.

23 And it seemed clear that I was -- at the hearing that

24 they weren't ready to address that issue.  And I

25 decided to resolve the issue by selling these funds.

C. WESTBROOK MURPHY

1

2    Q    Did it appear at the hearing that the panel

3  was going to reject your position?

4    A    They surely were not going to accept it.

5    Q    And you were facing sanctions for not

6  disposing of those funds?

7    A    All I can say is that's what they said.

8  There was never any specific sanction mentioned that I

9  remember other than in a general category.

10    Q    So you agreed to dispose of those funds

11  before the panel reached a decision.  Is that correct?

12    A    I believe that's -- well, you'd have to ask

13  the panel.  Mr. Rose and I met with them for a period

14  of time, at least 45 minutes, I would guess, and then

15  they excused us and we waited in the lobby while I

16  assume they talked to each other for 15 or 20 minutes

17  and then I believe they invited us back in and said

18  that the dispositions that I had agreed to would be

19  fine, would end the matter.

20    Q    Was that sanction imposed?

21    A    Not that I remember, I may have gotten a

22  letter of reprimand.  I don't remember.

23    Q    Do you recall when the hearing was held?

24    A    Early April, 2000.

25    Q    This e-mail was confirming your disposition

```
 1              C. WESTBROOK MURPHY
 2   of the T. Rowe Price mutual funds?
 3        A     That is correct.  My memory is that there
 4   were several other securities involved.  One was Latin
 5   American Discovery Fund, the other was Dupont, that
 6   are not referred to this in this memo.  Those were
 7   owned in my brokerage accounts.  All I had to do to
 8   dispose of that was to call the broker, which I think
 9   I may have done that afternoon.  If not, I did it the
10   next day.
11              Five of the mutual funds shares from T. Rowe
12   Price were owned by my wife so I couldn't do anything
13   about that while I was there.  And then, as I
14   explained in the last paragraph, the sixth fund had a
15   very peculiar issue affecting the disposition.
16        Q     And you were represented by retained counsel
17   at this hearing?
18        A     I was.
19        Q     That was Mr. David Rose?
20        A     It was.
21        Q     The same David Rose that's representing you
22   in this litigation.  Is that right?
23        A     So far as I know.
24        Q     Could we have marked as Defendant's
25   Exhibit 57 a copy of a letter on Rose & Rose
```

```
 1                      C. WESTBROOK MURPHY
 2    was the other person comply with PwC ethics policies.
 3         Q    Any other purpose?
 4         A    I would have hoped that in granting relief
 5    they would have gone back and reversed the decision of
 6    the independence office, this is 2001.  There was no
 7    monetary sanction, that is, as a result of the dispute
 8    in 2001 the firm said that it would suspend me without
 9    pay for two weeks.  And I did indeed stay home for two
10    weeks, but they never stopped the pay, so result I got
11    two weeks additional paid vacation as a practical
12    matter and I did not ask them to resolve, to reverse
13    that.
14         Q    Well, which determination of the
15    independence office did you hope to have reversed, the
16    determination to suspend you without pay for two
17    weeks?
18         A    Yes.
19         Q    Apart from the complaint you filed with the
20    ethics office in late May of 2001 have you asserted
21    any other claim against PwC arising from or relating
22    to independence issues?
23         A    There is -- your question is incorrect.  The
24    complaint I filed with the ethics office, which were
25    from events that arose in May of 2001, but I believe I
```

1                          C. WESTBROOK MURPHY

2          A    I don't remember.

3          Q    After relinquishing your managerial duties

4    in December of 1999 did you ever reassume those

5    duties?

6          A    To the extent that I was permitted to, yes,

7    and by that I mean by assignments which would have

8    been after the dispositions of securities that are

9    referred to in Exhibit 56 and 57.

10              I also alleged that because of having filed

11   a complaint, PwC then, in retaliation, refused to

12   assign me managerial duties.

13         Q    After what point in time?

14         A    After I filed a charge with the D.C. human

15   rights office.

16         Q    And that was this March of 2001.  Is that

17   correct?

18         A    Right.

19         Q    Well, when did you, if ever, perform any

20   managerial duties?

21         A    I was available for managerial duties

22   beginning in April of 2000.

23         Q    And did you communicate your availability to

24   anyone?

25         A    Excuse me.  My supervisor, Bob Bench.

C. WESTBROOK MURPHY

1

2      Q    When did you do that?

3      A    I am sure that he knew, I'm sure that I

4  informed him of the disposition of this issue that I

5  had in the spring of 2000 with the independence

6  office.

7      Q    Did you communicate to anyone else your

8  availability to perform managerial duties --

9      A    Yes.

10      Q    -- after December of 1999?

11      A    Yes.

12      Q    To whom else did you communicate that?

13      A    Well, generally to my colleagues at RAS and

14  also to those who were working on the Barclays

15  engagement.

16      Q    Is there any e-mail or writing reflecting

17  your availability to perform managerial duties after

18  December 1999?

19      A    Not apart from my position as a director.

20      Q    Well, is there any writing reflecting

21  your --

22      A    Well, there's writing reflecting that I was

23  appointed as a director and that's a normal duty for a

24  director at PwC.

25      Q    Well, this morning we looked at a number of

C. WESTBROOK MURPHY

e-mails where you communicate quite clearly to the
independence office and other partners at PwC your
relinquishment of management responsibilities
beginning in December of 1999.  Do you recall that?

    A    Yes.

    Q    But you never communicated in writing or by
e-mail thereafter that you are, again, available to
perform your duties as a director?

    A    Are you asking is there an e-mail that says
the dispute that I was having with the independence
office has now been resolved?

    Q    No, I'm asking whether there's an e-mail or
any written communication communicating that your
refusal to perform managerial duties had ended, if in
fact it had ended?

         MR. ROSE:  Mr. Nelson, I assume that you are
talking about apart from any documents that have
already been identified?

         MR. NELSON:  I'm not aware of any, Mr. Rose,
I'm not talking about apart from anything.  I'm asking
whether there is any document, any writing, any e-mail
wherein Mr. Murphy indicated after he had relinquished
his duties in December of 1999 that he was available
to perform his duties thereafter.

C. WESTBROOK MURPHY

1

2    MR. ROSE:  Well, I think it's a clear

3    implication from 57 is that he was available or that

4    he would be in a day or two, and that was the

5    notification to the whole firm that you are entitled

6    to ask further questions if you wish.

7    MR. NELSON:  57, Mr. Rose, being your letter

8    dated April 19, 2000?

9    MR. ROSE:  Yes.  It doesn't say a word about

10   independence rules, but it says he's doing what they

11   told him to do and, therefore, let's get on with it.

12   MR. NELSON:  Does the letter say anything

13   about managerial responsibilities?

14   MR. ROSE:  I said no, I said it does not.  I

15   said it is a clear implication from that letter that

16   the dispute is over and that he should be allowed to

17   return to normal --

18   MR. NELSON:  I'm not asking about that

19   dispute.  I'm asking about Mr. Murphy's availability

20   to perform the duties of his directorship position.

21   That's what I'm asking about.

22   A    Let me respond this way.  My understanding,

23   I believe, from the people who were at the hearing and

24   I'm quite certain from Darlene Shea, who was the

25   personnel officer for financial services and was

C. WESTBROOK MURPHY

1

2    there, was that my attempt in late December of 1999 to

3    divest myself of managerial duties was ineffective and

4    that anybody with the title of manager or of director

5    or of senior manager was a manager.  So, so far as the

6    firm was concerned, I had never suspended my

7    managerial duties.

8    BY MR. NELSON:

9        Q    Well, are you saying that the actual

10   relinquishment of your managerial duties was

11   ineffective to excuse you from compliance with certain

12   independence requirements.  Is that right?

13       A    Which requirements apply to managers.

14       Q    Well, I'm sorry could I have that --

15       A    The requirements you are talking about

16   applied to managers.  And one of these memos that we

17   looked at this morning has definition of managerial

18   duties in it.  I tried to adhere to that definition.

19       Q    Well, you were trying to relinquish your

20   management duties.  Is that right?  And you did, is

21   that correct, as set forth in the chart that we marked

22   earlier and as is set forth in your repeated e-mails

23   to various partners and to the independence office.

24   Right?

25       A    Yes.  I believe that when this issue was

```
                    C. WESTBROOK MURPHY
1
2    resolved I was still working in the Barclays
3    engagement and assumed a somewhat more active role.
4         Q    That was an engagement reflected on the
5    chart that was --
6         A    Yes.  I think the other two engagements that
7    are reflected on that chart were completed.
8              MR. ROSE:  It's number 52.
9    BY MR. NELSON:
10        Q    Defendant's Exhibit 52?
11        A    Yeah.
12        Q    Let me ask you, did you do anything to
13   document your intention to reassume the
14   responsibilities of your directorship position?
15             MR. ROSE:  I object to the form of the
16   question unless you add the word else.
17   BY MR. NELSON:
18        Q    Can you answer the question, Mr. Murphy?
19        A    Well, I believe I just had.  That I expanded
20   somewhat the role in the one engagement that I was
21   working on at the time at Barclays.
22        Q    I asked you whether you did any anything to
23   document your availability or your intention to begin
24   to perform the responsibilities of your position?
25        A    If I, at Barclays, or for that matter if I,
```

```
 1                  C. WESTBROOK MURPHY
 2    with some other client, assumed responsibilities I
 3    temporarily had avoided, that would document the fact
 4    that I had done so.
 5         Q    Well, did you have any actual managerial
 6    responsibilities at PwC in April 2000?
 7         A    According to whose definition?
 8         Q    According to a job description or anything
 9    else.  According to the types of duties that you had
10    relinquished earlier.
11         A    I believe I have already testified that I
12    resumed some of those managerial duties at Barclays.
13         Q    And when did you resume the performance of
14    those duties?
15         A    April of 2000.
16         Q    And what specific duties did you perform?
17         A    I'm afraid I don't remember.
18         Q    Well, was it in April of 2000 or was it
19    sometime thereafter?
20         A    I believe it was April of 2000, and I don't
21    think that I worked on the Barclays engagement after
22    June of 2000.
23         Q    So your recollection is that between April
24    of 2000 and June of 2000 you performed certain
25    managerial responsibilities or duties in connection
```

                    C. WESTBROOK MURPHY

1

2    with the Barclays engagement?

3        A    I believe so.

4        Q    And, but you don't recall what those duties

5    were?

6        A    That's correct.

7        Q    Apart from whatever duties you may have

8    performed in the Barclays engagement, beginning in

9    April 2000, did you perform any other managerial

10   duties after April 2000?

11       A    Until when?

12       Q    Until any time?

13            MR. ROSE:  Until now, I guess.

14   BY MR. NELSON:

15       Q    Take it month by month, year by year.

16       A    Well, let me see.  Since then I have

17   performed duties which would clearly be considered

18   managerial under the terms of the literature as it

19   then existed, existed in 2000 defining managerial

20   duties.  I don't believe that definition is in the

21   current literature.  I just don't remember.

22       Q    I'm not concerned with the definition.  You

23   relinquished what you considered to be managerial

24   duties in December of 1999, correct?

25       A    Correct.

```
1                    C. WESTBROOK MURPHY

2        Q    And you were clear that you continued to

3   refrain from exercising any of those duties for an

4   indefinite period, which you are now saying ended in

5   April 2000.  Is that right?

6             Can you answer that question?

7        A    Not without consulting an exhibit.  And, by

8   the way, I see that in Exhibit 55 on page 1761 is the

9   name Bill Moony, that was the author of the PwC

10  supervised independence, 1761.  Refresh my

11  recollection.

12  BY MR. NELSON:

13       Q    Refresh your recollection of what?

14       A    Of the person to whom I wrote a memo in late

15  July 1999 suggesting that the expansion of the PwC

16  independence requirements was ill advised.

17       Q    Ill advised or unlawful, in your view?

18       A    That it was just ill advised.

19       Q    Well, putting aside the Barclays Bank --

20            MR. ROSE:  I don't think he's finished

21  looking at what he's looking at.

22  BY MR. NELSON:

23       Q    Okay.

24       A    As of 1999, insofar as I know, 2000,

25  managerial duties as defined by the AICPA included
```

```
 1              C. WESTBROOK MURPHY

 2   continuing responsibility for the overall planning and

 3   supervision of engagement for specified clients.

 4              Authority to determine that an engagement is

 5   complete subject to final partner approval if

 6   required.

 7              Three, responsibility for client

 8   relationships, for example, negotiating and collecting

 9   fees for engagements and marketing the firms'

10   services.

11              Four, existence of profit sharing as a

12   significant feature of total compensation.  That one

13   still doesn't pertain.

14              Five, responsibility for overall management

15   of firm development or establishment of firm's

16   policies upon technical matters.

17              So in that list numbers 1, 2, 3, and 5 I

18   have performed since April of 2000 to one degree or

19   another.

20      Q    Well, just let's stick to the balance of

21   2000.  What duties falling within Category 1 did you

22   perform, if you recall?

23      A    I don't remember, Mr. Nelson.

24      Q    You don't recall?  So you don't recall any

25   specific managerial duties within the definition as
```

C. WESTBROOK MURPHY

1

2    you've just read that you performed after April of

3    2000?

4        A    No, that's not what I said.

5        Q    Well, actually the question is after

6    December of 1999.

7            What about specific duties, actual work,

8    that's what I'm asking here.  You can't recall

9    anything specific?

10       A    Is there a pending question?

11       Q    Yes.  Can you specifically recall any

12   managerial duties, within the definition that you just

13   read, that you performed after December of 1999?

14       A    Yes.

15       Q    What do you recall?

16       A    Well, for instance, I believe it's the Item

17   Number 5 is advising the firm on technical matters.

18   We have produced for you several hundred pages of

19   documents in which I was advising the firm on

20   technical matters associated with Section 404 of the

21   Sarbanes-Oxley Act, and Section 11 of the Federal

22   Deposit Insurance Corporation Improvement Act.

23       Q    And when did you begin advising PwC on

24   Sarbanes-Oxley matters?

25       A    After Sarbanes-Oxley was enacted.

```
1                     C. WESTBROOK MURPHY

2        Q     And when was that?

3        A     July of 2002, I believe July 29.

4        Q     And how long after that did you begin

5   advising the PwC?

6        A     About a week.

7        Q     And what did the FDIC provisions or statute

8   that you referred to --

9        A     1992.

10       Q     1992?

11       A     That's correct, that's when it was enacted.

12       Q     No, when did you -- when did you advise the

13   client with respect to that after December 1999?

14       A     Well, I don't believe you had asked about

15   clients yet.  You had asked about advising on

16   technical matters.  I don't believe that required

17   advising necessarily clients on the matters.

18       Q     No, PwC, I think you were talking about

19   advising PwC, or are you talking about advising

20   clients?

21            MR. ROSE:  The question has to do with FDIC?

22            THE WITNESS:  I think the question fairly

23   stated is:  When was the first time after April 2000.

24   BY MR. NELSON:

25       Q     No, December 1999.
```

```
 1                    C. WESTBROOK MURPHY
 2        A     All right.  December of 1999 I advised
 3   either the firm or the client on the technical
 4   requirements of the FDIC Improvement Act, Section 112
 5   of the Federal Deposit Insurance Corporation Act in
 6   its implementing regulation 12 CFR Part 363 and the
 7   answer is, I don't remember.
 8        Q     Do you recall any -- do you recall
 9   specifically performing any managerial duties falling
10   within the Categories 1, 2, or 3 of the definition you
11   referred to earlier?
12        A     Yes.
13        Q     What do you recall?
14        A     Well, in connection --
15        Q     Well, let's take it category by category.
16   The first category states, "a continuing
17   responsibility for the overall planning and
18   supervision of engagements for specified clients."
19              Did you ever perform any duties or
20   responsibilities that fall within that definition, if
21   you will?
22        A     Ever?
23        Q     Well, after December 1999?
24        A     Yes.
25        Q     And what specifically do you recall doing?
```

```
 1                    C. WESTBROOK MURPHY

 2        A    A small engagement for a company called

 3   NEXT.

 4        Q    And when was that engagement?

 5        A    I do not remember.

 6        Q    Well, was it after December 1999?

 7        A    Yes.

 8        Q    And how long after, do you recall?

 9        A    No.

10        Q    But it was definitely after that?

11        A    Yes.

12        Q    And how long did that engagement last?

13        A    Maybe six weeks.

14        Q    And --

15        A    An engagement in the summer of 2003 for

16   Wells Fargo Card Services.  And by the way, to save a

17   question, Items 2 and 3 would also apply to both of

18   those engagements.

19        Q    Who was in charge of those engagements?

20        A    Well, except for the partner who signed off

21   on them, I was.

22        Q    And who was the partner who signed off on

23   those?

24        A    David Albright.

25        Q    Do you recall any other -- specifically
```

1                    C. WESTBROOK MURPHY

2    recall any other management duties within this

3    definition that you performed after December 1999?

4        A     Within this definition you mean Items 1, 2,

5    and 3?

6        Q     Well, I don't mean to limit it to Item 1, 2,

7    and 3.  I think you already testified that 4 was

8    inapplicable to --

9        A     That's right.

10       Q     So you obviously didn't do anything in that

11   regard?

12       A     That's correct.

13       Q     So that --

14             MR. ROSE:  So I think --

15       A     But I've testified about Item 5 on technical

16   matters.

17   BY MR. NELSON:

18       Q     Yes, you did, you referred to Sarbanes-Oxley

19   and FDIC?

20       A     Right.

21       Q     And then Items 1, 2, and 3?

22       A     And for that matter I can add independence.

23       Q     Well, that --

24       A     Part of what we produced for you recently

25   was some correspondence within PwC relating to a

1                    C. WESTBROOK MURPHY

2    determination that the SEC had made in November of

3    last year about independence of auditors for mutual

4    funds and whether mutual fund auditors would provide a

5    specific service to the SEC.

6            We believe that that was incorrectly

7    determined and I helped draft a letter and was

8    principal author of the letter to the SEC, addressed

9    to the SEC, asking for them to reconsider that

10   decision.  As far as I know that letter was never

11   sent.

12       Q    Well, let me provide a time frame in my

13   question to the period beginning in December 1999

14   through March of 2001 when you filed your complaint of

15   discrimination and advised Mr. Bench that you wished

16   to be considered as a candidate for partnership, in

17   that time frame.  The NEXT card engagement occurred

18   during that time frame?

19       A    I do not remember.

20       Q    What about the Wells Fargo Card Services

21   engagement, was that in that time frame?

22       A    No.

23       Q    That was later?

24       A    Yes, I believe I already testified it was in

25   the summer of 2003.  I'm sure that during the time

```
 1                C. WESTBROOK MURPHY

 2    frame you are asking about, which is roughly ten

 3    months or so beginning in April of 2000 --

 4            MR. ROSE:  He's asking --

 5    BY MR. NELSON:

 6        Q    Well, I know the answer at least between

 7    December of 1999 and April of 2000 you affirmatively

 8    state that you didn't perform any management

 9    responsibilities.

10        A    Yes.

11        Q    But actually I began the period in December

12    of '99.  There would have been absolutely nothing

13    until at least April of 2000 or so?

14        A    That's what I believe.  So from -- roughly a

15    ten month period beginning then, it is very likely

16    that I gave technical advice on the Federal Deposit

17    Insurance Corporation Act and probably some other

18    banking statutes, but I've got no specific

19    recollection of doing so.  The client work to which I

20    was assigned, I was not manager.

21        Q    Do I understand your testimony to be that

22    the engagements listed on the chart marked as

23    Defendant's Exhibit 52 other than the Barclays Bank

24    engagement were concluded by April of 2000?

25        A    That is correct.
```

C. WESTBROOK MURPHY

1

2  raise could be resolved.

3      Q    And was that so that you wouldn't be deemed

4  to be, continue to be deemed to be a management or a

5  managerial employee?

6      A    For that temporary period, that is correct.

7      Q    Which was an indefinite period.  Is that

8  correct?

9      A    It was an indefinite period because, at the

10  time, I did not know how long it would take to resolve

11  the issue.

12      Q    Well, is it correct that you made inquiries

13  within PwC about assuming a position with a title

14  below the level of manager?

15      A    Yes, that is correct.

16      Q    And as a director you were then two levels

17  above manager.  Is that correct?

18      A    I believe that is correct.

19      Q    Well, what is the hierarchy?  You've got

20  manager, senior manager, director, is that how it

21  works?

22      A    That was correct at the time.  There is now

23  a position of managing director to which I was

24  promoted about a month ago.

25      Q    Congratulations, but I'm just trying to

1                    C. WESTBROOK MURPHY

2    understand at the time, and it's probably still the

3    same way that -- stopping --

4        A    At the time.

5        Q    -- stopping the director there was the

6    position of manager.  What was the immediately higher

7    position?

8        A    Senior manager.

9        Q    And what was the immediately higher

10   position?

11       A    Director.

12       Q    Okay.  And you were a director?

13       A    That is correct.

14       Q    And you made inquiries of PwC in 1999 about

15   assuming the position with the title below manager.

16   Is that right?

17       A    That is correct.

18       Q    What was the prohibition referenced in this

19   technical advisory that, the prohibition that I just

20   read as continuing after February 5, 2001 ever

21   changed?

22       A    So far as I know the sentence that you just

23   read on page 2242 is still the rule.  That's the PwC

24   rule.  The SEC rule and AICPA rule are somewhat less

25   restrictive.  I don't believe they refer to local

```
 1                    C. WESTBROOK MURPHY

 2    seems -- aren't you simply objecting to the

 3    application of the local rule here?

 4         A    No.

 5         Q    Okay.

 6              MR. ROSE:  He's --

 7         A    I'm trying to get a local rule to be

 8    applied.  That's what I think.

 9    BY MR. NELSON:

10         Q    To the way it's being applied?

11         A    No.

12         Q    By the way, whatever happened to your

13    Manulife investment?  You were directed to dispose of

14    it and you objected to it.  What happened to it?

15         A    I did dispose of it.  It wasn't easy, but I

16    did dispose of it.

17         Q    And why did you do it?

18         A    Because we had another hearing that we

19    haven't gotten to yet and I was sanctioned and

20    directed to dispose of it.

21         Q    And you were directed to dispose of it and

22    you were threatened with sanction, I believe, and

23    termination, is that right, termination of your

24    employment?

25         A    I don't remember.  I remember the sanction
```

```
 1                   C. WESTBROOK MURPHY

 2    that they actually attempted to impose.

 3              MR. ROSE:  Which you've already described.

 4              THE WITNESS:  Yes.

 5    BY MR. NELSON:

 6         Q    By the way, did Chatelain ever respond to

 7    your e-mail of April 30, 2001, that's Defendant's

 8    Exhibit 61?

 9         A    Not that I remember.

10         Q    So was it your understanding on April 30,

11    2001 that Mr. Chatelain, on behalf the independence

12    office, and on behalf of the PwC, was telling you that

13    the national rule was still in effect for managerial

14    employees at PwC?

15         A    Yes.

16         Q    And at the end of the day you were forced to

17    dispose of your Manulife shares.  Is that right?

18         A    That's correct.

19         Q    Okay.  And your understanding is that it was

20    because of PwC was based on a national rule.  Is that

21    right?  That you claim PwC --

22         A    That is correct.

23         Q    And by the way, who authors these technical

24    advisories on independence?

25         A    So far as I know the independence office
```

```
                     C. WESTBROOK MURPHY
 1
 2   least on a temporary basis of having to dispose of a
 3   personal investment.   Is that correct?
 4        A     That is correct, but that is not in the time
 5   frame that we are talking about now.
 6        Q     I understand, but it was in the time frame
 7   that was less than a year before that particular
 8   problem was resolved?
 9        A     That's correct.
10        Q     And when was the Manulife sanctions hearing
11   resolved.   It was later than that?
12        A     It was late May of 2001.
13        Q     And 2001 or 2000?
14        A     2001, I believe.
15              MR. ROSE:   This is all 2000?
16        A     Yes, late.
17              MR. ROSE:   This is all 2001?
18        A     Late May of 2001.
19   BY MR. NELSON:
20        Q     So it's on -- it was ongoing.   You filed
21   your discrimination complaint in March of 2001?
22        A     Yes, I believe the answer to the question
23   that I thought you asked was none.   That is, the
24   dispute over this independence that we've been
25   discussing regarding the Manulife shares came to a
```

C. WESTBROOK MURPHY

1

2      Q     Defendant's Exhibit 62 is a memorandum dated

3  March 21, 2001 from Mr. Murphy to Mr. Bench.  And it's

4  clearly marked, numbered 01070 through 01076.

5           And Mr. Murphy, can you identify the

6  document which is marked as Defendant's Exhibit 62?

7      A     Well, you just identified it except for a

8  topic which is Accomplishment Report April 1, 2000 to

9  March 31, 2001.

10      Q     And did you prepare and send to Mr. Bench

11  this accomplishment report?

12      A     Yes.

13      Q     On March 21, 2001?

14      A     Yes.

15      Q     And for what purpose did you send this to

16  Mr. Bench?

17      A     All employees in the regulatory advisory

18  services were requested to prepare and send in a

19  memorandum and accomplishment report.  And my

20  understanding is it would be relied on in the annual

21  review that would take place in the late spring of

22  2001 looking toward whatever personnel changes,

23  promotions, salaries, increases would be made

24  effective July 1.

25      Q     And were professional employees such as

C. WESTBROOK MURPHY

1

2  yourself required to prepare and submit an

3  accomplishment report annually, is that the way it

4  worked?

5      A    That was the practice at RAS.  I don't

6  believe it was the practice in other parts of the

7  firm.

8      Q    And this was in anticipation of the annual

9  performance review?

10      A    That is correct.

11      Q    And various employment decisions concerning

12  salaries, promotions and the like were made on July 1

13  of each year?

14      A    They were effective July 1.

15      Q    I'm sorry, effective July 1?

16      A    Yes.  That date has now been changed.  They

17  are now effective the end of August.

18          MR. ROSE:  Sorry, is that the partnership?

19  What's effective?

20          THE WITNESS:  The changes that result from

21  the annual review.  So, no, not partnership.  The

22  changes such as bonuses, promotions within staff

23  level.

24  BY MR. NELSON:

25      Q    Well, you referred in your complaint and in

                    C. WESTBROOK MURPHY

1

2    your earlier testimony to an annual promotion cycle at

3    PwC is that --

4         A     This is a part of that cycle.

5         Q     A part of that cycle and that cycle makes

6    changes and promotion decisions, salary decisions

7    effective July 1 of each year?

8         A     It did at the time this memo was written in

9    2001.  Now those decisions are effective September 1.

10        Q     What about the annual promotion cycle.  Is

11   that still July 1?

12        A     Only for partners.  Partnership admissions

13   are effective July 1.

14        Q     Of each year, and that's been the case for

15   how long as far as you know?

16        A     For as long as I've been with either PwC or

17   its predecessor.

18        Q     And that used to also, until now, be the

19   date, that same annual promotion cycle applied to

20   management and directorship positions.  Is that right?

21   That same July 1?

22        A     It did.  The dates now don't align with each

23   other any longer.

24        Q     And is it correct that this report related

25   your accomplishments during the 12 month period from

C. WESTBROOK MURPHY

2  April 1, 2000 to March 31, 2001?

3      A    That was its intent.

4      Q    You state in the first paragraph that your

5  accomplishments during this period were limited by

6  your assignments.  Is that right?

7      A    That is correct.

8      Q    And who were the principal sources of your

9  assignments during this period?

10      A    Bob Bench.

11      Q    Was he the only source essentially?

12      A    I don't know that he would have been the

13  only one but far and away the most important.

14      Q    Are there any other sources of assignments

15  during this period that are of any significance?

16      A    Bill Lewis, some of the work that I did at

17  Barclays was for Bob Bench, some of it was for Bill

18  Lewis.  David Albright was a partner by this time,

19  that is in 2001, and the GMAC Mortgage engagements

20  referred to here were supervised by him.

21      Q    Were the sources of your assignments

22  essentially partners in RAS?

23      A    Yes.

24      Q    In prior years who were the principal

25  sources of your assignments?

                        C. WESTBROOK MURPHY

1

2      the office were Bill Lewis, John Campbell and David

3      Albright, none of whom at the time was older than 45.

4          Q    When you wrote this accomplishment report to

5      what did you attribute the decrease in the magnitude

6      of your assignments?

7          A    I don't remember that I attributed it to

8      anything at the time.

9          Q    Is it correct that you filed your complaint

10     with the D.C. Office of Human Rights and notified

11     Mr. Bench of your complaint about a week before you

12     submitted this accomplishment report?

13         A    That is correct.

14         Q    Before the filing of that complaint is it

15     correct that you had never before complained formally

16     or informally of discrimination at PwC?

17         A    Well, it is -- that's correct.

18         Q    Is it correct that the complaint you filed

19     with the D.C. Office of Human Rights in March 2001 did

20     not allege discrimination in assignments?

21         A    I don't remember whether it did or not.  It

22     speaks for itself.

23         Q    Well, it does speak for itself, but you

24     don't recall?

25         A    I don't recall.

                    C. WESTBROOK MURPHY

1

2        Q    I'll represent to you it did not, but I'm

3    talking about your initial complaint.  Did you

4    personally generate any new business during the 12

5    month period ended March 31, 2001?

6        A    Not that I remember.

7        Q    And to what do you attribute your failure to

8    generate any new business for PwC during that period?

9        A    I was not successful in bringing that year

10   any clients to the firm that I remember.

11       Q    Have you personally --

12       A    Now, wait just a minute.  I think to some

13   extent our engagements as they went on at Barclays

14   added GMAC both of which are mentioned in this memo

15   expanded.  And that was based on the quality of the

16   work that a number of us, including me, had done.

17       Q    Expanded in what respect?

18       A    That they asked us to issue a month.

19       Q    New engagements?

20       A    That's a semantic question.  I don't know

21   whether it was a new expansion letter or expansion

22   or --

23       Q    I'm asking whether you, Westbrook Murphy,

24   generated any new business during this period.  You

25   testified that you hadn't and I asked you to what you

C. WESTBROOK MURPHY

1

2    hours and that was not really working more, that was

3    properly recording your time, the result of which

4    would show more billable hours.

5         Q    Do you consider the accomplishments you are

6    reporting in Defendant's Exhibit 62 to be substantial?

7    This is for the 12-month period ended March 31, 2001.

8         A    No.

9         Q    In the first paragraph of Defendant's

10   Exhibit 62 you indicate that your "accomplishments

11   during this period were limited by independence

12   impediments emanating from PwC management."

13            Do you see that?

14        A    Yes.

15        Q    And how did that impede your performance?

16        A    Well, we've already discussed at great

17   length what was going on in the spring of 2000.

18        Q    Well, how did that impede your performance?

19        A    Until my independence issue was resolved, I

20   was not acting in a managerial capacity.

21        Q    Well, approximately how many hours of

22   managerial work do you think that you delegated to

23   Messieurs Welsh, Donovan and Albertazzi during the

24   first quarter or so of 2000?

25        A    Donovan, very little, Welsh probably less

C. WESTBROOK MURPHY

1

2     Q     Well, how many days?

3     A     I don't know.  If I did, I'd say.

4     Q     Well, do you think you spent more time on

5  independence issues than you spent on GMACM projects?

6     A     No.

7     Q     What were you doing for the rest of your

8  time with PwC during this 12-month period?

9     A     Whatever I was asked to do.  Some of it is

10  reflected in the last two pages of this memo, pages

11  1075 and '76.

12     Q     Well, did we leave anything out?

13     A     I'm sure I left some things out.

14     Q     Anything significant?

15     A     That would be -- as I remember, in the

16  results of the annual review process that were given

17  back to me in the summer of '01, one of the criticisms

18  was that my time had not been well documented.  I'm

19  sorry, I may have the years confused.  I know the year

20  after Sarbanes-Oxley was passed, I documented it quite

21  extensively.

22     Q     Documented what?

23     A     The way I was spending the amount of

24  chargeable time.

25     Q     Don't your employees try to put their best

C. WESTBROOK MURPHY

Page 890

1    asked do I have any familiarity with it. I think I

2    have known some people who have been promoted, but

3    I do not know the process they went through to

4    become promoted to the position of director --

5        Q    -- directorship position presumably would

6    include a director, a managing director or senior

7    managing director?

8        A    Oh, I believe that's a different question.

9        Q    Were you recently promoted or given the

10   title of managing director?

11       A    Yes.

12       Q    Was a prospectus of some sort submitted,

13   to your knowledge, in connection with that? Is

14   that a promotion, Mr. Murphy?

15       A    I believe that is a promotion. Yes, there

16   was a prospectus, and we have produced a copy of

17   it, as well as the copies of earlier drafts.

18       Q    And were you involved in the preparation

19   of the recent prospectus?

20       A    I was at the request of my supervisor,

21   Bill Lewis.

22       Q    All right. And you provided some of the

23   information that was contained on the prospectus

24   that was submitted?

25       A    Yes.

C. WESTBROOK MURPHY

```
 1    July 1 for employees who are promoted to

 2    partnership.

 3       Q    And just so I'm clear, you said fiscal

 4    year.  When would that change have been effective?

 5    What year for the staff promotions --

 6       A    Well, it was in calendar 2000 for the

 7    fiscal year that began on July 12,000, which would

 8    be fiscal year 2003.

 9       Q    Well, when --

10            MR. ROSE:  2002.  You mean it was July --

11            THE WITNESS:  No.  July 1, 2000 is the

12    beginning of fiscal year 2003 that ends July 30,

13    2003 (sic).

14            BY MR. NELSON:

15       Q    Well, when was the first year -- what --

16    September date -- what year --

17       A    Calendar year 2002.

18       Q    Calendar 2002?

19       A    That's my memory, yes.

20       Q    Okay.  And for partners the admission date

21    for partners was --

22       A    Remains --

23       Q    Remains July 1?

24       A    That's correct.

25       Q    And was that case the throughout your
```

C. WESTBROOK MURPHY

1    tenure both with Pricewaterhouse and

2    Pricewaterhouse Coopers?

3         A    The partners being admitted effective

4    July 1, yes, yes.

5         Q    That has not changed?

6         A    That has not changed.

7         Q    All right.  Your testimony is you have no

8    familiarity with this type of prospectus?  I

9    understand you said that.  I just -- it came from

10   your files, and there have been other documents

11   similar to this in your files.

12        A    I don't believe that was my testimony --

13        Q    Okay.  What --

14        A    -- I think you asked if I could identify

15   this, and I said no.

16        Q    All right.  What can you tell me about

17   this form that was produced from your files?

18        A    It appears to be a prospectus for a

19   directorship candidate, but it says level of

20   responsibility, director, managing director, senior

21   managing director.  None of that is filled out.

22   It's got spaces for information about the

23   candidate.

24        Q    Okay.  We understand it's a blank form and

25   it's a multi-page form.

C. WESTBROOK MURPHY

Page 894

1          MR. ROSE:  What is it you want to ask him

2     about it?

3          MR. NELSON:  Well, I want to ask him about

4     a document he's produced.

5          MR. ROSE:  He's answered your questions.

6     I'm just wondering what the relevance of something

7     he says he's not familiar with it is.

8          BY MR. NELSON:

9     Q     Do you understand that the promotion

10    process involves a sponsoring partner?  Referring

11    to the last page.

12    A     This form has a date on it of July 1,

13    19 -- prospectus for directorship candidate for

14    July 1, 1998.  That was the first day of the merger

15    between Pricewaterhouse and Coopers and Lybrand.

16    So this firm would have been used -- the form

17    probably would have been used, judging by the date,

18    during the spring of 1998.

19          During that time, the regulatory advisory

20    services, where I have been ever since I joined the

21    firm, was managed by Robert Bench, whose deposition

22    has been taken in this action.  It was and clear to

23    me that all promotions would have to be approved by

24    him.  Beyond that, I don't remember any great

25    familiarity with the procedure.

C. WESTBROOK MURPHY

Page 895

1     Q    When you say approved by Mr. Bench, do you

2   mean the process would have to be initiated by

3   Mr. Bench?

4     A    That was my understanding.

5     Q    Okay.  So that for any promotions for

6   professional employees and RAS, Mr. Bench would

7   have to initiate the process and make a

8   recommendation before anything could happen?

9     A    That was my understanding.

10     Q    And would that -- are you familiar with

11   the term sponsoring partner in this context or not?

12     A    I am not.

13     Q    And Mr. Bench retired, did he not,

14   effective July 1, 2003?

15     A    I believe that's correct.

16     Q    And who replaced Mr. Bench?

17     A    William J. Lewis.

18     Q    And did Mr. Lewis play the same role in

19   connection with -- in RAS?

20     A    To a lesser degree.

21     Q    To a lesser degree than Mr. Bench?

22     A    Yes.

23     Q    And in what respects?

24     A    There are -- besides Mr. Lewis, there are

25   three other partners in RAS:  David Albright, John

C. WESTBROOK MURPHY

Page 896

```
 1    Campbell, most recently Jeff Levine who started off

 2    as a law clerk with me.  And Mr. Lewis shares his

 3    managerial responsibilities with the other partners

 4    in the group to a greater extent than Mr. Bench

 5    did, including recommendations for promotions.

 6            In addition to that, the firm now has a

 7    much more elaborate process for approving whatever

 8    recommendations go forward from the RAS group than

 9    it did before 1998.

10        Q    Before 1998 --

11        A    So, Mr. Lewis's discretion in promotions

12    is because of the processes involved after his

13    recommendation.  His discretion or the weight of

14    his opinion is somewhat less than it would have

15    been when Mr. Bench was running RAS during the

16    1990's.

17        Q    Okay.  In the testimony you just gave, you

18    referred to a change being made in July 1, 1998.

19    Did the changes that you're describing happen or

20    became effective when Mr. Bench retired and

21    Mr. Lewis replaced him?

22        A    Some did.  Some became effective earlier

23    than that.

24        Q    All right.  Well, as we've noted, this

25    form is blank.  Is it correct that you were not a
```

C. WESTBROOK MURPHY

Page 897

1    candidate for managing director for the July 1,

2    1998 promotion cycle?

3        A    That is correct.

4        Q    And you don't know why you have this form

5    in your files; is that right?

6        A    That is correct.

7        Q    Let me show you a document previously

8    marked as Plaintiff's Exhibit 67.  This was marked

9    by your attorney, Mr. Rose, I believe in

10   Mr. Bench's deposition.  It's a prospectus on

11   directorship candidate for July 1, 1999, and it

12   bears Bates numbers 00050 through 54.

13           MR. ROSE:  Thank you.

14           BY MR. NELSON:

15       Q    Mr. Murphy, can you identify this

16   document, Plaintiff's Exhibit 67, which was

17   produced from your files earlier?

18       A    Yes.

19       Q    What is it?

20       A    During the spring of 1999, Mr. Bench

21   believed that RAS needed another managing director.

22   We had had two managing directors:  Harold Schuler

23   who's a Plaintiff in this lawsuit, and Paul Kergan.

24   Paul Kergan had left the firm sometime within the

25   past year.  Mr. Bench believed we needed another

C. WESTBROOK MURPHY

Page 898

1    managing director and recommended me for that

2    position.

3        At his request, I drafted this prospectus

4    that's now marked as Exhibit 67.  He forwarded it

5    on, and I -- he later told me -- and I believe I've

6    testified on this already -- that when he went to a

7    meeting in New York with others, including Darlene

8    Shea, to go over recommended bonuses, salaries

9    increases for our group, he was told that was

10   position of managing director had been abolished.

11   And, for that reason, his recommendation was not

12   approved.

13       Now, at least a couple of things in here

14   that I'm sure Mr. Bench himself did, although I was

15   the principal draftsman.  Also as an exhibit

16   somewhere in one of the depositions is the email

17   that Mr. Bench used to forward this document in an

18   electronic form before the meeting that I just

19   talked about, although we had been unsuccessful in

20   getting PWC to admit that Exhibit 67 was the

21   attachment to that memo that Mr. Bench sent.

22       Q    Well, to whom was it forwarded, to your

23   knowledge?

24       A    I don't remember.

25       Q    You have no recollection?