Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------x

C. WESTBROOK MURPHY, et al.,        )

               Plaintiffs,        )

    v.        )  Civil Action

PRICEWATERHOUSECOOPERS, LLP,        )  No. 02-982

et al.,        )  (RJL/DAR)

               Defendants.        )

--------------------------------x

C. WESTBROOK MURPHY,        )

               Plaintiff,        )

    v.        )  Civil Action

PRICEWATERHOUSECOOPERS, LLP,        )  No. 05-1054

               Defendant.        )  (RJL)

--------------------------------x

Deposition of CHARLES WESTBROOK MURPHY

Washington, D.C.

Wednesday, November 1?, ????

10:00 a.m.

Job No.:  22-91057

Pages 1 - 273

Reported By:  Joan V. Cain

Page 2

1        Deposition of CHARLES WESTBROOK MURPHY, held

2   at the law offices of:

3

4            WINSTON & STRAWN LLP

5            1700 K Street, Northwest

6            Washington, D.C.  20006

7            (202) 282-5000

8

9        Pursuant to Notice, before Joan V. Cain,

10  Certified Court Reporter and Notary Public in and for

11  the District of Columbia.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 3

1                   A P P E A R A N C E S

2

3   ON BEHALF OF PLAINTIFF C. WESTBROOK MURPHY:

4       RICHARD A. SALZMAN, ESQUIRE

5       HELLER HURON CHERTKOF LERNER

6       SIMON & SALZMAN

7       Suite 412

8       1730 M Street, Northwest

9       Washington, D.C.   20036

10      Telephone:   (202) 293-8090

11

12  ON BEHALF OF DEFENDANTS:

13      ERIC M. NELSON, ESQUIRE

14      WINSTON & STRAWN, LLP

15      200 Park Avenue

16      New York, New York 10166-4193

17      Telephone:   (212) 294-6700

18

19

20

21

22

23

24

25

Page 4

1                    C O N T E N T S

2

3   EXAMINATION OF CHARLES WESTBROOK MURPHY          PAGE

4     By Mr. Nelson                                    6

5

6                    E X H I B I T S

7               (Retained by Counsel.)

8   DEPOSITION EXHIBITS                              PAGE

9      67  E-mail from Mr. Murphy to               21

10         Mr. Lewis, 1/18/06

11     68  E-mails from Ms. Miller to              24

12         Mr. Murphy, 11/29/05, 1/19/06

13     69  E-mail from Mr. Murphy to               31

14         Multiple Recipients

15     70  E-mail Chain, 2/8/06                    36

16     71  E-Mail from Mr. Murphy to               40

17         Mr. Blair, 10/5/06

18     72  Memo from Mr. Murphy, 8/22/05           52

19     73  E-Mail from Mr. Murphy to              123

20         Mr. Nally, 2/9/06

21     74  Plaintiff Murphy's Answers to         139

22         Defendants' Interrogatories

23     75  Memo to File from Mr. Murphy, 2/1/02   235

24     76  E-mail from Mr. Murphy to             241

25         Mr. Schuler, 1/17/06



Page 5

1        E X H I B I T S   C O N T I N U E D

2            (Retained by Counsel.)

3    DEPOSITION EXHIBITS                        PAGE

4       77  E-mail from Mr. Murphy to            243

5           Mr. Schuler, 2/14/06

6       78  Telecopier Transmission from Mr. Rose   253

7           to Mr. M. Nelson, 9/29/06

8       79  Memo from Mr. Bench to               258

9           Mr. Murphy, 3/13/95

10      80  Performance Appraisal Prepared by    260

11          Mr. Bench for Mr. Murphy

12      81  Memo from Mr. Murphy to the Annual   263

13          Review Committee, 6/23/05

14      82  E-Mail from Mr. Murphy to            266

15          Mr. McGovern, 7/14/99

16      83  E-Mail Bates Stamped Murphy          266

17          03302 to 03304

18      84  E-Mails Bates Stamped Murphy         267

19          03176 to 03178

20      85  Memo to File from Mr. Murphy, 5/31/01   268

21

22

23

24

25

Page 6

1        CHARLES WESTBROOK MURPHY

2            P R O C E E D I N G S

3        CHARLES WESTBROOK MURPHY

4      having been sworn, testified as follows:

5    EXAMINATION BY COUNSEL FOR DEFENDANTS

6    BY MR. NELSON:

7      Q    Would you state your full name for the

8    record?

9      A    Charles Westbrook Murphy.

10     Q    Has your address changed since the last time

11   you were deposed two years ago?

12     A    Residence address?

13     Q    Residence address.

14     A    No.

15     Q    Would you state the address for the record?

16     A    400 Fairlea Drive, Edgewater, Maryland.

17     Q    Is that near a larger city or a town?

18     A    That depends on how you define near.  The

19   closest city, that's larger, is Annapolis, Maryland.

20     Q    I see.  And how far is Edgewater from

21   Annapolis?

22     A    About 5 miles.

23     Q    How far is Annapolis from Washington, D.C.,

24   or from your former office at PwC in Washington?

25     A    32 miles.



Page 18

CHARLES WESTBROOK MURPHY

1

2    Q    Did she encourage you to retire?

3    A    I believe the answer is yes, but not

4  strongly.  I think a better word would be advise.

5    Q    She advised you to retire?

6    A    I think that's a better word.

7    Q    What was your total compensation from PwC in

8  2005?

9    A    Best of my memory is $280,000.

10    Q    And what were the components of that

11  $280,000?

12    A    Salary of between 260 and 265, bonus of

13  between 10,000 and 15,000, and what they called a work

14  life benefit of, I believe, 2500.

15    Q    What was your annual salary at PwC at the

16  time of your retirement on March 1, 2006?

17        MR. SALZMAN:  I thought he just answered

18  that question.

19        MR. NELSON:  No.  I had asked him what his

20  total compensation for 2005 was.

21        MR. SALZMAN:  I apologize.

22    A    I'm sorry.  Would you repeat the question?

23  BY MR. NELSON:

24    Q    What was your annual salary at the time of

25  your retirement on March 1, 2006?

Page 19

CHARLES WESTBROOK MURPHY

1

2     A     I believe it was between 265 and $270,000.

3     Q     When had you received your last salary

4  increase at PwC?  What was the effective date of that?

5     A     September 1, 2006.

6     Q     Do you mean 2005?

7     A     I'm sorry.  2005, yes.  Thank you.

8     Q     Did you contemplate that your salary would

9  continue to increase over time?  Had you continued to

10 work at PwC?

11    A     Yes.

12    Q     Is it correct that you were not subject to

13 mandatory retirement at any age as a managing director

14 at PwC?

15    A     That is correct.

16    Q     I believe you testified that you first

17 notified PwC of your intention to retire in

18 January of 2006?

19    A     That is correct.

20    Q     And whom did you notify?

21    A     I sent a letter to my supervisor,

22 Bill Lewis.  I sent it as an attachment to an e-mail.

23 He was not in the office.  I would have told him

24 personally.  He had been there since I've known him a

25 long time and consider him to be a good friend.  So, I

Page 66

1       CHARLES WESTBROOK MURPHY

2   BY MR. NELSON:

3       Q    Apart from other qualifications, could you

4   make a business case for the admission of any of

5   these, approximately 100, managing directors to be

6   partners?

7       A    For everyone who had been appointed a

8   managing director, there was a business case that was

9   based on one of two factors, either, A, that they had

10  what is called, within the firm, a book of business

11  that they were managing or they were subject matter

12  experts in an area that was of particular importance

13  to the firm.

14      Q    Is it your understanding the business case

15  for becoming a managing director is the same as the

16  business case for becoming a partner, if you know?

17      A    I believe they are substantially similar.

18      Q    What's the basis for that belief?

19      A    Having reviewed the partnership prospectus

20  or I guess its proposal from Mr. Lavine and from

21  Mr. Albright, having reviewed my own, and having

22  reviewed Mr. Schuler's.

23      Q    Did --

24      A    I'm sorry.  Plus the comments that were made

25  during the webcast in 2004.

Page 67

1          CHARLES WESTBROOK MURPHY

2      Q      Did Mr. Albright and Mr. Lavine have a book

3   of business, as you put it?

4      A      The proposal said that they did.  Book of

5   business is not my term.  That's the firm's term.

6      Q      Did the proposals for those two individuals

7   refer to them as subject matter experts?

8      A      I believe they did.

9      Q      Are you talking specifically about the

10  business case or the general qualifications to be

11  partner?

12     A      About whom are you asking that question?

13     Q      Mr. Albright and Mr. Lavine.

14          MR. SALZMAN:  I don't understand your

15  question.  Can you rephrase it?

16     A      Well, you asked me about the business case.

17  That I thought I answered that, and then you asked me,

18  "Did it say anything about subject matter expertise?"

19  And I thought I answered that.  What's left?

20  BY MR. NELSON:

21     Q      Well, my question was, Was that specifically

22  mentioned in connection with a business case for

23  admission?

24     A      Was what specifically mentioned?

25     Q      Subject matter expertise.

Page 68

CHARLES WESTBROOK MURPHY

1

2     A    Yes.  Yes.

3     Q    In the business case?

4     A    Well, it -- my recollection of those

5  partnership proposals from Messrs. Lavine and Albright

6  was that each of them mentioned some specific areas in

7  which they were purported to have expertise and in

8  which, according to the proposal, additional expertise

9  was needed at the partnership level.

10    Q    Well, specifically, what factors do you

11 understand to be considered in connection with a

12 business case for admission as partner?

13         MR. SALZMAN:  Are you asking him what

14 factors are supposed to be considered by the firm?

15 His understanding of --

16         MR. NELSON:  The witness's understanding.

17         MR. SALZMAN:  -- what's supposed to be

18 considered or what is actually considered?

19         MR. NELSON:  Well, if there's a difference,

20 then he can so testify.

21    A    I would start with competence in whatever --

22 in discharging whatever responsibilities the candidate

23 has, as soon as been given within the firm, since

24 someone who doesn't perform competently is not likely

25 to be much in the way of business.  Next is the amount

CHARLES WESTBROOK MURPHY

1

2 laws with which banks have to comply.

3     Q    Are those qualifications to be a partner at

4 PwC, knowing about trading rooms -- and I'm sorry.

5 What else was it?

6     A    Compliance.

7     Q    Compliance rules?

8     A    That those are qualifications if one is

9 going to -- knowledge of the banking industry, and in

10 my belief, deep knowledge of the banking industry,

11 should be a qualification for one who becomes a

12 partner who's going to specialize in the banking

13 practice, and Hal Schuler and I both possess that deep

14 knowledge.

15     Q    And that deep knowledge is equal between the

16 two of you; is that right?

17     A    Overall I believe that it is.

18     Q    Different but equal.  Is that what you're

19 saying?

20     A    Yes.

21     Q    And what other qualifications?  Are you

22 equal in other respects as well?  You're talking about

23 industry knowledge.  I think before you mentioned that

24 another factor was business brought in.

25     A    I believe that if Hal Schuler has brought in

Page 88

CHARLES WESTBROOK MURPHY

1

2    Poland.

3    Q    Are there any other respects in which you

4    believe yourself to be better qualified than

5    Mr. Schuler for admission as a partner at PwC?

6        MR. SALZMAN:  Objection, relevance.

7    A    Again, a slight edge I think just in writing

8    and communications ability.  Hal is very good, and I

9    remember one instance, he had written a report on the

10   liquidity -- this was an engagement for

11   Pricewaterhouse of, I believe, the Farm Home Loan Bank

12   in Omaha -- Farm Credit Bank in Omaha, and our mutual

13   supervisor, Bob Bench, gave me a copy of the report

14   and said it was so well done that it was worth

15   reading, and I read it and I agreed with him.

16        I thought it was very well done and very

17   well written.  So, I think he's quite good.  I think

18   I'm probably better.  I'm more of a word man.  He's

19   more of a numbers man.

20   BY MR. NELSON:

21   Q    Any other differences between your

22   qualifications and Mr. Schuler's?

23   A    I'm better looking.

24   Q    Anything else?

25   A    Not that occurs to me at the moment.

Page 89

CHARLES WESTBROOK MURPHY

1

2    Q    As of July 1 --

3    A    Excuse me.  I want to go back and correct

4    that last answer.  He knows more about bank operations

5    than I do.

6    Q    Any other differences?

7    A    Not that I can think of now.

8    Q    As of July 1, 2000, how would you rank the

9    professional employees in RAS, Regulatory Advisory

10   Services, in terms of their qualifications to be a

11   partner, starting with the most qualified?

12   A    You're excluding the ones that are -- that

13   already were partners?  So, we're excluding

14   Bill Lewis, Bob Bench, John Campbell?

15   Q    Yes, let's exclude those who are already

16   partners.

17   A    First, I'm going to have to remember who

18   they were.

19   Q    Let's start with the most qualified

20   professional --

21   A    I would say that the most qualified would be

22   Westbrook Murphy, and the second most qualified would

23   be Hal Schuler, and that's shown, among other things

24   by the responsibilities we had.  Hal was a managing

25   director.  I was acting as a managing director, and we

1    CHARLES WESTBROOK MURPHY

2    were the only two employees in RAS who were either --

3    were acting as managing directors either de facto or

4    de jure, and at that time, I think everybody else

5    would have been a distant -- anybody else would have

6    been a distant third.

7        Q    Well, who would have been third in your

8    ranking at that time?

9        A    I take that back about the distant third.  I

10   think Gary Welsh would have been very well qualified.

11   So, I would make him third.

12       Q    And who would you make fourth best

13   qualified?

14       A    Perhaps David Sapin.  If he was still -- I

15   don't remember whether he was still with RAS then or

16   not.  I believe he was.

17       Q    Who would be fifth?

18       A    His experience would have been a little

19   light at the time.  I'm not sure that I'm remembering

20   who was in RAS, but I don't think there would be

21   any -- I don't think there'd be anybody else who, if I

22   was making the decision, I would have made a partner

23   in the year 2000.

24       Q    No, I'm not asking who you would make

25   partner.  I'm asking just in terms of qualifications,

1          CHARLES WESTBROOK MURPHY

2          (Whereupon, at 1:04 p.m., the

3  above-entitled matter was recessed until 2:01 p.m.)

4      CONTINUED EXAMINATION BY COUNSEL FOR DEFENDANTS

5  BY MR. NELSON:

6      Q    Mr. Murphy, did I understand you to testify

7  that you had sent your retirement letter to Mr. Lewis

8  because he was your immediate supervisor?

9      A    That is what I testified, yes.

10     Q    And how long was Mr. Lewis your immediate

11  supervisor?  During what period?

12     A    From July 1, 2003 until February 28th, 2006.

13     Q    And what role did Mr. Lewis play generally

14  in Regulatory Advisory Services or in the firm during

15  that period of time?

16     A    Well, he was the head of Regulatory Advisory

17  Services.

18     Q    He was Mr. Bench's --

19     A    He was Mr. Bench's replacement.  Mr. Bench

20  reached the mandatory retirement age and had to leave.

21     Q    Who else reported directly to Mr. Lewis

22  during this period?  Would it have been all the

23  professional employees in RAS?

24     A    As well as David Albright, John Campbell,

25  and -- I'm sorry -- Jeff Lavine.

CHARLES WESTBROOK MURPHY

1

2    Q    He assumed Mr. Bench's role; is that right?

3    A    That is correct.  Just to be complete, in

4  the fall of 19 -- I'm sorry -- in the fall of 2004, he

5  also became the leader of the bank audit practice when

6  Tim Ryan became the leader of financial services, and

7  he -- for the rest of the time that I was there, he

8  had two jobs.  One is head of RAS and one is head of

9  banking.

10    Q    I take it Mr. Lewis is a partner as opposed

11  to a principal?

12    A    He is.  He is a CPA and, in my opinion, an

13  excellent one.

14    Q    And what was his background, if you know?

15    A    I believe he -- he joined Pricewaterhouse in

16  New York, I believe, directly out of college.  That

17  was in the 1980s.  Approximately 1990, he left the

18  firm to go to an accounting fellowship at the office

19  of the comptroller of the currency.  When that flip

20  was finished, which I believe was a two-year period,

21  he came back to Pricewaterhouse, but not as an auditor

22  in New York.  Instead, he came back to RAS, where he

23  and I worked together very closely.

24    Q    I take it you have a high regard for

25  Mr. Lewis?

CHARLES WESTBROOK MURPHY

1

2    A    I do.

3    Q    You believe he's a well-qualified partner?

4    A    I do indeed.

5    Q    Had you discussed with Mr. Lewis your

6 aspirations within the firm?

7    A    Yes.

8    Q    And we're talking about the period that he

9 was your immediate supervisor?

10    A    Yes.

11    Q    And what did you discuss with Mr. Lewis?

12    A    And perhaps even before that, each of us had

13 to prepare annually in the fall a plan for the, then,

14 new fiscal year which would end the first of June.

15 The first of those, I had to prepare.  The partner who

16 reviewed it was Allan Schott.  And I don't believe

17 I've mentioned him before.  He was a partner in RAS

18 from the time of the merger in 1998 until he left in,

19 I believe, the winter -- January or February of 2003.

20 I may be wrong on when he left.

21        But, anyway, the first plan that I prepared,

22 he was the one who reviewed it.  After he left all the

23 other plans, it was Bill Lewis who reviewed it and

24 each of those plan at my -- one of the questions is,

25 "What is your career at PwC?  What's the next step?"

Page 99

1              CHARLES WESTBROOK MURPHY

2   And in all of them, I put that -- I wanted to be a

3   partner.

4        Q     And during what period is this?  Beginning

5   when?

6        A     Probably 2002, perhaps 2001.

7        Q     And you've produced those documents, have

8   you?

9        A     Yes.

10       Q     Did you ever discuss that aspiration with

11  Mr. Lewis?

12       A     Yes.

13       Q     And what were those discussions?

14       A     I only remember one specific discussion, and

15  that was I had put in the draft of the plan that I had

16  to overcome PwC's illegal employment policy.  And he

17  asked me to take out the word "illegal," which I did.

18       Q     Was there any other discussion of your

19  indication that you wanted to be a partner?

20       A     Not that I remember.

21       Q     Was that the only conversation that you had

22  with Mr. Lewis on that subject?

23       A     On the subject of becoming a -- in

24  connection with -- the only conversations I had with

25  him were in connection with preparing those plans.

Page 100

CHARLES WESTBROOK MURPHY

1

2    Q    Okay.  And the only conversation you

3    remember is that you made a reference to illegal

4    employment practice at PwC and he asked you to take

5    out the word "illegal"?

6    A    No.  When he did that the first time, I

7    didn't have to do it the next year or the year after

8    that.

9    Q    You didn't put "illegal" in there in the

10   succeeding years?

11   A    Right.

12   Q    Did you ever discuss the substance of what

13   you were saying?

14   A    I'm sorry.  I don't understand the question.

15   Q    Did you ever discuss with Mr. Lewis, apart

16   from what you've related, your aspiration to become a

17   partner at PwC?

18   A    Not that I remember.

19   Q    Do you know any -- can you identify any

20   employees who made partner as subject matter experts

21   or principally or solely as subject matter experts?

22   A    I know of one.  I don't remember his name,

23   and it would have been in the mid-1990s back at

24   Pricewaterhouse, and he was a statistical whiz.  And

25   that was I was told that that was -- I knew him

Page 101

CHARLES WESTBROOK MURPHY

1

2   slightly.  I worked with him a little.  And I was told

3   that the basis for his being admitted to the

4   partnership was just his sheer talent in that one

5   area.

6        Q    What area of the firm did he work in?

7        A    It was in the nonauditing side of the firm,

8   which is now called "advisory," but it's been called a

9   number of different things over the years.

10       Q    It wasn't RAS?

11       A    It was not RAS.

12       Q    Was he based in Washington in the same

13  office?

14       A    He was.

15       Q    And that's the only employee you can

16  identify who became a partner as a SME, a subject

17  matter expert?

18       MR. SALZMAN:  Your question was either

19  solely as or principally as?

20       MR. NELSON:  Solely or principally, correct.

21  Right.

22       A    There are some in the administrative side of

23  the firm.  We may even have deposed some of them.

24  BY MR. NELSON:

25       Q    And what about among the ranks of the

Page 102

CHARLES WESTBROOK MURPHY

1

2    managing directors, those who became managing

3    directors in 2004 forward, can you identify any

4    subject matter experts or managing directors who were

5    principally subject matter experts?  I think you

6    testified that that was one of the tracks or one of

7    the --

8        A    In addition to me?

9        Q    Okay.  You're saying you're a subject matter

10    expert?

11        A    That's what the proposal said.

12        Q    Okay.  And do you know other employees who

13    were promoted or who were made managing directors

14    based on their being -- principally being subject

15    matter experts?

16        MR. SALZMAN:  I'm going to object to the

17    question because I don't think he said that he

18    principally is a subject matter expert.

19        MR. NELSON:  I'm not talking about him.  I'm

20    talking about --

21        MR. SALZMAN:  You used the word "other,"

22    though.

23        MR. NELSON:  Okay.  Thank you.

24        A    I was told during the webcast in November of

25    2004 and at other times that to become a managing

Page 103

CHARLES WESTBROOK MURPHY

1

2  director, one either had to, as I said, manage a book

3  of business or be a subject matter expert and that

4  either would qualify.  And my proposal emphasized the

5  subject matter expertise.  I'm fairly certain that's

6  true for some of the people in the tax practice and

7  beyond that I just don't know.  I can't tell you.

8  BY MR. NELSON:

9      Q    What about Hal Schuler?

10     A    I don't remember.  At the time I read his

11 proposal, but I don't remember what it says.

12     Q    I want to go back to the last exhibit,

13 Defendants' Exhibit 72.  And turning to the second

14 page, you refer there to conversations you had with

15 the three managing directors, including David Brown,

16 Mark Lange, L-a-n-g-e, and Sunita, S-u-n-i-t-a, Suri,

17 S-u-r-i.  Did you know any of these individuals before

18 meeting them at this conference in August of 2005?

19     A    I did not.

20     Q    When during the three-day or the

21 two-and-a-half day conference, did you speak to David

22 Brown, if you recall?

23     A    I don't recall.

24     Q    When you spoke with him, was anyone else

25 present?

Page 151

CHARLES WESTBROOK MURPHY

1

2    before or shortly after that meeting about why he

3    was -- about his not attending.

4        Q    Did you provide Mr. Blackburn with a copy of

5    what's been marked as Defendants' Exhibit 72?

6        A    Not that I remember.

7        Q    Did you discuss with Mr. Schuler the content

8    of Defendants' Exhibit 72?

9        A    I think I remember discussing it in a

10   meeting that he and I had with our counsel.

11       Q    Do you remember any discussions with

12   Mr. Schuler outside the presence of counsel?

13       A    No.

14       Q    What counsel were present at this meeting

15   that you think you remember?

16       A    Best of my memory, Mr. Rose and Mr. Salzman.

17       Q    And approximately, when would this have

18   been?

19       A    After August 22nd 2005.

20       Q    How soon after?

21       A    I have no way of remembering.

22       Q    On page 4 of your interrogatory responses,

23   you named Hyacinth Clark and Lynn McDermott --

24       A    Yes.

25       Q    -- of the EEOC in Washington.  Do you see

1          CHARLES WESTBROOK MURPHY

2    that?

3        A    Yes.

4        Q    What is Ms. Clark's position with EEOC?

5        A    My understanding is that they are both

6    assigned.  Both she and Ms. McDermott are assigned to

7    the Washington field office or Washington regional

8    office of the EEOC and that Ms. Clark is an

9    investigator.

10       Q    And what is Lynn McDermott's position?

11       A    I don't know.

12       Q    Is she senior or higher ranking than

13   Ms. Clark?

14       A    Don't know.

15       Q    Is she a lawyer?

16       A    I don't know.

17       Q    Have you ever met Ms. McDermott?

18       A    Yes.

19       Q    Have you met Ms. Clark face-to-face?

20       A    Yes.

21       Q    On how many occasions?

22       A    Twice.

23       Q    And when were those occasions?

24       A    September of 2005.  Once early in the month

25   and once late in the month.  I met at the EEOC office

CHARLES WESTBROOK MURPHY

1
2  with both of them.

3      Q    Both Ms. Clark and Ms. McDermott?

4      A    They were both there both times.

5      Q    Those are the only two occasions you met

6  with either or both of them?

7      A    Correct.

8      Q    And who was present at these meetings?

9  Let's take them one by one.

10      A    Well, besides the two of them and me,

11  Mr. Salzman.

12      Q    And how long was the meeting early in

13  September of 2005?

14      A    Two hours, two-and-a-half hours, something

15  in that range.

16      Q    And what gave rise to that meeting?  Why was

17  it held?

18      A    Before I filed the lawsuit for failure to

19  promote in 2004, I filed a charge administratively

20  with the D.C. field office of the EEOC and they were

21  assigned to investigate that charge.

22      Q    And when did you learn that they had been

23  assigned?

24      A    I believe some time in August 2005.

25      Q    How did you learn that?

1          CHARLES WESTBROOK MURPHY

2     A    I was told by my -- by Mr. Salzman, who said

3     they wanted to meet with me.

4     Q    They wanted to meet with you?

5     A    Yes.

6     Q    Was it your understanding your counsel had

7     communicated with them before that?

8     A    Since he was the one who told me that they

9     wished to meet, I assumed that he must have.

10    Q    I mean, before, were you aware that

11    Mr. Salzman had met or communicated with Ms. McDermott

12    or Ms. Clark before August of 2005?

13    A    I don't know whether he had or not.

14    Q    What did you do to prepare for the meeting?

15    A    I believe I read through the charge that I

16    had filed and I had discussions with Mr. Salzman.

17    Q    You read through the charge including the

18    exhibits?

19    A    Yes.

20    Q    And who said what to whom at this two to

21    two-and-a-half hour meeting in early September 2005?

22         MR. SALZMAN:  You're talking about the

23    meeting with Ms. Clark and Ms. McDermott?

24         MR. NELSON:  Correct.

25    A    Ms. Clark said several times that I -- we,

1          CHARLES WESTBROOK MURPHY

2    Mr. Salzman and I, could tell that they were taking

3    this investigation very seriously because they had two

4    people at the meeting and it was usually just one.  We

5    discussed the interest of the EEOC in age

6    discrimination against partners in -- against persons

7    in large firms who were nominally called "partners."

8    I was well aware and they were well aware of the case

9    that the EEOC had filed in Chicago against one of the

10   large law firms, Sidley Austin Brown & Wood.

11          They were, I believed, particularly

12   anxious -- anxious may not be -- interested in

13   information about PwC, and were disappointed -- that

14   may not be the right word -- had gotten no information

15   from a letter that they showed me that, I believe, you

16   personally had sent back on behalf of PwC.  My

17   understanding is that EEOC had sent my charge to PwC

18   and asked for an answer -- asked for what their view

19   was and that you sent back a letter that said that

20   Mr. Schuler's similar charge, which he filed in New

21   York, had been dismissed because of the pending

22   litigation and that the D.C. office should likewise

23   dismiss the charge that I had filed, but otherwise

24   provided no information.

25          And so, they were very interested in the

1          CHARLES WESTBROOK MURPHY

2    information that I could provide them about PwC and

3    how it worked and what facts might bear on whether a

4    so-called partner at PwC would be an employee within

5    the meeting of anti-discrimination statutes.

6    BY MR. NELSON:

7        Q    What else were they interested?  Is that the

8    thrust of it?

9             MR. SALZMAN:  They wanted your home address

10   and phone number?  I'm kidding.

11       A    They had gave every indication that they had

12   read the complaint and the exhibits very thoroughly

13   and asked me about a couple of details that were

14   buried someplace in the exhibits.

15   BY MR. NELSON:

16       Q    Do you remember what those details were?

17       A    No.  I remember thinking at the time that it

18   was not something that -- not a question that would

19   occur to a casual reader or somebody who had just

20   scanned briefly through the document, suggested to me

21   a thorough reading and understanding of what had been

22   filed.

23       Q    What else did they tell you?

24       A    They asked a question and I don't, now,

25   remember exactly what it was that was not fully

1                CHARLES WESTBROOK MURPHY

2    resolved or it was on the basis of that question that

3    several weeks later on my behalf, Mr. Salzman called

4    him and we set up another meeting to provide more

5    detail on whatever that question was.

6        Q    Did they express any views about your

7    charge?

8        A    I only remember one.  That is, we discussed

9    the factors that are laid out in the EEOC manual,

10   which are, of course, the Supreme Court endorsed in

11   the Clackamas case, and how those factors would apply

12   on the one hand to Sidley Austin Brown & Wood and on

13   the other to PricewaterhouseCoopers, and on the

14   question of election of the managing board, whatever

15   it was called at PwC -- it's the U.S. board of

16   partners and principals.  I don't remember what it's

17   called at Sidley & Austin.

18           PwC, as you know, the partners vote on who

19   is elected to that board.  And my understanding is

20   that at Sidley & Austin, they do not.  And that was --

21   I remember specifically either of the ladies we were

22   meeting with saying that that would be a factor that

23   would tend to show a PwC partner being less like an

24   employee than a partner at Sidley & Austin.  I believe

25   they also told me what their procedure would be,

Page 235

CHARLES WESTBROOK MURPHY

1

2      Q    But that would be your policy, correct?

3      A    I don't believe I said anything about my

4  policy.

5           MR. SALZMAN:  His policy?  What do you mean?

6      A    I didn't have a policy.

7  BY MR. NELSON:

8      Q    You consented to PwC's policy, right?

9      A    That's what PwC says.

10          MR. NELSON:  Mark as the next exhibit, a

11  memo to file from Mr. Murphy.  It's Bates-numbered

12  Murphy 03506 through Murphy 03507.

13               (Defendants' Exhibit 75 was marked for

14  identification and was retained by counsel.)

15  BY MR. NELSON:

16     Q    Can you identify Defendants' Exhibit 75?

17     A    Yes.  It's a memorandum that I wrote on

18  February 1, 2002 concerning retirement for PwC

19  partners.

20     Q    In the last paragraph on page 1 that goes

21  over to page 2, you describe disadvantages that would

22  be suffered by an employee aged 56 or older who was

23  admitted as a partner?

24     A    That is correct.

25     Q    Do you see that?

Page 236

CHARLES WESTBROOK MURPHY

1

2      A    Yes.

3      Q    And how old were you on July 1, 2000?

4      A    60.

5      Q    And when did you turn 60?

6      A    January 30, 2000.

7      Q    In the parenthetical at the end of the

8  subparagraph at the top of page 2, you state

9  that, "The answer to this question is unclear."

10        Do you see that?

11      A    Yes.

12      Q    Has the answer since become clear to you?

13      A    I think there's very little between the --

14  in the interconnection between the employee retirement

15  benefits and continuing healthcare after retirement

16  that is clear to me.

17      Q    You recognize that a partner might -- who

18  had -- admitted at some point had to retire at age 60

19  might lose retirement health benefits; is that right?

20      A    Apparently.

21      Q    And you said it might foreclose the

22  availability of health benefits that would normally be

23  available to former PwC employees?

24      A    I believe the question that's being

25  addressed here is after the hiatus that's described,

Page 237

CHARLES WESTBROOK MURPHY

1    "Would health benefits then become available," and I'm

2    sure I do not know the answer to that question now.

3        Q    And you testified earlier that your right to

4    retiree health benefits vested on June 30th of 2005,

5    correct?

6        A    I'm not sure "vested" is the correct word,

7    but became available when retirement vested.

8        Q    Became available.  Okay.  When your

9    retirement vested and your retirement didn't vest

10   until June 30, 2005; is that right?

11       A    Right.

12       Q    And whether you agreed or not, you were

13   informed in the year 2000, were you not, that that was

14   the case?

15       A    That is correct.

16       Q    And if you retired earlier, you wouldn't

17   have had health benefits; is that right?

18       A    That is correct.

19       Q    And you understood then -- assumed the

20   retirement provision is effective and not unlawful as

21   you contend if you were admitted as a partner, you

22   would have -- your period of employment as an employee

23   would have ended at that point.  You understood that,

24   right?  If you're admitted as a partner, you're no

Page 238

CHARLES WESTBROOK MURPHY

1

2    longer an employee?

3        A    Assuming -- that's a big assumption.  No, I

4    believe you had more than one question wrapped up

5    there.  No, I would not assume that had I been

6    admitted to as a partner, I would no longer be an

7    employee within the meaning of the statutes --

8        Q    I'm not talking about --

9        A    -- and the PwC qualified retirement plan,

10   such as the RBAP specifically defined employee to

11   include partners.  It's very specific in the

12   definition in the retirement plan.

13       Q    Right.  And do you know why that is?

14       A    No.

15       Q    I suggest you find out why that is.  Because

16   I'm not going to answer your questions here, but you

17   might find out what it is.

18       MR. SALZMAN:  I don't think he asked you a

19   question, but I do think you're almost done.

20       MR. NELSON:  I think he's misreading

21   something and misunderstanding quite a few things

22   here.

23   BY MR. NELSON:

24       Q    What information would you need to clarify

25   the one question that you think might be -- might have

Page 239

CHARLES WESTBROOK MURPHY

1
2  been a little unclear to you in 2002?

3     A    I've got no idea.  And at this point, I

4  would have no interest in finding out.

5     Q    Well, didn't you testify that if you are --

6  if the -- admitted as partner, as you claim you should

7  have been on any of the dates you claim you should

8  have been, the objective in granting relief would put

9  you in the position that you would have been had you

10  gotten that position at that time?

11         MR. SALZMAN:  Objection, calls for a legal

12  conclusion, and I object to the characterization of

13  prior testimony.

14     A    Well, assuming that's what I testified.  So,

15  what?

16         MR. SALZMAN:  And that too.  I think we're

17  past 7 hours.

18     A    Where I to be admitted tomorrow as a partner

19  in PwC and the only way to continue health benefits

20  for the remainder of my life would be to work as a

21  partner for 5 years, I might very well do that.

22  BY MR. NELSON:

23     Q    The mandatory retirement provision -- this

24  is what your memo addresses.  I'm not going to argue

25  with you.  Your memo speaks for yourself -- speaks for

Page 240

1                  CHARLES WESTBROOK MURPHY

2    itself.  That's all.  I just wondered whether you had

3    the answer to the question with clarification?

4        A    And I believe I testified about this memo

5    before -- testified before about this memo, and I --

6    after I wrote this memo, I showed it to Gary Welsh

7    because the memo, to a large part, recites

8    conversations between Gary and Darlene Shay (phonetic)

9    and asking if I understood correctly what he had told

10   me.  And I don't now remember whether he made any

11   corrections, but if he did, they are reflected in the

12   memo.

13       Q    You were at the deposition of Roger Hindman?

14       A    I was.

15       Q    And you understood Roger Hindman was the

16   national benefits leader or is and has been?

17       A    Yes.

18       Q    So, your attorney asked that question or any

19   of these questions that are summarized in your memo to

20   file?

21            MR. SALZMAN:  Objection, relevance.

22       A    Well --

23            MR. SALZMAN:  I think we're done.

24            MR. NELSON:  We're not done.

25            MR. SALZMAN:  I think you have to tell me --

CHARLES WESTBROOK MURPHY

1

2   you're asking questions about what his attorney --

3   we're beyond the 7 hours.

4         MR. NELSON:  What 7 hours?  If you want to

5   do it, then we'll discuss the 7 hours, you know,

6   tomorrow about Friday or anything else.  I mean, I'm

7   not done, and let's get a time count.  Let's figure it

8   out.

9         MR. SALZMAN:  Okay.

10        MR. NELSON:  Let's figure it out.

11        MR. SALZMAN:  It's now 6:10.  We started the

12  deposition at 10:00.

13              (Discussion off the record.)

14              (Recessed at 6:12 p.m.)

15              (Reconvened at 6:22 p.m.)

16        MR. NELSON:  I'd like to mark as Defendants'

17  Exhibit 76 --

18        MR. SALZMAN:  Trombones?

19        MR. NELSON:  If you like -- e-mails, dated

20  January 17, 2006.  It's designated, Bates number

21  Murphy 05385.

22              (Defendants' Exhibit 76 was marked for

23  identification and was retained by counsel.)

24  BY MR. NELSON:

25    Q    Mr. Murphy, can you identify Defendants'

1                    CHARLES WESTBROOK MURPHY

2   Exhibit 76?

3       A    It is a memo from me to Hal Schuler, but

4   it's sent to his home e-mail, which is in the name of

5   his wife, Jan Schuler.

6       Q    Was it your practice to send e-mail messages

7   to Hal Schuler to his wife's e-mail address?

8       A    It happened with some regulator.

9       Q    Did Hal Schuler have his own e-mail address?

10      A    Not at home.

11      Q    Not at home?

12      A    No.

13      Q    His only e-mail address is at PwC; is that

14  it?

15      A    That's my understanding.

16      Q    So, if you wished to e-mail Hal not on his

17  PwC computer, you would send it him via his wife, Jan

18  Schuler?  Was that the practice?

19      A    It happened with some regularity.

20      Q    Do you know if anyone communicated with

21  Ms. Clark in response to this note to Mr. Salzman?

22      A    I do not.

23      Q    You do not know, as you sit here now, or you

24  don't know?  You never knew?

25      A    I don't know now, and I don't know whether I

Page 243

CHARLES WESTBROOK MURPHY

1
2      ever knew.  That, I think, would be clear from my

3      earlier testimony.  I didn't even remember this note.

4          Q    Is this ESC investigation important to you?

5          A    Yes.  I hope it's important to PwC.

6          Q    What did you understand the status of

7      proceedings at the EEOC to be at that juncture?

8          A    I have no understanding other than what's

9      stated in this e-mail.

10          MR. NELSON:  I'll have marked as Defendants'

11     Exhibit 77 an e-mail from Mr. Murphy, dated February

12     14, 2006.  This is also addressed to Jan Schuler.

13              (Defendants' Exhibit 77 was marked for

14     identification and was retained by counsel.)

15     BY MR. NELSON:

16          Q    Can you identify Defendants' Exhibit 77?

17          A    It's an e-mail that I sent to Hal Schuler

18     via his wife's e-mail address with carbon copies to

19     each of my three children.

20          Q    And what was the source of the information

21     set forth in the first paragraph?

22          A    I don't remember, but I can't imagine that

23     it was anything other than something that Mr. Salzman

24     told me.

25          Q    This e-mail indicates page 1 of 2 and page 2

Page 244

CHARLES WESTBROOK MURPHY

1

2  of 2, but there's no content on page 2.

3      Do you see that?

4  A   Yes.

5  Q   Has something been redacted from this

6  document?

7  A   Not that I know of.  And each of these --

8  each of these memos, both Exhibits 76 and 77, are sent

9  from my home e-mail.

10 Q   I see that.  But I'd ask you to check

11 whether this is a complete copy of this e-mail because

12 page 2 is blank.  It may have printed out that way.

13 It may have been a malfunction, but your testimony is

14 there's been no redaction?

15 A   Well, I don't believe there's been any --

16     MR. SALZMAN:  I don't believe there has

17 either.

18 A   Redaction.  I think the fact that they're

19 two pages is simply an artifact of the printing.

20     MR. SALZMAN:  I think it's also, just to

21 note for the record, clear that in circumstances where

22 we have redacted information, we've said on the

23 document that we redacted information.

24     MR. NELSON:  I appreciate that.  I'm seeing

25 a blank page, and it's not necessarily -- this e-mail

Page 245

1                    CHARLES WESTBROOK MURPHY

2    doesn't necessarily end in a way that, you know,

3    indicates that the message is concluded.

4        A    Well, it does to me.

5    BY MR. NELSON:

6        Q    Okay.  In the first paragraph, you state,

7    "For a number of reasons, I believe that PwC's, quote,

8    partners, close quote, look even more like, quote,

9    employees, close quote, than do the partners in the

10   Chicago law firm."

11            What Chicago law firm are you referring to?

12       A    Sidley Austin Brown & Wood.

13       Q    And what are the reasons PwC partners look

14   more like employees than the partners at Sidley &

15   Austin?

16            MR. SALZMAN:  Objection, calls for a legal

17   conclusion.

18            You can answer.

19            MR. NELSON:  Okay, fine.  I'm asking a

20   question about a statement he made in an e-mail to

21   Mr. Schuler.

22            MR. SALZMAN:  I know.  Right.

23   BY MR. NELSON:

24       Q    Have you already testified as to all the

25   reasons?

Page 246

1          CHARLES WESTBROOK MURPHY

2      A     I've already -- no, I've not testified to

3   all the reasons.  I believe that you asked for an

4   example, and I gave an example, and that's where we

5   left it the last time we addressed this question.

6      Q     And now I'm asking you what are the reasons

7   that you refer to in your e-mail here to Mr. Schuler?

8          MR. SALZMAN:  Same objection.

9          You can go ahead and answer it, though.

10     A     Well, for example, I think that -- I know

11  that PwC partners are subject to vacation limits.

12  They are the same vacation as employees, at least as

13  the higher-level employees.  Law firms that I know

14  about don't have such rules for partners with vacation

15  limits.  The partner is there and working.  He gets

16  whatever credit he gets under the compensation

17  formula, and he's free to take off anytime he wants.

18          It is, I think, far more rare in a law firm

19  than at PwC for there to be a requirement imposed by

20  the firm that there be a second partner to review the

21  first partner's work.  At PwC, that's the rule rather

22  than the exception.  I think at most law firms, it

23  would be the exception rather than the rule.

24          I believe at -- once at Sidley & Austin, the

25  partners were liable without limit for the debt -- for

1          CHARLES WESTBROOK MURPHY

2   the firm's debts.  I think that's correct.  I may be

3   remembering that incorrectly, but whether I remember

4   that correctly or not, they're not liable without

5   limit at PwC.  They're liable only to the amount of

6   their capital, plus perhaps some other amounts they

7   have -- the partner has left in the firm.

8          There are a number of documents at PwC that

9   refer to partners and principal as employees.  We've

10  already mentioned one of them, the qualified

11  retirement plans.  Most law firms that I'm familiar

12  with have a method for sharing profits that is far

13  more certain than what there is at PwC, where the

14  amount depends on the outcome of a performance review

15  by some other partner.

16         And at the moment, I think that's all I can

17  think of, although the list is a long one.  I'm quite

18  sure there are more that I cannot now remember.

19  BY MR. NELSON:

20     Q    Things of this nature that's part of this

21  list.  Is that the list you're referring to?

22     A    Yes.

23     Q    Referring to the second paragraph, could you

24  explain the reason why you say PwC cannot consider you

25  for admission as a partner?

Page 248

1                    CHARLES WESTBROOK MURPHY

2          MR. SALZMAN:  I'm sorry, Eric.  I'm not

3     following your question.  You said in the second

4     paragraph?

5          A    I'm not either.

6     BY MR. NELSON:

7          Q    Second paragraph, second sentence.

8          MR. SALZMAN:  The one that says, "This

9     mandatory retirement policy, according to PwC's

10    attorneys, is the reason that PwC cannot consider me

11    for promotion"?

12         MR. NELSON:  Yes.  My question relates to

13    that sentence.  And my question is, Can he explain the

14    reason why that he believes that PwC cannot consider,

15    underscoring the word "consider," him for partner?

16         A    I believe it's explained in the next

17    sentence.  Because what you've said is that they

18    considered me for partner, and if I became a partner,

19    they'd have to immediately take me out and shoot me.

20    That's what you've told the court.

21    BY MR. NELSON:

22         Q    In light of that, why would you want to be

23    considered for partner if the sole impact would be

24    your immediate retirement?

25         MR. SALZMAN:  Well, that assumes --

Page 249

CHARLES WESTBROOK MURPHY

1

2      A    That assumes that the age 60 --

3           MR. SALZMAN:  My objection is that assumes a

4  legal conclusion that we don't agree with.

5           MR. NELSON:  No, I understand that.

6           MR. SALZMAN:  Okay.

7  BY MR. NELSON:

8      Q    Can you answer the question?

9      A    Well, it's in the first sentence in that

10 paragraph.  As Frederick Kessler used to say, the

11 villain in the piece is the mandatory retirement age.

12 If the mandatory retirement age was not there, then

13 the sole impact of my promotion would not be my

14 immediate retirement.

15     Q    I understand that, Murphy.  My question is,

16 Why would you want to be considered for partner if the

17 sole impact would be your immediate retirement?

18          MR. SALZMAN:  Same objection.

19     A    I don't believe that I said that I would.  I

20 said what I would like -- I have to get the mandatory

21 retirement age set aside before I could be considered

22 for partner, and once it's set aside, then there would

23 be no mandatory retirement.

24 BY MR. NELSON:

25     Q    You're not answering my question.  Is the

Page 250

CHARLES WESTBROOK MURPHY

1

2  answer you would not want to be a partner if the sole

3  impact was your immediate retirement?

4      A    Well, at this point --

5           MR. SALZMAN:  Objection.

6      A    -- it wouldn't make much difference because

7  I've retired already.  That may have been the case

8  from 2000 through 2006.

9  BY MR. NELSON:

10     Q    Okay.  Well, let's focus on July 1, 2000.

11 Why would you want to be admitted as a partner, or is

12 your testimony you would not want to be admitted as a

13 partner on July 1, 2000 if that were to result in your

14 immediate retirement?

15     A    If that would have resulted in my immediate

16 retirement, I would not have wanted to have been

17 admitted to a partnership.

18     Q    And the same question for July 1, 2004.  If

19 your admission as a partner on July 1, 2004 would

20 result in your immediate retirement, would you not

21 want that?

22     A    Same answer.

23     Q    The answer is, No, you would not want that;

24 is that correct?

25     A    That's right.

Page 253

1                      CHARLES WESTBROOK MURPHY

2   BY MR. NELSON:

3       Q      Do you understand also that each year, many

4   partners have their compensation increased?

5       A      That is my understanding.

6       Q      And you understand that happens on a regular

7   basis?

8       A      That happens on a regular basis, and it's

9   based on an evaluation by other partners, both the

10  increases and the decreases.

11      Q      And do you think it's more often that

12  partners' income is increased or decreased?

13      A      I believe it, more often, is increased

14  because the income of the firm as a whole is

15  increasing.  So, even if the amount of each individual

16  partner in whatever -- if the partners' shares or

17  percentage of the firms' income stayed exactly the

18  same from year to year to year, it would have

19  increased simply because the firms' revenues were

20  increasing.

21      MR. NELSON:  Can we mark as Defendants'

22  Exhibit 78 a telecopier transmission from Dave Rose to

23  Eric M. Nelson, dated September 29, 2006?

24                  (Defendants' Exhibit 78 was marked for

25  identification and was retained by counsel.)