CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

      ***CONFIDENTIAL***              Volume: I
    ***ATTORNEYS' EYES ONLY***       Pages: 1-231
                                     Exs: 94-103

            UNITED STATES DISTRICT COURT

               DISTRICT OF COLUMBIA


C. WESTBROOK MURPHY,
                Plaintiff        Docket No.
          vs.                    CA 05-1054
PRICEWATERHOUSECOOPERS, LLP,
                Defendant
          * * *
C. WESTBROOK MURPHY,
                Plaintiff        Docket No.
          vs.                    CA 02-982
PRICEWATERHOUSECOOPERS, LLP, et
al,
                Defendants
          *   *   *
HAROLD SCHULER,
                Plaintiff        Docket No.
          vs.                    CA 05-2355
PRICEWATERHOUSECOOPERS, LLP,
                Defendant



             DEPOSITION of ROBERT BENCH, a
witness called by and on behalf of the Plaintiff C.
Westbrook Murphy, taken pursuant to the Federal
Rules of Civil Procedure, before Heidi B. Stutz,
Certified Shorthand Reporter No. 146599S and Notary
Public in and for the Commonwealth of Massachusetts,
at the offices of Krokidas & Bluestein, 600 Atlantic
Avenue, Boston, Massachusetts, on Wednesday,
November 29, 2006, commencing at 10:04 a.m.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
1   APPEARANCES:

2         RICHARD A. SALZMAN, ESQ.
          Heller, Huron, Chertkof, Lerner, Simon &
3         Salzman
          1730 M Street, NW, Suite 412
4         Washington, D.C. 20036
          202-293-7110
5             On behalf of the Plaintiff C. Westbrook
              Murphy
6
          DAVID L. ROSE, ESQ.
7         Rose & Rose
          1320 19th Street, NW, Suite 601
8         Washington, D.C. 20036
          202-331-8555
9             On behalf of the Plaintiff Harold Schuler

10        ERIC M. NELSON, ESQ.
          STEPHEN L. SHEINFELD, ESQ.
11        Winston & Strawn, LLP
          200 Park Avenue
12        New York, New York 10166-4193
          212-294-2646
13            On behalf of the Defendant

14   ALSO PRESENT:  C. Westbrook Murphy

15

16

17

18

19

20

21

22

23

24
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                        Page 3
 1                    I N D E X

 2
     WITNESS:          DIRECT  CROSS  REDIRECT  RECROSS
 3

 4   ROBERT BENCH        4       216

 5
     EXHIBITS:             DESCRIPTION          PAGE
 6

 7     94      Document PwC04043                27

 8     95      Document PwC03452-03491          75

 9     96      Document PwC03589-03592          87

10     97      Document PwC08825-08850          134

11     98      Document PwC19581-19593          178

12     99      Document PwC19539-19569          196

13    100      Document PwC19506-19528          198

14    101      Document PwC19488-19504          208

15    102      Document PwC03241-03243          216

16    103      Document PwC03238-03240          216

17

18
     ***ALL EXHIBITS KEPT BY ATTORNEY SALZMAN***
19

20

21

22

23

24

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

1                P R O C E E D I N G S

2    Whereupon:

3                    ROBERT BENCH,

4    having been satisfactorily identified and duly sworn

5    by the Notary Public, was examined and testified as

6    follows:

7                    DIRECT EXAMINATION

8     BY MR. SALZMAN:

9        Q.   Good morning, Mr. Bench.

10       A.   Good morning.

11       Q.   My name is Rick Salzman.  I'm one of the

12   lawyers that represents Wes Murphy in connection

13   with his lawsuit against PricewaterhouseCoopers.

14   We're here today for your deposition.  Do you

15   understand that?

16       A.   Yes.

17       Q.   I know you've had your deposition taken

18   before.  Same ground rules apply.  You understand

19   that you are under oath?

20       A.   Right.

21       Q.   It's just as if you were in a court of

22   law, do you understand that?

23       A.   Right.

24       Q.   Okay, great.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 50

1    Q.   Okay.  Would it be fair to say that in the

2  year or so before he was made a partner he was

3  getting a lot of calls directly to him from either

4  internal clients or external clients?

5    A.   I think it's fair to assume.

6    Q.   Can you recall the first time that you

7  talked with anyone in Price Waterhouse about

8  actually sponsoring David Albright to become a

9  partner?  By "sponsoring" I mean actually initiating

10  the formal process.

11    A.   No, really, no.

12    Q.   We've looked at the memo back in February

13  of 1996 in which you were sort of talking about him

14  as a candidate.  But I'm talking about, you know,

15  really making the specific decision that I'm going

16  to propose him at this particular time.  Do you

17  recall any conversation with anybody at PWC about

18  that?

19    A.   No.  I'd be guessing.

20    Q.   Okay.  Can you describe for me the process

21  that was in place at that time in terms of having a

22  partnership slot available within RAS or a

23  partnership position available within RAS for you to

24  make a proposal?  Do you understand my question?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 51

1          MR. NELSON:  I object to the form of

2     it.  If you can answer it, you may.

3          Q.   How did you know that, okay, now I've got

4     a partnership available to me within RAS that I can

5     propose somebody for?

6          MR. NELSON:  I object to the form of

7     the question.  It assumes facts not on this record,

8     at least.

9          A.   I have an answer, but do you mind

10    repeating the question?

11          MR. SALZMAN:  Do you want to read

12    back just that last --

13          THE WITNESS:  I was thinking as you

14    asked that question.

15          MR. SALZMAN:  Can you read back that

16    last question?

17               (The previous question was

18               read back by the reporter.)

19          A.   All right.  But you used the word, I think

20    you said was there a process, and there was no

21    process.  This was a very fluid thing.  There's a

22    lot of collaboration that goes on.  There was a lot

23    of collaboration that went on at Price Waterhouse,

24    there's a lot of collaboration that goes on at

HENNESSEY & LANGE COURT REPORTING
617-523-1874

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 52

1    PricewaterhouseCoopers.

2            You start to hear noises from your

3    partner saying, you know, maybe we need some more

4    partners in RAS or is RAS partners short.  Or these

5    guys are so good, they should be partners.  I

6    certainly wouldn't call that a process.  But the

7    drum beats start to beat, the drums start to beat

8    that the practice is growing, does it need to be

9    supported by more partners?  People are growing,

10   should they be made partner because they're

11   performing as partners day after day?  Shouldn't we

12   make this person a partner?  That is a collaborative

13   kind of discussion that builds.

14            And, you know, the other side of

15   that is, of course, the individual is building a

16   reputation and building an expectation.  And it, you

17   know, it's not a process.  It isn't quite making a

18   stew, either.  But the thing comes together in terms

19   of drum beats both from the performance of the

20   individual per se and the response to the

21   individual's performance from a collaborative group

22   of people.

23   Q.    Okay.  With respect to Mr. Albright's

24   candidacy, can you tell me about any feedback that

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 53

1   you got from other partners that you recall or any

2   discussions that you recall in advance of sponsoring

3   him for partnership?

4       A.   I have a recollection that a number of

5   people, a number of partners were demanding David's

6   time, were starting to say David should be a

7   partner.

8       Q.   Okay.  Who were the other partners within

9   RAS at that time?

10      A.   Bill Lewis and John Campbell.

11      Q.   Was Alan Schott --

12      A.   No.

13      Q.   -- with you?  Okay.

14           Sitting here today can you recall

15   any discussions with Mr. Lewis about sponsoring Mr.

16   Albright?

17      A.   I don't recall any discussions.

18      Q.   Do you recall any discussions with Mr.

19   Campbell about sponsoring --

20      A.   I don't recall any discussions with Mr.

21   Campbell.

22      Q.   Okay.  Who were you reporting to within PW

23   at the time?

24      A.   At '96?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   mortgage companies.

2        Q.   Who are you talking about?

3        A.   Maryann Murphy, Tim Ryan, Mike Seelig.  A

4   lot of enthusiasm by that group.

5        Q.   Okay.

6        A.   And I think that would show up in his

7   file.

8        Q.   Back in the period shortly before you

9   sponsored Mr. Albright, so I'm talking about the,

10  say, fall, '98 to fall, '99 time frame, did you

11  believe that you could use more than one additional

12  partner in RAS?

13       A.   I don't remember, I don't remember it that

14  way.

15       Q.   What do you recall about that?

16       A.   What I recall was that we were developing

17  a few people that had, to me, the appearance of

18  partner about them.

19       Q.   And who were those people at that time?

20       A.   Well, I don't remember.  Hal Schuler was

21  certainly one, David, but we had some other people

22  that weren't even -- well, I don't know the dates.

23  But we had some other people.  Again, they skated

24  very well.  I mean, they might have been new to us

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1    or they might have only been senior managers, but --

2         Q.   No, I appreciate that.  It's helpful.  I'm

3    trying to make sure that I understand this.  So let

4    me ask it to you this way:  Is it fair to say that

5    if in the, say, early 1999 time frame you felt that

6    there were two people or three people who by that

7    point were ready to become a partner, that you felt

8    that you could sponsor all of them as opposed to

9    having the understanding that there's now one

10   partnership slot available and you've got to pick

11   among your people?  Do you understand my question?

12                  MR. NELSON:  Just note my objection

13   to the form of that question.

14        A.   I understand your question.

15        Q.   Yeah.

16        A.   As you move, as you move through your time

17   frames, we move through a merger.  And as we move

18   through a merger of Price Waterhouse and Coopers &

19   Lybrand, we move into an enormous new organization

20   in transition.  And so when you say did I sponsor or

21   was I interested in sponsoring, as you move into the

22   new PWC, you move into new forms of collaboration,

23   new processes of management, and some of them are

24   transitional.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              But one of the things that we moved

2    into was this human resource committee and something

3    called the ARC, the annual review committee, where

4    we had a collaboration of partners overseeing the

5    annual performance of non-partners.  And through

6    that process people are identified.  That's not new.

7    But the fact that you have a group of partners doing

8    it is new.  And, you know, the ranking of

9    individuals and who might be partner drifts.  It

10   gets fluid, but it changes.

11             And I may be incorrect here, but now

12   to get to your question, the sponsoring of a

13   candidate now becomes something that the chairman of

14   the ARC or the collaboration does through the

15   chairman of the ARC, okay.  And I don't know how

16   that process -- I don't know how that process works

17   today in '06.  I'll bet you dollars to donuts it

18   changed in '05 and '04 and '03 and '02 and '01, and

19   certainly between '99 and let's say '02, '03 because

20   you've just got this firm in transition to new sets

21   of collaboration and management.

22      Q.   Okay.  At the time that you sponsored Mr.

23   Albright to become a partner, or at the time that he

24   was sponsored to become a partner did you compare

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 61

1   qualifications with the other high level

2   professionals within RAS to make the determination

3   that Mr. Albright was the person that you were going

4   to sponsor?

5              MR. NELSON:  I think he's already

6   answered that.

7       A.   I think I did, too.  I think I answered

8   that already.

9       Q.   Is that what you were answering when you

10  said you do that on a daily basis?

11      A.   I do it on a daily basis.  But the

12  decision to move forward on a particular person,

13  with a particular person is a decision made by the

14  ARC, by these committees.  It's not made by one

15  person.  It's made by a group of people in a room

16  looking at a whole group of people and how they're

17  rated and how does their performance match up

18  against somebody else's performance over time on a

19  sustained basis.  And when you do that some people

20  clearly stand out.

21      Q.   Okay.

22      A.   And other people don't stand out so

23  they're not even considered because they don't stand

24  out.  They don't fit any of the criteria.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1      Q.   I want you to try to focus on that ARC

2   process for Mr. Albright.  Do you recall anything

3   about the discussion in that room about Mr.

4   Albright?

5      A.   I don't.

6      Q.   Do you recall whether the ARC compared Mr.

7   Albright to any of the other professionals within

8   RAS?

9      A.   It would have.  I said it would have, I

10  told you that.

11            MR. NELSON:  Let's take a break,

12  please.

13            MR. SALZMAN:  Sure.

14            (Recess 11:32-11:54 a.m.)

15            MR. SALZMAN:  We're back on the

16  record.

17      Q.   Mr. Bench, who were the members of the ARC

18  committee, other than yourself, that participated in

19  the Albright sponsorship?

20            MR. NELSON:  Are you talking about

21  in connection with the candidacy for July 1, 2000?

22            MR. SALZMAN:  Yeah.

23      A.   To the best of my recollection, myself,

24  John Campbell, Bill Lewis, probably John Fletcher,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 63

1    maybe Alan Schott, I don't remember.

2        Q.    Anyone else that you can recall?

3        A.    No.  And I'm guessing at those five.  I'm

4    assuming the RAS partners plus the head of banking

5    practice, who I think was John Fletcher.

6        Q.    Okay.  And was there someone from the

7    human resources office?

8        A.    Yes, there would have been.

9        Q.    What was that person's role?

10       A.    It would have either been Darlene Shea or

11   Lisa Englehart.

12       Q.    Okay.

13       A.    I don't recall which one, but probably one

14   of those two.

15       Q.    What was the HR person's role at the

16   meeting?

17       A.    Well, the HR person's role, first of all,

18   there is a formal role for the HR person at these

19   meetings and in terms of their formal role, I

20   suggest you ask the firm.

21       Q.    Well, what was your understanding of their

22   role?

23       A.    Yeah.  But my understanding is that the HR

24   person's first job is to be sure that the review of

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 64

1    the person includes a review of the person's file of

2    performance evaluations completed for the person

3    during the year on the engagements the person was

4    on.  And so the HR person's first job is to make

5    certain that whatever performance evaluations should

6    have been completed by various people got to that

7    file before the meeting.  And then that HR person

8    designates to the attendees at the meeting the

9    particular files that they will review and

10   summarize.  And then those people make a

11   presentation to the rest of the group on the people

12   whose files they have, okay.

13              So in my stack is Steve and Eric and

14   my job in front of the rest of the group is to say,

15   well, Eric worked on six engagements, he was rated

16   one on all of his engagements, seems to be strong on

17   interacting with the client, seems to be strong in

18   technical things based on the documentation that's

19   in the file, and that's the presentation.  And my

20   view would be that Eric this year should be a one.

21   Q.   And would the discussion at that meeting

22   also include a discussion about sponsoring somebody

23   for partnership?  Was that all part of the same kind

24   of a meeting, annual performance and what's the next

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1    role for this person?

2        A.    What's the next -- well, at one point, at

3    one point -- for the longest time there was a

4    designation on the evaluation forms that said what's

5    the next role for this person or what's the step?

6    And again, that's been fluid and I think that

7    they've carried that, well, what's the development

8    plan for the person.

9            But at that point at the end of the

10   day the discussion was you end up rating all the

11   people and then you discuss compensation based on

12   the ratings, what might be the compensation

13   recommendations, and then maybe yes, maybe no, but

14   anyway, do we have any potential partner candidates

15   in this group.

16       Q.    Okay.  Did anyone keep track of the

17   potential partner candidates that were mentioned?

18   Was there any kind of a list kept?

19       A.    The HR, it gets back to the -- the role of

20   the HR person is to keep notes of all the meetings.

21       Q.    So the HR person did take notes of those

22   meetings?

23       A.    (Witness nods head.)

24       Q.    Yes?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 68

1  know the reduction, I don't know any of the

2  specifics of that.

3      Q.   Did he tell you that it was going to be a

4  significant reduction in his compensation if he

5  remained at the firm?

6           MR. NELSON:  Object to the form.

7      A.   Yeah.  I don't, I don't remember it that

8  way.  I recall that it would, the whole issue was a

9  significant event.

10     Q.   Did you ever have a conversation with him

11  directly in which you advised him that if he decided

12  to stay with the firm his compensation would be

13  reduced?

14     A.   I don't remember any conversation like

15  that.

16     Q.   Were you involved in any decisions

17  relating to his compensation?

18     A.   No, not that I recall, not that I recall.

19     Q.   Was it your understanding that the firm

20  had some concerns about his performance as a

21  partner?

22     A.   I assumed that was the nature of the

23  conversation that he was having with the firm.

24     Q.   Who was he talking to, do you remember?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 69

1      A.    I'm going to say partner affairs, but I
2   may be entirely wrong.
3      Q.    Do you know who within partner affairs?
4      A.    No.
5      Q.    Did you attend any kind of meetings in
6   which Mr. Schott's tenure with the firm was
7   discussed or any actions that might be proposed or
8   contemplated with respect to Mr. Schott?
9      A.    No.  He was dealing with New York.
10     Q.    What was your view about his performance
11  as a partner at PWC?
12     A.    Well, I guess I don't recall my view of
13  his performance.  I mean, at the time?
14     Q.    Yeah.
15     A.    I don't recall.
16     Q.    You don't have any memory about that at
17  all?
18     A.    No, no, I have a memory, but you asked,
19  you asked me what was my view at the time and I
20  don't remember my view at the time.
21     Q.    Sitting here today, what's your view of
22  his performance?
23     A.    Now we're talking what -- when did he
24  leave?  When did he retire?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

1                    MR. NELSON:  2001, I believe.

2                    MR. ROSE:  Something like that.

3                    MR. SALZMAN:  Yeah.

4        A.    You know, bottom line was he took a

5    decision to retire.

6        Q.    Was it your view that he was performing

7    well as a partner?

8        A.    I think the answer is yes and no.

9        Q.    Tell me what you mean by that.

10       A.    As a partner he was mentoring staff, he

11   was available to the staff, he represented the firm

12   on some external legal bodies like Westbrook did and

13   Gary Welsh did.  There were a few -- now I'm

14   stretching my imagination -- not my imagination, my

15   memory, but he was critical in some engagements, as

16   I recall, that went to other practices.  He did some

17   overseas work and represented the firm overseas.

18   But in terms of -- which I think to a certain extent

19   was the role he had at Coopers & Lybrand before the

20   merger.

21                    But in terms of generating new

22   business, in terms of being productive in terms of

23   chargeable hours, I think, if I recall, I think his

24   chargeable hours were low and I'm not, I don't

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 71

1    remember any significant sales.  I shouldn't use the

2    word "significant," any stream of sales, maybe

3    that's the better way to say it.

4        Q.    Can you give me an idea when what you mean

5    when you say chargeable hours were low in terms of

6    the number?

7        A.    No, I don't know what I mean by that

8    necessarily.

9        Q.    Ballpark it for me.  300 hours, a thousand

10   hours?

11       A.    No, I don't want to ballpark it.  I think

12   it's a matter of a sustained level versus an up and

13   down level.

14       Q.    Do you remember anything else about your

15   conversations with Mr. Schott regarding his

16   departure from the firm?

17       A.    No.  I mean, what I recall for the most

18   part is most of the visits were about the fact that

19   either he had not returned a call to New York or was

20   waiting for a call from New York.  There was a lot

21   of gaps.  I forget the time period we're talking

22   about, but as I recall, his discussions went over a

23   long period of time with a lot of in between time.

24   So there was nothing much to discuss other than he

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

1    hadn't called them or they hadn't called him.

2        Q.    Did you at any point serve as Mr. Schott's

3    primary reviewing partner, the partner who would

4    evaluate his performance?

5        A.    I must have been his primary reviewing

6    partner.

7        Q.    For all of the time that he worked in RAS?

8                MR. NELSON:  Well, I don't know what

9    you mean by that, so I object to it.  Mr. Schott

10   became a member of, a partner of PWC on July 1, 1998

11   when the firm was formed.  Are you asking about all

12   of Mr. Bench's time in RAS?

13               MR. SALZMAN:  I didn't ask about all

14   of Mr. Bench's time in RAS.  I asked about all of

15   Mr. Schott's time in RAS.

16               MR. NELSON:  Could I have the

17   question back, please?

18       Q.    My question to you is did you serve as his

19   primary reviewing partner during the entire time

20   that Mr. Schott was in RAS?

21       A.    I believe so.

22       Q.    And as his primary reviewing partner did

23   you have any role in setting his compensation?

24       A.    No.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 73

1    Q.   To your understanding, who did set his

2   compensation?

3    A.   I don't know.

4    Q.   Mr. Bench, if you could take a look at a

5   document that previously was marked Deposition

6   Exhibit 46.

7              (Document handed to witness.)

8    Q.   It's a compliance report related to David

9   Albright.

10              MR. ROSE:  46?

11              MR. SALZMAN:  Yeah.

12    A.   46, okay.

13    Q.   Mr. Bench, if you'd take a look at the

14   second page, there are some entries there about

15   partner development programs.  Do you see that, one

16   dated 5/18/98?

17    A.   Yeah.  Can I move this sticker?  Is there

18   anything under this sticker?

19    Q.   I don't believe so.

20              MR. NELSON:  There isn't

21   (indicating).

22    A.   Okay.

23              MR. NELSON:  Wait a minute, I'm

24   sorry.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Can I react to this form?

2      Q.   Sure.  If you want to look at a copy of

3  the first page, I don't believe there's --

4      A.   I don't understand it.

5      Q.   Okay.

6      A.   I'll tell you why.  Just for the -- I

7  don't get it.  Is this a PWC form?

8      Q.   It was produced to us by PWC.

9      A.   PWC, yeah, there it is.

10     Q.   My question --

11     A.   Okay, I'm sorry.

12     Q.   My question is on the second page do you

13  see the entries for partner development program?  It

14  says something Accelera and then partner development

15  program growth?

16     A.   Yes.

17     Q.   Do you know what that's referring to?

18     A.   No.

19     Q.   Okay.  Do you recall any partner

20  development programs that Mr. Albright was sent to?

21          MR. NELSON:  I'm sorry, I object to

22  the form of the question.  I don't know what you

23  mean by "sent to," so I object to that.

24     A.   No.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 75

1      Q.   Do you know of any partner development

2   programs that Mr. Albright attended?

3      A.   No.  I do now that I've seen the form.  I

4   don't quite know what they are.

5      Q.   Okay.

6      A.   I never knew we had something called a

7   partner development program.  But I don't understand

8   this form for the following reasons.  I mean, it is

9   a PWC form, but in the upper right-hand corner it

10  says report FY 1999.  And it says date created

11  8/26/99.  And 8/26/99 would have been FY 2000.  I

12  don't know what BEU title is.  Down below it says,

13  you know, usable, bah, bah, bah, education credits,

14  whatever they are, 1997, then down below it says

15  fiscal year 1998.  So I'm just eyeballing this form,

16  I don't get it.  If that's helpful to anybody.

17     Q.   Okay.

18     A.   I don't get it.

19     Q.   Well, that's fine.  Thanks.

20     A.   Sorry.

21     Q.   But you've answered my questions about it.

22          MR. SALZMAN:  Let's have this marked

23  as 95.

24          (Deposition Exhibit No. 95

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 76

1                    marked for identification.)

2        Q.    Mr. Bench, Deposition Exhibit 95 is a

3    document that was produced to us by PWC Bates

4    stamped 3452 through 3491.  It's titled Global

5    Internal Admissions Guidelines FY 2000.  Were these

6    the partner admission guidelines that you used with

7    respect to Mr. Albright's admission to the

8    partnership?

9                    MR. NELSON:  Object to the form of

10   the question since you asked if Mr. Bench used

11   these, if that's the question.

12                   MR. SALZMAN:  It certainly is.

13       A.    I don't remember whether I used these or

14   not.

15       Q.    Okay.  Do you recall whether the ARC, the

16   committee that you testified about earlier used

17   these admission guidelines in their consideration of

18   candidates in the 2000 process?

19       A.    I don't know whether the ARC used them or

20   not.

21       Q.    Okay.  Do you have any reason to think

22   that there were other guidelines that were used with

23   respect to Mr. Albright's admission?

24       A.    No.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 77

1                    MR. NELSON:  Note my objection to

2       the form of that question.

3           Q.   If you can take a look at the --

4           A.   Can I study this just for a second more,

5       please?

6           Q.   Yeah.

7                    MR. NELSON:  Take your time.

8           A.   Just to try to get my mind around it.

9           Q.   Mr. Bench, I'm going to have a couple of

10      questions for you about this document.  I can refer

11      you to a few specific pages.

12          A.   Yeah.  Just give me five minutes to get my

13      mind around this, because I don't, I just don't ever

14      remember seeing it before.

15          Q.   Okay.

16          A.   Sorry.

17          Q.   Are you ready?

18          A.   No.  Can't even remember, there's all

19      these acronyms.

20                   Okay, I believe I'm --

21          Q.   Okay, great.  If you look to the third

22      page of the document --

23                   MR. NELSON:  Do you want to ask the

24      witness whether he recalls ever having seen this

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    document before?  You don't want to ask that, I

2    gather.

3        Q.    Why don't you look to the third page?

4                THE WITNESS:  I thought I offered

5    that.

6                MR. NELSON:  I thought you testified

7    that you don't recall ever seeing this document

8    before.

9        A.    I don't think I've seen this document

10   before.  3454?

11               MR. SALZMAN:  Eric.

12               MR. NELSON:  What is it?

13               MR. SALZMAN:  You don't need to

14   suggest to me the questions that I'll ask.

15               MR. NELSON:  I'm not suggesting the

16   questions.

17               MR. SALZMAN:  You don't need to talk

18   to the witness.

19               MR. NELSON:  I'm not talking to the

20   witness.

21               MR. SALZMAN:  All you need to do is

22   listen to the questions and object to them.

23               MR. NELSON:  There has to be a

24   foundation for the questions.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 79

```
 1        Q.   Now, if you take a look at the third page,
 2   do you see the statement in the first paragraph,
 3   "These guidelines should be used as the basis for
 4   the internal admissions process for FY 2000"?
 5        A.   Are we on page 3454?
 6        Q.   Yes.
 7        A.   Yes.
 8        Q.   Okay.  Now, do you believe that you and
 9   the other members of the ARC committee used these
10   guidelines with respect to any partnership admission
11   decisions or recommendations you were making for the
12   FY 2000 time frame?
13                 MR. NELSON:  I object.  It's asked
14   and answered.  I object to the form.  He said he
15   doesn't recall having ever seen it.  Based on the
16   distribution list in it, it doesn't appear that it
17   was distributed to partners.
18                 MR. SALZMAN:  Eric, that's not an
19   objection.
20                 MR. NELSON:  It is an objection.
21                 MR. SALZMAN:  No, it's just
22   coaching.
23                 MR. NELSON:  There's no foundation.
24                 MR. SALZMAN:  It's flat out coaching
```

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    and you need to stop doing that.

2            MR. NELSON:  It's not coaching.  No,

3    I think the questioning is improper.  Your approach

4    is improper.

5            MR. SALZMAN:  My questioning is not

6    in the slightest improper.

7            MR. NELSON:  You're showing the

8    witness a document that he's never seen, no evidence

9    it was ever distributed to him, and you're asking

10   him whether or not he complied with a document that

11   he never saw, that he used a document he never saw.

12   It's asked and answered.

13       A.   My reaction is --

14       Q.   You just need to answer my question, Mr.

15   Bench.  You don't have to give me your reaction.  My

16   question was did you --

17       A.   I'm sorry, you give me the question and

18   I'll give you the background.

19           MR. NELSON:  Please, let Mr. Bench

20   answer the way he wants to answer your question.

21   Don't tell him and interrupt his answer and tell him

22   you don't like the way he's answering.  Let him

23   finish, and then you can tell him you don't like his

24   answer.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 81

1          Q.    My question to you, Mr. Bench, was did you

2     and the other members of the ARC committee during

3     the FY 2000 process use these guidelines?

4          A.    Perhaps.

5          Q.    Okay.

6          A.    Because I haven't read this document.  As

7     you notice, it took me time to get used to the

8     document.  I was having difficulty getting used to

9     the document because, as I mentioned, all these

10    acronyms.  They're all strange acronyms to me.  I

11    don't know what they mean.  So I had to keep

12    referring back to the acronym.  So this is all new

13    stuff for me.

14         Q.    That's fine.  I understand that.

15         A.    And the reason is -- I'm not finished.

16         Q.    Please finish.

17         A.    These are guidelines, from what I gather,

18    to country line of service leaders.  And country

19    admissions committees and theater admissions

20    coordinating committees.  They appear to be issued

21    in August, 1999.  And more than likely they were

22    issued to this level of the organization to try to

23    achieve compatible and consistent process at this

24    level of the country line of service leaders, etc.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 82

1    So it was issued to them.

2              I don't know if the partners at

3    large were copied.  I don't recall the document.  As

4    I repeat myself, I don't even know what the acronyms

5    mean, or I didn't know what they mean until I read

6    the document.

7              Nevertheless, in response to your

8    question, I would assume that the approach we took

9    at the ARC was under the auspices of human

10   resources.  We had a human resources leader in the

11   room and I would suspect that if we did anything

12   that was incompatible or inconsistent, somebody

13   would have said something, incompatible and

14   inconsistent with the expectations what our role

15   was.

16       Q.   Okay.  If you'd take a look at the next

17   page, so it would be Bates stamped 3455, there

18   appear to be -- there's a table that reflects time

19   frames for the partner admission process.  Do you

20   see that?  And there is a time frame in there for

21   LOS candidate identification assessments and

22   nominations.  Do you see that?

23       A.   Yeah.

24       Q.   Okay.  Is it your understanding that that

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 85

1    question was quite clear.

2              MR. NELSON:  I object to the form of

3    the question.  I don't think it's quite clear.  I

4    think it's objectionable.

5         A.   I know the answer is yes, but could you

6    please repeat the question?

7         Q.   My question was were these the global core

8    criteria that you and the other ARC committee

9    members used in connection with the Albright partner

10   admission process?

11        A.   These are criteria that we would have

12   considered for every one of our staff.

13        Q.   Okay.  And when you were making the

14   decision about whether to sponsor Mr. Albright for

15   partnership were these the criteria that you

16   employed?

17        A.   These would have been the criteria that we

18   would have thought about and considered whether

19   these guidelines existed or not.

20        Q.   Got it, okay.  With respect to the

21   leadership category, was there some method that you

22   used to measure the candidates' either performance

23   or credentials with respect to this core criteria

24   leadership?

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 86

1      A.    I'm going to try to answer your question

2    and I'm going to try not to be argumentative.  And

3    again, I'm not a lawyer, but to proceed down this

4    list item by item as to what we did or did not do

5    six years ago, I don't recall.

6      Q.    Okay.

7      A.    But the performance evaluation forms for

8    individuals would have encapsulated this, these

9    concepts or these elements, I guess, elements.  And

10   so all RAS personnel very more than likely, without

11   doing a check, without doing a tick, ticking and

12   checking exercise, would have been thought about in

13   these various areas.

14     Q.    Okay.  Did you have any minimum threshold

15   with respect to chargeable hours that a candidate

16   needed to have in order to be sponsored for partner?

17     A.    No.

18     Q.    Did you have any minimum threshold in

19   terms of the amount of business sales revenue that a

20   candidate needed to have brought in in order to be

21   sponsored for partner?

22     A.    No.

23     Q.    Did you have any minimum threshold with

24   respect to the number of engagements that a

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 117

1    million?

2              MR. NELSON:  He just answered it.

3    Just asked and answered, it's the same question.

4         A.   The dollar figure is fine.  It's great.

5    But I'll answer it again because you asked me again.

6    It's not the dollar amount.  In the case of some of

7    these clients the dollars represent a significant

8    amount of human effort and in many cases the amount

9    of human effort is a reflection of the degree of

10   problem that was there that needed to be resolved or

11   remediated.  And to me, to me, the socio-utility of

12   what we were doing for the firm, for the client, for

13   the financial system, that's what got us out of bed

14   every day, okay.

15             So we could look at this, I mean --

16   anyway, these numbers, these numbers could have been

17   lower.  The value of the work is still there, okay.

18   And it's sustained performance over time at key

19   critical issues, critical clients, right.  And, you

20   know, I don't know how to say it any more, very

21   valuable work in terms of the health of the

22   financial system, the health of a particular client

23   and, of course, developmental for the person doing

24   the work.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 118

1     Q.   Okay.  In terms of his demonstrated

2   history as a rainmaker did you believe that Mr.

3   Albright's performance in that criteria was good

4   enough to justify his admission to the partnership?

5              MR. NELSON:  Hold it.  Object to the

6   form of the question, "rainmaker."  But go ahead.

7   If you can answer it, go ahead.

8     A.   It has nothing to do with being a

9   rainmaker.  It has to do with sustained performance

10  over time across a population of clients, which

11  means across a population of partners, across a

12  population of issues, whether it's one day capital

13  markets, next thing is mortgage banking compliance,

14  next thing it's Section 20, establishing a Section

15  20.  It's the breadth and depth and dimension of

16  what's happening.

17              The money is terrific, great, okay.

18  But we did, you know, plenty of things that, you

19  know, might not be on this sheet.  I don't know if

20  they have a cutoff in terms of money here or not.

21  Say significant sales.  But it would be interesting

22  to go back and actually look at Dave's time sheets

23  over time.  I'm sure you're going to see him serving

24  30 clients a year, 25 clients a year.  And he's

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

1    doing that because I'm not giving him all of that.

2    The client's calling him, the partners around the

3    country are calling him.  He's just a busy guy.  And

4    this is the top of the cone, okay.  Is that helpful?

5        Q.    Yeah.

6        A.    It has nothing to do with rainmaking.

7        Q.    Who provided this information?

8        A.    This would have been lifted from the firm

9    -- let's see, let me back up.  Well, first of all,

10   it would have been lifted from various records is

11   one answer.  The client -- well, this one here

12   doesn't say number of hours, but like up on top,

13   some of this data came from time sheets.  They have

14   computerized time records for everybody, each

15   individual.  So the client and the chargeable hours

16   for David would have been there.  We have client

17   codes, client amount of chargeable hours to the firm

18   under each engagement code.  The dollars would have

19   been the totality of cash in, okay.

20            But for instance, RBMG I think was a

21   client, I'll say, of Tim Ryan.  I may be wrong.  It

22   was a mortgage banking client.  But they're not

23   going to -- they absolutely have no problem, I'm

24   sure, with saying that Dave Albright is responsible

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 120

1   for that revenue because it was one engagement after

2   the other after the other after the other

3   dimensioning across the institution.  It was

4   technology, it was accounting, it was capital

5   market, just dimension, mushroomed.  But this would

6   --

7              Anyway, at the end of the day this

8   would have come out of client codes for, let's say,

9   RBMG, there would be a client code for RBMG, you

10  bring up the client code, here's all the hours

11  charged, here's what's been billed so far, here's

12  what's to be billed.

13      Q.   To your understanding, why does the firm

14  ask an applicant to provide the list of significant

15  sales efforts in conjunction with the partner

16  candidate admission form?

17              MR. NELSON:  I'll object to the

18  form.  I don't know that there's any testimony that

19  the firm asked the applicant to provide this

20  information.

21      A.   Yeah, I caught that, I caught that.

22      Q.   You caught what?

23      A.   At the end of the day why is this

24  information here?  You said who asked the applicant.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 124

1    description of the significant public educational,

2    alumni and charitable appointments, trade

3    associations, publications, public speaking,

4    conference presentations, etc.; do you see that?

5        A.   Yes.

6        Q.   Are you familiar with the term "thought

7    leadership" --

8        A.   Yes.

9        Q.   -- at PWC?

10             Is this the category of the

11   application that essentially asks for description of

12   examples of thought leadership?

13       A.   Yeah.  Number one, I have a question as to

14   whether thought leadership was in the language at

15   this time.

16       Q.   Okay.

17       A.   Anyway, but if it had been in the language

18   at this time, external, these external activities

19   would have equalled thought leadership because they

20   have publications here and public speaking.

21       Q.   Okay.  And in terms of the information

22   that Mr. Albright has provided here, did you have an

23   impression of whether that reflected a high degree

24   of thought leadership, low degree of thought

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 125

1    leadership?

2             MR. NELSON:  Just note my objection.

3    Again, I don't know who provided this information.

4             MR. SALZMAN:  Fair enough.

5    Q.    With respect to the information that is

6    reflected here, what's your characterization or your

7    impression of the degree of external activities,

8    thought leadership type of activity?

9    A.    The first answer is that it's modest as

10   shown here.  The second answer is, because I was on

11   many of his jobs one way or another, he was

12   exercising all sorts of thought leadership on site

13   on the project in terms of dealing with the various

14   issues that he dealt with.  Third -- and I'm glad

15   you asked the question because maybe it will be

16   helpful.  If he's traveling 70 percent of the time

17   and charging 1800 hours a year, there's no time.

18   That's what we wanted Wesbrook to do.  That's why

19   what we did with Westbrook.

20   Q.    Meaning he was doing more of the thought

21   leadership external activities stuff?

22   A.    Well, he had the time.  He wasn't charging

23   the hours that these people were.  They were paying

24   for Westbrook.  They're out earning their money so

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

1    Westbrook can make speeches.  That's the balance we

2    tried to achieve.

3        Q.    Okay.  Was that the role that you assigned

4    to Mr. Murphy?

5        A.    That's the role that Mr. Murphy ended up

6    doing when he wasn't charging hours.  And he charged

7    many less hours than David, so that's the balance.

8    Somebody's got to earn the money, somebody's got to

9    project the practice.

10                MR. SALZMAN:  I think the, our host

11    popped her head in to tell us something, so let's

12    take a one-minute break, if we can.

13                (A brief recess.)

14        A.    So is that responsive to that question?

15        Q.    Yes, thank you.

16                Would you agree with me that that,

17    in terms of this category, external activities, that

18    Mr. Murphy had a greater amount of external activity

19    that he had participated in than Mr. Albright?

20                MR. NELSON:  As reflected in this

21    document?

22        A.    I would guess at this time, whatever it

23    is, summer of '98, that Westbrook clearly would have

24    had more speaking appearances, publications, etc.,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 127

1    than David.  Because Westbrook wasn't as chargeable

2    as David was doing out-client service.  I don't know

3    what the stats are, but I guess that there's a good,

4    significant difference.

5        Q.    Why was that, in your view?  Why wasn't

6    Mr. Murphy charging as many hours?

7        A.    I always wondered.

8        Q.    Did you ever form an opinion about that?

9        A.    David got many more calls than Westbrook

10   did.  The demand for David's time was extraordinary.

11   Everybody wanted David out there on their

12   engagements.  And if David got on the engagement,

13   the client never wanted David to leave.

14       Q.    What do you recall happening with respect

15   to Mr. Albright's partner admission process after

16   the submission of this application?  Do you recall

17   what the next step was?

18       A.    No.

19       Q.    Okay.  Do you remember whether he was

20   interviewed by anybody in the firm in connection

21   with the partner process?

22       A.    I don't, but let me please say that,

23   again, we're either '98 or '99 here.

24       Q.    Yes.  That's fair, I understand that.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 160

1    accept a guess.

2         Q.    I will, your best guess.

3         A.    I'll guess that Jeff during this period

4    was in constant demand from the New York partners to

5    service clients primarily in the compliance and

6    Section 20 area.  And I'll guess that Westbrook was

7    in less demand to do the same.  That's my guess.

8         Q.    Okay.  Do you recall when you first

9    identified Jeff Lavine as a serious partner

10   candidate?

11              MR. NELSON:  I just object to the

12   form of the question.

13        A.    It was not right away.

14        Q.    Okay.

15        A.    This was not Bobby Orr initially.  Jeff

16   was more than a turtle, but the phone wouldn't stop

17   ringing off the hook in terms of demand for Jeff's

18   services from the partners and from the clients

19   heavily in New York.  And Jeff absolutely won the

20   confidence of a broad stream of partners across the

21   New York practice as the guy to go to for help on

22   these compliance and Section 20 issues of compliance

23   issues.  We had some others.  Paul Nelson was in

24   great demand for a while.  But Jeff was really hot.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 161

1    Jeff got hot.  And he got hotter as he sort of

2    incrementally -- he's an incremental person, but in

3    increments it solidified strong.

4              But anyway, he incrementally went

5    through the technical hurdles very successfully to

6    the extent that he knew enough of the technical

7    hurdles that he became a go-to person by other

8    people struggling in their technical stuff.  And all

9    of a sudden he is now -- all of a sudden he evolves

10   into being the hub.  As I said to Westbrook,

11   Westbrook was the, what did I call you?  The traffic

12   cop at TD.  Jeff became the traffic cop on

13   engagement after engagement after engagement.  And

14   suddenly everybody realized there are these large

15   fees and when you put everything together, it was

16   Jeff that somehow was generating these fees.

17             He had great radar at clients to go

18   around and sniff out the next client need.  He had

19   terrific radar at that.  And then the clients would

20   give him an opportunity and then he had great radar

21   running around the New York office or Washington

22   finding people to do the service.  So all of a

23   sudden internally he becomes Santa Claus because

24   he's got all these opportunities, every day walking

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 162

1   around giving out work that he has kind of

2   generated.  And so now everybody wants him only in

3   New York, everybody wants him on these foreign

4   banks.  He was just a revenue generator for a lot of

5   people, not just RAS.  And he would get what we call

6   add-on and add-on and add-on to engagements.

7               And he appears -- I shouldn't say

8   "appear."  There's no way you do that without having

9   some very good client management skills.  I mean,

10  you're getting into the guts of the client, finding

11  out what the next thing they wished they had or

12  wished they could fix and saying I can fix that.

13      Q.   Okay.  Do you recall whether you had

14  identified Mr. Lavine as someone who you intended to

15  sponsor for partnership by the time you wrote

16  Deposition Exhibit 7, that is, by April of '99?

17      A.   I don't know that.  The best I can answer

18  that question -- it's a good question.  The best

19  answer I can give you is around that time we had

20  something going.  There was something going on,

21  okay.  Jeff was in demand.  This guy Dave Sapin was

22  in demand.  Paul Nelson was doing compliance manuals

23  at foreign banks in New York and he was in demand.

24  There was a lot of what we call non-Prudential

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 163

1    regulatory activity going on generally in the

2    compliance area generally requiring legal skills,

3    okay, and it was all sort of pouring into Westbrook,

4    Gary Welsh, Dave Sapin, Jeff Lavine.  And then Dave

5    Sapin and Jeff Lavine were leveraging these other

6    people here to help out, Conte and Van Huysen, okay,

7    and it's leveraging, it's working.  I say it that

8    way because I probably sat down and said, jeez,

9    we've got to organize this better, right.

10        Q.    That's why you wrote Exhibit 7?

11        A.    Probably, yeah.

12              MR. NELSON:  Take a break?

13              MR. SALZMAN:  Sure.

14              (Recess 3:50-4:12 p.m.)

15        Q.    Mr. Bench, what was your role, if any, in

16    sponsoring Mr. Lavine for partnership?

17        A.    I would have --

18              MR. NELSON:  What year, did you say?

19        Q.    Let's start with 2003.

20        A.    My last year.

21              MR. NELSON:  You mean the July 1,

22    2003?

23              MR. SALZMAN:  Yeah.

24        A.    Which means fall of 2002.  What was my

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 164

1    role in sponsoring Mr. Lavine?  I would have been a

2    member of the ARC, A-R-C, the Annual Review

3    Committee, that would have been decided -- I would

4    have been a member of the committee that would have

5    decided whether to put Jeff's name in play as a

6    potential candidate for admission.

7         Q.   Great.  Sitting here today can you recall

8    an ARC meeting in which the topic of Mr. Lavine's

9    partnership sponsoring was discussed?

10        A.   I can't recall the meeting.  I have no

11   doubt that the meeting occurred.  I mean, there

12   would have been an ARC meeting.  I recall that Jeff

13   was a sustained number one-rated, outstanding

14   performer across all spectrums, and certainly in the

15   last -- if this is '02, then let's say 2000, 2001,

16   2002 I recall Jeff was on quite a roll in terms of

17   engagements, highly lucrative engagements with him

18   being kind of the hub, running the hub and spoke of

19   those engagements.  So he would have had enormous

20   chargeable time.

21             And as I recall, when I was leaving,

22   he would have been, I think, at Credit Agricole,

23   which was an assignment that went on forever.  And

24   every time Jeff and John Campbell walked into the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 165

1    place they received another engagement.  It was a

2    very, an engagement with all sorts of, many, many,

3    many engagements within the engagement.

4        Q.    Okay.  Let me ask you to focus on the

5    2000, 2002 time frame.  Do you recall what the

6    projects were that I think you just described Mr.

7    Lavine sort of as the hub in terms of project

8    management, can you just tell me the names of some

9    of those projects?

10       A.    Well, I don't know how long the Credit

11   Agricole engagement went, but it was long.  It

12   contained several sub engagements, all of which -- I

13   believe when we began at Credit Agricole there were

14   four firms providing assistance.  And the bank over

15   time stopped providing engagements to those three

16   other firms and we became the sole firm.

17              The engagements, I don't want to get

18   -- I just say the engagements ran across a spectrum

19   of regulatory interests, be it controls, be it

20   computers, be it clearing and payments, compliance,

21   there was a whole range of things.

22              And, you know, Jeff was also a CPA

23   and was also a career auditor for Arthur Andersen.

24   I think he got up to the manager level, which meant

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 166

1    he did four or five years at Arthur Andersen, then

2    had a CPA, then he had a law degree and then he had

3    all the Section 20 experience.  But anyway, it was

4    like the cactus that blossomed at Credit Agricole.

5              Then prior to that he was, I may be

6    wrong, but within this time frame of 2000, 2002, he

7    would have been this hub, running the hub and spoke

8    at Barclay's.  And then I don't know if there were

9    -- anyway, that also was an enormous,

10   multi-dimensional, complex engagement.

11             And so I don't even know if there

12   was any time for anything in between.  But I don't

13   know why BNP Paribas sticks in my mind as another

14   place he may have been and been catalytic to a lot

15   of business.

16        Q.    Okay.  What was his role on the Barclay's

17   project in the 2000, 2001, 2002 time frame?

18        A.    Well, first of all, it was a very, very,

19   very structured engagement because the client

20   demanded structure.  And the client put together its

21   own project office.  And ran the whole project plan

22   which was pages, pages of tasks to be done, let's

23   say, under general category headings.  There were

24   pages, pages.  And it had colors.  It was a

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 169

1      Q.   Are there whole sections that are yours

2    such that you could sort of tell me, all right, that

3    this section is mine?

4      A.   Not entirely.

5      Q.   Okay.

6      A.   Not entirely.  I have the sense that maybe

7    this is a mix of Bill Lewis and myself.  I mean,

8    this document says, "Looking forward capacity issues

9    will again be at the forefront of our practice in

10   the event of Bob Bench's retirement."  If I was

11   writing this thing, I don't think I would have said

12   it that way.  I would have said "my."  And then

13   there's accounting information that's not me.  So

14   anyway, it's a hybrid document.  At the end of the

15   day it looks as if the signer is Tim Ryan, but, you

16   know, the information in there has been lifted by

17   somebody and put into a document.

18     Q.   Fair enough.

19          When you were thinking about

20   sponsoring Mr. Lavine for partnership with respect

21   to this proposal for FY 2003 did you consider

22   sponsoring Wes Murphy?

23     A.   I'm not a sponsor.

24     Q.   Did you consider --

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

1      A.    The sponsor is the committee.

2      Q.    Okay.  Did the committee talk about or

3    consider sponsoring Mr. Murphy?

4      A.    The committee only considered one-rated --

5    people with sustained outstanding performance over

6    time, generally one-rated people.  Westbrook was not

7    a one-rated person or did not have sustained

8    performance over time.

9      Q.    So is it your testimony that the committee

10   did not consider Mr. Murphy?

11     A.    My testimony is the committee considered

12   candidates with sustained outstanding performance

13   over time who were rated one.  That's my testimony.

14   I think that's accurate, over time.

15     Q.    At any ARC committee meeting in which the

16   issue of partnership was discussed did you propose

17   Wes Murphy as someone who the committee should

18   consider sponsoring?

19     A.    The committee doesn't propose.  I mean, no

20   member of the committee proposes.

21     Q.    Don't focus, I'm not trying to attach any

22   formal significance to the word "propose."  In any

23   of the ARC committee meetings was his name discussed

24   as someone who should be thought about, considered

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 171

1    for partnership?

2              MR. NELSON:  That's been asked and

3    answered, I think.

4         A.   I don't recall anybody who did not have

5    sustained outstanding performance over time and

6    rated on a sustained basis less than one considered

7    to be a partner.

8         Q.   So is the answer to my question that, to

9    your recollection, Mr. Murphy was not discussed at

10   any ARC committee meetings as someone who would be a

11   candidate for partnership?

12        A.   Correct.

13        Q.   Okay.  Could you sponsor an employee who

14   was already age 60 for partnership?

15        A.   I couldn't sponsor any employee at any age

16   for partnership.

17        Q.   Could the ARC committee sponsor, to your

18   understanding, an employee who --

19        A.   The ARC committee could select -- the ARC

20   committee does not select based on age whatsoever.

21   The ARC committee has criteria which is sustained

22   outstanding service over time.

23        Q.   Okay.  You understood in the 2002, 2003

24   time frame that the PWC partnership agreement had a

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    provision regarding mandatory retirement at age 60,

2    is that correct?

3        A.    Generally, yes, generally, yes.

4        Q.    How could an employee who was already age

5    60 be a candidate for partnership, to your

6    understanding?

7                MR. NELSON:  I object to the form of

8    the question, to his understanding.

9                MR. ROSE:  What other kind of

10   understanding, who else's understanding should it

11   be?

12               MR. NELSON:  You're asking a

13   hypothetical question on the basis of understanding.

14   He may or may not have any understanding.

15       Q.    Go ahead, Mr. Bench.

16               MR. NELSON:  And I think it's asked

17   and answered.

18       A.    No, I mean, if you're asking -- well, the

19   answer is the committee, if the committee had a --

20   no, I'll back off of that.  The committee did not

21   consider age in its deliberations whatsoever.

22       Q.    Okay.  Let me ask you a hypothetical.

23       A.    We deal with hypotheticals, do we?

24       Q.    Yeah.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 185

1    all the years.

2              MR. NELSON:  Yeah, I understand.

3              MR. SALZMAN:  Yeah, for FY --

4         Q.   If you take a look again at page 19587,

5    under, again under the question 9 with respect to

6    your specific counselees or mentees, you identified

7    David Sapin as a partner candidate for FY '01, do

8    you see that?

9         A.   Yeah.

10        Q.   And then you identify Jeff Lavine as a

11   partner candidate for FY '02, is that right?

12        A.   Yeah.

13        Q.   So as of September of 1999 you had already

14   identified Jeff Lavine as a partner candidate, is

15   that correct?

16        A.   As of when?

17        Q.   September of 1999.

18        A.   No, that wouldn't have been -- oh, I'm

19   sorry, let me think about that question.

20        Q.   You filled out this form at least as of

21   9/24/99, is that right?

22        A.   '99.  I see, I get that, yeah.  This is as

23   of.

24        Q.   As of that date.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 186

1    A.    For June, 2000.

2              MR. NELSON:  You haven't asked what

3    these entries mean.

4    Q.    Is the answer to my question that, yes,

5    you had identified Jeff Lavine as a partner

6    candidate?

7              MR. NELSON:  Potential or actual?

8    A.    Can I go back?  There it is.  David

9    Albright, Dave Sapin, Jeff Lavine and Harold

10   Schuler.  These were four individuals who I felt

11   were meeting the criteria, I felt were meeting or

12   were, or blossoming into the criteria to be a

13   partner candidate.  One had already been a partner

14   candidate.  But they were showing the sustained

15   performance over time, cross spectrum, that they

16   should be followed.

17   Q.    Okay.  By the time that you filled out

18   this form Jeff Lavine and Dave Sapin had been

19   serving as directors for three months or so, is that

20   right?

21   A.    I guess.  We have to reconcile that with

22   the last discussion.  Whenever they make -- when did

23   they make director?  You're saying --

24   Q.    As of July of '99.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 187

1    A.    You're saying on July 1st, '99 they became

2  directors?

3    Q.    I believe that that's right.

4    A.    Okay, fine.

5    Q.    What engagements, if any, can you recall

6  Jeff Lavine having managed by the time that you

7  filled out this form?

8    A.    I don't remember.

9    Q.    How about David Sapin?

10    A.    I don't remember.  What I recollect about

11  both of them was that they were in very high demand

12  for essentially capital markets, regulatory advisory

13  work, very high demand, both of them.

14    Q.    Okay.  Did you at any point propose David

15  Sapin for --

16    A.    David Sapin, again, the firm's in

17  transition here.  This is 1999, very fluid place.

18    Q.    Right.

19    A.    And David Sapin physically remained, his

20  office was, remained within RAS.  But he was

21  transferred and agreed to the transfer to something

22  called a capital markets regulatory practice that

23  was formed as we transitioned through the merger.

24  And Alan Schott's former colleague at Coopers &

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 188

1   Lybrand, Roger Coffin, was named head of this

2   capital markets regulatory practice in New York and

3   David Sapin went on their books and became their

4   person.

5        Q.   I see.  So if someone was going to sponsor

6   him for partnership, it would have been that unit,

7   is that right?

8        A.   Off he went.

9        Q.   Okay.  Did you sponsor -- by "you," I mean

10  RAS or the ARC --

11       A.   Yeah, I understand.

12       Q.   -- sponsor Mr. Lavine in FY '02?

13       A.   No.

14            MR. NELSON:  You asked did he

15  transfer?

16            MR. SALZMAN:  I'm asking about

17  Lavine now.

18            MR. ROSE:  He's asked about Lavine.

19            MR. NELSON:  Did you ask if he

20  transferred him?

21            MR. SALZMAN:  I asked if he

22  sponsored him.

23            MR. NELSON:  Oh, sponsored him.

24            MR. SALZMAN:  That's okay.  It's

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 210

1  Ryan?

2       A.   I assume Tim Ryan.

3       Q.   Okay.

4       A.   I do not know that.

5       Q.   Okay.  The next sentence you said, "Third,

6  the partner compensation letter informed me that I

7  have a lesser role for '03, but no one has discussed

8  this with me."  What did you mean by "a lesser role

9  for '03"?

10      A.   Well, I had a lesser level of compensation

11 and I had -- which I didn't get to understand

12 because I no longer had partners reporting to me.

13      Q.   Okay.  And you said no one had talked --

14      A.   Correct.

15      Q.   -- to you about that?

16      A.   Correct.

17      Q.   Okay.  You said, "Fourth, HR eliminated my

18 counseling roles" --

19      A.   Yes.

20      Q.   -- "for '03."  What did you mean by that?

21      A.   They issued a list of counseling partners

22 for the staff of RAS and I was not one of them.

23      Q.   Okay.  Who within HR did that, do you

24 recall?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 211

1     A.   I don't recall.

2     Q.   Do you have an understanding of why they

3 did that?

4     A.   No.

5     Q.   Did you have an understanding of why your

6 compensation was reduced?

7     A.   No.

8     Q.   If you turn to page 19496, you said, "My

9 dianes show I spent 200 hours in counseling of

10 staff."  What's a "diane"?

11     A.   My copy says "diaries."

12     Q.   I'm sorry.  Well, that makes much more

13 sense, doesn't it?  Okay.  Thank you for clarifying

14 that.  Okay.

15          You also made the comment, "I've

16 recently learned about the details of the Murphy/

17 Schuler claims as well as the fact that Murphy

18 shared details of his litigation with many RAS

19 staff."  Do you see that?

20     A.   Yes.

21     Q.   Tell me what you recall about that.  Who

22 did he share details with and what did he tell them?

23     A.   My recollection is, first, that when

24 Westbrook filed his action we carried on.  There was