1

1

2          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
3
   ----------------------------------------X
4  C. WESTBROOK MURPHY, et al.,

5                    Plaintiffs,          Case No. 02-982
                                          (RJL/DAR)
6              vs.

7  PRICEWATERHOUSECOOPERS, LLP, et al.,

8                    Defendants.
   ----------------------------------------X
9  C. WESTBROOK MURPHY, et al.,

10                   Plaintiffs,          Case No. 05-1054
                                          (RJL/DAR)
11             vs.

12 PRICEWATERHOUSECOOPERS, LLP, et al.,

13                   Defendants.
   ----------------------------------------X
14 HAROLD SCHULER,

15                   Plaintiff,           Case No. 05-2355

16             vs.

17 PRICEWATERHOUSECOOPERS, LLP, et al.,

18                   Defendants.
   ----------------------------------------X
19

20          DEPOSITION OF JOHN F. CARTER

21              New York, New York

22           Friday, October, 20, 2006

23

24 Reported by:
   ELIZABETH SANTAMARIA
25

Page 2

1

2

3

4

5

6                              October 20, 2006

7                              10:24 a.m.

8

9

10          DEPOSITION of JOHN F. CARTER, held at

11    the offices of Winston & Strawn, 200 Park

12    Avenue, New York, New York, pursuant to

13    Notice, before ELIZABETH SANTAMARIA, a

14    Notary Public of the State of New York.

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1

 2   A p p e a r a n c e s :

 3

 4        HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN

 5        Attorneys for Plaintiff

 6        C. Westbrook Murphy

 7             1730 M Street, N.W. - Suite 412

 8             Washington, D.C. 20036-4517

 9        BY:   TAMMANY M. KRAMER, ESQ.

10

11        WINSTON & STRAWN LLP

12        Attorneys for Defendant

13        PriceWaterhouseCoopers, LLP

14             200 Park Avenue

15             New York, New York 10166-4193

16        BY:   ERIC M. NELSON, ESQ.

17             STEPHEN L. SHEINFELD, ESQ.

18

19

20

21

22

23

24

25
```

Page 4

```
 1

 2    A p p e a r a n c e s  (c o n t 'd) :

 3

 4         ROSE & ROSE, P.C.

 5         Attorneys for Plaintiff

 6         Harold Schuler

 7              1320 19th Street N.W. - Suite 601

 8              Washington, D.C. 20036

 9         BY:   DAVID L. ROSE, ESQ.

10         (Present via telephone)

11

12

13         ALSO PRESENT:  C. Westbrook Murphy

14                        John Daly, Esq.
                          Office of the General Counsel - PWC
15

16                        --o0o--

17

18

19

20

21

22

23

24

25
```

Page 5

1

2  J O H N   F.   C A R T E R, called as a witness,

3         having been duly sworn by a Notary Public,

4         was examined and testified as follows:

5  EXAMINATION BY

6  MS. KRAMER:

7         Q.     Good morning, Mr. Carter.

8         A.     Good morning.

9         Q.     My name is Tammany Kramer and I

10  represent C. Westbrook Murphy.  I have a few

11  questions for you today.

12             Can you state your full name and

13  address for the record.

14         A.     John F. Carter, 220 Riverside

15  boulevard, apartment 8N, New York, New York 10069.

16         Q.     You are currently a partner at

17  PriceWaterhouseCoopers; is that correct?

18         A.     Yes.

19         Q.     Throughout the day today I am going

20  to be asking you questions where I use the term

21  "partner."  When I use that term, I'm going to mean

22  it to include partners and principals, unless my

23  question indicates otherwise.  Is that all right

24  with you?

25         A.     Fine.

96

Carter

1    individual's career there is, you know, an expressed

2    interest as to whether they have an interest, any

3    desire to be admitted as a partner.

4

5            If an individual is going to be

6    proposed for admission, if you want me to start at

7    that stage, a sponsoring partner will complete a

8    proposal form for that individual.  Normally those

9    candidates that are within the pipeline who are

10   considered to be potential partner candidates will

11   be vetted at a business unit level.  If the business

12   unit has a need for partners and believes that those

13   individuals have the skills and attributes to fill

14   those needs, they will be proposed as a partner

15   candidate.

16           Depending upon the particular line of

17   service, they will either use a business unit

18   process or a national service line process to vet

19   those candidates.  Soundings input will be received

20   from the partners, so every partner has the ability

21   to see what candidates are being proposed and to

22   submit information with respect to the candidacy and

23   their view of the qualifications and that individual

24   to be a partner.

25           The line of service committee will

97

Carter

1  
2  then make a determination as to who has the

3  qualities to be admitted and to fill those business

4  cases.  Those candidates are typically approved by

5  the line of service leader.  The line of service

6  leader will recommend those candidates to Partner

7  Affairs and then we administer a global soundings

8  process where those candidates from the U.S. along

9  with all candidates from other territories, other

10  countries, will appear on a database available to

11  all partners globally who can then submit soundings

12  information on those particular candidates.

13            During the global soundings process,

14  that input is only available to the board admissions

15  committee which is augmented by partners at large to

16  serve on that committee, because the number of board

17  committee members on the admissions committee is

18  typically not sufficient in size for the number of

19  candidates being considered.  They will do a final

20  assessment of the quality of the candidates and

21  validation of the business cases and make a

22  recommendation to the board as to those candidates

23  that should move forward and be voted on by the

24  board to be admitted as partners.

25            Q.     You talked about a pipeline of

113

                                Carter

1    Q.    Yes, the average number admitted.

2          MR. NELSON:  From 1998 to date?

3          MS. KRAMER:  Yes.

4    A.    I can't --

5          MR. NELSON:  You can borrow my

6    calculator and we can probably get an

7    exact average.

8    A.    The reason that's difficult to answer

9    is the firm has changed quite significantly since

10   the time of the merger and the divestiture of our

11   consulting practice, valuations practice, business

12   recovery services practice.

13         At the date of the merger we were

14   admitting in the 200s.  That fell post-disposition,

15   economic slump of 2001-2002, to probably around 100

16   and it's probably back in the 140-something range.

17   148 was the exact number last fiscal year.  So it

18   has fluctuated.  So I would not give you an average

19   and I am not sure the average is meaningful, given

20   the change in the partnership during that period of

21   time.

22   Q.    Can somebody who is 60 and is an

23   employee for PWC, can that person be made partner?

24   A.    I would say that if they meet the

114

Carter

1  qualifications, they could be.  I'm not quite sure

2  why they would be, but ...

3

4           Age has nothing to do with it.

5      Q.    Do you know of any instances where

6  somebody of 60 or over has been admitted to

7  partnership?

8      A.    I do not, but I think it's important

9  to know that as individuals are going through the

10 admissions process, I have no idea of the age of the

11 candidates.

12           MS. KRAMER:  Let's mark this as

13      Exhibit 19.  Do you object to Mr. Murphy

14      viewing this document?

15           MR. ROSE:  I couldn't hear what the

16      objection was.

17           MS. KRAMER:  It is marked for

18      attorneys of record only, two-page

19      document, PWC41074108.

20           MR. NELSON:  Give me a second.

21           (Recess taken.)

22           MR. NELSON:  We have no objection

23      to Mr. Murphy seeing this at the

24      deposition understanding that it is not

25      losing its For Attorneys of Record Only

116

1                              Carter

2              going to do that because I can't do it

3              line by line at this juncture and as

4              Mr. Salzman consented to my doing it and

5              agreed to my doing that at Mr. Levine's

6              deposition last week.

7              Q.      Mr. Carter, have you had time to look

8      at this document?

9              A.      I didn't know I was allowed to.

10                     I have looked at it.

11             Q.      I would like to direct your attention

12     to the second page, PWC4108.

13             A.      Yes.

14             Q.      In the center there is a list of five

15     bullet points.  Do you see that?

16             A.      I do.

17             Q.      The letter, which is to David

18     Albright congratulating him on his admission to PWC

19     partnership, states that by June 16th he has to

20     submit proof of his date of birth.  Do you see that?

21             A.      I do.

22             Q.      Is this something that newly admitted

23     partners are routinely asked to provide?

24             A.      This is data that was requested of

25     partners who have been approved for admission after

163

Carter

1                              Carter

2  assignment is going to be for the next year?

3         A.    After the completion of the system,

4  and it is reviewed and approved by the partner

5  affairs committee and the board, the information is

6  confirmed with the primary reporting partner whose

7  responsibility it is to have a meeting with the

8  partner to describe their overall performance

9  assessment for the year, their responsibility and

10 share level for the next year.

11             Oftentimes that's attended by another

12 partner, maybe a business unit leader or a member of

13 the extended leadership team, so that there are two

14 people who deliver the message to provide additional

15 coaching to the individual partner.

16        Q.    Does Dennis Nally have a primary

17 reporting partner?

18        A.    Dennis Nally is evaluated by the

19 management evaluation and compensation committee of

20 the board.  He is also evaluated globally by our

21 global CEO, who goes through a similar process with

22 a global management evaluation and compensation

23 committee, because 20 percent of his income is paid

24 for by the global organization.

25             So he is evaluated both within the

164

1                          Carter

2     U.S. by the U.S. board and also a component of his

3     evaluation is currently by DiPiazza, who is our

4     global CEO, and the global governance process.

5            Q.      How many countries are part of the

6     global PWC firm?

7            A.      We are in approximately 140

8     territories.

9            Q.      Globally how many partners are there?

10           A.      Approximately 9,000.

11           Q.      Does Dennis Nally have any other

12     commenting partners?

13           A.      2150.  I mean really.  He serves for

14     the partners and he gets lots of feedback and input.

15           Q.      He gets that directly?

16           A.      I would say he gets it pretty

17     directly.

18           Q.      Does he get that as part of a formal

19     evaluation process?

20           A.      Formal evaluation, as I indicated, is

21     done by the management evaluation and compensation

22     committee of the board.  But Dennis is out with the

23     partners and receives lots of input.  He attends two

24     partner meetings every weekends during the fall

25     partner meeting series, he is out in offices, he is

165

                              Carter

1

2    doing client visits, he is visiting with partners

3    one-on-one.  He is very in touch with the partners

4    and gets lots of feedback.

5           Q.     What is the process by which he is

6    evaluated by the MECC?

7           A.     He completes an annual goal setting

8    process.

9               The leadership team or management

10   committee uses a modified version of the partner

11   balance scorecard.  It's basically a Word document,

12   the same dimensions as the balance scorecard.  We

13   set primary and secondary objectives by each of the

14   four components of the balance scorecard -- people,

15   quality, partnership and teamwork -- and those goals

16   are reviewed with the MECC, M-E-C-C, management

17   evaluation and compensation committee, of the board.

18               And at the end of the year he will do

19   a self-assessment similar to all the other partners

20   and the MECC will review that assessment.  They get

21   input from the board so they'll solicit it from all

22   board members at large and obviously they have

23   visibility to him throughout the year.  And they do

24   a formal evaluation of him that is presented and

25   discussed with him from a U.S. perspective by the

166

1                        Carter

2     lead director of the board who chairs the management

3     evaluation and compensation committee.  As I

4     indicated there is a global process, too, but I

5     don't know if you want me to go into that or not.

6           Q.     Does the U.S. board have input into

7     that global process?

8           A.     There are U.S. board members who sit

9     on the global board and there are individuals from

10    the U.S. on the global board who sit on the

11    governance committee, which is the equivalent of the

12    MECC in the U.S. that would oversee the compensation

13    of those who go through the global management

14    evaluation and compensation process.

15          Q.     With respect to the inappropriate

16    behavior, negative allocation we were talking about,

17    does that include conduct-related issues as opposed

18    to performance-related issues?

19                 Do you understand the distinction?

20          A.     What do you mean by conduct?

21          Q.     Say a partner is caught boozing it up

22    at a client meeting.  Is there some action or

23    sanction that can be taken with respect to that

24    inappropriate behavior?

25          A.     I would classify that as more of an

169

Carter

1  personal relationship.  Within our organization that

2  is not forbidden, but if you are in a reporting

3  relationship you are disclose it, so that you are

4  not in a reporting relationship.

5  

6       Q.    Can a partner choose the person who

7  serves as their primary reporting partner?

8       A.    Usually not.  Usually they are

9  assigned based upon the organizational structure

10  within a particular business unit.  So normally they

11  are assigned as opposed to input of somebody saying,

12  you know, "I would rather have Mary than Joe."

13       Q.    Who rates the performance of the

14  board members?

15       A.    The board members each have a primary

16  reporting partner based upon their, if I could use

17  the term, day job; their job, board-related job.  So

18  each of them is either a line partner or a business

19  unit leader, and so -- and their natural reporting

20  cycle would be assessed as any other partner.

21            One of the duties of the lead

22  director, as specified in the P&PA, is that that

23  individual will assess their performance as a board

24  member and does a review of the ultimate

25  compensation recommendations of all the board

170

1                          Carter

2    members.

3                    MR. ROSE:  The lead partner?  Is

4          that what you said?

5                    THE WITNESS:  The partners and

6          principal agreement specifies that the

7          board will elect, if you will, a lead

8          director and the lead director has

9          particular responsibilities outlined in

10         the partnership agreement that the

11         partners have delegated to that lead

12         director.

13                   MR. ROSE:  Thank you.

14                   THE WITNESS:  Absolutely.

15            Q.     You said earlier that you spent

16   100 percent of your time doing sort of internal firm

17   stuff.  Can you give me a ballpark percentage of how

18   much of their time the board members spend on board

19   related duties?

20            A.     It does vary.  As you can appreciate,

21   the lead director probably spends more time than a

22   board member who is not the lead director and a

23   board member who is also a global board member, of

24   which there are six, is going to spend more time

25   than just a U.S. board member.  On average I would

173

Carter

1
2    the various board committees, do they also have

3    primary reporting partners in connection with their

4    day jobs?

5           A.     Those who serve on those board

6    committees are board members; therefore, it follows

7    the same.

8           Q.     Who would the primary reporting

9    partners be for line of service leaders?

10          A.      In today's current structure, the

11   line of service leaders report to the managing

12   partner of operations.

13          Q.     Who is that?

14          A.     Greg Garrison.

15          Q.     With respect to the U.S. leadership

16   team, the other team members, do they have primary

17   reporting partners?

18          A.     Yes.

19          Q.     Generally speaking who are the

20   primary reporting partners for those individuals?

21          A.      Generally they are Greg Garrison or

22   Dennis Nally.

23          Q.     Do partners vote for who their line

24   of service leader is?

25          A.     They do not.

216

1                              Carter

2          A.       There is a database, a Lotus Notes

3    database, that houses the partner plans and

4    evaluations.  Only the overall performance

5    assessment for the year and a partner's

6    responsibility and equity unit level are in UPAS.

7          Q.       In 2001 there was a shortfall; is

8    that right?

9          A.       A shortfall?

10         Q.       Financial shortfall.

11         A.       To?  What do you mean by shortfall?

12         Q.       In 2001 was there a compulsory

13   reduction in the distributions to some of the

14   partners?

15         A.       In 2001 we did not achieve budget, if

16   that's what you are referring to as shortfall, and

17   many partners ended up in a negative settlement

18   situation.

19         Q.       Were you involved in the calculations

20   of the negative settlements?

21         A.       My team in Tampa does the final

22   settlement process so, yes, I was involved in how we

23   were to handle that particular situation.

24         Q.       Are you based in Tampa or in

25   New York?

Page 222

```
 1                         Carter
 2          A.      I have no idea the age of our
 3   employees or when our employees retire.
 4          Q.      What is your understanding of why
 5   there is a mandatory retirement age at
 6   PriceWaterhouse?
 7          A.      It is really for the vitality of the
 8   partnership, to continue the growth and prospects
 9   for admission.  And as you may well know, it is a
10   pretty stressful environment, and I think it is one
11   of the things that an individual knows upon
12   admission, clearly been voted on by the partners at
13   the time of the merger and when an individual is
14   admitted in signing the articles of the partnership,
15   have full knowledge of that.  And it keeps, if you
16   will, it fresh and allows for mobility and for
17   continued admissions.
18          Q.      Is there a mandatory retirement age
19   for nonpartners?
20          A.      No.
21          Q.      Why not?
22          A.      Isn't it illegal?
23                  MR. NELSON:  Well, isn't it?
24          Q.      Would the same --
25                  MR. ROSE:  Is that the witness
```