1

1          UNITED STATES DISTRICT COURT
             DISTRICT OF COLUMBIA
2    _____

3    C. WESTBROOK MURPHY and          x
     HAROLD SCHULER,                   :
4                                      :
                   Plaintiffs,         :
5             vs.                      : Case No.
                                       : 1:02CV00982(RJC)(DAR)
6    PRICEWATERHOUSECOOPERS, LLP,      :
     et al.,                           :
7                                      :
                   Defendants.         x
8    _____

9                   Washington, D.C.

10             Wednesday, April 30, 2003

11

12   DEPOSITION OF:

13             TIMOTHY F. RYAN,

14   a witness, was called for examination by counsel

15   for the plaintiffs, pursuant to Notice and

16   agreement of the parties as to time and date,

17   beginning at approximately 10:09 o'clock, a.m.,

18   in the law offices of Winston & Strawn, Esquires,

19   1400 L Street, Northwest, Washington, D.C. 20005,

20   before Catherine S. Boyd, a Court Reporter and

21   Notary Public in and for the District of

22   Columbia, when were present on behalf of the



**CAROL J. THOMAS STENOTYPE**
**REPORTING SERVICES, INC.**
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

2

1         respective parties:

2         APPEARANCE OF COUNSEL

3             For the Plaintiffs:

4             ROSE & ROSE, ESQUIRES
              BY:  DAVID L. ROSE, ESQUIRE
5             1320 19th Street, Northwest, Suite 601
              Washington, D.C.  20036
6             202.331.8555

7             For the Defendants:

8           · WINSTON & STRAWN, ESQUIRES
              BY:   ERIC M. NELSON, ESQUIRE
9                  STEPHEN L. SHEINFELD, ESQUIRE
              200 Park Avenue
10            New York, New York  10166-4193
              212.294.6647

11

12                       -  0  -

13                   I-N-D-E-X

14        Witness:                          Page:

15        TIMOTHY F. RYAN

16            Examination by Mr. Rose          5

17                       -  0  -

18        Exhibits:  (Included with transcript)  Page:

19        Exhibit No. 1 for Identification
          to the Ryan Deposition
20        (Bates Nos. PwC00002-PwC00028)          65

21                          --continued--

22

3

1      Exhibits:(Cont)(Included with transcript)Page:

2      Exhibit No. 2 for Identification
      to the Ryan Deposition
3      (Bates Nos. 00850-00852)          111

4      Exhibit No. 3 for Identification
      to the Ryan Deposition
5      (Bates Nos. 00996-00997)          165

6      Exhibit No. 4 for Identification
      to the Ryan Deposition
7      (Bates No. 00170)          184

8      Exhibit No. 5 for Identification
      to the Ryan Deposition
9      (Bates Nos. 00294-00209)          186

10     Exhibit No. 6 for Identification
      to the Ryan Deposition
11     (Bates Nos. 00184-00189)          191

12     Exhibit No. 7 for Identification
      to the Ryan Deposition
13     (Bates No. 00195)          194

14     Exhibit No. 8 for Identification
      to the Ryan Deposition
15     (Bates No. 00196)          195

16     Exhibit No. 9 for Identification
      to the Ryan Deposition
17     (Bates No. 00183)          197

18     Exhibit No. 10 for Identification
      to the Ryan Deposition
19     (Bates No. 00393)          200

20     Exhibit No. 11 for Identification
      to the Ryan Deposition
21     (Bates No. 00181)          203

22                              --continued--

4

```
1        Exhibits:(Cont)(Included with transcript)Page:

2        Exhibit No. 12 for Identification
         to the Ryan Deposition
3        (Bates Nos. 00198-00199)              210

4        Exhibit No. 13 for Identification
         to the Ryan Deposition
5        (Bates No. 00173)                     211

6        Exhibit No. 14 for Identification
         to the Ryan Deposition
7        (Bates No. 00160)                     221

8        Exhibit No. 15 for Identification
         to the Ryan Deposition
9        (Bates No. 00172)                     223

10       Exhibit No. 16 for Identification
         to the Ryan Deposition
11       (Bates No. 00153)                     224

12       Exhibit No. 17 for Identification
         to the Ryan Deposition
13       (Bates No. 00158)                     225

14       Exhibit No. 18 for Identification
         to the Ryan Deposition
15       (Bates Nos. 01010-01011)              226

16       Exhibit No. 19 for Identification
         to the Ryan Deposition
17       (Bates PwC10082-C000084)              230

18                         - 0 -

19

20

21

22
```

```
 1      Whereupon,

 2                      TIMOTHY F. RYAN,

 3      a witness, after having been duly sworn by the

 4      Notary Public, was called herein, and testified

 5      as follows:

 6                      EXAMINATION BY COUNSEL FOR PLAINTIFFS

 7                      BY MR. ROSE:

 8          Q.    Mr. Ryan, would you state your full name

 9      for the record, please?

10          A.    Timothy Francis Ryan.

11          Q.    Okay.  And where do you reside, sir?

12          A.    I live in Norfolk, Massachusetts.

13          Q.    And which direction how are you from

14      Boston?  North?  South?

15                You're not east I assume?

16          A.    No -- halfway between Providence and

17      Boston.

18          Q.    Oh, okay.  And what PWC office do you

19      work out of or at?

20          A.    Boston.

21          Q.    Okay.  And where is that located?

22          A.    160 Federal Street.
```

1          Q.   Okay.  And so it was shortly after

2     that -- I'm sorry.  Go ahead.

3          A.   I don't recall when I became a CPA;

4     whatever the statutory, whatever the earliest I

5     could have after I passed.

6          Q.   Is there a statutory --

7          A.   They give you three years experience.

8          Q.   Two or three?

9          A.   I can't -- I don't know.

10         Q.   But it was two or three, is that --

11         A.   Yes.

12         Q.   Okay.  Okay.  And that was while you

13    were working I assume?

14         A.   Yes.

15         Q.   Okay.  What's the, what kind of, what

16    practice did you, were you employed in your, what

17    practice did you start in when you were at PWC?

18         A.   At the time, audit; that's all they had.

19         Q.   Okay.  And how long were you in audit?

20         A.   I have been in audit my entire career.

21         Q.   Okay.  There's initials ABAS.  What do

22    they mean?

1     A.    Audit and business advisory, and that's

2     the practice that I'm in.

3     Q.    Okay.

4     A.    That's synonymous with audit the way I

5     use it.

6     Q.    Okay.  Okay.  The S is services, ABAS?

7     A.    Yes.

8     Q.    Did you, did your work at PW focus on

9     any industry or industries?

10    A.    Early on in my career, probably by the

11    second year, I had started to focus on financial

12    institutions.

13    Q.    And financial institutions, I guess they

14    include banks?

15    A.    Banks, mortgage banks, thrifts,

16    industrial banks, monoline consumer finance

17    companies, credit unions.

18    Q.    Does it include life insurance companies

19    or insurance companies?

20    A.    No, it doesn't.

21    Q.    Okay.

22    A.    Unless they own a bank, which is --

1          when I became a partner, clearly there was the

2          sense of responsibility and liability, so from a

3          responsibility standpoint, I, you know, took a

4          number of personal actions to make sure that

5          given the liability that comes with being a

6          partner, that --

7               Q.   Buy liability insurance?

8               A.   I did not.  I put the house in my wife's

9          name, moved assets out of my name into my wife.

10              Q.   Okay.

11              A.   That's it.

12              Q.   Okay.  Let me come back to several

13         things.

14                   You say you voted for senior partner.

15         That was one of those things that you did.

16                   Was that a contested election, or was

17         that something where the nominating committee had

18         recommended just one person?

19              A.   If you contest it, what does it mean?

20              Q.   Like -- pardon me -- the Democrats and

21         Republicans contest elections, they run the same

22         candidate --

```
 1              MR. NELSON:  Was there more than one
 2    candidate?
 3              BY MR. ROSE:
 4        Q.   Was there more than one candidate for
 5    one seat?
 6        A.   Yes.  Yes, there was.
 7        Q.   Okay.  And so what year was that?
 8        A.   If I work backwards, we had one within
 9    the last two years.
10        Q.   A contested election?
11        A.   Yes, we did.
12        Q.   Was Mr. Nally involved?
13        A.   He was one of the candidates.
14        Q.   And who was the other candidate?
15        A.   Bob Hers.
16        Q.   How do you spell his name?
17        A.   I believe it's H-e-r-s.  I believe he
18    was the other candidate.
19        Q.   Were they both proposed by the
20    nominating committee?
21        A.   Yes, they were.
22        Q.   How about the votes for, I think the
```

1      partnership calls them members-at-large, the

2      people who were on the board?

3         A.   I did participate in voting for board

4      members.

5         Q.   Um-hm.  Were those contested?

6         A.   Absolutely.

7         Q.   And how many, how often did you have a

8      vote for members of the board?

9         A.   I recall the one two years ago.  There

10     may have been one prior to that.  I just don't

11     recall.

12        Q.   Were there issues besides the people

13     that -- did the people contending for senior

14     partner -- well, let's ask several, if the senior

15     partner and the board -- was there any

16     disagreement about policy in terms of the

17     election between Mr. Nally and Mr. Hers?

18        A.   I don't know there was a policy, but to

19     answer your question, there were detailed

20     biography, backgrounds, information on the

21     candidates, including Webcast I believe, phone

22     calls to give people information on the

```
1     candidates.

2          Q.    Um-hm.

3          A.    And there were clearly differences

4     between the two.

5               I don't recall a specific policy, but

6     there were clearly differences between the two.

7          Q.    Difference in terms of background or

8     experience or capacity or --

9          A.    All three.

10         Q.    Okay.  And how about the vote for, there

11    was a contested vote for members-at-large, is

12    that right?

13         A.    I don't recall that term.

14         Q.    It was members of the board?

15         A.    Yes.

16         Q.    Okay.

17         A.    Yes.  Each candidate had a background

18    that anybody could go on and partner, could go on

19    and read and research.

20         Q.    And do you recall how many seats were

21    contested and how many people were running?

22         A.    I don't recall.  I don't recall, but
```

```
 1    there were several people who didn't, who were

 2    nominated who didn't make it, so --

 3         Q.    Did you know personally Mr. Nally or Mr.

 4    Hers?

 5         A.    No.  I've met Dennis a couple of times,

 6    Bob once, but not personally.

 7         Q.    Just introduced and shaking hands, okay.

 8    And how about the people who vote, who were

 9    members of the board?

10         A.    Some.

11         Q.    You knew some of them?

12         A.    Yes.

13         Q.    Did you tend to vote for them, or not

14    necessarily?

15         A.    Nope.

16         Q.    Okay.  So how did you decide how to

17    vote?

18         A.    I read the backgrounds.  I talked to

19    other partners.  I talked to them.

20         Q.    Other partners you worked with, were

21    working with?

22         A.    I read the backgrounds.  I talked to --
```

1        Q.    To the candidates?

2        A.    I talked to, in some cases, to the

3     candidates.

4               In many cases, I talked to my own

5     partners -- what do you think?  What do you know

6     about this guy?

7        Q.    People that were working, you were

8     working with?

9        A.    My peers, my partners.

10       Q.    Okay.  Who do you include in that group?

11       A.    Over a hundred, so I mean my partners,

12    the partners that I interact with on a daily,

13    weekly, monthly basis.

14       Q.    Um-hm.

15       A.    Could be somebody in Los Angeles,

16    somebody in Chicago that I respected an opinion

17    and may know a candidate, and I wanted to

18    understand, you know, what their background,

19    position, views.

20       Q.    And how was the vote on, how did the

21    vote on these matters count?

22             Was it a one man -- sorry -- one person,

1        one vote, or was it, did you vote based on the

2        number of shares?

3            A.    One person, one vote.

4            Q.    Okay.   That's both board and senior

5        partner?

6            A.    Yes.

7            Q.    Do you recall whether the votes were

8        lopsided or close?

9            A.    We don't know.

10           Q.    Oh, okay.   Who does know?

11           A.    I don't know.

12           Q.    Does the board?

13           A.    I assume it's the law firm that

14       administers the, the vote.

15           Q.    What firm is that?

16           A.    Cravath.

17           Q.    Cravath, Swaine & Moore?

18           A.    Yeah, I believe.   I don't -- don't hold

19       me to that, but I think it starts with a K.

20           Q.    It's a C.   It's the same firm I think.

21           A.    Yeah.   I don't know.

22           Q.    Cravath, Swaine & Moore is an old-line

 1    downtown New York firm which was around when I

 2    was young.

 3            MR. NELSON:  Midtown Manhattan; let's

 4    move on.

 5            Yes, they have been in midtown for quite

 6    a few years now.

 7            MR. ROSE:  Used to be downtown.

 8            MR. NELSON:  They used to be downtown.

 9            THE WITNESS:  It's completely

10    confidential.  That's why I don't know.

11            I just remember the ballot says it's

12    completely confidential.

13            MR. NELSON:  And just, Mr. Rose, we will

14    be designating, pursuant to the protective order,

15    which I understand Judge Robinson has now signed,

16    we will be designating portions of this

17    transcript as confidential.

18            MR. ROSE:  Sure.  Yes.  I got a fax

19    yesterday or the day before.

20            (There was a pause in the proceedings.)

21            BY MR. ROSE:

22        Q.   Let's go back to the question of your

63

1    assumed my current responsibilities approximately

2    in June of 2001 roughly.

3            I might be off by a month either way.

4        Q.    Okay.

5        A.    I don't function -- I still do a

6    significant amount of mortgage work.

7        Q.    In the, in the practice that you

8    supervise now, how many partners -- if I say

9    partner, I'm going to include principal in this

10   unless you hear something to the contrary, so how

11   many partners do you have working in the banking,

12   I guess it's the banking practice, right?

13       A.    Yes; approximately 45.

14       Q.    Now the banking practice is a part of a

15   larger practice, is it not?

16       A.    Yes, it is.

17       Q.    Okay.  And what's the name of the larger

18   practice?

19            Was it called financial institutions at

20   one time, FISP or something like that?

21       A.    At one time; it's currently called the

22   financial services practice.

64

1     Q.   And who's the head of that practice?

2     A.   Bob Moritz.

3     Q.   Okay.  And is the financial services

4     practice part of ABAS, is that correct?

5     A.   Yes, it is.

6     Q.   Who is the head of ABAS?

7     A.   Greg Garrison.

8     Q.   And where is he located?  Where is his

9     office located?

10    A.   I truthfully don't know.  It's probably

11    in New York or Los Angeles, but I --

12    Q.   Okay.  Moritz is located in New York I

13    believe?

14    A.   Yes.

15    Q.   Do you know whether Mr. Garrison is a

16    member of the board?

17    A.   I don't believe he is.

18    Q.   Is there anybody that is sort of over

19    him?

20         You mentioned something about, something

21    like a chain of command?

22    A.   Yes.

```
 1                    AFTERNOON SESSION

 2                         (2:07 p.m.)

 3         EXAMINATION BY COUNSEL FOR PLAINTIFFS

 4         (Resumed)

 5         BY MR. ROSE:

 6         Q.    Okay.  I'm trying to direct your

 7    attention to the last answer that you gave, which

 8    was fairly, quite thorough, and I thank you for

 9    that.

10              Now the financial services business unit

11    is the unit that has banking and four other

12    units, is that correct?

13         A.    Yes.

14         Q.    And what are the other units?

15         A.    Capital markets.

16         Q.    Okay.

17         A.    Insurance, investment management, and

18    real estate.

19         Q.    And that's the unit that Mr. Moritz is

20    the leader of?

21         A.    Yes.

22              MR. NELSON:  You mean FSBU, not  --
```

163

1          BY MR. ROSE:

2          Q.   Are they still all candidates as far as

3     you know?

4          A.   No, they are not still candidates.

5          Q.   How many are still candidates?

6          A.   I believe at this point, four are still

7     candidates.

8          Q.   And what's left in the process is the

9     admissions committee, is that --

10         A.   I don't know.  I don't know.

11         Q.   Okay.  Fine.  Do you know the age of the

12    five candidates that were being considered, not

13    precisely, but roughly?

14         A.   I don't.  It's not a factor that I

15    considered, that the other partners consider.

16         Q.   Was any of them over the age of 50?

17         A.   I don't know.  I don't consider it.

18         Q.   Of the five, what are the organizational

19    units within -- I'm sorry.  Let's go back.

20              What are the organizational units within

21    banking?

22              Are there some?

```
1        A.    Yes, there is.

2        Q.    Okay.  What are they?

3        A.    Mortgage banking.

4        Q.    Okay.  Okay.  I think -- okay.  Is this

5    the list we had before?

6        A.    I don't think so.  I don't think we've

7    covered this.

8        Q.    Okay.  So it's mortgage banking?

9        A.    Regulatory advisory -- RAS, regulatory

10   advisory services; those are the only two formal

11   units within banking.

12              The rest is the general banking

13   practice.

14       Q.    So you think you would classify it as

15   three units or two?

16       A.    I would classify it as two units, and

17   then the rest.

18       Q.    Okay.  And of the five people, which

19   came from mortgage banking?

20              How many came from mortgage banking?

21       A.    One from mortgage banking.

22       Q.    How many from regulatory advisory
```

1       to come down and thank them for their efforts.

2               It was to come down and thank them for

3       how hard several of them had been working.

4               It was to come down and tell them that

5       we recognized that business advisory, which is a

6       small piece of our firm, which is an audit firm,

7       is a very important part of what we do, and that

8       we recognize that the career model in our firm is

9       skewed to its audit, but we're working on it.

10              It was intended to be a morale-boosting

11      session.

12              It lasted four hours.  This memo was one

13      page, and just reading it, there's a lot of

14      things in here that while, while not inaccurate,

15      certainly are not contextually correct.

16          Q.   Okay.

17          A.   And what I would say is that in the

18      context of the sentences you asked me, it's

19      important to point out that we went around the

20      room on a number for two hours asking each of

21      the, many, asking many of the people in the group

22      to speak to their accomplishments so they could

172

1        Q.    What, what did you and do you mean by

2      responsible metrics?

3        A.    There is, there is a frustration and a

4      perception -- not a frustration.

5          There's a perception in the regulatory

6      group among many of the people in the group that

7      they are managed by the numbers, and that a lot

8      of the intangibles that can't be quantitatively

9      measured are not considered.

10     As I have stated in a number of meetings

11    with the group, that one of the reasons for my

12    frequent interaction with the group,

13    accessibility and availability, is to understand

14    the intangibles.

15     We recognize, I said to the group as I

16    said at the meeting, we recognize that RAS is not

17    the traditional business model of an audit, and

18    that because of the way we as a professional

19    services firm try to measure our performance, a

20    lot of their performance cannot be measured

21    because they may help out with a phone call, they

22    may help out in some way that isn't traditionally

1    measured because they're a business advisory

2    unit.

3            And what I said to them is I said it is

4    their job to help us see through the metrics, and

5    it's our job as partners and my job as the leader

6    to listen and to work and not take the easy route

7    out and listen to the metrics, and they had my

8    commitment that I would do that.

9            I gave an example at the meeting.  I

10   specifically pointed out that one of the staff

11   had been working on a non-billable project at my

12   request for a big chunk of the year, and that in

13   no way, shape or form, although billable hours

14   are a metric, would that individual be adversely

15   rated because of what that individual was doing

16   was very valuable and just didn't fit the typical

17   metrics.

18           I also pointed out in the same side,

19   though, that it's not a free ride and don't think

20   that we're not going to look at the metrics, and

21   if the metrics aren't good and there's no good

22   story behind the fact why the metrics were bad,

1        do you think that he lacks?

2            A.    Based upon my experience with Hal, which

3        has been since the banking leader, Hal --

4            Q.    Been since?  I'm sorry.

5            A.    Since the banking leader -- I had never

6        interacted with Hal in any meaningful way prior

7        to the time I became the banking leader.

8                 During my time, since being in the

9        banking leadership role, I found Hal to be

10       disruptive, unreasonable, overly critical,

11       unbalanced, has not demonstrated the ability to

12       develop people, unconstructive, and based upon my

13       interaction with Hal, I would have doubts about

14       putting him in front of clients.

15                And in addition to all of that, Hal had

16       never approached me nor, quite frankly, had Mr.

17       Murphy, saying they were even interested in a

18       partnership during my tenure as the banking

19       leader.

20           Q.    Were you -- when did you first become

21       aware that Mr. Murphy and then Mr. Schuler were

22       complaining about lack of promotion to

1     partnership?

2          A.     Quite truthfully, even to this day, I

3     don't understand Mr. Murphy's complaint to be

4     that he wasn't considered for promotion.

5               I understood Mr. Murphy's complaint to

6     be the mandatory retirement age.

7               I've never been aware, been aware

8     through interaction with Mr. Murphy that he

9     desired to be a partner.

10              I became aware that he had filed a

11    complaint against the firm shortly after my

12    taking over as a banking leader.

13         Q.    In 2001?

14         A.    In approximately June of 2001.

15         Q.    Yeah.   And the complaint was filed in

16    May I believe.

17              The administrative complaint was filed

18    in, I guess it was a little later in the year,

19    but it was May or June I guess.

20              MR. NELSON:   It was filed in March, Mr.

21    Rose.

22              MR. ROSE:   March -- thank you.

1                    THE WITNESS:  I was not aware at that

2          time of Mr. Schuler's complaints.

3                    BY MR. ROSE:

4          Q.    What difference does it make whether he

5          approached you or not?

6                    Is that normally part of the process, to

7          have the individual approach you?

8          A.    As I've testified earlier today, part of

9          the process that goes on over this continuous

10         process of counseling and getting to know and

11         being open with our people, part of that process

12         is the individual letting us know what their

13         career goals are.

14                   And I would tell you that I have been

15         approached by over 20 to 30 people within the

16         practice over the last two years about asking to

17         sit down and talk about their career aspirations,

18         what they need to do, what they should focus on,

19         what the realistic prospects are, and I have met

20         with every one of those people.

21         Q.    Do you have a record of the people that

22         you have met with?

1          A.    Mr. Rose, you have to understand I have

2     one responsibility, and that is to run this

3     practice the way I see fit and the way my firm

4     expects me to do it, and my one objective is to

5     make sure that we serve this firm well, its

6     clients and its people, and that's what I'm

7     focused on when I'm meeting with people and

8     clients.

9          Q.    The firm has a policy of not judging

10    people over the age of 60 on the merits, isn't

11    that right?

12               MR. NELSON:  Objection.

13               BY MR. ROSE:

14         Q.    Is that right or not to the best --

15               MR. NELSON:  Objection.

16               MR. ROSE:  Fine.  Are you going to

17    direct him not to answer?

18               THE WITNESS:  I'm not aware of such a

19    policy.

20               BY MR. ROSE:

21         Q.    You want to read it?  The policy is you

22    have to retire when you're age 60, and --