# Exhibit N

Memo to file

From C.W. Murphy

Thursday, May 31, 2001

Re: Independence hearing

My attorney David Rose and I just completed a conference call regarding the shares I own in Manulife Financial Corporation ("MFC"). On the call from PricewaterhouseCoopers ("PwC") were:

- Martin Burton
- John Korbel
- Claire Raubenstine
- Steven Witzel
- Darlene Shea

The call began with John Korbel setting out the dates of the following communications regarding the MFC shares: Disposal notices addressed to me on April 20, and May 4, 11, 18; telephone call to me from Walter Ricciardi and Steve Witzel on May 11; and my advice on May 15 that I would sell my MFC shares. He noted that the independence database did not yet reflect my disposal of the MFC shares.

Martin Burton then referred to my May 27 Lotus note about the history of disposal notices for other securities that had been sent to me in error. He explained the reason for the error in a number of specific instances—including mistakes about whether PwC's Washington, D.C. office participated significantly in the issuer's audit and about the date on which the issuer became a PwC audit client.

Clair Raubenstine asked who bore the financial responsibility when an employee received a notice to dispose of a security, incurred a financial cost in disposing of the security as requested, and PwC then determined that disposal notice had been issued in error. Steve Witzel responded that the employee, and not PwC, must bear the cost of PwC's error.

I was asked for the current status of my efforts to dispose of MFC shares. I responded that, when my insurance company demutualized in the fall of 1999, it did not issue share certificates to me. Instead, it sent me then a certificate of ownership which I had since mislaid and could not find. On May 14, 2001, I called the servicing agent in Toronto and requested a new ownership certificate, which was promised to be sent to me within two days. A week later—having not received that certificate—I called again and requested that another certificate be sent to me by overnight express, giving an account number for that purpose. The first certificate did not arrive by mail until May 29, and the second did not arrive by express until May 30. On May 29—within hours [it was about two hours] of receiving the first certificate, I had executed it and sent by overnight express to my

1

DEFENDANT'S EXHIBIT 85 1/15/06 JC

Murphy-03372

broker, with instructions to obtain the shares as quickly as possible and then immediately to sell them. I did not know as of this morning (May 31) the status of the processing by my broker.

Someone asked me why other PwC employees who owned MFC shares were able to dispose of them more promptly than I. I responded that I could not speak for other PwC employees, but suggested the possibility that their ownership interest in MFC might already have been represented by share certificates held by them or by their brokers.

John Korbel noted that PwC employees could not yet take advantage of the recently revised SEC independence rules because changes had not yet been made in the independence rules of the AICPA or of the state boards of accountancy. He emphasized the importance of complying with those rules.

I inquired whether anyone was suggesting that I had violated the rules of the AICPA or of the state boards of accountancy. Steve Witzel responded that: "The AICPA rules are irrelevant." He acknowledged that the dispute over my ownership of MFC shares arose solely under PwC's rules.

I said that I believed that the distinction between the AICPA independence rules and the PwC rules was important, because my question was about the interpretation of the PwC rules. So far as I knew, those rules were found in the June, 2000 recodification of the PwC rules and in Independence Technical Advisory Nos. 2001-3 and 2001-5 issued in January and February, 2001. My question was the extent—if any—that the "current independence rules" as described in those Advisories modified the June 2000 PwC rules. Upon first receiving Advisory No. 2001-3, I immediately on January 24, 2001, asked this question of Mike Gagnon, and did not receive a response.

John Korbel suggested that Kenny Chatelain's note to me of April 25, 2001, (at 10:30 p.m.) answered my question. I responded that his note did not address the meaning of the "current independence policies" as found in the January and February Technical Advisories. Moreover, before I received Chatelain's note, the Securities Disposition Office had advised me to address my question to one of the independence partners listed in Advisory No. 2001-5. I had done so by writing Mike Gagnon earlier on April 25. It was not until the telephone call from Messrs. Ricciardi and Witzel on May 11 (at about 6:00 p.m.) that I learned that I would receive no response to my inquiry to Gagnon, and that there was no other avenue within PwC for seeking an interpretation of PwC's independence rules.

Korbel explained that Chatelain managed the operations of the independence office, and that his interpretations were final. I responded that I did not have an organization chart of the independence office, and did not (prior to this conversation) know what Chatelain's responsibilities encompassed. Korbel responded that any of PwC's designated independence partners were empowered to give binding interpretations of PwC's policies. I noted that Kenny Chatelain was not listed in Advisory 2001-5 [or elsewhere that I know of] as an independence partner.

2

Murphy-03373

Steve Witzel acknowledged that my interpretation of Advisory Nos. 2001-3 and 2001-5 was "a legitimate one." He (and perhaps others) also understood my position that I did not have a definitive answer to my question about PwC's "current independence rules" until the May 11 telephone call from Messrs. Riccardi and Witzel.

In response to further questions from John Korbel, I read from Advisory No. 2001-5 the description of "current independence rules" for employees and managers. He read the first two sentences of that Advisory, saying that PwC employees "must continue to comply with PwC's existing personal independence policy." I pointed out that this sentence begs the question of what is "PwC's existing independence policy."

Korbel then referred to a "scoring matrix" to guide the panel's decision in disciplinary hearings such as this one. [This was the first time I learned of such a matrix.] He represented that—under that matrix—I was on the border line between suspension and termination—primarily because of what he called my "attitude." I asked if the matrix included in consideration of the number of notices I previously had received erroneously requesting the disposition of a security. He represented that it did.

John Korbel then announced that PwC would impose on me a two-week suspension without pay. Since tomorrow begins a new pay period, the suspension would begin tomorrow, Friday, June 1, 2001. The suspension will last longer if I have not disposed of my MFC shares within the two weeks; i.e., I must dispose of the MFC shares for the suspension to end.

In response to my question, Darlene Shea said that I would have to pay the firm by check for benefits normally deducted from my pay (such as health and life insurance premiums), and that she would advise me of the amount I should send to PwC.

*No adjmnt for consideration*

Murphy-03374