UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| C. Westbrook Murphy, *et ano.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>PricewaterhouseCoopers LLP, *et al.*, )<br>)<br>Defendants. )<br>) | Civil Action No. 02-00982 (RJL/DAR) |
| C. Westbrook Murphy, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PricewaterhouseCoopers LLP, )<br>)<br>Defendant. ) | Civil Action No. 05-01054 (RJL/DAR) |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
<u>DISMISSING PLAINTIFF MURPHY'S REMAINING CLAIMS</u>**

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212-294-6700

1700 K Street, N.W.
Washington, D.C. 20036
(202) 282-5000
Facsimile: (202) 282-5100

Attorneys for Defendant

TABLE OF CONTENTS

Page

Table of Cases ................................................................................................................... i

Preliminary Statement ........................................................................................................1

Argument .............................................................................................................................3

I.      SUMMARY JUDGMENT IN FAVOR OF PwC IS WARRANTED ON THE
        UNDISPUTED FACTS ............................................................................................3

        A.      Murphy's Burden in Opposition to Summary Judgment .....................................3

        B.      Absolute Lack of Qualifications .........................................................................3

        C.      Relative Lack of Qualifications ..........................................................................9

        D.      Lack of Genuine Interest ..................................................................................17

II.     MURPHY IS NOT "AGGRIEVED" BY AN "ADVERSE EMPLOYMENT
        ACTION" ...............................................................................................................19

        A.      Murphy Has Suffered No Tangible Harm .........................................................19

        B.      As a Matter of Law, PwC Partners Are Not "Employees" within
                the Coverage of the ADEA ..............................................................................22

Conclusion .........................................................................................................................25

## TABLE OF CASES

*Amiri v. Hilton Washington Hotel*, 360 F. Supp. 2d 38 (D.D.C. 2003)...............................3

*Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................3

*Barbour v. Browner*, 181 F.3d 1342 (D.C. Cir. 1999)........................................................10

*Beeck v. Federal Express Corp.*, 81 F. Supp. 2d 48 (D.D.C. 2000) ..................................17

*Brady v. Sergeant at Arms*, No. 06-5362 (D.C. Cir. Mar. 28, 2008)..........4, 11, 12, 17, 19

*Carter v. George Washington University*, 387 F.3d 872 (D.C. Cir. 2004).....................3, 4

*Carter v. Pena*, 14 F. Supp. 2d 1 (D.D.C. 1997), aff'd, No. 97-5324, 1998 WL
    315616 (D.C. Cir. Apr. 8, 1998) ................................................................................15

*Clackamas v. Gastroenterology Associates*, 538 U.S. 440 (2002) ....................................22

*Coles v. Harvey*, 471 F. Supp. 2d 46 (D.D.C. 2007) .........................................................22

*Dang v. Inn at Foggy Bottom*, 85 F. Supp. 2d 39 (D.D.C. 2000) ......................................16

*EEOC v. Sidley Austin Brown & Wood*, 315 F.2d 696 (7th Cir. 2002) ..............................23

*Feldman v. Hunterdon Radiological Associates*, 901 A.2d 322 (N.J. 2006)....................22

*Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180 (D.C. Cir.
    1996) .........................................................................................................................9, 10

*Goss v. George Washington University*, 942 F. Supp. 659 (D.D.C. 1996) .......................17

*Jackson v. Gonzalez*, 456 F.3d 703 (D.C. Cir. 2007) .....................................................9, 10

*Jenkins v. Southern Farm Bureau Casualty*, 307 F.3d 741 (8th Cir. 2002) .....................22

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996)........................................................18

*Morgan v. Federal Home Loans Mtg. Corp.*, 328 F.3d 647 (D.C. Cir. 2002)..................17

*Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549 (D.C. Cir. 1997) ..................................5

*Murphy v. PricewaterhouseCoopers LLP*, 357 F. Supp. 2d 230 (D.D.C. 2004).........12, 13

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1981)........................................................15

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997) ................................................................15

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ...........................................................20

*Simpson v. Ernst & Young*, 100 F.3d 436 (6th Cir. 1996) ..................................................23

*Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161 (2d Cir. 2006) .............................................15

*Smith v. Castaways Family Diner*, 453 F.3d 971 (7th Cir. 2006) ......................................24

*Strother v. Southern California Permanente Medical Group*, 79 F.3d 859 (9th
    Cir. 1996) .......................................................................................................................22

*Thomas v. NFL Players Ass'n*, 131 F.3d 198 (D.C. Cir. 1997) ..........................................15

*Williams v. Boorstin*, 663 F.2d 109 (D.C. Cir. 1980) ........................................................13

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243 (D.C.
    Cir. 1987) ..................................................................................................................18, 20

*Woodruff v. Peters*, 452 F.3d 521 (D.C. Cir. 2007) .......................................................9, 18

**Preliminary Statement**

In opposition to summary judgment, Murphy submits a 56-page brief and a 30-page coda in the form of a declaration purporting to extol and detail his educational and professional background and qualifications dating back to graduation from law school in 1965. That submission is accompanied by a "Statement of Genuine Issues" that -- far from complying with the mandate of LCvR 7(h) that such a statement be "concise" -- consists of 11 pages of lengthy paragraphs that seek to obscure and sidestep the undisputed material facts set forth in PwC's LCvR 7(h) statement.

Murphy's opposition seeks to bury the dispositive points presented by PwC in an avalanche of immaterial factual assertions and extraneous legal contentions. He further seeks to distort the extensive history of this litigation to fashion a "law of the case" argument on points that have never been addressed by this Court, and that Murphy is otherwise unable to counter on the merits. In so doing, Murphy fails to acknowledge that the Magistrate Judge reopened discovery in May 2006 on Murphy's motion to permit inquiry into the particular circumstances and reasons he was not made a partner at PwC, and that this motion is premised on undisputed facts in the reopened discovery record developed by Murphy's counsel.

While mischaracterizing Point I of PwC's motion as its "one new argument" (see Murphy Opp. at 3), Murphy eventually addresses the point, almost as an afterthought at the end of his purported "Statement of Facts" and on the last page of his declaration. The undisputed evidence in the reopened discovery record conclusively establishes that Murphy did not come close to meeting the threshold qualification of "sustained '1' rated performance over time" (grudgingly acknowledged by Murphy as "not having enough '1' ratings") (id. at 3, 36). Murphy's opposition is unsupported by admissible evidence sufficient to establish a genuine issue of material fact on this dispositive point.

On the law, Murphy simply does not address or take issue with the Supreme Court and D.C. Circuit precedent on which PwC relies. Murphy's omission of a Table of Cases from his lengthy Memorandum of Points and Authorities may complicate review of his opposition papers, but should not serve to conceal his implicit acceptance of the settled legal principles on which PwC's motion is based.

Murphy fails to acknowledge that his "absolute and relative lack of qualifications" for partnership consideration is recognized by the courts as one of "the two most common legitimate reasons" on which an employer might lawfully reject an employee for promotion (see PwC Mem. at 18-19) (citations omitted). He does not address PwC's legal showing that his absolute failure to meet the minimum qualification for partnership consideration alone suffices to defeat his claims as a matter of law (id. at 20-21). Instead, he responds only to PwC's alternative legal ground for summary judgment -- based on Murphy's demonstrated lack of qualifications relative to those RAS employees who had sustained "1" rated performance over time and were sponsored as partner candidates (see id. at 21-22) -- by arguing that PwC's articulation of that legitimate nondiscriminatory reason is a pretext for discrimination (see Murphy Opp. at 36). To support that argument, Murphy invites this Court to sit improperly as a "super-personnel department" and second-guess the performance ratings assigned by the RAS partners over the years (see PwC Mem. at 23-24). Moreover, his purported evidence of "general or systemic" discrimination is not supported by admissible evidence, and is otherwise insufficient in the absence of evidence of specific discrimination against him.

Finally, with regard to Point II, Murphy fails to overcome his own admissions in reopened discovery that his non-admission as a partner resulted in no tangible harm, and was therefore not an actionable adverse employment action. His last ditch effort to avoid dismissal

on this alternative ground by resurrecting his *in terrorem* claim that PwC partners should be deemed "employees" -- with extensive additional briefing and a lengthy submission of a purported "expert" on the law -- is unavailing.

**Argument**

**I.**

**SUMMARY JUDGMENT IN FAVOR OF PwC IS**
**WARRANTED ON THE UNDISPUTED FACTS**

**A.    Murphy's Burden in Opposition to Summary Judgment**

To avoid summary judgment, Murphy's burden is thus to show a genuine issue of material fact supported by admissible evidence (*see* Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "A genuine issue of material fact is one capable of affecting the outcome of the litigation that is supported by admissible evidence sufficient for a reasonable trier-of-fact to find in favor of the non-moving party" (Amiri v. Hilton Washington Hotel, 360 F.Supp.2d 38, 41 (D.D.C. 2003) (Leon, J.), citing Andersen, 477 U.S. at 247-48).

Notwithstanding the magnitude of his submission, Murphy fails to meet his burden in opposition to summary judgment.  As detailed below, Murphy raises innumerable issues of immaterial fact.  And, to the extent he purports to address the material facts, his assertions are not only unsupported but, in many instances, belied by evidence in the record.

**B.    Absolute Lack of Qualifications**

On the undisputed facts, PwC's motion demonstrates that Murphy's absolute failure to meet the minimum qualification for consideration as a partner candidate from the RAS unit is dispositive of his remaining claims (*see* PwC Mem. at 21, citing Carter v. George Washington Univ., 387 F.3d 872, 882-83 (D.C. Cir. 2004)).  Although Murphy does not address or otherwise take issue with this legal point, the D.C. Circuit last month clarified the framework typically

3

applied by the courts in this Circuit in analyzing motions for summary judgment in employment

discrimination cases (see Brady v. Sergeant at Arms, No. 06-5362 (D.C. Cir. Mar. 28, 2008)).  In

cases where the employer has articulated a legitimate, non-discriminatory reason for the

challenged employment decision, the Court "emphasize[d] that the question whether the plaintiff

in a disparate-treatment discrimination suit actually made out a *prima facie* case is almost always

irrelevant when the district court considers an employer's motion for summary judgment or

judgment as a matter of law" (Slip op. at 2, 5-7; cf. Carter, 387 F.3d at 882-83).  Rather, in

considering such a motion, "the district court must resolve one central question:  Has the

employee produced sufficient evidence for a reasonable jury to find that the employer's asserted

non-discriminatory reason was  not the actual reason and that the employer intentionally

discriminated against the employee on the basis of [age]?"  (Slip op. at 7) (citation omitted).

With regard to his demonstrated absolute lack of qualifications, Murphy attempts to

challenge the undisputed facts that his performance ratings did not qualify him for consideration

as a potential partner candidate from RAS.  He thus purports to raise a genuine issue for the

trier-of-fact with respect to (1) PwC's proof of the "sustained '1' rated performance over time"

standard adopted and consistently applied by the RAS partners, and (2) Murphy's sustained "2"

and "3" performance ratings over time.

### 1.    Proof of the RAS Standard

Murphy contends that the "sustained '1' rated performance" standard applied by the RAS

partners is "not documented anywhere" (Murphy Opp. at 26).  Significantly, Murphy does not

dispute, in his prolix "Statement of Genuine Issues" or elsewhere, that "[t]he partnership

consideration process begins in the individual practice areas of the firm[,]" or that "[t]he

potential candidacy of a particular employee in a practice unit is initiated by the recommendation

of a partner in that unit" (PwC's LCvR 7(h) Statement, ¶ 5) (record citations omitted).  Nor does

4

Murphy dispute that he worked in the RAS unit throughout his employment with the firm (id., ¶ 1), or that Robert Bench (and, later, William Lewis), managing partners of the RAS unit, were his immediate supervisors (id., ¶ 6).  Moreover, Murphy affirmatively testified that he understood that the partnership consideration process for RAS employees would be initiated, if at all, by Bench (see PwC Mem. at 7) (citations omitted).

The testimony of both Bench and Lewis establish and reflect the fact that the partners in the RAS unit considered only sustained "1" rated performers over time as potential partner candidates from RAS (Bench 11/29/06 Dep. at 170-71, 185-86; Lewis Dep. at 175-76, 178-79; see PwC Mem. at 8-10, 14-15).  While not citing any evidence contradicting that unequivocal testimony, Murphy asserts that there is no document setting forth that RAS standard, as a standard.  However, the documentary evidence, most notably the Partner Candidate Proposals for RAS employees from 1998 through 2004, consistently reflect the uniform application of that standard by RAS partners (see, e.g., PwC Exhs. F at PwC 03242, G at PwC 04122 & H at 5-6).

Murphy's reliance on general guidelines set forth in an "Information Guide" for all practice units in the firm's entire ABAS Line of Service, as purportedly setting forth a lower standard -- i.e., "a minimum performance rating of at least 2.5 to be considered for promotion to the next level" (see Murphy Opp. at 26-27, citing Murphy Exh. 39) -- is misplaced.  As noted, it is undisputed that the partners in each individual practice unit within the firm set their own standards for consideration of potential partner candidates among employees in their particular unit.  Murphy chooses to ignore entirely Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997), where the D.C. Circuit expressly found irrelevant the decisions and standards of departments and units, other than the one in which the plaintiff worked, in a firm with a partnership consideration process indistinguishable from the process at PwC (id. at 1557 ).

Accordingly, Murphy's contention that certain employees in other practice units in Financial Services -- which he concedes was "two levels above RAS" -- were sponsored for partnership admission with one or more "2" ratings (see Murphy Opp. at 27, citing Murphy Exh. 40) is irrelevant.  RAS was one of two specialized units in the Banking practice, which, in turn, was one of five units in Financial Services (see PwC Mem. at 4; Murphy Opp. at 10 n.3).  Murphy does not contend that any of the Financial Services employees he identifies were even in the Banking practice, much less in RAS.

In further support of summary judgment on the standard for partnership consideration in the RAS unit, PwC submitted the Partner Candidate Proposals for RAS employees Schuler, Albright and Lavine, each of which specifically shows "1" annual performance ratings for each of the three years preceding consideration and sponsorship by the RAS partners (PwC Exh. F at PwC 03242; PwC Exh. G at PwC 04122; PwC Exh. H at 5-6).  No RAS employees sponsored for partnership from the RAS unit from 1999 through 2004 had any annual ratings other than "1" in the three years preceding sponsorship.[1]

Confronted with this documentary evidence demonstrating that the sustained "1" rated performance standard was consistently applied by the RAS partners in actual practice, Murphy argues that Albright's "1" rating for 1997, as shown in his Partner Candidate Proposal (PwC Exh. G at PwC 04122), was a mistake.  To support his contention, Murphy offers what he claims to be Albright's annual performance evaluation for that year, purportedly showing an overall "2" rating (Murphy Opp. at 25-26).  That document is an undated and unsigned second page of a "Performance Assessment Form" (see PwC Exh. S) containing some handwritten notes (see

---

[1] The discovery record also includes a Partner Candidate Proposal for Lavine for the July 1, 2004 admission cycle (Murphy Exh. 34 at PwC 4751) and a Partner Candidate Proposal for RAS employee Daniel Weiss for the July 1, 2003 cycle (PwC Exh. R).  While Weiss was not admitted as a partner, his Partner Candidate Proposal similarly shows "1" rated annual performance for each of the three years preceding his sponsorship by the RAS partners (id. at PwC 08801).

Murphy Exh. 37). He argues that the one-page draft "pertains to 1997," but does not even speculate as to who made the notes or under what circumstances (Murphy Opp. at 26 n.5). [2]

In any event, contrary to Murphy's assertion, Albright's annual performance evaluation for 1997, signed by Bench and Albright, was in fact produced by PwC (see PwC Exh. T). That evaluation, covering various engagements on which Albright had worked over a twelve-month period, specified an overall rating of "1" (see id. at PwC 03798).

In sum, the "sustained 1 rated performance over time" standard is established by the unrebutted testimony of the two managing partners of the RAS unit, and its consistent application by the RAS partners in actual practice throughout the relevant time period, as shown in the Partner Candidate Proposals for RAS employees. Murphy's conjecture and surmise with respect to a document he says reflects a "2" rating for Albright in 1997 is plainly insufficient to raise a genuine issue for trial on this dispositive point. Murphy's "2" and "3" ratings simply did not make the grade for partnership consideration in RAS.

### 2.    Murphy's Performance Ratings

Murphy contends that his "2" and "3" annual performance ratings by Bench were not "fair" (see Murphy Opp. at 27). This newly-contrived contention cannot withstand scrutiny or be given serious consideration. Murphy signed off on all of his performance evaluations over the years (see Murphy Dep. at 126-29), and can point to no evidence that he ever protested or objected to any of his annual ratings until submission of his memorandum in opposition to this dispositive motion. Moreover, Murphy testified unequivocally that Bench had not discriminated against him in not recommending him as a candidate for partner (see PwC Mem. at 10-11).

---

[2] Murphy previously testified that he could identify Bench's handwriting (see Murphy 11/15/06 Dep. at 260), so it is fair to conclude that the notes were not written by Bench.

Yet Murphy now contends that Bench's annual evaluations of Murphy were lower than evaluations on particular engagements he received from other partners and employees (Murphy Opp. at 27-28).[3]  Murphy asserts, again without any evidentiary support, that "[o]rdinarily, there is (as would be expected) a close correlation between the employees' overall ratings and their marks on engagements" (id.).  In fact, there need not be "a close correlation" since the annual rating, unlike the engagement evaluations, is assigned by the ARC based on performance "relative" to other RAS employees (see Murphy Exh. 39, at PwC 01147) ("[t]his rating is based on the staff-person's relative standing within his/her peer group").

Having expressly admitted that Bench did not discriminate against him, Murphy now asserts that his performance ratings are "best explained by retaliation" against him for complaining of discrimination in March 2001 in an effort to cut an early retirement deal (Murphy Opp. at 28).  Until now, Murphy has never complained that his performance ratings were discriminatory or retaliatory.  His belated assertions are based purely on conjecture, speculation and surmise, for which he offers no evidentiary support whatsoever.[4]

In sum, by conjuring up previously unasserted and wholly unsupported claims that his ratings are unfair and retaliatory, Murphy fails to raise a genuine issue as to any material fact bearing on the dispositive point:  Murphy's "2" and "3" performance ratings fell short of meeting the minimum threshold qualification for partnership consideration of sustained "1" rated

---

[3] The engagement appraisers were often fellow employees, not partners (see, e.g., Murphy Exh. 41, at PwC 03033).

[4] Murphy's grossly distorted interpretation of some Ryan testimony -- as "not speculative to conclude that retaliation was at work" (id. at 26) -- typifies Murphy's submission.  Ryan testified that he had been advised that the firm could not take action against Murphy for his inactivity and lack of productivity in light of the filing of his complaint. Indeed, Murphy had advised Schuler that a complaint could be filed for purposes of "protection" (Murphy Dep. at 661-62).  Murphy himself acknowledges that he had 1,100 hours totally unaccounted for at that time (Murphy Dep. at 673-6; see also Lewis Dep. at 176-81), and Bench testified that Albright and Lavine "were out earning their money so [Murphy] can make speeches" (Bench 11/29/06 Dep. at 124-26 ("That's the role that Mr. Murphy ended up doing when he wasn't charging hours.")).  Ryan thus testified that "we needed to find something for Westbrook to do" (see Murphy Opp. at 26).

performance over time.  Murphy's attempt to show that the ratings were inaccurate or unfair is beside the point.  Rather, the issue is whether the RAS partners "<u>honestly and reasonably believed</u>" in the accuracy and fairness of the ratings (<u>see</u> <u>Brady</u>, Slip op. at 10) (emphasis in opinion).  Murphy has produced no evidence to the contrary (<u>id.</u> at 8, 12).

**C.**     **Relative Lack of Qualifications**

Assuming arguendo that Murphy's "2" and "3" annual performance ratings did not absolutely disqualify him from consideration as a potential candidate for partnership, PwC demonstrated that the differences in his performance, relative to Albright and Lavine -- who were both sponsored and admitted as partners from RAS with sustained "1" rated performance over time -- is a reasonable and non-discriminatory reason for the RAS partners' choice of partner candidates (PwC Mem. at 21-22, citing <u>Fischbach v. District of Columbia Dep't of Corrections</u>, 86 F.3d 1180, 1182 (D.C. Cir. 1996)).  In opposition, Murphy does not take issue with this point, and, avoiding any mention of the D.C. Circuit decision in <u>Fischbach</u>, recognizes that he has the burden of proving that the "proffered explanation is pretext" for discrimination (<u>Fischbach</u>, 86 F.3d at 1182).

The D.C. Circuit recently reiterated that, in considering evidence purporting to show pretext, the issue is not "the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers" (<u>Woodruff v. Peters</u>, 482 F.3d 521, 531 (D.C. Cir. 2007).  Murphy makes various arguments to support his contention that a reasonable jury could find that PwC's explanation is pretextual and "shielded discriminatory motives" (<u>see</u> <u>Jackson v. Gonzalez</u>, 496 F.3d 703, 707 (D.C. Cir. 2007)).  He contends that "[t]he two most salient facts in this case are Wes Murphy's exceptional qualifications for partnership and PwC's policy requiring partners to retire at 60" (Murphy Opp. at 9).  Neither is sufficient to defeat summary judgment.

1.    **Murphy's Assessment of Relative Performance
and Qualifications Is Irrelevant**

On this point, PwC's motion noted that "Murphy was a valued employee who can

undoubtedly marshal highly favorable statements concerning his performance and contributions

to the firm" (PwC Mem. at 24). As anticipated, Murphy's opposition sets forth an extended

exegesis of his purported qualifications for partnership, both in absolute terms and relative to his

personal view of the qualifications of Albright and Lavine (see Murphy Opp. at 11-25; Murphy

Decl., ¶¶ 3-7, 16-39 & 44-50). While Murphy's submission includes innumerable

misstatements, mischaracterizations and omissions, PwC declines to take the bait and join issue

on the merits of his grandiose, but essentially irrelevant, contentions.

This Court, too, should decline the invitation to sit as a "super-personnel department" and

second-guess the business judgments of the RAS partners reflected in their extensive evaluations

and ratings of the performance of RAS employees over time (see Fischbach, 86 F.3d at 1183;

Jackson, 456 F.3d at 707; Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999)). Murphy

cannot apply his own standards to judge relative qualifications, or ask the Court to apply its own

standards to override the performance ratings by the RAS partners. Even assuming arguendo

that Murphy had met the minimum qualifications for partnership consideration, the D.C. Circuit

has made clear that the district court "must respect the employer's unfettered discretion to choose

among qualified candidates[,]" and that "liability cannot rest solely upon a judge's determination

that an employer misjudged the relative qualifications of admittedly qualified candidates"

(Fischbach, 86 F.3d at 1183).

Murphy provides an insufficient basis "for rejecting the presumptive validity" of the

numerical performance ratings by the RAS partners over a period of many years (see Woodruff,

482 F.3d at 531). Moreover, "[i]f the employer's stated belief about the underlying facts is

10

reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts" (Brady, Slip op. at 9) (citations omitted).  Here, the testimony of the two RAS managing partners explaining the underlying reasons why Albright and Lavine were sustained "1" rated performers over time, while Murphy received ratings of "2" or "3" which he never contested until now (see PwC Mem. 16-17), fully supports the reasonableness of their honest reliance on the ratings in the consideration of potential partner candidates from RAS.  The RAS partners' views of each employee's performance, which Murphy is now asking this Court to second-guess, are reflected in the annual performance ratings and evaluations (see Bench 11/29/06 Dep. at 63-65, 85-86).

Murphy's quotations from his managing director prospectuses, submitted by Bench in 1999 (Murphy Exh. 3) and by Lewis in 2004 (Murphy Exh. 18), are insufficient to cast doubt on this dispositive point.  In the first instance, Murphy himself drafted each of those recommendations (Murphy Dep. at 890, 898).  The 1999 prospectus, which merely sought a redesignation of Murphy's job title to Managing Director (Murphy Exh. 3), was unsuccessful (Murphy Dep. at 155-56, 898); and, with respect to the 2004 recommendation, Lewis made clear that, while he thought Murphy should be given the Managing Director title (Lewis Dep. at 212-13), Murphy was  not qualified for a partnership position (see PwC Mem. at 16-17).

Murphy disingenuously attempts to equate his qualifications for promotion in the Managing Director program instituted at the firm in 2004 with qualifications for partnership.  As Murphy testified, a "business case" for Managing Director promotions were to be based on one of two factors:  a candidate could either (i) be "managing a book of business," or (ii) be a "subject matter expert in an area that was of particular importance to the firm" (Murphy 11/15/06 Dep. at 65-66).  Albright and Lavine had made partner based on qualifications in both categories

(id. at 66-68), while Murphy was promoted to Managing Director solely as a "subject matter expert" ("SME") (id. at 101-102).[5]

Under the circumstances, including Murphy's express and unequivocal admission that Bench did not discriminate against him in not recommending him as a candidate for partner, it is submitted that no reasonable juror could conclude that PwC's stated reason for not considering him as a partner candidate was not "honestly" believed and was a pretext for discrimination (see Brady, Slip op. at 10, 12).

### 2.    The Partner Retirement Provision

Murphy's heavy reliance on the age-60 partner retirement provision in the PwC Partnership Agreement is misplaced for several reasons. First, it is not a "policy," but an agreement among partners. Second, as this Court previously noted, it "neither addresses nor binds the plaintiffs in any way" (Murphy, 357 F.Supp.2d at 245). Third, PwC has no policy or practice, written or otherwise, not to consider employees for partnership at any age; to the contrary, PwC partners uniformly testified that an employee's age is not a factor.

Murphy's counsel previously conceded, in response to inquiries of this Court, that the partner retirement provision has no application to Murphy, and that there were no documents suggesting the existence of any policy not to consider an employee for partnership based on age (4/12/04 Motion Hearing at 59-63).

Murphy thereafter sought, unsuccessfully, to establish that PwC has a policy not to consider employees age 60 or over as candidates for partner. As a matter of fact, PwC has no such policy. Murphy's counsel deposed various PwC partners on this point, and each and every

---

[5] Murphy could not identify any similarly situated employees at PwC who had made partner solely or principally as a SME (Murphy 11/15/06 Dep. at 100). He said he knew of one employee -- a "statistical whiz" -- who had made partner as a SME back in the mid-1990's at a predecessor firm (id. at 100-101). That employee was not in the RAS unit, and the only other SMEs who would have made partner are in "the administrative side of the firm" (id. at 101).

one of them consistently testified that there were no age-based policies, related to the partner retirement provision or otherwise, applicable to partnership consideration.  (See Nally Dep. at 121-22; Sullivan Dep. at 244-46; Carter Dep. 113-14; Ryan Dep. at 248; Bench 11/29/06 Dep. at 171-72; Lewis Dep. at 189-90, 193; Albright Dep. at 281.)

In sum, Murphy was unable to find any evidentiary support for his conclusory allegation that the age-60 partner retirement provision precluded consideration of him as a candidate for partner.  Murphy nonetheless argues that "the firm's mandatory retirement policy" constitutes "potent proof of age discrimination in the selection of partners at PwC," and that "a jury might well conclude that PwC's policy was sufficient to show that discrimination based on age was a substantial factor in the decision to reject Murphy (Murphy Opp. at 7).  But there is no such proof and, on the undisputed facts, there is not such policy.  Summary judgment cannot properly be denied to allow Murphy to present an argument to a jury that is not only unsupported by any evidence, but directly contrary to the overwhelming evidence in the record.

Relying on this Court's ruling on prior motions in this case, Murphy further asserts that the partner retirement provision is evidence of "systematic or general instances of discrimination" (Murphy Opp. at 8 n.1, citing Murphy, 357 F.Supp.2d at 247).  In light of the facts developed in reopened discovery, it is submitted that the retirement provision, which is applicable only to partners and has been in place for decades at PwC and its predecessor firms, does not constitute any evidence of discrimination against employees.  Moreover, Murphy overlooks this Court's further ruling that "evidence of systematic or general instances of discrimination can only be collateral to evidence of specific discrimination against the actual plaintiff" (Murphy, 357 F.Supp.2d at 247, quoting Williams v. Boorstin, 663 F.2d 109, 115 n.38

(D.C. Cir. 1980) (emphasis supplied); and, there is absolutely no evidence of specific discrimination against Murphy.

Murphy points to the fact that no partners have been admitted at age 60 or over (see Murphy Opp. at 9). In light of the undisputed facts that there is no policy not to admit new partners based on age, the fact that none over 60 have been admitted is a reflection of the fact that no such employees, including Murphy, would want to be admitted at that age in light of the lawful partner retirement provision. Indeed, in a memorandum he wrote in 2002, Murphy himself detailed the disadvantages of being admitted as a partner at age 56 or over (see PwC Exh. Q).

Making partner at that age for employees such as Murphy, who was initially employed by a PwC predecessor firm at age 49,[6] would be particularly disadvantageous. Had Murphy made partner in 2000, 2001 or 2004, he would not only have been subject to immediate retirement without entitlement to any partner retirement benefits (including medical insurance), but would have lost his eligibility for retiree health care benefits that he otherwise now receives as a result of continuing his employment until his voluntary retirement after an additional five years of service (see Murphy 11/15/06 Dep. at 234-37). Moreover, Murphy testified that he would not want to have been admitted to partnership in either the July 1, 2000 or July 1, 2004 admission cycles only to then be subject to immediate retirement pursuant to the age-60 retirement provision for partners (id. at 249-50).

---

[6] Murphy acknowledges that he was advised at the time of his initial hire by PW in 1989 that "the combination of his age and the structure of the PW retirement plans make it economically disadvantageous for him to be a PW partner" (Murphy Opp. at 8) (emphasis supplied). Significantly, he was never told that he would not be considered as a candidate for partner because of his age. To the contrary, the same memorandum proceeds to note that the firm "may later decide . . . that [Murphy's] billings, the importance of his work, and the expectations of our clients, will warrant partnership status" (Murphy Exh. 6).

On the law, Murphy asserts that "a jury might well conclude" that the age-60 partner retirement provision is "sufficient to show that discrimination based on age was a substantial factor in the decision to reject Murphy," and that this "shift[s] the burden of proof" to PwC "to demonstrate that he would have been rejected even if his age had not been taken into account" (Murphy Opp. at 7-8, citing Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1981)).  Of course, there is no evidence whatsoever that Murphy's age had been taken into account, and the undisputed evidence is overwhelmingly to the contrary.  Moreover, whatever other considerations may have been taken into account, the undisputed evidence conclusively shows that Murphy's performance ratings did not qualify him for partnership consideration under the "sustained '1' rated performance" standard invariably applied by the RAS partners over the years.

Accordingly, there is no factual basis on which Murphy might proceed on a Hopkins "mixed motive" theory.[7]  But even under the "mixed motive" standard, PwC would be entitled to summary judgment on this record (see Raskin v. Wyatt Co., 125 F.3d 55, 60-61 (2d Cir. 1997); Carter v. Pena, 14 F.Supp.2d 1, 8-9 (D.D.C. 1997) (Lamberth, J.), aff'd, No. 97-5324, 1998 WL 315616 (D.C. Cir. Apr. 8, 1998); see also Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 173-74 (2d Cir. 2006)).

### 3.    **Stray Comments**

Apart from the partner retirement provision, Murphy also purports to rely on a stray comment of partner Timothy Ryan, taken out of context and purportedly documented only in a

---

[7] Thomas v. NFL Players Assn., 131 F.3d 198 (D.C. Cir. 1997), on which Murphy relies (see Murphy Opp. at 33-35), is of no help to him.  Thomas emphasized that, to invoke the "mixed motive" standard under Hopkins, the plaintiff must make a "strong showing" that discriminatory motive played a "substantial role" in the "particular employment decision" at issue (id. at 204) (citations to Hopkins omitted).  In other words, "[w]hat is required" is what Murphy does not come close to showing:  "direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision" (id., quoting Hopkins, 490 U.S. at 277).

self-serving memorandum written by Murphy himself in connection with this litigation (see

Murphy Opp. at 8-10).  Accordingly to Murphy's notes, Ryan stated at a meeting of RAS

personnel in April 2003:  "From a purely selfish point of view, we want those of you who can be

partners for 20 years or more to become partners so you can continue to grow the practice" (id. at

10).  This, according to Murphy, effectively ruled him out "in light of the mandatory retirement

provision" since he was "already age 60" (id. at 8).

Ryan testified that the statement, made in passing during the course of a four-hour

meeting, was "not contextually correct" (Ryan Dep. at 169); that the meeting was intended to be

"a morale boosting session" (id.); and that, in context, Ryan was simply saying that "we want to

have you folks around, and we don't want you to leave this place" (id. at 176).  Murphy does not

contend that his out-of-context memorialization of a single sentence in a four-hour meeting

constitutes evidence of a policy of the firm.  Indeed, Murphy's counsel had carefully avoided any

inquiry at Ryan's deposition into whether his statement reflected a PwC partner admissions

policy, whether he had ever discussed any such policy with any other PwC partner, or whether it

is reflected in any document (see Ryan Dep. at 166-77).  Bench and Lewis each testified that

they had never heard Ryan or any other PwC partner express a preference for partner candidates

who could serve a significant length of time as partners (Bench Dep. at 106 ("I've never heard

anyone say that in 16 years with the firm"); Lewis Dep. at 189-90 (never "heard any partners say

anything to the effect that they would want to make people partners who could serve in the

partnership for 20 or more years")).[8]

Murphy previously admitted that Ryan's remarks were irrelevant to his claims for the

2000 and 2001 partner admissions cycles since "he did not become Banking Practice leader until

---

[8] The existence of any policy to admit partners who could only serve 20 years or more before retirement at age 60 is
further belied by the fact that hundreds of PwC employees over the age of 40 have been admitted as partners (see
Murphy Exh. 9).

2001 (after both promotion cycles at issue here)" (see Docket No. 121 at 31 n.3).  And, he does not now claim that Ryan was responsible for his not being considered as a potential candidate from RAS in the 2004 admission cycle, asserting instead that "Bob Bench was responsible for Murphy's annual evaluations" that disqualified him from consideration (see Murphy Opp. at 27). As a matter of law, "stray remarks" not directed at the plaintiff, and not made by persons involved in the specific employment decision at issue, cannot support an inference of age discrimination (Goss v. George Washington University, 942 F.Supp 659, 664-65 (D.D.C. 1996); see also Beeck v. Federal Express Corp., 81 F.Supp.2d 48, 54 (D.D.C. 2000) (alleged remarks at meetings that do not relate to the actual employment decision at issue are not direct evidence of discrimination); Dang v. Inn at Foggy Bottom, 85 F.Supp.2d 39, 42 (D.D.C. 2000) (remarks, even if made by decision-makers, are not direct evidence where "unrelated to the decisional process itself")).

In sum, Murphy's evidence of his own performance and purported qualifications, the partner retirement provision, and the Ryan stray remark is not sufficient for a reasonable jury to find that PwC's "asserted non-discriminatory reason was not the actual reason and that the [RAS partners] intentionally discriminated against [him] on the basis of [his age]" (see Brady, Slip op. at 7).  Summary judgment is thus warranted (id.).

D.    **Lack of Genuine Interest**

In addition to Murphy's absolute and relative lack of qualifications, Lewis articulated another reason for not considering Murphy as a potential partner candidate:  Lewis did not believe that Murphy had a genuine interest in becoming a partner (see PwC Mem. at 15, 22).  As a matter of law, a belief that an employee is not interested in the position at issue is a legitimate, non-discriminatory reason for not considering the employee as a candidate (see Morgan v. Fed. Home Loans Mtg. Corp., 328 F.3d 647, 653-54 (D.C. Cir. 2002)).

17

Rather than address this point on the merits, Murphy contends that it "was the same -- and the only -- explanation that PwC used to seek summary judgment in its second motion, which the Court denied" (Murphy Opp. at 30), and claims that it is barred by the "law of the case" doctrine (id. at 37-38). Murphy's opposition is pure sleight of hand. PwC's prior motion was limited to the ground that Murphy's failure to express an interest in partnership precluded his establishment of an essential element of a *prima facie* case, and did not rely on any partner's articulation of this failure as a reason for not considering him for partnership (see Docket No. 119 at 33-38; see Reply on prior motion (Docket No. 125) at 5; Nelson Reply Decl. (Docket No. 125-2, ¶ 5). This motion simply does not raise "the same issue" presented on the prior motion (cf. LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996)).

In any event, it was not until the subsequent reopening of discovery that Lewis was deposed and articulated his belief that Murphy had no genuine interest in partnership (see PwC Mem. at 15). This alone defeats Murphy's "law of the case" argument, even if PwC had presented the same issue on its prior motion (see Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 251 (D.C. Cir. 1987) ("[a] subsequent motion for summary judgment based on an expanded record is always permissible") (citation omitted)).

On the merits, Murphy makes no effort to show that Lewis did not honestly believe that Murphy had no genuine interest in partnership, and thus cannot show that Lewis' testimony was a pretext for discrimination (see Woodruff, 482 F.3d at 531). Moreover, it is difficult to conceive of how any partner might have had an honest belief that Murphy was genuinely interested in becoming a partner in light of Murphy's voluntary relinquishment of all of his managerial responsibilities as a Director, his request for a demotion, his request for part-time status, his efforts to retire early with continuing health benefits, his total failure to account for

1,100 working hours in a single year, and his consistently sub par performance ratings.  It is no wonder that Lewis honestly believed that Murphy's belatedly expressed interest in partnership was not genuine, but asserted solely for purposes of pursuing this litigation.  See Brady, Slip op. at 9 ("[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there is ordinarily no basis for permitting a jury to conclude that the employer is lying about the underlying facts") (citations omitted).

In sum, given the absence of evidence of pretext, summary judgment is also warranted on the basis of this articulated non-discriminatory reason for not considering Murphy as a candidate for partnership, even if Murphy's relative qualifications were somehow sufficient to raise a genuine issue for trial.

## II.

## MURPHY IS NOT "AGGRIEVED" BY AN "ADVERSE EMPLOYMENT ACTION"

### A.    Murphy Has Suffered No Tangible Harm

Based principally on a flawed "law of the case" argument, Murphy seeks to avoid dismissal on this alternative ground.  Murphy notes that PwC briefed the point in its reply brief on a prior motion for summary judgment.  However, Murphy can point to no authority that an issue raised only in reply on a prior motion precludes a subsequent motion affirmatively seeking dismissal on that ground, especially where the Court never even addressed, much less specifically ruled on, the point.  Indeed, on a subsequent motion in Case 2, Murphy expressly asserted that (Case 1:05-cv-1054-RJL, Docket No. 9 at 5):

> [A] purported lack of standing was not a basis on which PwC sought summary judgment on the 2000 and 2001 claims.  Rather, PwC is referring to an argument it raised for the first time in its reply memorandum (not in its motion), and it was presented in an effort to deflect Murphy's argument that he had presented direct evidence of age discrimination, and that a *prima facie* analysis was

19

not required.  Arguments raised for the first time on reply need not
even be considered [Sierra Club v. EPA, 292 F.3d 895, 900 (D.C.
Cir. 2002) ("our caselaw makes clear that an argument first made
in the reply comes too late")], and certainly cannot be viewed as
dispositive of a separate claim.

In any event, while part of the point is set forth verbatim from PwC's prior reply brief,

Murphy ignores the fact that it is now supported by Murphy's own admissions at his deposition

on November 15, 2006 in subsequently reopened discovery.  As stated in its opening brief on this

motion, Murphy "expressly admitted at his reopened deposition that he would not want to

become a partner . . . only to then be subject to immediate retirement pursuant to the age-60

retirement provision for partners" (PwC Mem. at 28, citing Murphy 11/15/06 Dep. at 250).  At

that reopened deposition, Murphy also identified a memorandum he had prepared in 2002

detailing the disadvantages of his becoming a partner (id.) (record citations omitted).  As stated

by the D.C. Circuit, "[a] subsequent motion for summary judgment based on an expanded record

is always permissible" (Williamsburg Wax Museum, 810 F.2d at 251 (court concluded that the

testimony of the appellant's founder at "a deposition taken during discovery after the denial of

the first motion for summary judgment," had "sufficiently added to the record to justify the

district court's consideration of the second motion")).

Murphy is unable to disavow his own admissions in reopened discovery that he would

have been disadvantaged by being made a partner, and, therefore, did not want the partnership

position he purportedly seeks in this litigation.  In other words, Murphy admitted that his not

making partner was not an adverse employment action.  To avoid dismissal, he purports to rely

on, but grossly distorts, testimony of PwC's Chairman, Dennis Nally, that was also elicited in

reopened discovery.

Murphy's assertion that Nally testified that "each time a partner turning 60 asked for

permission to defer mandatory retirement, the Senior Partner and the Board unanimously granted

20

the request" (Murphy Opp. at 39) is not supported by the record.  Nally testified that, in each

instance, the partner did not make the request, but the firm asked the partner to defer and extend

past age 60 (Nally Dep. at 129); and, that the "business case" for an extension would first be

considered by the partner affairs committee of the board which would, in turn, make a

recommendation to the full board (id. at 127-28).  John Carter, the national head of Partner

Affairs, testified that extensions beyond age 60 were granted only "on a very limited basis, one

or two individuals a year, . . . for very specific client success[ion] reasons or client service

reasons" (Carter Dep. at 223-24).  Similarly, partner Lewis explained that extensions were

granted "where we had client service situations, where it was in our best interests to have that

person continue in a client service role in order to facilitate an effective transition to a new

partner at a future date" (Lewis Dep. at 188-89).

         As Murphy was a SME, with no significant client relationships (see p. 12, supra), there is

absolutely no basis on which an extension or deferral of retirement might have even been

considered.  Murphy's position is thus reduced to his argument that he has been adversely

affected by the loss of additional compensation he would have received as a partner for all of two

days, at most (Murphy Opp. at 40 n.14).  But Murphy does not dispute that, following his two-

day tenure as a partner, he would not only be without a job at PwC, but would have lost

substantial retirement and retiree health care benefits that he now receives as a result of

continuing his employment until his voluntary retirement in February 2006 at age 66 (see PwC

Mem. at 14) (record citations omitted).

         In sum, based on his own admissions, Murphy suffered no tangible harm as a result of his

not being made a partner, and therefore cannot complain of his having been denied that status.

As Murphy further testified, "[i]f the mandatory retirement age was not there, then the sole

impact of my promotion would not be my immediate retirement" (Murphy 11/15/06 Dep. at 248-49). Accordingly, as a final contention to avoid dismissal on this ground, Murphy asserts that PwC partners should be deemed "employees" under <u>Clackamas Gastroenterology Assocs. v. Wells</u>, 538 U.S. 440 (2003), and, as such, cannot lawfully be subject to the retirement provision in the Partnership Agreement.

**B.    As a Matter of Law, PwC Partners Are Not <u>"Employees" within the Coverage of the ADEA</u>[9]**

Murphy continues to proffer ever-changing theories as to which PwC partners should be considered "employees" for antidiscrimination law purposes, and why.[10]  Specifically, while plaintiffs initially alleged that all PwC partners save for members of the firm's Board of Partners and Principals should be deemed "employees" (<u>see</u>, <u>e.g.</u>, Complaint, ¶ 15), Murphy has apparently now abandoned that insupportable contention in favor of the somewhat narrower proposition that "a newly admitted partner (the type of position Murphy would have occupied beginning in July 2000 but for age discrimination) resembles an employee of the firm far more than an actual owner" (Murphy Opp. at 5, 41).  But that argument is also untenable.

Under the Partnership Agreement, the "foundational document" with which (Murphy concedes) "the actual operation of PwC is consistent" (Macey Report, ¶¶ 111, 20(f) & 56), newly admitted PwC partners have the same fundamental rights and privileges as do other partners of

---

[9] In light of this Court's Minute Order denying leave to file excess pages to address this point, PwC respectfully refers the Court to its prior briefing of the <u>Clackamas</u> issue (Docket No. 68 at 50-63).

[10] Courts routinely resolve the partner-employee issue on summary judgment (<u>see</u> <u>Feldman v. Hunterdon Radiological Associates</u>, 901 A.2d 322, 333-34 (N.J. 2006), and cases cited therein).  Nor do the cases upon which Murphy purports to rely support a contrary conclusion.  <u>Strother v. Southern California Permanente Medical Group</u>, 79 F.3d 859 (9th Cir. 1996), involved a Rule 12(b)(6) motion to dismiss, not a Rule 56 summary judgment motion. The court in <u>Strother</u> also expressly noted that "resolution of the [partner/employee] issue on summary judgment could be appropriate" (<u>id.</u> at 868).  <u>Jenkins v. Southern Farm Bureau Casualty</u>, 307 F.3d 741 (8th Cir. 2002), involved a different issue, <u>i.e.</u>, whether plaintiff was an independent contractor or an employee.  Finally, in <u>Coles v. Harvey</u>, 471 F.Supp.2d 46 (D.D.C. 2007), the issue was whether the plaintiff was a joint employee of the defendant federal agency and a placement service, and was before the court on a Rule 12(b) motion, prior to discovery.

the firm.  These rights include the right to elect (and to ratify the removal of) the firm's Senior

Partner and Board members, to amend the Partnership Agreement, and to terminate the firm and

determine the disposition of its assets (PwC Exh. C, § 4.1).  Like other PwC partners, new

partners also enjoy protections against expulsion not afforded the firm's professional employees,

whose employment is "at will" (id., § 11.2).  They have the right to participate in firm profits

(id., § 8.1(a)), and they are responsible for losses up to the amount of their substantial capital

contributions (id., §§ 8.1(b), 9.1).  And, since there are no tenure requirements for serving as a

Board member or even as Senior Partner, a new partner is as eligible as any other to be elected to

those positions, the holders of which even Murphy concedes are *bona fide* partners and not

"employees" under the ADEA (see id., Arts. V, VI).

Here, in contrast to the cases relied upon by Murphy, EEOC v. Sidley, Austin, Brown &

Wood, 315 F.3d 696 (7th Cir. 2002), and Simpson v. Ernst & Young, 100 F.3d 436 (6th Cir.

1996), the record confirms that PwC partners possess "meaningful voting rights" guaranteeing

them a "meaningful voice" in the firm's governance.  Under the Partnership Agreement, partners

"reserve to themselves the authority," *inter alia*, to elect and ratify the removal of the firm's

Senior Partner and Board members; to ratify the required withdrawal of partners; to amend the

Partnership Agreement; and, to terminate the firm and determine the disposition of its assets

(PwC Exh. C,  §§ 4.1(a)-(i)).  Further, elections of the Senior Partner and Board members, all of

whom are subject to term limits, generally involve multiple candidates whose differing

backgrounds, positions and views are presented via, among other things, firmwide webcasts, and

partners' votes are tallied on a head-count basis (Ryan Dep. at 36-42; Sullivan Dep. at 29-35).[11]

---

[11] At deposition, Murphy conceded the distinctions.  Testifying on the EEOC's thorough investigation into the Clackamas allegations in his charge (see Murphy 11/15/06 Dep. at 151-56), Murphy testified that Commission representatives recognized the critical difference between PwC and Sidley in terms of governance and control under

Murphy's argument that the Board of Principals and Partners actually "runs the show" further ignores the settled principle that it is not the <u>exercise</u> of control, but rather the <u>right</u> to control that is key to determining whether an individual is properly viewed as an "employer" or an "employee" (<u>Smith v. Castaways Family Diner</u>, 453 F.3d 971, 984-85 (7th Cir. 2006)):

> Determining whether an individual controls or has the right to control an enterprise, and thus constitutes an employer, must take into account not only the authority that person wields within the enterprise but also the source of that authority.  Specifically, a court must consider whether the individual exercises the authority by right, or whether he exercises it by delegation at the pleasure of others who ultimately do possess the right to control the enterprise.

Murphy's argument thus boils down to the unremarkable proposition that there are lines of reporting authority within PwC.  But, as a practical matter, no business organization, including any partnership consisting of more than a handful of members, could operate in the absence of leaders and infrastructure (Sullivan Dep. at 195-96).

For his other principal argument -- that PwC's limited liability status compels a finding that its members are not partners -- Murphy misreads the Seventh Circuit's decision in <u>Sidley</u>, seizing on the court's remark that "[p]erhaps the most partneresque feature" of the individuals whose status was at issue in that case was "their personal liability for the firm's debts" (315 F.3d at 703).  But Judge Posner, writing for the majority, explicitly rejected the idea that unlimited liability was "most important" (as Murphy claims), or even pertinent to a determination of whether an individual should be characterized an "employee" under the ADEA (<u>id.</u> at 704):

> The matter of liability for partnership debts illustrates the importance of referring the question whether a partner in a particular firm is an employer or an employee to statutory purpose. If implicit in the ADEA's exemption for employers is recognition that partners ordinarily have adequate remedies under partnership law to protect themselves against oppression (including age or

---

the <u>Clackamas</u> standard, and, indeed, expressed the view that "a PwC partner [was] less like an employee than a partner at Sidley & Austin" (<u>id.</u> at 156-57).

other invidious forms of discrimination) by the partnership, then
exposure to liability can hardly be decisive. These [individuals]
were not empowered by virtue of bearing large potential liabilities!

It further bears mention that whatever protection is afforded by PwC's limited liability

status applies with equal force to all PwC partners, including members of the Board and the

Senior Partner, who Murphy contends are employers and the owners of the firm.

Accordingly, Murphy's argument that PwC partners should be deemed "employees"

under the ADEA, must be rejected.

### Conclusion

PwC's motion for summary judgment dismissing plaintiff Murphy's remaining claims

should be granted.

Dated: April 10, 2008

                                              Respectfully submitted,

                                              /s/ Eric M. Nelson
                                              Eric M. Nelson, Esq. (admitted *pro hac vice*)
                                              Stephen L. Sheinfeld, Esq. (admitted *pro hac vice*)
                                              WINSTON & STRAWN LLP
                                              200 Park Avenue
                                              New York, New York 10166
                                              (212) 294-6700
                                              Facsimile: (212) 294-4700

                                              Gene C. Schaerr, Esq. #416368
                                              WINSTON & STRAWN LLP
                                              1700 K Street, N.W.
                                              Washington, D.C. 20036
                                              (202) 282-5000
                                              Facsimile: (202) 282-5100

                                              Counsel for Defendant
                                              PricewaterhouseCoopers LLP