**4/23/2003  MURPHY, WESTBROOK**

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF COLUMBIA
 3   - - - - - - - - - - - - - - - - - - x
     C. WESTBROOK MURPHY,                :
 4        and                            :
     HAROLD SCHULER,                      :
 5                                        :
                   Plaintiffs,            :
 6                                        :
              vs.                         :   CASE NUMBER
 7                                        :
     PRICEWATERHOUSECOOPERS, LLP, et al., :   1:02CV00982
 8                                        :
                   Defendants.            :
 9   - - - - - - - - - - - - - - - - - - x
10                      Washington, D.C.
11                      Wednesday, April 23, 2003
12            Deposition of C. WESTBROOK MURPHY, a
13   witness herein, called for examination by counsel
14   for Defendants in the above-entitled matter,
15   pursuant to notice, the witness being duly sworn by
16   KAREN YOUNG, a Notary Public in and for the District
17   of Columbia, taken at the offices of Winston &
18   Strawn, 1400 L Street, N.W., Washington, D.C., at
19   10:13 a.m. on Wednesday, April 23, 2003, and the
20   proceedings being taken down by Stenotype by KAREN
21   YOUNG, and transcribed under her direction.
22
23
24
25
```

4/23/2003 MURPHY, WESTBROOK

```
1    APPEARANCES:

2        On Behalf of the Plaintiffs:

3            DAVID L. ROSE, ESQ.

4            Rose & Rose, P.C.

5            1320 19th Street, N.W., Suite 601

6            Washington, D.C. 20036

7            (202) 331-8555

8

9        On Behalf of the Defendants:

10           ERIC M. NELSON, ESQ.

11           STEPHEN L. SHEINFELD, ESQ.

12           Winston & Strawn

13           200 Park Avenue

14           New York, NY 10166-4193

15           (212) 294-2646

16

17

18

19

20

21

22

23

24

25
```

4/23/2003 MURPHY, WESTBROOK

```
 1        the RAS partners -- there are four of them, Tim
 2        Ryan, who is managing partner for the banking
 3        practice, and somebody from human resources.
 4              They discuss the evaluations and determine
 5        who to recommend for promotion, what bonuses to
 6        either award or recommend, what salary increases to
 7        award or recommend.  This process, the committee
 8        process was explained at the RAS staff meeting in
 9        August of 19 -- I'm sorry.  August of 2002 by
10        Darlene Shea, who I mentioned before.
11        Q.    And generally how does the present
12        performance evaluation or appraisal procedure differ
13        from the procedure in place at Price Waterhouse?
14        A.    The mechanic is very different, that is,
15        there was a hand -- a hard form that was completed
16        by hand.  I know a number of my evaluations were
17        done by Bob Bench in his own handwriting.
18        Q.    As opposed to electronically?
19        A.    As opposed to electronically.
20        Q.    Or even typed?
21        A.    Or even typed.  And the practice at least
22        in our shop, or at least as far as I know, was to do
23        one evaluation that covered everything that had
24        happened, complete one evaluation form that covered
25        everything that had happened during the year rather
```

1    than an engagement-by-engagement evaluation.  I also

2    think that the action on the evaluation,

3    recommendation for bonus or promotion, was handled

4    in a different manner, that is, there wasn't the

5    formality of the committee meeting that there is

6    now.  I think Bench may have just sent his

7    recommendations on to be approved either by the

8    managing partner in the D.C. office or by the

9    manager of the -- managing partner of the financial

10   services institution practice.

11        Q.    Well, but were the appraisal or evaluation

12   forms signed by the appraisee as well as the

13   appraiser?

14        A.    Yes.

15        Q.    And it was -- that's true for both firms;

16   is that right?

17        A.    That's been the practice, yes, all --

18   since I've been at -- since 1990 as far as I know.

19        Q.    And has the appraisee always been afforded

20   an opportunity to comment either --

21        A.    I believe so.

22        Q.    Either verbally or in writing?

23        A.    I believe so.

24        Q.    Or both?

25        A.    Or both, yes.

```
 1        Q.    That's always been the practice as far as
 2   you know?
 3        A.    I believe that's correct.
 4        Q.    If the appraisee signs an appraisal
 5   without a comment, does that signify the appraisee's
 6   agreement with the evaluation or assessment?
 7        A.    It would to me, yes.
 8                              (Defendants' Exhibit No.
 9                              11 was marked for
10                              identification.)
11             BY MR. NELSON:
12        Q.    Exhibit 11 will be performance
13   evaluations, Bates stamped PwC01501 through
14   PwC01507.  Can you identify Defendants' Exhibit 11?
15        A.    It's a memorandum to me dated March 21,
16   1997 from Bob Bench attaching a performance
17   evaluation explaining who will review the evaluation
18   and inviting me to provide comments, and it contains
19   my handwritten comments dated April 2nd, 1997.
20        Q.    And do those comments appear on the first
21   page of this exhibit?
22        A.    Correct.
23        Q.    And that's your handwriting and that's
24   your signature?
25        A.    Correct.
```

```
 1        Q.    Is it correct that Defendants' Exhibit 11

 2   attaches the performance evaluation forms in use --

 3        A.    Yes.

 4        Q.    -- at Price Waterhouse --

 5        A.    Yes.

 6        Q.    -- in the spring of 1997?

 7        A.    Yes.

 8        Q.    Are these electronic forms or --

 9        A.    I don't -- I believe not.

10        Q.    Did you also sign your name on page PwC

11   0105 -- 01506?  Is that your signature next to

12   Mr. Bench's signature?

13        A.    Yes.

14        Q.    What period of time do these evaluations

15   of your performance cover?

16        A.    Typically they are -- they cover a

17   12-month period beginning April 1st and ending March

18   31st, and they are prepared in advance of the end of

19   the fiscal year, which would be June 30th, so that

20   the decisions are then made on the basis of this

21   performance evaluation for salaries, bonuses,

22   promotions.

23        Q.    And does this -- this form cover -- covers

24   what period then, these forms?

25        A.    It covers -- it would cover the 12 months
```

1     whatever response Ms. Shea might make to me.

2         Q.    Did you do anything to try to increase

3     your leverage in any negotiation of an early

4     retirement package?

5         A.    No.

6         Q.    Nothing?

7         A.    No.

8         Q.    I don't know if the court reporter can

9     hear that.  You said no?

10        A.    No.

11        Q.    Why did you wish to retire at age 60?

12        A.    I seemed to have reached the end of the

13    line professionally at PwC.  In 1999, Mr. Bench had

14    recommended me for promotion to the position of

15    managing partner.  His recommendation had not been

16    accepted.

17        Q.    You say for managing partner?

18        A.    Pardon?

19        Q.    Promotion to what position?

20        A.    Managing director.  By year 2000, I was 60

21    and partnership -- advancement to partnership seemed

22    to be foreclosed under the provisions as I then

23    understood them of the partnership agreement that

24    require the partners to retire at age 60, so there

25    seemed to be no further avenue for advancement in

1    available with what coverage and at what cost.

2        Q.    And were you unable to afford coverage on

3    your own?

4        A.    No.

5        Q.    You were not unable?

6        A.    That's correct.

7        Q.    You were able?

8        A.    Yes.

9        Q.    You just didn't want to; is that right?

10       A.    That's correct.

11       Q.    You testified a few minutes ago that

12   Mr. Bench's recommendation to promote you to the

13   position of managing director had not been accepted.

14   When did that occur, or at least when were you

15   advised of that?

16       A.    The recommendation was made in late May or

17   early June of 1999.

18       Q.    And what were you told?

19       A.    I'm sorry.  It was probably made earlier

20   than that.  It was probably made a month or so

21   earlier, and I heard nothing back from it, so

22   sometime thereafter, probably in June of 1999, I

23   inquired of Mr. Bench what had happened to his

24   recommendation.

25       Q.    And what did he say?

1      A.    He said that he had met in New York with

2  several people -- I don't know who -- to discuss

3  promotions and salary increases and bonuses and that

4  he had been told that the position of managing

5  director had been abolished.

6      Q.    What led you to conclude that you would

7  have received further compensation increase, salary

8  increases had you been promoted to managing director

9  that you wouldn't otherwise receive as -- in

10  whatever your position was?

11      A.    I'd strongly suspect that the salaries of

12  those -- managing directors under the title of the

13  description of that position as I understand it have

14  greater responsibility than directors, and I assume

15  that they are compensated accordingly.

16      Q.    Well, that's your assumption.  Did you ask

17  -- make any inquiries in that regard to Mr. Bench

18  when he told you that he was told that the position

19  had been abolished?

20      A.    Not that I remember.

21      Q.    Did you ask him whether this would have

22  any constraints on salary increases going forward?

23      A.    Not that I remember.

24      Q.    And in fact, you've received a number of

25  salary increases after receiving that advice; isn't

545

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF COLUMBIA
 3    - - - - - - - - - - - - - - - - - x
      C. WESTBROOK MURPHY                  :
 4                                         :
             and                           :
 5                                         :
      HAROLD SCHULER,                       :
 6                                         :
                  Plaintiffs,             :
 7                                         :
             vs.                           :    CASE NUMBER
 8                                         :
      PRICEWATERHOUSECOOPERS, LLP, et al., :    1:02CV00982
 9                                         :
                  Defendants.             :
10    - - - - - - - - - - - - - - - - - x    Volume 3
11                         Washington, D.C.
12                         Thursday, May 15, 2003
13              Continued Deposition of C. WESTBROOK
14    MURPHY, a witness herein, called for examination by
15    counsel for Defendants in the above-entitled matter,
16    pursuant to notice, the witness being duly sworn by
17    KAREN YOUNG, a Notary Public in and for the District
18    of Columbia, taken at the offices of Winston &
19    Strawn, 1400 L Street, N.W., Washington, D.C., at
20    1:09 p.m. on Thursday, May 15, 2003, and the
21    proceedings being taken down by Stenotype by KAREN
22    YOUNG, and transcribed under her direction.
23
24
25
```

COPY

546

```
 1    APPEARANCES:

 2        On Behalf of the Plaintiffs:

 3            DAVID L. ROSE, ESQ.

 4            Rose & Rose, P.C.

 5            1320 19th Street, N.W., Suite 601

 6            Washington, D.C. 20036

 7            (202) 331-8555

 8

 9        On Behalf of the Defendants:

10            ERIC M. NELSON, ESQ.

11            Winston & Strawn

12            200 Park Avenue

13            New York, NY 10166-4193

14            (212) 294-2646

15

16

17

18

19

20

21

22

23

24

25
```

661

1    the question?  I'm sorry.

2              MR. NELSON:  I asked Mr. Murphy how he

3    responded to Mr. Schuler's expressed concern.

4              MR. ROSE:  What does Mr. Murphy's views

5    about the likelihood of success have anything to do

6    with this case?

7              MR. NELSON:  I didn't ask him about the

8    likelihood of success.  If that's what he answered,

9    then that's what he answered.  I asked him how he

10   responded.

11             THE WITNESS:  I don't believe that I did

12   respond.

13             BY MR. NELSON:

14        Q.   Do you understand and did you at some

15   point advise Mr. Schuler of your understanding that

16   the filing of a charge and a complaint of

17   discrimination against PwC affords the plaintiff

18   certain protection in the workplace?

19        A.   My understanding is that it is illegal for

20   an employer to retaliate against someone who has

21   filed a complaint of discrimination under the --

22   both the federal and state laws that we've alleged

23   in this case, and I'm sure that I discussed that

24   understanding with Mr. Schuler before this lawsuit

25   was filed, indeed, before his charge was filed with

662

1    the D.C. Human Rights Office.

2        Q.    And indeed, I think you testified earlier

3    that Mr. Schuler filed a charge in part to protect

4    himself; is that right?

5        A.    I believe that is correct.

6        Q.    Do you also understand that PwC is not

7    constrained from taking actions that may be adverse

8    to you, including terminating your employment, for a

9    legitimate nondiscriminatory reason?

10       A.    That is my understanding.

11             MR. NELSON:  Let's take a break.

12                  (Recessed at 4:42 p.m.)

13                  (Reconvened at 4:49 p.m.)

14             MR. NELSON:  Mr. Rose, if you have some

15    questions for Mr. Murphy --

16             MR. ROSE:  I do.

17             MR. NELSON:  I suggest you ask them now.

18             MR. ROSE:  I will.  Would you make these

19    two pages one exhibit please, and we are on 21 I

20    believe.  This would be 21?

21             MR. NELSON:  You're talking about

22    plaintiffs' exhibits?

23             MR. ROSE:  Yes.

24             MR. NELSON:  I don't know.

25             MR. ROSE:  Would you mark this as

673

1    A.    What I recall is largely what I said, that

2    because -- in part because the Financial Services

3    Practice and the banking practice in particular had

4    dealt with one of the big issues coming out of

5    Sarbanes-Oxley that would now affect the rest of the

6    firm, he thought we were in a good position, we

7    being the Financial Services Practice, to take a

8    leadership role, and for several months, August,

9    September and into October, I believe he relied on

10   me to a great extent to help identify issues that

11   the firm and he should be dealing with.  By

12   November, in my opinion, the firm leadership, and I

13   mean the overall firm, had become much more

14   effective in identifying and dealing with the

15   issues.

16       Q.    When did you begin your work with regard

17   to Sarbanes-Oxley?

18       A.    In the first week in August of 2002.

19       Q.    And how many hours approximately did you

20   record from the beginning of August through the end

21   of 2002 with respect to Sarbanes-Oxley?

22       A.    My best estimate would be 1,100.

23       Q.    Those are not chargeable hours; is that

24   right?

25       A.    That is correct.  Well, I'm sorry.  That

674

1    is -- that's not entirely correct.  My practice is

2    if I get an inquiry from an engagement team for a

3    specific client and the member -- the engagement --

4    I'm sorry, the question requires any degree of

5    research, requires me to spend any significant --

6    significant's not -- any measurable, really

7    measurable time in answering it, my practice would

8    be to charge the client.  That's usually a matter of

9    an hour or two, and that's not included in the 1,100

10   figure that I just gave you.

11       Q.   What would those hours total for 2002, the

12   chargeable time, the hour or two here and there?

13            MR. ROSE:   Okay, fine, fine, fine.

14       A.   I believe the latest report that PwC

15   provided me showed 130 some chargeable hours for the

16   ten months beginning July 1, 2002.

17       Q.   And that's your total chargeable hours for

18   that ten-month period; is that right?

19       A.   That's my understanding.

20       Q.   And some of that was Sarbanes-Oxley

21   related?

22       A.   Some of it was, yes.

23       Q.   Approximately what -- how many of the 130

24   chargeable hours were devoted to Sarbanes-Oxley

25   issues?

675

1    A.    My best estimate, and -- it would be half.

2    PwC does have some documentation from which that

3    could be determined.  My best estimate.

4    Q.    Just to be clear, the 1,100 non-chargeable

5    hours you devoted to Sarbanes-Oxley was over what

6    period of time?

7    A.    Nine -- I'm sorry.  Ten months.  The same

8    ten-month period.  That, by the way, does not

9    include the time on the -- that would include --

10    that number, 1,100, would include the regulatory and

11    legislative efforts that I described.  It would not

12    include the efforts at updating the guidance for

13    internal control reporting and attestations by

14    banks.

15    Q.    When did that ten-month period begin?

16    A.    July 1, 2002.

17    Q.    With respect to the legislative and

18    regulatory efforts that you testified to a few

19    moments ago --

20    A.    Yes.

21    Q.    -- working with the other big four

22    accounting firms and with AICPA, generally -- I

23    don't need chapter and verse.  What was your role in

24    those efforts?

25    A.    The work product of the first effort, the

676

1 regulatory one commenting on the proposed

2 regulation, was discussing with this group usually

3 by conference call what issues were involved, what

4 our response might be to those issues.  I believe I

5 wrote some memoranda that I sent by e-mail, and then

6 working with the counsel for the group on what would

7 be the deliverable, and he wrote a draft and some of

8 us submitted comments.  I submitted substantial

9 comments that were included in the final draft.

10    Turning to the legislative effort, it's

11 much the same kind of process, that is, helping the

12 others involved in the effort to understand what the

13 effect might be of the proposed legislative change

14 and how it fits in more generally with the bank

15 regulatory milieu, then helping to discuss what our

16 response is, and finally, this group has come up

17 with some alternative language to what's in the

18 bill.

19    What's in the bill was proposed by the

20 banking agency.  We've come up with some alternative

21 language and some legislative history that might

22 accompany it, and I was -- again, counsel for the

23 group drafted both of those.  I gave him some

24 substantial comments on his proposed language from

25 the legislative history and he agreed with those,

C. WESTBROOK MURPHY

1          UNITED STATES DISTRICT COURT

            DISTRICT OF COLUMBIA    ORIGINAL

2

3   - - - - - - - - - - - - - - - - - - - - - - -x

    C. WESTBROOK MURPHY,         :

4                            :

    and                     :

5                            :

    HAROLD SCHULER,           : Case No.

6                            : 1:02CV00982

          Plaintiffs,       :

7                            :

       v.                  :

8                            :

    PRICEWATERHOUSE COOPERS, LLP, ET AL, :

9                            :

         Defendants.       :

10   - - - - - - - - - - - - - - - - - - - - - - -x

11

12     Continued Deposition of C. WESTBROOK MURPHY

13              Washington, D.C.

14         Tuesday, November 30, 2004

15              10:15 a.m.

16

17

18

19

20

21

22

23   Job No. 22-46677

24   Page No. 884 -999, Volume 5

25   Reported by:  Sandy Medford Nelson

LEGALINK
A WORDWAVE COMPANY
LegaLink Manhattan                tel (212) 557-7400   www.legalink.com
420 Lexington Avenue, Suite 2108    tel (800) 325-3376
New York, NY 10170                fax (212) 692-9171

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

C. WESTBROOK MURPHY

Page 885

```
 1        Continued Deposition of C. Westbrook Murphy

 2   held at the offices of:

 3        WINSTON & STRAWN, LLP

 4        1400 L Street, Northwest, Room 5A

 5        Washington, D.C. 200036

 6        (202) 371-5700

 7

 8

 9        Pursuant to agreement, before Sandy Medford

10   Nelson, Notary Public in and for the District of

11   Columbia.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C. WESTBROOK MURPHY

```
 1                A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF:

 3          DAVID L. ROSE, ESQUIRE

 4          Rose & Rose, P.C.

 5          1320 19th Street, Northwest, Suite 601

 6          Washington, D.C. 20036

 7          (202) 331-8555

 8    ON BEHALF OF DEFENDANT:

 9          ERIC M. NELSON, ESQUIRE

10          MARK KONKEL, ESQUIRE

11          Winston & Strawn, LLP

12          200 Park Avenue

13          New York, New York 10166-4193

14          (212) 294-4700

15

16

17

18

19

20

21

22

23

24

25
```

C. WESTBROOK MURPHY

```
 1    asked do I have any familiarity with it.  I think I
 2    have known some people who have been promoted, but
 3    I do not know the process they went through to
 4    become promoted to the position of director --
 5         Q    -- directorship position presumably would
 6    include a director, a managing director or senior
 7    managing director?
 8         A    Oh, I believe that's a different question.
 9         Q    Were you recently promoted or given the
10    title of managing director?
11         A    Yes.
12         Q    Was a prospectus of some sort submitted,
13    to your knowledge, in connection with that?  Is
14    that a promotion, Mr. Murphy?
15         A    I believe that is a promotion.  Yes, there
16    was a prospectus, and we have produced a copy of
17    it, as well as the copies of earlier drafts.
18         Q    And were you involved in the preparation
19    of the recent prospectus?
20         A    I was at the request of my supervisor,
21    Bill Lewis.
22         Q    All right.  And you provided some of the
23    information that was contained on the prospectus
24    that was submitted?
25         A    Yes.
```

C. WESTBROOK MURPHY

Page 897

1    candidate for managing director for the July 1,

2    1998 promotion cycle?

3        A    That is correct.

4        Q    And you don't know why you have this form

5    in your files; is that right?

6        A    That is correct.

7        Q    Let me show you a document previously

8    marked as Plaintiff's Exhibit 67.  This was marked

9    by your attorney, Mr. Rose, I believe in

10   Mr. Bench's deposition.  It's a prospectus on

11   directorship candidate for July 1, 1999, and it

12   bears Bates numbers 00050 through 54.

13            MR. ROSE:  Thank you.

14            BY MR. NELSON:

15       Q    Mr. Murphy, can you identify this

16   document, Plaintiff's Exhibit 67, which was

17   produced from your files earlier?

18       A    Yes.

19       Q    What is it?

20       A    During the spring of 1999, Mr. Bench

21   believed that RAS needed another managing director.

22   We had had two managing directors:  Harold Schuler

23   who's a Plaintiff in this lawsuit, and Paul Kergan.

24   Paul Kergan had left the firm sometime within the

25   past year.  Mr. Bench believed we needed another

1     managing director and recommended me for that

2     position.

3             At his request, I drafted this prospectus

4     that's now marked as Exhibit 67. He forwarded it

5     on, and I -- he later told me -- and I believe I've

6     testified on this already -- that when he went to a

7     meeting in New York with others, including Darlene

8     Shea, to go over recommended bonuses, salaries

9     increases for our group, he was told that was

10    position of managing director had been abolished.

11    And, for that reason, his recommendation was not

12    approved.

13            Now, at least a couple of things in here

14    that I'm sure Mr. Bench himself did, although I was

15    the principal draftsman. Also as an exhibit

16    somewhere in one of the depositions is the email

17    that Mr. Bench used to forward this document in an

18    electronic form before the meeting that I just

19    talked about, although we had been unsuccessful in

20    getting PWC to admit that Exhibit 67 was the

21    attachment to that memo that Mr. Bench sent.

22    Q     Well, to whom was it forwarded, to your

23    knowledge?

24    A     I don't remember.

25    Q     You have no recollection?