Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ORIGINAL

--------------------------------x

C. WESTBROOK MURPHY, et al.,        )

               Plaintiffs,    )

    v.                              )    Civil Action

PRICEWATERHOUSECOOPERS, LLP,        )    No. 02-982

et al.,                             )    (RJL/DAR)

             Defendants.    )

--------------------------------x

C. WESTBROOK MURPHY,                )

              Plaintiff,    )

    v.                              )    Civil Action

PRICEWATERHOUSECOOPERS, LLP,        )    No. 05-1054

             Defendant.    )    (RJL)

--------------------------------x

Deposition of CHARLES WESTBROOK MURPHY

Washington, D.C.

Wednesday, November 15, 2006

10:00 a.m.

Job No.:  22-91057

Pages 1 - 273

Reported By:  Joan V. Cain





Page 2

1          Deposition of CHARLES WESTBROOK MURPHY, held

2     at the law offices of:

3

4               WINSTON & STRAWN LLP

5               1700 K Street, Northwest

6               Washington, D.C.   20006

7               (202) 282-5000

8

9          Pursuant to Notice, before Joan V. Cain,

10    Certified Court Reporter and Notary Public in and for

11    the District of Columbia.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF C. WESTBROOK MURPHY:

    RICHARD A. SALZMAN, ESQUIRE

    HELLER HURON CHERTKOF LERNER

    SIMON & SALZMAN

    Suite 412

    1730 M Street, Northwest

    Washington, D.C.  20036

    Telephone:  (202) 293-8090


ON BEHALF OF DEFENDANTS:

    ERIC M. NELSON, ESQUIRE

    WINSTON & STRAWN, LLP

    200 Park Avenue

    New York, New York 10166-4193

    Telephone:  (212) 294-6700

Page 65

CHARLES WESTBROOK MURPHY

1

2  beforehand.

3      Q    I think your prior testimony was, I think,

4  about a dozen.

5      A    All right.  I'll stick with that estimate of

6  a dozen.

7      Q    You'll stick with a dozen?

8      A    There are, of course, a number that I

9  wouldn't have worked with because they worked in other

10  practices.

11      Q    So, you had -- in your comment to Mr. Nally,

12  you stated that at least a hundred of -- presumably

13  the 180 managing directors at the conference were in

14  your view qualified to be partner?

15      A    I believe it says that the audience probably

16  contained at least a hundred managing directors

17  qualified to be partner, and Mr. Nally, in no way,

18  disagreed with that.

19          MR. NELSON:  I'm sorry.  Could I have my

20  question back?

21              (The reporter read the record as

22  requested.)

23      A    Is the question whether the 100 is a subset

24  of the 180 who were in attendance?  If that's the

25  question, the answer is yes.



Page 66

CHARLES WESTBROOK MURPHY

1

2  BY MR. NELSON:

3    Q    Apart from other qualifications, could you

4  make a business case for the admission of any of

5  these, approximately 100, managing directors to be

6  partners?

7    A    For everyone who had been appointed a

8  managing director, there was a business case that was

9  based on one of two factors, either, A, that they had

10  what is called, within the firm, a book of business

11  that they were managing or they were subject matter

12  experts in an area that was of particular importance

13  to the firm.

14    Q    Is it your understanding the business case

15  for becoming a managing director is the same as the

16  business case for becoming a partner, if you know?

17    A    I believe they are substantially similar.

18    Q    What's the basis for that belief?

19    A    Having reviewed the partnership prospectus

20  or I guess its proposal from Mr. Lavine and from

21  Mr. Albright, having reviewed my own, and having

22  reviewed Mr. Schuler's.

23    Q    Did --

24    A    I'm sorry.  Plus the comments that were made

25  during the webcast in 2004.




Page 67

1                      CHARLES WESTBROOK MURPHY

2       Q      Did Mr. Albright and Mr. Lavine have a book

3    of business, as you put it?

4       A      The proposal said that they did.  Book of

5    business is not my term.  That's the firm's term.

6       Q      Did the proposals for those two individuals

7    refer to them as subject matter experts?

8       A      I believe they did.

9       Q      Are you talking specifically about the

10   business case or the general qualifications to be

11   partner?

12      A      About whom are you asking that question?

13      Q      Mr. Albright and Mr. Lavine.

14             MR. SALZMAN:  I don't understand your

15   question.  Can you rephrase it?

16      A      Well, you asked me about the business case.

17   That I thought I answered that, and then you asked me,

18   "Did it say anything about subject matter expertise?"

19   And I thought I answered that.  What's left?

20   BY MR. NELSON:

21      Q      Well, my question was, Was that specifically

22   mentioned in connection with a business case for

23   admission?

24      A      Was what specifically mentioned?

25      Q      Subject matter expertise.

Page 68

CHARLES WESTBROOK MURPHY

1

2    A    Yes.  Yes.

3    Q    In the business case?

4    A    Well, it -- my recollection of those

5    partnership proposals from Messrs. Lavine and Albright

6    was that each of them mentioned some specific areas in

7    which they were purported to have expertise and in

8    which, according to the proposal, additional expertise

9    was needed at the partnership level.

10   Q    Well, specifically, what factors do you

11   understand to be considered in connection with a

12   business case for admission as partner?

13       MR. SALZMAN:  Are you asking him what

14   factors are supposed to be considered by the firm?

15   His understanding of --

16       MR. NELSON:  The witness's understanding.

17       MR. SALZMAN:  -- what's supposed to be

18   considered or what is actually considered?

19       MR. NELSON:  Well, if there's a difference,

20   then he can so testify.

21   A    I would start with competence in whatever --

22   in discharging whatever responsibilities the candidate

23   has, as soon as been given within the firm, since

24   someone who doesn't perform competently is not likely

25   to be much in the way of business.  Next is the amount






Page 89

CHARLES WESTBROOK MURPHY

1

2    Q    As of July 1 --

3    A    Excuse me.  I want to go back and correct

4    that last answer.  He knows more about bank operations

5    than I do.

6    Q    Any other differences?

7    A    Not that I can think of now.

8    Q    As of July 1, 2000, how would you rank the

9    professional employees in RAS, Regulatory Advisory

10   Services, in terms of their qualifications to be a

11   partner, starting with the most qualified?

12   A    You're excluding the ones that are -- that

13   already were partners?  So, we're excluding

14   Bill Lewis, Bob Bench, John Campbell?

15   Q    Yes, let's exclude those who are already

16   partners.

17   A    First, I'm going to have to remember who

18   they were.

19   Q    Let's start with the most qualified

20   professional --

21   A    I would say that the most qualified would be

22   Westbrook Murphy, and the second most qualified would

23   be Hal Schuler, and that's shown, among other things

24   by the responsibilities we had.  Hal was a managing

25   director.  I was acting as a managing director, and we



Page 90

1          CHARLES WESTBROOK MURPHY

2    were the only two employees in RAS who were either --

3    were acting as managing directors either de facto or

4    de jure, and at that time, I think everybody else

5    would have been a distant -- anybody else would have

6    been a distant third.

7        Q    Well, who would have been third in your

8    ranking at that time?

9        A    I take that back about the distant third.  I

10   think Gary Welsh would have been very well qualified.

11   So, I would make him third.

12       Q    And who would you make fourth best

13   qualified?

14       A    Perhaps David Sapin.  If he was still -- I

15   don't remember whether he was still with RAS then or

16   not.  I believe he was.

17       Q    Who would be fifth?

18       A    His experience would have been a little

19   light at the time.  I'm not sure that I'm remembering

20   who was in RAS, but I don't think there would be

21   any -- I don't think there'd be anybody else who, if I

22   was making the decision, I would have made a partner

23   in the year 2000.

24       Q    No, I'm not asking who you would make

25   partner.  I'm asking just in terms of qualifications,



CHARLES WESTBROOK MURPHY

1
2  And in all of them, I put that -- I wanted to be a

3  partner.

4       Q    And during what period is this?  Beginning

5  when?

6       A    Probably 2002, perhaps 2001.

7       Q    And you've produced those documents, have

8  you?

9       A    Yes.

10      Q    Did you ever discuss that aspiration with

11 Mr. Lewis?

12      A    Yes.

13      Q    And what were those discussions?

14      A    I only remember one specific discussion, and

15 that was I had put in the draft of the plan that I had

16 to overcome PwC's illegal employment policy.  And he

17 asked me to take out the word "illegal," which I did.

18      Q    Was there any other discussion of your

19 indication that you wanted to be a partner?

20      A    Not that I remember.

21      Q    Was that the only conversation that you had

22 with Mr. Lewis on that subject?

23      A    On the subject of becoming a -- in

24 connection with -- the only conversations I had with

25 him were in connection with preparing those plans.

Page 100

CHARLES WESTBROOK MURPHY

1

2       Q     Okay.  And the only conversation you

3   remember is that you made a reference to illegal

4   employment practice at PwC and he asked you to take

5   out the word "illegal"?

6       A     No.  When he did that the first time, I

7   didn't have to do it the next year or the year after

8   that.

9       Q     You didn't put "illegal" in there in the

10  succeeding years?

11      A     Right.

12      Q     Did you ever discuss the substance of what

13  you were saying?

14      A     I'm sorry.  I don't understand the question.

15      Q     Did you ever discuss with Mr. Lewis, apart

16  from what you've related, your aspiration to become a

17  partner at PwC?

18      A     Not that I remember.

19      Q     Do you know any -- can you identify any

20  employees who made partner as subject matter experts

21  or principally or solely as subject matter experts?

22      A     I know of one.  I don't remember his name,

23  and it would have been in the mid-1990s back at

24  Pricewaterhouse, and he was a statistical whiz.  And

25  that was I was told that that was -- I knew him



Page 101

1                    CHARLES WESTBROOK MURPHY

2    slightly.  I worked with him a little.  And I was told

3    that the basis for his being admitted to the

4    partnership was just his sheer talent in that one

5    area.

6        Q    What area of the firm did he work in?

7        A    It was in the nonauditing side of the firm,

8    which is now called "advisory," but it's been called a

9    number of different things over the years.

10       Q    It wasn't RAS?

11       A    It was not RAS.

12       Q    Was he based in Washington in the same

13   office?

14       A    He was.

15       Q    And that's the only employee you can

16   identify who became a partner as a SME, a subject

17   matter expert?

18            MR. SALZMAN:  Your question was either

19   solely as or principally as?

20            MR. NELSON:  Solely or principally, correct.

21   Right.

22       A    There are some in the administrative side of

23   the firm.  We may even have deposed some of them.

24   BY MR. NELSON:

25       Q    And what about among the ranks of the

Page 102

CHARLES WESTBROOK MURPHY

1

2 managing directors, those who became managing

3 directors in 2004 forward, can you identify any

4 subject matter experts or managing directors who were

5 principally subject matter experts?  I think you

6 testified that that was one of the tracks or one of

7 the --

8     A    In addition to me?

9     Q    Okay.  You're saying you're a subject matter

10 expert?

11     A    That's what the proposal said.

12     Q    Okay.  And do you know other employees who

13 were promoted or who were made managing directors

14 based on their being -- principally being subject

15 matter experts?

16         MR. SALZMAN:  I'm going to object to the

17 question because I don't think he said that he

18 principally is a subject matter expert.

19         MR. NELSON:  I'm not talking about him.  I'm

20 talking about --

21         MR. SALZMAN:  You used the word "other,"

22 though.

23         MR. NELSON:  Okay.  Thank you.

24     A    I was told during the webcast in November of

25 2004 and at other times that to become a managing



Page 151

CHARLES WESTBROOK MURPHY

1

2  before or shortly after that meeting about why he

3  was -- about his not attending.

4      Q    Did you provide Mr. Blackburn with a copy of

5  what's been marked as Defendants' Exhibit 72?

6      A    Not that I remember.

7      Q    Did you discuss with Mr. Schuler the content

8  of Defendants' Exhibit 72?

9      A    I think I remember discussing it in a

10 meeting that he and I had with our counsel.

11     Q    Do you remember any discussions with

12 Mr. Schuler outside the presence of counsel?

13     A    No.

14     Q    What counsel were present at this meeting

15 that you think you remember?

16     A    Best of my memory, Mr. Rose and Mr. Salzman.

17     Q    And approximately, when would this have

18 been?

19     A    After August 22nd 2005.

20     Q    How soon after?

21     A    I have no way of remembering.

22     Q    On page 4 of your interrogatory responses,

23 you named Hyacinth Clark and Lynn McDermott --

24     A    Yes.

25     Q    -- of the EEOC in Washington.  Do you see

Page 152

CHARLES WESTBROOK MURPHY

1
2    that?

3    A    Yes.

4    Q    What is Ms. Clark's position with EEOC?

5    A    My understanding is that they are both

6    assigned.  Both she and Ms. McDermott are assigned to

7    the Washington field office or Washington regional

8    office of the EEOC and that Ms. Clark is an

9    investigator.

10    Q    And what is Lynn McDermott's position?

11    A    I don't know.

12    Q    Is she senior or higher ranking than

13    Ms. Clark?

14    A    Don't know.

15    Q    Is she a lawyer?

16    A    I don't know.

17    Q    Have you ever met Ms. McDermott?

18    A    Yes.

19    Q    Have you met Ms. Clark face-to-face?

20    A    Yes.

21    Q    On how many occasions?

22    A    Twice.

23    Q    And when were those occasions?

24    A    September of 2005.  Once early in the month

25    and once late in the month.  I met at the EEOC office

Page 153

CHARLES WESTBROOK MURPHY

1

2  with both of them.

3      Q      Both Ms. Clark and Ms. McDermott?

4      A      They were both there both times.

5      Q      Those are the only two occasions you met

6  with either or both of them?

7      A      Correct.

8      Q      And who was present at these meetings?

9  Let's take them one by one.

10     A      Well, besides the two of them and me,

11  Mr. Salzman.

12     Q      And how long was the meeting early in

13  September of 2005?

14     A      Two hours, two-and-a-half hours, something

15  in that range.

16     Q      And what gave rise to that meeting?  Why was

17  it held?

18     A      Before I filed the lawsuit for failure to

19  promote in 2004, I filed a charge administratively

20  with the D.C. field office of the EEOC and they were

21  assigned to investigate that charge.

22     Q      And when did you learn that they had been

23  assigned?

24     A      I believe some time in August 2005.

25     Q      How did you learn that?

Page 154

CHARLES WESTBROOK MURPHY

1

2    A    I was told by my -- by Mr. Salzman, who said

3 they wanted to meet with me.

4    Q    They wanted to meet with you?

5    A    Yes.

6    Q    Was it your understanding your counsel had

7 communicated with them before that?

8    A    Since he was the one who told me that they

9 wished to meet, I assumed that he must have.

10    Q    I mean, before, were you aware that

11 Mr. Salzman had met or communicated with Ms. McDermott

12 or Ms. Clark before August of 2005?

13    A    I don't know whether he had or not.

14    Q    What did you do to prepare for the meeting?

15    A    I believe I read through the charge that I

16 had filed and I had discussions with Mr. Salzman.

17    Q    You read through the charge including the

18 exhibits?

19    A    Yes.

20    Q    And who said what to whom at this two to

21 two-and-a-half hour meeting in early September 2005?

22        MR. SALZMAN:  You're talking about the

23 meeting with Ms. Clark and Ms. McDermott?

24        MR. NELSON:  Correct.

25    A    Ms. Clark said several times that I -- we,

Page 155

CHARLES WESTBROOK MURPHY

1
2  Mr. Salzman and I, could tell that they were taking

3  this investigation very seriously because they had two

4  people at the meeting and it was usually just one.  We

5  discussed the interest of the EEOC in age

6  discrimination against partners in -- against persons

7  in large firms who were nominally called "partners."

8  I was well aware and they were well aware of the case

9  that the EEOC had filed in Chicago against one of the

10 large law firms, Sidley Austin Brown & Wood:

11        They were, I believed, particularly

12 anxious -- anxious may not be -- interested in

13 information about PwC, and were disappointed -- that

14 may not be the right word -- had gotten no information

15 from a letter that they showed me that, I believe, you

16 personally had sent back on behalf of PwC.  My

17 understanding is that EEOC had sent my charge to PwC

18 and asked for an answer -- asked for what their view

19 was and that you sent back a letter that said that

20 Mr. Schuler's similar charge, which he filed in New

21 York, had been dismissed because of the pending

22 litigation and that the D.C. office should likewise

23 dismiss the charge that I had filed, but otherwise

24 provided no information.

25        And so, they were very interested in the

Page 156

CHARLES WESTBROOK MURPHY

1
2    information that I could provide them about PwC and

3    how it worked and what facts might bear on whether a

4    so-called partner at PwC would be an employee within

5    the meeting of anti-discrimination statutes.

6    BY MR. NELSON:

7        Q    What else were they interested?  Is that the

8    thrust of it?

9            MR. SALZMAN:  They wanted your home address

10   and phone number?  I'm kidding.

11       A    They had gave every indication that they had

12   read the complaint and the exhibits very thoroughly

13   and asked me about a couple of details that were

14   buried someplace in the exhibits.

15   BY MR. NELSON:

16       Q    Do you remember what those details were?

17       A    No.  I remember thinking at the time that it

18   was not something that -- not a question that would

19   occur to a casual reader or somebody who had just

20   scanned briefly through the document, suggested to me

21   a thorough reading and understanding of what had been

22   filed.

23       Q    What else did they tell you?

24       A    They asked a question and I don't, now,

25   remember exactly what it was that was not fully



Page 157

CHARLES WESTBROOK MURPHY

1

2  resolved or it was on the basis of that question that

3  several weeks later on my behalf, Mr. Salzman called

4  him and we set up another meeting to provide more

5  detail on whatever that question was.

6       Q     Did they express any views about your

7  charge?

8       A,    I only remember one.  That is, we discussed

9  the factors that are laid out in the EEOC manual,

10  which are, of course, the Supreme Court endorsed in

11  the Clackamas case, and how those factors would apply

12  on the one hand to Sidley Austin Brown & Wood and on

13  the other to PricewaterhouseCoopers, and on the

14  question of election of the managing board, whatever

15  it was called at PwC -- it's the U.S. board of

16  partners and principals.  I don't remember what it's

17  called at Sidley & Austin.

18            PwC, as you know, the partners vote on who

19  is elected to that board.  And my understanding is

20  that at Sidley & Austin, they do not.  And that was --

21  I remember specifically either of the ladies we were

22  meeting with saying that that would be a factor that

23  would tend to show a PwC partner being less like an

24  employee than a partner at Sidley & Austin.  I believe

25  they also told me what their procedure would be,




Page 234

CHARLES WESTBROOK MURPHY

1

2   I was consenting to.

3       Q    Did you read this every time you clicked

4   "okay"?

5       A    No.

6       Q    Did you read it the first time?

7       A    I don't know.  I don't even know when was

8   the first time.

9       Q    Did you think it was important enough to

10  create this memo for the EEOC --

11      A    Well, that I did.

12      Q    -- they got it verbatim?

13      A    That I did.

14      Q    Did you see that it said you consented to

15  monitoring for law enforcement or other purposes?

16      A    I know that's what it says.

17      Q    You've seen that, okay.  So, you're saying,

18  to your knowledge, PwC's only looked at e-mails and

19  other matters for law enforcement purposes, that's to

20  your knowledge, even though --

21      A    I wouldn't say -- that depends how you're

22  going to define "law enforcement purposes."  If you're

23  equating law enforcement with some kind of

24  criminality, it would be broader than that.  It

25  wouldn't be limited just to law enforcement.



Page 235

CHARLES WESTBROOK MURPHY

1

2     Q     But that would be your policy, correct?

3     A     I don't believe I said anything about my

4   policy.

5           MR. SALZMAN:  His policy?  What do you mean?

6     A     I didn't have a policy.

7   BY MR. NELSON:

8     Q     You consented to PwC's policy, right?

9     A     That's what PwC says.

10          MR. NELSON:  Mark as the next exhibit, a

11  memo to file from Mr. Murphy.  It's Bates-numbered

12  Murphy 03506 through Murphy 03507.

13               (Defendants' Exhibit 75 was marked for

14  identification and was retained by counsel.)

15  BY MR. NELSON:

16    Q     Can you identify Defendants' Exhibit 75?

17    A     Yes.  It's a memorandum that I wrote on

18  February 1, 2002 concerning retirement for PwC

19  partners.

20    Q     In the last paragraph on page 1 that goes

21  over to page 2, you describe disadvantages that would

22  be suffered by an employee aged 56 or older who was

23  admitted as a partner?

24    A     That is correct.

25    Q     Do you see that?

Page 236

CHARLES WESTBROOK MURPHY

1

2    A     Yes.

3    Q     And how old were you on July 1, 2000?

4    A     60.

5    Q     And when did you turn 60?

6    A     January 30, 2000.

7    Q     In the parenthetical at the end of the

8    subparagraph at the top of page 2, you state

9    that, "The answer to this question is unclear."

10        Do you see that?

11    A     Yes.

12    Q     Has the answer since become clear to you?

13    A     I think there's very little between the --

14    in the interconnection between the employee retirement

15    benefits and continuing healthcare after retirement

16    that is clear to me.

17    Q     You recognize that a partner might -- who

18    had -- admitted at some point had to retire at age 60

19    might lose retirement health benefits; is that right?

20    A     Apparently.

21    Q     And you said it might foreclose the

22    availability of health benefits that would normally be

23    available to former PwC employees?

24    A     I believe the question that's being

25    addressed here is after the hiatus that's described,

Page 237

CHARLES WESTBROOK MURPHY

1
2  "Would health benefits then become available," and I'm
3  sure I do not know the answer to that question now.
4      Q    And you testified earlier that your right to
5  retiree health benefits vested on June 30th of 2005,
6  correct?
7      A    I'm not sure "vested" is the correct word,
8  but became available when retirement vested.
9      Q    Became available.  Okay.  When your
10  retirement vested and your retirement didn't vest
11  until June 30, 2005; is that right?
12      A    Right.
13      Q    And whether you agreed or not, you were
14  informed in the year 2000, were you not, that that was
15  the case?
16      A    That is correct.
17      Q    And if you retired earlier, you wouldn't
18  have had health benefits; is that right?
19      A    That is correct.
20      Q    And you understood then -- assumed the
21  retirement provision is effective and not unlawful as
22  you contend if you were admitted as a partner, you
23  would have -- your period of employment as an employee
24  would have ended at that point.  You understood that,
25  right?  If you're admitted as a partner, you're no



1          CHARLES WESTBROOK MURPHY

2          MR. SALZMAN:  I'm sorry, Eric.  I'm not

3    following your question.  You said in the second

4    paragraph?

5          A    I'm not either.

6    BY MR. NELSON:

7          Q    Second paragraph, second sentence.

8          MR. SALZMAN:  The one that says, "This

9    mandatory retirement policy, according to PwC's

10   attorneys, is the reason that PwC cannot consider me

11   for promotion"?

12         MR. NELSON:  Yes.  My question relates to

13   that sentence.  And my question is, Can he explain the

14   reason why that he believes that PwC cannot consider,

15   underscoring the word "consider," him for partner?

16         A    I believe it's explained in the next

17   sentence.  Because what you've said is that they

18   considered me for partner, and if I became a partner,

19   they'd have to immediately take me out and shoot me.

20   That's what you've told the court.

21   BY MR. NELSON:

22         Q    In light of that, why would you want to be

23   considered for partner if the sole impact would be

24   your immediate retirement?

25         MR. SALZMAN:  Well, that assumes --

Page 249

CHARLES WESTBROOK MURPHY

1

2      A      That assumes that the age 60 --

3          MR. SALZMAN:  My objection is that assumes a

4  legal conclusion that we don't agree with.

5          MR. NELSON:  No, I understand that.

6          MR. SALZMAN:  Okay.

7  BY MR. NELSON:

8      Q.     Can you answer the question?

9      A      Well, it's in the first sentence in that

10 paragraph.  As Frederick Kessler used to say, the

11 villain in the piece is the mandatory retirement age.

12 If the mandatory retirement age was not there, then

13 the sole impact of my promotion would not be my

14 immediate retirement.

15     Q      I understand that, Murphy.  My question is,

16 Why would you want to be considered for partner if the

17 sole impact would be your immediate retirement?

18         MR. SALZMAN:  Same objection.

19     A      I don't believe that I said that I would.  I

20 said what I would like -- I have to get the mandatory

21 retirement age set aside before I could be considered

22 for partner, and once it's set aside, then there would

23 be no mandatory retirement.

24 BY MR. NELSON:

25     Q      You're not answering my question.  Is the



Page 250

CHARLES WESTBROOK MURPHY

1

2  answer you would not want to be a partner if the sole

3  impact was your immediate retirement?

4      A    Well, at this point --

5          MR. SALZMAN:  Objection.

6      A    -- it wouldn't make much difference because

7  I've retired already.  That may have been the case

8  from 2000 through 2006.

9  BY MR. NELSON:

10     Q    Okay.  Well, let's focus on July 1, 2000.

11 Why would you want to be admitted as a partner, or is

12 your testimony you would not want to be admitted as a

13 partner on July 1, 2000 if that were to result in your

14 immediate retirement?

15     A    If that would have resulted in my immediate

16 retirement, I would not have wanted to have been

17 admitted to a partnership.

18     Q    And the same question for July 1, 2004.  If

19 your admission as a partner on July 1, 2004 would

20 result in your immediate retirement, would you not

21 want that?

22     A    Same answer.

23     Q    The answer is, No, you would not want that;

24 is that correct?

25     A    That's right.



Page 253

CHARLES WESTBROOK MURPHY

1

2  BY MR. NELSON:

3      Q    Do you understand also that each year, many

4  partners have their compensation increased?

5      A    That is my understanding.

6      Q    And you understand that happens on a regular

7  basis?

8      A    That happens on a regular basis, and it's

9  based on an evaluation by other partners, both the

10  increases and the decreases.

11      Q    And do you think it's more often that

12  partners' income is increased or decreased?

13      A    I believe it, more often, is increased

14  because the income of the firm as a whole is

15  increasing.  So, even if the amount of each individual

16  partner in whatever -- if the partners' shares or

17  percentage of the firms' income stayed exactly the

18  same from year to year to year, it would have

19  increased simply because the firms' revenues were

20  increasing.

21          MR. NELSON:  Can we mark as Defendants'

22  Exhibit 78 a telecopier transmission from Dave Rose to

23  Eric M. Nelson, dated September 29, 2006?

24              (Defendants' Exhibit 78 was marked for

25  identification and was retained by counsel.)

Page 260

CHARLES WESTBROOK MURPHY

1

2  document Bates-numbered Murphy 00146 through '00148.

3          (Defendants' Exhibit 80 was marked for

4  identification and was retained by counsel.)

5          MR. SALZMAN:  Do you have one of those for

6  me, Eric?

7          MR. NELSON:  Oh, I'm sorry, Rick.

8          MR. SALZMAN:  That's all right.

9          Thanks.

10 BY MR. NELSON:

11     Q ·  Can you identify this document?

12     A     Appears to be a draft of a performance

13 appraisal prepared by Bob Bench for me covering four

14 or five different engagements during fiscal 1998.

15 It's a draft.

16     Q     Presumably, you've seen this before, have

17 you not?  It's produced from your files.

18     A     I believe so.

19     Q     Do you recognize the handwriting?

20     A     The handwriting is Bob Bench's handwriting.

21     Q     Do you see the last handwritten entry on the

22 last page?

23     A     Yes.

24     Q     Can you read that?

25     A     "Recommending redesignation in code 23 to

