CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
    ***CONFIDENTIAL***              Volume: I
  ***ATTORNEYS' EYES ONLY***        Pages: 1-231
                                    Exs: 94-103
```

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA


C. WESTBROOK MURPHY,
         Plaintiff              Docket No.
     vs.                        CA 05-1054
PRICEWATERHOUSECOOPERS, LLP,
         Defendant
         * * *
C. WESTBROOK MURPHY,
         Plaintiff              Docket No.
     vs.                        CA 02-982
PRICEWATERHOUSECOOPERS, LLP, et
al,
         Defendants
         * * *
HAROLD SCHULER,
         Plaintiff              Docket No.
     vs.                        CA 05-2355
PRICEWATERHOUSECOOPERS, LLP,
         Defendant



         DEPOSITION of ROBERT BENCH, a
witness called by and on behalf of the Plaintiff C.
Westbrook Murphy, taken pursuant to the Federal
Rules of Civil Procedure, before Heidi B. Stutz,
Certified Shorthand Reporter No. 146599S and Notary
Public in and for the Commonwealth of Massachusetts,
at the offices of Krokidas & Bluestein, 600 Atlantic
Avenue, Boston, Massachusetts, on Wednesday,
November 29, 2006, commencing at 10:04 a.m.

HENNESSEY & LANGE COURT REPORTING
617-523-1874

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1   APPEARANCES:

 2         RICHARD A. SALZMAN, ESQ.
           Heller, Huron, Chertkof, Lerner, Simon &
 3         Salzman
           1730 M Street, NW, Suite 412
 4         Washington, D.C. 20036
           202-293-7110
 5             On behalf of the Plaintiff C. Westbrook
               Murphy
 6
           DAVID L. ROSE, ESQ.
 7         Rose & Rose
           1320 19th Street, NW, Suite 601
 8         Washington, D.C. 20036
           202-331-8555
 9             On behalf of the Plaintiff Harold Schuler

10         ERIC M. NELSON, ESQ.
           STEPHEN L. SHEINFELD, ESQ.
11         Winston & Strawn, LLP
           200 Park Avenue
12         New York, New York 10166-4193
           212-294-2646
13             On behalf of the Defendant

14   ALSO PRESENT:  C. Westbrook Murphy

15

16

17

18

19

20

21

22

23

24
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

1                    I N D E X
2
  WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS
3
4 ROBERT BENCH         4      216
5
  EXHIBITS:           DESCRIPTION              PAGE
6
7    94          Document PwC04043              27
8    95          Document PwC03452-03491        75
9    96          Document PwC03589-03592        87
10   97          Document PwC08825-08850        134
11   98          Document PwC19581-19593        178
12   99          Document PwC19539-19569        196
13   100         Document PwC19506-19528        198
14   101         Document PwC19488-19504        208
15   102         Document PwC03241-03243        216
16   103         Document PwC03238-03240        216
17
18
   ***ALL EXHIBITS KEPT BY ATTORNEY SALZMAN***
19
20
21
22
23
24

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 63

1  maybe Alan Schott, I don't remember.
2      Q.  Anyone else that you can recall?
3      A.  No.  And I'm guessing at those five.  I'm
4  assuming the RAS partners plus the head of banking
5  practice, who I think was John Fletcher.
6      Q.  Okay.  And was there someone from the
7  human resources office?
8      A.  Yes, there would have been.
9      Q.  What was that person's role?
10     A.  It would have either been Darlene Shea or
11 Lisa Englehart.
12     Q.  Okay.
13     A.  I don't recall which one, but probably one
14 of those two.
15     Q.  What was the HR person's role at the
16 meeting?
17     A.  Well, the HR person's role, first of all,
18 there is a formal role for the HR person at these
19 meetings and in terms of their formal role, I
20 suggest you ask the firm.
21     Q.  Well, what was your understanding of their
22 role?
23     A.  Yeah.  But my understanding is that the HR
24 person's first job is to be sure that the review of

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 64

1   the person includes a review of the person's file of
2   performance evaluations completed for the person
3   during the year on the engagements the person was
4   on.  And so the HR person's first job is to make
5   certain that whatever performance evaluations should
6   have been completed by various people got to that
7   file before the meeting.  And then that HR person
8   designates to the attendees at the meeting the
9   particular files that they will review and
10  summarize.  And then those people make a
11  presentation to the rest of the group on the people
12  whose files they have, okay.
13          So in my stack is Steve and Eric and
14  my job in front of the rest of the group is to say,
15  well, Eric worked on six engagements, he was rated
16  one on all of his engagements, seems to be strong on
17  interacting with the client, seems to be strong in
18  technical things based on the documentation that's
19  in the file, and that's the presentation.  And my
20  view would be that Eric this year should be a one.
21      Q.  And would the discussion at that meeting
22  also include a discussion about sponsoring somebody
23  for partnership?  Was that all part of the same kind
24  of a meeting, annual performance and what's the next

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1  role for this person?

2     A.   What's the next -- well, at one point, at

3  one point -- for the longest time there was a

4  designation on the evaluation forms that said what's

5  the next role for this person or what's the step?

6  And again, that's been fluid and I think that

7  they've carried that, well, what's the development

8  plan for the person.

9          But at that point at the end of the

10 day the discussion was you end up rating all the

11 people and then you discuss compensation based on

12 the ratings, what might be the compensation

13 recommendations, and then maybe yes, maybe no, but

14 anyway, do we have any potential partner candidates

15 in this group.

16    Q.   Okay.  Did anyone keep track of the

17 potential partner candidates that were mentioned?

18 Was there any kind of a list kept?

19    A.   The HR, it gets back to the -- the role of

20 the HR person is to keep notes of all the meetings.

21    Q.   So the HR person did take notes of those

22 meetings?

23    A.   (Witness nods head.)

24    Q.   Yes?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 85

1    question was quite clear.
2            MR. NELSON:  I object to the form of
3    the question.  I don't think it's quite clear.  I
4    think it's objectionable.
5        A.   I know the answer is yes, but could you
6    please repeat the question?
7        Q.   My question was were these the global core
8    criteria that you and the other ARC committee
9    members used in connection with the Albright partner
10   admission process?
11       A.   These are criteria that we would have
12   considered for every one of our staff.
13       Q.   Okay.  And when you were making the
14   decision about whether to sponsor Mr. Albright for
15   partnership were these the criteria that you
16   employed?
17       A.   These would have been the criteria that we
18   would have thought about and considered whether
19   these guidelines existed or not.
20       Q.   Got it, okay.  With respect to the
21   leadership category, was there some method that you
22   used to measure the candidates' either performance
23   or credentials with respect to this core criteria
24   leadership?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

1   A.   I'm going to try to answer your question
2   and I'm going to try not to be argumentative.  And
3   again, I'm not a lawyer, but to proceed down this
4   list item by item as to what we did or did not do
5   six years ago, I don't recall.
6   Q.   Okay.
7   A.   But the performance evaluation forms for
8   individuals would have encapsulated this, these
9   concepts or these elements, I guess, elements.  And
10  so all RAS personnel very more than likely, without
11  doing a check, without doing a tick, ticking and
12  checking exercise, would have been thought about in
13  these various areas.
14  Q.   Okay.  Did you have any minimum threshold
15  with respect to chargeable hours that a candidate
16  needed to have in order to be sponsored for partner?
17  A.   No.
18  Q.   Did you have any minimum threshold in
19  terms of the amount of business sales revenue that a
20  candidate needed to have brought in in order to be
21  sponsored for partner?
22  A.   No.
23  Q.   Did you have any minimum threshold with
24  respect to the number of engagements that a

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 124

1  description of the significant public educational,
2  alumni and charitable appointments, trade
3  associations, publications, public speaking,
4  conference presentations, etc., do you see that?
5      A.   Yes.
6      Q.   Are you familiar with the term "thought
7  leadership" --
8      A.   Yes.
9      Q.   -- at PWC?
10            Is this the category of the
11 application that essentially asks for description of
12 examples of thought leadership?
13     A.   Yeah.  Number one, I have a question as to
14 whether thought leadership was in the language at
15 this time.
16     Q.   Okay.
17     A.   Anyway, but if it had been in the language
18 at this time, external, these external activities
19 would have equalled thought leadership because they
20 have publications here and public speaking.
21     Q.   Okay.  And in terms of the information
22 that Mr. Albright has provided here, did you have an
23 impression of whether that reflected a high degree
24 of thought leadership, low degree of thought

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 125

1  leadership?

2          MR. NELSON:  Just note my objection.
3  Again, I don't know who provided this information.
4          MR. SALZMAN:  Fair enough.
5     Q.   With respect to the information that is
6  reflected here, what's your characterization or your
7  impression of the degree of external activities,
8  thought leadership type of activity?
9     A.   The first answer is that it's modest as
10 shown here.  The second answer is, because I was on
11 many of his jobs one way or another, he was
12 exercising all sorts of thought leadership on site
13 on the project in terms of dealing with the various
14 issues that he dealt with.  Third -- and I'm glad
15 you asked the question because maybe it will be
16 helpful.  If he's traveling 70 percent of the time
17 and charging 1800 hours a year, there's no time.
18 That's what we wanted Wesbrook to do.  That's why
19 what we did with Westbrook.
20    Q.   Meaning he was doing more of the thought
21 leadership external activities stuff?
22    A.   Well, he had the time.  He wasn't charging
23 the hours that these people were.  They were paying
24 for Westbrook.  They're out earning their money so

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

1  Westbrook can make speeches. That's the balance we
2  tried to achieve.
3      Q. Okay. Was that the role that you assigned
4  to Mr. Murphy?
5      A. That's the role that Mr. Murphy ended up
6  doing when he wasn't charging hours. And he charged
7  many less hours than David, so that's the balance.
8  Somebody's got to earn the money, somebody's got to
9  project the practice.
10         MR. SALZMAN: I think the, our host
11  popped her head in to tell us something, so let's
12  take a one-minute break, if we can.
13         (A brief recess.)
14     A. So is that responsive to that question?
15     Q. Yes, thank you.
16         Would you agree with me that that,
17  in terms of this category, external activities, that
18  Mr. Murphy had a greater amount of external activity
19  that he had participated in than Mr. Albright?
20         MR. NELSON: As reflected in this
21  document?
22     A. I would guess at this time, whatever it
23  is, summer of '98, that Westbrook clearly would have
24  had more speaking appearances, publications, etc.,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

1      A.   The sponsor is the committee.
2      Q.   Okay.  Did the committee talk about or
3  consider sponsoring Mr. Murphy?
4      A.   The committee only considered one-rated --
5  people with sustained outstanding performance over
6  time, generally one-rated people.  Westbrook was not
7  a one-rated person or did not have sustained
8  performance over time.
9      Q.   So is it your testimony that the committee
10 did not consider Mr. Murphy?
11     A.   My testimony is the committee considered
12 candidates with sustained outstanding performance
13 over time who were rated one.  That's my testimony.
14 I think that's accurate, over time.
15     Q.   At any ARC committee meeting in which the
16 issue of partnership was discussed did you propose
17 Wes Murphy as someone who the committee should
18 consider sponsoring?
19     A.   The committee doesn't propose.  I mean, no
20 member of the committee proposes.
21     Q.   Don't focus, I'm not trying to attach any
22 formal significance to the word "propose."  In any
23 of the ARC committee meetings was his name discussed
24 as someone who should be thought about, considered

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 171

1  for partnership?
2             MR. NELSON: That's been asked and
3  answered, I think.
4      A.  I don't recall anybody who did not have
5  sustained outstanding performance over time and
6  rated on a sustained basis less than one considered
7  to be a partner.
8      Q.  So is the answer to my question that, to
9  your recollection, Mr. Murphy was not discussed at
10 any ARC committee meetings as someone who would be a
11 candidate for partnership?
12     A.  Correct.
13     Q.  Okay. Could you sponsor an employee who
14 was already age 60 for partnership?
15     A.  I couldn't sponsor any employee at any age
16 for partnership.
17     Q.  Could the ARC committee sponsor, to your
18 understanding, an employee who --
19     A.  The ARC committee could select -- the ARC
20 committee does not select based on age whatsoever.
21 The ARC committee has criteria which is sustained
22 outstanding service over time.
23     Q.  Okay. You understood in the 2002, 2003
24 time frame that the PWC partnership agreement had a

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 172

1   provision regarding mandatory retirement at age 60,
2   is that correct?
3       A.   Generally, yes, generally, yes.
4       Q.   How could an employee who was already age
5   60 be a candidate for partnership, to your
6   understanding?
7            MR. NELSON:  I object to the form of
8   the question, to his understanding.
9            MR. ROSE:  What other kind of
10  understanding, who else's understanding should it
11  be?
12           MR. NELSON:  You're asking a
13  hypothetical question on the basis of understanding.
14  He may or may not have any understanding.
15      Q.   Go ahead, Mr. Bench.
16           MR. NELSON:  And I think it's asked
17  and answered.
18      A.   No, I mean, if you're asking -- well, the
19  answer is the committee, if the committee had a --
20  no, I'll back off of that.  The committee did not
21  consider age in its deliberations whatsoever.
22      Q.   Okay.  Let me ask you a hypothetical.
23      A.   We deal with hypotheticals, do we?
24      Q.   Yeah.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 185

1  all the years.
2         MR. NELSON:  Yeah, I understand.
3         MR. SALZMAN:  Yeah, for FY --
4     Q.  If you take a look again at page 19587,
5  under, again under the question 9 with respect to
6  your specific counselees or mentees, you identified
7  David Sapin as a partner candidate for FY '01, do
8  you see that?
9     A.  Yeah.
10    Q.  And then you identify Jeff Lavine as a
11 partner candidate for FY '02, is that right?
12    A.  Yeah.
13    Q.  So as of September of 1999 you had already
14 identified Jeff Lavine as a partner candidate, is
15 that correct?
16    A.  As of when?
17    Q.  September of 1999.
18    A.  No, that wouldn't have been -- oh, I'm
19 sorry, let me think about that question.
20    Q.  You filled out this form at least as of
21 9/24/99, is that right?
22    A.  '99.  I see, I get that, yeah.  This is as
23 of.
24    Q.  As of that date.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 186

1   A.   For June, 2000.

2        MR. NELSON:  You haven't asked what
3   these entries mean.

4   Q.   Is the answer to my question that, yes,
5   you had identified Jeff Lavine as a partner
6   candidate?

7        MR. NELSON:  Potential or actual?

8   A.   Can I go back?  There it is.  David
9   Albright, Dave Sapin, Jeff Lavine and Harold
10  Schuler.  These were four individuals who I felt
11  were meeting the criteria, I felt were meeting or
12  were, or blossoming into the criteria to be a
13  partner candidate.  One had already been a partner
14  candidate.  But they were showing the sustained
15  performance over time, cross spectrum, that they
16  should be followed.

17  Q.   Okay.  By the time that you filled out
18  this form Jeff Lavine and Dave Sapin had been
19  serving as directors for three months or so, is that
20  right?

21  A.   I guess.  We have to reconcile that with
22  the last discussion.  Whenever they make -- when did
23  they make director?  You're saying --

24  Q.   As of July of '99.