Page 1

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 3
    ----------------------------------------X
 4  C. WESTBROOK MURPHY, et al.,

 5                     Plaintiffs,         Case No. 02-982
                                              (RJL/DAR)
 6            vs.

 7  PRICEWATERHOUSECOOPERS, LLP, et al.,

 8                     Defendants.
    ----------------------------------------X
 9  C. WESTBROOK MURPHY, et al.,

10                     Plaintiffs,         Case No. 05-1054
                                              (RJL/DAR)
11            vs.

12  PRICEWATERHOUSECOOPERS, LLP, et al.,

13                     Defendants.
    ----------------------------------------X
14  HAROLD SCHULER,

15                     Plaintiff,          Case No. 05-2355

16            vs.

17  PRICEWATERHOUSECOOPERS, LLP, et al.,

18                     Defendants.
    ----------------------------------------X
19
20            DEPOSITION OF JOHN F. CARTER

21                 New York, New York

22              Friday, October, 20, 2006

23

24  Reported by:
    ELIZABETH SANTAMARIA
25
```

```
                                                          Page 2
 1
 2
 3
 4
 5
 6                        October 20, 2006
 7                        10:24 a.m.
 8
 9
10         DEPOSITION of JOHN F. CARTER, held at
11    the offices of Winston & Strawn, 200 Park
12    Avenue, New York, New York, pursuant to
13    Notice, before ELIZABETH SANTAMARIA, a
14    Notary Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:05-cv-01054-RJL    Document 76-7    Filed 04/10/2008    Page 3 of 18

Page 3

1

2  Appearances:

3

4       HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN

5       Attorneys for Plaintiff

6       C. Westbrook Murphy

7            1730 M Street, N.W. - Suite 412

8            Washington, D.C. 20036-4517

9       BY:    TAMMANY M. KRAMER, ESQ.

10

11      WINSTON & STRAWN LLP

12      Attorneys for Defendant

13      PriceWaterhouseCoopers, LLP

14           200 Park Avenue

15           New York, New York 10166-4193

16      BY:    ERIC M. NELSON, ESQ.

17             STEPHEN L. SHEINFELD, ESQ.

18

19

20

21

22

23

24

25

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

```
                                                              Page 4
 1

 2     Appearances (cont'd):

 3

 4          ROSE & ROSE, P.C.

 5          Attorneys for Plaintiff

 6          Harold Schuler

 7                1320 19th Street N.W. - Suite 601

 8                Washington, D.C. 20036

 9          BY:   DAVID L. ROSE, ESQ.

10          (Present via telephone)

11

12

13          ALSO PRESENT:  C. Westbrook Murphy

14                         John Daly, Esq.
                           Office of the General Counsel - PWC
15

16                         --oOo--

17

18

19

20

21

22

23

24

25
```

Page 113

1                         Carter
2        Q.      Yes, the average number admitted.
3                MR. NELSON:  From 1998 to date?
4                MS. KRAMER:  Yes.
5        A.      I can't --
6                MR. NELSON:  You can borrow my
7        calculator and we can probably get an
8        exact average.
9        A.      The reason that's difficult to answer
10   is the firm has changed quite significantly since
11   the time of the merger and the divestiture of our
12   consulting practice, valuations practice, business
13   recovery services practice.
14               At the date of the merger we were
15   admitting in the 200s.  That fell post-disposition,
16   economic slump of 2001-2002, to probably around 100
17   and it's probably back in the 140-something range.
18   148 was the exact number last fiscal year.  So it
19   has fluctuated.  So I would not give you an average
20   and I am not sure the average is meaningful, given
21   the change in the partnership during that period of
22   time.
23       Q.      Can somebody who is 60 and is an
24   employee for PWC, can that person be made partner?
25       A.      I would say that if they meet the

114

1        Carter

2  qualifications, they could be.  I'm not quite sure

3  why they would be, but ...

4              Age has nothing to do with it.

5       Q.   Do you know of any instances where

6  somebody of 60 or over has been admitted to

7  partnership?

8       A.   I do not, but I think it's important

9  to know that as individuals are going through the

10 admissions process, I have no idea of the age of the

11 candidates.

12             MS. KRAMER:  Let's mark this as

13         Exhibit 19.  Do you object to Mr. Murphy

14         viewing this document?

15             MR. ROSE:  I couldn't hear what the

16         objection was.

17             MS. KRAMER:  It is marked for

18         attorneys of record only, two-page

19         document, PWC41074108.

20             MR. NELSON:  Give me a second.

21             (Recess taken.)

22             MR. NELSON:  We have no objection

23         to Mr. Murphy seeing this at the

24         deposition understanding that it is not

25         losing its For Attorneys of Record Only

Page 163

1           Carter

2  assignment is going to be for the next year?
3       A.   After the completion of the system,
4  and it is reviewed and approved by the partner
5  affairs committee and the board, the information is
6  confirmed with the primary reporting partner whose
7  responsibility it is to have a meeting with the
8  partner to describe their overall performance
9  assessment for the year, their responsibility and
10 share level for the next year.
11           Oftentimes that's attended by another
12 partner, maybe a business unit leader or a member of
13 the extended leadership team, so that there are two
14 people who deliver the message to provide additional
15 coaching to the individual partner.
16      Q.   Does Dennis Nally have a primary
17 reporting partner?
18      A.   Dennis Nally is evaluated by the
19 management evaluation and compensation committee of
20 the board.  He is also evaluated globally by our
21 global CEO, who goes through a similar process with
22 a global management evaluation and compensation
23 committee, because 20 percent of his income is paid
24 for by the global organization.
25           So he is evaluated both within the

```
 1                      Carter
 2    U.S. by the U.S. board and also a component of his
 3    evaluation is currently by DiPiazza, who is our
 4    global CEO, and the global governance process.
 5          Q.    How many countries are part of the
 6    global PWC firm?
 7          A.    We are in approximately 140
 8    territories.
 9          Q.    Globally how many partners are there?
10          A.    Approximately 9,000.
11          Q.    Does Dennis Nally have any other
12    commenting partners?
13          A.    2150.  I mean really.  He serves for
14    the partners and he gets lots of feedback and input.
15          Q.    He gets that directly?
16          A.    I would say he gets it pretty
17    directly.
18          Q.    Does he get that as part of a formal
19    evaluation process?
20          A.    Formal evaluation, as I indicated, is
21    done by the management evaluation and compensation
22    committee of the board.  But Dennis is out with the
23    partners and receives lots of input.  He attends two
24    partner meetings every weekends during the fall
25    partner meeting series, he is out in offices, he is
```

```
 1                         Carter
 2     doing client visits, he is visiting with partners
 3     one-on-one.  He is very in touch with the partners
 4     and gets lots of feedback.
 5            Q.     What is the process by which he is
 6     evaluated by the MECC?
 7            A.     He completes an annual goal setting
 8     process.
 9                   The leadership team or management
10     committee uses a modified version of the partner
11     balance scorecard.  It's basically a Word document,
12     the same dimensions as the balance scorecard.  We
13     set primary and secondary objectives by each of the
14     four components of the balance scorecard -- people,
15     quality, partnership and teamwork -- and those goals
16     are reviewed with the MECC, M-E-C-C, management
17     evaluation and compensation committee, of the board.
18                   And at the end of the year he will do
19     a self-assessment similar to all the other partners
20     and the MECC will review that assessment.  They get
21     input from the board so they'll solicit it from all
22     board members at large and obviously they have
23     visibility to him throughout the year.  And they do
24     a formal evaluation of him that is presented and
25     discussed with him from a U.S. perspective by the
```

Page 166

```
 1                        Carter
 2    lead director of the board who chairs the management
 3    evaluation and compensation committee.  As I
 4    indicated there is a global process, too, but I
 5    don't know if you want me to go into that or not.
 6         Q.    Does the U.S. board have input into
 7    that global process?
 8         A.    There are U.S. board members who sit
 9    on the global board and there are individuals from
10    the U.S. on the global board who sit on the
11    governance committee, which is the equivalent of the
12    MECC in the U.S. that would oversee the compensation
13    of those who go through the global management
14    evaluation and compensation process.
15         Q.    With respect to the inappropriate
16    behavior, negative allocation we were talking about,
17    does that include conduct-related issues as opposed
18    to performance-related issues?
19               Do you understand the distinction?
20         A.    What do you mean by conduct?
21         Q.    Say a partner is caught boozing it up
22    at a client meeting.  Is there some action or
23    sanction that can be taken with respect to that
24    inappropriate behavior?
25         A.    I would classify that as more of an
```

Page 169

1                        Carter
2    personal relationship.  Within our organization that
3    is not forbidden, but if you are in a reporting
4    relationship you are disclose it, so that you are
5    not in a reporting relationship.
6          Q.     Can a partner choose the person who
7    serves as their primary reporting partner?
8          A.     Usually not.  Usually they are
9    assigned based upon the organizational structure
10   within a particular business unit.  So normally they
11   are assigned as opposed to input of somebody saying,
12   you know, "I would rather have Mary than Joe."
13         Q.     Who rates the performance of the
14   board members?
15         A.     The board members each have a primary
16   reporting partner based upon their, if I could use
17   the term, day job; their job, board-related job.  So
18   each of them is either a line partner or a business
19   unit leader, and so -- and their natural reporting
20   cycle would be assessed as any other partner.
21               One of the duties of the lead
22   director, as specified in the P&PA, is that that
23   individual will assess their performance as a board
24   member and does a review of the ultimate
25   compensation recommendations of all the board

                                                                    Page 170
1                        Carter
2    members.
3              MR. ROSE:  The lead partner?  Is
4         that what you said?
5              THE WITNESS:  The partners and
6         principal agreement specifies that the
7         board will elect, if you will, a lead
8         director and the lead director has
9         particular responsibilities outlined in
10        the partnership agreement that the
11        partners have delegated to that lead
12        director.
13             MR. ROSE:  Thank you.
14             THE WITNESS:  Absolutely.
15        Q.   You said earlier that you spent
16   100 percent of your time doing sort of internal firm
17   stuff.  Can you give me a ballpark percentage of how
18   much of their time the board members spend on board
19   related duties?
20        A.   It does vary.  As you can appreciate,
21   the lead director probably spends more time than a
22   board member who is not the lead director and a
23   board member who is also a global board member, of
24   which there are six, is going to spend more time
25   than just a U.S. board member.  On average I would

Page 173

1                           Carter
2      the various board committees, do they also have
3      primary reporting partners in connection with their
4      day jobs?
5             A.      Those who serve on those board
6      committees are board members; therefore, it follows
7      the same.
8             Q.      Who would the primary reporting
9      partners be for line of service leaders?
10            A.      In today's current structure, the
11     line of service leaders report to the managing
12     partner of operations.
13            Q.      Who is that?
14            A.      Greg Garrison.
15            Q.      With respect to the U.S. leadership
16     team, the other team members, do they have primary
17     reporting partners?
18            A.      Yes.
19            Q.      Generally speaking who are the
20     primary reporting partners for those individuals?
21            A.      Generally they are Greg Garrison or
22     Dennis Nally.
23            Q.      Do partners vote for who their line
24     of service leader is?
25            A.      They do not.

```
                                                    Page 201
 1                        Carter
 2             So that would be an example that I
 3    can think of but, again, for the record I'm not sure
 4    what the board discussed.
 5             MS. KRAMER:  Please mark
 6        Exhibit 24.
 7             (Plaintiff's Exhibit 24, document
 8        bearing Bates Nos. PWC00002 - 00028, marked
 9        for identification, as of this date.)
10        Q.    Mr. Carter, I am showing you the
11    PriceWaterhouseCoopers partners and principals
12    agreement as in effect April 1, 2001, Bates number
13    PWC00002 through 00028.
14             MR. ROSE:  Through what?
15             MS. KRAMER:  02 through 28.
16             MR. ROSE:  Is that the partnership
17        agreement?
18             MS. KRAMER:  It is the 2001
19        partnership agreement.
20             MR. ROSE:  Okay.  Thank you.  I'm
21        sorry.
22        Q.    I would like to direct your attention
23    to page PWC 22, Section 11.2 on required withdrawal.
24             MR. NELSON:  This document wasn't
25        produced with the notations and the
```

1                       Carter
2           underscoring.  I just want to note that
3           for the record.
4           Q.    Reviewing Section 11.2, required
5    withdrawal, sitting here today can you tell me if
6    there is any difference between the required
7    withdrawal provision that's currently in effect
8    under the partners and principals agreement and what
9    is reflected here in Exhibit 24?
10          A.    In substance, I don't believe any
11   revisions have been made to these provisions.
12          Q.    Can you tell me any examples of
13   instances where withdrawal has been required by the
14   firm?
15          MR. NELSON:  I can't hear you,
16       Tammany.  Please speak up.
17          Q.    Can you describe examples of
18   instances where withdrawal has been required by the
19   firm?
20          A.    Required as specified in Section
21   11.2?
22          Q.    Yes.
23          A.    Since I have been in the role, there
24   was one request for required withdrawal.
25          Q.    What were the circumstances of that

Page 203

1                      Carter
2    request?
3        A.    The circumstances was for -- again,
4    my recollection serving me, it was
5    performance-related coupled with some questionable
6    personal conduct.  The individual ultimately
7    voluntarily withdrew.
8        Q.    Do you remember what stage the
9    request for withdrawal got to before the person
10   voluntarily withdrew?
11       A.    The individual was delivered a letter
12   requesting that they withdraw and they had an
13   appearance before the partner affairs committee with
14   their counsel.  A vote of the partner affairs
15   committee was never taken.
16       Q.    To your knowledge, what situations,
17   if any, have there been where a partner was given
18   the suggestion that withdrawal from the firm would
19   be preferable?  Short of going through this
20   formalized process that's described in Section 11.2.
21             Do you understand my question?
22             MR. NELSON:  Can I have the
23       question back.
24             (Record read.)
25             MR. NELSON:  Just note my objection

```
                                                              223
 1                         Carter
 2         asking questions?
 3              MR. NELSON:  He wanted to know if
 4         the mandatory retirement age for employees
 5         is illegal.
 6         Q.   Would the same logic of wanting to
 7   preserve vitality and keeping it fresh extend to
 8   retirement age for nonpartners?
 9              MR. NELSON:  You know, this is
10         having a discussion, an argument, over
11         something that's hypothetical.
12         A.   I have no opinion on that.
13         Q.   What instances, if any, are you aware
14   of a partner who wanted to work past the age 60,
15   past the mandatory retirement age?
16              MR. NELSON:  Work where?
17              MS. KRAMER:  Work at PWC.
18         Q.   What instances are you aware of when
19   a partner wanted to continue as a member of the
20   partnership at PWC past the age of 60?
21         A.   As you may be aware, the partnership
22   agreement, the board has the ability to extend the
23   retirement age for partners for two one-year periods
24   of time.  And on a very limited basis, one or two
25   individuals a year, partners are extended beyond
```

```
                                                          Page 224
 1                       Carter
 2    age 60 for very specific client success reasons or
 3    client service reasons.  So I am aware of those
 4    instances.
 5         Q.    Are you aware of any other instances
 6    that you may have found out about some other way
 7    where a partner wanted to continue on in the
 8    partnership past 60?
 9         A.    I have not been party to those
10    conversations.
11         Q.    What is the average age of persons
12    admitted to partnership at PWC?
13         A.    I don't know the answer to that.
14         Q.    Is that something that would be
15    calculable?
16         A.    Certainly.
17         Q.    So you are aware of the average
18    retirement age but not the average promotional age?
19               MR. NELSON:  Objection to the
20         question.
21               MR. ROSE:  For employees?
22               MS. KRAMER:  For employees who
23         joined the partnership.
24         Q.    I would like to direct your attention
25    to Exhibit 24, Page 21, Section 11.5, "Conduct After
```