UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                              :
C. Westbrook Murphy and      :
Harold Schuler,           :
        Plaintiffs,     :
      v.             : Civil Action No.
                  : 02-982 (RL/DAR)
PricewaterhouseCoopers, LLP, :
et al,             :
        Defendants.    :
- - - - - - - - - - - - - - - - - x
                              :
C. Westbrook Murphy and      :
Harold Schuler,           :
        Plaintiffs,     :
      v.             : Civil Action No.
                  : 05-1054 (RJL)
PricewaterhouseCoopers, LLP,  :
        Defendant.     :
- - - - - - - - - - - - - - - - - x

Washington, D.C.

Friday, November 17, 2006

Deposition of

        WILLIAM J. LEWIS

a witness of lawful age, taken on behalf of the

Plaintiff Murphy in the above-entitled action, before

Edward J. Greenberg, Notary Public in and for the

District of Columbia, in the offices of Heller, Huron,
Chertkof, Lerner, Simon and Salzman, PLLC, 1730 M

Street, Northwest, Suite 412, Washington, D.C. 20036,

commencing at 10:04 a.m.

Diversified Reporting Services
202-467-9200

Page 2

APPEARANCES:

On Behalf of Plaintiff Murphy:

RICHARD A. SALZMAN, ESQ.
Heller, Huron, et al.
1730 M Street, Northwest, Suite 412
Washington, D.C.  20036
202/293-8090

On behalf of Plaintiff Schuler:

DAVID L. ROSE, ESQ.
Rose & Rose, PC
1320 19th Street, Northwest, Suite 601

Washington, D.C.  20036

202/331-8555

On Behalf of the Defendant:

STEPHEN L. SHEINFELD, ESQ.

Winston & Strawn, LLP

200 Park Avenue

New York, New York  10166-4193

212/294-2650

Also Present:

C. Westbrook Murphy, Plaintiff

Diversified Reporting Services
202-467-9200

1    Q    And how did he perform in that function?

2    A    He did a good job.

3    Q    With respect to any projects that you recall

4    working directly with Mr. Murphy on, how would you

5    describe his performance on the roles that he actually

6    fulfilled?

7    A    On tasks that, you know, Westbrook had to do,

8    he took them very seriously, he worked very hard on

9    them, and the product he delivered in the areas where I

10   was involved was a very good product.

11   Q    Okay.  Did you consider him to be a hard

12   worker?

13   A    I think Westbrook worked hard at any task that

14   he was given.  But I think Westbrook's track record over

15   the time that I've known him was that he didn't -- he

16   wasn't always working hard.  He was often not

17   productively, you know, engaged.

18   Q    What did you believe the reason for that was?

19   A    I believe part of it was the narrowness of the

20   subject matter expertise that he had.  I believe part of

21   it was that, as I said earlier, he didn't take the

22   opportunity to broaden his subject matter expertise into

Page 107

1    other areas.  I don't -- there were not significant

2    sales efforts on Westbrook's part where he sold work

3    that he could deliver.  So he generally needed someone

4    to provide him with the work that he would have to do --

5        Q    What's the basis of your statement?

6             MR. SHEINFELD:  You're stepping on the back of

7    his answer.

8             THE WITNESS:  I think I've --

9             BY MR. SALZMAN:

10       Q    I'm sorry.

11       A    No, that's okay.

12       Q    I did interrupt you, Mr. Lewis.

13       A    That's okay, I think I was finishing.

14       Q    Okay.  So you've listed for me what you

15   believe to be the reasons for your impression that Mr.

16   Murphy was not always working hard; is that fair?

17       A    I'm not -- I can't recall the question.  The

18   question you asked, I thought I answered.  But I'm not

19   sure --

20       Q    If that was the question?

21       A    If that was the question you asked me.

22       Q    Were you trying to describe why you felt like

Page 149

1    as a managing director, did not, what he did, what Bob

2    was referring to, so I can't give you a point of view.

3          BY MR. SALZMAN:

4      Q    Okay.  Do you see the next sentence?  It says

5    "He generates sales," and then there's a number that

6    appears to be impossible to read.

7          MR. ROSE:  It's $5 million.

8          BY MR. SALZMAN:

9      Q    I believe it is $5 million.  I'll represent

10   that to you.  "He oversees large engagement revenues,

11   and he deals with the executive vice president level

12   continually at clients, and at the partner level

13   internally."

14          Do you see that?

15     A    I do.  I see what's there.  I can't read it

16   either, but I see what's there.

17     Q    If you just assume for the moment that the

18   number there is $5 million, do you have any reason to

19   believe what the e-mail says is not true?

20          MR. SHEINFELD:  Objection to form of the

21   question.

22          THE WITNESS:  I can't take a point of view on

Page 150

1   it.  I know nothing about the facts.  Anything I said

2   would be speculation one way or the other.

3          BY MR. SALZMAN:

4      Q    Do you remember finding out what happened with

5   respect to the proposal to promote Mr. Murphy to

6   managing director at that time?

7      A    Like I said, I think I indicated earlier that

8   I can't recall whether I even knew about it.

9      Q    Did you ever learn what happened in respect to

10  it?

11     A    I learned when we were doing the latest

12  managing director proposals, that it did not happen.

13  That's all I know.

14     Q    Okay.  This will be marked as Exhibit 75.

15                          (Deposition Exhibit No. P-75

16                           was marked for

17                           identification.)

18          BY MR. SALZMAN:

19     Q    I'm showing you Deposition Exhibit No. 75.  It

20  is an one page document, PWC1028.  It's an e-mail from

21  Mr. Schott, Paul Schott, to Darlene Shea.  It's dealing

22  with the same subject matter, the managing director

Diversified Reporting Services
202-467-9200

Page 175

1      Q     The one discussion you are referring to, when

2   did that take place?

3      A     I don't recall exactly, but it was in the last

4   several years.

5      Q     Can you ball park it for me?  2002?  2003?

6      A     I would say it was in there, one of those

7   years, 2004.

8      Q     And what did he say to you at that point?

9      A     I seem to recall he had started to insert into

10  his plan a number of items related to his feelings, you

11  know, claims against the firm or feeling the firms

12  weren't treating him properly regarding -- I can't

13  remember exactly what it was, but he started to

14  introduce things that weren't about here's how I'm going

15  to go out and serve the clients into his plan, and one

16  of them was all right, I want to be a partner.

17          At that time, we had a discussion about what

18  the prospects were.

19      Q     Tell me about that discussion, if you can

20  recall.

21      A     I can't recall all the details.  You know, the

22  gist of it was that the process, the elements of what I

Page 176

1    think it would have taken would have been he would have

2    had to demonstrate sustained performance, sustained high

3    rate  performance overall evaluations, which to that

4    point, I don't believe he really had, so that would be a

5    development point.  He would have to do that.

6              He would also have to -- there was a year

7    recently before that where he had a very large amount of

8    time that was not just non-chargeable, it was not

9    accounted for.  It was like 1,100 hours.

10             I remember telling Westbrook at that time that

11   was a problem, that sort of thing couldn't happen again,

12   and wasn't directionally consistent with what we would

13   expect of a partner, to be idle for 1,100 hours without

14   any record of what they did.

15             I remember having that discussion with

16   Westbrook.

17        Q    **What else do you recall about that**

18   **conversation?**

19        A    I also said that I felt that he would have to

20   demonstrate something where he was developing client

21   relationships to get work, getting repeat calls.  You

22   know, helping us appreciate that he could sustain

Page 177

1    himself and a group of people as a partner, which is

2    what we need to do.

3         We have to keep ourselves productively

4    employed as well as a group of people below us.  He

5    would have to be able to demonstrate that.

6         I think as I stated earlier, I didn't think he

7    had shown that.  Those were among the comments I had.

8    **Q    What else do you remember about that**

9    **conversation?**

10   A    That's all.  I think that's about what I

11   remember.

12   **Q    What did he say?**

13   A    I don't recall exactly what Westbrook said, to

14   be honest.

15   **Q    Did you document that conversation in any**

16   **fashion, any kind of note, memo to the file, anything?**

17   A    I can't recall.  There were times when we had

18   a documentation process for coaching and things like

19   this, that was more formal than others, and I can't

20   recall what was in place at that time, and whether I

21   documented it.

22   **Q    You were supposed to document it; right?**

Diversified Reporting Services
202-467-9200

Page 178

1           MR. SHEINFELD:  Object to the form of the

2    question.

3           THE WITNESS:  I don't know at that time what

4    the documentation requirements were.

5           BY MR. SALZMAN:

6       Q    In the 2002/2003 time frame, you don't know

7    what the documentation requirements were?

8       A    I don't remember exactly what they were, and I

9    don't know whether or not -- I just don't have any

10   recollection.

11      Q    You don't have any memory one way or the other

12   whether you did document it?

13      A    I don't have a memory.

14      Q    You haven't seen a document that reflects that

15   conversation, have you?

16      A    I don't recall whether I saw one.

17      Q    You said there was an 1,100 hour block of time

18   that was not accounted for.  Tell me what you meant by

19   that.

20      A    Each employee, at this time, would create a

21   development plan and would lay out what their goals

22   were, and then they would say here's what they did

Page 179

1    against those goals.

2           My recollection was that we had a discussion

3    at the review committee about the fact that we didn't

4    have any support for Westbrook's -- 1,100 hours of

5    Westbrook's time.

6           I can't recall whether initially it was

7    because we didn't have the development plan completed

8    for Westbrook, by Westbrook rather, that he didn't

9    complete it, or that he did complete it and that it

10   couldn't explain what he was doing for 1,100 hours.

11          It was an issue, a significant issue, which

12   after the process, I told him he couldn't expect to be

13   evaluated as a high performer and have the kind of

14   objectives that he was starting to articulate about

15   making partner if he had over half of his year

16   unaccounted for.

17      Q    **What position was he occupying at that time?**

18   **What was his title?**

19      A    I don't recall.  Like I said, I don't recall

20   which year it was, so I don't really recall what title

21   he had.

22      Q    **Was it before or after he was promoted to**

Page 180

1    managing director?

2        A    I can't recall.

3        Q    Do you have any idea?

4        A    No.

5        Q    He was promoted to managing director in the

6    Fall of 2004.  With that as a benchmark, what's your

7    best memory?

8        A    I'm sorry.  I really can't recall, even what

9    year he was promoted to managing director.  I'm sorry.

10   I don't have a recall of those years specifically.

11       Q    Did you ask Mr. Murphy to provide you with

12   information about what he was doing during that 1,100

13   hour block of time?

14       A    I believe I did; yes.

15       Q    And what did he say?

16       A    I don't recall what I got back, but I do

17   believe I asked.  I mean, it was an incomplete record.

18   In addition to my concern about the fact that was a

19   hinderance to Westbrook and his objectives, we had an

20   incomplete record.

21            I told him that.  I don't recall what we got

22   back.

Diversified Reporting Services
202-467-9200

Page 181

1        Q    Did you document in any fashion this issue,

2    about the 1,100 missing hours?

3        A    I don't know how it was documented.  It was

4    discussed at our review committee.  How it was

5    documented, I can't remember who was his file reviewer.

6        Q    You haven't seen any documentation that

7    discusses that?

8        A    I can't recall if I saw any documentation.

9        Q    Did you believe that Mr. Murphy's interest in

10   being a partner was genuine?

11       A    Frankly, no; I don't.

12       Q    Why?

13       A    I thought that he was raising it, you know, in

14   concert with the action he was taking, frankly.

15       Q    You thought it was just part of his legal

16   claims?

17   Is that what you're saying?

18            MR. SHEINFELD:  Objection; asked and answered.

19            THE WITNESS:  I don't know what his legal

20   motives were.  I'm saying that I didn't think it was --

21   I responded to your first question the way I felt.

22            BY MR. SALZMAN:

Page 188

1      A    I can't think of anyone that I know of who I

2    know asked and was denied.

3      Q    **The three examples that you know of, in each**

4    **circumstance, the person asked to have retirement**

5    **deferred and the firm granted that?**

6           MR. SHEINFELD:  Objection to the form of the

7    question and use of the word "examples."

8           BY MR. SALZMAN:

9      Q    **Is that right?**

10     A    I don't know if they are examples.

11     Q    **The three times that you're aware of that**

12   **someone asked to have their retirement deferred, they**

13   **were granted; is that correct?**

14     A    These three circumstances involved client --

15     Q    **Actually --**

16          MR. SHEINFELD:  No, let him answer the

17   question.

18          THE WITNESS:  They were three circumstances

19   where we had client service situations, where it was in

20   our best interest to have that person continue in a

21   client service role in order to facilitate an effective

22   transition to a new partner at a future date, and in all

Diversified Reporting Services
202-467-9200

Page 189

1    three cases, that's why they were extended.  All three

2    were client situations.

3            BY MR. SALZMAN:

4        Q    Who was the client with respect to Kevin

5    Gaynor?

6        A    Prudential Insurance.

7        Q    Who was the client with respect to Gary

8    Dormbush?

9        A    MasterCard International.

10       Q    How about Dean Secord?

11       A    It was a big insurance company.  I'm sorry.

12   It escapes me.  Philadelphia based.  There are a couple

13   there, and I can't remember which one it was, but it was

14   one of the large insurance companies in Philadelphia.

15       Q    Have you ever heard any partners talk about

16   age as a factor in considering applicants for

17   partnership?

18       A    No.

19       Q    Have you ever heard any partners express an

20   interest in having younger employees generally as

21   partners?

22       A    No.

Page 190

1      Q    Have you ever heard any partners say anything

2   to the effect that they would want to make people

3   partners who could serve in the partnership for 20 or

4   more years?

5      A    I don't recall that.

6      Q    Have you ever heard any partners talking about

7   whether or not a person who was already age 60 could

8   become a partner?

9      A    No.  I don't recall that.

10     Q    Can an employee who has already reached the

11  age of 60 become a partner at PwC?

12     A    I don't know.  I don't know the answer to that

13  question.  I truly don't.

14     Q    Why don't you know the answer to that

15  question?

16     A    Well, I don't know how the mandatory

17  retirement age would operate.  I just don't know.

18     Q  . Have you served in a capacity in which you

19  were sponsoring people for partnerships?

20     A    Yes.

21     Q    What position were you serving in?

22     A    Partner.

Diversified Reporting Services
202-467-9200

Page 193

1    age?

2         MR. SHEINFELD:  Object to the form of the

3    question.  It's the same badgering being continued.

4         THE WITNESS:  I don't guess people's ages.  It

5    isn't a factor in the process we're talking about.  It's

6    not relevant to me how old they are, if they're

7    qualified candidates, then I'm interested in sponsoring

8    them.

9         BY MR. SALZMAN:

10      Q    How about Keith Olson, how old would you say

11   he was at the time you sponsored him?

12      A    I don't know.  Similar to what I said for

13   Pace.  Probably somewhere in his 40s, I think.

14      Q    Any idea how long he has been at PwC?

15      A    I can't say exactly because he's been in and

16   out of the firm.

17      Q    How long were the retirement deferrals for

18   Messrs. Gaynor, Dormbush and Secord?

19      A    Gaynor was for two one year deferrals.

20   Dormbush, I'm not sure how long Dormbush's has been.  I

21   don't know how long Secord's was for.

22      Q    Did you ever see an e-mail from Dennis Nally

Diversified Reporting Services
202-467-9200

Page 211

1    of Mr. Murphy; is that right?

2        A    Yes.

3        Q    Did you understand when you submitted this

4    document that it was submitted in connection with a

5    proposed personnel action for Mr. Murphy?

6        A    No, I didn't understand that.

7        Q    Did you understand that it was submitted for

8    the purpose of proposing to promote him to managing

9    director?

10       A    I came to Westbrook and asked him if he wanted

11   to become managing director, and he said yes.  We

12   proceeded in a proposal.

13       Q    A proposal to promote him to managing

14   director?

15       A    Exactly; right.

16       Q    It would be a promotion that would affect his

17   pay and his position within the firm; right?

18       A    Yes.

19       Q    You took that seriously; right?

20       A    Very seriously.

21       Q    Is the partners' sponsor section that you

22   signed and submitted to the firm accurate?

Page 212

1         A     In what context?

2         **Q     Do you believe --**

3         A     I believe he should have been a managing

4    director.  I recommended him for managing director and I

5    believed he should be a managing director, and he became

6    a managing director.

7         **Q     Are the statements made in the partners'**

8    **sponsor section accurate and reflect your view of Mr.**

9    **Murphy at the time?**

10        A     There are some statements in here -- the way

11   we created this document was Westbrook created it and I

12   edited it.

13             There are some statements in here that I can't

14   say I can audit.  In other words, I know exactly that

15   the detail -- for instance, he referred to engagements

16   that I wasn't any part of, like SunTrust and Shawmut.

17   These are matters of record about Westbrook.  They are

18   included in here.

19             He does make comments in here about his sales,

20   that I think are not exact, where he says they led to

21   engagements of $7 million.  I can't really say what that

22   relates to.  I'm assuming it relates to matters we

Page 213

1   talked about earlier in the testimony, but I don't know

2   exactly what those are.

3       Q    Let me ask you, Mr. Lewis.  Do you stand by

4   this managing director proposal that you submitted?

5       A    Yes, I stand by the fact that Westbrook was a

6   good candidate for managing director and that he should

7   have been promoted to managing director, and that he

8   was.

9       Q    Do you believe any of the statements in the

10  partners' sponsor section are not true?

11      A    I can't say for sure that if they are all

12  attributed to the actions of Westbrook that they are all

13  true.

14      Q    Do you believe there are some statements that

15  are misleading?

16      A    I gave you an example.  I don't say they are

17  misleading, but what I would say is, for instance, there

18  was a comment that I read where Westbrook characterizes

19  -- speaks about the success we had on add on engagements

20  that he was involved in, where we had additional work.

21          I testified earlier that has happened quite

22  commonly for our practice.  I don't know that was the