1

1            UNITED STATES DISTRICT COURT
                DISTRICT OF COLUMBIA
2      _____

3    C. WESTBROOK MURPHY and          x
     HAROLD SCHULER,                  :
4                                     :
                    Plaintiffs,       :
5         vs.                         : Case No.
                                      : 1:02CV00982(RJC)(DAR)
6    PRICEWATERHOUSECOOPERS, LLP,     :
     et al.,                          :
7                                     :
                    Defendants.       x
8      _____

9                   Washington, D.C.

10              Wednesday, April 30, 2003

11

12   DEPOSITION OF:

13              TIMOTHY F. RYAN,

14   a witness, was called for examination by counsel

15   for the plaintiffs, pursuant to Notice and

16   agreement of the parties as to time and date,

17   beginning at approximately 10:09 o'clock, a.m.,

18   in the law offices of Winston & Strawn, Esquires,

19   1400 L Street, Northwest, Washington, D.C. 20005,

20   before Catherine S. Boyd, a Court Reporter and

21   Notary Public in and for the District of

22   Columbia, when were present on behalf of the



**CAROL J. THOMAS STENOTYPE
REPORTING SERVICES, INC.**
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

1    respective parties:

2    APPEARANCE OF COUNSEL

3        For the Plaintiffs:

4            ROSE & ROSE, ESQUIRES
             BY:  DAVID L. ROSE, ESQUIRE
5            1320 19th Street, Northwest, Suite 601
             Washington, D.C.  20036
6            202.331.8555

7        For the Defendants:

8            WINSTON & STRAWN, ESQUIRES
             BY:  ERIC M. NELSON, ESQUIRE
9                 STEPHEN L. SHEINFELD, ESQUIRE
             200 Park Avenue
10           New York, New York  10166-4193
             212.294.6647

11

12                    -  0  -

13                  I-N-D-E-X

14    Witness:                              Page:

15    TIMOTHY F. RYAN

16            Examination by Mr. Rose          5

17                    -  0  -

18    Exhibits:  (Included with transcript)  Page:

19    Exhibit No. 1 for Identification
      to the Ryan Deposition
20    (Bates Nos. PwC00002-PwC00028)           65

21                          --continued--

22

1          when I became a partner, clearly there was the

2          sense of responsibility and liability, so from a

3          responsibility standpoint, I, you know, took a

4          number of personal actions to make sure that

5          given the liability that comes with being a

6          partner, that --

7              Q.    Buy liability insurance?

8              A.    I did not.  I put the house in my wife's

9          name, moved assets out of my name into my wife.

10             Q.    Okay.

11             A.    That's it.

12             Q.    Okay.  Let me come back to several

13         things.

14                   You say you voted for senior partner.

15         That was one of those things that you did.

16                   Was that a contested election, or was

17         that something where the nominating committee had

18         recommended just one person?

19             A.    If you contest it, what does it mean?

20             Q.    Like -- pardon me -- the Democrats and

21         Republicans contest elections, they run the same

22         candidate --

```
 1              MR. NELSON:  Was there more than one

 2     candidate?

 3              BY MR. ROSE:

 4         Q.  Was there more than one candidate for

 5     one seat?

 6         A.  Yes.  Yes, there was.

 7         Q.  Okay.  And so what year was that?

 8         A.  If I work backwards, we had one within

 9     the last two years.

10         Q.  A contested election?

11         A.  Yes, we did.

12         Q.  Was Mr. Nally involved?

13         A.  He was one of the candidates.

14         Q.  And who was the other candidate?

15         A.  Bob Hers.

16         Q.  How do you spell his name?

17         A.  I believe it's H-e-r-s.  I believe he

18     was the other candidate.

19         Q.  Were they both proposed by the

20     nominating committee?

21         A.  Yes, they were.

22         Q.  How about the votes for, I think the
```

1     partnership calls them members-at-large, the

2     people who were on the board?

3         A.   I did participate in voting for board

4     members.

5         Q.   Um-hm.  Were those contested?

6         A.   Absolutely.

7         Q.   And how many, how often did you have a

8     vote for members of the board?

9         A.   I recall the one two years ago.  There

10    may have been one prior to that.  I just don't

11    recall.

12        Q.   Were there issues besides the people

13    that -- did the people contending for senior

14    partner -- well, let's ask several, if the senior

15    partner and the board -- was there any

16    disagreement about policy in terms of the

17    election between Mr. Nally and Mr. Hers?

18        A.   I don't know there was a policy, but to

19    answer your question, there were detailed

20    biography, backgrounds, information on the

21    candidates, including Webcast I believe, phone

22    calls to give people information on the

```
1        candidates.
2              Q.    Um-hm.
3              A.    And there were clearly differences
4        between the two.
5                    I don't recall a specific policy, but
6        there were clearly differences between the two.
7              Q.    Difference in terms of background or
8        experience or capacity or --
9              A.    All three.
10             Q.    Okay.  And how about the vote for, there
11       was a contested vote for members-at-large, is
12       that right?
13             A.    I don't recall that term.
14             Q.    It was members of the board?
15             A.    Yes.
16             Q.    Okay.
17             A.    Yes.  Each candidate had a background
18       that anybody could go on and partner, could go on
19       and read and research.
20             Q.    And do you recall how many seats were
21       contested and how many people were running?
22             A.    I don't recall.  I don't recall, but
```

1      there were several people who didn't, who were

2      nominated who didn't make it, so --

3          Q.   Did you know personally Mr. Nally or Mr.

4      Hers?

5          A.   No.  I've met Dennis a couple of times,

6      Bob once, but not personally.

7          Q.   Just introduced and shaking hands, okay.

8      And how about the people who vote, who were

9      members of the board?

10         A.   Some.

11         Q.   You knew some of them?

12         A.   Yes.

13         Q.   Did you tend to vote for them, or not

14     necessarily?

15         A.   Nope.

16         Q.   Okay.  So how did you decide how to

17     vote?

18         A.   I read the backgrounds.  I talked to

19     other partners.  I talked to them.

20         Q.   Other partners you worked with, were

21     working with?

22         A.   I read the backgrounds.  I talked to --

1          Q.    To the candidates?

2          A.    I talked to, in some cases, to the

3    candidates.

4                In many cases, I talked to my own

5    partners -- what do you think?  What do you know

6    about this guy?

7          Q.    People that were working, you were

8    working with?

9          A.    My peers, my partners.

10         Q.    Okay.  Who do you include in that group?

11         A.    Over a hundred, so I mean my partners,

12   the partners that I interact with on a daily,

13   weekly, monthly basis.

14         Q.    Um-hm.

15         A.    Could be somebody in Los Angeles,

16   somebody in Chicago that I respected an opinion

17   and may know a candidate, and I wanted to

18   understand, you know, what their background,

19   position, views.

20         Q.    And how was the vote on, how did the

21   vote on these matters count?

22               Was it a one man -- sorry -- one person,

1          one vote, or was it, did you vote based on the

2          number of shares?

3              A.    One person, one vote.

4              Q.    Okay.   That's both board and senior

5          partner?

6              A.    Yes.

7              Q.    Do you recall whether the votes were

8          lopsided or close?

9              A.    We don't know.

10             Q.    Oh, okay.   Who does know?

11             A.    I don't know.

12             Q.    Does the board?

13             A.    I assume it's the law firm that

14         administers the, the vote.

15             Q.    What firm is that?

16             A.    Cravath.

17             Q.    Cravath, Swaine & Moore?

18             A.    Yeah, I believe.   I don't -- don't hold

19         me to that, but I think it starts with a K.

20             Q.    It's a C.   It's the same firm I think.

21             A.    Yeah.   I don't know.

22             Q.    Cravath, Swaine & Moore is an old-line

1      downtown New York firm which was around when I

2      was young.

3               MR. NELSON:  Midtown Manhattan; let's

4      move on.

5               Yes, they have been in midtown for quite

6      a few years now.

7               MR. ROSE:  Used to be downtown.

8               MR. NELSON:  They used to be downtown.

9               THE WITNESS:  It's completely

10     confidential.  That's why I don't know.

11              I just remember the ballot says it's

12     completely confidential.

13              MR. NELSON:  And just, Mr. Rose, we will

14     be designating, pursuant to the protective order,

15     which I understand Judge Robinson has now signed,

16     we will be designating portions of this

17     transcript as confidential.

18              MR. ROSE:  Sure.  Yes.  I got a fax

19     yesterday or the day before.

20              (There was a pause in the proceedings.)

21              BY MR. ROSE:

22       Q.   Let's go back to the question of your

1     of you becoming the U.S. banking leader?

2        A.   Roles, responsibility, his expectations

3     of me, how you manage in a partnership given that

4     it's a partnership, and how do you -- you know,

5     his advice, his counsel given that I wouldn't be

6     able to bang my fist and tell people what to do,

7     given the nature of the partnership.

8        We talked a lot about his style, his

9     recommendations, how to manage that structure.

10    We talked a lot about that.

11       We talked about the expectations of his

12    boss, you know, you know, the person he reports

13    directly to.

14        Q.   And that's Mr. Garrison?

15        A.   Yes.

16        Q.   Okay.  And Mr. Garrison was his, his

17    boss or the person he reported to back in 2001?

18        A.   No.

19        Q.   It was not?

20        A.   It was not.

21        Q.   Okay.  Who did Mr. Moritz report to

22    then, do you recall?

1      should be the agenda, 997?

2          A.    Yes.

3          Q.    It's the Bates number.  Okay.  So the

4      two pages that you have are 996, which is marked

5      as page 2, and 998, is that correct?

6               The first page is 998?

7          A.    I can't tell whether it's a six or an

8      eight.

9          Q.    Okay.  Neither can I.  All right.

10     That's probably a six I guess.

11              Directing your attention to the third

12     paragraph, there's some, the first sentence

13     attributes a three-sentence quote, four-sentence

14     quote to you.

15              Does that, does that look like an

16     accurate statement of what you said?

17              (The witness reviewed the document.)

18              THE WITNESS:  Yeah.  Just, just -- yes.

19     Having said that, I think it's, Mr. Rose, it's

20     very important to I think state for the record

21     from my standpoint just looking at this memo --

22              BY MR. ROSE:

```
 1          Q.    Um-hm.

 2          A.    The context is critical.

 3          Q.    Okay.  I'm happy -- one of the reasons

 4     you're here is to tell us about the context.

 5          A.    And --

 6          Q.    So please do.

 7          A.    This meeting, the regulatory advisory

 8     services group had a very poor year in Fiscal

 9     2002, and when I took over in my practice, the

10     banking practice, it was clear to me that, that

11     there was an expectation gap because the staff in

12     that group didn't think they had a bad year, and

13     I made a concerted effort over the last twelve

14     months to communicate regularly with the group,

15     including in person, and be readily accessible to

16     the group, and work with the partners to level

17     that expectations.

18          Q.    I need to ask --

19                MR. NELSON:  You're interrupting, Mr.

20     Rose.

21                Let him finish.

22                BY MR. ROSE:
```

```
 1          Q.    All right.  Go ahead?
 2          A.    And we have met a number of times
 3     throughout the last twelve months, and in the
 4     course of those discussions, I have been very
 5     clear that the perception among the group is,
 6     their perception is that they perform at
 7     exceptional levels, and my perception is that
 8     they are doing their jobs.
 9                That's what we expect of them, and that,
10     in my view, that's not exceptional.  That's
11     expected as a group, as a practice unit.
12                I have also tried to build morale
13     because morale hasn't been very good in that
14     group, and the purpose of this meeting was with
15     the benefit of A, my and others, other partners
16     trying to turn the group around, B, with the
17     environment, and increased regulatory scrutiny
18     that's come to the banking industry over the last
19     twelve months, and C, with Sarbanes-Oxley, over
20     the last nine months, the practice has had the
21     wind at their backs.  They're doing much better.
22                And so the purpose of this meeting was
```

1         to come down and thank them for their efforts.

2              It was to come down and thank them for

3         how hard several of them had been working.

4              It was to come down and tell them that

5         we recognized that business advisory, which is a

6         small piece of our firm, which is an audit firm,

7         is a very important part of what we do, and that

8         we recognize that the career model in our firm is

9         skewed to its audit, but we're working on it.

10             It was intended to be a morale-boosting

11        session.

12             It lasted four hours.  This memo was one

13        page, and just reading it, there's a lot of

14        things in here that while, while not inaccurate,

15        certainly are not contextually correct.

16        Q.    Okay.

17        A.    And what I would say is that in the

18        context of the sentences you asked me, it's

19        important to point out that we went around the

20        room on a number for two hours asking each of

21        the, many, asking many of the people in the group

22        to speak to their accomplishments so they could

1        be proud of about what they accomplished, talk

2        about it and get my feedback.

3              Towards the very end of that portion of

4        the meeting, Mr. Schuler, Hal, spoke to the work

5        that he did at the Ohio insurance agency, and the

6        context of my statement, quite honestly, was he

7        had talked for quite some time already and had

8        started to go slide by slide, and we, we were

9        running out of time.

10             He had already talked a long time, and I

11       said yes, Hal, I've seen them.  You sent them to

12       me, and they look good, and thank you.

13             He then proceeded, which isn't in his

14       memo, he proceeded to go on a several-minute

15       tirade about how big the firm is and how bad the

16       expense policies are and the infrastructure in

17       the firm, and in which case, I didn't appreciate

18       where the meeting was going because it was meant

19       to be a, a morale booster, and I responded to Hal

20       look, Hal, we're all dealing with that.  We're

21       not perfect, and most of us are just trying to

22       deal with it, and we're trying to get it fixed.

1              And the last thing I'll say is this

2       concept of making money for PWC is that, is what

3       everybody there is asked to do.  Okay.

4              Q.    Did Mr. Campbell, directing your

5       attention to the next paragraph, do you know what

6       the, was the term walking the halls something

7       that Mr. Campbell used?

8              (The witness reviewed the document.)

9              THE WITNESS:  I don't recall.

10             BY MR. ROSE:

11             Q.    Okay.  Do you recall anything that Mr.

12      Campbell said?

13             A.    Mr. Campbell must have spoken for over

14      90 minutes at this meeting.

15             Q.    And who is he?  I'm sorry.

16             A.    He is one of the regulatory partners.

17             Q.    Okay.  Go ahead, please.

18             A.    So I, he spoke for over 90 minutes.  I

19      can't repeat everything he said the 90 minutes.

20             Q.    Did you say something about reasonable,

21      responsible metrics?

22             A.    Yes, I did.

1          Q.    What, what did you and do you mean by

2     responsible metrics?

3          A.    There is, there is a frustration and a

4     perception -- not a frustration.

5               There's a perception in the regulatory

6     group among many of the people in the group that

7     they are managed by the numbers, and that a lot

8     of the intangibles that can't be quantitatively

9     measured are not considered.

10               As I have stated in a number of meetings

11     with the group, that one of the reasons for my

12     frequent interaction with the group,

13     accessibility and availability, is to understand

14     the intangibles.

15               We recognize, I said to the group as I

16     said at the meeting, we recognize that RAS is not

17     the traditional business model of an audit, and

18     that because of the way we as a professional

19     services firm try to measure our performance, a

20     lot of their performance cannot be measured

21     because they may help out with a phone call, they

22     may help out in some way that isn't traditionally

1    measured because they're a business advisory

2    unit.

3            And what I said to them is I said it is

4    their job to help us see through the metrics, and

5    it's our job as partners and my job as the leader

6    to listen and to work and not take the easy route

7    out and listen to the metrics, and they had my

8    commitment that I would do that.

9            I gave an example at the meeting.  I

10   specifically pointed out that one of the staff

11   had been working on a non-billable project at my

12   request for a big chunk of the year, and that in

13   no way, shape or form, although billable hours

14   are a metric, would that individual be adversely

15   rated because of what that individual was doing

16   was very valuable and just didn't fit the typical

17   metrics.

18           I also pointed out in the same side,

19   though, that it's not a free ride and don't think

20   that we're not going to look at the metrics, and

21   if the metrics aren't good and there's no good

22   story behind the fact why the metrics were bad,

1    that we would fight through and try to understand

2    that as well.

3         That's what I meant by responsible

4    metrics.

5         Q.    Okay.    Thank you.    The paragraph I guess

6    the about, not the immediately next paragraph,

7    but the one below that starts with the words he

8    stated.

9         Is that first sentence reasonably, is

10   that, were you quoted, was that something you

11   said -- we are committed to making RAS partners.

12        A.    Again, I think the context is important.

13   Prior to the meeting, the RAS partners Bench,

14   Lewis, Albright and Campbell and I had prepared

15   for the meeting by phone the week before and in

16   person prior to the meeting, and in their view,

17   what they were sharing with me is four

18   individuals who have expectations and the

19   capabilities to make partner some day in their

20   view, and I was advised that they need to know

21   whether we're committed to doing that, not

22   promises, but just will we ever make another RAS

1      partner?

2              That's what they told me I needed to

3      address, and in that context, I said yes, we can

4      make RAS partners.  The career model here is not

5      necessarily just a director track.

6              In that context, yes, I did say this.

7         Q.  Okay.  And in the next sentence where

8      there is a long quote, is that an accurate quote?

9              MR. NELSON:  The one that begins he

10     continued?

11             MR. ROSE:  Well, the quote starts after

12     the words, with the word from and ends with the

13     word practice.

14             MR. NELSON:  All right.

15             BY MR. ROSE:

16        Q.  Do you see that sentence there?

17        A.  Yes.  That is not accurate.

18        Q.  It's not accurate?

19        A.  That's right.

20        Q.  What did you say, or did you say

21     anything in that --

22        A.  What I said was -- the topic was, the

1          topic that we were talking about was, at this

2          point, was the pace at which everybody was

3          working, and people were working, as they are in

4          the rest of the banking practice and the rest of

5          the firm, people were working very, very hard.

6                    And what we were talking about here is

7          the need to grow, to grow the practice, but at

8          the same time, not run our people into the

9          ground, and the need to get more people in and

10         develop, develop people.

11                   And I made the statement from a selfish

12         standpoint, we want to have you folks around, and

13         we don't want you to leave this place.

14         Q.    Did you say we want you to be around so

15         you continue to grow the practice or something to

16         that effect?

17                   (The witness reviewed the document.)

18                   THE WITNESS:  I think I said what I

19         said, what I just said earlier.

20                   MR. ROSE:  Could you read that back?

21         I'm sorry.

22                   (The record was read by the court

1    reporter.)

2              BY MR. ROSE:

3        Q.    Do you think you may have used the word

4    is it your memory you didn't say for, did you say

5    for a long time?  Did you say 20 years?  Did you

6    say anything of that kind?

7        A.    I don't recall.

8        Q.    One way or the other?

9        A.    That's right.

10             MR. ROSE:  Sorry.  Would you read the

11   question?

12             (The record was read by the court

13   reporter.)

14             BY MR. ROSE:

15       Q.    When you said that RAS had a poor year

16   in 2002, what was the basis?  What's the -- I

17   thought I understood you to say -- let me go back

18   and state what I thought I heard you say earlier,

19   and I'll ask, and then ask you the question.

20             I believe you said earlier that you

21   didn't review the, you didn't get statements from

22   PWC about performance, written statements is what

1          A.    Mr. Rose, you have to understand I have

2    one responsibility, and that is to run this

3    practice the way I see fit and the way my firm

4    expects me to do it, and my one objective is to

5    make sure that we serve this firm well, its

6    clients and its people, and that's what I'm

7    focused on when I'm meeting with people and

8    clients.

9          Q.    The firm has a policy of not judging

10   people over the age of 60 on the merits, isn't

11   that right?

12               MR. NELSON:  Objection.

13               BY MR. ROSE:

14         Q.    Is that right or not to the best --

15               MR. NELSON:  Objection.

16               MR. ROSE:  Fine.  Are you going to

17   direct him not to answer?

18               THE WITNESS:  I'm not aware of such a

19   policy.

20               BY MR. ROSE:

21         Q.    You want to read it?  The policy is you

22   have to retire when you're age 60, and --