MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003                    PAUL J. SULLIVAN

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

C. WESTBROOK MURPHY,              x
                                 :
HAROLD SCHULER,                  :
                                 :
          Plaintiffs,            :
     vs.                         : NO. 1:02CV00982
                                 :
PRICEWATERHOUSECOOPERS, LLP,     :
                                 :
et al.,                          :
                                 :
          Defendants.            x

                    Friday, June 6, 2003

                    Boston, Massachusetts


DEPOSITION OF:

               PAUL J. SULLIVAN,

a witness, was called for examination by counsel

for the plaintiffs, pursuant to Notice and agreement

of the parties as to time and date, beginning at

approximately 9:58 o'clock, a.m., at the offices of

PRICEWATERHOUSECOOPERS, LLP, One International Place,

Room 973, Boston, Massachusetts, before Darlene M.

Coppola, Registered Professional Reporter, Certified

Professional Reporter, and Notary Public in and for

969b43a6-dfcb-4b28-a5e5-d219657a4478

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003                    PAUL J. SULLIVAN

Page 2

1    the State of Massachusetts, when were present on

2    behalf of the respective parties:

3

4    APPEARANCE OF COUNSEL:

5        Representing the Plaintiffs:

6            ROSE & ROSE, ESQUIRES

7            BY:  DAVID L. ROSE, ESQUIRE

8            1320 19th Street, N.W., Suite 601

9            Washington, D.C.  20036

10           202.331.8555

11           fax 202.331.0996

12           e-mail:  daver@roselawyers.com

13       Representing the Defendants:

14           WINSTON & STRAWN, ESQUIRES

15           BY:  STEPHEN L. SHEINFELD, ESQUIRE

16           200 Park Avenue

17           New York, New York  10166

18           212.294.2650

19           fax 212.294.4700

20           e-mail:  ssheinfeld@winston.com

21

22                              --continued--

969b43a6-dfcb-4b28-a5e5-d219657a4478

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003                    PAUL J. SULLIVAN

Page 3

1      APPEARANCE OF COUNSEL:        (cont)

2          Representing the Defendants:

3              PRICEWATERHOUSECOOPERS, LLP

4              BY:  JOHN E. DALY, ESQUIRE

5              1177 Avenue of the Americas

6              New York, New York  10036

7              646.471.1159

8              fax 813.637.7745

9              e-mail:  johndaly@us.pwc.com

10

11                              -  0  -

12

13

14

15

16

17

18

19

20

21

22

CAROL J. THOMAS STENOTYPE REPORTING SERVICES, INC.                    800-322-9221

969b43a6-dfcb-4b28-a5e5-d219657a4478

Page 29

1    net revenues, number of partners, number of

2    employees, that sort of thing.  Does that help?

3    A       Uh-huh.

4    Q       Would you try to answer?

5    A       There are 11 partners.

6    Q       Now, is that what you mean?

7    A       There's actually 13 TS partners in the

8    Boston office now.

9    Q       Okay.  Are you now a member of the board

10   of partners and principals at

11   PricewaterhouseCoopers?

12   A       Yes.

13   Q       When did you become a member?

14   A       I believe the effective day was July 1,

15   19 -- 2001.

16   Q       How did it happen, to your knowledge,

17   that you became -- they call that member at

18   large, do they not?

19           Is that how it's designated?

20   A       Yes.

21   Q       How did you happen to be chosen as a

22   member at large?

969b43a6-dfcb-4b28-a5e5-d219657a4478

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 30

1    A        My partners chose me.

2    Q        Through a nominating committee of some

3    kind?

4    A        Yes.

5    Q        That was called a board nominating

6    committee?

7    A        I believe it was.

8    Q        A nominating committee?

9    A        I believe it was.

10   Q        How many people -- how many people were

11   on the ballot, I guess, for member at large at

12   the time before your election or selection?

13          MR. SHEINFELD:  Objection to the form of

14   the question.

15          MR. ROSE:  Okay.  I agree with that.  Let

16   me rephrase it.

17   Q        Was your admission to --

18          MR. ROSE:  I'm sorry.

19   Q        Was your election or selection to the

20   board the result of an election?

21   A        Yes.

22   Q        And it was an election by the principals

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003                    PAUL J. SULLIVAN

Page 31

1     and partners and principals throughout the

2     United States, was it not?

3     A        That's correct.

4     Q        I'm asking -- so what I'm asking you is

5     whether there were more partners or principals

6     nominated by the board nominating committee

7     than there were vacancies in the election that

8     involved you?

9     A        Yes.

10    Q        How many more -- do you know how many

11    vacancies there were?

12    A        There were 18 positions of the board to

13    be filled.

14    Q        Eighteen to be filled?

15    A        Yes.

16    Q        Were some of them people who were already

17    serving?

18    A        I believe there was.

19    Q        Do you have any sense of whether that

20    number was 12 or 15, five or nine; anything

21    like that?  Was it more than half or less than

22    half?

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003                    PAUL J. SULLIVAN

Page 32

1    A        It was two or three.

2    Q        It was two or three that were

3    carry-overs?

4    A        I believe so, somewhere in that range.

5             MR. ROSE:  Thank you.

6    Q        Approximately how many people were

7    nominated by the board nominating committee?

8    A        I don't recall specifically.

9    Q        Just give me an estimate.

10   A        I believe there was 50 or so names that

11   were put forth to our partners.

12   Q        Was there anything like an election

13   campaign?

14   A        No.

15   Q        So in 2001, were there something like

16   2,700 partners?

17   A        I believe that's about right, yes,

18   somewhere in that between that and 3,000

19   partners in the United States.

20            MR. ROSE:  Yes.  I was asking about the

21   United States.

22   Q        In a group that large, how do individuals

MURPHY v. PRICEWATERHOUSE, et al.   June 6, 2003

PAUL J. SULLIVAN

Page 33

1    know who they support?

2         MR. SHEINFELD:  Objection to the form of

3    the question.

4         MR. ROSE:  Okay.  Well, let me see -- you

5    want to try your hand at that or would you

6    rather have it rephrased?

7         THE WITNESS:  You need to rephrase it.

8         MR. ROSE:  Rephrase?

9         THE WITNESS:  Yes.

10    Q      Well, let me ask it this way:  Do you

11    know what information was available to the --

12    I'm going to use partners the same way that

13    it's been used prior to this.  Partners

14    includes principals, okay?  So I don't have to

15    say it every time.  Is that agreeable?

16    A      Yes.

17    Q      So what information did the non-board

18    partners as people who weren't members of the

19    board, great majority of the 2,700, what

20    information did they have about the 18 -- I'm

21    sorry, about the 50 or more candidates?

22         MR. SHEINFELD:  Objection to the form of

PAUL J. SULLIVAN

Page 34

1    the question, insofar as it assumes knowledge

2    of the others.  You can ask him if he's aware

3    of information disseminated.

4         MR. ROSE:  No, that's really what I'm

5    asking, if you can answer his question.

6    A      I believe there was just a general

7    profile of the individuals, along with a

8    general statement as to their philosophy,

9    belief in our partnership, in our culture, as

10   well as their willingness to accept the

11   position if our partners so deemed it, that

12   they would ask that partner to do that,

13   function in that role.

14   Q      So all of the people on the list were --

15   so do I understand that some of the people who

16   were named did not want to be on the board?

17        MR. SHEINFELD:  Objection to the form of

18   the question.

19   Q      Do you know whether some of the 50 people

20   whose names were on the list had not consented

21   to perform as a member of the board?

22   A      I don't know.  I believe that at that

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 35

1   point, they would have all agreed to serve on

2   the board.

3            MR. ROSE:  Sure.  That's what I would

4   assume.

5   Q       What differences in philosophy, if any, I

6   use philosophy, beliefs and culture as a group,

7   okay, what kind of philosophy, belief and

8   culture -- what differences were there as you

9   could ascertain them among the candidates in

10  terms of philosophy, belief and culture?

11  A       I don't know.  I don't recall.

12  Q       There was never any debate or election

13  hearing; is that right?

14  A       Correct.

15  Q       Do you believe that you had solid support

16  from the Boston office for your candidacy for

17  partners in the Boston office, to be more

18  specific?

19  A       I don't know.

20  Q       Do you believe that -- do you have any

21  idea of how the board nominating committee is

22  selected?

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003                    PAUL J. SULLIVAN

Page 166

1   us money because every page costs both of us.

2   So I will take -- if you give me ten minutes, I

3   will draft this.  Why don't you come back and I

4   may need two minutes more or whatever, but

5   let's come back around five minutes of three

6   and resume then.

7           MR. SHEINFELD:  Okay.

8

9                     (Recessed at 2:46 PM)

10

11                    (Resumed at 3:13 PM)

12

13          MR. ROSE:  Back on the record.

14

15   Q      Mr. Sullivan, I'd like you to assume the

16   following facts:  During the initial soundings

17   for partnership within a practice area, a

18   partner who was the immediate supervisor of a

19   PwC professional employee for more than ten

20   years made a formal recommendation that the

21   employee be admitted into partnership and that

22   soundings were made through the normal process

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003          PAUL J. SULLIVAN

Page 167

1    with involvement of a representative of human

2    resources and that of the partners within the

3    practice group whose views were sought, eight

4    expressed their views in a recommendation and

5    of the eight, six recommended the partner --

6    the candidate, excuse me, for admission, and

7    two voted no, that is, against admission; and

8    the six partners who voted yes, that is, for

9    admission, had greater or as great knowledge

10   and familiarity of the skills and abilities and

11   other characteristics of candidates than the

12   two partners who voted no, that is, against

13   admission; and further assume that the practice

14   group did not send the recommendation for that

15   candidate's admission to the admissions

16   committee or any other part of the firm for

17   further consideration; and lastly, assume that

18   there was no explanation or reason given for

19   the two negative votes.

20          If the above facts are -- if the above

21   facts are assumed to be true -- please assume

22   that the above facts are true, and with that

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 168

1    assumption, was -- would the practice group's

2    failure to forward that candidate's name -- the

3    recommendation for admission to partnership of

4    that candidate, was that consistent with the

5    policies of PwC as you understand it?

6            MR. SHEINFELD:  Objection to the form of

7    the question as an incomplete hypothetical.

8    The witness can answer.

9    A        The facts there are extremely confusing.

10   As I said on numerous occasions, there are a

11   number of different assessments that go into

12   whether or not a candidate moves forward.

13   There's also -- partners don't fill out forms

14   on individuals and say no as to their admission

15   unless they basically have a basis to say that.

16   During the process, those -- those partners are

17   all discussed with both the partners who have

18   said yes and because there are many times yes's

19   may be very lukewarm but look strong on a piece

20   of paper and vice versa.  The no's may be very

21   minor, but when the individuals are spoken to,

22   it may be a lot stronger.  So given the process

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 169

1    as I normally understand it, when a business

2    unit reviews a candidate, where 25 percent of

3    the soundings would say no, I would not expect

4    that that person would move forward.

5    Q       You would not expect it to move forward?

6    A       That person would not normally move

7    forward.

8            MR. ROSE:  Okay, thank you.

9    Q       So your statement that the partners's

10   views are considered equal and that there's no

11   veto doesn't seem to be correct; is that

12   correct?

13   A       No.

14   Q       How are those two things --

15   A       Because --

16           MR. ROSE:  Excuse me, let me ask the

17   question.

18   Q       How are those two things compatible?

19   A       Because I think it works both ways.  As

20   an example, the point you're trying to make

21   here is that and let's just use the example

22   where a business unit leader and the rest of

MURPHY v. PRICEWATERHOUSE, et al. June 6, 2003

PAUL J. SULLIVAN

Page 170

1    the other business unit leaders wanted somebody

2    to be a partner, but the line partners within

3    the organization say no, that person would not

4    move forward either.

5    Q        So you're saying a majority of the

6    partners who are sounded expressed  a negative

7    view?

8    A        There's not a vote here, first of all.

9    There's people who are expressing views of

10   candidates.  The fact that you fill out a

11   sounding is not a vote.  There's nowhere in our

12   procedures that says that that's a vote.

13            MR. ROSE:  I didn't say it's a vote.

14            THE WITNESS:  You did.  You said that

15   eight people --

16            MR. ROSE:  Okay, voted --

17            THE WITNESS:  They're expressing their

18   views on a piece of paper.  So even if the line

19   of service wanted some individual and filled

20   out a sounding which said that that individual

21   should be a partner and the line partners in

22   that group said no, even if there were only two

MURPHY v. PRICEWATERHOUSE, et al.   June 6, 2003

PAUL J. SULLIVAN

Page 171

1    of them, that person would not -- if 25 percent

2    of the line partners said no that the person

3    shouldn't go forward, if the leaders of that

4    group wanted to, that person has as much

5    probability of not going forward either.  So it

6    works both ways.

7    Q        Well, who decides whether it goes forward

8    or not?

9    A        The committee?

10   Q        What committee?

11   A        The committee.  The business unit has a

12   committee.  They have a file reviewer.  They

13   would have an individual who would talk to all

14   the people who filled out the soundings.  That

15   person would normally present to the business

16   unit committee, normally composed of all line

17   partners, that this is the overall

18   recommendation based upon that individual's

19   review of the soundings, interviews, review of

20   the files, discussions with anybody else that

21   that person believes is appropriate and then

22   that person would typically discuss this with

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 172

1    the committee.  The committee would make a

2    decision as to whether or not the person should

3    move forward.  I will tell you that if 25

4    percent of the soundings would normally say no

5    whether or not they're prepared by leadership

6    or line partners, chances are that the

7    individual would not move forward.

8    Q        So in that sense, it's more like a

9    fraternity than in terms of a vote?  If there's

10   significant opposition, even by a minority of

11   the partners, you're telling me, as I

12   understand your answer, that the minority would

13   carry the --

14   A        If they have a basis for their opinions

15   which are sound.

16   Q        Well, who decides whether they're sound,

17   sir?  That's the --

18   A        The committee of line partners.

19   Q        Who typically --

20   A        I just explained to you --

21           MR. ROSE:  Okay, okay.

22   A        -- the process.  The process is that the

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 173

1    person is reviewed by the business unit

2    admissions committee made up of line partners,

3    not management.  Those individuals will make a

4    decision as to which candidates they would

5    present to the business unit leaders to go

6    forward in the process.

7    Q      My assumption was that that was not done

8    for this hypothetical candidate.  If the

9    business unit committee that's supposed to deal

10   with admissions was not, in fact, given the

11   opportunity to review that recommendation,

12   would that be contrary to the policies of PwC?

13            MR. SHEINFELD:  Objection to the form of

14   the question.  I think it's confusing.

15            MR. ROSE:  Do you have any suggestion to

16   make it less confusing?

17            MR. SHEINFELD:  Well, he testified, I

18   believe, that the process is that the committee

19   takes information and does something with it.

20   Now you're saying that there's no committee.

21            MR. ROSE:  No, I'm not saying there's no

22   committee.  Of course, there's a committee for

969b43a6-dfcb-4b28-a5e5-d219657a4478

Page 180

1          MR. SHEINFELD:  Objection to form.

2     Q     What is your position?  You said it's not

3     really a recommendation.

4          THE WITNESS:  This is all hypothetical?

5          MR. ROSE:  Of course, it's hypothetical.

6          THE WITNESS:  And you're asking me to

7     voice an opinion about a whole bunch of

8     hypothetical things that are changing

9     constantly here.

10          MR. ROSE:  I don't think anything's

11     changed.

12     A     First of all, I explained the process,

13     that an individuals goes into the process.

14     Their file is reviewed by a member of business

15     committee.  The sponsoring form, all the -- all

16     the evaluations, all the soundings are

17     reviewed, partners are discussed, the files are

18     reviewed.  A candidate is decided to move

19     forward or not.  The business units do not have

20     party to that process, other than they have the

21     ability to fill out a sounding just like any

22     other partner in the firm.  That's why any

969b43a6-dfcb-4b28-a5e5-d219657a4478

Page 181

1    partner has the right to say whatever they have

2    on their minds as relates to a candidate.

3    During that process, a sponsor is also

4    interviewed normally and discussed with that

5    sponsor by the committee as to why that sponsor

6    believes this person should be a partner.  The

7    committee takes all the facts and circumstances

8    into consideration.  It makes a decision as to

9    whether or not that candidate moves forward.

10   Now, you're asking me if this person just never

11   got to that point --

12        MR. ROSE:  No, I'm not.  I'm sorry,

13   that's not what I'm asking.

14        THE WITNESS:  Well, now, then I don't

15   understand the question.

16        MR. ROSE:  Sir, I'm asking you to assume

17   that the sponsoring -- as I did a minute ago

18   that the sponsoring -- you raised the question

19   of whether it went to a committee within the

20   practice group.  I'm asking you to assume that

21   it did not go to the committee, that the

22   committee did not review the process and the

PAUL J. SULLIVAN

Page 192

1    an informed decision.

2    Q       But this committee is made up of partners

3    within the practice, right?

4    A       Yes, that's right.

5    Q       And we assume that all of the partners in

6    the practice report in some sense to the leader

7    of the practice --

8    A       That's correct.

9    Q       -- in their normal duties?

10   A       That's correct.

11   Q       But in their duties as it concerns

12   admissions, they're supposed to put that aside?

13   A       We're partners.  Partners don't want to

14   make people partners unless they are people

15   that we want to be as partners.

16   Q       We --

17   A       We may designate individuals within our

18   organization to be leaders.  But the leaders

19   work for our partners.  Our partners do not

20   work for our leaders.  There's a clear

21   distinction between that as a partnership

22   versus some corporate entity that normally

969b43a6-dfcb-4b28-a5e5-d219657a4478

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003                    PAUL J. SULLIVAN

Page 195

1    Q       Are you finished?  Please continue?

2            MR. SHEINFELD:  Let's hear back the

3    question and answer.

4

5                 *   (Question And Answer Read)

6

7            MR. ROSE:  I'm sorry to interrupt.

8    A       We operate under our partnership articles

9    as a partnership.  Our partners vote our

10   management -- our senior partner in and our

11   board of partners.  We work as representatives

12   of our partners.

13   Q       So you --

14   A       We need to have a chain of command within

15   any organization, otherwise you would have or

16   could potentially have a lot of people going in

17   a lot of different directions.  We do run a

18   business.  We do have a strategy.  We do have

19   tactics.  But we work together as a group of

20   partners.  In all the years that I have been a

21   partner in this firm, I don't tell partners

22   what to do.  I ask them to work with me on

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 196

1    something.  We respect the opinions of all of

2    our partners because they are our partners.

3    When one partner fills out a sounding -- the

4    reason why we have confidentiality surrounding

5    our soundings is that we want to make sure that

6    all of our partners know that they are just

7    talking to our partners about other partners or

8    potential partner candidates, that they are --

9    do not have to worry about potential threats of

10   saying something about somebody when somebody

11   else in the organization may feel differently

12   about it.        I mentioned to you before, there

13   are many situations.  There are situations

14   where a leadership team will want a candidate

15   to be admitted, but line partners do not want

16   it.  It doesn't happen.  So it doesn't matter

17   whether you're a member of management or a line

18   partner.  We're all partners.

19        MR. ROSE:  Thank you.

20   Q    But some partners are more equal than

21   others, aren't they?

22        MR. SHEINFELD:  Objection to the form of

969b43a6-dfcb-4b28-a5e5-d219657a4478

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 244

1          MR. SHEINFELD:  It's argumentative.

2

3     Q      If you assume that it was unlawful, do

4     you think that it doesn't matter what the

5     reason was?

6          MR. SHEINFELD:  Objection, argumentative,

7     assumes facts not in evidence.

8          MR. ROSE:  Would you read back his last

9     answer, please.

10

11                    *   (Testimony Read)

12

13          MR. ROSE:  Thank you.

14

15    Q      In your term as a member of the

16    admissions committee, have you -- has the

17    committee ever considered anybody  -- to your

18    knowledge, has the committee ever considered

19    anybody who is age 60 or older for admission to

20    partnership?

21    A      We don't know the ages of the individuals

22    being proposed, so I don't have anyway of

969b43a6-dfcb-4b28-a5e5-d219657a4478

Page 245

1    telling.

2    Q       You say we, you mean PwC?

3    A       The admissions committee.

4    Q       Are you telling me the admissions

5    committee couldn't look into the data if it

6    wanted to?

7            MR. SHEINFELD:  Objection, argumentative.

8    Q       I've seen two or three filled out

9    candidate forms.  I think you've three.  If you

10   haven't, I'll show you the third one; but

11   you're now aware, if you weren't before, that

12   you're aware from Plaintiff's Exhibit 21 that

13   there is a provision on the form that has date

14   of birth; are you not?

15           MR. SHEINFELD:  Objection.  Asked and

16   answered.

17   A       It was on the form.

18   Q       And so do you believe that if the

19   admissions committee wanted to know the date of

20   birth of the person, it can't tell from the

21   material before them, if they were having

22   trouble in asking, they would have trouble

MURPHY v. PRICEWATERHOUSE, et al.  June 6, 2003

PAUL J. SULLIVAN

Page 246

1    asking the appropriate officials within PwC to

2    let them look at the gender and date of birth

3    or nationality of the partner -- of the

4    proposed partner?

5         MR. SHEINFELD:  Objection to the form of

6    the question.  You can answer if you understand

7    it.

8    A       We have no need to know what the age of

9    the individuals are when we go through our

10   admissions process.  It's not something that I

11   would even go to look for because I don't need

12   to know it.

13   Q       But if a person is over 60, he would

14   be -- do you -- you still intended to comply

15   with the partnership agreement, he would have

16   to retire on the day he was admitted; would he

17   not?

18   A       I don't know what would happen.

19   Q       You've never been confronted with that

20   situation, as far as you know?

21   A       As far as I know, no.

22   Q       Do you have any idea of how many

969b43a6-dfcb-4b28-a5e5-d219657a4478

Page 253

CHARLES WESTBROOK MURPHY

1

2  BY MR. NELSON:

3      Q    Do you understand also that each year, many

4  partners have their compensation increased?

5      A    That is my understanding.

6      Q    And you understand that happens on a regular

7  basis?

8      A    That happens on a regular basis, and it's

9  based on an evaluation by other partners, both the

10  increases and the decreases.

11     Q    And do you think it's more often that

12  partners' income is increased or decreased?

13     A    I believe it, more often, is increased

14  because the income of the firm as a whole is

15  increasing.  So, even if the amount of each individual

16  partner in whatever -- if the partners' shares or

17  percentage of the firms' income stayed exactly the

18  same from year to year to year, it would have

19  increased simply because the firms' revenues were

20  increasing.

21         MR. NELSON:  Can we mark as Defendants'

22  Exhibit 78 a telecopier transmission from Dave Rose to

23  Eric M. Nelson, dated September 29, 2006?

24              (Defendants' Exhibit 78 was marked for

25  identification and was retained by counsel.)