# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

C. WESTBROOK MURPHY and     )
HAROLD SCHULER,     )
     )
     Plaintiffs,     )
     )   **Civil Case No.  02-0982 (RJL)**
     v.     )   **Civil Case No.  05-1054 (RJL)**
     )
PRICEWATERHOUSECOOPERS,     )
LLP,     )
     )
     Defendant.     )
     )

# MEMORANDUM OPINION
September 22, 2011 [Dkt. #235, #236]

This case is before the Court on cross-motions for summary judgment. Plaintiff

Harold Schuler ("Schuler" or "plaintiff") moves for partial summary judgment on

liability, asserting claims under the New York Human Rights Law ("NYHRL"), N.Y.

Exec. Law §§ 290 *et seq.* Pl. Schuler's Mot. for Partial Summ. J. on Liability, Oct. 26,

2010 ("Schuler's Mot. for Partial Summ. J.") [Dkt. #235]. In response, defendant

PricewaterhouseCoopers, LLP ("PwC" or "defendant") moves for summary judgment on

all remaining claims. Def.'s Mot. for Summ. J. on All Remaining Claims, Oct. 28, 2010

("Def.'s Mot. for Summ. J.") [Dkt. #236]. In addition, plaintiff Schuler and co-plaintiff

C. Westbrook Murphy[1] ("Murphy" or "plaintiff") seek to amend – through responsive

---

[1]    I have already denied Murphy's formal request to amend the Complaint. *See* Pl. Murphy's Mot. to Am. Compl., Jan. 7, 2011 [Dkt. #244]; Def.'s Opp'n to Pl.'s Mot. to Am. Compl., Jan. 28, 2011 [Dkt. #248]; Minute Order, Feb. 5, 2011 (denying motion to

pleadings – their Complaint, initially filed in 2002, to expand claims under the NYHRL and to add parallel claims under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-502. *See* Pl. Murphy's Opp'n to Summ. J. at ("Murphy Opp'n") at 5 n.1, Jan. 7, 2011 [Dkt. #245]; Pl. Schuler's Mem. of Points and Authorities in Opp'n to Def.'s Mot. for Summ. J. on All Remaining Claims ("Schuler Opp'n") at 6-7, Nov. 23, 2010 [Dkt. #238].

Upon review of the pleadings, the entire record, and the applicable law, the Court DENIES plaintiff's Motion for Partial Summary Judgment and GRANTS defendant's Motion for Summary Judgment. The Court also DENIES plaintiffs' request to amend their initial Complaint.

## BACKGROUND

### I.    Procedural History

Plaintiff Schuler, a resident of Virginia, began working for PwC's Regulatory Advisory Services ("RAS") group in 1988. Complaint ("Compl."), May 20, 2002, ¶ 12 [Dkt. #1]; *see also* Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶¶ 2, 15 [Dkt. #236]. The RAS group is based in PwC's Washington, D.C., office. Compl. ¶ 12. His co-plaintiff, Murphy, is a resident of Maryland who began working for PwC in 1989.[2] Compl. ¶ 13; DSUMF ¶¶ 2, 15. This litigation began in 2002 when plaintiffs

---

amend). Thus, his request to amend is now denied to the extent that he seeks it through pleadings.

[2]    Schuler and Murphy first worked for RAS at PwC's pre-merger predecessor, Price Waterhouse. DSUMF ¶ 2.

filed a complaint alleging that, but for age discrimination, they would have been asked to join PwC's partnership in 1999, 2000, and 2001. Compl., ¶¶ 42-51. Plaintiffs alleged violations of the Age Discrimination in Employment Act ("ADEA"), the District of Columbia Human Rights Act ("DCHRA"), and the New York Human Rights Law ("NYHRL"). *Id.; see also Schuler v. Pricewaterhouse Coopers, LLP,* 595 F.3d 370, 373 (D.C. Cir. 2010) (*"Schuler II"*) (describing the initial lawsuit).

In 2004, I dismissed as untimely Schuler's 1999 and 2000 claims and Murphy's 1999 claim under the ADEA. *Murphy v. PricewaterhouseCoopers, LLP (Murphy I)*, 357 F. Supp. 2d 230, 240 (D.D.C. 2004), *aff'd in part, rev'd in part, Schuler II*), 595 F.3d at 371.[3]   In the same Order, I also exercised supplemental jurisdiction over plaintiffs' DCHRA claims and, with respect to plaintiffs' NYHRL claims, concluded that "[f]or a non-resident to assert a claim under this statute, [plaintiffs] must allege that the *actual impact of the discriminatory act was felt in New York." Murphy I,* 357 F. Supp. 2d at 244-45 (emphasis added) (internal citation omitted). Because plaintiffs had alleged actions instead of actual impact, I dismissed all three (1999, 2000, and 2001) of plaintiffs' NYHRL claims for failure to state a claim upon which relief could be granted. *Id.* at 244.

---

[3]     I noted that "[e]ach incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice'" for which a charge must be filed. *Murphy I*, 357 F. Supp. 2d at 239 (quoting and citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Relying upon *Morgan*, I reasoned that "plaintiffs . . . may not avail themselves of a 'continuing violation' theory to support a claim based on conduct not alleged in a timely charge." *Murphy I*, 357 F. Supp. 2d at 239 (quoting and citing *Morgan*, 536 U.S. at 113).

In 2008, I granted summary judgment for PwC on plaintiffs' remaining ADEA and DCHRA claims.[4] With respect to Murphy, I granted summary judgment to PwC on all claims. *Murphy v. PricewaterhouseCoopers, LLP,* 580 F. Supp. 2d 4, 15-16 (D.D.C. 2008) (*Murphy 2008 Summ. J. Op.*) [Dkt. #217]. In addition, I granted summary judgment for PwC as to Schuler's ADEA and DCHRA claims for 2001, and dismissed as untimely Schuler's 1999 and 2000 DCHRA claims.[5] *Murphy v. Pricewate-rhouseCoopers, LLP,* 580 F. Supp. 2d 16, 25-26, 28 (D.D.C. 2008) (*Schuler 2008 Summ. J. Op.*) [Dkt. #219].

In 2010, our Circuit Court affirmed my determination that all of plaintiffs' ADEA and DCHRA claims were either untimely or meritless. It also reversed and remanded the NYHRL-related aspects of my ruling, holding that a claim under the New York statute need not allege in-state *impact*, but rather "that a discriminatory act *occurred* in New York."[6] *Schuler II,* 595 F.3d. at 378 (emphasis added) (internal citation omitted). The

---

[4]    Those claims stemmed from separate, but similar, lawsuits plaintiffs filed in 2005. *See Schuler II,* 595 F.3d at 373 (describing suits).

[5]    Then, in a separate but related case, Schuler's ADEA claim was barred under the doctrine of collateral estoppel. *Schuler v. PricewaterhouseCoopers, LLP,* 739 F. Supp. 2d 1, 4 (D.D.C. 2010) (*Schuler III*). That ruling was premised on my 2004 holding (addressing the 2002 Complaint) that neither plaintiff could file a "pattern and practice claim" as an individual instead of as a class. *Murphy I,* 357 F. Supp. 2d at 241. Since that is precisely what Schuler attempted to do in his 2005 Complaint, I held the issue to be precluded. *Schuler III,* 739 F. Supp. 2d at 4-5, *aff'd* 2011 WL 2118575 (D.C. Cir. May 3, 2011). With respect to Schuler's DCHRA claims, I declined to exercise supplemental jurisdiction and dismissed the claims without prejudice. *Id.* at 7.

[6]    Importantly, however, our Circuit Court qualified its interpretation of the NYHRL as authoritative only "[a]bsent a contrary interpretation by the New York Court of Appeals." *Schuler I,* 514 F.3d at 1379.

4

panel reasoned that since PwC is headquartered in New York, plaintiffs were "entitled to the reasonable inference" that any alleged discrimination did, indeed, take place there. *Id.* (quoting *Schuler I*, 514 F.3d at 1377 (D.C. Cir. 2008)).   Determining that this inference defeated defendant's motion to dismiss, the Court reversed and remanded the NYHRL claims. *Schuler II*, 595 F.3d. at 378.   These same claims are before me today.

## II.   Facts

### A. PwC and Partnership

Over the past nine years, I have made extensive findings of fact in this case and its related cases. *See, e.g., Murphy I*, 357 F. Supp. 2d 230 (D.D.C. 2004); *Murphy 2008 Summ. J. Op.*, 580 F. Supp. 2d 4 (D.D.C. 2008); *Schuler 2008 Summ. J. Op.*, 580 F. Supp. 2d 16 (D.D.C. 2008); *Schuler v. PricewaterhouseCoopers, LLP*, 739 F. Supp. 2d 1 (D.D.C. 2010) (*Schuler III*).   Nevertheless, a brief recitation of the salient facts is warranted here.   Schuler was born on October 21, 1944, and Murphy was born on January 30, 1940. Compl. ¶ 11.   In July 1999 – the first time plaintiffs claim they were passed over for promotion – Schuler was 54 and Murphy was 59.   At that point, Schuler had worked for PwC for approximately 10 years and Murphy for approximately 11 years. *See* Compl. ¶¶ 12-13.

As I have described before, "PwC is an accounting and audit firm with over 20,000 employees and more than 2,000 individuals who are partners or principals." *Schuler III*, 739 F. Supp. 2d at 2 (internal citations omitted).   It is "organized and exists pursuant to the PwC Partnership and Principals Agreement ('the Partnership Agreement'), which provides that '[a]n Individual's association with the Firm shall cease

at the end of the Fiscal Year in which he or she attains age 60.'" *Id.* That is, PwC's

Partnership Agreement requires partners to retire when they turn 60. The Partnership

Agreement clarifies that "[t]he term 'Individual' is defined as 'a person who is either a

Partner or a Principal.'" *Id.* Importantly – and as I have decided before – "[t]he sole

parties to the Partnership Agreement are the partners and principals of PwC; there is no

such mandatory retirement provision for PwC employees."[7] *Id.*

PwC is organized into business units called practice groups. Both Schuler and

Murphy worked in the Washington, D.C.-based Regulatory Advisory Services practice

group ("RAS"), a "niche practice" within the larger Banking group, during their tenure at

PwC. Compl. ¶¶ 12-13; DSUMF ¶ 2. Practice groups are particularly important in the

partnership process because the decision of whether to sponsor an employee for

partnership is made, as an initial matter, at the business unit level – that is, within RAS

for the plaintiffs. *See* DSUMF ¶ 3.

Not surprisingly, annual employee performance ratings also play a prominent role

in the partnership-selection process. PwC evaluates performance with a rating system

that ranges from "1" (the best rating) to "4." DSUMF ¶ 4 (citing deposition testimony

and prior opinions in the D.C. Circuit and this Court). PwC claims that in order to be

sponsored for inclusion in the partnership, an employee must show "consistently

---

[7]     Moreover, I have already ruled that because the Partnership Agreement "neither addresses nor binds non-partner employees," it is not itself indicative of bias against older, non-partner employees. Def.'s Reply to Murphy Opp'n at 12 (internal citations and quotation marks omitted); *see also Murphy I,* 357 F. Supp. 2d at 249.

outstanding performance over time."[8]  *Id.*  Moreover, PwC claims that within the RAS

group, an employee is considered for partnership only if he received ratings of "1" in

*each* of the three years preceding sponsorship.  *Id*; *see also Schuler II*, 595 F.3d at 377

("The record documents the existence and exercise of such a policy: Every candidate the

RAS proposed for partner in the years for which there are data in the record (1999

through 2004) had a performance rating of '1' in each of the three years before he was

proposed.").

PwC admits new partners in a given practice only when a "business case" exists

for doing so.[9]  DSUMF ¶ 14 (citing deposition testimony and prior opinions from the

D.C. Circuit and this Court).  Candidacy begins when an employee is sponsored for

partnership within his group.  *See id.* ¶ 7.  Sponsorship triggers the "soundings" stage,

during which the candidate's name is submitted for partner feedback.  *Id.*; Def.'s Ex. 8,

at 163-64 [Dkt. #236-9] (Lewis Dep.).  According to PwC, an employee's performance in

the soundings stage is measured by both the number of responses generated during

soundings, and by the substance of the partners' feedback.  *See* Def.'s Mot. for Summ. J.

at 5; *see also* Def.'s Ex. 14 at 68 [Dkt. #236-15] (Moritz Dep.).  To wit, PwC states that a

successful candidate typically generates twenty or more responses in the soundings

process, with a large portion of those responses reflecting positive feedback about the

---

[8]     Murphy disputes this and notes that this requirement is not contained in PwC's
written policies.  *See* Murphy Opp'n at 28-29.

[9]     There was no business case for making a partner in RAS during the 2001
partnership cycle.  DSUMF ¶ 14 (citing deposition testimony).

candidate. Def.'s Mot. for Summ. J. at 5.[10]

## B. Partnership Prospects for Murphy and Schuler

Although Murphy was based in Washington, D.C.'s RAS Unit, he worked on "36 engagements or proposals in New York . . . [p]rior to and during the 2000 promotion cycle."[11] Murphy Opp'n at 5-6. In 1997, Murphy received a "2" on his annual performance review; in 1998, a "2;" in 1999, a "1;" and in 2001, a "3." DSUMF ¶ 5; Def.'s Mot. for Summ. J. at 5-6; Def.'s Ex. 12 at 10 [Dkt. #236-13] (Murphy's Statement of Genuine Issues From 2008 (conceding that "Murphy was not given '1' overall ratings for most of the years in question")). Murphy was never sponsored for partnership candidacy and was thus never subject to soundings. Def.'s Mot. for Summ. J. at 5-6.

Schuler also spent some time on engagements in New York City, despite being based in PwC's Washington, D.C., office. In calendar year 1999, he spent 108 hours in New York, and between January and June 2000, he spent another 763 hours there. Schuler's Mot. for Partial Summ. J. at 8.

Schuler received "consistently outstanding ratings" in the late 1990s: "1"s from 1993 to 2000. Schuler's Stmt. Of Undisputed Facts [Dkt. #235-2] ¶ 1; *see also* Def.'s Mot. for Summ. J. at 6. He was sponsored for admission to the partnership in the 1999 cycle, at which time twelve partners submitted soundings. Def.'s Mot. for Summ. J. at 6.

---

[10]    Despite sworn deposition testimony from a PwC partner stating that most partner candidates garner 20-30 soundings, *see* Def.'s Ex. 14 at 68 (Moritz Dep.), Schuler disputes the twenty-soundings criterion. *See, e.g.*, Schuler Opp'n at 17.

[11]    Murphy explains that "[t]his was not a situation where Murphy only occasionally spent time working in New York. . . . Some of these engagements were so extensive that Murphy spent months on end working in New York City." Murphy Opp'n at 5-6.

Six of the soundings favored his admission to the partnership, two opposed it, and four partners reported that they had insufficient information to make a determination. *Id.*; *see also* Schuler's Mot. for Partial Summ. J. at 6. After the sounding stage, Schuler was not considered further for partnership in the 1999 cycle. Def.'s Ex. 18 ¶ 4 [Dkt. #236-19] (Lucas Decl.); Def.'s Ex. 17 at 121 [Dkt. #236-18] (Bench Dep.). Schuler disputes that his results in the soundings were the actual reason he was not promoted in 1999. Schuler's Mot. for Partial Summ. J. at 12-17.

The next year, Schuler's supervisor, Robert Bench, proposed that Schuler's name be submitted for soundings in the 2000 partnership cycle. Def.'s Ex. 18 ¶ 4 (Lucas Decl.); Schuler's Mot. for Partial Summ. J. at 6. However, Christopher Lucas, head of PwC's banking practice (which encompasses the RAS niche practice) "did not see a significant change in circumstances or views" among the partners and thus decided that another round of soundings was not warranted. Def.'s Ex. 18 ¶ 4 (Lucas Decl.); *see also* Schuler's Mot. for Partial Summ. J. at 7. That decision ended Schuler's candidacy for partnership in the 2000 cycle.

## III.    Recent Developments in New York Law

As previously mentioned, our Circuit Court in 2010 reversed and remanded the NYHRL-related aspects of my ruling, holding that a plaintiff need not allege in-state *impact*, but rather only "that a discriminatory act *occurred* in New York." *Schuler II*, 595 F.3d. at 378 (emphasis added). Importantly, however, our Circuit Court qualified this determination, acknowledging that its interpretation of the NYHRL was authoritative only "[a]bsent a contrary interpretation by the New York Court of Appeals." *Schuler I*,

9

514 F.3d at 1379.  And in fact, since our Circuit Court's ruling, the New York Court of

Appeals *has* finally clarified the protections and boundaries of the NYHRL and

NYCHRL.  In *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 291 (N.Y. 2010), the New

York Court of Appeals ruled, as I had in 2010, that to prevail, a plaintiff claiming a

NYHRL or NYCHRL violation "must *plead and prove* that the alleged discriminatory

conduct had an *impact* in New York."  And although the New York Court of Appeals did

not preclude nonresident plaintiffs "who work in the city" from alleging violations, it

specifically noted that the impact requirement would "concomitantly narrow[] the class

of nonresident plaintiffs who may invoke [the NYCHRL's] protection."  *Id.* at 290.

## ANALYSIS

### I.    Standard of Review on Summary Judgment

As I noted when this litigation began, "[s]ummary judgment is appropriate when

the pleadings and the record demonstrate that 'there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law.'"  *Murphy I,*

357 F. Supp. 2d at 238 (quoting Fed. R. Civ. P. 56(c)).  When assessing a motion for

summary judgment, a court must consider not only the pleadings, but also affidavits,

answers to interrogatories, and depositions in order to determine whether there is a

"genuine issue of material fact."  *See Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

Finally, "[t]he court must view the facts in the light most favorable to the non-movant,

giving the non-movant the benefit of all justifiable inferences derived from the evidence

in the record."  *Murphy I,* 357 F. Supp. 2d at 238 (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986)).

## II.    Plaintiffs' Request to Amend The 2002 Complaint

In light of the pleading requirements announced in *Hoffman*, plaintiffs now seek to
amend their initial Complaint to allege impact in New York, as well as to add claims
under the NYCHRL. *See, e.g.*, Schuler Opp'n at 4.[12]   Not surprisingly, PwC opposes
plaintiffs' attempt to amend the 2002 Complaint *nine years* into this litigation. *See* Def.'s
Reply to Pl. Schuler Opp'n to Def.'s Mot. for Summ. J. on all Remaining Claims ("Def.'s
Reply to Schuler Opp'n") at 8 [Dkt. #243].

To prevail on a NYHRL or NYCHRL claim, nonresidents of New York (like the
plaintiffs) "must *plead and prove* that the alleged discriminatory conduct had an impact
in New York." *Hoffman*, 15 N.Y.3d at 291 (emphasis added).   That the initial complaint
here lacked an allegation of impact is beyond question.   Indeed, I dismissed plaintiffs'
NYHRL claims in 2004 after finding that "[t]he plaintiffs fail[ed] to allege an impact in
New York." *Murphy I*, 357 F. Supp. 2d at 244.[13]   Even now, both plaintiffs acknowledge
as much. *See* Murphy Opp'n at 5 n.1 (noting submission of a proposed amended
complaint alleging New York impact); Schuler Opp'n at 4 (seeking to amend the
complaint to do the same).

---

[12]    Rather than filing a motion, Schuler seeks to amend the Complaint by alleging
additional facts in his summary judgment and opposition briefs. Schuler Opp'n at 4-6.

[13]    Although this Court's 2004 NYHRL dismissal was reversed on appeal, the D.C.
Circuit did not question the finding that New York impact was never alleged. *Schuler II*,
595 F.3d at 378 ("The district court reasoned that in order to assert a claim under the
NYHRL a non-New-York resident . . . must allege that the actual impact of the
discriminatory act was felt in New York, *which the appellants have not done*.")
(emphasis added) (internal citations and quotation marks omitted).   Rather, the D.C.
Circuit disagreed that such an allegation was even required. *Id.*

PwC argues that the *Hoffman* standard mirrors the standard I applied in 2004, when I dismissed plaintiffs' NYHRL claims for failure to state a claim. *See* Def.'s Mot. for Summ. J. at 11. Because plaintiffs' claims have already been judged under the proper standard, PwC argues, and because neither plaintiff's complaint alleges New York impact, PwC asserts that it is entitled to summary judgment as a threshold matter. *Id.*

Schuler, for his part, disputes that his NYHRL claims were ever fairly judged since New York law in 2004 was "unsettled." Schuler Opp'n at 4. He stresses that "as recently *as five months ago*, this Circuit did not require [him] to allege in-state impact," and that he now has "good cause" to amend his complaint. *Id.* at 5 (emphasis in original). Murphy makes a similar argument, concluding that it was "not necessary, before *Hoffman*, to plead or prove New York impact, because the D.C. Circuit twice" held as much. Murphy Opp'n at 5. I disagree.

To be sure, the decision of whether to grant leave to amend is ultimately "vested in the sound discretion" of the district court. *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977). And although requests for leave to amend are, in general, "freely given," Fed. R. Civ. P. 15(a), courts must also weigh the benefits of granting leave against the harms that result. Indeed, "[a]mong the more common reasons for denying leave to amend are that the amendment will result in undue prejudice to the other party, is unduly delayed . . . or that the party has had sufficient opportunity to state a claim and has failed." *Doe*, 566 F.2d at 720 (quoting MOORE'S FEDERAL PRACTICE § 15.08 at 897-900).

Thus, the question of whether to grant leave to amend turns not on New York's human-rights statute pleading standards or when they were "settled," but rather on what

12

the facts and theory of *this* case have been for the past nine years.  Suffice it to say that nine years is *more* than enough time for plaintiffs to plead the facts which are both true and essential to their allegations of age discrimination.  Plaintiffs could have amended the Complaint, or at the least moved for leave to amend, during *any* of the nine years of litigation preceding *Hoffman*.[14]  But they did not.[15]  Instead, plaintiffs chose – presumably as part of their litigation strategy – to plead discriminatory acts instead of discriminatory impact.  Indeed, plaintiffs' litigation strategy and theory of the case became even clearer when I dismissed their NYHRL claims in 2004: rather than seek leave to amend their Complaint to plead a violation of New York law as interpreted by this Court, they instead chose to appeal my ruling that an allegation of impact was even necessary.  *Schuler II*, 595 F.3d 370 (D.C. Cir. 2010).  The sheer passage of time – and plaintiffs' obvious choice of litigation strategy – weigh heavily against granting leave to amend now, almost a decade into this litigation.  This is especially true where, as here, the balance of plaintiffs' original claims – as well as separate, but related claims – have

---

[14]    The intervening ruling by the New York Court of Appeals creates the illusion that a new pleading standard emerged in 2011.  That plaintiffs are reacting to the clarity *Hoffman* provided (and admit as much) does not negate the fact that they could have pleaded their claims, in the first instance, in a way that satisfies the standard *Hoffman* now demands.

[15]    What is more, three years after filing the original lawsuit, Schuler filed another suit in which he attested that he had "been employed in Washington, D.C., without interruption since October 1, 1998."  Def.'s Ex. 25 (Schuler's 2005 Compl.) ¶ 29 [Dkt. #235-26].

been litigated *and resolved* under the same set of pleadings and the same set of facts.[16]
Plaintiffs do not deserve a second bite at the apple; the prejudice to defendant is simply
too much.[17]

Since plaintiffs had more than sufficient time to plead their NYHRL claims, and,
more importantly, because their claims have already been fairly adjudicated under the
proper standard in my 2004 analysis, the request for leave to amend is DENIED.  No
reasonable jury could conclude that plaintiffs felt the impact of PwC's actions in New
York because plaintiffs did not – and may not now – allege it.  Plaintiffs have not
provided any evidence of discriminatory impact in New York, and, as a result,
defendant's Motion for Summary Judgment on All Remaining Claims [Dkt. #236] is
GRANTED.

## III.    Alternative Grounds for Summary Judgment

In any event, even if I granted leave to amend – which I do not – *and* even if
*Hoffman* protected plaintiffs, each of plaintiffs' claims would still fail and defendant
would be entitled to summary judgment.  Together with the factual record, previous
grants – and affirmances – of summary judgment on plaintiffs' ADEA claims (claims

---

[16]    Because plaintiffs did not develop a factual record regarding a purported New
York *impact*, PwC had no opportunity to develop or refute a factual record on that
allegation during discovery.  *See* Def.'s Opp'n to Pl.'s Mot. to Am. Compl., Jan. 28,
2010, at 3-4 [Dkt. #248].

[17]    Moreover, for the reasons explained below, plaintiffs' discrimination claims
would fail even if the Complaint were amended to allege impact.  The futility of
plaintiffs' amendment also warrants denial.  *See, e.g., Nat'l Wrestling Coaches Ass'n v.
Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004) (courts routinely deny motions to
amend when new claims are futile or meritless).

14

established under the same standard as claims under the NYHRL) underscore that

plaintiffs simply cannot and do not offer evidence from which a reasonable jury could

find age discrimination. *See* Def.'s Mot. for Summ. J. at 3.

### A. Schuler's Claims

#### 1. Schuler's 1999 Claim Is Untimely And Cannot Survive Summary Judgment.

As a preliminary matter, Schuler's 1999 claim fails under the NYHRL's three-year

statute of limitations. *See Cordone v. Wilens & Baker*, 730 N.Y.S. 2d 89, 90 (App. Div.

2001). A claim of employment discrimination under the NYHRL "accrues on the date

than an adverse employment determination is made and communicated to plaintiff."

*Pinder v. City of New York*, 853 N.Y.S.2d 312, 313 (App. Div. 2008); *see also* Def.'s

Mot. for Summ. J. at 13.

It is undisputed that plaintiffs first filed their claims on May 20, 2002. Compl.,

May 20, 2002 [Dkt. #1]. PwC asserts that the statute of limitations for any 1999 claim

began running no later than April 30, 1999 – the latest date by which both plaintiffs knew

they would not be made partner in the 1999 cycle. Def.'s Mot. for Summ. J. at 13-14.

Schuler does not seriously dispute that more than three years elapsed between learning of

his non-promotion and filing his complaint.[18]   Instead, he argues that the 1999 claim is

---

[18]    Schuler disputes, however, PwC's assertion that he knew of his non-promotion by April 30, arguing that it is unclear whether he knew "*eight* or *nine* months after Spring 1998." Schuler's Resp. to Def.'s Statement of Undisputed Material Facts ("Schuler's Resp. to Def.'s Facts") ¶ 12 [Dkt. #238-1] (emphasis added). But as PwC points out, "[e]ven assuming that 'spring' lasted through June 30, 1998, and that he learned the result *ten* months later," Schuler knew about the non-promotion no later than April 30, 1999. Def.'s Mot. for Summ. J. at 14 (emphasis in original).

timely under the "continuing wrong" doctrine.  According to Schuler's theory, each non-promotion was part of a pattern and practice of discriminatory behavior such that the statute of limitations *for all of his claims* did not begin to run until the *last* instance of alleged non-promotion (here, in 2000 for the 1999 claim or 2001 for the 2000 claim). Schuler's Opp'n at 9-10.  I disagree.

As a threshold matter of law, Schuler cannot rely on a "continuing violation" theory to support his NYHRL state *or* city claims.  Indeed, the U.S. Supreme Court unambiguously determined that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  That *Morgan* applies to the NYHRL and the NYCHRL has been confirmed by New York's own federal courts.  *See, e.g., Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 527 (S.D.N.Y. 2002), *aff'd*, 76 Fed. Appx. 366 (2d Cir. Sept. 4, 2003) (applying *Morgan* to the NYHRL because "there is virtually no difference between the New York State Human Rights Law and federal employment discrimination laws.").[19]  This forecloses Schuler's attempt to marshal discrete acts of

---

[19]     Schuler disputes, in various ways, *Morgan*'s application to New York state law. *See* Schuler Opp'n at 10-12.  Yet he relies on factually inapposite cases to support his argument. *See, e.g., Covington v. Walker*, 3 N.Y.3d 287 (N.Y. 2004) (divorce); *Boland v. New York*, 30 N.Y.2d 337 (N.Y. 1972) (involuntary commitment).  Moreover, despite Schuler's *allegation* of a "continuing violation" theory, he does not support his allegation with record evidence. *See* Def.'s Reply to Schuler Opp'n at 5; *see also* Schuler Opp'n at 10, 18 (conclusory allegations regarding the 1999 and 2000 non-promotions).  Such a deficiency is, of course, fatal to Schuler's claim. *See Celotex v. Catrett*, 477 U.S. at 324 (requiring "nonmoving party to go beyond the pleadings").  This is especially true in New York, where a plaintiff invoking the "continuing violation" doctrine must establish – not just allege – a "connection to actionable conduct during the limitations period." *See Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 41 (App. Div. 2009).

alleged discrimination into one, ongoing claim.  His 1999 claim is untimely under the

three-year statute of limitations and, as a result, PwC's request for summary judgment is

GRANTED as to Schuler's 1999 claim.

> **2.    No Reasonable Jury Could Find That Schuler Suffered Age Discrimination in 2000, And Schuler No Longer Pursues His 2001 Claim.**

Because Schuler no longer pursues his 2001 discrimination claim, *see* Schuler

Opp'n at 2 n.1; Def.'s Opp'n to Pl. Schuler's Mot. for Partial Summ. J. ("Def.'s Opp'n to

Schuler MPSJ"), Nov. 29, 2010, at 1 n.1 [Dkt. #239], his 2000 claim is all that remains.

Unfortunately for Schuler, however, PwC offers legitimate, non-discriminatory reasons

for not promoting Schuler in 2000.  As a result, no reasonable jury could infer that

Schuler's suffered age discrimination at PwC.

To begin, PwC assumes – for purposes of its motion – that Schuler has carried the

initial burden of establishing a *prima facie* case of discrimination for the 2000 cycle.  *See*

Schuler Mot. for Partial Summ. J. at 9-10; *see also* Def.'s Opp'n to Schuler MPSJ at 7

(citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 & n.1 (D.C. Cir. 2008)).

The burden thus shifts to PwC to "articulate a non-discriminatory reason for its

decision[s]" regarding Schuler's candidacy. *See Barnette v. Chertoff*, 453 F.3d 513, 516

(D.C. Cir. 2006).  If PwC asserts a legitimate, non-discriminatory reason for its actions,

the Court "must resolve one central question: Has the employee produced sufficient

evidence for a reasonable jury to find that the employer's asserted nondiscriminatory

reason was not the actual reason and that the employer intentionally discriminated against

the employee on the basis" of age? *Brady*, 520 F.3d at 494.

Schuler's 2000 claim relates to his partner candidacy in 1999, a year in which he was submitted for soundings but garnered only twelve responses: six favorable, two in opposition, and four claiming "insufficient information."[20]  DSUMF ¶ 8; Schuler's Resp. to Def.'s Facts ¶ 8 (conceded as undisputed).  In support of his 1999 age discrimination claim – which is excluded under the statute of limitations and is therefore not before this Court – Schuler alleges a host of defects with PwC's partnership-promotion process in general, and with PwC's evaluation of Schuler, specifically.  *See, e.g.*, Schuler's Mot. for Partial Summ. J. at 9-20.[21]

---

[20]   Because Schuler's 2000 claim is premised, in large part, upon his 1999 claim, the allegations and responses regarding those two years are, in many respects, intertwined. Even so, Schuler's 2000 claim is distinct from his 1999 claim, which is excluded under the NYHRL's statute of limitations.

[21]   Suffice it to say that none of Schuler's arguments present genuine issues of fact. For example, I have already analyzed and dismissed Schuler's statistical analysis as only minimally probative. *Schuler 2008 Summ. J. Op.*, 580 F. Supp. 2d at 30; *see also* Schuler Opp'n at 24 (admitting as much).  And contrary to Schuler's assertions, PwC's Partnership Agreement and Schuler's statistics provide minimal factual support for the salient issue: whether PwC had a legitimate, non-discriminatory reason for not promoting *these plaintiffs* in these years. *See Schuler II*, 595 F.3d at 377.

In addition, the comparison between 2003 partner-candidate Jeff Lavine (who was "significantly younger" than Schuler, *see* Schuler Opp'n at 3) and Schuler is imperfect: though each had twelve soundings in his first year of consideration, Schuler's soundings were mixed while all twelve of Lavine's were favorable. Def.'s Mot. for Summ. J. at 21; Schuler Opp'n at 29.  It is no surprise, then, that Lavine's name was resubmitted for soundings in 2004, or that his candidacy was successful.

Further, Schuler's contention that twenty soundings are actually required to make partner is foreclosed by the D.C. Circuit's prior determination that soundings must be "sufficiently numerous and favorable," *Schuler II*, 595 F. 3d at 372.  Indeed, an employee who made partner in 2004 by garnering eighteen responses (with sixteen favorable and none unfavorable) was rejected the year before, when, like Schuler, his soundings generated only twelve responses (although all twelve were favorable). Def.'s Mot. for Summ. J. at 5, 21.  Schuler points to no successful partnership candidates with as few or as negative soundings as he received.   Finally, Schuler's argument that his non-

His 2000 claim is related, but distinct: Schuler claims that PwC failed to articulate a legitimate, nondiscriminatory reason for his 2000 non-promotion. *Id.* at 17. To support this claim, Schuler rejects the sworn declaration of Christopher Lucas, former head of PwC's banking division, explaining PwC's reason for not promoting Schuler in 2000. In his declaration, Lucas stated that because Schuler "had been given serious consideration in the [1999] partner admission cycle, when the soundings were insufficient to support his partner candidacy," another round of soundings in 2000 was not warranted since there had been no "significant change in circumstances or views." DSUMF ¶ 13; Def.'s Opp'n to Schuler MPSJ at 4. Insisting that PwC was merely "carrying over its explanation from 1999," Schuler contends that "this explanation says nothing about [his] job performance in the 2000 promotion cycle or his qualifications." Schuler Mot. for Partial Summ. J. at 17.[22]

Irrespective of his self-serving interpretation of Lucas' explanation, Schuler casts no real doubt on the legitimacy or credibility of Lucas' statement. More importantly,

_____

promotion was based on age and not the result of his soundings, Schuler Opp'n at 14-18 (calling the soundings rationale "content-less"), also fails. A comparison between Schuler and successful PwC partners unequivocally demonstrates that Schuler's soundings were "insufficient" – both in number (quantity) and in the support they expressed (or here, the lack thereof) (quality).

[22]     Schuler also argues that even if the Lucas declaration were credible, "it does not provide Schuler a 'full and fair opportunity to demonstrate pretext.'" Schuler Mot. for Partial Summ. J. at 17 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Yet Schuler made the tactical decision not to depose Lucas. *See* Def.'s Opp'n to Schuler MPSJ at 14. Now, having passed up opportunities during discovery to explore Lucas' rationale, Schuler cannot cast doubt on Lucas' sworn declaration and question its legitimacy.

however, Schuler offers no evidence that Lucas – or anyone else at PwC, for that matter –

discriminated against Schuler because of age.  To the contrary, Lucas' declaration states

that he personally decided not to submit Schuler for additional soundings in 2000, and

that the decision was based on the results of Schuler's 1999 soundings.[23]  This sworn

explanation is both credible and non-discriminatory, and as a result it satisfies PwC's

burden to provide a legitimate, non-discriminatory reason for Schuler's 2000 non-

promotion.  Because Schuler cannot and does not offer any evidence of age-based animus

or pretext, his claim fails and PwC's request for summary judgment is GRANTED as to

Schuler's 2000 claim.

### B. Murphy's Claims

#### 1. The Timeliness of Murphy's 1999 Claim is a Genuine Issue of Material Fact.

Unlike Schuler, Murphy disputes that more than three years elapsed between

learning of his non-promotion and filing the Complaint.  Indeed, Murphy stated in a

sworn declaration that "[i]t was in June 1999, and not earlier that I learned the results of

the 1999 promotion cycle."  Murphy Ex. 1 ¶ 29(b) [Dkt. #245-3] (Murphy 2011 Decl.).

PwC argues that Murphy actually knew about his non-promotion two months earlier,

when Murphy learned that he would be sponsored for a promotion – "not for partnership,

*but instead* to the position of Managing Director."  Def.'s Mot. for Summ. J. at 13-14;

Murphy Ex. 1 ¶ 28 (Murphy 2011 Decl.) (emphasis added).  But Murphy replies that

---

[23]     Indeed, an employer's explanation suffices as long as it is "not illegal under the antidiscrimination laws."  *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999).  There is no evidence of such illegal motivation here.

since promotion to Managing Director became infeasible due to the position's elimination, his supervisor could have reconsidered sponsoring Murphy for partner that cycle – even without Murphy's knowledge. Murphy Ex.1 ¶ 29(b) (Murphy 2011 Decl.). As a result, Murphy argues, he did not learn *definitively* of his non-promotion until June 2000, when the list of new partners was released and his name was not on it. *Id.*; Murphy Opp'n at 35.

Murphy's version of the facts is, at best, improbable. Indeed, is difficult to countenance Murphy's claim that when he was informed of his promotion to Managing Director (*not* partner), he believed that an even *more* competitive promotion might still be on the horizon. It is even more difficult to understand how he thought such a promotion could happen during the same promotion cycle. Nevertheless, Murphy submitted a sworn declaration attesting to his belief, and I must view the facts in the light most favorable to Murphy. Thus, the date by which Murphy knew of his 1999 non-promotion is a genuine issue of fact, and the Court cannot say, based on the record, that Murphy's 1999 claim was untimely.[24] As a result, his 1999 claim survives a statute-of-limitations challenge and will proceed for analysis on the merits.

---

[24]    Unlike Schuler, whose own version of the facts is inconsistent with the passage of time (he claims to have known within nine months of June 1998, *but somehow not by April 1999*), Murphy's version is plausible, however unlikely: he was told that he would be sponsored for promotion to a non-partner position, yet he claims not to have understood that partnership was off the table for that year.

2.    **No Reasonable Jury Could Find That Murphy Suffered Age Discrimination in 1999, 2000, or 2001.[25]**

Although a genuine issue of fact exists as to whether Murphy's 1999 claim is untimely, the claim nonetheless fails on the merits. Although Murphy offers evidence and legal theories about his non-promotion to partner, each of these theories fails, and none of the evidence creates a genuine issue of fact.

First, Murphy relies on a "mixed motives" legal theory for his age discrimination claims, asserting that he can prevail on an NYHRL claim by showing that age was a motivating factor in the adverse action he suffered – even if it was not the but-for cause. *See* Murphy Opp'n at 11 (citing *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)).[26] To support this theory, Murphy offers various pieces of evidence that age was a motivating factor in PwC rejecting his partner candidacy.[27]

---

[25]    Murphy's pleadings cast doubt on whether he even is still pursuing his 1999 and 2001 claims. *See* Def.'s Reply In Support of Mot. for Summ. J. on All of Pl. Murphy's Remaining Claims ("Def.'s Reply to Murphy Opp'n") at 15 [Dkt. #247] (citing Murphy's assertion that "the present motion addresses only Murphy's NYHRL claims (which focus on the 2000 promotion cycle)," Murphy Opp'n at 24, and his description of the 2000 partnership cycle as "[t]he first non-promotion cycle at issue in this case," *id.* at 22). To the extent all three claims are still viable, all three fail for the reasons described herein. In addition, the 2001 claim also fails on the merits because the D.C. Circuit already ruled that with respect to plaintiff Schuler – and thus also for plaintiff Murphy – "there was no business case" for making any partners within RAS in 2001. *See* Def.'s Reply to Murphy Opp'n at 16 (citing *Schuler II*, 595 F.3d at 376). As a result, there is no genuine issue of fact as to whether Murphy's age played any role in PwC denying a promotion to partner in that year.

[26]    *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009), and its progeny likely foreclose this legal theory by holding that a plaintiff bringing an ADEA disparate-treatment claim must prove that age was the but-for cause of – and not just a motivating factor in – an adverse employment action. *See also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (age discrimination suits under the NYHRL and

Even if Murphy's mixed-motive theory were legally viable, however, he would still have to demonstrate that a reasonable jury could conclude that age was a motivating factor in his non-promotion.  But having already determined that the evidence Murphy offers does not even meet the lesser burden-shifting standard required to make a *prima facie* showing under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Murphy 2008 Summ. J. Op.*, 580 F. Supp. 2d at 10 n.9, it goes without saying that Murphy cannot meet the far more substantial evidentiary burden here.[28]

Second, Murphy disputes PwC's claim that an employee must demonstrate "consistently outstanding performance" to be sponsored for partnership, Def.'s Mot. for Summ. J. at 5, and further disputes that an RAS employee would be considered for partnership only if he received ratings of "1" in *each* of the three years preceding sponsorship.  *Id.*  Specifically, he notes that PwC does not have a written policy documenting these performance requirements.   Murphy Opp'n at 28-29.

Unfortunately for Murphy, his argument is definitively foreclosed by our Circuit Court's prior determination that

---

NYCHRL "are subject to the same analysis as claims brought under the ADEA").

[27]     For example, Murphy offers evidence that PwC does not allow partners age 60 or older to continue work at the firm; repeats conversations in which PwC partners told Murphy that the firm would not even consider someone 60 or older for partnership; and cites statistics about internal promotions.  Murphy Opp'n at 13-15.

[28]     Moreover, no reasonable jury could doubt that Murphy's performance ratings disqualified him from partnership track.  *See, e.g., Schuler II*, 595 F.3d at 376-77; *Murphy 2008 Summ. J. Op.*, 580 F. Supp. 2d at 12-14.

RAS proposed for partnership only employees with performance ratings of "1" in each of the three prior years; *and Murphy was not promoted because he did not meet that requirement. The record documents the existence and exercise of such a policy*: Every candidate the RAS proposed for partner in the years for which there are data in the record (1999 through 2004) had a performance rating of "1" in each of the three years before he was proposed, *and Murphy did not have three years of "1s" immediately before any year in which he claims he should have been made a partner*. *Schuler II*, 595 F.3d at 376-77 (emphasis added) (internal citations omitted).[29]

Third, Murphy argues that the actual substance of his ratings was tainted by age bias – in other words, that his performance merited higher ratings (and ratings worthy of partnership) which he would have received if he were younger. *See* Murphy Opp'n at 1, 7, 29. In support of his claim, Murphy cites reviews of his own strong performances on individual client engagements, and then compares his annual performance ratings to other employees who he says performed as well or worse on individual engagements.[30] *Id.* at 17-23.

---

[29]   For this reason, Murphy's additional argument – that certain other PwC employees were made partner with performance ratings lower than those PwC describes here, *see* Murphy Opp'n at 28-29, falls flat. In any event, Murphy's argument is flawed: he cites examples of employees admitted to partnership from other practice groups with less stringent standards than the RAS. *Id.*; *see also* Def.'s Mot. for Summ. J. at 5 (describing the requirement as applying to "the small RAS unit").

[30]   For example, Murphy concludes (without evidentiary support) that performance ratings were rigged in favor of certain employees who Murphy believes were pre-ordained to become a partner. *See* Murphy Opp'n at 8 ("After naming Albright as partnership material, Bench always gave him the overall "1" annual ratings that would ease his path to partnership."). But because Murphy offers no evidence supporting this conclusory statement, his argument is valueless. *See also, e.g., Murphy 2008 Summ. J. Op.*, 580 F. Supp. 2d at 15 (Murphy did not show evidence sufficient to suggest that his – or others' – ratings were based on anything other than personal merit). Indeed, the Court need only look as far as Murphy's co-plaintiff for evidence undercutting Murphy's

But what I found when Murphy presented the same argument in support of his ADEA claims is still true today. Murphy does not support with any objective evidence what he presupposes to be true: that "his overall annual ratings should have been 'close[ly] correlate[ed]' to the ratings he received on individual engagements." *Murphy 2008 Summ. J. Op.*, 580 F. Supp. 2d at 15 n.20. Indeed, outside of the engagements he cites, Murphy's annual evaluations showed room for improvement in the areas of productivity and chargeable hours. Def.'s Reply to Murphy Opp'n at 9-10 [Dkt. #247]; Def.'s Ex. 30 [Dkt. #247-2] (Bench Dep.); Murphy Ex. 12 [Dkt. #245-15] (FY 1993 evaluation). In other words, the annual evaluation encompasses more than just individual ratings from discrete engagements.[31] In sum, Murphy does not demonstrate that *any* genuine issue of material fact exists regarding PwC's policies, or about Murphy's allegations of age discrimination. Because no reasonable jury could find that age was a

---

assertions: Schuler, at the age of 54, received the "consistently outstanding" ratings that Murphy claims were reserved for younger employees. *See Schuler II*, 595 F.3d at 377.

[31]    Murphy also offers a smattering of other evidence to support his age-discrimination claim. None of the evidence is, however, persuasive. For example, Murphy cites a memo his supervisor wrote when Murphy was hired, noting that Murphy's age would make it "economically disadvantageous" for him to become a partner. *See* Murphy Opp'n at 15; Murphy Ex. 8 at 5 [Dkt. #245-11] (Bench memo.). But the memo language makes clear that the supervisor was commenting on the economic ramifications of partnership *for Murphy* ("economically disadvantageous *for him* to be a PW partner"), not for the firm. *See* Def.'s Reply to Murphy Opp'n at 12. This suggests that the supervisor was counseling Murphy – not discriminating against him. *See id.* Murphy also offers as evidence of a discriminatory policy one partner's comment that "[f]rom a purely selfish standpoint, we want those of you who can be partners for twenty years or more to become partners." Murphy Opp'n at 15; Murphy's Ex. 6 at ¶ 9(a) [Dkt. #245-9] (Murphy 2008 Decl.). But I have held that "Murphy provides no support to show that Ryan['s] statement[] [was a] widely held polic[y]." *Murphy 2008 Summ. J. Op.*, 580 F. Supp. 2d at 15 n.21.

motivating factor in Murphy's non-promotion to partner, his 1999 claim fails.  For the same reasons, Murphy's 2000 and 2001 claims also fail, and summary judgment is GRANTED for defendant on all counts related to plaintiff Murphy.

## CONCLUSION

For all of the foregoing reasons, the plaintiffs' request to amend their initial Complaint is DENIED.  The court also DENIES Plaintiff Schuler's Motion for Partial Summary Judgment on Liability [Dkt. #235] and GRANTS defendant PwC's Motion for Summary Judgment on All Remaining Claims [Dkt. #236].  An order consistent with this decision accompanies this Opinion.

RICHARD J. LEON
United States District Judge